SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Shana A. Elberg
Bram A. Strochlic
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

TOGUT, SEGAL & SEGAL LLP
Albert Togut
Kyle J. Ortiz
Amy Oden
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Fax: (212) 967-4258

– and –

Van C. Durrer, II
Destiny N. Almogue (*pro hac vice* pending)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Fax: (213) 687-5600

– and –

Jennifer Madden (*pro hac vice* pending)
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Fax: (650) 470-4570

*Proposed Counsel for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| | | |
|---|---|---|
| *In re* | : | **Chapter 11** |
| | : | |
| **THE McCLATCHY COMPANY**, *et al.*, | : | **Case No. 20-10418 (MEW)** |
| | : | |
| Debtors.[1] | : | **(Joint Administration Pending)** |
| | : | |

------------------------------------------------------------ x

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO PAY PREPETITION WAGES, COMPENSATION, AND EMPLOYEE BENEFITS

---

[1]  The last four digits of Debtor The McClatchy Company's tax identification number are 0478. Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/McClatchy. The location of the Debtors' service address for purposes of these chapter 11 cases is: 2100 Q Street, Sacramento, California 95816.

The McClatchy Company and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**," the "**Company**," or "**McClatchy**"), hereby move (this "**Motion**") this Court for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "**Interim Order**" and the "**Final Order**," respectively), granting the relief described below. In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Sean M. Harding in Support of Chapter 11 Petitions and First Day Papers* (the "**First Day Declaration**"),[2] filed contemporaneously herewith. In further support of the Motion, the Debtors, by and through their undersigned proposed counsel, respectfully represent as follows:

## RELIEF REQUESTED

1.      By this Motion, the Debtors request that the Court enter the Interim Order and the Final Order under Bankruptcy Code sections 105(a), 363(b), 507(a), 541, 1107(a), and 1108 authorizing, but not directing, the Debtors, to: (a) pay and/or perform, as applicable, prepetition obligations to current employees (collectively, the "**Employees**"), including accrued prepetition wages, salaries, other cash, and non-cash compensation claims, except as otherwise set forth herein (collectively, the "**Employee Claims**"), and pay obligations to or on account of temporary employees and independent contractors (collectively, the "**Temporary Employee/Independent Contractor Claims**"); (b) honor and continue in the ordinary course of business, until further notice, and pay (but not assume) the prepetition amounts associated with the Debtors' vacation, sick-time, and holiday-time policies, employee benefit plans and programs, savings and retirement plans, worker's compensation plans and programs, and

---

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

severance plans, the most significant of which are described below, and to pay all fees and costs in connection therewith, except as otherwise set forth herein (collectively, the "**Employee Benefit Obligations**"); (c) reimburse Employees for prepetition out-of-pocket expenses incurred in the ordinary course of business and pay business expenses charged to corporate credit cards (the "**Employee Expense Obligations**"); (d) pay over to the appropriate parties all prepetition withholdings from Employees and payroll-related taxes associated with the Employee Claims and the Employee Benefit Obligations (the "**Employee Withholdings**"); and (e) honor and continue in the ordinary course of business, until further notice, and pay (but not assume) the prepetition amounts associated with the Debtors' Retiree Welfare Program (as defined below) (the "**Former Employee Obligations,**" and, together with the Employee Claims, the Temporary Employee/Independent Contractor Claims, the Employee Benefit Obligations, and the Employee Expense Obligations, the "**Prepetition Employee Obligations**").  Following entry of the requested Interim Order and prior to the entry of the Final Order (the "**Interim Period**"), none of the Debtors' Employees, Independent Contractors (as defined below), or Temporary Employees (as defined below) will receive payments for severance obligations or payments in excess of the amount entitled to priority under Bankruptcy Code section 507(a)(4) or 507(a)(5), as applicable.

2.    In addition, the Debtors request that the Interim Order and the Final Order authorize, but not direct, the Debtors to continue their ordinary-course Employee compensation, benefits and related programs described in this Motion after the Petition Date, as such were in effect as of the commencement of these Chapter 11 Cases and as such may be modified or supplemented from time to time in the ordinary course of business.

3.    Finally, the Debtors request entry of the Interim Order and the Final Order (a) authorizing all applicable banks and other financial institutions (collectively, the "**Banks**"), when

requested by the Debtors in their sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of the Prepetition Employee Obligations, whether such checks or other requests were submitted before, on, or after the Petition Date; (b) authorizing the Banks to rely on the representations of the Debtors as to which checks are subject to this Motion, *provided* that any such Bank shall not have any liability to any party for relying on such direction and representations by the Debtors; (c) providing that the Banks shall, at the direction of the Debtors, receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Prepetition Employee Obligations that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and that any such Bank shall not have any liability to any party for relying on such direction by the Debtors; and (d) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any checks, drafts and other forms of payment which may be inadvertently dishonored or rejected.

4.      The relief requested herein should not be construed (a) as a request to assume, or for authority to assume, any executory contract under section 365 of the Bankruptcy Code or otherwise; (b) to waive, affect, or impair any of the Debtors' rights, claims, or defenses, including, but not limited to, those arising from section 365 of the Bankruptcy Code, other applicable law, or any agreement; (c) to grant third party beneficiary status or bestow any additional rights on any third party; (d) to be otherwise enforceable by any third party other than the Banks; or (e) to impair the Debtors' or any other party in interest's ability to contest or object to any claims, including the Prepetition Employee Obligations, asserted against the Debtors on any ground permitted by applicable law.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. This is a core proceeding under 28 U.S.C. § 157(b). This is a core proceeding under 28 U.S.C. § 157(b).

6.      Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

7.      The legal predicates for the relief requested herein are sections 105(a), 363(b), 507(a), 541, 1107(a), and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**"), Bankruptcy Rules 6003 and 6004, and Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

## BACKGROUND

### I.      The Chapter 11 Cases

8.      On the date hereof (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

9.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

10.     To date, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

11.     The McClatchy Company and its direct and indirect Debtor subsidiaries are a diversified digital and print media business, focused on providing strong, independent local journalism to 30 communities across 14 states, as well as national news coverage through the Debtors' Washington, D.C.-based bureau.  The Debtors also provide a full suite of both local and nationwide digital marketing services.  The Debtors' businesses are comprised of websites and mobile applications, mobile news and advertising, video products, a digital marketing agency, daily newspapers, niche publications, other print and digital direct marketing services and community newspapers.  The Debtors' business operations, corporate and capital structures, and restructuring efforts are described in greater detail in the First Day Declaration.

## II.     The Debtors' Employee Compensation and Benefits Programs

### A.     Wages, Salaries, and Bonuses

#### (i)     *Wages and Salaries*

12.     The Debtors currently employ approximately 2,800 full and part-time Employees in 37 corporate offices throughout the United States.  Approximately 1,350 of these employees are salaried employees, with the remainder being paid on an hourly basis.  This includes approximately 240 unionized Employees (such unionized Employees, the "**Unionized Employees**").[3]

---

[3]     The Debtors are party to eight active collective bargaining agreements (collectively, the "**CBAs**") governing the Union Employees. The Union Employees are covered under the same welfare plans, as discussed herein, as the Debtors' other domestic Employees. Certain of the relief requested in this Motion also related to Employee compensation, severance, benefits, and programs subject to the provisions of Bankruptcy Code sections 1113

13.    The average monthly payroll for the Debtors' Employees is approximately $14.9 million, including payroll taxes.  The Debtors' administer their own payroll process internally, but use ADP to process payroll taxes.[4]  All Employees are paid every two weeks, one week in arrears.  Thus, on a given pay date, Employees are paid for the two-week period ending a week prior to the pay date.

14.    The Debtors have made their most recent payroll, for the period January 19, 2020 through February 2, 2020, for all Employees.  The Debtors estimate that as of the Petition Date, approximately $5.5 million is owed in the aggregate on account of accrued and unpaid wages, salaries, and related payroll taxes and withholdings (the "**Employee Wage Claims**").

15.    To supplement its workforce, the Debtors utilize individuals who provide a range of services to the Debtors on a contractual basis, some of whom are paid through integrated networks that the Debtors draw from in certain markets in order to reduce costs while supplementing critical parts of their operations (the "**Independent Contractors**")[5] and approximately 20 temporary employees (the "**Temporary Employees**").  The Debtors estimate that, as of the Petition Date, approximately $25,000 is accrued and owed to the Temporary

---

and 1114, governing collective bargaining agreements and retiree benefits, respectively. The Debtors seek the authority, but not direction, to honor their obligations under the CBAs in the ordinary court of business.

[4]    The Debtors use ADP to process payroll taxes. Specifically, each payroll period, the Debtors wire ADP the amounts necessary to satisfy the Debtors' payroll tax obligations.  ADP's services are crucial to the smooth functioning of the Debtors' payroll system because they ensure that appropriate amounts are deposited and remitted to the relevant taxing authorities. The Debtors pay ADP approximately $7,500 per month for their services. As of the Petition Date, the Debtors estimate they owe approximately $15,000 to ADP on account of these services.

[5]    Specifically, the Debtors use approximately 20 agencies that provide the Debtors with between two and 20 Independent Contractors each.

Employees (the "**Temporary Employee Claims**") and $500,000[6] is accrued and owed to the

Independent Contractors (the "**Independent Contractor Claims**").

16.     The Debtors request authorization, but not direction, to pay any Employee Wage

Claims, Temporary Employee Claims, and Independent Contractor Claims, in each case up to the

$13,650 priority cap provided for under Bankruptcy Code section 507(a)(4) (the "**Priority**

**Cap**"),[7] pursuant to the Interim Order, and, pursuant to the Final Order, to pay such claims in the

ordinary course of business, including any amounts that were not paid under the Interim Order

on account of the $13,650 priority cap; *provided, however*, the Debtors may pay amounts over

the Priority Cap to Employees for Sales Commissions earned prepetition.

17.     Periodically, the states in which the Debtors have Employees are permitted to

adjust their unemployment tax rates and, in doing so, additional, unforeseen payroll taxes may be

owed by the Debtors.  To the extent this occurs, the Debtors seek permission to pay any

additional payroll taxes owed as a result.  In addition, the Debtors seek authorization to pay the

outstanding amounts owed as of the Petition Date to or on account of the Independent

Contractors.

### (ii)     *Sales Commissions*

18.     In the ordinary course of business, certain Employees are eligible to earn sales

commissions, which compensate certain non-insider sales Employees for achieving certain sales

quotas (the "**Sales Commissions**"). None of the Employees entitled to earn Sales Commissions

are involved in the management of the Debtors' business. Amounts payable as Sales

---

[6]     This includes amounts owed to freelance employees.

[7]     Specifically, Bankruptcy Code sections 507(a)(4) and (a)(5) grant priority status respectively to "wages, salaries, or commissions" and "contributions to any employee benefit plan," which together are capped at $13,650. 11 U.S.C. §§ 507(a)(4), (a)(5).

Commissions depend on a variety of factors, including, without limitation, geography, department, and the Employee's position-level and performance during the applicable time period, with various components being designed to compensate the sales Employees for sales growth and to align such sales Employees' interests with the operational goals and objectives of the Debtors. Sales Commissions payments to eligible Employees are typically paid monthly. Sales Commissions are a part of the aggregate compensation package for the participating Employees and provide value to the Debtors' estates because they encourage such Employees to achieve important performance goals.

19.    Accordingly, the Debtors request authority, but not direction, under the Interim and Final Orders to continue paying Sales Commissions in the ordinary course of business and in their sole discretion.  Further, the Debtors request authority, but not direction, under the Final Order to pay any and all Sales Commission amounts due to the applicable Employees in the ordinary course of business and in the Debtor's sole discretion, irrespective of whether such amounts (a) relate to the prepetition period and/or (b) exceed the Priority Cap.  The Debtors are not seeking authority to pay any prepetition Sales Commissions obligations to "insiders."

### (iii)    *Corporate Incentive Plan*

20.    In the ordinary course of business, the Company has maintained an incentive plan for certain eligible employees that was payable upon the achievement of certain financial goals set by the Compensation Committee of the Board of Directors as well as certain personal goals set by an eligible employee's managers (the "**Corporate Incentive Plan**").  Historically, 75% of a participating employee's target incentive payment was payable upon achievement of the corporate financial goals and 25% of the participating employee's target incentive payment was payable upon achievement of the employee's personal goals.  Incentive payments under the Corporate Incentive Plan are paid semi-annually in July (for the first half of the year) and

January (for the second half of the year). For the second half of 2019, approximately 135 employees participated in the Corporate Incentive Plan.  In 2019, the Company did not achieve its financial goals, and as a result, participating employees were only eligible to receive incentive payments for achievement of personal goals.  Incentive payments due to participating employees for the 2019 plan year were paid on January 10, 2020.  Accordingly the Company does not believe that any prepetition amounts are due and owing for the 2019 plan year.  However, out of an abundance of caution, the Debtors request authority, but not direction, under the Interim and Final Orders to pay any prepetition amounts due under the 2019 Corporate Incentive Plan.

21.    Given the Company's financial situation, the Company modified the 2020 Corporate Incentive Plan.  Only approximately 40 employees are currently eligible to participate in the Corporate Incentive Plan.  None of the participating employees are "insiders" of the Company. Target incentive payments for all eligible employees were set at approximately 20% of the target incentive payout available under the 2019 Corporate Incentive Plan. Participating employees in the 2020 Corporate Incentive Plan are eligible to receive incentive payments upon achievement of their personal goals; the Company has eliminated financial goals.

22.    The Debtors believe that the Corporate Incentive Plan is ordinary course; however, out of an abundance of caution, the Debtors request authority, but not direction, under the Interim and Final Orders to continue making incentive payments under the Corporate Incentive Plan in the ordinary course of business and in their sole discretion.  Further, the Debtors request authority, but not direction, under the Final Order to pay any and all amounts due under the Corporate Incentive Plan to the applicable Employees in the ordinary course of business and in the Debtor's sole discretion, irrespective of whether such amounts (a) relate to the prepetition period and/or (b) exceed the Priority Cap.

### *(iv)    Other Incentive Plans and Incentive Compensation*

23.    The Debtors currently maintain the Key Employee Incentive Plan (the "**KEIP**")
to incentivize the Company's key employees to execute the Debtors' business plan, to implement
a value-maximizing restructuring transaction, and to maintain operational stability through any
such restructuring. There are seven participants in the KEIP. The KEIP provides for
performance-based incentive payments based on four separate targets.  Performance is measured
at the end of each of the following three fiscal periods: (1) Q4 2019 through Q1 2020, (2) Q2
2020 through Q3 2020, and (3) Q4 2020. The KEIP payments will be paid out at the end of each
measurement period. At this time, the Debtors are not seeking authority to pay any outstanding
amounts on account of the KEIP pursuant to this Motion, but reserve the right to seek such relief
by separate motion.

24.    In the ordinary course of business, the Debtors also maintain other quarterly,
semi-annual, and annual incentive plans and sales contests (collectively, the "**Other Incentive
Plans**") to reward non-insider employees for achievement of certain objectives. In January 2020,
the Debtors paid 440 employees approximately $1,000,000 on account of the quarterly plans, one
employee approximately $20,000 on account of the semi-annual plan, and four employees
approximately $55,000 on account of the annual plan. None of the participants in the Other
Incentive Plans are "insiders."  The structure of and criteria for payment under the Other
Incentive Plans vary across geography and department, and payments under such Other Incentive
Plans depend on a variety of factors, including, without limitation, the Employees' position-level
and performance during the applicable time period, with various incentive components under the
Incentive Plans being designed to reward the Employees and align such Employees' interests
with the goals and objectives of the Debtors. Amounts paid under the Other Incentive Plans are a
part of the aggregate compensation package for the participating Employees and provide value to

the Debtors' estates because they encourage such Employees to achieve important performance goals.

25.      Accordingly, the Debtors request authority, but not direction, under the Interim and Final Orders to continue the Other Incentive Plans in the ordinary course of business and in their sole discretion.  Further, the Debtors request authority, but not direction, under the Final Order to pay any and all amounts due under the Incentive Plans to the applicable Employees in the ordinary course of business and in the Debtor's sole discretion, irrespective of whether such amounts (a) relate to the prepetition period and/or (b) exceed the Priority Cap. The Debtors are not seeking authority at this time to pay any prepetition obligations to "insiders" under the Incentive Plans.

          *(v)*      ***Retention Plans***

26.      The Company maintains an executive retention plan (the "**Executive Retention Plan**"). The Executive Retention Plan was modified in October 2019. There are six participants in the Executive Retention Plan. As a condition of keeping the retention payment, participants are required to continue their employment with the Company through September 30, 2020.[8]  All bonuses under the Executive Retention Plan totaled approximately $5.92 million in the aggregate and were paid in full in October 2019. Thus, no amounts remain accrued and unpaid under the Executive Retention Plan as of the Petition Date; as such, the Debtors are not, by this Motion, seeking any relief with respect to the Executive Retention Plan.

27.      In October 2019, the Company established the 2020 Key Employee Retention Plan (the "**2020 KERP**").  There are approximately 70 participants in the plan.  The amount paid

---

[8]      One participant in the Executive Retention Plan is expected to retire in June 2020, and thus, will only be required to stay until her retirement date.

keeping the retention payment, the participants are generally required to continue their employment with the Company through September 30, 2020 or repay the retention payment to the Company upon the Employee's resignation or termination.  All bonuses under the 2020 KERP totaled approximately $3 million in the aggregate and were paid in full by November 2019.[9]  Thus, no amounts remain accrued and unpaid under the 2020 KERP as of the Petition Date; as such, the Debtors are not, by this Motion, seeking any relief with respect to the 2020 KERP.

28.     Prior to the adoption of the 2020 KERP, the Company had adopted in November 2018 a retention plan for certain non-executive employees designed to motivate and reward eligible Employees for continued dedicated service (the "**2019 Non-Executive Retention Plan**").[10]  There were 17 participants in the 2019 Non-Executive Retention Plan.  There are only seven remaining Employees that are participants in the 2019 Non-Executive Retention Plan.  As a condition to receiving the bonus, the Employees are required to remain employed by the Company through April 17, 2020.  The Debtors have budgeted approximately $330,000 in payments under the 2019 Non-Executive Retention Plan to be paid in April 2020. To the extent necessary, the Debtors by this Motion request authority, but not direction, to continue the 2019 Non-Executive Retention Plan in the ordinary course of business in the Debtors' sole discretion.

---

[9]     Under the 2019 KERP, the Participants were originally entitled to receive payments in three installments, with one third of the total payment to be made in June 2019, one third in December 2019, and one third in June 2020.

[10]    From time to time, the Debtors maintain certain other retention plans with non-executive employees who provide news coverage for certain events. As a condition to receiving payment under these retention plans, the participating employees must remain employed by the Company through an agreed upon date.

B. **Employee Benefit Plans**

29.     The Debtors provide benefit packages to Employees,[12] including medical plans, dental plans, vision plans, and life insurance plans, which are described in more detail below.

*(i)    Medical Plans*

30.     The Debtors provide their Employees with medical benefits pursuant to two different preferred provider medical plans (collectively, the "**Medical Plans**") through Aetna ("**Aetna**") and CVS ("**CVS**"). Medical coverage is self-insured by the Debtors, with Employees submitting claims to Aetna or CVS, which are then paid by the Debtors.

31.     As of the Petition Date, approximately 1,260 Employees have elected individual coverage under the Medical Plans, 450 Employees have elected to cover themselves and either (1) a spouse or domestic partner, or (2) one or more dependent child(ren) under the Medical Plans, and 230 Employees have elected family coverage under the Medical Plans.

32.     The Medical Plans are funded through Employee contributions by participating Employees and by the Debtors.  Approximately 74% of the cost of the Medical Plans is borne by the Debtors, and Employees contribute to the Medical Plans through payroll deductions to pay for the balance.  Employee contributions are collected by the Debtors as a pro-rated amount from the first two pay dates in each calendar month.  Thus, payments to the Medical Plans consist of both Employee contributions and contributions from the Debtors.  Total annualized spend related to the Medical Plans, based on the Debtors' most current enrollment data, is approximately $22.5 million.

---

[12]    Approximately 175 currently enrolled former employees and/or their spouses/dependents are covered by the Company's medical, dental, and/or vision coverage under COBRA. Approximately 100 former employees are pending enrollment.

33.    In addition, the Medical Plans have an employee wellness component. Payments for this component of the Medical Plans are made to Virgin Pulse.

34.    As of the Petition Date, the Debtors estimate that approximately $2.5 million is currently owed under the Medical Plans. The Debtors request authority to make all payments and remittances for amounts attributable to the prepetition period and related to the Medical Plan, including administrative fees, in the ordinary course of business and in their sole discretion.

*(ii)    Dental Plans*

35.    The Debtors also offer their Employees dental benefits pursuant to two dental plans (the "**Dental Plan**") through Cigna ("**Cigna**"). Dental coverage is self-insured by the Debtors, with Employees submitting claims to Cigna, which are then paid by the Debtors.

36.    As of the Petition Date, approximately 1,290 Employees have elected individual coverage, 550 Employees have elected to cover themselves and either (a) a spouse or domestic partner or (b) one or more dependent child(ren), and 210 Employees have elected family coverage.

37.    The Dental Plan is funded through contributions by participating Employees and by the Debtors. Approximately 72% of the cost of the Dental Plan is borne by the Debtors, and the remainder is paid through Employee contributions which the Debtors collect as a pro-rated amount from the first two pay dates in each calendar month. The total annual cost of the Dental Plan to the Debtors is approximately $1.5 million. As of the Petition Date, the Debtors estimate that approximately $76,000 is currently owed under the Dental Plan. The Debtors seek authority to make all payments or remittances for amounts attributable to the prepetition period and relating to the Dental Plan, including administrative fees, in the ordinary course of business and in their sole discretion.

*(iii)    Vision Plan*

15

38.    The Debtors also offer their Employees vision benefits pursuant to a vision plan (the "**Vision Plan**") through Vision Service Plan ("**VSP**"). Vision coverage is self-insured by the Debtors, with Employees submitting claims to VSP, which are then paid by the Debtors.

39.    As of the Petition Date, approximately 1,250 Employees have elected individual coverage, 490 Employees have elected to cover themselves and either (a) a spouse or domestic partner or (b) one or more dependent child(ren), and 180 Employees have elected family coverage.

40.    The Vision Plan is funded through contributions by participating Employees and by the Debtors.  Approximately 8% of the cost of the Vision Plan is borne by the Debtors, and the remainder is paid through Employee contributions which the Debtors collect as a pro-rated amount from the first two pay dates in each calendar month.  The total annual cost of the Vision Plan is approximately $200,000. As of the Petition Date, the Debtors estimate that $10,000 is currently owed under the Vision Plan. The Debtors seek authority to make all payments or remittances for amounts attributable to the prepetition period and relating to the Vision Plan, including administrative fees, in the ordinary course of business and in their sole discretion.

*(iv)*    *Life, Short-Term Disability, and Long-Term Disability Insurance*

41.    The Debtors provide Employees with basic life insurance coverage of 1.0x salary, including direct sales commission and certain incentives, up to $300,000 to benefits-eligible full-time Employees (the "**Basic Life Insurance Plan**"). The Debtors provide Executives with basic life insurance coverage of 1.5x salary, with similar enhancement to Long-Term Disability (as defined below), up to $1 million (the "**Executive Life Insurance Plan**"). The Debtors provide Accidental Death and Personal Loss ("**ADPL**," and together with the Basic Life Insurance Plan and the Executive Life Insurance Plan, the "**Life Insurance Plans**") coverage in the same amount as the basic life insurance coverage.

16

42.     The Debtors provide each Employee with short-term disability coverage ("**Short-Term Disability**").[13]  Such coverage generally provides 60% of the Employee's base salary (plus direct sales commissions and certain incentives) up to a maximum of $2,500 per week for a maximum of 25 weeks following a seven-day waiting period.  The Debtors provide each Employee with long-term disability insurance coverage ("**Long-Term Disability**," and together with the Short-Term Disability, the "**Disability Plans**"). Such coverage generally provides 50% of the Employee's base salary (plus direct sales commissions and certain incentives) up to a monthly maximum of $15,000. Employees may obtain, at their own expense, additional Long-Term Disability coverage that increase the total coverage at 60% of the Employee's base salary (plus direct sales commissions and certain incentives) up to a monthly maximum of $15,000. The Debtors provide executives with Long-Term Disability equal to 60% of the executive's base salary.

43.     Employees may obtain certain types of supplemental life insurance coverage for themselves, their spouses, domestic partners, and eligible children ("**Supplemental Life Insurance**") at their own expense. In particular, Employees may obtain Supplemental Life Insurance coverage for themselves of up to $500,000.  Employees who elect supplemental life insurance coverage for themselves may also obtain, at their own expense, life insurance coverage of up to $250,000 for their spouse or domestic partner and up to $20,000 per child.

44.     The Basic Life Insurance, Short-Term Disability, and Long-Term Disability, are paid primarily through employer contributions, with the Debtors bearing approximately 90% of

---

[13]    The Short-Term Disability is self-funded by the Debtors and administered by Aetna. Aetna also administers the Company's Long-Term Disability and Supplemental Life Insurance plans.  Aetna recently sold its short-term disability, long-term disability, and life insurance businesses to The Hartford.  The Company expects that The Hartford will become the administrator of these plans during the course of the Chapter 11 Cases.

the aggregate cost. The cost of the Supplemental Life Insurance is borne solely by Employees. The Debtors pay approximately $60,000 per month on account of the Basic Life Insurance, Short-Term Disability, and Long-Term Disability. As of the Petition Date, the Debtors estimate that $20,000 is currently owed under the Life Insurance Plans, inclusive of amounts withheld from Employees. The Debtors seek authority to make all payments or remittances for amounts attributable to the prepetition period and relating to the Life Insurance Plans, including administrative fees, in the ordinary course of business and in their sole discretion.

### (v)    *Additional Benefits*

45.    The Debtors offer Employees the opportunity to use tax-advantaged flexible spending accounts to use pre-tax dollars toward the payment of medical expenses ("**FSA Medical Plan**") or dependent care expenses ("**FSA Dependent Plan**," collectively with the FSA Medical Plan, the "**FSA Plan**"). At the beginning of each calendar year, the FSA Medical Plan participants commit a set amount of funds for their FSA Medical Plan account, and the Debtors collect a pro-rated amount from the employee's first two paychecks of each month and pay claims as they come due (up to the pre-committed amount). The participant submits claims to the claims administrator, and the claims administrator reimburses the Employee for the claimed amount and seeks reimbursement from the Debtors. On January 1 of each year, an Employee can withdraw up to the entire amount of their elected annual contribution for their FSA Medical Plan. Any unused FSA Medical Plan balances for an Employee at year end are forfeited if not claimed by March 31 of the following year. If any Employee is terminated or otherwise leaves the Company with a negative account balance, the Employee is not required to repay those amounts to the Company.

46.    The Debtors provide the FSA Dependent Plan for dependent care assistance which covers dependent care expenses for children up to the age of 13 and for adult dependents.

At the beginning of each calendar year, the FSA Dependent Plan participants commit a set amount of funds for the FSA Dependent Plan, and the Debtors collect a pro-rated amount from the employee's first two paychecks of each month and pay claims as they come due (up to the pre-committed amount). At any given time, an Employee can only withdraw up to their current contribution amounts for the year; thus, an Employee will never have a negative account balance. Any unused FSA Dependent Plan balances for dependent care expenses at year end are forfeited if not claimed by March 31 of the following year.

47.     The Debtors pay an administrative fee of approximately $1,100 per month for the FSA Plans. As of the Petition Date, approximately $360,000 is outstanding on account of administrative fees and claims under the FSA Medical Plan, and approximately $40,000 is outstanding on account of administrative fees and claims under the FSA Dependent Plan. The Debtors are seeking authority to pay outstanding administrative fees and continue the FSA program in the ordinary course of business.

48.     The Debtors offer Health Savings Accounts ("**HSA**") to eligible employees enrolled in the Saving Advantage Plan. At the beginning of each calendar year, the HSA participants commit a set amount of funds for the HSA, and the Debtors collect a pro-rated amount from the employee's first two paychecks of each month and pay claims as they come due (up to the pre-committed amount). The Debtors make an annual employer contribution to each employee's HSA based on their level of coverage in the Savings Advantage Plan.[14] The contribution is generally paid in two installments per year, in January and July, respectively. As

---

[14]    Specifically, a $500 annual contribution is made for Employees who have elected to cover only themselves; a $750 annual contribution is made for Employees who have elected to cover themselves and either a spouse or one or more dependent child(ren); and a $1,000 annual contribution is made for Employees who have elected to cover themselves and their family.

of the Petition Date, approximately $50,000 is outstanding on account of claims under the HSAs,

and the Debtors are seeking authority to pay outstanding fees and continue the HSAs in the

ordinary course of business.

49.     The Debtors also provide an Employee Assistance Program ("**EAP**"), a

confidential program that assists Employees and their families with balancing the demands of

work, life, and personal issues. Under the EAP, Employees are eligible to access licensed

behavioral health professionals. As of the Petition Date, approximately $6,000 is outstanding on

account of claims under the EAP, and the Debtors are seeking authority to pay outstanding fees

and continue the EAP in the ordinary course of business.

50.     The Debtors make available to Employees, at the Employees' expense, certain

additional insurance coverage. As of the Petition Date, such optional coverage includes voluntary

critical illness and accident insurance, provided by Allstate; a legal and identity protection plan,

provided by InfoArmor; pet insurance, provided by Nationwide; and a transit benefit, provided

by PayFlex (collectively, the "**Optional Plans**"). The Optional Plans are fully funded by

Employees.  As such, the Debtors withhold monthly premiums for the Optional Plans from the

payroll disbursements to Employees who elect to participate.  On average, the aggregate monthly

cost for all Employee premiums under the Optional Plans is approximately $80,000. The Debtors

incur no out-of-pocket costs on account of the Optional Plans.  The Debtors hereby request

authority to continue the Optional Plans during and after the Interim Period in the ordinary

course of business and, to the extent that the Debtors hold funds representing premiums withheld

from Employees' paychecks in connection with the Optional Plans, to remit such funds to the

Company during and after the Interim Period in the ordinary course of business.

51.     The Debtors also offer tuition reimbursement for certain eligible Employees (the "**Tuition Reimbursement Program**"). Under the Tuition Reimbursement Program, the Debtors reimburse participating Employees 60% of their tuition fees once the Employee successfully passes the course. Currently, two employees participate in the Tuition Reimbursement Program. As of the Petition Date, the Debtors owe approximately $109,000 for the Tuition Reimbursement Program. Approximately $5,000 is expected to come due during the Interim Period. The Debtors also offer relocation reimbursement ("**Relocation Reimbursement Program**") to certain eligible Employees. No amounts on account of the Relocation Reimbursement Program remain accrued and unpaid as of the Petition Date.

### (vi)    401(k) Savings Plans

52.     The Debtors offer Employees a savings and retirement plan. Specifically, Employees each year may contribute pre-tax , Roth or post-tax compensation, consistent with IRS regulations, for investment in a 401(k) plan (the "**401(k) Plan**"). The Debtors match one-third of the first 6% of pre-tax or Roth contributions Employees make to the plan up to the annual maximum of $2,000 in matching contributions per employee per calendar year.[15]  The 401(k) Plan is invested with Vanguard.  There are approximately 5,700 Employees or former Employees with account balances in the 401(k) Plan (the "**401(k) Plan Participants**").  The Debtors withhold approximately $1.3 million each month from active 401(k) Plan Participants' paychecks on account of contributions to the 401(k) Plan ("**401(k) Plan Withholdings**") and have contributed an average amount per month of approximately $210,000 as matching

---

[15] For the year 2020, there is a $2,000 cap on the Debtors' employer contribution.

21

contributions for the trailing twelve months.[16]  As of the Petition Date, the Debtors estimate that

they hold approximately $0 in prepetition 401(k) Plan Withholdings and owe approximately

$75,000 as matching contributions for the prepetition period.  The Debtors seek the authority by

this Motion to continue to transfer such 401(k) Plan Withholdings amounts to the 401(k) Savings

Plans and honor their unpaid matching and other obligations under 401(k) Plans in the ordinary

course.

53.    The Debtors also sponsor two supplement 401(k) Plans that cover executives and

senior management. One is the Benefit Restoration Plan ("**BER**"), which provides match-like

contributions on a participant's eligible compensation that exceeds the statutory limit. The other

supplemental 401(k) Plan is the Bonus Recognition Plan ("**BOR**"), which provides match-like

contributions on a participant's management-by-objectives payment. Participants become fully-

vested in both the BER and BOR after three years of service. The Debtors carry a liability for

benefits earned under the BER and BOR but not yet payable for participants with less than three

years of vesting service. There are a total of seven remaining participants in the BER whose

benefits have not yet vested, and a total of four remaining participants in the BOR whose

benefits have not yet vested. Given the Company's financial situation, both the BER and BOR

were suspended for the year 2020, and therefore, neither plan will accrue additional benefits in

2020.

### C.    Social Security, Income Taxes, and Other Withholding

54.    The Debtors routinely withhold from Employee paychecks amounts that the

Debtors are required to transmit to third parties.  Examples include Social Security, FICA,

---

[16]    Contributions by 401(k) Participants vary by month, and accordingly the Debtors' matching amounts vary by
month.  In addition, the Debtors true up their matching contributions at year-end to reflect the amount that
would have been matched had such 401(k) Plan Participant contributed evenly across the calendar year.

federal and state income taxes, garnishments, health care payments, other insurance payments, 401(k) contributions, and certain other voluntary payroll deductions. The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and therefore are not property of the Debtors' bankruptcy estates. Thus, the Debtors believe they have authority to direct such funds to the appropriate parties in the ordinary course of business. Nonetheless, out of an abundance of caution, the Debtors request authority to do so.

### D.    Vacation, Holiday, and Sick Time

55.    The Debtors offer their Employees other forms of compensation, including vacation time, overtime pay, paid holidays, other earned time off. This form of compensation is usual, customary, and necessary if the Debtors are to retain qualified employees during the reorganization process.

56.    The manner in which vacation time ("**Vacation Time**") accrues varies from Debtor to Debtor and based on the Employee's tenure. All eligible Employees receive between two and five weeks of Vacation Time per calendar year. At year end, Employees outside of California and D.C. may rollover up to one week of unused Vacation Time to be used during the following year, which is not paid out upon termination. All other unused Vacation Time for these employees is forfeited. Employees in California and D.C. may rollover Vacation Time from year to year, however, the Employee's accrued Vacation Time cannot exceed their annual Vacation Time accrual plus one additional week. Vacation Time for California and D.C. Employees is paid out upon termination.

57.    Employees accrue and use Vacation Time constantly, making it difficult to quantify the cost of accrued Vacation Time as of the Petition Date. However, the Debtors estimate that the Employees have accrued an aggregate of approximately $2.0 million worth of Vacation Time.

23

58.     The Debtors provide Holiday time ("**Holiday Time**") in accordance with an approved holiday schedule.  The Debtors have designated nine holidays during calendar year 2020.

59.     The Debtors also provide certain Employees with sick time ("**Sick Time**" and, together with Vacation Time and Holiday Time, "**PTO**"). Eligible Employees are entitled to between five and ten days of Sick Time per calendar year.[17] Employees who would not otherwise be eligible to receive Sick Time may otherwise be entitled to up to 48 hours of Sick Time per calendar year as statutorily required in certain jurisdictions, including California, Washington, and D.C. Sick Time may not be rolled over to the next calendar year, and no cash payouts for unused Sick Time (whether at the end of the calendar year or upon an Employee's termination) are offered.

60.     By this Motion, the Debtors seek authority to honor all prepetition PTO liabilities to their Employees, except as otherwise indicated herein.  The Debtors anticipate that their Employees will use their PTO in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.  PTO remains subject to ordinary-course restrictions.

**E.    Business Expenses**

61.     The Debtors routinely reimburse Company employees for travel, lodging, ground transportation, meals, supplies, and other business expenses (collectively, the "**Reimbursable Expenses**"). In the ordinary course of business, the Debtors maintain company-paid credit cards

---

[17]    Prior to The McClatchy Company's merger with the Knight Ridder, Inc. in 2006, certain employees of Knight Ridder were eligible to roll over and continue to accrue Sick Time from year to year.  Accordingly, certain Employees have accrued substantial amounts of Sick Time.  These Employees are not entitled to use additional Sick Time in excess of what they would otherwise earn in a calendar year without a physician's note, and are not eligible to be paid out for such Sick Time upon resignation or termination.

(the "**Corporate Credit Cards**").  The Corporate Credit Cards are issued by Wells Fargo Bank, N.A. ("**Wells Fargo**") under the WellsOne Commercial Card Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Card Agreement**"), between the Debtors and Wells Fargo. There are currently 1,154 active Corporate Credit Cards held by employees that are used to pay for the Reimbursable Expenses. Amounts charged to the Corporate Credit Cards are paid directly by the Debtors.

62.    Employees may also incur out-of-pocket Reimbursable Expenses and seek reimbursement for their Reimbursable Expenses from the Debtors.  Accordingly, the Reimbursable Expenses are incurred by Employees with the understanding that they will be reimbursed by the Debtors.

63.    Certain prepetition Reimbursable Expenses may not have been paid as of the Petition Date because, among other reasons, amounts charged to the Corporate Credit Cards have not yet become due or Employees have not yet submitted a request for reimbursement.  There is a lag time between the time expenses are incurred and the time expenses are reimbursed and paid.  Thus, it is difficult for the Debtors to determine with precision the actual amount of incurred but not reported Reimbursable Expenses as of any particular time.  Typically, however, the average aggregate monthly amount expended by the Debtors for the Reimbursable Expenses varies between $1.5 million and $2.4 million. As of the Petition Date, approximately $1,300,000 is outstanding on the Corporate Credit Cards. The Debtors are seeking authority, but not direction, to make payments to the Corporate Credit Cards to ensure continued payment of the Reimbursable Expenses.

64.    The Debtors believe that payment of the Reimbursable Expenses is important to the morale of the Debtors' workforce, which, in turn, is critical to maximizing the value of the

estates. Cancellation of the Corporate Credit Cards would cause disruption to the Debtors'
businesses, and it would be inequitable to require the Employees to personally bear any approved
business-related expenses they incurred in furtherance of their responsibilities to the Debtors.
The Reimbursable Expenses may represent a significant cost to the Employees who incurred
them, but represent a relatively minimal cost to the Debtors' estates in light of the overall
benefits achieved.

65.     By this Motion, the Debtors seek authority, but not direction, to pay all
Reimbursable Expenses accrued and outstanding as of the Petition Date.

**F.     Postpetition Continuation of Ordinary-Course Employee Programs**

66.     Finally, the Debtors seek an order authorizing, but not directing, the Debtors to
continue their ordinary-course Employee compensation (including, wages, salaries, and the
Incentive Plans), PTO, expense reimbursement, corporate credit cards, benefits (including,
without limitation, insurance), savings and retirement plans, workers' benefits (including,
without limitation, insurance), and related programs during the postpetition reorganization
process.  Though the Debtors believe that such programs constitute ordinary course of business
expenses authorized under the Bankruptcy Code and applicable law without notice or a hearing,
out of an abundance of caution, the Debtors seek authorization to continue such programs during
the pendency of these Chapter 11 Cases, as such may be modified or supplemented from time to
time in the ordinary course of business.

**III.    Workers' Compensation**

67.     The Debtors provide workers' compensation benefits (the "**Workers'**
**Compensation Programs**") to the Employees.  In particular, under the laws of the various
jurisdictions in which they operate, the Debtors are required to maintain policies and programs to
provide Employees with workers' compensation benefits.  In accordance with this obligation, the

Debtors maintain workers' compensation insurance policies in all jurisdictions where they operate. The workers' compensation benefits provided by the Debtors are covered primarily under the Debtors' workers' compensation insurance program administered by Travelers LLC ("**Travelers**"), with the exception of Employees in Washington and California.

68.    The Workers' Compensation Programs include a large-deductible workers' compensation plan (the "**Large Deductible Plan**") whereby Travelers pays out claims as they arise, and the Debtors reimburse Travelers for claims under the deductible. The Debtors estimate that approximately $7.6 million is owed on account of claims under the Large Deductible Plan. In addition, the Large Deductible Plan requires the Debtors to issue a $23.3 million letter of credit for the benefit of Travelers in order to provide Travelers with security in the event that the Large Deductible Plan terminates or if the Debtors are unable to meet their premium obligations.

69.    Workers' compensation insurance coverage for employees in Washington is purchased from, and claims are administered by, Washington's Department of Labor & Industries ("**WA DOL&I**"). For the 12 months preceding the Petition Date, the Debtors paid approximately $149,000 to the WA DOL&I. The Debtors estimate approximately $27,000 is owed on account of claims pending before the WA DOL&I.

70.    In California, the Debtors are self-insured for workers' compensation by York Risk Services Group. Under this self-insured plan, the Debtors pay the cost of claims as they are incurred. For the 12 months preceding the Petition Date, the Debtors paid approximately $1.2 million on account of workers' compensation claims arising in California. The Debtors estimate approximately $5 million is owed on account of worker's compensation claims for California Employees.

71.     Failure to maintain workers' compensation insurance could result in administrative or legal proceedings against the Debtors and their officers and directors. Accordingly, the Debtors seek authority to pay all workers' compensation obligations, including any outstanding insurance premiums and any other amounts related to prepetition workers' compensation claims, as they become due in the ordinary course of the Debtors' business.

**IV.     Severance Plan**

72.     In addition to the Debtors' other benefit plans and programs, the Debtors provide severance pay to eligible Employees under a wrap-around ERISA severance plan (the "**Severance Plan**").  Under the Severance Plan, upon involuntary termination or, if applicable, voluntary election under the terms of the Severance Plan, the Debtors generally provide four to 26 weeks of severance pay (consisting of base pay plus direct sales commission, if applicable) and benefits to participating full-time Employees, and two to 13 weeks of severance pay to participating part-time Employees, depending on length of service. Eligible Employees who are not offered and/or do not accept a non-comparable position with the Company are eligible for severance pay allowance equal to two weeks of pay per year of service.

73.     Eligible, full-time Employees who are eliminated but who are offered and accept a non-comparable position with the Company may be eligible for severance pay equal to one week of base pay per year of service. The minimum severance pay allowance for such employees will be two weeks of base pay and the maximum severance pay allowance will be thirteen weeks of base pay.

74.     Payments made under the Severance Plan are made in a lump sum and subject to applicable federal and state withholding taxes.  In addition to payment for a certain number of weeks' worth of wages, benefits under the Severance Plan for a particular Employee may

include, at the discretion of senior management, payment for certain healthcare benefits (*i.e.* COBRA coverage assistance).

75.     Currently, 28 former Employees have been terminated but have not yet received payments on account of the Severance Plan.  As of the Petition Date, the remaining payments due to these former Employees total approximately $300,000 and approximately $265,000 of this amount will come due during the Interim Period. No former Employees currently receiving payments under the Severance Plan are due amounts in excess of the Priority Cap during the Interim Period.

76.     The Debtors believe the Severance Plan provides important value to the Debtors' business and therefore to their estates, because they allow the Debtors to help ensure a smooth transition of involuntarily terminated employees.  As such, the Debtors request authority, but not direction, under the Interim and Final Orders to continue the Severance Plan in the ordinary course of business and in their sole discretion.  Further, the Debtors request authority, but not direction, to pay the amounts due under the Severance Plan up to the Priority Cap pursuant to the Interim Order, and, pursuant to the Final Order, to pay such claims in the ordinary course of business, including any amounts that were not paid under the Interim Order on account of the Priority Cap.[18]

## V.     Former Employee Benefits

### A.     Non-Qualified Plans

77.     The Debtors make contributions to three supplemental income plans for the benefit of select former Employees: the Executive Supplemental Retirement Plan (the "**ESRP**"),

---

[18]    The Debtors are not seeking authority at this time to make severance payments to senior management, however, the Debtors expressly reserve the right to do so at a future time.

the Supplemental Executive Retirement Plan (the "**SERP**") and the Retirement Benefit

Restoration Plan (the "**BRP**," and together with the ESRP and the SERP, the "**Supplemental**

**Income Plans**"). The ESRP provides payment to plan participants in three annual installments

following separation from the Company, and the SERP and BRP provide a monthly annuity

payment to plan participants following separation from the Company. The Supplemental Income

Plans provide such payments to plan participants upon eligible termination or death

circumstances and are funded through the Debtors' payroll. The plans are maintained for the

purpose of providing deferred compensation. As of the Petition Date, there were approximately

450 retired Employees participating in the Supplemental Income Plans and approximately 14

current Employees participating in the Supplemental Income Plans. The Debtors estimate that

payments on account of the Supplemental Income Plans are approximately $640,000 per month

and the Debtors believe that, as of the Petition Date, they owe approximately $1.3 million in

aggregate on account of the Supplemental Income Plans.

78.     In addition, the Debtors are party to individual separation agreements with

approximately 182 retired Employees, pursuant to which the Debtors agreed to provide post-

retirement supplemental income benefits (the "**Special Arrangements**").[19]  Under the Special

Arrangements, retired Employees or their beneficiaries receive annual or monthly annuity

payments. The Debtors estimate that payments on account of the Special Arrangements are

approximately $65,000 per month and the Debtors believe that, as of the Petition Date, they owe

approximately $130,000 in aggregate on account of the Special Arrangements.

---

[19] There are approximately 27 retired employees who qualify for both the BRP and the Special Arrangements Plan.

79.    The Debtors are not seeking authority to pay any outstanding amounts on account of the Supplemental Income Plans or Special Arrangements pursuant to this Motion, but reserve all rights to seek such relief by separate motion.

**B.    Qualified Pension Plans**

80.    The Debtors also maintain The McClatchy Company Retirement Plan, a company-sponsored single employer pension plan (the "**Pension Plan**" together with the Supplemental Income Plans and the Special Arrangements, the "**Former Employee Benefit Plans**"). The Pension Plan was frozen as of March 31, 2009. While the Pension Plan is frozen, pension obligations continue to exist for past service performed by certain Employees and former Employees. The Pension Plan covers approximately 24,000 participants. The Pension Plan is a noncontributory defined benefit pension plans covering Plan Participants of certain Debtors.

81.    The Pension Plan is insured by the Pension Benefit Guaranty Corporation ("**PBGC**"), a wholly owned United States government corporation established under 29 U.S.C. § 1302 to administer the pension plan termination insurance program created under Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1301–1461.

82.    The Debtors have been required to make minimum funding contributions based on actuarial calculation to the Pension Plan on a quarterly basis (the "**Quarterly Contributions**"). The last Quarterly Contribution was made on October 15, 2019.

83.    The Debtors are not seeking authority to pay Quarterly Contributions on account of the Pension Plan pursuant to this Motion, but reserve all rights to seek such relief by separate motion.

**C.    Retiree Welfare Benefits**

84.     The Debtors also sponsor a welfare plan for certain retired employees (the

"**Retiree Welfare Program**"), pursuant to which the Debtors provide health reimbursement

accounts to fund medical benefits and life insurance. Under the Retiree Welfare Program, for

certain participants, the Debtors provide health reimbursement plans with a quarterly credit to

assist in maintaining certain medical benefits, that eligible retired Employees can decide to

participate in. Under the Retiree Welfare Program, in 2005, the Debtors established health

reimbursement plans for certain participants with varying amounts to assist in maintaining

certain medical benefits. The health reimbursement plan participant submits claims to the claims

administrator, and the claims administrator reimburses the Employee for the claimed amount and

seeks reimbursement from the Debtors. The Debtors also make payments in connection with life

insurance plans provided to select retired Employees under the Retiree Welfare Program.  The

Debtors expect to owe approximately $90,000 on account of the Retiree Welfare Program as of

the Petition Date.

85.     The Debtors seek authority to continue to honor their obligations under the

Retiree Welfare Program in the ordinary course of the Debtors' business.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

**VI.     Payment of Prepetition Employee Obligations Is Appropriate Under Bankruptcy
Code Sections 507(a)(4) and 507(a)(5).**

86.     The Debtors believe that a substantial portion of the amounts they seek to pay

hereunder are entitled to priority under sections 507(a)(4) and (a)(5) of the Bankruptcy Code.

Section 507(a)(4) of the Bankruptcy Code grants priority to employee claims for "wages,

salaries, or commissions, including vacation, severance and sick leave pay" earned within 180

days before the Petition Date up to $13,650 per employee.  11 U.S.C.  § 507(a)(4).  Similarly,

section 507(a)(5) of the Bankruptcy Code provides the claims for contributions to certain

employee benefit plans are also afforded priority treatment to the extent of the number of

employees covered by each plan multiplied by $13,650, less any amounts paid pursuant to

Bankruptcy Code section 507(a)(4). *Id.* § 507(a)(5). Because of the number of Employees

working for the Debtors, and because some amounts are unknown pending submission of claims,

the Debtors do not know the exact amount due to each Employee for the prepetition period.

However, the overwhelming majority of the Debtors' Employees are owed amounts under the

$13,650 cap. Any amounts in excess of the priority cap represent reasonable compensation for

an extended period of time. By this Motion, Debtors seek authority pursuant to the Interim

Order to pay the Prepetition Employee Obligations up to $13,650 per Employee and, pursuant to

the Final Order, authority to pay amounts that exceed the Priority Cap.

87.     Because the vast majority of the Prepetition Employee Obligations the Debtors

seek to pay hereunder (including *all* of the Prepetition Employee Obligations encompassed by

the proposed Interim Order) constitute priority claims, the relief requested in herein affects only

the timing of payment, and not the amount, and will not prejudice general unsecured creditors.

**VII.    Bankruptcy Code Sections 541 Authorizes Payment of Employee Withholdings.**

88.     A portion of the Prepetition Employee Obligations constitute funds held in trust

for payment to third parties. The payment of the Employee Withholdings will not prejudice the

Debtors' estates because such withholdings are held in trust for the benefit of the related payees

and, thus, do not constitute property of the Debtors' estates under Bankruptcy Code section 541.

*See* 11 U.S.C. § 541(d); *Begier v. IRS*, 496 U.S. 53, 58–59 (1990). Further, failure to pay these

amounts could subject the Debtors and their officers and directors to liability. *See, e.g.*, *In re

Sheppard*, 253 B.R. 397 (Bankr. D.S.C. 2000) (officer responsible for a company not paying its

federal employment tax liabilities found personally liable for such tax liabilities); *In re Geise*,

151 B.R. 432 (Bankr. N.D. Ohio 1992) (same); *see also* 26 U.S.C. § 6672(a) ("Any person

33

required to collect, truthfully account for, and pay over any tax imposed by this title who

willfully fails to . . . pay over such tax . . . shall, in addition to other penalties provided by

law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not

accounted for and paid over.")

## VIII.    Payment of the Prepetition Employee Obligations is Appropriate Under the Doctrine of Necessity.

89.    As a result of the commencement of the Chapter 11 Cases, and in the absence of

an order of the Court providing otherwise, the Debtors will be prohibited from paying or

otherwise satisfying their Prepetition Employee Obligations, and the checks, wire transfers, and

direct deposit transfers issued in respect of the Prepetition Employee Obligations will be

dishonored. Failing to honor these obligations would have devastating consequences for the

Debtors' ability to operate their business during these Chapter 11 Cases and, thus, the Debtors'

reorganization.  Authorization to pay the Prepetition Employee Obligations is, therefore,

necessary to maximize the value of the Debtors' estates for all creditors and stakeholders.

90.    Even if certain prepetition Employee claims are not entitled to priority, payment

of these claims is necessary to retain their current employees and maintain positive employee

morale, and therefore, to preserve and protect the Debtors' ongoing business operations.

91.    The bankruptcy court's power to authorize the pre-plan satisfaction of prepetition

claims whose payment is critical to the debtor's business is firmly established under the

"doctrine of necessity," which "recognizes the existence of the judicial power to authorize a

debtor in a reorganization case to pay pre-petition claims where such payment is essential to the

continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R.  174, 176 (Bankr.

S.D.N.Y. 1989).[20] Although the "doctrine of necessity" pre-dates the Bankruptcy Code, *see Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 309 (1882), the modern application of the doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including sections 105(a), 1107(a), and 1108. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (fiduciary duties implicit in Bankruptcy Code section 1107(a) justify the "preplan satisfaction of a prepetition claim" where necessary to preserve going concern value). Courts have located additional support for the pre-confirmation satisfaction of critical claims in Bankruptcy Code section 363(b), under which a court may authorize the use of property outside the ordinary course of business where a debtor "articulate[s] some business justification, other than mere appeasement of major creditors" for such relief. *See Ionosphere.*, 98 B.R. at 175 (Bankr. S.D.N.Y. 1989).

92.     The Debtors' ability to maximize value and continue operations depends, in large part, upon the retention and motivation of the Employees whose efforts will be critical to the successful reorganization process. The Debtors' Employees possess knowledge unique to the Debtors' products and operations. If amounts owed are not received, insurance reimbursements are not made, or other benefits delayed, the Employees may suffer substantial personal hardship and in some cases will be unable to meet their basic needs, potentially making it difficult or impossible for them to continue working for the Debtors. In order to avoid Employee

---

[20]     *See also In re C.A.F. Bindery, Inc.*, 1999 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *In re Friedman's Inc.*, No. 09-10161 (CSS), 2011 WL 5975283, at * 3 (Bankr. D. Del. Nov. 30, 2011) ("[N]ormally, a debtor only pays pre-petition, unsecured claims through a confirmed plan of reorganization . . . most courts will allow such payments under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business."); *In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) ("The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."; *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit the pre-plan payment of prepetition obligation when essential to the continued operation of the debtor."); *In re Eagle-Pitcher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a prepetition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the chapter 11 process.").

resignations and to maintain Employee morale, it is critical that the Debtors be authorized to pay each of their Employees all compensation amounts that have been earned under the Debtors' prepetition contractual obligations or practices, subject to the limitations described herein.

93.     For the reasons set forth herein, for the Debtors to meet their fiduciary duties as debtors in possession, and in light of the critical need for the Debtors to preserve the going concern value of their businesses in order to effect a successful reorganization through, among other things, continuing the orderly day-to-day operations of the Debtors' business, payment of the Prepetition Employee Obligations as requested herein is proper in accordance with the doctrine of necessity.  Accordingly, the Debtors must be authorized, but not directed, to pay all Prepetition Employee Obligations.

94.     The relief requested is commonly granted in this District.  *See, e.g., In re Trident Holding Co., LLC*, No. 19-10384 (SHL) (Bankr.  S.D.N.Y.  Mar.  8, 2019; *In re Synergy Pharmaceuticals Inc.*, No.  18-14010 (JLG) (Bankr.  S.D.N.Y.  Jan.  24, 2019); *In re Glansaol Holdings Inc.*, No.  18-14102 (MEW) (Bankr.  S.D.N.Y.  Jan.  22, 2019); *In re Sears Holdings Corporation*, No.  18-23538 (RDD) (Bankr.  S.D.N.Y.  Nov.  16, 2018); *In re Hooper Holmes, Inc.*, No.  18-23302 (RDD) (Bankr.  S.D.N.Y.  Sept.  25, 2018); *In re Aralez Pharmaceuticals US Inc.*,  No.  18-12425 (MG) (Bankr.  S.D.N.Y.  Sept.  14, 2018); *In re Cenveo, Inc.*, No.  18-22178 (RDD) (Bankr.  S.D.N.Y.  Feb.  6, 2018); *In re 21st Century Oncology Holdings, Inc.*, No.  17-22770 (RDD) (Bankr.  S.D.N.Y.  Jun. 20, 2017); *In re Answers Holdings, Inc.*, No.  17-10496 (SMB) (Bankr.  S.D.N.Y.  Apr.  4, 2017); *In re BCBG Max Azria Glob.  Holdings, LLC*, No.  17-10466 (SCC) (Bankr.  S.D.N.Y.  Mar.  29, 2017).[21]

---

[21]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion. Copies of these orders, however, are available upon request.

IX.    **The Proposed Payment-Processing Procedures are Appropriate.**

95.    As set forth above, the Debtors request that all Banks be authorized and directed

to honor and process payments on account of the Prepetition Employee Obligations as directed

by the Debtors.  The Debtors have sufficient liquidity to pay the amounts delineated in this

Motion in the ordinary course of business and have implemented controls to ensure that

prepetition claims will not be paid except as authorized by this Court.  The Debtors therefore

submit that the payment processing procedures described in the Motion are appropriate.

X.    **The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers'
Compensation Claims.**

96.    Section 362(a)(1) of the Bankruptcy Code operates to stay:

the commencement or continuation, including the issuance or employment of process, of a
judicial, administrative, or other action or proceeding against the debtor that was or could
have been commenced before the commencement of the case under this title, or to recover
a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1). Section 362 of the Bankruptcy Code, however, permits a debtor or other

parties in interest to request a modification or termination of the automatic stay for "cause." Id. at

§ 362(d)(1).

97.    Here, cause exists to modify the automatic stay to permit the Employees to

proceed with workers' compensation claims in the appropriate judicial or administrative forum.

Staying the workers' compensation claims could have a detrimental effect on the financial well-

being and morale of the Employees. As previously discussed, Employees' departure or

demoralization likely will cause severe disruption to the Debtors' businesses and likely will

impair the success of their restructuring.

**IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY**

98.    The Court may grant the relief requested in this Motion immediately if the "relief

is necessary to avoid immediate and irreparable harm." Fed.  R.  Bankr.  P.  6003; see also *In re*

*First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008). In explicating the standards governing preliminary injunctions, the Second Circuit instructed that irreparable harm "'is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)). Further, the "harm must be shown to be actual and imminent, not remote or speculative. " *Id.; see also Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

99.      The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## MOTION PRACTICE

100.      This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to the Motion. Accordingly, the Debtors submit that this Motion satisfies Local Bankruptcy Rule 9013-1(a).

## RESERVATION OF RIGHTS

101.    Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' or any other party in interest's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim; (d) granting third party beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

## NOTICE

102.    Notice of this Motion will be given to: (a) the U.S. Trustee, (b) counsel to the DIP Agent, (c) counsel to the Prepetition Agents, (d) counsel to Chatham, (e) counsel to Brigade, (f) the PBGC, (g) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors, (h) any party that has requested notice pursuant to Bankruptcy Rule 2002, (i) the Banks, and (j) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(b). The Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

103.    No previous request for the relief sought herein has been made to this Court or any other court.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

## CONCLUSION

The Debtors respectfully request that this Court enter the Interim Order and the

Final Order, substantially in the form annexed hereto, granting the relief requested herein and

such other and further relief as may be just and proper.

Dated: New York, New York
        February 13, 2020

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Van C. Durrer, II*
Shana A. Elberg
Bram A. Strochlic
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

– and –

Van C. Durrer, II
Destiny N. Almogue (*pro hac vice* pending)
300 S. Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Fax: (213) 687-5600

– and –

Jennifer Madden (*pro hac vice* pending)
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Fax: (650) 470-4570

– and –

TOGUT, SEGAL & SEGAL LLP
Albert Togut
Kyle J. Ortiz
Amy Oden
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Fax: (212) 967-4258

*Proposed Counsel to Debtors and Debtors in Possession*

**EXHIBIT A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------- x
In re                                            :     Chapter 11
                                                 :
THE McCLATCHY COMPANY, et al.,                   :     Case No. 20-10418 (MEW)
                                                 :
Debtors.¹                                        :     (Joint Administration Pending)
                                                 :
------------------------------------------------------- x
```

## INTERIM ORDER AUTHORIZING DEBTORS TO PAY PREPETITION WAGES, <u>COMPENSATION, AND EMPLOYEE BENEFITS</u>

Upon the motion (the "**Motion**")[2] of the Debtors for an interim order (this "**Interim Order**") and a Final Order (i) authorizing, but not directing, the Debtors, *inter alia*, to pay prepetition wages, salaries, employee benefits, and amounts to or on account of independent contractors or temporary employees; (ii) authorizing, but not directing, the Debtors to continue the maintenance of all employee benefit programs in the ordinary course; (iii) authorizing, but not directing, the Debtors to honor employee expense obligations and payment of the Corporate Credit Cards; (iv) authorizing the Debtors to pay over to appropriate parties prepetition withholdings; (v) authorizing the Debtors to honor certain retiree benefit obligations; (vi) authorizing financial institutions to receive, process, honor and pay all checks, drafts and other forms of payment, including fund transfers, used by the Debtors relating to the foregoing; and (vii) granting related relief as further described herein; and upon consideration of the First Day

---

[1]   The last four digits of Debtor The McClatchy Company's tax identification number are 0478.  Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/McClatchy.  The location of the Debtors' service address for purposes of these chapter 11 cases is: 2100 Q Street, Sacramento, California 95816.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference from the United States District Court for the*

*Southern District of New York*, dated January 31, 2012; and this Court having found that this is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order

consistent with Article III of the United States Constitution; and this Court having found that

venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408

and 1409; and due and sufficient notice of this Motion having been given under the particular

circumstances; and it appearing that no other or further notice is necessary; and it appearing that

the relief requested in the Motion is in the best interests of the Debtors, their estates, their

creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient

cause appearing therefor; it is hereby;

**ORDERED, ADJUDGED AND DECREED that:**

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors are authorized, but not directed, to pay and/or honor, in their sole

discretion, the Prepetition Employee Obligations as and when such obligations are due.

3.      The Debtors are authorized, but not directed, in their sole discretion, to honor the

Employee Benefit Obligations and Employee Expense Obligations that were in effect as of the

Petition Date, including, but not limited to, Vacation Time, Holiday Time, Sick Time,

Reimbursable Expenses, Medical Plans, Dental Plan, Vision Plan, Life Insurance Plans,

Disability Plans, 401(k) Plan, Workers' Compensation Programs, and the Severance Plan, and to

continue such programs as such were in effect as of the commencement of these Chapter 11

Cases and as such may be modified or supplemented from time to time in the ordinary course of

business; *provided, however*, that such relief shall not constitute or be deemed an assumption or

2

an authorization to assume any of such Employee Benefit Obligations, including, policies, plans, programs, practices, and procedures, under section 365(a) of the Bankruptcy Code.

4.      The Debtors are authorized to maintain and administer the Corporate Incentive Plan in the ordinary course; *provided, however*, that the Debtors shall not pay amounts thereunder prior to entry of the Final Order.

5.      The Debtors are authorized, but not required, to continue to honor all obligations to the Union Employees under the relevant CBAs.

6.      The Debtors are authorized, but not directed, in their sole discretion, to pay all Employee Withholdings as and when such obligations are due. The Debtors may remit any and all amounts withheld from Employees, including social security, FICA, federal and state income taxes, garnishments, health care payments, other insurance premiums, retirement fund withholding, and other types of withholding, whether these amounts relate to the period prior to the date of the Debtors' chapter 11 filings or subsequent thereto.

7.      The Debtors are authorized, but not directed, in their sole discretion, to honor the Former Employee Obligations; *provided, however*, that such relief shall not constitute or be deemed an assumption or an authorization to assume any of such Former Employee Obligations, including, policies, plans, programs, practices, and procedures, under section 365(a) of the Bankruptcy Code.

8.      The Debtors are authorized to continue to use the commercial card program under the WellsOne Commercial Card Agreement, dated on or around May 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Card Agreement"), between the Debtors and Wells Fargo Bank, N.A. ("Wells Fargo") subject to the terms and conditions thereof. Wells Fargo is authorized to make advances from time to time to the Debtors

with a maximum exposure at any time up to $5 million.  All prepetition charges and fees are authorized and required to be paid.  The indebtedness owed by the Debtors to Wells Fargo in respect of the Card Agreement was secured by certain collateral pursuant to the terms of the Prepetition ABL Credit Documents (as defined in the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Order")).  To satisfy the requirement that Wells Fargo continue to have a valid and perfected, non-avoidable first-priority lien pursuant to the Card Agreement, the Debtors, in accordance with the DIP Order, grant Wells Fargo a priming lien and security interest in the Bank Product Cash Collateral (as defined in the DIP Order) pursuant to Bankruptcy Code section 364(d)(1) with respect to the indebtedness owed by the Debtors to Wells Fargo in respect of the Card Agreement.  Such lien shall not be primed by any lien granted to any post-petition lender or other person.

9.      Wells Fargo may rely on the representation of the Debtor with respect to its use of the commercial card program pursuant to the Card Agreement, and Wells Fargo shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

10.      In accordance with section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum and the Debtors are authorized to pay all prepetition amounts relating thereto in the ordinary course of business.

11.    All Banks are (a) authorized and directed to receive, process, honor and pay any and all prepetition and postpetition checks, drafts, electronic transfers and other forms of payment used by the Debtors to satisfy their Prepetition Employee Obligations, whether presented before, on, or after the Petition Date; *provided* that sufficient funds are on deposit in the applicable accounts to cover such payments, and (b) prohibited from placing any holds on, or attempting to reverse, any automatic transfers on account of Prepetition Employee Obligations. The Banks shall rely on the direction and representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Interim Order, and any such Bank shall not have any liability to any party for relying on such direction and representations by the Debtors as provided for in this Interim Order or for inadvertently honoring or dishonoring any check or fund transfer.

12.    To the extent the Debtors have not yet sought to remit payment on account of the Prepetition Employee Obligations, the Debtors are authorized, but not directed, to issue checks or provide for other means of payment of the Prepetition Employee Obligations.

13.    The Debtors are authorized to issue new postpetition checks to replace any checks, drafts and other forms of payment, or effect new postpetition electronic transfers on account of the Prepetition Employee Obligations, which may be inadvertently dishonored or rejected and to reimburse any expenses that may be incurred as a result of any bank's failure to honor a prepetition check.

14.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claims, including any claim held by any Employee or any third party. For the avoidance

of doubt, nothing contained in the Motion or this Interim Order is intended or should be construed to create an administrative priority claim on account of any Employee.

15.    Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Interim Order.

16.    Nothing in the Motion or this Interim Order or the relief granted (including any actions taken or payments made by the Debtors pursuant thereto) shall be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' or any other party in interest's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third party beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

17.    Notwithstanding anything to the contrary contained in this Interim Order, (a) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under the DIP Financing Orders approved by this Court in the Chapter 11 Cases, and (b) to the extent there is any inconsistency between the terms of such DIP Financing Orders and any action taken or proposed to be taken hereunder, the terms of such DIP Financing Orders shall control.

18.    The Court finds and determines that the requirements of Bankruptcy Rule 6003 are satisfied and that the relief requested is necessary to avoid immediate and irreparable harm.

19.     Notice of the Motion satisfies the requirements set forth in Bankruptcy Rule 6004(a).

20.     Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be effective and enforceable immediately upon entry hereof.

21.     All time periods set forth in this Interim Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

22.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Interim Order.

23.     Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**").

24.     The Final Hearing on the Motion shall be held on _____ ___, 2020 at __:___ a.m./p.m., prevailing Eastern Time.  Any objections or responses to the entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____ ___, 2020, and shall be served on: (a) the U.S. Trustee, (b) counsel to the DIP Agent, (c) counsel to the Prepetition Agents, (d) counsel to Chatham, (e) counsel to Brigade, (f) the PBGC, (g) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors, (h) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (i) the Banks.  If no objections or responses are filed and served, this Court may enter a final order without further notice or hearing.

25.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

Dated: New York, New York
      February __, 2020

                                            _____
                                             UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------- x
```
*In re*                                                       :    **Chapter 11**
                                                            :
**THE McCLATCHY COMPANY,** *et al.,*                          :    **Case No. 20-10418 (MEW)**
                                                            :
Debtors.[1]                                                 :    **(Joint Administration Pending)**
                                                            :
```
------------------------------------------------------- x
```

### FINAL ORDER AUTHORIZING DEBTORS TO PAY PREPETITION WAGES, COMPENSATION, AND EMPLOYEE BENEFITS

Upon the motion (the "**Motion**")[2] of the Debtors for an Interim Order and a final order (this "**Final Order**") under Bankruptcy Code sections 105(a), 363(b), 507(a), 541, 1107(a), and 1108 and Bankruptcy Rules 6003 and 6004 (i) authorizing, but not directing, the Debtors, *inter alia*, to pay prepetition wages, salaries, employee benefits, and amounts to or on account of independent contractors or temporary employees; (ii) authorizing, but not directing, the Debtors to continue the maintenance of all employee benefit programs in the ordinary course; (iii) authorizing, but not directing, the Debtors to honor employee expense obligations and payment of the corporate credit cards; (iv) authorizing the Debtors to pay over to appropriate parties prepetition withholdings; (v) authorizing the Debtors to honor certain retiree benefit obligations; (vi) authorizing financial institutions to receive, process, honor and pay all checks, drafts and other forms of payment, including fund transfers, used by the Debtors relating to the

---

[1]    The last four digits of Debtor The McClatchy Company's tax identification number are 0478.  Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/McClatchy.  The location of the Debtors' service address for purposes of these chapter 11 cases is: 2100 Q Street, Sacramento, California 95816.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

foregoing; and (vii) granting related relief as further described herein; and upon consideration of

the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States*

*District Court for the Southern District of New York*, dated January 31, 2012; and this Court

having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court

may enter a final order consistent with Article III of the United States Constitution; and this

Court having found that venue of this proceeding and the Motion in this district is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of this Motion having

been given under the particular circumstances; and it appearing that no other or further notice is

necessary; and it appearing that the relief requested in the Motion is in the best interests of the

Debtors, their estates, their creditors, and other parties in interest; and after due deliberation

thereon; and good and sufficient cause appearing therefor; it is hereby;

**ORDERED, ADJUDGED, AND DECREED that:**

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      To the extent the Debtors have not yet sought to remit payment on account of the

Prepetition Employee Obligations, the Debtors are authorized, but not directed, to issue checks

or provide for other means of payment of the Prepetition Employee Obligations.

3.      The Debtors are authorized, but not directed, to pay and/or honor, in their sole

discretion, the Prepetition Employee Obligations as and when such obligations are due.

4.      The Debtors are authorized, but not directed, in their sole discretion, to honor the

Employee Benefit Obligations and Employee Expense Obligations that were in effect as of the

Petition Date, including, but not limited to, Vacation Time, Holiday Time, Sick Time,

Reimbursable Expenses, Medical Plans, Dental Plan, Vision Plan, Life Insurance Plans,

Disability Plans, 401(k) Plan, Workers' Compensation Programs, and the Severance Plan, and to continue such programs as such were in effect as of the commencement of these Chapter 11 Cases and as such may be modified or supplemented from time to time in the ordinary course of business; *provided, however*, that such relief shall not constitute or be deemed an assumption or an authorization to assume any of such Employee Benefit Obligations, including, policies, plans, programs, practices, and procedures, under Bankruptcy Code section 365(a).

5.      The Debtors are authorized, but not required, to continue to honor all obligations to the Union Employees under the relevant collective bargaining agreements.

6.      The Debtors are authorized to maintain and administer the Incentive Plans in the ordinary course of business and to pay all amounts due thereunder in the ordinary course of business irrespective of whether such amounts (a) relate to the prepetition period and/or (b) exceed the limits provided for by Bankruptcy Code sections 507(a)(4) or 507(a)(5).

7.      The Debtors are authorized to continue to use the commercial card program under the WellsOne Commercial Card Agreement, dated on or around May 3, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Card Agreement"), between the Debtors and Wells Fargo Bank, N.A. ("Wells Fargo") subject to the terms and conditions thereof. Wells Fargo is authorized to make advances from time to time to the Debtors with a maximum exposure at any time up to $5 million.  All prepetition charges and fees are authorized and required to be paid. The indebtedness owed by the Debtors to Wells Fargo in respect of the Card Agreement was secured by certain collateral pursuant to the terms of the Prepetition ABL Credit Documents (as defined in the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Certain*

3

*Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Order")).  To satisfy the requirement that Wells Fargo continue to have a valid and perfected, non-avoidable first-priority lien pursuant to the Card Agreement, the Debtors, in accordance with the DIP Order, grant Wells Fargo a priming lien and security interest in the Bank Product Cash Collateral (as defined in the DIP Order) pursuant to Bankruptcy Code section 364(d)(1) with respect to the indebtedness owed by Debtors to Wells Fargo in respect of the Card Agreement.  Such lien shall not be primed by any lien granted to any post-petition lender or other person.

8.      Wells Fargo may rely on the representation of the Debtors with respect to its use of the commercial card program pursuant to the Card Agreement, and Wells Fargo shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

9.      The Debtors are authorized, but not directed, in their sole discretion, to pay all Employee Withholdings as and when such obligations are due. The Debtors may remit any and all amounts withheld from Employees, including social security, FICA, federal and state income taxes, garnishments, health care payments, other insurance premiums, retirement fund withholding, and other types of withholding, whether these amounts relate to the period prior to the date of the Debtors' chapter 11 filings or subsequent thereto.

10.     The Debtors are authorized, but not directed, in their sole discretion, to honor the Former Employee Obligations; *provided, however*, that such relief shall not constitute or be deemed an assumption or an authorization to assume any of such Former Employee Obligations, including, policies, plans, programs, practices, and procedures, under section 365(a) of the Bankruptcy Code.

11.    In accordance with section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum and the Debtors are authorized to pay all prepetition amounts relating thereto in the ordinary course of business.

12.    The Debtors are authorized to issue new postpetition checks to replace any checks, drafts and other forms of payment, or effect new postpetition electronic transfers on account of the Prepetition Employee Obligations, which may be inadvertently dishonored or rejected and to reimburse any expenses that may be incurred as a result of any bank's failure to honor a prepetition check.

13.    All Banks are (a) authorized and directed to receive, process, honor and pay any and all prepetition and postpetition checks, drafts, electronic transfers and other forms of payment used by the Debtors to satisfy their Prepetition Employee Obligations, whether presented before, on, or after the Petition Date; *provided* that sufficient funds are on deposit in the applicable accounts to cover such payments, and (b) prohibited from placing any holds on, or attempting to reverse, any automatic transfers on account of Prepetition Employee Obligations. The Banks shall rely on the direction and representations of the Debtors as to which checks and fund transfers should be honored and paid pursuant to this Final Order, and no such Bank shall have any liability to any party for relying on such direction and representations by the Debtors as provided for in this Final Order.

14.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claims, including any claim held by any Employee or any third party. For the avoidance

of doubt, nothing contained in the Motion or this Final Order is intended or should be construed to create an administrative priority claim on account of any Employee.

15.     Any party receiving payment from the Debtors is authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by this Final Order.

16.     No provision of this Final Order shall be construed as authority to make any payment which is subject to the provisions of Bankruptcy Code section 503(c).

17.     Nothing in the Motion or this Final Order or the relief granted (including any actions taken or payments made by the Debtors pursuant thereto) shall be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' or any other party in interest's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim or other obligation; (d) granting third-party beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

18.     Notwithstanding anything to the contrary contained in this Interim Order, (a) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under the DIP Financing Orders approved by this Court in the Chapter 11 Cases, and (b) to the extent there is any inconsistency between the terms of such DIP Financing Orders and any action taken or proposed to be taken hereunder, the terms of such DIP Financing Orders shall control.

19.     Notice of the Motion satisfies the requirements set forth in Bankruptcy Rule 6004(a).

20.     Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be effective and enforceable immediately upon entry hereof.

21.     All time periods set forth in this Final Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

22.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Final Order.

23.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

Dated:  New York, New York
        February __, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

861446-WILSR01A - MSW