SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Shana A. Elberg
Bram A. Strochlic
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

– and –

Van C. Durrer, II
Destiny N. Almogue (*pro hac vice* pending)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Fax: (213) 687-5600

– and –

Jennifer Madden (*pro hac vice* pending)
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Fax: (650) 470-4570

TOGUT, SEGAL & SEGAL LLP
Albert Togut
Kyle J. Ortiz
Amy Oden
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Fax: (212) 967-4258

*Proposed Counsel for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
|  |  |  |
|---|---|---|
| *In re* | : | **Chapter 11** |
| | : | |
| **THE McCLATCHY COMPANY,** *et al.,* | : | **Case No. 20-10418 (MEW)** |
| | : | |
| **Debtors.[1]** | : | **(Joint Administration Pending)** |
| | : | |
------------------------------------------------------- x

---

[1] The last four digits of Debtor The McClatchy Company's tax identification number are 0478. Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/McClatchy. The location of the Debtors' service address for purposes of these chapter 11 cases is: 2100 Q Street, Sacramento, California 95816.

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**DISCLOSURE STATEMENT WITH RESPECT TO
THE JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF THE McCLATCHY COMPANY AND ITS
AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

**DISCLAIMER**

THE DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THE DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND PROVIDING INFORMATION REGARDING RELATED TRANSACTIONS AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN AND WHETHER TO PARTICIPATE IN RELATED TRANSACTIONS. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THE DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THE DISCLOSURE STATEMENT SINCE THE DATE OF THE DISCLOSURE STATEMENT.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETIES BEFORE CASTING A BALLOT. THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE SECURITIES DESCRIBED IN THE DISCLOSURE STATEMENT TO BE ISSUED PURSUANT TO THE PLAN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, AS AMENDED, OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW, GENERALLY, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(a)(2) OF THE SECURITIES ACT, AS APPLICABLE.

THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION COMMENTED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THE DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, UNLESS SPECIFICALLY INDICATED OTHERWISE.

THE FINANCIAL PROJECTIONS, ATTACHED HERETO AS <u>EXHIBIT B</u> AND DESCRIBED IN THE DISCLOSURE STATEMENT, HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH THEIR ADVISORS. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY,

REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP").

PLEASE REFER TO **ARTICLE VIII** OF THE DISCLOSURE STATEMENT, ENTITLED "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN" FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS LLC, THE DEBTORS' CLAIMS AND SOLICITATION AGENT, NO LATER THAN 4:00 P.M. PREVAILING EASTERN TIME, ON FEBRUARY 24, 2020. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN **ARTICLE III** OF THE DISCLOSURE STATEMENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS IN THEIR SOLE AND ABSOLUTE DISCRETION.

THE CONFIRMATION HEARING WILL COMMENCE ON [●], 2020 AT [__:__] [A.M. / P.M.] PREVAILING EASTERN TIME, BEFORE THE HONORABLE [●],UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, 1 BOWLING GREEN, NEW YORK, NEW YORK 10004. THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES WHO HAVE FILED AN OBJECTION TO THE PLAN. THE BANKRUPTCY COURT, IN THEIR DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING. THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

THE PLAN OBJECTION DEADLINE IS [●], 2020 AT 4:00 P.M. PREVAILING EASTERN TIME. ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN INTEREST IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER SO THAT THEY ARE RECEIVED ON OR BEFORE THE PLAN OBJECTION DEADLINE.

THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT AND EXHIBITS, ONCE FILED, AND OTHER DOCUMENTS AND MATERIALS RELATED THERETO MAY BE OBTAINED BY: (A) ACCESSING THE DEBTORS' RESTRUCTURING WEBSITE AT http://www.kccllc.net/McClatchy, (B) EMAILING McClatchyInfo@kccllc.com, (C) CALLING THE DEBTORS' RESTRUCTURING HOTLINE AT 866-810-6898, WITHIN THE UNITED STATES OR CANADA, OR 424-236-7215, OUTSIDE OF THE UNITED STATES OR CANADA, OR (D) ACCESSING THE COURT'S WEBSITE AT http://www.nysb.uscourts.gov. COPIES OF SUCH DOCUMENTS AND MATERIALS MAY ALSO BE EXAMINED BETWEEN THE HOURS OF 8:00 AM AND 4:00 PM, MONDAY THROUGH FRIDAY, EXCLUDING FEDERAL HOLIDAYS, AT THE OFFICE OF THE CLERK OF THE COURT, 1 BOWLING GREEN, NEW YORK, NEW YORK 10004.

## EXECUTIVE SUMMARY

The McClatchy Company, Cypress Media, Inc., Aboard Publishing, Inc., Bellingham Herald Publishing, LLC, Belton Publishing Company, Inc., Biscayne Bay Publishing, Inc., Cass County Publishing Company, Columbus-Ledger Enquirer, Inc., Cypress Media, LLC, East Coast Newspapers, Inc., El Dorado Newspapers, Gulf Publishing Company, Inc., Herald Custom Publishing of Mexico, S. de R.L. de C.V., HLB Newspapers, Inc., Idaho Statesman Publishing, LLC, Keltatim Publishing Company, Inc., Keynoter Publishing Company, Inc., Lee's Summit Journal, Incorporated, Lexington H-L Services, Inc., Macon Telegraph Publishing Company, Mail Advertising Corporation, McClatchy Big Valley, Inc., McClatchy Interactive LLC, McClatchy Interactive West, McClatchy International Inc., McClatchy Investment Company, McClatchy Management Services, Inc., McClatchy Newspapers, Inc., McClatchy News Services, Inc., McClatchy Property, Inc., McClatchy Resources, Inc., McClatchy Shared Services, Inc., McClatchy U.S.A., Inc., Miami Herald Media Company, N & O Holdings, Inc., Newsprint Ventures, Inc., Nittany Printing and Publishing Company, Nor-Tex Publishing, Inc., Olympian Publishing, LLC, Olympic-Cascade Publishing, Inc., Pacific Northwest Publishing Company, Inc., Quad County Publishing, Inc., San Luis Obispo Tribune, LLC, Star-Telegram, Inc., Tacoma News, Inc., The Bradenton Herald, Inc., The Charlotte Observer Publishing Company, The News and Observer Publishing Company, The State Media Company, The Sun Publishing Company, Inc., Tribune Newsprint Company, Tru Measure, LLC, Wichita Eagle and Beacon Publishing Company, Inc., and Wingate Paper Company, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**," the "**Company**" or "**McClatchy**"), are a diversified digital and print media business focused on providing strong, independent local journalism to 30 communities across 14 states, as well as selected national news coverage through the Debtors' Washington D.C. based bureau.

The Debtors' proposal for the reorganization of their business is set forth in the *Joint Chapter 11 Plan of Reorganization of The McClatchy Company. and its Affiliated Debtors and*

*Debtors in Possession* (as amended, modified, or supplemented, the "**Plan**") [Docket No. 25], a copy of which is attached hereto as <u>Exhibit A</u>.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Debtors' proposed Plan, as filed on the date hereof with the United States Bankruptcy Court for the Southern District of New York. Certain provisions of the Plan, and thus the description and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties. Accordingly, the Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 3019, and **Article 13.4** of the Plan.

The Plan provides for an equitable distribution of recoveries to the Debtors' creditors, preserves the value of the Debtors' business as a going concern, and preserves the jobs of employees. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation or attempts by another party in interest to file a plan, could result in significant delays, litigation and costs, the loss of jobs by the Debtors' employees, and/or impaired recoveries. Moreover, the Debtors believe that the Debtors' creditors will receive greater and earlier recoveries under the Plan than those that would be achieved in liquidation or under an alternative plan. **For these reasons, the Debtors urge you to return your ballot accepting the Plan.**

## Plan Overview and Summary of Distributions

The following summary[2] is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement with respect to the Plan and the Plan itself.

A.      Overview and Funding of the Plan

The Plan provides for the following key economic terms and mechanics:

- Issuance of New First Lien Notes. On the Effective Date, Reorganized McClatchy will authorize and issue new 10.000% Senior Secured Notes due 2026 (the "**New First Lien Notes**") pursuant to the New First Lien Notes Indenture by and among Reorganized McClatchy, as issuer, the subsidiary guarantor parties thereto, and the First Lien Notes Agent, on terms substantially similar to those contained in the First Lien Notes Indenture, subject to certain modifications set forth on **Exhibit E** hereto and as may be otherwise agreed to by the Debtors and the Supporting Parties.

- Issuance of Reorganized Equity: On the Effective Date, Reorganized McClatchy will authorize and issue the Reorganized Equity.  97% of the Reorganized Equity will be distributed to holders of Second Lien/Third Lien Claims and 3% of the Reorganized Equity will be distributed to holders of PBGC Claims, each subject to dilution from the MIP Equity and the Warrant Equity.

- Cancellation of Old McClatchy Securities, Agreements, and the Second Lien Term Loan:  Except as otherwise provided in the Plan, on the Effective Date, the 2027 Debentures, the 2029 Debentures, the First Lien Notes, the Third Lien Notes and the Existing Parent Equity, and all options, warrants, rights and other instruments evidencing an ownership interest in the Debtors (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing (collectively, the "**Old McClatchy Securities**"), as well as the Second Lien Term Loan and all instruments and documents relating thereto, shall be cancelled, and any obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to the foregoing, shall be released and discharged and cancelled.

- Exit Financing: On the Effective Date, the Reorganized Debtors, as borrowers, will enter into the Exit Facilities, comprising (i) a $50 million asset-based revolving credit facility (the "**Exit ABL Facility**") and (ii) a new 1.5 lien term loan facility in the aggregate principal net amount of $81 million, consisting of (a) the conversion of the Subordinated Chatham Notes Claims to term loans thereunder, and (b) $30 million of new money financing provided by certain of the Chatham Parties, or affiliates thereof, as well as an aggregate principal amount of 7.000% of original issue discount (the "**Exit**

---

[2]     These summaries below are qualified in their entirety by reference to the provisions of the Plan.  For a more detailed description of the terms and provisions of the Plan, see **Article VI** below.

**1.5L Facility**") on terms consistent with the term sheet attached hereto as **Exhibit F** and as otherwise agreed upon by the Debtors and the Supporting Parties.

- Unsecured Creditors: Unsecured Creditors will receive their Pro Rata portion of Reorganized McClatchy Warrants for up to 2.5% of the Reorganized Equity or their Pro Rata portion of Cash in the aggregate amount of $3,000,000.

The Reorganized Debtors' debt at emergence shall comprise of the following: (i) the $50 million Exit ABL Facility, (ii) the Exit 1.5L Facility in the aggregate principal net amount of $81 million, and (iii) $217.9 million in principal amount of the New First Lien Notes. At emergence, the Reorganized Debtors anticipate having liquidity of approximately $34 million due to a combination of cash-on-hand and availability under the Exit Facilities.

The Reorganized Debtors' debt structure at emergence will consist of the following:

| Debt | |
|------|------|
| Exit ABL Facility | $50 million |
| Exit Term Loan Facility | $81 million |
| New First Lien Notes | $217.9 million |

B.     Summary of Treatment of Claims and Interests under the Plan.

The Plan contains separate classes for Holders of Claims and Interests. Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims and Interests. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, Professional Claims, and Priority Tax Claims have not been classified. The treatment of all such unclassified claims is set forth in **Article II** of the Plan.

The table below summarizes the classification and treatment of Claims and Interests under the Plan. These summaries are qualified in their entirety by reference to the provisions of the Plan. For a more detailed description of the terms and provisions of the Plan, see **Article VI** below. The tables below also set forth the estimated percentage recovery for Holders of Claims and Interests in each Class, and the Debtors' estimates of the amount of Claims that will ultimately become Allowed in each Class based upon (a) review by the Debtors of their books and records, (b) all Claims scheduled by the Debtors, and (c) consideration of the provisions of the Plan that affect the

allowance of certain Claims.[3]  The aggregate Claim amounts in each Class and the estimated percentage recoveries in the table below are set forth for the Debtors on a consolidated basis.

| Class Description | Status | Proposed Treatment |
|---|---|---|
| **Unclassified Claims** | | |
| Administrative Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount: $27 million** | Unclassified | Administrative Claims consist of the Administrative Claims of each of the Debtors.<br><br>Except to the extent that the Debtors and a holder of an Allowed Administrative Claim agree to a less favorable treatment, a holder of an Allowed Administrative Claim (other than a DIP Facility Claim, which shall be subject to **Article 2.2** of the Plan, or a Professional Claim, which shall be subject to **Article 2.3** of the Plan) shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Administrative Claim, cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the later of (i) thirty (30) days following the Effective Date (or as soon as reasonably practicable thereafter); (ii) thirty (30) days after the date when the Administrative Claim becomes an Allowed Administrative Claim (or as soon as reasonably practicable thereafter); or (iii) the date when the Administrative Claim becomes payable pursuant to any agreement between the Debtors and the holder of the Administrative Claim; or (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary |

---

[3]     Although the Debtors believe that the estimated recoveries are reasonable, there is no assurance that the actual amounts of Allowed Claims in each Class will not materially exceed the estimated aggregate amounts shown in the table below. The actual recoveries under the Plan will depend upon a variety of factors, including:  (i) the reconciliation of asserted claims, (ii) cure amounts, (iii) whether, and in what amount and with what priority, contingent Claims against the Debtors become non-contingent and fixed; (iv) whether, and to what extent, Disputed Claims are resolved in favor of the Debtors. Accordingly, no representation can be or is being made with respect to whether each estimated recovery amount shown in the table above will be realized; and (v) any and all other factors set forth in **Article VIII** "Plan-Related Risk Factors and Alternatives to Confirmation and Consummation of the Plan" (including, but not limited to, **Article VIII.D.4**).

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the holder of such Allowed Administrative Claim; *provided*, *however*, that other than the holder of (v) a DIP Facility Claim, (w) a Professional Claim, (x) an Administrative Claim Allowed by a final order of the Bankruptcy Court on or before the Effective Date, (y) an Administrative Claim that is not disputed and arose in the ordinary course of business and was paid or is to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, or (z) an Administrative Claim arising under chapter 123 of title 28 of the United States Code, the holder of any Administrative Claim shall have filed a proof of claim form no later than the Administrative Claims Bar Date and such claim shall have become an Allowed Claim. |
| DIP Facility Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount: $4 million** | Unclassified | DIP Facility Claims consist of Claims of each of the Debtors arising under, derived from, based upon, or as a result of the DIP Facility.<br><br>Pursuant to the DIP Order, all DIP Facility Claims are Allowed. Except to the extent that a Holder of a DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every DIP Facility Claim, Holders of a DIP Facility Claim shall be (a) paid in full in Cash on the Effective Date, such payments to be distributed to the DIP Agent for the ratable benefit of the Holders of DIP Facility Claims, or (b) converted into and deemed outstanding under the Exit ABL Facility pursuant to the Confirmation Order. |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | To the extent that any Letter of Credit remains undrawn as of the Effective Date, the Debtors shall (i) cause that Letter of Credit to be replaced with a letter of credit issued under the Exit ABL Facility, (ii) collateralize that Letter of Credit with Cash in an amount specified in the Exit Facilities, (iii) provide a back-to-back letter of credit to the Letter of Credit Issuer on terms and from a financial institution reasonably acceptable to the Letter of Credit Issuer, or (iv) provide such other treatment as the Letter of Credit Issuer shall agree in its sole discretion.

Upon the Effective Date, all Liens and security interests granted to secure the DIP Facility shall be deemed discharged, cancelled, and released and shall be of no further force and effect. To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any Liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, shall take any commercially reasonable steps requested by the Debtors or the Reorganized Debtors, at the expense of the Reorganized Debtors, that are necessary to cancel and/or extinguish such publicly-filed Liens and/or security interests. |
| Professional Claims **Estimated Recovery: 100%** **Estimated Amount: $13 million** | Unclassified | Professional Claims consist of claims against a Debtor for professional services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date by any Professional.

*Payment of Interim Amounts:* Subject to the Holdback Escrow Amount, on the Effective Date, the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | Effective Date as to which no objection has been filed. |
| | | *Holdback Escrow Account:* On the Effective Date, the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals. The Distribution Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order. Such funds shall not be considered property of the Debtors, the Reorganized Debtors, or the Estates. The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Distribution Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court. When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors. |
| Priority Tax Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount: $5 million** | Unclassified | Priority Tax Claims consist of the Priority Tax Claims of each of the Debtors.<br><br>Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor (or Reorganized Debtor, as applicable), each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, Cash equal to the amount of such Allowed Priority Tax Claim (i) on the Effective Date, (ii) at the sole option of the Debtors, in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) if the Priority |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | Tax Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim. |
| **Classified Claims** | | |
| Class 1: Other Priority Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount: $0** | Unimpaired | Class 1 consists of all Other Priority Claims.<br><br>On or as soon as practicable after the Effective Date, except as otherwise provided in and subject to **Article 9.5** of the Plan, and except to the extent that a Holder of an Allowed Class 1 Claim and the applicable Debtor or Reorganized Debtor, subject to the consent of the Supporting Parties (not to be unreasonably withheld, conditioned, or delayed), agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class 1 Claim, each such Holder of an Allowed Class 1 Claim shall be paid in full in Cash; <u>provided</u>, <u>however</u>, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. |
| Class 2: Other Secured Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount: $0.5 million** | Unimpaired | Class 2 consists of all Other Secured Claims.<br><br>On or as soon as practicable after the Effective Date, except as otherwise provided in and subject to **Article 9.5** of the Plan, and except to the extent that a Holder of an Allowed Class 2 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 2 Claim, each such Holder of an Allowed Class 2 Claim |

| Class Description | Status | Proposed Treatment |
| --- | --- | --- |
| | | shall, at the election of the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Supporting Parties (not to be unreasonably withheld, conditioned, or delayed): (i) have its Allowed Class 2 Claim Reinstated and rendered Unimpaired on the Effective Date in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Class 2 Claim to demand or receive payment of such Allowed Class 2 Claim prior to the stated maturity of such Allowed Class 2 Claim from and after the occurrence of a default; or (ii) be paid in full in Cash in an amount equal to such Allowed Class 2 Claim, including postpetition interest, if any, on such Allowed Class 2 Claim required to be paid pursuant to section 506 of the Bankruptcy Code. Nothing in **Article 4.2** or elsewhere in the Plan shall preclude the Reorganized Debtors, as applicable, from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien. |
| Class 3: ABL Credit Facility Claims **Estimated Recovery: 100%** **Estimated Amount: $0** | Unimpaired | Class 3 consists of all ABL Credit Facility Claims. Except to the extent that a Holder of an Allowed Class 3 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 3 Claim, on the Effective Date each such Holder of an Allowed Class 3 Claim shall be, to the extent not previously "rolled up" or |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | converted into the DIP Facility pursuant to the applicable DIP Order, paid in full in Cash in an amount equal to such Allowed Class 3 Claim, including postpetition interest, if any, on such Allowed Class 3 Claim required to be paid pursuant to section 506 of the Bankruptcy Code , and all issued and undrawn Letters of Credit (as defined in the ABL Credit Agreement) shall be replaced or cash collateralized in the amounts specified under the DIP Documents or Exit Facilities, as applicable. |
| Class 4: First Lien Notes Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount: $262.9 million** | Impaired | Class 4 consists of all First Lien Notes Claims.<br><br>On the Effective Date, except to the extent that a Holder of an Allowed Class 4 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 4 Claim shall receive (1) its Pro Rata share of, to the extent not already paid as adequate protection, Cash in an amount equal to any accrued and unpaid interest (including any interest on interest) on the First Lien Notes that was due as of the Petition Date, and (2):<br><br>(i) for each Holder of an Allowed Class 4 Claim that is not a Chatham Subordinated Notes Claim, its Pro Rata share of New First Lien Notes; or<br><br>(ii) for each Holder of an Allowed Class 4 Claim that is a Chatham Subordinated Notes Claim, its Pro Rata amount of the Exit 1.5L Facility instead of its Pro Rata share of New First Lien Notes, pursuant to such Holders' agreement to receive less favorable treatment than each Holder of an Allowed Class 4 Claim that is not a Chatham Subordinated Notes Claim. |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| **Class 5:** Second Lien/Third Lien Claims<br><br>**Estimated Recovery: Unknown**<br>**Estimated Amount: Unknown** | Impaired | Class 5 consists of all Second Lien/Third Lien Claims.<br><br>Consistent with the Settlement of Junior Lien Secured Claims, except to the extent that a Holder of an Allowed Class 5 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class 5 Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 5 Claim shall receive on its Pro Rata share, based on the aggregate amount of Allowed Second Lien Notes Claims and Allowed Third Lien Notes Claims, of 97% of the Reorganized Equity, subject to dilution by the MIP Equity and the Warrant Equity.<br><br>For the avoidance of doubt, (a) the treatment provided to Holders of Allowed Class 4 Claims is the only treatment such Claims will receive, (b) to the extent that any Second Lien/Third Lien Deficiency Claims exist, such Claims form part of the Second Lien/Third Lien Notes Claims and shall receive no treatment separate and apart from the treatment that the Holders of such Claims receive as Holders of Allowed Class 5 Claims, and (c) Holders of Allowed Class 5 Claims shall be deemed to have waived, and not be entitled to any distribution under the Plan on account of, their Second Lien/Third Lien Deficiency Claims. |
| Class 6: Go-Forward Trade Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount: $14 million** | Unimpaired | Class 6 consists of all Go-Forward Trade Claims.<br><br>On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Class 6 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | release and discharge of and in exchange for each and every Allowed Class 6 Claim, each such Holder of an Allowed Class 6 Claim shall, at the election of the Reorganized Debtors: (i) have its Allowed Class 6 Claim Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code; (ii) be paid in full in Cash in an amount equal to such Allowed Class 6 Claim; or (iii) be paid in the ordinary course as such Allowed Class 6 Claim become due. |
| Class 7: PBGC Claims<br><br>**Estimated Recovery: 4%**<br>**Estimated Amount: Unknown** | Impaired | Class 7 consists of the PBGC Claims.<br><br>Pursuant to Bankruptcy Rule 9019 and in full and final satisfaction, settlement, release, and discharge of and in exchange for the Allowed Class 7 Claims, PBGC shall receive (i) a $33 million secured note due on the thirteenth (13th) anniversary of the Effective Date that shall provide for annual amortization payments commencing in 2023 (the "PBGC Note"), provided, however, that if the Effective Date occurs within forty-five (45) days of the Petition Date, then the PBGC Note shall be due on the tenth anniversary of the Effective Date and the annual amortization payments shall commence on the one month anniversary of the Effective Date; and (ii) 3% of the Reorganized Equity (subject to dilution by the MIP Equity and the Warrant Equity). The liens on and security interests in the Reorganized Debtors' assets granted pursuant to the PBGC Note shall be junior in all respects to the liens and security interests provided for under the Exit Facilities and the New First Lien Notes. To the extent there is any modification to the above treatment of the PBGC Claim, such treatment shall be agreed upon by the Debtors and the Chatham Parties, and the Brigade Parties must also consent to such treatment (such |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | consent not to be unreasonably withheld or conditioned). |
| Class 8: General Unsecured Claims<br><br>**Estimated Recovery: 1.6%**<br>**Estimated Amount: $3 million** | Impaired | Class 8 consists of all General Unsecured Claims.<br><br>On or as soon as reasonably practicable after the Effective Date, except as otherwise provided in and subject to **Article 9.5** of the Plan, and except to the extent that a Holder of an Allowed Class 8 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class 8 Claim, each Holder of an Allowed Class 8 Claim shall receive its Pro Rata portion of either (i) 100% of the Reorganized McClatchy Warrants among those holders of Allowed General Unsecured Claims that properly exercise the Warrant Election, or (ii) Cash in the aggregate amount of $3,000,000 among those holders of Allowed General Unsecured Claims that properly exercise the Cash Election. |
| Class 9: Intercompany Claims<br><br>**Estimated Recovery: 0-100%**<br>**Estimated Amount: N/A** | Unimpaired | Class 9 consists of all Intercompany Claims.<br><br>On the Effective Date, all net Allowed Class 9 Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors and/or any Affiliates of the Debtors shall, at the election of the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Supporting Parties (not to be unreasonably withheld, conditioned, or delayed), be either (i) Reinstated, in full or in part, and treated in the ordinary course of business, or (ii) released, waived, and discharged. The treatment of the Intercompany Claims shall be effectuated in a tax efficient manner. |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| Class 10: Intercompany Interests<br><br>**Estimated Recovery: 0-100%** | Unimpaired | Class 10 consists of all Intercompany Interests.<br><br>On the Effective Date, all Class 10 Interests held by the Debtors shall be Reinstated and otherwise unaffected by the Plan, subject to the Plan Transaction Documents; provided, however, that the Ponderay Owners shall abandon their Interests in Ponderay.<br><br>To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the holders of the Reorganized Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims. Holders of Intercompany Interests shall not otherwise receive or retain any property on account of such Intercompany Interests. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date. |
| Class 11: Subordinated Claims<br><br>**Estimated Recovery: 0%**<br>**Estimated Amount: $0** | Impaired | Class 11 consists of all Claims under Bankruptcy Code sections 510(b) and (c).<br><br>Holders of Allowed Class 11 Claims shall not receive any distributions on account of such Allowed Class 11 Claims, and on the Effective Date all Allowed Class 11 Claims shall be released, waived, and discharged. |
| Class 12: Existing Parent Equity<br><br>**Estimated Recovery: 0%** | Impaired | Class 12 consists of all Existing Parent Equity. |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | Holders of Allowed Class 12 Interests shall not receive any distributions on account of such Allowed Class 12 Interests, and on the Effective Date all Allowed Class 12 Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors and the obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged. |

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS. THE DEBTORS <u>STRONGLY RECOMMEND</u> THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.

**A VOTE TO ACCEPT THE PLAN OR A DECISION TO ABSTAIN FROM VOTING ON THE PLAN CONSTITUTES YOUR CONSENT TO THE RELEASE SET FORTH IN ARTICLE X OF THE PLAN OF THE PARTIES SPECIFIED IN ARTICLE X OF THE PLAN UNLESS YOU OPT OUT OF SUCH RELEASE IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN YOUR BALLOT.**

# TABLE OF CONTENTS

ARTICLE I. INTRODUCTION ...................................................................................1
    A.     Rules of Interpretation ............................................................................2

ARTICLE II. OVERVIEW OF THE PLAN ...............................................................2
    A.     Summary of the Plan ...............................................................................2
    B.     Unclassified Claims ................................................................................3
    C.     Treatment of Claims and Interests Under the Plan .................................4
    D.     Liquidation Analysis ...............................................................................4

ARTICLE III. VOTING PROCEDURES .....................................................................5
    A.     Classes Entitled to Vote .........................................................................5
    B.     Voting Procedures ...................................................................................6

ARTICLE IV. GENERAL INFORMATION .................................................................7
    A.     Overview of the Company's Business .....................................................7
    B.     The Company's Corporate Structure .......................................................8
    C.     The Company's Board of Directors .........................................................8
    D.     Executive Officers and Senior Management of the Debtors .................11
    E.     The Debtors' Workforce .......................................................................13
    F.     Qualified Pension Plan .........................................................................13
    G.     The Company's Prepetition Capital Structure .......................................13

ARTICLE V. THE CHAPTER 11 CASES ...................................................................17
    A.     Events Leading to the Commencement of the Chapter 11 Cases .........17
    B.     Summary of Material Prepetition Legal Proceedings ...........................24
    C.     Stabilization of Operations/First Day Relief ........................................25
    D.     Schedules and Statements and Rule 2015.3 Reports ...........................27
    E.     Analyzing Executory Contracts and Unexpired Leases.........................27
    F.     Management and Key Employee Compensation Plans .........................28
    G.     Analysis and Resolution of Claims........................................................28

ARTICLE VI. PLAN SUMMARY ...............................................................................29
    A.     Overview of Chapter 11 .........................................................................29
    B.     Overall Structure of the Plan..................................................................30
    C.     Classification, Treatment, and Voting of Claims and Interests ............33
    D.     Means for Implementation of the Plan...................................................41
    E.     Unexpired Leases and Executory Contracts .........................................48
    F.     Releases and Discharge..........................................................................51
    G.     Conditions Precedent .............................................................................56
    H.     Miscellaneous Provisions.......................................................................56

ARTICLE VII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE
PLAN .........................................................................................................................58
    A.     The Confirmation Hearing .....................................................................58
    B.     Confirmation Standards ..........................................................................58

C.     Liquidation Analysis ................................................................60
D.     Financial Feasibility ...............................................................60
E.     Acceptance by Impaired Classes .............................................61
F.     Confirmation Without Acceptance by All Impaired Classes ................62

ARTICLE VIII. PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO
CONFIRMATION AND CONSUMMATION OF THE PLAN ......................................63
A.     General .................................................................................63
B.     Certain Bankruptcy Considerations ..........................................63
C.     Claims Estimations ................................................................64
D.     Risk Factors That May Affect the Value of the Securities to Be Issued
Under the Plan .....................................................................64
E.     Bankruptcy-Specific Risk Factors That Could Negatively Impact the
Debtors' Business .................................................................67
F.     Additional Risk Factors That Could Negatively Impact the Company's
Business ..............................................................................71
G.     Risks Associated with Forward-Looking Statements ......................78
H.     Disclosure Statement Disclaimer ..............................................80
I.     Liquidation Under Chapter 7 ...................................................81

ARTICLE IX. EXEMPTIONS FROM SECURITIES ACT REGISTRATION ....................82
A.     Securities Issued in Reliance on Section 1145 of the Bankruptcy Code and
Section 4(A)(2) of the Securities Act .........................................82
B.     Restricted Securities ..............................................................83

ARTICLE X. CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES ......................................................................84
A.     Certain United States Federal Income Tax Consequences to the Debtors ......85
B.     Certain United States Federal Income Tax Consequences to U.S. Holders
of Claims ............................................................................87
C.     Information Reporting and Backup Withholding ...........................95
D.     Importance of Obtaining Professional Tax Assistance ....................95

ARTICLE XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ..............................................................................96
A.     Continuation of the Bankruptcy Cases ......................................96
B.     Alternative Plans of Reorganization .........................................96
C.     Liquidation Under Chapter 7 or Chapter 11 ................................96

ARTICLE XII. RECOMMENDATION .............................................................97
A.     Hearing on and Objections to Confirmation ...............................97
B.     Recommendation .................................................................98

EXHIBITS

**Exhibit A**     Joint Chapter 11 Plan of Reorganization of The McClatchy Company and its Affiliated Debtors and Debtors in Possession
**Exhibit B**     Financial Projections
**Exhibit C**     Liquidation Analysis
**Exhibit D**     Corporate Structure Chart

**Exhibit E**     New First Lien Notes Term Sheet for Modified Terms

**Exhibit F**     Exit 1.5L Facility Term Sheet

**Exhibit G**     Identities of Key Executives and Nature of Their Compensation

# ARTICLE I.

## INTRODUCTION

The Company is a diversified digital and print media business focused on providing strong, independent local journalism to 30 communities across 14 states, as well as selected national news coverage through the Debtors' Washington D.C. based bureau.

On February 13, 2020, the Debtors filed voluntary petitions for relief under the Bankruptcy Code and commenced the Chapter 11 Cases. The Debtors' cases are pending in the Bankruptcy Court and are jointly administered under Case No. 20-10418 (MEW). No trustee has been appointed in the Chapter 11 Cases.

The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for purposes of soliciting votes to accept or reject the Plan, a copy of which is attached to the Disclosure Statement as **Exhibit A**.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operations and financial history, their reasons for seeking protection under chapter 11, and significant events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the requirements for confirmation of the Plan and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted. All capitalized terms used and not otherwise defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

FOR A DESCRIPTION OF THE PLAN AND THE VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AND INTERESTS, PLEASE SEE **ARTICLES VIII** AND **X** HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASE, AND CERTAIN FINANCIAL INFORMATION. TO THE EXTENT ANY PORTION OF THIS DISCLOSURE STATEMENT CONFLICTS WITH THE PLAN, THE PLAN SHALL GOVERN. ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES CONTAINED HEREIN ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS OR STATUTORY PROVISIONS THEY ARE SUMMARIZING. THE DEBTORS' MANAGEMENT HAS PROVIDED FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

A.     Rules of Interpretation

For purposes of this Disclosure Statement, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in the Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Disclosure Statement to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Disclosure Statement; (f) the words "herein," "hereunder," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (g) captions and headings to Articles and Sections of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) to the extent the Disclosure Statement is inconsistent with the terms of the Plan, the Plan shall control; (j) to the extent the Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control; (k) references to "shares," "shareholders," "directors," and/or "officers" shall also include "membership units," "members," "managers," or other functional equivalents, as applicable, as such terms are defined under the applicable state limited liability company or alternative comparable laws, as applicable; and (l) any immaterial effectuating provision may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan without further Final Order of the Bankruptcy Court.

The Plan and the Disclosure Statement are the product of extensive discussions and negotiations between and among the Debtors and various parties in interest, including the Chatham Parties, the Brigade Parties, and the PBGC. Each of the Debtors was represented by counsel, who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto. Accordingly, the general rule of contract construction known as "contra proferentem" shall not apply to the construction or interpretation of any provision of the Plan, the Disclosure Statement, or any contract, instrument, release, indenture, exhibit, or other agreement or document generated in connection herewith.

## ARTICLE II.

## OVERVIEW OF THE PLAN

A.     Summary of the Plan

The Plan provides for the following key economic terms and mechanics:[4]

---

[4]     Any summaries or descriptions of the Plan are qualified in their entirety by reference to the provisions of the Plan. For a more detailed description of the terms and provisions of the Plan, see **Article VI** below.

- Issuance of New First Lien Notes. On the Effective Date, Reorganized McClatchy will authorize and issue new 10.000% Senior Secured Notes due 2026 (the "**New First Lien Notes**") pursuant to the New First Lien Notes Indenture by and among Reorganized McClatchy, as issuer, the subsidiary guarantor parties thereto, and the First Lien Notes Agent, on terms substantially similar to those contained in the First Lien Notes Indenture, subject to certain modifications set forth on **Exhibit E** hereto and as may be otherwise agreed to by the Debtors and the Supporting Parties.

- Issuance of Reorganized Equity: On the Effective Date, Reorganized McClatchy will authorize and issue the Reorganized Equity. 97% of the Reorganized Equity will be distributed to holders of Second Lien/Third Lien Claims and 3% of the Reorganized Equity will be distributed to holders of PBGC Claims, each subject to dilution from the MIP Equity and the Warrant Equity.

- Cancellation of Old McClatchy Securities, Agreements, and the Second Lien Term Loan: Except as otherwise provided in the Plan, on the Effective Date, the 2027 Debentures, the 2029 Debentures, the First Lien Notes, the Third Lien Notes and the Existing Parent Equity, and all options, warrants, rights and other instruments evidencing an ownership interest in the Debtors (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing, as well as the Second Lien Term Loan and all instruments and documents relating thereto, shall be cancelled, and any obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to the foregoing, shall be released and discharged and cancelled.

- Exit Financing: On the Effective Date, the Reorganized Debtors, as borrowers, will enter into the Exit Facilities, comprising (i) a $50 million asset-based revolving credit facility (the "**Exit ABL Facility**") and (ii) a new 1.5 lien term loan facility in the aggregate principal net amount of $81 million, consisting of (a) the conversion of the Subordinated Chatham Notes Claims to term loans thereunder, and (b) $30 million of new money financing provided by certain of the Chatham Parties, or affiliates thereof, as well as an aggregate principal amount of 7.000% of original issue discount (the "**Exit 1.5L Facility**") on terms consistent with the term sheet attached hereto as **Exhibit F** and as otherwise agreed upon by the Debtors and the Supporting Parties.

- Unsecured Creditors: Unsecured Creditors will receive their Pro Rata portion of Reorganized McClatchy Warrants for up to 2.5% of the Reorganized Equity or their Pro Rata portion of Cash in the aggregate amount of $3,000,000.

B.     Unclassified Claims.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, DIP Facility Claims, Professional Claims, and Priority Tax Claims. These Claims are therefore excluded from the Classes of Claims set forth in **Article II** of the Plan. The projected percentage of recoveries provided below are projected as of February 13, 2020.

| Claim | Plan Treatment | Projected Recovery Under the Plan |
|---|---|---|
| **Administrative Claims** | Paid in full in Cash. | 100% |
| **DIP Facility Claims** | Paid in full in Cash. | 100% |
| **Professional Claims** | Paid in full in Cash. | 100% |
| **Priority Tax Claims** | Paid in full in Cash. | 100% |

C.     Treatment of Claims and Interests Under the Plan

The table below summarizes the classification, treatment, and estimated percentage recoveries of the Claims and Interests under the Plan. Estimated percentage recoveries have been calculated based upon a number of assumptions. For certain Classes of Claims, the actual percentage recovery is contingent upon a number of factors, including, but not limited to, Claims that are subject to liquidation pursuant to litigation.

| Class | Type of Claim or Equity Interest | Treatment of Claim/Interest | Estimated % Recovery Under the Plan |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | 100% |
| 2 | Other Secured Claims | Unimpaired | 100% |
| 3 | ABL Credit Facility Claims | Unimpaired | 100% |
| 4 | First Lien Notes Claims | Impaired | 100% |
| 5 | Second Lien/Third Lien Claims | Impaired | Unknown |
| 6 | Go-Forward Trade Claims | Unimpaired | 100% |
| 7 | PBGC Claims | Impaired | 4% |
| 8 | General Unsecured Claims | Impaired | 1.6% |
| 9 | Intercompany Claims | Unimpaired | 0-100% |
| 10 | Intercompany Interests | Unimpaired | 0-100% |
| 11 | Subordinated Claims | Impaired | 0% |
| 12 | Existing Parent Equity | Impaired | 0% |

D.     Liquidation Analysis

The Debtors have prepared a liquidation analysis, attached hereto as **Exhibit C** (the "**Liquidation Analysis**") to assist Holders of Claims and Interests in evaluating the Plan. The Liquidation Analysis compares the creditor recoveries to be realized if the Debtors were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code with the distributions to Holders of Allowed Claims and Interests under the Plan. The analysis is based upon the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the analysis is subject to potentially material changes including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided in the Liquidation Analysis.

The Debtors believe that the Plan provides the same or a greater recovery for Holders of Allowed Claims and Interests as would be achieved in a liquidation pursuant to chapter 7 of the Bankruptcy Code because of, among other things, the additional Administrative Claims generated by conversion to a chapter 7 case, the administrative costs of liquidation and associated delays in

connection with a chapter 7 liquidation, the negative impact on the market for the Debtors' assets caused by attempting to sell a large number of assets in a short time frame, and the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets, each of which likely would diminish the value of the Debtors' assets available for distributions.

## ARTICLE III.

## VOTING PROCEDURES

The following Classes are the only Classes entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| **4** | **First Lien Notes Claims** | Impaired |
| **5** | **Second Lien/Third Lien Claims** | Impaired |
| **7** | **PBGC Claims** | Impaired |

If your Claim or Interest is not included in any of these Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below).

A.  <u>Classes Entitled to Vote</u>

Under the Bankruptcy Code, acceptance of a plan of reorganization by a Class of Claims is determined by calculating the number and the amount of Claims voting to accept, based on the actual total Allowed Claims voting on the Plan. Acceptance by a Class requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan. In addition, under the Bankruptcy Code, creditors are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no distribution of property under the Plan. The following table sets forth which Classes of Claims will or will not be entitled to vote on the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | ABL Credit Facility Claims | Unimpaired | Presumed to Accept |
| 4 | First Lien Notes Claims | Impaired | Entitled to Vote |
| 5 | Second Lien/Third Lien Claims | Impaired | Entitled to Vote |
| 6 | Go-Forward Trade Claims | Unimpaired | Presumed to Accept |
| 7 | PBGC Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 10 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 11 | Subordinated Claims | Impaired | Deemed to Reject |
| 12 | Existing Parent Equity | Impaired | Deemed to Reject |

B.    Voting Procedures

The Debtors retained Kurtzman Carson Consultants LLC ("**KCC**") to, among other things, act as Claims and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

The Voting Record Date (as defined in the Solicitation Motion)[5] is **February 10, 2020**. The Voting Record Date is the date for determining (1) which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the Solicitation Procedures (as defined in the Solicitation Motion) and (2) whether Claims have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the Holder of a Claim. The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan. In order for the Holder of a Claim in the Voting Classes to have such Holder's Ballot (as defined in the Solicitation Motion) counted as a vote to accept or reject the Plan, such Holder's Ballot or Master Ballot (as defined in the Solicitation Motion), as applicable, must be properly completed, executed, and delivered in accordance with the instructions included in the Ballot by: (1) first class mail; (2) courier; (3) personal delivery; or (4) email so that such Holder's Ballot or Master Ballot, as applicable, is **actually received** by the Claims and Solicitation Agent prior to **4:00 p.m. prevailing Eastern Time on February 24, 2020** (the "**Voting Deadline**"). It is important that the Holder of a Claim in the Voting Classes follow the specific instructions provided on such Holder's Ballot and the accompanying instructions.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.[6]

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A

---

[5]    As used herein, the "**Solicitation Motion**" refers to the Debtors' Motion for Entry of an Order (A) Approving the Adequacy of the Debtors' Disclosure Statement; (B) Approving Solicitation and Notice Procedures With Respect to Confirmation of the Debtors' Proposed Plan of Reorganization; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto, filed substantially concurrently with this Disclosure Statement.

[6]    Holders who return Ballots that do not indicate a vote to accept or reject the Plan may still opt-out of the third party release provisions set forth in the Plan.

CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST.

IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT, AS APPROPRIATE, WHEN SUBMITTING A VOTE.

IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE DISCLOSURE STATEMENT, THE PLAN, OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND SOLICITATION AGENT, KCC, AT 866-810-6898, WITHIN THE UNITED STATES OR CANADA, OR 424-236-7215, OUTSIDE OF THE UNITED STATES OR CANADA, OR AT http://www.kccllc.net/McClatchy.

## ARTICLE IV.

## GENERAL INFORMATION

A.    Overview of the Company's Business

McClatchy is a 163-year-old family-controlled public company that provides independent local journalism to 30 communities in 14 states through its local newspapers, including well-respected publications such as the *Miami Herald*, *The Kansas City Star*, *The Sacramento Bee*, *The Charlotte Observer*, *The* (Raleigh) *News & Observer*, and the (Fort Worth) *Star-Telegram*, as well as national news coverage through its Washington, D.C. bureau.  McClatchy also provides a full suite of digital marketing services, through its local sales teams and excelerate®, its full-service national digital marketing agency that provides digital marketing tools designed to customize digital marketing plans for its customers.

McClatchy's media companies and excelerate® distribute content, including video products, through its owned and operated websites and mobile applications, third-party search and ad exchanges, social media platforms, electronic editions of its daily newspapers (or "e-editions"), as well as its printed daily newspapers. McClatchy also prints selected niche publications and community newspapers and offers other print and digital direct marketing services.  Its media companies range from large daily newspapers and news websites serving metropolitan areas to non‑daily newspapers with news websites and online platforms serving small communities.  For the full year ended December 29, 2019, McClatchy had an average aggregate paid daily circulation of 1.1 million and a Sunday print circulation of 1.5 million, in addition to 55.7 million average monthly unique visitors to its online platforms, 3.4 billion page views of its digital product— reflecting a 114% increase of digital-only subscribers between Q4 2017 and Q4 2019, a 10% sequential increase in digital-only subscribers for the 15th consecutive quarter of growth, and an 18% increase at the end of Q4 2019 as compared to Q4 2018.

To strengthen its position as a leading local media company and to address the headwinds facing the journalism industry, including consolidation pressure, decreased circulation and audience revenues, and competition from digital products, McClatchy – with notable acceleration under a new leadership team appointed in the past three years – has focused on expanding its digital

businesses and transitioning into a digitally focused, digitally driven media company. To that end, McClatchy has implemented a business strategy aimed at growing digital subscriptions and broadening its digital audiences, as well as expanding its full-service digital agency, excelerate®, to provide customized digital marketing plans for its customers.

McClatchy is headquartered in Sacramento, California, and its businesses include four operating regions (which are roughly divided between those media companies operated west of the Mississippi River and those operated east of it).

B.      The Company's Corporate Structure

The McClatchy Company is the direct or indirect parent company of each of the Debtors, which are all incorporated in the United States. A corporate organization chart of the Debtors and certain non-Debtor affiliates is attached hereto as **Exhibit D.**

The Company's financial reporting for MNI (on a consolidated basis) and for each of the Company's segments is provided in the Company's annual and quarterly reports. The Company's annual and quarterly reports, along with its proxy statements, for the last five (5) years are available at the Company's website at http://investors.mcclatchy.com/investor-overview.

C.      The Company's Board of Directors

The following persons comprise the board of directors of McClatchy (the "**Board of Directors**"):

| Name | Position |
|---|---|
| Kevin S. McClatchy | Director, Chairman of the Board |
| Elizabeth Ballantine | Director |
| Leroy Barnes, Jr. | Director |
| Molly Maloney Evangelisti | Director |
| Craig I. Forman | Director |
| Anjali Joshi | Director |
| Brown McClatchy Maloney | Director |
| William McClatchy | Director |
| Theodore R. Mitchell | Director |
| Clyde W. Ostler | Director |
| Maria Thomas | Director |

Kevin S. McClatchy,[*] 56, has been a director of McClatchy since September 1998, and non-executive Chairman of the Board since May 2012. From 1996 to 2007, he was the managing general partner and chief executive officer of the Pittsburgh Pirates Major League Baseball team. From 1994 to 1995, he was president of the Northern California Sports Development Group and The Modesto A's, a minor league baseball team. Mr. McClatchy held various positions with McClatchy from 1990 to 1994, including serving as sales director for The Newspaper Network, Inc., advertising director at the Amador Ledger Dispatch and sales representative for The Sacramento Bee.

Elizabeth Ballantine, 70, has been a director of McClatchy since March 1998. Prior to joining the Board of Directors, Ms. Ballantine was a director of Cowles Media Company, a position she had held since 1993. Since 1999, Ms. Ballantine has been president of EBA Associates, a consulting firm. From 1993 to 1999, she was an attorney in the Washington, D.C. law firm of Dickstein, Shapiro, Morin and Oshinsky LLP. From 1990 until 1993, she worked as a private consultant advising clients on international business investments. Ms. Ballantine is a life trustee of Grinnell College in Iowa and was chair of the Governing Board of the National Cathedral School in Washington, D.C. Since December 2004, Ms. Ballantine has been a director of the mutual funds of the Principal Financial Group of Des Moines, Iowa. She also serves on the board of directors of Durango Herald, Inc. of Durango, Colorado.

Leroy Barnes, Jr., 67, has been a director of McClatchy since September 2000. Mr. Barnes is the retired vice president and treasurer of PG&E Corporation, a position he held from 2001 to 2005. From 1997 to 2001, Mr. Barnes was vice president and treasurer of Gap, Inc. Prior to that, Mr. Barnes held various executive positions with Pacific Telesis Group/SBC Communications. Earlier in his career, Mr. Barnes was a consultant at Touche Ross & Co., a predecessor of Deloitte & Touche LLP. Mr. Barnes is also a member of the boards of directors of Frontier Communications, Inc. since May 2005, and Principal Funds, Inc. and Principal Variable Contracts, Inc., each since March 2012. He has also been a trustee of Principal ETF, Inc. since December 2014. Mr. Barnes had also served as a member of the board of directors of Herbalife, Ltd. from December 2004 to February 2015.

Molly Maloney Evangelisti,[*] 66, has been a director of McClatchy since July 1995. She worked in various capacities for The Sacramento Bee from October 1978 to December 1996, including the oversight of special projects.

Craig I. Forman, 58, has been President and Chief Executive Officer of McClatchy since January 2017 and a director of McClatchy since July 2013. In addition to private board roles in Silicon Valley consumer technology businesses, Mr. Forman's other public board roles include Canada's Yellow Media (T:YLO), where he chairs the governance committee, is a member of the Compensation Committee, and where he played a key role in the company's successful 2012 capital restructuring. Previously, he also served on the boards of mobile advertising platform leader Digital Turbine (Nasdaq: APPS), which he joined when it purchased venture backed-Appia Inc., which Mr. Forman chaired. He also chaired WHERE, another venture-backed mobile technology company, which exited to eBay/PayPal. Mr. Forman's career is at the intersection of consumer markets and TMT, and includes IPO, Mergers and Acquisitions, Divestiture, Restructuring and Transformation experience. Prior to McClatchy, as executive vice president and president of EarthLink's Access and Audience division and chief product officer, Mr. Forman drove more than $1.2 billion in annual revenue. Mr. Forman joined EarthLink from Yahoo, where he headed its Media and Information division. Mr. Forman's responsibilities included most of the internet portal's leading properties including Yahoo! News, Yahoo Finance, Yahoo Sports, as well as its Health, Weather, Education, Kids, and other news and information businesses. Mr. Forman led a technology-driven content strategy that kept these properties as No. 1 in their categories despite external challenges from such competitors as Google, Microsoft and major media companies. Earlier, Mr. Forman served as a senior operating executive at Time Warner's CNN Group and Time Inc. divisions, and at The Wall Street Journal/Dow Jones. He also was a member of the management team that took early search-engine Infoseek public. Mr. Forman has a master's degree

in law from Yale, and undergraduate degree in public affairs from Princeton, and is an alumnus of corporate-board training programs at Stanford and Harvard business schools.

Anjali Joshi, 58, has been a director of McClatchy since July 31, 2017. Ms. Joshi is currently Vice President for Product Management at Google, Inc., and has held various positions there since 2006, including Search and News. Prior to joining Google, Ms. Joshi served as Executive Vice President of Engineering for Covad Communications, Inc. from 1998 to 2003. Ms. Joshi also held positions at AT&T Bell Labs working in the areas of voice and high-speed data from 1990 to 1998.

Brown McClatchy Maloney,[*] 63, has been a director of McClatchy since September 2004. Mr. Maloney is the owner of Radio Pacific and the operator of KONP radio, an ABC affiliate, and two additional radio stations in western Washington State. Mr. Maloney is also the owner of Olympic View Properties and Cedar Ridge Properties, both Washington state real estate companies. In addition, Mr. Maloney serves as a member of the board of directors of The Seattle Times Company. From 1988 through November 2011, he was the owner of Olympic View Publishing, a weekly newspaper company in Washington State. From 1974 to 1987, prior to his ownership of Olympic View Publishing and Radio Pacific, Mr. Maloney held various circulation and advertising positions at the *Anchorage Daily News*, *The Sacramento Bee* and *The Fresno Bee*. He served as the president of the Washington Newspaper Publishers Association from 1996 to 1997 and is the former president of the Washington Newspaper Publishers Association Foundation.

William McClatchy,[*] 57, has been a director of McClatchy since September 2004. Mr. McClatchy is an entrepreneur, journalist and currently a real estate investor. He formerly managed Index Investing's ETFzone.com, a website supplying content concerning exchange-traded index funds. In 1999, Mr. McClatchy co-founded indexfunds.com, a website for index investing content. From 1987 through 1991, Mr. McClatchy served in a variety of editorial positions for computer magazines, including staff writer at *PC Week* and *MAC Week*, and microcomputing editor at *Information* Week. From 1993 to 1996, Mr. McClatchy worked as a reporter for *The Fresno Bee*.

Theodore R. Mitchell, 63, assumed the Presidency of the American Council on Education on September 1, 2017. Prior to that he was the Under Secretary of the United States Department of Education from May 2014 until January 2017, responsible for all post-secondary and adult education policy programs as well as the $1.3 trillion Federal Student Aid Portfolio. Prior to his federal service, Dr. Mitchell served for ten years as CEO of the NewSchools Venture Fund, a national investor in education technology from September 2005 to May 2014. He served, as well, as President of the California State Board of Education, President of Occidental College, and in a variety of leadership roles at UCLA, including Vice Chancellor. Dr. Mitchell was deputy to the President and to the Provost at Stanford University and began his career as a professor at Dartmouth College where he also served as Chair of the Department of Education. Dr. Mitchell served as a McClatchy Director from September 2001 until May 2014. Dr. Mitchell was re-elected to the Board of McClatchy in May 2017. Dr. Mitchell has also been serving on the board of overseers of TIAA, a major financial services company, since December 2018.

Clyde W. Ostler, 72, has been a director of McClatchy since May 2013. In March 2011, Mr. Ostler retired from Wells Fargo and Company as a Group Executive Vice President, Vice Chairman of Wells Fargo Bank California and President of Wells Fargo Family Wealth. During his 40-year tenure with Wells Fargo, Mr. Ostler served in a number of capacities including Vice Chairman in the Office of the President, Chief Financial Officer, Chief Auditor, Head of Retail Branch Banking, Head of Information Technology, Head of Institutional and Personal Investments and Head of Internet Service. Mr. Ostler was a member of Wells Fargo's management committee for over 25 years. He has served on a number of for-profit and not-for-profit boards. He is currently a member of the board of directors and chair of the Audit Committee of EXLService Holdings, Inc., a position he has held since December 2007. From May 2002 to November 2006, Mr. Ostler served on the board of directors of Mercury Interactive Corporation and from November 1999 to November 2004, was a member of the board of directors of BARRA, Inc. Mr. Ostler is currently on the Scripps Institution of Oceanography Directors' Advisory Council.

Maria Thomas, 55, has been a director of McClatchy since August 2016. Since 2017 Ms. Thomas has been an angel investor and founder of Axios Ventures, LLC. Prior to that, in 2016, Ms. Thomas served as the interim CEO and strategic advisor to Glamsquad, a NYC-based startup offering beauty services on demand. From February 2013 to August 2015, Ms. Thomas served as Chief Marketing and Consumer Officer for SmartThings, a pioneer in the consumer Internet of Things arena. She helped SmartThings navigate its two year journey from launch on Kickstarter to a $200 million sale to Samsung. From 2008 to 2010, Ms. Thomas was the first non-founder CEO at Etsy, where under her leadership, Etsy became a trusted global brand with seven million customers and a trusted e-commerce platform serving hundreds of thousands of sellers with gross merchandise sales of more than $300 million. From 2001 to 2008, she was SVP and GM of NPR Digital. She was a driving force behind NPR's successful transformation from a radio-only company to a best-in-class, multimedia enterprise. Ms. Thomas started her career on Wall Street as a financial analyst and spent seven years with World Bank Group as an Investment Officer with the International Finance Corporation, the World Bank's private sector arm.

D.    Executive Officers and Senior Management of the Debtors

The executive officers and senior management team of the Debtors is composed of highly capable professionals with substantial experience. The Debtors' executive officers and management team consists of the following individuals:

| Name | Position |
| --- | --- |
| Craig I. Forman | President and Chief Executive Officer |
| Elaine Lintecum | Vice President of Finance, Chief Financial Officer and Treasurer |
| Scott Manuel | Vice President, Customer and Product |
| Billie S. McConkey | Vice President of People, General Counsel and Corporate Secretary |
| Kristin Roberts | Vice President of News |
| Peter Farr | Corporate Controller and Chief Accounting Officer |

Please refer to **Article IV.C** above for Mr. Forman's biography.

Elaine Lintecum, 64, has been Vice President of Finance, Chief Financial Officer and Treasurer of McClatchy since May 2012. Ms. Lintecum joined McClatchy in 1988 as the corporate analyst responsible for external financial reporting and for SEC compliance. She was promoted to investor relations manager in 1993, was named assistant treasurer and director of treasury services in 2000 and became Treasurer in 2002. Prior to joining McClatchy, Ms. Lintecum worked for Deloitte, Haskins & Sells, a predecessor of Deloitte & Touche LLP, as a certified public accountant. Ms. Lintecum also served on the Board of Directors of the Seattle Times Company and The Ponderay Newsprint Company until 2020, and currently serves on the Board of Directors of the River City Bank. Ms. Lintecum expects to step down as Vice President of Finance, Chief Financial Officer and Treasurer of McClatchy on or about March 31, 2020.

Scott Manuel, 44, has been Vice President, Customer and Product since October 9, 2017. Prior to joining McClatchy, Mr. Manuel held various positions beginning in 2010 at Thomson Reuters, which included Vice President, Technology Strategy & Architecture – Healthcare, Intellectual Property & Science, Vice President, Global Data Center Operations and his last position was Vice President, Head of Strategic Product Management & Delivery - Applied Innovation.

Billie S. McConkey, 49, is McClatchy's Vice President of People, General Counsel and Corporate Secretary, roles she has held since 2015. Ms. McConkey worked with McClatchy as special employment counsel from 2006 until March 2015. Previously, from 2000 to 2006, Ms. McConkey was special labor counsel for Knight Ridder, Inc. and from 1998 to 2000, Ms. McConkey was vice president, labor and employment counsel for Central Newspapers, Inc. Ms. McConkey was also an associate at the law firms, Brown & Bain P.A. (a predecessor of Perkins Coie LLP) and Bryan Cave LLP from 1995 to 1998.

Kristin Roberts, 44, has been McClatchy's Vice President of News since May 2019. Ms. Roberts leads 30 newsrooms focused on delivering local news and information that is essential to the lives of readers and viewers in communities across the U.S. Before her appointment to this top position, Ms. Roberts was executive editor for politics and regional editor for its East Region newsrooms, including the *Miami Herald*, *el Nuevo Herald*, *Lexington Herald Leader* and the McClatchy Washington Bureau, among others. Prior to joining McClatchy in 2017, Ms. Roberts served as National Editor at POLITICO where she guided coverage of the 2016 presidential race to produce in-depth reporting on the candidates and their campaigns that broke news and consistently led the field. Ms. Roberts began her career at Reuters, spending 13 years covering everything from Wall Street and economics in New York and Miami to defense and foreign policy in Washington before moving into newsroom leadership.

Peter Farr, 55, is to be appointed Vice President, Finance and Chief Financial Officer at the end of March 2020 with responsibility for all of McClatchy's financial operations. Mr. Farr joined McClatchy in 2018 and has served as the Corporate Controller and Chief Accounting Officer. Prior to joining McClatchy, Mr. Farr was Director of Accounting at The Boeing Company. During his 10-year career at Boeing he held various executive-level roles in finance and accounting. Previously, Mr. Farr was Assistant Vice President in Accounting Policy at Allianz SE in Munich, Germany. Mr. Farr has also worked as a certified public accountant for Deloitte &

Touche LLP and KPMG LLP and holds CPA licenses in the states of Montana and Washington. He also served as a captain in the United States Marine Corps.

E.     The Debtors' Workforce

As of the Petition Date, the Debtors employed approximately 2,900 full and part-time employees in 37 corporate offices throughout the United States. Approximately 1,300 of these employees are salaried employees, with the remainder being paid on an hourly basis. This includes approximately 240 unionized employees.

F.     Qualified Pension Plan

The Debtors also maintain The McClatchy Company Retirement Plan, a company-sponsored single employer pension plan (the "**Pension Plan**"). The Pension Plan is a noncontributory defined benefit pension plan covering approximately 24,000 current and former employees, and their beneficiaries, of certain Debtors. The Pension Plan was frozen as of March 31, 2009; however, pension obligations continue to exist for past service performed by certain Employees and former Employees. The Debtors are required to make minimum funding contributions to the Pension Plan on account of these legacy liabilities on a quarterly basis under the Internal Revenue Code sections 412 and 430 (the "**Quarterly Contributions**"). The last Quarterly Contribution was made on October 15, 2019.

The Pension Plan is covered by the Pension Benefit Guaranty Corporation ("**PBGC**"), a wholly owned United States government corporation established under 29 U.S.C. § 1302 to administer the pension termination insurance program created under Title IV of the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1301–1461.67. As described below, through the Plan, the Debtors are seeking a distress termination of the Pension Plan, which would result in PBGC becoming the trustee of the Pension Plan, assuming the Pension Plan assets and liabilities, and paying benefit under the Pension Plan, subject to certain statutory guarantee limits. The Debtors believe, under current regulations, such a solution would not have an adverse impact on qualified pension benefits for substantially all of their retirees.

G.     The Company's Prepetition Capital Structure

The Debtors' prepetition capital structure consisted of the following:

| Debt | |
|------|------|
| ABL Facility | — |
| First Lien Notes | $262.9 million |
| Second Lien Term Loan | $157.1 million |
| Third Lien Notes | $268.4 million |
| Debentures | $14.9 million |

| Debt | |
| --- | --- |
| **Equity** | |
| The McClatchy Company Class A Common Stock | 5,502,435 shares[7] |
| The McClatchy Company Class B Common Stock | 2,428,191 shares[8] |

Prior to the Petition Date, The McClatchy Company had approximately $703.3 million of outstanding debt on a consolidated basis, consisting of the following: no amounts outstanding under an asset-based revolving credit facility; $262.9 million of first lien notes due 2026; $157.1 million under Junior Lien Term Loan Credit Agreement dated as of July 16, 2018; $268.4 million of third lien notes due 2031; and $14.9 million of debentures.[9]

As of the Petition Date, certain of the Debtors (the "**Debtor Secured Claims Parties**") are obligated as borrowers, issuers, or guarantors on the Debtors' secured indebtedness, which consists of the ABL Facility, the First Lien Notes, the Second Lien Tern Loan Facility, and the Third Lien Notes (each as defined below, and collectively, the "**Secured Claims**"). Each of the Secured Claims is secured by a lien on and security interest in substantially all of the Debtor Secured Claims Parties' assets. The Debtors' principal debt obligations, as of the Petition Date, were as follows:

      1.    ABL Facility

The McClatchy Company and certain other Debtors are parties to that certain Credit Agreement dated as of July 16, 2018 (the "**ABL Credit Agreement**") by and among The McClatchy Company as parent, the borrowers thereto, the lenders thereto (the "**ABL Lenders**"), and Wells Fargo Bank, National Association, in its capacity as agent (the "**ABL Agent**"). The ABL Credit Agreement provides for up to $65.0 million secured asset-backed revolving credit facility (the "**ABL Facility**") with a letter of credit subfacility and a swing line subfacility. In addition, the ABL Credit Agreement provides for a $35.0 million cash secured letter of credit facility ("**LOC Facility**"). The commitments under the ABL Credit Agreement expire July 16, 2023. The Company's obligations under the ABL Credit Agreement are guaranteed by The McClatchy Company and by Debtor subsidiaries.

As of the Petition Date, the Company had no amounts outstanding under the ABL Facility and had $26.65 million standby letters of credit secured under the LOC Facility. The Company has been required to provide cash collateral equal to 100% of the aggregate undrawn stated amount of each outstanding letter of credit.

---

[7]    This number represents the total number of shares of class A common stock in The McClatchy Company outstanding as of November 8, 2019.

[8]    This number represents the total number of shares of class B common stock in The McClatchy Company outstanding as of November 8, 2019.

[9]    More information regarding the Company's financials, including financial reporting for MNI on a consolidated basis and for each of the Company's segments, is provided in the Company's annual and quarterly reports.

2. First Lien Notes

The Company entered into that certain Indenture dated as of July 16, 2018 (the "**First Lien Notes Indenture**") by and among the Company, subsidiaries of the Company party thereto as guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent, pursuant to which the Company issued $310,000,000 aggregate principal amount of 9.000% Senior Secured Notes due 2026 (the "**First Lien Notes**").

The First Lien Notes mature on July 15, 2026, and bear interest at a rate of 9.000% per annum. Interest on the First Lien Notes is payable semi-annually on January 15 and July 15 of each year, commencing on January 15, 2019.

As of the Petition Date, the First Lien Notes had an outstanding principal balance of approximately $262.9 million.

3. Second Lien Term Loan

The Company is party to that certain Junior Lien Term Loan Credit Agreement dated as of July 16, 2018 (the "**Second Lien Term Loan Agreement**") by and among the Company, the guarantors party thereto, the lenders party thereto and The Bank of New York Mellon, as administrative agent and collateral agent. The Second Lien Term Loan Agreement provides for a $157.1 million secured term loan that matures on July 15, 2030 (the "**Tranche A Second Lien Term Loans**") and a $193.5 million term loan that matures on July 15, 2031 (the "**Tranche B Second Lien Term Loans**"). The Company's obligations under the Second Lien Term Loan Agreement are guaranteed by the Company's subsidiaries that guarantee the First Lien Notes as set forth in the Second Lien Term Loan Agreement.

The Second Lien Term Loan bears interest at a rate per annum equal to 7.795%. Interest on the loan is payable semi-annually in arrears on January 15 and July 15 of each year, and commenced on January 15, 2019.

As of the Petition Date, the Company had approximately $157.1 million outstanding under the Second Lien Term Loan.

4. Third Lien Notes

The Company is party to that certain Indenture dated as of December 18, 2018 (the "**Third Lien Notes Indenture**") by and among the Company, subsidiaries of the Company party thereto as guarantors and The Bank of New York Mellon, as trustee and collateral agent, pursuant to which the Company issued $193,466,000 aggregate principal amount of 6.875% Senior Secured Junior Lien Notes due 2031 (the "**Third Lien Notes**"). The Notes were issued to affiliates of the Chatham Parties in exchange for an equal principal amount of Tranche B Second Lien Term Loan under the Second Lien Term Loan Agreement, as described above. The Notes are of substantially similar character as the Tranche B Second Lien Term Loan. As a result of this transaction, the Tranche B Second Lien Term Loan was fully extinguished.

In March 2019, The McClatchy Company issued $75.0 million aggregate principal amount of additional Third Lien Notes. Pursuant to the terms of the Second Lien Term Loan Agreement, affiliates of the Chatham Parties were permitted to elect to convert up to $75.0 million in aggregate principal amount of the unsecured 6.875% debentures due in 2029 (the "**2029 Debentures**") owned by them into an equal principal amount of Tranche B Second Lien Term Loans or notes with terms substantially similar to the Tranche B Second Lien Term Loans upon written notice to the Company. The Chatham Parties made such election, and on December 18, 2018, the Company issued to affiliates of the Chatham Parties $193,466,000 aggregate principal amount of Third Lien Notes in exchange for an equal principal amount of the Tranche B Second Lien Term Loan.

The Third Lien Notes mature on July 15, 2031, and bear interest at a rate of 6.875% per annum. Interest on the Third Lien Notes is payable semi-annually in arrears on January 15 and July 15 of each year and commenced on January 15, 2019.

As of the Petition Date, the Third Lien Notes had an outstanding principal balance of approximately $268.4 million.

5.     Unsecured Debentures

The McClatchy Company entered into that certain Fourth Supplemental Indenture dated as of June 27, 2006 (the "**Fourth Supplemental Indenture**") by and among Knight-Ridder, the Company, JPMorgan Chase Bank, N.A., as Trustee (the "**1997 Trustee**"), and The Bank of New York Trust Company, N.A., as Series Trustee (the "**Series Trustee**"), to supplement that certain Indenture dated as of November 4, 1997 by and between Knight-Ridder and the 1997 Trustee, as supplemented by the First Supplemental Indenture dated as of June 1, 2001 by and among Knight-Ridder, the 1997 Trustee and the Series Trustee, the Second Supplemental Indenture dated as of November 1, 2004 by and among Knight-Ridder, the 1997 Trustee and the Series Trustee, and the Third Supplemental Indenture dated as of August 16, 2005 by and among Knight-Ridder, the 1997 Trustee and the Series Trustee (such Indenture, as so supplemented, the "**1997 Indenture**").

Pursuant to the terms of the Fourth Supplemental Indenture, The McClatchy Company assumed the obligations of Knight-Ridder under the 1997 Indenture and the securities issued pursuant to the 1997 Indenture, including the obligation to pay the principal of (and premium, if any) and interest on the securities issued pursuant to the 1997 Indenture. Pursuant to the 1997 Indenture, Knight-Ridder issued, among other securities, the (i) debentures due on November 1, 2027, bearing interest at 7.15% in the aggregate principal amount of $100 million, with interest payable semi-annually, and (ii) Debentures due on March 15, 2029, bearing interest at 6.875% in the aggregate principal amount of $300 million, with interest payable semi-annually.

As of the Petition Date, the Debtors has outstanding $14.9 million of unsecured debenture claims.

6.     The McClatchy Company Common Stock

As of February 11, 2020, there were 5,507,220 shares of The McClatchy Company's Class A Common Stock outstanding and 2,428,191 shares of The McClatchy Company's Class B common stock outstanding.

The Class A Common Stock is listed in the NYSE American under the symbol MNI.  On September 9, 2019, the Company received written notification from NYSE American indicating that it was not in compliance with certain listing standards.  The Company had approximately 18 months from the receipt of the notice to become compliant under a plan that is subject to approval by NYSE American.  The Company submitted a plan to NYSE American on October 9, 2019, advising it planned to regain compliance with the continued listing standards by March 9, 2021.  NYSE American accepted McClatchy's plan, conditioned on continuous reporting to the NYSE.  On February 12, 2020 the closing price of McClatchy's Class A Common Stock was $0.75 per share.

The Class B Common Stock is not publicly traded.  Class B Common Stock is convertible at the option of the holder into Class A Common Stock on a share-for-share basis.  The holders of shares of Class B Common Stock are parties to an agreement, the intent of which is to preserve control of the Company by the McClatchy family.  Under the terms of the agreement, the Class B shareholders have agreed to restrict the transfer of any shares of Class B Common Stock to one or more "Permitted Transferees," subject to certain exceptions.  A "Permitted Transferee" is any of our current holders of shares of Class B Common Stock; any lineal descendant of Charles K. McClatchy (1858 to 1936); or a trust for the exclusive benefit of, or in which all of the remainder beneficial interests are owned by, one or more lineal descendants of Charles K. McClatchy. Generally, Class B shares can be converted into shares of Class A Common Stock and then transferred freely (unless, following conversion, the outstanding shares of Class B Common Stock would constitute less than 25% of the total number of all our outstanding shares of common stock).

Both classes of stock participate equally in dividends.  Holders of Class B are entitled to one vote per share and to elect as a class 75% of the Board of Directors, rounded down to the nearest whole number.  Holders of Class A Common Stock are entitled to one-tenth of a vote per share and to elect as a class 25% of the Board of Directors, rounded up to the nearest whole number.

The Company has certain reporting requirements due to its status as a public company. In addition, the Company has independent reporting requirements under the ABL Credit Agreement and Second Lien Term Loan Agreement. The Company's annual and quarterly reports, along with its proxy statements, from the last five (5) years are available at the Company's website at http://investors.mcclatchy.com/investor-overview.

## ARTICLE V.

## THE CHAPTER 11 CASES

The following is a general summary of the Chapter 11 Cases, including certain events preceding the Chapter 11 Cases and the Debtors' restructuring initiatives implemented since the Petition Date.

A. Events Leading to the Commencement of the Chapter 11 Cases
   1. The News Industry Headwinds and the Digital Transformation

The company purchased Knight-Ridder, Inc. in 2006, adding 20 newspapers to its portfolio and, in so doing, taking on $5.0 billion in debt to consummate the transaction.  The company had

an investment grade rating from both Moody's Investor Services and Standard & Poor's at the time of the acquisition. Similarly, the debt to finance the transaction was rated investment grade by both such credit rating agencies. The Great Recession (commencing in 2007) and the impact of internet journalism and alternative digital advertising sources has undermined the revenue model of the entire news industry. Between 2006 and 2018, McClatchy's advertising revenues fell by 80%. Local news outlets in particular were hard hit, as the internet and entry of new digital advertising platforms forced major disruptions in the traditional print advertising industry (e.g., news and advertising no longer being distributed and sold according to geographic location). In addition, paid print circulation volume and print audience have steadily decreased over the same period; between 2006 and 2018, total daily print circulation fell by 58.6%. This decline in daily circulation and associated revenues is reflective of the fragmentation of audiences faced by all media companies. McClatchy has responded to these trends by exploring synergies through purchases or sales, implementing a business plan that focuses on a shift to digital news circulation and subscriptions, digital advertising, and strategically implementing cost-cutting initiatives.

In response to the industry-wide economic pressures, newspaper and media companies have seen a tremendous amount of consolidation in the industry. Likewise, McClatchy has considered several transactions that would benefit from economies of scale and synergies. In the past year, McClatchy reached agreement on the terms of two separate strategic transactions that would have delivered the business; however, on both occasions, McClatchy was unable to come to agreeable terms on financing, leaving the transactions unexecutable.

At the same time, management has been highly focused on pursuing the Company's digital transformation, anchored in independent community journalism. Over the past two years, McClatchy has accelerated the pace and cadence of its transformation to such a digital media company.

Specifically, the McClatchy Company has:

1.      increased digital-only subscribers to 219,806, up 114% between Q4 2017 and Q4 2019;

2.      grew digital-only subscribers by 10% sequentially from Q3 2019, making Q4 2019 the 15th consecutive quarter of growth in digital-only subscribers, which is a key area for gauging the success of McClatchy's digital transformation;

3.      achieved an improving trend in adjusted EBITDA over the first three consecutive quarters of 2019; and

4.      increased total digital users to approximately 535,265 at the end of the fourth quarter of 2019, up 18% from a year earlier.

McClatchy continues to pursue new digital products and offerings. For example, McClatchy continues to expand its concept of comprehensive digital marketing solutions for local businesses via excelerate,® which offers advertisers integrated packages including website customization, search engine marketing and optimization, social media presence and marketing services, and other multi-platform advertising opportunities, and expand the footprint of excelerate® to markets beyond those served by McClatchy's media companies.

McClatchy has also continued to expand revenues from digital products in other ways. For example, McClatchy's real-time, programmatic buying and selling of digital advertising inventory – often targeting very specific audiences at very specific times – grew approximately 12.4% in 2018 compared to 2017. Video revenue increased 47.5% in 2018 compared to 2017, due to McClatchy's focus on the use of video in its digital products to enhance the content that McClatchy brings to readers and viewers, and also to compete for a growing advertising stream.

McClatchy has diversified and will continue to grow ways in which the digital subscribers are acquired. For instance, some of the Company's growth is driven by a new sports only subscription product branded as SportsPass™, which was launched in 11 of McClatchy's markets during 2018, and in May 2018, McClatchy partnered with Google to offer a way for readers to purchase a subscription to each of McClatchy's digital brands, branded as "Subscribe with Google."

Lastly, McClatchy has been and will continue to outsource production and printing facilities and has moved its content online as is evident from its digital subscription growth. As of September 2019, all but seven of its newspapers are printed by third party or sister newspapers and as a result, the Company cut its newsprint and printing costs by 16.4% for 2019. McClatchy plans to further explore ways to efficiently reduce and consolidate costs related to production and printing and expects a further reduction of newsprint costs in 2020.

McClatchy continues to improve its technology to know the Company's customers better, to identify areas of interest that allows McClatchy to target and retarget potential subscribers and to provide new products to all subscribers.

Because of the success of the strategies highlighted above and with accelerating success in the past three years, McClatchy now operates a much more balanced business with roughly 40% of its revenue (and growing) from digital sources, and 60% from print, and roughly half from subscription revenue, and half from advertising. This more-balanced distribution of revenues is less reliant on the advertising revenues that suffered so mightily during the Great Recession and which have been siphoned off by large technology platform digital 'pure-pay' competitors who are largely unconstrained by legacy pensions or large debt capital structures. As the second-largest local newspaper company in the United States, as a consequence of these strategies, McClatchy had about 220,000 digital-only subscribers at the end of 2019 and over 535,000 paid digital customer relationships.

### 2.  Debt Repayment and Other Cost-Cutting Measures

McClatchy has successfully restructured and/or refinanced a large amount of its corporate debt over the past decade. During the Great Recession, McClatchy refinanced its debt twice. In 2010, McClatchy issued $875 million of 11.5% bonds due in 2017 that replaced all of its bank term debt and extended its maturities. In 2012, when the market was more favorable, it again refinanced its notes into 9.0% bonds due in 2022 and it continued to repurchase other bonds, further reducing debt.  By mid-2018, McClatchy had paid down its debt from $1.77 billion at the end of 2010 to $710 million. As of January 15, 2020, McClatchy had approximately $703.3 million in total aggregate principal amount of debt outstanding.

As described above, in 2018, McClatchy entered into an arrangement pursuant to which loans secured from the Chatham Parties helped McClatchy redeem its first lien debt due in 2022, pay refinancing costs and issue $310 million of first lien 9.0% bonds due in 2026. This again extended the maturities of McClatchy's first lien debt. In connection with this renegotiation, the vast majority of McClatchy's 2027 and 2029 unsecured debt was renegotiated to junior secured debt with extended maturities of 2030 and 2031 maturity respectively.

As described in the section above, McClatchy also entered into an ABL facility with Wells Fargo for up to $65 million in capacity depending on the level of its accounts receivables and newsprint inventories. In most quarters that lending capacity is limited to $30 million to $40 million, but it increases in the fourth quarter due to the seasonality of McClatchy's business which is tied to the Thanksgiving and Christmas retail season.

In April 2019, McClatchy recognized a net gain of $2.3 million related to the sale of a distribution center in Miami, Florida. In May 2019, McClatchy closed a sale and leaseback of real property in Kansas City, Missouri. The transaction resulted in net proceeds of $29.7 million. In June 2019, in accordance with the Company's 2026 Notes Indenture, McClatchy redeemed $32 million aggregate principal amount of its 2026 Notes from the net proceeds of the Kansas City and Miami asset dispositions. As a result of the $36.6 million principal amounts redeemed in these transactions, McClatchy recorded a loss on extinguishment of debt of $2 million in the quarter and six months ended June 30, 2019.

In addition, in the past several years, McClatchy has undertaken other strategic and cost-cutting measures to boost its ability to generate revenue and cash flow and remove legacy costs. Between 2006 and 2018, in response to industry headwinds, McClatchy has cut its operating cash expenses by approximately 60%. McClatchy removed more than $41 million of legacy costs from its business in the first half of 2019, reflecting a reduction of 11.7% compared to the first half of 2018. McClatchy achieved this through disciplined cost reductions that were put into place in the second half of 2018 and in the first half of 2019. Much of this cost reduction came from job eliminations and consolidations. In the first half of 2019, the number of full-time equivalent employees of McClatchy declined by 20.6%.

In addition, in February 2019, McClatchy announced a one-time voluntary Early Retirement Incentive Program ("**ERIP**") that was offered to approximately 450 employees. The ERIP allowed such employees to accept a special termination benefit based on years of continuous service and the option to take their vested benefits under the Company's qualified pension plan in a lump sum payment. Nearly 50% of the eligible employees opted into the program. Lump sum pension and termination payments made under the ERIP resulted in a net reduction to the qualified pension liability of approximately $13.1 million and the recognition of a one-time non-cash charge of $6.8 million.

The reduction in debt and full-time equivalent employees over time is reflected in the charts below.





In addition, in 2019 McClatchy reorganized itself along functional disciplines, which focuses on an investment in data analytics to better measure customer experiences, segment the Company's audiences by engagement, and deliver a dynamic experience across a broader array of product services. McClatchy also restructured and centralized the advertising division, resulting in $4.9 million in savings in the advertising department in the second quarter of 2019 compared to the second quarter of 2018.

Although, McClatchy experienced adjusted EBITDA growth in the third quarter of 2019, as of the Petition Date, its projected operating cashflows are insufficient to allow it to address its remaining legacy liabilities as they come due.

3.      Pension Liabilities

McClatchy is the contributing sponsor of the Pension Plan, a single-employer defined benefit pension plan that was established in 1944 that covers approximately 24,000 current and former employees of certain of the Debtors. With each successive acquisition of a business, throughout the 1990's and into the 2000's, McClatchy assumed the pension plan applicable to the employees and retirees of the acquired company.

Despite the declining revenues that McClatchy has experienced since 2006, McClatchy has continued to make both mandatory and voluntary contributions to the Pension Plan. In the past 15 years, the Company has contributed cash and/or property of more than $530 million to the pension plan—$228 million of cash was contributed during the period from 2011 to 2014. The Company

made additional real property contributions of $49.7 million in 2011, and $47.1 million in 2016. The plan has subsequently sold a number of the contributed properties bringing in $42.4 million of cash to the pension plan (at a net gain), and in 2019, the Company made lease payments of $4.4 million on the remaining contributed property, now valued at $55.4 million. Overall, since 2001, the company has made voluntary contributions of nearly $580 million and since 2011, McClatchy has contributed $275.1 million in excess contributions, above and beyond the minimum contributions otherwise required.

As of March 31, 2019, the latest measurement date of the pension plan, McClatchy had a total unfunded liability estimated to be $535 million (measured for GAAP purposes), with total assets of $1.31 billion and liabilities estimated to be $1.85 billion. The contributions to the Pension Plan required under the Internal Revenue Code sections 412 and 430 for fiscal years 2020, 20201, and 2022 are estimated to be $124 million, $88 million, and $117 million, respectively.

Given the size of these required contributions, in June, 2019, the Company sought a waiver of the minimum required contributions to its defined benefit plan for the plan years 2019, 2020, and 2021. Although the Company anticipated that it will have material positive cash flow during these periods, the required contributions would materially exceed all of the Company's available liquidity. Simultaneously, the Company was pursuing legislative relief via the SECURE Act for relief from the near-term payments of minimum required contributions to its pension plan. Without relief from the IRS waiver or the SECURE Act, McClatchy would inevitably receive a "going concern qualification" from its external auditors on its audited financial statements for fiscal year 2019. A going concern qualification would be an event of default under the company's Second Lien Notes and the ABL Facility. Further, a default on those instruments would trigger a default on the company's First Lien Notes, resulting in all of its debt coming due immediately.

In connection with the Company's November 13, 2019 earnings release, the Company announced that the IRS would not approve its waiver application. Moreover, while the "Minimum Funding Standards for Community Newspapers" law enacted as part of a year-end 2019 omnibus spending plan covers dozens of similar family-controlled titles including The Seattle Times and Minneapolis Star-Tribune, McClatchy and more than a dozen other similarly situated newspaper companies were unable to achieve passage of a "technical fix" that would have extended pension relief to these public companies.

4.    Negotiations with PBGC, the Chatham Parties, and Others

Beginning in September and October 2019, while awaiting a decision on the IRS waiver application, McClatchy commenced discussions with the Pension Benefit Guaranty Company ("**PBGC**") and its largest debt holder, the Chatham Parties, for the purpose of exploring other alternatives that would provide a more permanent, rather than temporary, solution to its qualified pension obligations, nonqualified pension obligations and capital structure.

Specifically, management engaged in discussions with PBGC for a distress termination of its pension plan that would result in PBGC taking over its defined benefit pension plans and allow McClatchy to continue ordinary business operations. The Company and its advisors met with PBGC on numerous occasions—including three in person meetings—to discuss the parameters of a distress termination and a potential settlement of claims in connection therewith. In addition,

both the PBGC and the holders of the First Lien Notes, Second Lien Term Loan, and Third Lien Notes hired external advisors, had access to thousands of pages of diligence, and attended telephonic and in-person meetings with both the Company's advisors and management.

Shortly after commencing settlement discussions with PBGC, management engaged in discussions with the Chatham Parties to explore a path for an out-of-court restructuring that would additionally de-lever the Company. In connection with these discussions, the Company set up a comprehensive electronic data room and the Chatham Parties and their advisors engaged in due diligence. McClatchy and its advisors and the Chatham Parties and their advisors engaged in extensive discussions regarding potential structures for a de-leveraging transaction.

In connection with all of these efforts to address the Company's liquidity pressures, the Company engaged the financial and legal services of Evercore Group L.L.C. ("**Evercore**"); FTI Consulting, Inc.; Skadden, Arps, Slate, Meagher & Flom LLP; Togut, Segal & Segal LLP; and the Groom Law Group, Chartered, who are all assisting the Company in evaluating and executing available transactions with its stakeholders.

As negotiations progressed, it became clear that an out-of-court transaction would not be feasible given the sheer number of the Company's participants in non-qualified pension plans, among other similar unsecured creditors, as well as the lack of any ability to propose a restructuring to such creditors outside of a court-supervised process. Accordingly, the Company, in consultation with its financial advisors and counsel, determined that negotiating a chapter 11 plan of reorganization that would fix its balance sheet and settle its pension liabilities, including liabilities arising from a distress termination, resulting in a de-leveraged capital structure, would be the best available option to maximize value for its stakeholders.

As negotiations with the Chatham Parties regarding a restructured balance sheet progressed, the Company, with support from the Chatham Parties, continued its negotiations with PBGC. PBGC engaged Jefferies as its financial advisor on or around December 16, 2019 to assist it in evaluating a potential distress termination and any proposed settlement. The Company continued to respond to PBGC's and its advisors' information requests, provided Jefferies access to the electronic data room and provided multiple opportunities for Jefferies to meet with the Company's advisors and management.

As negotiations intensified during late December, 2019, McClatchy identified Brigade Capital Management and each of its managed funds or accounts that is a beneficial holder of the First Lien Notes (collectively, the "**Brigade Parties**") and Leon Cooperman as significant holders of the First Lien Notes. Under confidentiality agreements, McClatchy granted both the Brigade Parties and Mr. Cooperman access to the electronic data room and began to negotiate the terms of the continuation of the First Lien Notes following a balance sheet restructuring.

The Company has taken all steps to avoid termination of the Pension Plan; however, in spite of these efforts, the Pension Plan's projected required contributions greatly exceed the Company's projected revenues. After months of intensive negotiations, the Company's board of directors determined that it was prudent to commence the solicitation of the Plan among the holders of the First Lien Notes, the Second Lien Facility, Third Lien Notes and the PBGC, which the Company did on February 13, 2020, immediately prior to commencing the Chapter 11 Cases.

5.     The DIP Facilities

Once the Debtors determined that a restructuring would be executed through a chapter 11 filing, Evercore, at the direction of the Debtors, launched a marketing process seeking DIP financing.  As part of these efforts, Evercore contacted five third-party lenders, consisting of traditional banks and alternative lenders.  In addition, Evercore solicited debtor-in-possession ("**DIP**") financing proposals from the prepetition ABL Lenders, and certain large existing noteholders.  The Debtors ultimately received two DIP financing proposals, one from the prepetition ABL Lenders, and one from Encina Business Credit, LLC ("**Encina**").  None of the parties contacted indicated a willingness to provide DIP financing on an unsecured, junior-lien, or *pari passu* basis.  The Debtors, with the assistance of Evercore and their other advisors, carefully considered both proposals before determining that the DIP financing provided by Encina (the "**DIP Financing**") represented the best available alternative for the Debtors under the circumstances.  Accordingly, the Company decided to enter into that certain Credit Agreement (the "**DIP Credit Agreement**") by and among (a) The McClatchy Company, as parent, (b) McClatchy Newspapers, Inc., as lead borrower, (c) the other borrowers party thereto, (d) Encina Business Credit, LLC, as administrative agent, and (e) the lenders thereto.[10]

The DIP Financing will facilitate the chapter 11 reorganization process, providing the Debtors with new capital—in the form of a senior secured, priming, superpriority debtor-in-possession asset-based revolving credit facility in the aggregate principal amount of approximately $50 million—which is needed to allow the Debtors to continue operations through the reorganization process.

B.     Summary of Material Prepetition Legal Proceedings

1.     *The Fresno Bee* Class Action Complaint

In December 2008, carriers of *The Fresno Bee* filed a class action lawsuit against The McClatchy Company and *The Fresno Bee* in the Superior Court of the State of California in Fresno County captioned *Becerra v. The McClatchy Company* (the "**Fresno case**") alleging that the carriers were misclassified as independent contractors and seeking mileage reimbursement. In February 2009, a substantially similar lawsuit, *Sawin v. The McClatchy Company*, involving similar allegations was filed by carriers of *The Sacramento Bee* (the "**Sacramento case**") in the Superior Court of the State of California in Sacramento County. The class consists of roughly 5,000 carriers in the Sacramento case and 3,500 carriers in the Fresno case. The plaintiffs in both cases are seeking unspecified restitution for mileage reimbursement. With respect to the Sacramento case, in September 2013, all wage and hour claims were dismissed, and the only remaining claim is an equitable claim for mileage reimbursement under the California Civil Code.

---

[10]   As set forth in further detail in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing The Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**DIP Financing Motion**"), filed concurrently herewith, the Debtors are seeking entry of interim and final orders approving the DIP Credit Agreement (the "**DIP Financing Orders**").

In the Fresno case, in March 2014, all wage and hour claims were dismissed, and the only remaining claim is an equitable claim for mileage reimbursement under the California Civil Code.

The court in the Sacramento case trifurcated the trial into three separate phases, independent contractor status, liability and restitution. On September 22, 2014, the court in the Sacramento case issued a tentative decision following the first phase, finding that the carriers that contracted directly with *The Sacramento Bee* during the period from February 2005 to July 2009 were misclassified as independent contractors. The McClatchy Company objected to the tentative decision, but the court ultimately adopted it as final. In June 2016, The McClatchy Company was dismissed from the lawsuit, leaving *The Sacramento Bee* as the sole defendant. On August 30, 2017, the court issued a statement of decision ruling that the court would not hold a phase two trial but would, instead, assume liability from the evidence previously submitted and from the independent contractor agreements. The McClatchy Company objected to this decision, but the court adopted it as final. The third phase began on June 20, 2019, and is ongoing.

The court in the Fresno case bifurcated the trial into two separate phases: the first phase addressed independent contractor status and liability for mileage reimbursement and the second phase was designated to address restitution, if any. The first phase of the Fresno case began in the fourth quarter of 2014 and concluded in late March 2015. On April 14, 2016, the court in the Fresno case issued a statement of final decision in favor of the Company and *The Fresno Bee*. Accordingly, there will be no second phase. The plaintiffs filed a Notice of Appeal on November 10, 2016.

The McClatchy Company continues to defend these actions vigorously and has not established a reserve in connection with the cases.

C.    Stabilization of Operations/First Day Relief

Upon commencing the Chapter 11 Cases, the Debtors sought a number of orders from the Bankruptcy Court to ensure a smooth transition of their operations into chapter 11 and facilitate the administration of the Chapter 11 Cases. Certain of these motions are briefly summarized below.

1.    Administrative Motions: Motion for Joint Administration [Docket No. 3]; Motion to Authorize Establishment of Case Management Procedures [Docket No. 8]; Motion to Authorize the Filing of a Consolidated List of Top 30 Unsecured Creditors [Docket No. 5]; and Application to Retain Claims and Noticing Agent [Docket No. 9]

To facilitate a smooth and efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, on the Petition Date the Debtors filed a motion seeking authority to jointly administer the Debtors' cases for procedural purposes only, a motion seeking authority to establish certain notice, case management, and administrative procedures, a

motion seeking authority to file a consolidated list of top 30 unsecured creditors, and an application seeking retention of KCC as claims and noticing agent.

### 2. Motion to Continue Using Existing Cash Management System [Docket No. 14]

On the Petition Date, the Debtors filed a motion seeking authority to continue using their cash management systems and their respective bank accounts, business forms, and investment practices. The cash management motion also seeks the waiver of certain operating guidelines related to bank accounts and requests authority to continue intercompany transactions.

### 3. Motion to Pay Employee Wages and Benefits [Docket No. 15]

On the Petition Date, the Debtors filed a motion seeking authority to pay prepetition wages, compensation and employee benefits and continue certain employee benefit programs in the ordinary course.

### 4. Motion to Authorize Maintenance of Customer Programs [Docket No. 18]

On the Petition Date, the Debtors filed a motion seeking authority for the Debtors to honor certain prepetition obligations to customers and to otherwise continue customer programs and practices in the ordinary course of business, thereby ensuring and maintaining customer satisfaction and loyalty without interruption during the course of the Chapter 11 Cases.

### 5. Motion to Pay Prepetition Sales, Use, and Franchise Taxes [Docket No. 16]

On the Petition Date, the Debtors filed a motion seeking authority for the Debtors to pay prepetition sales, use, franchise, income, property, and other taxes and any tax-related fees, charges, and assessments accrued prepetition.

### 6. Motion Determining Adequate Assurance of Payment for Future Utility Services [Docket No. [●]]

On the Petition Date, the Debtors filed a motion seeking the establishment of procedures for determining adequate assurance of payment for future utility services in recognition of the impact even a brief disruption of utility services would have on the Debtors.

### 7. Motion to Pay Critical Vendors [Docket No. 17]

On the Petition Date, the Debtors filed a motion seeking authority for the Debtors to pay prepetition Claims of certain critical vendors and suppliers and approve procedures related thereto.

### 8. Motion to Obtain Postpetition Financing [Docket No. 11]

On the Petition Date, the Debtors filed a motion seeking authority to obtain postpetition financing and to use cash collateral, as well as an order granting liens and providing superpriority administrative expense status, adequate protection, and modification of the automatic stay.

9. <u>Motion to Establish Procedures for Trading In, or Treating as Becoming Worthless, Equity Securities [Docket No. 19]</u>

On the Petition Date, the Debtors filed a motion seeking to establish trading procedures for its common stock and authority to object to and prevent transfers of its common stock and treatments of its common stock as becoming worthless, in order to preserve net operating losses and other tax attributes.

10. <u>Emergency Motion to Continue Using Corporate Credit Cards [Docket No. 2]</u>

On the Petition Date, the Debtors filed an emergency motion seeking a Bridge Order authorizing the Debtors to continue using the Corporate Credit Cards in the ordinary course during the Bridge Period.

11. <u>Applications for Retention of Debtors' Professionals</u>

The Debtors intend to file applications to retain certain Professionals to represent and assist the Debtors in connection with the Chapter 11 Cases shortly after the Petition Date. These Professionals include, among others: (a) Skadden, Arps, Slate, Meagher & Flom LLP as counsel for the Debtors; (b) Togut, Segal & Segal LLP as conflicts and efficiency counsel for the Debtors; (b) Kurtzman Carson Consultants LLC as administrative agent for the Debtors; (c) FTI Consulting, Inc. as restructuring advisor to the Debtors; and (d) Evercore as investment banker to the Debtors.

The Debtors will also file a motion to retain certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date.

D. <u>Schedules and Statements and Rule 2015.3 Reports</u>

On the Petition Date, the Debtors filed a motion seeking authority to extend the Debtors' deadline to file the Schedules and Statements by 30 days. By the same motion, the Debtors sought authority to extend the deadline to file the Rule 2015.3 Reports.

E. <u>Analyzing Executory Contracts and Unexpired Leases</u>

The Bankruptcy Code authorizes a debtor, subject to the approval of the Bankruptcy Court, to assume, assume and assign, or reject Executory Contracts and Unexpired Leases. The Debtors are engaged in a comprehensive evaluation of their Executory Contracts and Unexpired Leases. As part of the Plan Supplement, the Debtors will identify contracts to be rejected in the Rejection Schedule. All remaining contracts will be assumed.

Except as otherwise set forth in the Plan Supplement, the Cure with respect to each of the Executory Contracts or Unexpired Leases assumed pursuant to the Plan is designated by the Debtors as $0, subject to the determination of a different Cure pursuant to the objection procedures set forth in **Article VII** of the Plan.

F.       Management and Key Employee Compensation Plans

Prior to the Petition Date, and in the ordinary course of business, the Debtors used certain short-term and long-term incentive plans and other forms of compensation to drive business outperformance from senior executives and certain key employees. Specifically, the Debtors historically compensated senior executives and certain key employees with a combination of the following: (i) base/guaranteed annual cash compensation, (ii) a key employee incentive plan ("**KEIP**"), (iii) a long-term incentive plan, (iv) severance pay, which varied depending on whether a termination was for cause, and (v) a non-qualified pension plan.

Upon emergence from the Chapter 11 Cases, the long-term incentive plan will be completely forfeited, as will future earnings under the non-qualified pension plan. Each of the remaining compensation components will either remain largely consistent or undergo certain modifications in either amount or duration. The only form of compensation that will increase pursuant to the Plan and the transactions contemplated thereby is the annual guaranteed compensation for certain of the Debtors' most critical key management (as well as the KEIP for the Debtors' Vice President, News).

In accordance with Bankruptcy Code section 1129(a)(5)(B), attached hereto as **<u>Exhibit G</u>** is a schedule disclosing the identities of the Key Executives and the nature of the compensation to be paid to such Key Executives. A schedule including more detailed information regarding the Reorganized Debtors' anticipated management structure and compensation (the "<u>Solicited Terms of Key Executive Employment Agreements</u>") shall be served upon all parties entitled to vote on the Plan.

In connection with the Plan, the Reorganized Debtors will implement a management incentive plan on or after the Effective Date on terms approved by the New Board, which shall dilute the issued and outstanding Reorganized Equity distributed pursuant to the Plan to holders of Second Lien/Third Lien Claims by 10%.

G.       Analysis and Resolution of Claims

1.       Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Debtors reserve all rights to commence and pursue any and all Causes of Action that are not released pursuant to **Article X** of the Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in a list of retained causes of action to be included in the Plan Supplement. Such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date.

# ARTICLE VI.

# PLAN SUMMARY

A.      Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors, and interest holders. Chapter 11 also strives to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.   A plan of reorganization sets forth the means for satisfying claims and interests. Confirmation of a plan of reorganization makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity Holder in the debtor, whether or not such creditor or equity Holder is impaired under or has accepted the plan, or receives or retains any property under the plan. Subject to certain limited exceptions, and except as otherwise provided in the plan or the confirmation order itself, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for those debts the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "Unimpaired" and, because of such favorable treatment, are presumed to accept the plan. Accordingly, a debtor need not solicit votes from the Holders of claims or equity interests in such unimpaired classes. A chapter 11 plan also may specify that certain classes, including classes that will not receive any distribution of property or retain any claim against a debtor, are deemed to reject the plan. Such deemed rejecting classes need not be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class. The Debtors believe that the Plan has classified all Claims and Interests in compliance with section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under

the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT, AND THE EXHIBITS AND DEFINITIONS CONTAINED IN EACH DOCUMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON, AMONG OTHER ENTITIES, ALL HOLDERS OF CLAIMS AND INTERESTS, THE REORGANIZED DEBTORS, ALL ENTITIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

B.    Overall Structure of the Plan

The Plan will result in a de-leveraging of the Company's total funded debt by approximately 55% upon emergence from Chapter 11. In addition, the Plan will provide the Company with ample liquidity to continue operations across all of its current business segments as a going concern.

The Plan will be funded by the Exit Facilities and the Debtors' Cash balances on hand, after giving effect to the transactions contemplated by the Plan.

The Reorganized Debtors' debt at emergence shall comprise of the following: (i) the $50 million Exit ABL Facility, (ii) the Exit 1.5L Facility in the aggregate principal net amount of $81 million, and (iii) $217.9 million in principal amount of the New First Lien Notes. At emergence, the Reorganized Debtors anticipate having liquidity of approximately $34 million due to a combination of cash-on-hand and availability under the Exit Facilities.

1.    Administrative Claims.

Except to the extent that the Debtors and a holder of an Allowed Administrative Claim agree to a less favorable treatment, a holder of an Allowed Administrative Claim (other than a DIP Facility Claim, which shall be subject to **Article 2.2** of the Plan, or a Professional Claim, which shall be subject to **Article 2.3** of the Plan) shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Administrative Claim, cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the later of (i) thirty (30) days following the Effective Date (or as soon as reasonably practicable thereafter); (ii) thirty (30) days after the date when the Administrative Claim becomes an Allowed Administrative Claim (or as soon as reasonably practicable thereafter); or (iii) the date when the Administrative Claim becomes payable pursuant to any agreement between the Debtors and the holder of the Administrative Claim; or (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the holder of such Allowed Administrative Claim; *provided, however*, that other than the holder of (v) a DIP Facility Claim, (w) a Professional Claim, (x) an Administrative Claim Allowed by a final order of the Bankruptcy Court on or before the Effective Date, (y) an Administrative Claim that is not disputed and arose in the ordinary course of business and was paid or is to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, or (z) an Administrative Claim arising under chapter 123 of title 28 of the United States Code, the holder of any Administrative Claim shall have filed a proof of claim form no later than the Administrative Claims Bar Date and such claim shall have become an Allowed Claim. Except as otherwise provided herein and as set forth in **Articles 2.1, 2.2, and 2.3** of the Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in the Plan Supplement, with the Claims Agent and served on counsel for the Debtors or the Reorganized Debtors, as applicable, no later than the Administrative Claims Bar Date. Any request for payment of an Administrative Claim pursuant to **Article 2.1** of the Plan that is not timely filed and served shall be Disallowed automatically without the need for any objection from the Reorganized Debtors. For the avoidance of doubt, the Debtors' determination to object to the allowance of an Administrative Claim shall be subject to consultation with and approval of the Supporting Parties (such approval not to be unreasonably withheld, conditioned or delayed). The Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval. In the event that the Reorganized Debtors object to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

2. DIP Facility Claims.

Pursuant to the DIP Order, all DIP Claims are Allowed. Except to the extent that a Holder of a DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every DIP Facility Claim, Holders of a DIP Facility Claim shall be (a) paid in full in Cash on the Effective Date, such payments to be distributed to the DIP Agent for the ratable benefit of the Holders of DIP Facility Claims, or (b) converted into and deemed outstanding under the Exit ABL Facility pursuant to the Confirmation Order.

To the extent that any Letter of Credit remains undrawn as of the Effective Date, the Debtors shall (i) cause that Letter of Credit to be replaced with a letter of credit issued under the Exit ABL

Facility, (ii) collateralize that Letter of Credit with Cash in an amount specified in the Exit Facilities, (iii) provide a back-to-back letter of credit to the Letter of Credit Issuer on terms and from a financial institution reasonably acceptable to the Letter of Credit Issuer, or (iv) provide such other treatment as the Letter of Credit Issuer shall agree in its sole discretion.

Upon the Effective Date, all Liens and security interests granted to secure the DIP Facility shall be deemed discharged, cancelled, and released and shall be of no further force and effect. To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any Liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, shall take any commercially reasonable steps requested by the Debtors or the Reorganized Debtors, at the expense of the Reorganized Debtors, that are necessary to cancel and/or extinguish such publicly-filed Liens and/or security interests.

3.    Professional Claims.

(a)    *Final Fee Applications*. All final requests for payment of Professional Claims must be filed no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court.

(b)    *Payment of Interim Amounts*. Subject to the Holdback Escrow Amount, on the Effective Date, the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed. In order to receive payment on the Effective Date for unbilled fees and expenses incurred and approved by the Bankruptcy Court through the Effective Date, no later than two (2) days prior to the Effective Date, the Professionals shall estimate fees and expenses due for periods that have not been billed as of the Effective Date and shall deliver such estimate to counsel for the Debtors. Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period.

(c)    *Holdback Escrow Account*. On the Effective Date, the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Escrow Amount for all Professionals. The Distribution Agent shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order. Such funds shall not be considered property of the Debtors, the Reorganized Debtors, or the Estates. The remaining amount of Professional Claims owing to the Professionals shall be paid to such Professionals by the Distribution Agent from the Holdback Escrow Account when such claims are finally Allowed by the Bankruptcy Court. When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

(d)    *Post-Confirmation Date Retention*. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business

(including the reasonable fees and expenses incurred by Professionals in preparing, reviewing, prosecuting, defending, or addressing any issues with respect to final fee applications).

### 4. Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor (or Reorganized Debtor, as applicable), each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, Cash equal to the amount of such Allowed Priority Tax Claim (i) on the Effective Date, (ii) at the sole option of the Debtors, in installment payments over a period of not more than five (5) years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) if the Priority Tax Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim.

### C. Classification, Treatment, and Voting of Claims and Interests

### 1. Classification of Claims and Interests

(a) The Plan is a single plan of reorganization for the jointly administered Chapter 11 Cases, but does not constitute a substantive consolidation of the Debtors' Estates for voting purposes. The Plan, though proposed jointly, constitutes a separate plan for each of the Debtors for voting purposes. Therefore, all Claims against and Interests in a particular Debtor are placed in the Classes set forth below with respect to such Debtor. Classes that are not applicable as to a particular Debtor or group of Debtors shall be eliminated as set forth more fully in **Article 5.3** of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in **Article II** of the Plan.

(b) Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

| Class Description | Status | Proposed Treatment |
|---|---|---|
| Class 1: Other Priority Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount: $0** | Unimpaired | Class 1 consists of all Other Priority Claims.<br><br>On or as soon as practicable after the Effective Date, except as otherwise provided in and subject to **Article 9.5** of the Plan, and except to the extent that a Holder of an Allowed Class 1 Claim and the applicable Debtor or Reorganized |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | Debtor, subject to the consent of the Supporting Parties (not to be unreasonably withheld, conditioned, or delayed), agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class 1 Claim, each such Holder of an Allowed Class 1 Claim shall be paid in full in Cash; provided, however, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. |
| Class 2: Other Secured Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount: $0.5 million** | Unimpaired | Class 2 consists of all Other Secured Claims.<br><br>On or as soon as practicable after the Effective Date, except as otherwise provided in and subject to **Article 9.5** of the Plan, and except to the extent that a Holder of an Allowed Class 2 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 2 Claim, each such Holder of an Allowed Class 2 Claim shall, at the election of the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Supporting Parties (not to be unreasonably withheld, conditioned, or delayed):<br><br>(i) have its Allowed Class 2 Claim Reinstated and rendered Unimpaired on the Effective Date in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of an Allowed Class 2 Claim to demand or receive payment of such Allowed Class 2 Claim prior to the stated maturity of such Allowed Class 2 |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | Claim from and after the occurrence of a default; or<br><br>(ii) be paid in full in Cash in an amount equal to such Allowed Class 2 Claim, including postpetition interest, if any, on such Allowed Class 2 Claim required to be paid pursuant to section 506 of the Bankruptcy Code.<br><br>Nothing in **Article 4.2** or elsewhere in the Plan shall preclude the Reorganized Debtors, as applicable, from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien. |
| Class 3: ABL Credit Facility Claims<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount: $0** | Unimpaired | Class 3 consists of all ABL Credit Facility Claims.<br><br>Except to the extent that a Holder of an Allowed Class 3 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 3 Claim, on the Effective Date each such Holder of an Allowed Class 3 Claim shall be, to the extent not previously "rolled up" or converted into the DIP Facility pursuant to the applicable DIP Order, paid in full in Cash in an amount equal to such Allowed Class 3 Claim, including postpetition interest, if any, on such Allowed Class 3 Claim required to be paid pursuant to section 506 of the Bankruptcy Code , and all issued and undrawn Letters of Credit (as defined in the ABL Credit Agreement) shall be replaced or cash collateralized in the amounts specified under the DIP Documents or Exit Facilities, as applicable. |
| Class 4: First Lien Notes Claims | Impaired | Class 4 consists of all First Lien Notes Claims. |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| **Estimated Recovery: 100%**<br>**Estimated Amount: $262.9 million** | | On the Effective Date, except to the extent that a Holder of an Allowed Class 4 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 4 Claim shall receive (1) its Pro Rata share of, to the extent not already paid as adequate protection, Cash in an amount equal to any accrued and unpaid interest (including any interest on interest) on the First Lien Notes that was due as of the Petition Date, and (2):<br><br>(i) for each Holder of an Allowed Class 4 Claim that is not a Chatham Subordinated Notes Claim, its Pro Rata share of New First Lien Notes; or<br><br>(ii) for each Holder of an Allowed Class 4 Claim that is a Chatham Subordinated Notes Claim, its Pro Rata amount of the Exit 1.5L Facility instead of its Pro Rata share of New First Lien Notes, pursuant to such Holders' agreement to receive less favorable treatment than each Holder of an Allowed Class 4 Claim that is not a Chatham Subordinated Notes Claim. |
| Class 5: Second Lien/Third Lien Claims<br><br>**Estimated Recovery: Unknown**<br>**Estimated Amount: Unknown** | Impaired | Class 5 consists of all Second Lien/Third Lien Claims.<br><br>Consistent with the Settlement of Junior Lien Secured Claims, except to the extent that a Holder of an Allowed Class 5 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class 5 Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 5 Claim shall receive on its Pro Rata share, based on the aggregate amount of Allowed Second Lien Notes Claims and |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | Allowed Third Lien Notes Claims, of 97% of the Reorganized Equity, subject to dilution by the MIP Equity and the Warrant Equity.<br><br>For the avoidance of doubt, (a) the treatment provided to Holders of Allowed Class 4 Claims is the only treatment such Claims will receive, (b) to the extent that any Second Lien/Third Lien Deficiency Claims exist, such Claims form part of the Second Lien/Third Lien Notes Claims and shall receive no treatment separate and apart from the treatment that the Holders of such Claims receive as Holders of Allowed Class 5 Claims, and (c) Holders of Allowed Class 5 Claims shall be deemed to have waived, and not be entitled to any distribution under the Plan on account of, their Second Lien/Third Lien Deficiency Claims. |
| **Class 6: Go-Forward Trade Claims**<br><br>**Estimated Recovery: 100%**<br>**Estimated Amount: $14 million** | Unimpaired | Class 6 consists of all Go-Forward Trade Claims.<br><br>On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Class 6 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 6 Claim, each such Holder of an Allowed Class 6 Claim shall, at the election of the Reorganized Debtors: (i) have its Allowed Class 6 Claim Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code; (ii) be paid in full in Cash in an amount equal to such Allowed Class 6 Claim; or (iii) be paid in the ordinary course as such Allowed Class 6 Claim become due. |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| Class 7: PBGC Claims<br><br>**Estimated Recovery: 4%**<br>**Estimated Amount: Unknown** | Impaired | Class 7 consists of the PBGC Claims.<br><br>Pursuant to Bankruptcy Rule 9019 and in full and final satisfaction, settlement, release, and discharge of and in exchange for the Allowed Class 7 Claims, PBGC shall receive (i) a $33 million secured note due on the thirteenth (13th) anniversary of the Effective Date that shall provide for annual amortization payments commencing in 2023 (the "<u>PBGC Note</u>"), <u>provided</u>, <u>however</u>, that if the Effective Date occurs within forty-five (45) days of the Petition Date, then the PBGC Note shall be due on the tenth anniversary of the Effective Date and the annual amortization payments shall commence on the one month anniversary of the Effective Date; and (ii) 3% of the Reorganized Equity (subject to dilution by the MIP Equity and the Warrant Equity). The liens on and security interests in the Reorganized Debtors' assets granted pursuant to the PBGC Note shall be junior in all respects to the liens and security interests provided for under the Exit Facilities and the New First Lien Notes. To the extent there is any modification to the above treatment of the PBGC Claim, such treatment shall be agreed upon by the Debtors and the Chatham Parties, and the Brigade Parties must also consent to such treatment (such consent not to be unreasonably withheld or conditioned). |
| Class 8: General Unsecured Claims<br><br>**Estimated Recovery: 1.6%**<br>**Estimated Amount: $3 million** | Impaired | Class 8 consists of all General Unsecured Claims.<br><br>On or as soon as reasonably practicable after the Effective Date, except as otherwise provided in and subject to **Article 9.5** of the Plan, and except to the extent that a Holder of an Allowed Class 8 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | release, and discharge of and in exchange for each and every Allowed Class 8 Claim, each Holder of an Allowed Class 8 Claim shall receive its Pro Rata portion of either (i) 100% of the Reorganized McClatchy Warrants among those holders of Allowed General Unsecured Claims that properly exercise the Warrant Election, or (ii) Cash in the aggregate amount of $3,000,000 among those holders of Allowed General Unsecured Claims that properly exercise the Cash Election. |
| Class 9: Intercompany Claims<br><br>**Estimated Recovery: 0-100%**<br>**Estimated Amount: N/A** | Unimpaired | Class 9 consists of all Intercompany Claims.<br><br>On the Effective Date, all net Allowed Class 9 Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors and/or any Affiliates of the Debtors shall, at the election of the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Supporting Parties (not to be unreasonably withheld, conditioned, or delayed), be either (i) Reinstated, in full or in part, and treated in the ordinary course of business, or (ii) released, waived, and discharged. The treatment of the Intercompany Claims shall be effectuated in a tax efficient manner. |
| Class 10: Intercompany Interests<br><br>**Estimated Recovery: 0-100%** | Unimpaired | Class 10 consists of all Intercompany Interests.<br><br>On the Effective Date, all Class 10 Interests held by the Debtors shall be Reinstated and otherwise unaffected by the Plan, subject to the Plan Transaction Documents; provided, however, that the Ponderay Owners shall abandon their Interests in Ponderay. |

| Class Description | Status | Proposed Treatment |
|---|---|---|
| | | To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the holders of the Reorganized Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims. Holders of Intercompany Interests shall not otherwise receive or retain any property on account of such Intercompany Interests. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date. |
| **Class 11: Subordinated Claims**<br><br>**Estimated Recovery: 0%**<br>**Estimated Amount: $0** | Impaired | Class 11 consists of all Claims under Bankruptcy Code sections 510(b) and (c).<br><br>Holders of Allowed Class 11 Claims shall not receive any distributions on account of such Allowed Class 11 Claims, and on the Effective Date all Allowed Class 11 Claims shall be released, waived, and discharged. |
| **Class 12: Existing Parent Equity**<br><br>**Estimated Recovery: 0%** | Impaired | Class 12 consists of all Existing Parent Equity.<br><br>Holders of Allowed Class 12 Interests shall not receive any distributions on account of such Allowed Class 12 Interests, and on the Effective Date all Allowed Class 12 Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors or the Reorganized Debtors and the obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged. |

2.      Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

3.      Elimination of Classes

To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, for all Debtors or with respect to any particular Debtor shall be deemed to have been deleted from the Plan for all Debtors or for such particular Debtor, as applicable, for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code. In particular, Class 12 shall exist only with respect to The McClatchy Company, Class 3 shall exist only with respect to the Debtors which are obligors under the ABL Credit Facility, Class 4 shall exist only with respect to the Debtors which are obligors under the First Lien Notes, and Class 5 shall exist only with respect to the Debtors which are obligors under the Second Lien Term Loan and the Third Lien Notes.

4.      Deemed Acceptance if No Votes Cast

If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims in such Class.

5.      Cramdown

To the extent necessary, the Debtors shall request confirmation of the Plan, as it may be modified from time to time in accordance with the terms hereof, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify, amend, or withdraw the Plan, with respect to all Debtors or any individual Debtor or group of Debtors to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

D.      Means for Implementation of the Plan

1.      Substantive Consolidation

The Plan contemplates and is predicated upon deemed substantive consolidation of the Debtors' Estates and Chapter 11 Cases for distribution purposes only. On the Effective Date, each Claim against any Debtor shall be deemed only against The McClatchy Company and shall be deemed a single Claim against and a single obligation of The McClatchy Company, for distribution purposes only and the claims register shall be updated accordingly. This limited substantive consolidation effected pursuant to **Article 6.1** of the Plan shall not otherwise affect the rights of any Holder of any Claim, or affect the obligations of any Debtor with respect to such Claim.

2. General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provision of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

3. Settlement of Junior Lien Secured Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement designed to achieve an economic settlement of the Second Lien Term Loan Claims and Third Lien Notes Claims and an efficient resolution of the Chapter 11 Cases. In connection with such settlement, and as set forth in **Article 4.5** of the Plan, all Second Lien Term Loan Claims and all Third Lien Notes Claims shall be treated together as a single class in accordance with the terms of the Plan notwithstanding the terms of the Tranche A/B Intercreditor Agreement. Treatment of the Second Lien/Third Lien Claims as provided herein is a settlement and compromise of uncertainty and potential litigation, including, among other things, litigation relating to valuation of the Debtors.

4. New First Lien Notes

On the Effective Date, the Reorganized Debtors shall issue or cause to be issued the New First Lien Notes in exchange for the First Lien Notes in accordance with Section 4.4 hereof. The distribution of the New First Lien Notes shall be governed by the terms and conditions set forth in the Plan applicable to such distribution and by the terms and conditions of the New First Lien Notes Indenture and such other instruments evidencing or relating to such distribution, which terms and conditions shall bind each Person receiving such distribution or issuance. The New First Lien Notes Indenture shall not permit the incurrence of indebtedness secured by a first-priority lien on the Notes Priority Collateral other than those arising under the New First Lien Notes. Other than the obligations arising under the Exit ABL Facility (which shall be in an amount not to exceed $50 million), the Reorganized Debtors shall not be permitted to incur any obligations secured by a lien on the ABL Priority Collateral that is senior to the lien on such ABL Priority Collateral granted to the holders of the New First Lien Notes.

5. Plan Funding

Distributions under the Plan, and the Reorganized Debtors' operations post-Effective Date, will be funded from the following sources:

(a) *Exit Facilities*. On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities. Confirmation shall be deemed approval of the Exit Facilities (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facilities, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the Exit Facilities and such other documents as the Exit Lenders may reasonably require to effectuate the treatment afforded to such lenders pursuant

to the Exit Facilities, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate such Exit Facilities.

(b) *Second Lien/Third Lien Deficiency Claims*. Consistent with the Settlement of Junior Lien Secured Claims, effective as of the Effective Date, Holders of Second Lien/Third Lien Claims shall be deemed to have compromised their Second Lien/Third Lien Deficiency Claims.

(c) *Other Plan Funding*. Other than as set forth in **Articles 6.3(a), 6.3(b), and 6.3(c)** of the Plan, all Cash necessary for the Reorganized Debtors to make payments required by the Plan shall be obtained from the Debtors' Cash balances then on hand, after giving effect to the transactions contemplated herein.

6. Authorization and Issuance of Reorganized Equity

(a) On the Effective Date, Reorganized McClatchy shall authorize and issue the Reorganized Equity. Distribution of Reorganized Equity hereunder shall constitute issuance of 100% of the Reorganized Equity and shall be deemed issued on the Effective Date. The issuance of Reorganized Equity by Reorganized McClatchy, including options for the purchase thereof or other equity awards, if any, providing for the issuance of Reorganized Equity, is authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable.

(b) The Reorganized Equity issued under the Plan shall be subject to economic and legal dilution from (i) the MIP Equity, (ii) the Warrant Equity, and (iii) any other shares of Reorganized Equity issued after the Effective Date.

(c) All of the shares of Reorganized Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable, and the holders of Reorganized Equity shall not be required to execute the New Shareholders Agreement before receiving their respective distributions of Reorganized Equity under the Plan. Any such Entities who do not execute the New Shareholders Agreement shall be automatically deemed to have accepted the terms of the New Shareholders Agreement (in their capacity as shareholders of Reorganized McClatchy) and to be parties thereto without further action. The New Shareholders Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of Reorganized Equity shall be bound thereby.

(d) On the Effective Date, none of the Reorganized Equity will be registered under the Securities Act or listed on a national securities exchange, the Reorganized Debtors will not be reporting companies under the Exchange Act, the Reorganized Debtors shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party. In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Exchange Act, except in connection with a public offering, the New Corporate Governance Documents may impose certain trading restrictions, and the Reorganized Equity will be subject to certain transfer and other restrictions pursuant to the New Corporate

Governance Documents designed to maintain the Reorganized Debtors as private, non-reporting companies.

### 7. Exemptions from Securities Act Registration Requirements

The offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. Section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements. In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued pursuant to the Plan and any and all settlement agreements incorporated therein will be freely transferable under the Securities Act by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, (2) the restrictions, if any, on the transferability of such Securities and instruments, including restrictions contained in the governing documents to such Securities, and (3) any other applicable regulatory approval. In reliance upon these exemptions, the offer, issuance, and distribution of Securities will not be registered under the Securities Act or any applicable state Blue Sky Laws, and may not be transferred, encumbered or otherwise disposed of in the absence of such registration or an exemption therefrom under the Securities Act or under such laws and regulations thereunder. Accordingly, the Securities may be subject to restrictions on transfer as set forth in the governing documents to such Securities. Reorganized Equity will bear a legend relating to the transfer restrictions, including those arising under the New Corporate Governance Document, applicable to such stock.

### 8. Cancellation of Old McClatchy Securities, Agreements, and the Second Lien Term Loan

On the Effective Date, except as otherwise specifically provided for herein (a) the Old McClatchy Securities and the Second Lien Term Loan and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (including the First Lien Notes Indenture and the Third Lien Notes Indenture), shall be deemed to be automatically cancelled and discharged without further action by any person and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old McClatchy Securities, and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors, as the case may be, shall be deemed to be automatically released and discharged and cancelled without further action by any person; provided, however, that (i) the Class 10 Intercompany Interests shall be treated as set forth in **Article 4.10** of the Plan and (ii) any agreement (including the Indentures) that governs the rights of a Holder of a Claim and that is administered by a Servicer shall continue in effect solely for the purposes of allowing such Servicer to (x) make the distributions on account of such Claims under

the Plan and perform such other necessary functions with respect thereto, if any, as provided for in **Article 9.4** of the Plan and (y) maintain and exercise its Charging Lien or other right to priority payment against distributions under the Plan on account of such Servicer's reasonable fees, expenses, and indemnities owed to such Servicer under the terms of either of the Indentures. On or after the Effective Date, all duties and responsibilities of the First Lien Notes Agent under the First Lien Notes Indenture, the Second Lien Term Loan Agent under the Second Lien Term Loan Documents, and the Third Lien Notes Agent under the Third Lien Notes Indenture shall be discharged and deemed satisfied except to the extent required in order to effectuate the Plan.

9.      Continued Corporate Existence

(a)      Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as separate entities, the Reorganized Debtors, with all the powers of corporations or other entities under applicable law in the jurisdictions in which the Debtors have been incorporated or formed, as applicable, and pursuant to their certificate of incorporation and bylaws (or in each case, the functional equivalent thereof, as applicable) or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or in each case, the functional equivalent thereof, as applicable) or other organization documents are amended and restated by the Plan, including pursuant to **Article 6.12** of the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).

(b)      The following Debtors shall be dissolved upon the Effective Date: Newsprint Ventures, Inc., Tribune Newsprint Company, and Wingate Paper Company. Such Debtors are deemed to be dissolved without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law, if any). Any Claim arising as a result of such dissolutions shall be receive the applicable treatment under the Plan.

10.      Directors and Officers of the Reorganized Debtors

On the Effective Date, the term of the Existing Board shall expire, and the New Board shall be appointed. On the Effective Date the initial New Board shall consist of: (i) the Chief Executive Officer of the Reorganized Debtors; (ii) the Chairman of the Board shall be selected by the Existing Board in its sole discretion (the "**Chairman of the Board**"); (iii) three directors selected by the Chatham Parties in their sole and absolute discretion; and (iv) two directors that shall be independent directors (the "**New Independent Directors**") selected by the Chatham Parties; provided that the New Independent Directors shall be chosen from the list of individuals mutually acceptable to the Debtors and the Chatham Parties. The compensation of the Chairman of the Board shall be mutually agreed between the Supporting Parties and the Chairman of the Board consistent with customary standards. The Chairman of the New Board and the Chief Executive

Officer shall serve a three-year term following the Effective Date, and the New Independent Directors shall serve a one-year term following the Effective Date. Following such initial terms, the Chatham Parties shall select the directors of the New Board. For the avoidance of doubt, for so long as the New First Lien Notes are outstanding, the Reorganized Debtors shall maintain at least two independent directors.

Effective as of the Effective Date, the Reorganized Debtors shall enter the Key Executive Employment Agreements on mutually agreeable terms with the Key Executives to address existing change in control commitments or long-term agreements consistent with Reorganized McClatchy's commitment to local, independent journalism, the terms of which shall be consistent with the Solicited Terms of Key Executive Employment Agreements. In accordance with Bankruptcy Code section 1129(a)(5)(B), attached hereto as **Exhibit G** is a schedule disclosing the identities of the Key Executives and the nature of the compensation to be paid to such Key Executives. For the avoidance of doubt, consummation of the Restructuring Transactions on the Effective Date shall not constitute a "change of control" or similar transaction that causes the acceleration of payments or benefits under existing employment agreements with Key Executives. For the avoidance of doubt, the Chief Executive Officer shall receive no other compensation for board service in addition to his or her compensation as Chief Executive Officer.

11.    Employment, Retirement, and Other Agreements and Employee Compensation Plans

(a)    Employment Agreements. The Debtors shall assume or reject employment, severance (including change in control), retirement, indemnification or other agreement with their pre-Effective Date directors, officers, managing members and employees in accordance with the provisions of Article VII of the Plan. The Reorganized Debtors may enter into new employment arrangements and/or change in control agreements with the Debtors' officers who continue to be employed after the Effective Date.

(b)    Other Incentive Plans and Employee Benefits. Unless otherwise specified in the Plan, and except in connection and not inconsistent with Article 6.16(a) of the Plan, on and after the Effective Date, the Reorganized Debtors shall have the sole discretion to (a) amend, adopt, assume, and/or honor, in the ordinary course of business or as otherwise provided herein, any contracts, agreements, policies, programs, and plans for, among other things, compensation, pursuant to the terms thereof or hereof, including any incentive plan, 401(k) plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity from and after the Petition Date, and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.

After the Effective Date, subject to the Reorganized Debtors' rights, if any, under applicable non-bankruptcy law, unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall continue to pay all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of

section 1114 of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the Debtors has obligated themselves to provide such benefits.

As soon as reasonably practicable after the Effective Date, the New Board shall adopt and implement the MIP and other incentive compensation bonus, severance, supplemental retirement and related benefit plans for the Key Executives and other management of the Reorganized Debtors, which shall be mutually agreeable to the Chatham Parties and the Key Executives.

12.    Preservation Of Causes Of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not released pursuant to **Article 10.4** of the Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, including any actions or categories of actions specifically enumerated in a list of retained Causes of Action contained in the Plan Supplement, and such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date;  provided, however, that the Debtors shall release all Causes of Action arising under chapter 5 of the Bankruptcy Code and all state insolvency clawback analogs.  The Debtors or the Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.   The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successor holding such rights of action.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan.

13.    Reservation of Rights

With respect to any avoidance actions that the Debtors abandon in accordance with **Article 6.17** of the Plan, the Debtors and the Reorganized Debtors, as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned avoidance cause of action as a basis to object to all or any part of a claim against any Estates asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

14.    Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

15. <u>Insured Claims</u>

Notwithstanding anything to the contrary contained in the Plan, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, and (b) receive the treatment provided for in the Plan for Allowed General Unsecured Claims to the extent the applicable insurance policy does not provide coverage with respect to any portion of the Claim.

E. <u>Unexpired Leases and Executory Contracts</u>

1. <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>

(a) Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases to which any of the Debtors are parties shall be deemed assumed unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court; (ii) had previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; (iv) is identified for rejection on the Rejection Schedule included in the Plan Supplement; or (v) is to be rejected pursuant to the terms of the Plan.

(b) Entry of the Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases subject to compliance with the requirements herein. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order.

(c) Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the

Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or the Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

(d)     All assumed Executory Contracts and Unexpired Leases shall remain in full force and effect for the benefit of the Reorganized Debtors, and be enforceable by the Reorganized Debtors in accordance with their terms, notwithstanding any provision in such assumed Executory Contract or Unexpired Lease that prohibits, restricts, or conditions such assumption, assignment, or transfer. Any provision in the assumed Executory Contracts and Unexpired Leases that purports to declare a breach or default based in whole or in part on commencement or continuance of these Chapter 11 Cases or any successor cases is hereby deemed unenforceable. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

(e)     Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(f)     Notwithstanding anything to the contrary herein, the Debtors reserve the right to alter, amend, modify, or supplement the Rejection Schedule at any time before the Effective Date.  After the Effective Date, the Reorganized Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

2.     Claims Based on Rejection of Executory Contracts or Unexpired Leases

(a)     All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against

the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court.

3.    <u>Determination of Assumption Disputes and Deemed Consent</u>

(a)    Except as otherwise provided in the Plan, any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption, then payment of Cure shall occur following the entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

(b)    Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

(c)    If a proper and timely objection to the Debtors' proposed Cure was filed by the Cure Objection Deadline, the Cure shall be equal to (i) the amount agreed to between the Debtors or Reorganized Debtors, as applicable, and the applicable counterparty; or (ii) to the extent the Debtors or Reorganized Debtors and counterparty do not reach an agreement regarding any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. Objections, if any, to the proposed assumption and/or Cure must be in writing, filed with the Bankruptcy Court, and served in hard-copy form so that they are actually received by the Cure Objection Deadline.

(d)    If an objection to the proposed assumption and/or to the Cure is timely filed and received, and the parties do not reach a consensual resolution of such objection, a hearing with respect to such objection shall be held at such time scheduled by the Bankruptcy Court or the Debtors or Reorganized Debtors. Objections to the proposed Cure or assumption of an Executory Contract or Unexpired Lease will not be treated as objections to Confirmation of the Plan.

4.    <u>General Reservation of Rights</u>

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejection Schedule, nor anything contained in the Plan, shall constitute an admission by the

Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors, or any of their Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

F.  Releases and Discharge

### 1.  Discharge of the Debtors

**Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, and effective as of the Effective Date: (a) the distributions and rights that are provided in the Plan, if any, and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of Claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, right, or Interest accepted the Plan; (b) the Plan shall bind all Holders of Claims and Interests notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.**

### 2.  Compromises and Settlements

Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims or Interests and (b) Causes of Action that the Debtors have against other Entities up to the Effective Date. After the Effective Date, any such right shall pass to the Reorganized Debtors as contemplated in **Article 10.1** of the Plan, without the need for further approval of the Bankruptcy Court. Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan shall constitute

a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable.

### 3. Release by Debtors

**Without limiting any other applicable provisions of, or releases contained in, the Plan, pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, in consideration for the concessions made as set forth in the Plan and the other contracts, instruments, releases, agreements, or documents to be entered into or delivered in connection with the Plan, and the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, the Debtors and their Estates, the Reorganized Debtors, and any other Person seeking to exercise the rights of the Estates shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the DIP Credit Agreement, the Plan, this Disclosure Statement, the Plan Supplement, the New First Lien Notes, the Exit Facilities, any other Plan Transaction Document, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. For the avoidance of doubt, nothing in this paragraph shall in any way affect the operation of <u>Article 10.2</u> of the Plan, pursuant to section 1141(d) of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the Debtors' release pursuant to Bankruptcy Rule 9019, and further, shall constitute the Bankruptcy Court's finding that the Debtors' release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtors' release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and**

opportunity for hearing; and (6) a bar to any of the Debtors or Reorganized Debtors asserting any Claim or Causes of Action released pursuant to the Debtors' release. Nothing herein shall abrogate applicable attorney disciplinary rules.

### 4. Release by Holders of Claims and Interests

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan, and the Consideration and other contracts, instruments, releases, agreements, or documents to be entered into or delivered in connection with the Plan, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Debtors, the Reorganized Debtors, their Estates, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the DIP Credit Agreement, the Plan, this Disclosure Statement, the Plan Supplement, the New First Lien Notes, the Exit Facilities, any other Plan Transaction Document, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. For the avoidance of doubt, except as expressly provided herein, nothing in <u>Article 10.5</u> in the Plan shall in any way affect the operation of <u>Article 10.2</u> of the Plan, pursuant to section 1141(d) of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the third party release pursuant to Bankruptcy Rule 9019, and further, shall constitute the Bankruptcy Court's finding that the third party release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the third party release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim or Causes of Action released pursuant to the third party release. Nothing in the Plan shall abrogate applicable attorney disciplinary rules.

## 5.   Mutual Release by Debtors and Supporting Parties

**Mutual Release by Debtors and Supporting Parties.** Without limiting any other applicable provisions of, or releases contained in, the Plan or the Plan Transaction Documents, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the concessions made as set forth in the Plan and the other contracts, instruments, releases, agreements, or documents to be entered into or delivered in connection with the Plan, and the service of the Supporting Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, each of the Debtors and the Supporting Parties, for themselves and for their respective current and former Affiliates, and the Debtors' and the Supporting Parties', and their current and former Affiliates', current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, hereby mutually release each other from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the DIP Facility, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the DIP Credit Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the New First Lien Notes, the Exit Facilities, any other Plan Transaction Document, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  For the avoidance of doubt, nothing in this paragraph shall in any way affect the operation of <u>Article 10.2</u> of the Plan, pursuant to section 1141(d) of the Bankruptcy Code. Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the Debtors' and the Supporting Parties' mutual release pursuant to Bankruptcy Rule 9019, and further, shall constitute the Bankruptcy Court's finding that the mutual release is: (1) in exchange for the good and valuable consideration provided by both the Debtors and the Supporting Parties; (2) a good faith settlement and compromise of the claims released by the mutual release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given

and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Reorganized Debtors and the Supporting Parties asserting any Claim or Causes of Action released pursuant to the mutual release. Nothing herein shall abrogate applicable attorney disciplinary rules.

### 6.    Exculpation and Limitation of Liability

From and after the Effective Date, the Exculpated Parties shall neither have, nor incur any liability to any Person or Entity for any Exculpated Claim; **provided**, **however**, that the foregoing "exculpation" shall have no effect on: (1) the liability of any Person or Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document (i) previously assumed, (ii) entered into during the Chapter 11 Cases, or (iii) to be entered into or delivered in connection with the Plan, or (2) the liability of any Exculpated Party that results from any act or omission of such Exculpated Party that is determined in a Final Order to have constituted gross negligence or willful misconduct.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including with regard to the distributions of the Reorganized Equity pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violations of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 7.    Indemnification Obligations

Notwithstanding anything to the contrary contained in Article 6.16 of the Plan, (a) from and after the Effective Date, the Reorganized Debtors will indemnify each Indemnitee to the same extent of any Indemnification Obligation in effect prior to the Effective Date; and (b) the Reorganized Debtors' indemnification obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way.  The treatment of Indemnification Obligations in Article 10.8 of the Plan shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation of the Debtors, except that any Indemnitee may assert a Claim in the Chapter 11 Cases for any Prepetition Indemnification Obligation that is not satisfied because of the limitation contained in the prior sentence.

### 8.    Injunction

Except as otherwise provided in the Plan or the Confirmation Order, the satisfaction, release, and discharge pursuant to **Article 10.9** of the Plan shall act as an injunction, from and after the Effective Date, against any Entity (a) commencing or continuing in any manner or in any place, any action, employment of process, or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, except as set forth in **Article 9.11 or 9.12** of the Plan, in each case with respect to

any Claim, Interest, or Cause of Action satisfied, released or to be released, exculpated or to be exculpated, or discharged under the Plan or pursuant to the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 and 1141 thereof; provided, however, that nothing contained herein shall (1) preclude such Entities from exercising their rights pursuant to and consistent with the terms of the Plan or the Confirmation Order; or (2) be construed to prevent any Entity from defending against Claims objections or collection actions whether by asserting a right of setoff, recoupment, or otherwise, to the extent permitted by law.

9. <u>Release of Liens</u>

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Notwithstanding the above, nothing in the Plan or the Confirmation Order shall release any deed restriction, easements, or institutional control that runs with the land under environmental law.

10. <u>Reimbursement or Contribution</u>

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has filed a noncontingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

G. <u>Conditions Precedent</u>

**Article 11.1** of the Plan sets forth certain conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with **Article 11.2** of the Plan.

H. <u>Miscellaneous Provisions</u>

1. <u>Binding Effect</u>

Upon the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, all current and former Holders of Claims, all current and former Holders of Interests, and all other parties in interest and their respective heirs, successors, and assigns.

2.     <u>Payment of Restructuring Expenses</u>

Pursuant to their respective engagement letters, Ducera Partners LLC ("**Ducera**"), as financial advisor to the Chatham Parties and one of the Chatham Advisors, will earn a fee of $3,750,000 upon consummation of the Plan (the "**Ducera Transaction Fee**"), and GLC Advisors & Co. LLC ("**GLC**"), as financial advisor to the Brigade Parties and one of the Brigade Advisors, will earn a fee of $1,000,000 upon consummation of the Plan (the "**GLC Transaction Fee**"). There will be a credit of $75,000 per month against the Ducera Transaction Fee for each month after March 31, 2020. In addition, within two business days prior to consummation of the Plan, the Brigade Parties, in their sole discretion, may determine that GLC shall receive an additional discretionary fee from the Reorganized Debtors of up to $500,000 upon consummation of the Plan.

Pursuant to the terms of the Plan, on the Effective Date, without the need to file a fee or retention application in the Chapter 11 Cases, the Reorganized Debtors shall pay all reasonable and documented fees and expenses, including fees and expenses estimated to be incurred through the Effective Date, of the Chatham Advisors and the Brigade Advisors.

3.     <u>Modification and Amendments</u>

The Debtors may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan.

4.     <u>Confirmation of the Plan</u>

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to amend the Plan to any extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

5.     <u>Governing Law</u>

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control). Corporate governance matters shall be governed by the laws of the state of incorporation, formation, or functional equivalent thereof, as applicable, of the applicable Reorganized Debtor.

6.     <u>Conflicts</u>

In the event that the provisions of this Disclosure Statement and the provisions of the Plan conflict, the terms of the Plan shall govern.

# ARTICLE VII.

## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

A.  The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, may conduct the Confirmation Hearing to consider Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

B.  Confirmation Standards

Among the requirements for the Confirmation of the Plan are that the Plan is accepted by all Impaired Classes of Claims and Interests, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan. The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization. The Plan complies with the statutory requirements for Confirmation of the Plan, which are listed below.

1.  The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

2.  The Plan has been proposed in good faith and not by any means forbidden by law.

3.  Any payment made or to be made by the proponent, by a Debtors, or by a person issuing securities or acquiring property under a Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

4.  The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an Affiliate of the Debtors participating in a joint Plan with a Debtor or a successor to a Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and Holders of Interests and with public policies.

5.    The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such Insider.

6.    With respect to each Holder within an Impaired Class of Claims or Interests, each such Holder (a) has accepted the Plan, or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

7.    With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan, or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

8.    Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

- with respect to a Claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the Effective Date of the Plan, the Holder of the Claim will receive on account of such Claim Cash equal to the Allowed amount of such Claim, unless otherwise agreed;

- with respect to a Class of Claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each Holder of a Claim of such Class will receive (a) if such Class has accepted the Plan, deferred Cash payments of a value, on the Effective Date of the Plan, equal to the Allowed amount of such Claim; or (b) if such Class has not accepted the Plan, Cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and

- with respect to a priority tax claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the Holder of such Claim will receive on account of such claim deferred Cash payments, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim.

9.    If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

10.   Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

11.    All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

12.    The Plan provides that following the Effective Date of the Plan, subject to the Reorganized Debtors' rights, if any, under applicable non-bankruptcy law, unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall continue to pay all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the debtor has obligated itself to provide such benefits.[11]

C.    <u>Liquidation Analysis</u>

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Based on the Liquidation Analysis attached hereto as **<u>Exhibit C</u>**, the Debtors believe that the value of any distributions if the Debtor's Chapter 11 Case were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.

As a result, the Debtors believe Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

D.    <u>Financial Feasibility</u> Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code. For purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Debtors' management, with the assistance of their advisors, have prepared certain financial projections for fiscal years 2020 through 2022 (the "**Financial Projections**"). These Financial Projections and the assumptions upon which they are based, are attached hereto as **<u>Exhibit B</u>**.

---

[11]    The requirements for Confirmation of a plan of reorganization are set forth in section 1129(a) of the Bankruptcy Code.

In general, as illustrated by the Financial Projections, the Debtors believe that with the significantly de-leveraged capital structure provided under the Plan and increased liquidity, the Reorganized Debtors should have sufficient cash flow and availability to make all payments required pursuant to the Plan while conducting ongoing business operations. The Debtors believe that confirmation and consummation of the Plan is therefore not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The Financial Projections have not been examined or compiled by independent accountants. The Debtors make no representation as to their ability to achieve the projected results. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the three-year period of the Financial Projections may vary from the projected results, and the variations may be material. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

E.      Acceptance by Impaired Classes

The Bankruptcy Code also requires, as a condition to Confirmation, that each Class of Claims or Interests that is Impaired but still receives distributions under the Plan vote to accept the Plan, unless the Debtors can "cram-down" such Classes, as described below. A Class that is Unimpaired is presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless the Plan leaves unaltered the legal, equitable, and contractual rights to which the Claim or Interest entitles the Holder of such Claim or Interest, or the Debtors cure any default and reinstate the original terms of the obligation.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code: (a) an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than half in number of the voting Allowed Claims have voted to accept the Plan; and (b) an Impaired Class of Interests has accepted the Plan if the Holders of at least two-thirds in amount of the Allowed Interests of such Class actually voting have voted to accept the plan.

## F. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, even if the Plan has not been accepted by all Impaired Classes, provided that the Plan has been accepted by at least one Impaired Class entitled to vote, without counting the vote of any insider, as defined in Section 101(31) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the Debtors to confirm the Plan, notwithstanding the failure of any Impaired Class to accept the Plan, in a procedure commonly known as "cram-down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class of Claims or Interests that voted to reject the plan.

### 1. No Unfair Discrimination

The test to determine whether the Plan unfairly discriminates applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation.

### 2. Fair and Equitable Treatment

The test to determine whether the Plan affords fair and equitable treatment applies to Classes of different priority and status (e.g., Secured Claims versus General Unsecured Claims) and includes the general requirement that no Class of Claims receive more than 100% of the amount of the Allowed Claims in such Class. As to a dissenting Class, the test sets different standards depending on the type of Claims or Interests in such Class. Specifically, in order to demonstrate that the Plan is fair and equitable, the Debtors must demonstrate that:

Each Holder of a Secured Claim either (a) retains its Liens on the property, to the extent of the Allowed amount of its Secured Claim and receives deferred Cash payments having a value, as of the effective date of the chapter 11 plan, of at least the Allowed amount of such Claim, (b) has the right to credit bid the amount of its Claim if its property is sold and retains its Liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receives the "indubitable equivalent" of its Allowed Secured Claim.

Either (a) each Holder of an Unsecured Claim receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (b) the Holders of Claims and Interests that are junior to the Claims of the rejecting Classes will not receive any property under the Plan.

Either (a) each Holder of an Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such Holder is entitled, the fixed redemption price to which such Holder is entitled, or the value of the Interest or (b) the Holder of an Interest that is junior to the rejecting Class will not receive or retain any property under the chapter 11 plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Class 7 is not receiving a distribution because there is no Class of equal priority receiving more favorable treatment and no junior Classes to Classes 7 and 8 that will receive or retain any property on account of the Claims or Interests in such Class.

## ARTICLE VIII.

## PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH IN THIS **ARTICLE VIII** AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

A.    General

The following provides a summary of important considerations and risk factors associated with the Plan. However, it is not exhaustive. In considering whether to vote for or against the Plan, Holders of Claims and Interests that are Impaired and entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement, including the various risks and other factors described in The McClatchy Company's Annual Report on Form 10-K for the fiscal year ended December 30, 2018, as modified by the Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2019 June 30, 2019 and September 29, 2019, the entireties of which are publicly available at the Securities and Exchange Commission's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, located at http://www.sec.gov/edgar.shtml.[12]

B.    Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cram-down" (discussed in more detail in **Article VII** herein) are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  See **Article VII** of this Disclosure Statement.  Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all

---

[12]    The Company's annual and quarterly reports, along with its proxy statements, for the last five (5) years are available at the Company's website at http://investors.mcclatchy.com/investor-overview.

stakeholders. The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results since the Debtors' ability to obtain financing to fund their operations and their relations with customers and suppliers may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for their liabilities that will be subject to a plan of reorganization. Once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers, and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

C.     Claims Estimations

The Debtors reserve the right to object to the amount or classification of any Claim or Interest except any such Claim or Interest that is deemed Allowed under the Plan or except as otherwise provided in the Plan. There can be no assurance that the estimated Claim amounts set forth herein are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

D.     Risk Factors That May Affect the Value of the Securities to Be Issued Under the Plan

1.     Debtors cannot guarantee what recovery will be available to Holders of Allowed Claims in Voting Classes.

Various factors make certainty in creditor recoveries impossible. With respect to Class 7, the number or amount of Claims in Voting Classes that will ultimately be Allowed will affect the size of each Holder's Pro Rata recovery. With respect to Class 5, recoveries are dependent on the value of the Reorganized Equity, which is uncertain and may fluctuate significantly in the future due to a number of factors, many of which are beyond our control. These factors include those described below under **Article VIII.F**.

2.     Actual amounts of allowed claims may differ from the estimated claims and adversely affect the percentage recovery on certain claims.

The Claims estimates set forth above are based on various assumptions. The actual amounts of certain Claims may differ significantly from those estimates should one or more underlying assumptions prove to be incorrect. Such differences may be material and adversely affect the percentage recovery to Holders of such Allowed Claims under the Plan.

3.     <u>The Reorganized Debtors may not achieve projected financial results or meet post-reorganization debt obligations and be able to finance all operating expenses, working capital needs, and capital expenditures.</u>

The Reorganized Debtors may not be able to meet their projected financial results. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) enhancing their current customer offerings; (b) taking advantage of future opportunities; (c) growing their business; or (d) responding to competitive pressures. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve their projected revenues and cash flows could lead to cash flow and working capital constraints, which may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required. Further, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on unreasonable terms. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors. If any such required capital is obtained in the form of equity, the interests of the Holders of the then-outstanding Reorganized Equity (and options or other rights to acquire Reorganized Equity) could be diluted. While the Debtors' Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized. The Debtors do not, as a matter of course, publish their business plans and strategies or forward-looking projections of financial position, results from operations, and cash flows. The Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to the Holders of Claims or Interests, or to include such information in documents required to be filed with the Securities and Exchange Commission (the "**SEC**"), if any, or to otherwise make such information public.

4.     <u>Estimated valuation of the Reorganized Debtors and the Reorganized Equity and the estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Equity.</u>

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of the Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Reorganized Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Reorganized Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' estimates of the amount of Claims in each Class which will ultimately be allowed.

5. The Reorganized Debtors may be controlled by a small number of Holders.

Consummation of the Plan may result in a small number of Holders owning a significant percentage of the outstanding shares of Reorganized Equity. These Holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors and approve significant mergers, acquisitions, divestures, and other material corporate transactions, including the sale of the Reorganized Debtors. The Debtors can make no assurances regarding the future actions of the Holders of Reorganized Equity and the impact such actions may have on the value of the Reorganized Equity.

6. There may not be a trading market for Reorganized Equity or the Reorganized McClatchy Warrants to purchase Reorganized Equity, and if a trading market were to develop, there are uncertainties regarding such a market.

The Reorganized Equity and the Reorganized McClatchy Warrants to purchase Reorganized Equity will be new issues with no established trading market or prior trading history. There can be no assurance regarding the future development of a market for the Reorganized Equity or the Reorganized McClatchy Warrants, the ability of Holders thereof to sell their Reorganized Equity or their Reorganized McClatchy Warrants or the price for which such Holders may be able to sell such Reorganized Equity or Reorganized McClatchy Warrants. If a market were to develop, the Reorganized Equity and the Reorganized McClatchy Warrants could trade at prices lower than their initial values under the Plan. The trading prices of the Reorganized Equity and the Reorganized McClatchy Warrants will depend on many factors, including factors beyond the Company's control. Furthermore, the liquidity of, and trading market for, the Reorganized Equity and the Reorganized McClatchy Warrants may be adversely affected by price declines and volatility in the market for similar securities, as well as by changes in the Company's financial condition or results of operations.

The Company does not intend to register the Reorganized Equity or the Reorganized McClatchy Warrants under the Securities Act or to list the Reorganized Equity or the Reorganized McClatchy Warrants on any securities exchange. Holders of Reorganized Equity or Reorganized McClatchy Warrants should not expect to receive reports or financial statements from the Company except to the extent required by the Reorganized Debtors' debt agreements or to the extent voluntarily provided.

7. Certain tax implications of the Debtors' bankruptcy and reorganization may increase the tax liability of the Reorganized Debtors.

Holders of Allowed Claims should carefully review **Article IX** herein, "Certain United States Federal Income Tax Consequences," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors.

E.   Bankruptcy-Specific Risk Factors That Could Negatively Impact the Debtors' Business

    1.   The Company is subject to the risks and uncertainties associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Company's operations and its ability to execute its business strategy will be subject to risks and uncertainties associated with bankruptcy. These risks include:

- the Company's ability to continue as a going concern;

- the Debtors' ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to develop, prosecute, confirm and consummate the proposed plan of reorganization or any other plan of reorganization with respect to the Chapter 11 Cases;

- the ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a plan of reorganization, to appoint a United States Trustee or to convert the Chapter 11 Cases to chapter 7 cases;

- the Company's ability to obtain and maintain normal payment and other terms with credit card companies, customers, vendors and service providers;

- the Company's ability to maintain contracts that are critical to its operations;

- the Company's ability to attract, motivate and retain management and other key employees;

- the Company's ability to retain key vendors or secure alternative supply sources;

- the Company's ability to fund and execute its business plan; and

- the Company's ability to obtain acceptable and appropriate financing.

    2.   The Company will also be subject to risks and uncertainties with respect to the actions and decisions of its creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Company's plans.

These risks and uncertainties could affect the Company's business and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Company's relationships with its vendors, employees, and customers, which in turn could adversely affect the Company's operations and financial condition. Also, pursuant to the Bankruptcy Code, the Debtors need Bankruptcy Court approval for transactions outside the ordinary course of business, which may limit the Company's ability to respond timely

to events or take advantage of opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Company cannot predict or quantify the ultimate impact that events occurring during the Chapter 11 Cases will have on its business, financial condition and results of operations, and there is no certainty as to the Company's ability to continue as a going concern.

As a result of the Chapter 11 Cases, realization of assets and liquidation of liabilities are subject to uncertainty. While operating under the protection of the Bankruptcy Code, and subject to Bankruptcy Court approval or otherwise as permitted in the normal course of business, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the Company's consolidated financial statements. Further, a plan of reorganization could materially change the amounts and classifications reported in the Company's consolidated historical financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

3. <u>The Company's businesses could suffer from a long and protracted restructuring.</u>

The Company's future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect its operating results, as its ability to obtain financing to fund operations may be harmed by protracted bankruptcy proceedings. If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Company's enterprise would be substantially eroded to the detriment of all stakeholders.

Furthermore, the Company cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even once a plan of reorganization is approved and implemented, the Company's operating results may be adversely affected by the possible reluctance of prospective lenders, customers, or vendors to do business with a company that recently emerged from bankruptcy proceedings.

4. <u>The Debtors may not be able to obtain confirmation of the proposed Plan, sufficient debtor-in-possession financing may not be available, and their emergence from the Chapter 11 Cases is not assured.</u>

There can be no assurance that the proposed Plan (or any other plan of reorganization) will be approved by the Bankruptcy Court. There can be no assurances that the Debtors will receive the requisite votes to confirm the Plan. Moreover, the Debtors might receive formal objections to confirmation of the proposed plan from the various stakeholders in the Chapter 11 Cases. The Company cannot predict the impact that any objection might have on the Bankruptcy Court's decision whether to confirm the Plan. Any objection may cause the Debtors to devote significant resources in response which could materially and adversely affect their business, financial condition and results of operations. In addition, the DIP Facilities may not be sufficient to meet

the Debtors' requirements or may be restricted or terminated by the lenders under the DIP Facilities for the Debtors' breach thereof.

If the Plan is not confirmed by the Bankruptcy Court or cash flows and borrowings under the DIP Facilities are not sufficient to meet the Debtors' liquidity requirements, it is unclear whether the Debtors would be able to reorganize their business and what, if any, distributions Holders of claims against the Debtors, including Holders of their secured and unsecured debt and equity, would ultimately receive with respect to their claims. The Debtors would likely incur significant costs in connection with developing and seeking approval of an alternative plan of reorganization or additional financing, which might not be supported by any of the current debt Holders or other stakeholders. If an alternative plan of reorganization could not be agreed upon or additional financing could not be secured, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that Holders of claims would receive less favorable treatment than they would receive if the Debtors were to emerge as viable, reorganized entities. There can be no assurance as to whether the Debtors will successfully reorganize and emerge from the Chapter 11 Cases or, if the Debtors do successfully reorganize, as to when the Debtors would emerge from the Chapter 11 Cases.

5.      <u>The Debtors may not be able to obtain favorable pricing with respect to the Exit Facilities or may not be able to secure commitments for exit financing.</u>

The occurrence of the Effective Date is predicated on, among other things, the receipt of financing under the Exit Facilities. The Debtors do not have committed financing for this credit facility. Although the Debtors intend to negotiate with the DIP Lenders and others with respect to the Exit Facilities, there can be no assurance that the Debtors will be able to negotiate definitive documents and receive any or all of the necessary financing, or that the Debtors will receive the Exit Financing on favorable terms. If the Debtors do not receive the necessary financing under the Exit Facilities, the Debtors will not be able to effectuate the transactions scheduled for consummation on the Effective Date.

6.      <u>Operating under Chapter 11 of the Bankruptcy Code may restrict the Debtors' ability to pursue their business strategies.</u>

Under chapter 11 of the Bankruptcy Code, transactions outside the ordinary course of business will be subject to the prior approval of the Bankruptcy Court, which may limit the Debtors' ability to respond in a timely manner to certain events or take advantage of certain opportunities. The Debtors must obtain Bankruptcy Court approval to, among other things:

- engage in certain transactions with their vendors;

- buy or sell assets outside the ordinary course of business;

- consolidate, merge, sell or otherwise dispose of all or substantially all of their assets; and

- borrow for their operations, investments, or other capital needs or to engage in other business activities that would be in the Company's interest.

7.    <u>The Company depends on key personnel and may not be able to retain those employees or recruit additional qualified personnel.</u>

The Company is highly dependent on the continuing efforts of its senior management team and other key personnel to execute its business plans. The Debtors' deteriorating financial performance, along with the Chapter 11 Cases, puts them at risk of losing talent critical to the successful reorganization and ongoing operation of their business. The Company's business, financial condition, and results of operations could be materially adversely affected if the Debtors lose any of these persons during or subsequent to the Chapter 11 Cases, including as a result of any planned overhead reductions required by the Debtors' business plan. Furthermore, the Debtors may be unable to attract and retain qualified replacements as needed in the future. As discussed above in **Article V**, the Debtors are seeking authorization to continue their KEIP in the ordinary course of business, and following the Effective Date, the Reorganized Debtors plan to implement a management incentive plan, both which may mitigate some of the foregoing risks.

8.    <u>The Company's senior management team and other key personnel may not be able to execute the business plans as currently developed, given the substantial distraction to such individuals caused by these Chapter 11 Cases.</u>

As discussed above, the execution of the Company's business plans depends on the efforts of its senior management team and other key personnel to execute its business plans. Such individuals may be required to devote significant efforts to the Chapter 11 Cases, thereby potentially impairing their abilities to execute the business plans. Accordingly, the Company's business plan may not be implemented as anticipated, which may cause its financial results to materially deviate from the current projections.

9.    <u>The Reorganized Debtors may be subject to claims that will not be discharged in the Chapter 11 Cases, which could have a material adverse effect on their results of operations and profitability.</u>

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation and specified debts arising afterwards. With few exceptions, all claims that arose prior to confirmation of the plan of reorganization (i) would be subject to compromise and/or treatment under the plan of reorganization or (ii) would be discharged in accordance with the Bankruptcy Code and the terms of the plan of reorganization. However, any claims not ultimately discharged by the Bankruptcy Court, such as claims that fall under the exceptions to discharge listed in Section 523 of the Bankruptcy Code, could have an adverse effect on the Reorganized Debtors' results of operations and profitability.

10.    <u>The Company's financial results may be volatile and may not reflect historical trends.</u>

While in bankruptcy, the Company expects its financial results to continue to be volatile as asset impairments, asset dispositions, restructuring activities, contract terminations and rejections, and claims assessments may significantly impact the Company's consolidated financial

statements. As a result, the Company's historical financial performance is likely not indicative of its financial performance after the Petition Date. In addition, if the Debtors emerge from bankruptcy, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to their operating plans pursuant to a plan of reorganization. In addition, if the Debtors emerge from bankruptcy, they may be required to adopt fresh start accounting. If fresh start accounting is applicable, the Debtors' assets and liabilities will generally be recorded at fair value as of the fresh start reporting date in accordance with Accounting Standards Codification 805 (Business Combinations). The fair value of the Debtors' assets and liabilities may differ materially from the recorded values of assets and liabilities on their consolidated balance sheets, including the possibility of newly identified assets or liabilities resulting from a new basis of accounting. In addition, if fresh start accounting is required, the Debtors' financial results after the application of fresh start accounting may be different from historical trends.

11. <u>The Debtors may not have sufficient cash to maintain their operations during the Chapter 11 Cases or fund their emergence from the Chapter 11 Cases.</u>

Because of the Debtors' weakened financial condition, they will continue to have heightened exposure to, and less ability to withstand, the operating risks that are customary in the industry, such as changes to the business environment, digital disruption, and political instability. Any of these factors could result in the need for substantial additional funding. A number of other factors, including the chapter 11 filing, the Debtors' financial results in recent years, the Debtors' substantial indebtedness and the competitive environment the Debtors face, adversely affect the availability and terms of funding that might be available to the Debtors during, and upon emergence from, the Chapter 11 Cases. As a result of these and other factors, the Debtors may not be able to raise capital at acceptable rates, on acceptable terms or at all, to fund their current operations or their exit from bankruptcy. An inability to obtain necessary additional funding on acceptable terms would have a material adverse impact on the Debtors and on their ability to sustain their operations, both currently and upon emergence from the Chapter 11 Cases.

F. <u>Additional Risk Factors That Could Negatively Impact the Company's Business</u>

1. <u>The Company has significant competition in the market for news and advertising, which may reduce our advertising and audience revenues in the future.</u>

Currently, the Company's primary source of revenues is advertising, followed by audience. The competition the Company faces in the advertising industry generally results from an increasing number of digital media options available on the internet, which are expanding advertiser and consumer choices significantly, including social networking tools and mobile and other devices distributing news and other content. Faced with a multitude of media choices and a dramatic increase in accessible information, consumers may place greater value on when, where, how and at what price they consume digital content than they do on the source or reliability of such content. News aggregation websites and customized news feeds (often free to users) may reduce the Company's traffic levels by minimizing the need for the audience to visit the

Company's websites or use its digital applications directly. Online traffic is also driven by internet search results and referrals from social media platforms; therefore, such search results and referrals are critical to the Company's ability to compete successfully. Search engines frequently update and change the methods for directing search queries to web pages or change methodologies and metrics for valuing the quality and performance of internet traffic on delivering cost-per-click advertisements. Social media platforms may also change their emphasis on what content to highlight for users. The failure to successfully adapt to these changes across the Company's businesses could result in significant decreases in traffic to the Company's various websites, which could result in substantial decreases in conversion rates and repeat business, as well as increased costs if the Company was to replace free traffic with paid traffic, any or all of which could adversely affect its business, financial condition and results of operations. If traffic levels stagnate or decline, the Company may not be able to create sufficient advertiser interest in its digital businesses or to maintain or increase the advertising rates of the inventory on its digital platforms. In addition, the proliferation of news sources and advertising platforms has resulted in significant competition and a negative impact on its traditional print business. This increased competition for its advertisers and consumers has had and is expected to continue to have an adverse effect on its business and financial results, including negatively impacting revenues and operating income.

     2.      <u>The Company's advertising revenues may decline due to weak general economic and business conditions.</u>

The Company's advertising revenues are dependent on general economic and business conditions in its markets or those impacting its customers. Many traditional retail companies face greater competition from online retailers and have faced uncertainty in their businesses, affecting their advertising spending. These changes in business conditions have had and may continue to have an adverse effect on the Company's advertising revenues. To the extent economic conditions were to worsen, the Company's business and advertising revenues could be further adversely affected, which could negatively impact the Company's operations and cash flows and its ability to meet the covenants in its debt agreements. The Company's advertising revenues will be particularly adversely affected if advertisers respond to weak and uneven economic conditions or online competition by continuing to reduce their budgets or shift spending patterns or priorities, or if they are forced to consolidate or cease operations. Consolidation across various industries may also reduce the Company's overall advertising revenues. Further, the Company is subject to fluctuating economic conditions in the local markets it serves. For example, real estate advertising fluctuates with the health of the real estate market. In addition, seasonal variations in consumer spending cause the Company's quarterly advertising revenues to fluctuate. Advertising revenues in the fourth quarter, which contain more holidays, are typically higher than in the first three quarters, in which economic activity is generally slower. If general economic conditions and other factors cause a decline in revenues, particularly during the fourth quarter, the Company may not be able to increase or maintain its revenues for the year, which would have an adverse effect on its business and financial results.

3.    <u>To remain competitive, the Company must be able to respond to and exploit changes in technology, services and standards and changes in consumer behavior. Significant capital investments may be required.</u>

Technology in the media industry continues to evolve rapidly. Advances in technology have led to an increasing number of methods for delivery of news and other content and have resulted in a wide variety of consumer demands and expectations, which are also rapidly evolving. For example, the number of people who access online services through devices other than personal computers, including smartphones, handheld tablets and other mobile devices has increased dramatically in the past several years and is projected to continue to increase. If the Company is unable to exploit new and existing technologies to distinguish its products and services from those of its competitors or adapt to new distribution methods that provide optimal user experiences, its business and financial results may be adversely affected.

Technological developments also pose other challenges that could adversely affect the Company's revenues and competitive position. New delivery platforms may lead to pricing restrictions, the loss of distribution control and the loss of a direct relationship with consumers. The Company may also be adversely affected if the use of technology developed to block the display of advertising on websites proliferates.

Technological developments and any changes the Company makes to its business model may require significant capital investments. The Company may be limited in its ability to invest funds and resources in digital products, services or opportunities and the Company may incur costs of research and development in building and maintaining the necessary and continually evolving technology infrastructure. Some of the Company's existing competitors and new entrants may have greater operational, financial and other resources or may otherwise be better positioned to compete for opportunities and as a result, its digital businesses may be less successful, which could adversely affect its business and financial results.

4.    <u>If the Company is not successful in growing and managing its digital businesses, its business, financial condition will be adversely affected.</u>

The Company's future growth depends to a significant degree upon the development and management of its digital businesses. The growth of its digital businesses over the long term depends on various factors, including, among other things, the ability to:

- continue to increase digital audiences;
- attract advertisers to its digital products;
- tailor its product for mobile devices;
- maintain or increase the advertising rates on its digital products;
- improve its ability to increase the relevance of advertisements shown to users;
- manage the impact of new technologies that could block or obscure the display of advertisements;
- exploit new and existing technologies to distinguish its products and services from those of competitors and develop new content, products and services; and
- invest funds and resources in digital opportunities.

In addition, the Company expects that its digital business will continue to increase as a percentage of its total revenues in future periods. For 2018, digital advertising revenues comprised 43.3% of total advertising revenues compared to 34.7% in 2017. Digital-only advertising revenues increased 13.5% in 2018 compared to 9.8% in 2017. Total digital-only, which includes digital-only revenues from advertising and audience, was up 14.8% in 2018 compared to 9.4% in 2017. As its digital business becomes a greater portion of its overall business, the Company will face a number of increased risks from managing its digital operations, including, but not limited to, the following:

- structuring its sales force to effectively sell advertising in the digital advertising arena versus its historical print advertising business;
- attracting and retaining employees with the skill sets and knowledge base needed to successfully operate in digital business; and
- managing the transition to a digital business from a historical print-focused business and the need to concurrently reduce the physical infrastructure, distribution infrastructure and related fixed costs associated with the historical print business.

5.      If the Company is unable to execute cost-control measures successfully, its total operating costs may be greater than expected, which may adversely affect its profitability.

As a result of adverse general business conditions in its industry and its operating results, the Company has taken steps to lower operating costs by reducing workforce, consolidating or regionalizing operations and implementing general cost-control measures. If the Company does not achieve expected savings from these initiatives, or if its operating costs increase as a result of these initiatives, its total operating costs may be greater than anticipated. These cost-control measures may also affect its business and its ability to generate future revenue. Because portions of its expenses are fixed costs that neither increase nor decrease proportionately with revenues, the Company may be limited in its ability to reduce costs in the short term to offset any declines in revenues. If these cost-control efforts do not reduce costs sufficiently or otherwise adversely affect its business, income may decline.

6.      Difficult business conditions in the economy generally and in the Company's industry specifically, or changes to the Company's business and operations may result in goodwill and masthead impairment charges.

Due to business conditions, including lower revenues and operating cash flow, the Company recorded masthead impairment charges of $37.2 million and $21.5 million in 2018 and 2017, respectively. The Company also recorded goodwill impairment charges of $290.9 million in 2015 and masthead impairment charges of $9.2 million, $13.9 million and $5.2 million in 2016, 2015 and 2014, respectively. As of December 30, 2018, the Company has goodwill of $705.2 million and mastheads of $112.7 million. Further erosion of general economic, market or business conditions (nationally and in the Company's local markets) could have a negative impact on the Company's business and stock price, which may require that the Company records additional impairment charges in the future, which negatively affects its results of operations.

7. **The Company's business, reputation and results of operations could be negatively impacted by data security breaches and other security threats and disruptions.**

Certain network and information systems are critical to the Company business activities. Network and information systems may be affected by cybersecurity incidents that can result from deliberate attacks or system failures. Threats include, but are not limited to, computer hackings, computer viruses, denial of service attacks, worms or other destructive or disruptive software, or other malicious activities.

The Company's security measures may also be breached due to employee error, malfeasance, or otherwise. As a result of these breaches, an unauthorized party may obtain access to the Company's data or its users' data or its systems may be compromised. These events evolve quickly and often are not recognized until after an attack is launched, so the Company may be unable to anticipate these attacks or to implement adequate preventative measures. Its network and information systems may also be compromised by power outages, fire, natural disasters, terrorist attacks, war or other similar events. There can be no assurance that the actions, measures and controls the Company has implemented will be sufficient to prevent disruptions to mission-critical systems, the unauthorized release of confidential information or corruption of data.

Although the Company has experienced cybersecurity incidents, to date none has had a material impact on its financial condition, results of operations or liquidity. Nonetheless, these types of events are likely to occur in the future and such events could disrupt its operations or other third-party information technology systems in which the Company is involved. A significant breakdown, invasion, corruption, destruction or interruption of critical information technology systems or infrastructure by employees, others with authorized access to the Company's systems, or unauthorized persons could result in legal or financial liability or otherwise negatively impact its operations. They also could require significant management attention and resources, and could negatively impact its reputation among the Company's customers, advertisers and the public, which could have a negative impact on its financial condition, results of operations or liquidity.

8. **The Company is subject to significant financial risk as a result of its expected $348.9 million in total consolidated debt.**

On the Effective Date, the Company is expected to have approximately $348.9 million in total principal indebtedness outstanding, including the New First Lien Notes, the Exit ABL Facility, and the Exit Term Loan Facility. This level of debt increases its vulnerability to general adverse economic and industry conditions and the Company may need to refinance its debt prior to its scheduled maturity. Higher leverage ratios, its credit ratings, its economic performance, adverse financial markets or other factors could adversely affect the Company's future ability to refinance maturing debt on commercially acceptable terms, or at all, or the ultimate structure of such refinancing.

9. **The Company requires newsprint for operations and, therefore, its operating results may be adversely affected if the price of newsprint increases or if the Company experiences disruptions in its newsprint supply chain that reduce the availability of newsprint in its markets.**

The Company requires newsprint to deliver its daily and Sunday newspapers and maintain its print subscriber revenues. Newsprint accounted for 4.0% of its operating expenses, excluding impairments, in 2018 compared to 4.4% in 2017. The price of newsprint has historically been volatile. More recently newsprint availability has tightened in the United States. The price and availability of newsprint are affected by various factors, including:

- declining newsprint supply from mill closures;
- reduction in newsprint suppliers because of consolidation in the newsprint industry;
- tariffs on supply from other countries, primarily Canada:
- paper mills reducing their newsprint supply because of switching their production to other paper grades; and
- a decline in the financial situation of newsprint suppliers.

The Company has not attempted to hedge price fluctuations in the normal purchases of newsprint or enter into contracts with embedded derivatives for the purchase of newsprint other than the natural hedge created by its ownership interest in Ponderay. Pursuant to the Plan, the Company will abandon its interest in Ponderay. Consequently, the Company will no longer be able to rely on this relationship to provide a natural hedge in the cost of its newsprint. If the price of newsprint increases materially, the Company's operating results could be adversely affected. In addition, the Company relies on a limited number of suppliers for deliveries of newsprint.  If newsprint suppliers experience labor unrest, transportation difficulties or other supply disruptions, the Company's ability to produce and deliver newspapers could be impaired and/or the cost of the newsprint could increase, both of which would negatively affect its operating results.

10.    <u>A portion of the Company's employees are members of unions, and if the Company experiences labor unrest, its ability to produce and deliver newspapers could be impaired.</u>

If the Company experiences labor unrest, its ability to produce and deliver newspapers could be impaired in some locations. In addition, the results of future labor negotiations could harm its operating results. The Company's media companies have not experienced a labor strike for decades. However, the Company cannot ensure that a strike will not occur at one or more of its media companies in the future. As of December 30, 2018,  approximately 5.0% of full-time and part-time employees were represented by unions. Most of the Company's union-represented employees are currently working under labor agreements, with expiration dates through 2020. The Company faces collective bargaining upon the expirations of these labor agreements. Even if its media companies do not suffer a labor strike, its operating results could be harmed if the results of labor negotiations restrict its ability to maximize the efficiency of its newspaper operations. In addition, the Company's ability to make short-term adjustments to control compensation and benefits costs, rebalance its portfolio of businesses or otherwise adapt to changing business needs may be limited by the terms and duration of its collective bargaining agreements.

11. <u>The Company has invested in certain digital or other ventures, but such ventures may not be as successful as expected, which could adversely affect its results of operations.</u>

The Company continues to evaluate its business and make strategic investments in digital ventures, either alone or with partners, to further its digital growth. The Company has numerous small "seed" investments in other digital companies. The Company also owns 25.0% of Nucleus, a national marketing agency, and, through three wholly-owned subsidiaries, a combined 27.0% interest in the Ponderay Newsprint Company. Pursuant to the Plan, the Company will abandon its interest in Ponderay. The success of these ventures is dependent to an extent on the efforts and strategic plans of its partners. Further, the Company's ability to monetize the investments and/or the value it may receive upon any disposition may depend on the actions of its partners. As a result, the Company's ability to control the timing or process relating to a disposition may be limited, which could adversely affect the liquidity of these investments or the value it may ultimately attain upon disposition. If the value of the companies in which the Company invests declines, the Company may be required to record a charge to earnings. There can be no assurances that the Company will receive a return on these investments or that they will result in advertising growth or will produce equity income or capital gains in future years.

12. <u>Circulation volume declines will adversely affect the Company's print audience and print advertising revenues, and audience price increases could exacerbate declines in circulation volumes.</u>

Print advertising and audience revenues are affected by changes in customer habits, which impact circulation volumes and readership levels of the Company's print newspapers. In recent years, newspaper companies, including the Company, have experienced difficulty maintaining or increasing print circulation levels because of a number of factors, including:

- increased competition from other publications and other forms of media technologies available in various markets, including the internet and other new media formats that are often free for users;
- continued fragmentation of media audiences;
- a growing preference among some consumers to receive all or a portion of their news online or other than from a traditional printed newspaper; and
- increases in subscription and newsstand rates.

These factors could also affect the Company's media companies' ability to institute circulation price increases for print products. Also, print price increases have historically had an initial negative impact on circulation volumes that may not be mitigated with additional marketing and promotion. A prolonged reduction in circulation volumes would have a material adverse effect on print advertising revenues. To maintain its circulation base, the Company may be required to incur additional costs that the Company may not be able to recover through audience and advertising revenues.

13. The Company relies on third party vendors for various services and if any of those third parties fail to fulfill their obligations to the Company with quality and timeliness the Company expects, or if the Company's relationship with such vendors is damaged, its business may be harmed.

The Company relies on third party vendors to provide various services such as printing, distribution and production, as well as various information technology systems and services. The Company does not control the operation of these vendors. If any of these third party vendors terminate their relationship with the Company, or does not provide an adequate level of service, it would be disruptive to the Company's business as the Company seeks to replace the vendor or remedy the inadequate level of service. This disruption may adversely affect its operating results.

14. Developments in the laws and regulations to which the Company is subject may result in increased costs and lower advertising revenues from its digital businesses.

The Company is generally subject to government regulation in the jurisdictions in which the Company operates. In addition, its websites are available worldwide and are subject to laws regulating the internet both within and outside the United States. The adoption of any laws or regulations that limit use of the internet, including laws or practices limiting internet neutrality, could decrease demand for, or the usage of, the Company's products and services, which could adversely affect its operating results. The Company may incur increased costs necessary to comply with existing and newly adopted laws and regulations or penalties for any failure to comply. Advertising revenues from its digital businesses could be adversely affected, directly or indirectly, by existing or future laws and regulations relating to the use of consumer data in digital media.

15. Adverse results from litigation or governmental investigations can impact the Company's business practices and operating results.

In the ordinary course of business, the Company and its subsidiaries are parties to litigation and regulatory, environmental and other proceedings with governmental authorities and administrative agencies. Adverse outcomes in lawsuits or investigations could result in significant monetary damages or injunctive relief that could adversely affect the Company's operating results or financial condition as well as its ability to conduct its business as it is presently being conducted.

G.    Risks Associated with Forward-Looking Statements

1.    Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly

reflects, in all material respects, the financial results of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2. Financial Projections and Other Forward-Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections that are, by their nature, forward-looking, and which necessarily base projections on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future financial results of the Reorganized Debtors may turn out to be different from the Financial Projections.

Except for historical information, this Disclosure Statement may be deemed to contain "forward-looking" statements within the meaning of the Private Securities Litigation Reform Act of 1995. The Company is including this cautionary statement for the express purpose of availing itself of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.

Forward-looking statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. Examples of forward-looking statements include, but are not limited to, statements relating to future financial performance and operations and trends in advertising and uses of cash.

The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. Factors that could cause actual results to differ materially from these forward-looking statements include, but are not limited to, the factors listed in **Articles VIII.D, VIII.E, and VIII.F**.

The Company cautions each reader of this Disclosure Statement to carefully consider those factors set forth above and the acknowledgements contained in the "Risk Factors" section of this Disclosure Statement. Such factors have, in some instances, affected and in the future could affect the ability of the Company to achieve its projected results and may cause actual results to differ materially from those expressed herein. The Company undertakes no obligation to update any forward-looking statements in this Disclosure Statement.

The Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

H.     Disclosure Statement Disclaimer

        1.     This Disclosure Statement Was Not Approved by the Securities and
               Exchange Commission.

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

        2.     Reliance on Exemptions from Registration Under the Securities Act.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with federal or state securities laws or other similar laws. The offer of Reorganized Equity to Holders of certain Classes of Claims has not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the Reorganized Equity will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code and section 4(a)(2) of the Securities Act.

        3.     No Legal or Tax Advice Is Provided to You by this Disclosure Statement.

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

        4.     No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

        5.     Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file, and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

6.      <u>No Waiver of Right to Object or Right to Recover Transfers and Assets.</u>

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified herein.

7.      <u>Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.</u>

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

8.      <u>Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.</u>

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment so that the information provided in this Disclosure Statement and in the Plan is as accurate as possible, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

9.      <u>No Representations Outside this Disclosure Statement are Authorized.</u>

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel for the Debtors and the United States Trustee.

I.      <u>Liquidation Under Chapter 7</u>

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is described herein and attached hereto as **<u>Exhibit C</u>**.

# ARTICLE IX.

## EXEMPTIONS FROM SECURITIES ACT REGISTRATION

A.  <u>Securities Issued in Reliance on Section 1145 of the Bankruptcy Code and Section 4(A)(2) of the Securities Act</u>

Under the Plan, Reorganized Equity will be issued to Holders of Allowed Second Lien/Third Lien Claims in reliance upon section 1145 of the Bankruptcy Code and/or Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Section 1145 of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of stock or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor; and (c) the securities are issued in exchange for a claim against or an interest in a debtor or are issued principally in such exchange and partly for Cash and property.

Reorganized Equity issued pursuant to section 1145 of the Bankruptcy Code may be resold without registration under either (a) state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of several states or (b) the Securities Act, pursuant to an exemption provided by section 4(a)(1) of the Securities Act unless the Holder is an "underwriter" (as such term is defined in the Bankruptcy Code) with respect to the securities or an affiliate of the debtor. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor, if that purchase is with a view to distributing any security received or to be received in exchange for such a claim or interest;

- offers to sell securities offered or sold under a plan of reorganization for the holders of those securities;

- offers to buy those securities offered or sold under a plan of reorganization from the holders of the securities, if the offer to buy is (a) with a view to distributing the securities and (b) under an agreement made in connection with the plan of reorganization, the consummation of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

- an issuer with respect to the securities, as the term "issuer" is used in section 2(a)(11) of the Securities Act.

The reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(a)(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of

management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its succesor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person."

Section 4(a)(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act will not apply to the offer and sale of a security in connection with transactions not involving any public offering. The term "issuer," as used in section 4(a)(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security. Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(a)(2) of the Securities Act.

Reorganized Equity not issued pursuant to the Plan in reliance on section 1145 of the Bankruptcy Code will be issued to such persons pursuant to section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. Reorganized Equity issued pursuant to section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder shall be restricted securities (as described in **Article IX.B** below) and resales of such Reorganized Equity will be subject to the limitations described in **Article IX.B** below.

B.    Restricted Securities

To the extent that persons who receive Reorganized Equity pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, including as an "affiliate" of the issuer (the "**Restricted Holders**"), resales by Restricted Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Consequently, an "underwriter" or "affiliate" may not resell Reorganized Equity except in compliance with the registration requirements of the Securities Act or an exemption therefrom, including Rule 144. With respect to the Reorganized Equity issued pursuant to section 1145 of the Bankruptcy Code, any person who is an "underwriter" but not an "issuer" with respect to an issue of securities is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF THE REORGANIZED DEBTORS WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTORS EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF THE REORGANIZED DEBTORS. ACCORDINGLY, THE DEBTORS RECOMMEND THAT**

**POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

## ARTICLE X.

### CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

A summary description of certain United States federal income tax consequences of the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the principal United States federal income tax consequences of the Plan to the Debtors and for Holders of Claims who are entitled to vote to accept or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service ("**IRS**") or any other taxing authorities have been or will be sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other taxing authorities. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim. No assurance can be given that the IRS or another taxing authority would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), Treasury regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address state, local or non-United States tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to Non-U.S. Holders (as defined below) or to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, real estate investment trusts, regulated investment companies, United States expatriates, Holders of Claims who are, or who hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, dealers in securities or foreign currency, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). Furthermore, the following discussion does not address alternative minimum tax considerations for Holders of Claims or United States federal taxes other than income taxes. Except as expressly provided below, the following discussion assumes that Holders of Claims hold their Claims as capital assets for United States federal income tax purposes (generally, property held for investment), and that the various debt and other arrangements to which a Debtor is a party will be respected for United States federal income tax purposes in accordance with their forms.

For purposes of the following discussion, a "**U.S. Holder**" is a beneficial owner of a Claim that is (i) a citizen or individual resident of the United States; (ii) a corporation (or other entity classified as a corporation for United States federal income tax purposes) created or organized

under the laws of the United States or any political subdivision thereof; (iii) an estate, the income of which is subject to United States federal income taxation regardless of its source; or (iv) a trust that (a) is subject to the primary supervision of a United States court and has one or more United States persons, within the meaning of Internal Revenue Code section 7701(a)(30), who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury regulations to be treated as a United States person. For purposes of the following discussion, a "**Non-U.S. Holder**" is a beneficial owner of a Claim that is an individual, corporation, estate or trust for United States federal income tax purposes and is not a U.S. Holder.

If a partnership (including any entity classified as a partnership for United States federal income tax purposes) holds Claims, the United States federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership participating in the Plan (and its partners) should consult their tax advisors regarding the consequences of participating in the Plan.

**Each Holder of a Claim is strongly urged to consult its own tax advisor regarding the United States federal, state, local and non-United States tax consequences of the transactions described herein or contemplated by the Plan.**

A.  Certain United States Federal Income Tax Consequences to the Debtors

1.  Cancellation of Indebtedness Income

Under general United States federal income tax principles, each Debtor will realize cancellation of debt ("**COD**") income to the extent that its obligation to a Holder of a Claim that constitutes indebtedness for United States federal income tax purposes is discharged pursuant to the Plan for an amount that is less than the adjusted issue price of such Holder's Claim (in most cases, the adjusted issue price of a Claim equals the amount that a Debtor received upon incurring the obligation, with certain adjustments). For this purpose, the amount paid to a Holder of a Claim in discharge of its Claim generally will equal the sum of the amount of Cash paid to such Holder, the "issue price" of any debt issued to such Holder of a Claim, and the fair market value on the Effective Date of any other property paid to such Holder of a Claim.

Because each Debtor will be a debtor in a bankruptcy case at the time it realizes COD income pursuant to the Plan, the Debtors will not be required to include such COD income in their gross income for United States federal income tax purposes, but rather will be required to reduce certain of their respective United States federal income tax attributes by the amounts of COD income so excluded, subject to certain limitations. Under the general rules of Internal Revenue Code section 108, the excluded COD income is expected to result in a reduction, or elimination, of net operating losses ("**NOLs**"), NOL carryovers and certain other United States federal income tax attributes of the Debtors, including basis in assets (but, generally, not below the amount of its liabilities immediately after the discharge).

2.    Utilization of NOLs and Other Tax Attributes

Under Internal Revenue Code section 382, whenever there is a more than fifty percent (50%) owner shift of a corporation during a three (3) year testing period (an "**ownership change**"), the ability of the corporation to utilize its NOL carryovers, certain subsequently recognized built-in losses, disallowed interest carryovers, and certain other tax attributes ("**Pre-Change Losses**") to offset post-ownership change taxable income may be subject to an annual limitation.  The issuance of the Reorganized Equity pursuant to the Plan will constitute an ownership change for purposes of Internal Revenue Code section 382.  Unless the Debtors qualify under, and do not elect not to be subject to, a special rule under Internal Revenue Code section 382(l)(5) applicable to certain corporations under the jurisdiction of a court in a title 11 or similar case (the "**382(l)(5) Exception**"), the Reorganized Debtors' ability to utilize any Pre-Change Losses may be significantly limited as a result of this ownership change.

If the 382(l)(5) Exception applies, the Debtors' Pre-Change Losses will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the Effective Date of the Plan, and during the part of the taxable year prior to and including the Effective Date of the Plan, in respect of all debt converted into stock in the Plan. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the effective date of the Plan, any such ownership change of the Debtors would preclude the Debtors' utilization of any Pre-Change Losses at the time of the subsequent ownership change against future income. A future "ownership change" after such two-year period would subject the Reorganized Debtors to the general limitations under Internal Revenue Code section 382. A Debtor that qualifies for this exception may, if it so desires, elect not to have the 382(l)(5) Exception apply and instead remain subject to the annual limitation.

3.    Limitation on Interest Deductions

Internal Revenue Code section 163 imposes certain limitations on the deductibility of interest expense for United States federal income tax purposes.  Such limitations may impact the ability of the Reorganized Debtors to deduct interest expense, or the timing of available deductions for interest expense, incurred under debt instruments issued pursuant to the Plan, including, without limitation, the New First Lien Notes and the Exit 1.5L Facility.

The Exit 1.5L Facility may constitute an "applicable high yield discount obligation" within the meaning of Internal Revenue Code section 163(e)(5) (an "**AHYDO**"). In such event, the interest expense deduction with respect to a portion of the original issue discount on the Exit 1.5L Facility may be disallowed permanently, and the interest expense deduction with respect to the remainder of the original issue discount on the Exit 1.5L Facility may be deferred until paid in cash.

Under Internal Revenue Code section 163(j), any interest expense deductions otherwise allowable may be subject to annual limitations.  The deferral or disallowance of interest expense deductions, or annual limitation on the use of such deductions, may result in increased cash taxes payable by or with respect to the Reorganized Debtors.

B.    Certain United States Federal Income Tax Consequences to U.S. Holders of Claims

The following summary discusses certain United States federal income tax consequences of the transactions contemplated by the Plan to Holders of Claims that are U.S. Holders.  These consequences (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things: (i) the manner in which a U.S. Holder of a Claim acquired a Claim; (ii) the length of time the Claim has been held; (iii) the U.S. Holder of a Claim's method of tax accounting; (iv) whether the U.S. Holder of a Claim has taken a bad debt deduction with respect to the Claim (or any portion of the Claim) in the current or prior taxable years; (v) whether the Claim was acquired at a discount; (vi) whether the U.S. Holder of a Claim has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (vii) whether the Claim is an installment obligation for United States federal income tax purposes; and (viii) whether the Claim constitutes a "security" for United States federal income tax purposes.  The tax consequences described below are not exclusive, and some of the conclusions expressed are uncertain.  U.S. Holders may be treated for United States federal income tax purposes in some manner other than that set forth herein.  Therefore, each U.S. Holder of a Claim is strongly urged to consult its own tax advisor regarding information that may be relevant to its particular situation and circumstances and the tax consequences to it of the transactions contemplated by the Plan.

1.    U.S. Holders of Class 4 –First Lien Notes Claims That Are Not Chatham Subordinated Notes Claims

Pursuant to the Plan, each U.S. Holder of an Allowed Class 4 Claim that is not a Chatham Subordinated Notes Claim will receive (1) its Pro Rata share of, to the extent not already paid as adequate protection, Cash in an amount equal to any accrued and unpaid interest (including any interest on interest) on the First Lien Notes that was due as of the Petition Date, and (2) its Pro Rata share of New First Lien Notes in exchange for such U.S. Holder's Allowed Class 4 Claim.

The United States federal income tax consequences of the Plan to such U.S. Holders will depend on whether such U.S. Holders' Allowed Class 4 Claims and New First Lien Notes constitute "securities" for United States federal income tax purposes.  Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances.  Most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for United States federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  In addition, the IRS has ruled that a new debt obligation with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, because the new debt represents a continuation of the holder's investment in the corporation in substantially the same form. There are other factors that may be relevant to the determination, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into equity of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.

The Debtors intend to take the position that each of the Allowed Class 4 Claims and the New First Lien Notes constitute "securities" for United States federal income tax purposes. The remainder of this discussion assumes that each of the Allowed Class 4 Claims and the New First Lien Notes constitute "securities" for United States federal income tax purposes. Each U.S. Holder should consult its tax advisor regarding the treatment of such obligations as "securities."

If the Allowed Class 4 Claims and New First Lien Notes are characterized as "securities" for United States federal income tax purposes, the exchange of the Allowed Class 4 Claims for New First Lien Notes and Cash, if any, should be treated as a "recapitalization" for United States federal income tax purposes. In such event, a U.S. Holder generally should recognize gain (but not loss) on the exchange, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized in the exchange or (ii) the amount of any "boot" received in the exchange, provided, however, that to the extent any Cash or any of the New First Lien Notes are treated as received in exchange for accrued but untaxed interest, the U.S. Holder generally will recognize interest income to that extent. For purposes of the preceding sentence, the amount of gain realized should be equal to the difference between (a) the sum of (x) the issue price of the New First Lien Notes received pursuant to the Plan (except New First Lien Notes treated as received in exchange for accrued but unpaid interest) and (y) the amount of Cash received pursuant to the Plan (except Cash treated as received in exchange for accrued but unpaid interest) and (b) the U.S. Holder's adjusted tax basis in the Allowed Class 4 Claim surrendered (except for any tax basis of the Allowed Class 4 Claim attributable to accrued but unpaid interest). The amount of any "boot" received in the exchange should be equal to the sum of (a) the fair market value of the excess of the "principal amount" of the New First Lien Notes received pursuant to the Plan (except New First Lien Notes treated as received in exchange for accrued but unpaid interest) over the "principal amount" of the Allowed Class 4 Claims surrendered in exchange therefor, and (b) the amount of any Cash received in the exchange (except Cash treated as received in exchange for accrued but unpaid interest). Any gain recognized should be capital in character, subject to the "market discount" rules described below, and should be long-term capital gain if the U.S. Holder's holding period for the surrendered Allowed Class 4 Claim exceeded one year. Each U.S. Holder should consult its tax advisor regarding the treatment of Cash, and the calculation of boot, received pursuant to the Plan.

A U.S. Holder's aggregate tax basis in New First Lien Notes should be equal to the tax basis of the Allowed Class 4 Claims surrendered in exchange therefor increased by the amount of any gain recognized and decreased by the amount of any Cash received in the exchange (except Cash treated as received in exchange for accrued but unpaid interest), provided, however, that to the extent any Cash or any New First Lien Notes are treated as received in exchange for accrued but unpaid interest, the tax basis of such New First Lien Notes should equal the amount of such accrued interest decreased by the amount of Cash so received.

A U.S. Holder's holding period for its New First Lien Notes generally should include its holding period for the Allowed Class 4 Claims exchanged therefor, provided, however, that to the extent any New First Lien Notes are treated as received in exchange for accrued but unpaid interest, the holding period for such New First Lien Notes should begin on the day following the Effective Date.

(a)     Market Discount

If a U.S. Holder of an Allowed Class 4 Claim had purchased its First Lien Note at a price less than such First Lien Note's "revised issue price" (generally, the issue price increased by all previous holders' inclusions of original issue discount), the difference would constitute "market discount" for United States federal income tax purposes. Gain recognized by a U.S. Holder in the exchange of an Allowed Class 4 Claim bearing market discount pursuant to the Plan should generally be treated as ordinary interest income to the extent of the market discount accrued on such Allowed Class 4 Claim during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include accrued market discount in taxable income currently. Any accrued market discount in respect of the Allowed Class 4 Claim in excess of the gain recognized in the exchange should carry over to the New First Lien Note received in exchange therefor pursuant to the Plan, and any gain recognized by the U.S. Holder on a subsequent taxable disposition of such New First Lien Note may be treated as ordinary income to the extent of any such accrued market discount not previously included in income. U.S. Holders should consult their tax advisors regarding the potential application of the market discount rules.

(b)     Original Issue Discount on the New First Lien Notes

The New First Lien Notes may be issued with original issue discount ("**OID**") for United States federal income tax purposes. The amount of OID on the New First Lien Notes will equal the difference between their "stated redemption price at maturity" and their "issue price." The stated redemption price at maturity of the New First Lien Notes will equal the principal amount of the New First Lien Notes plus all payments on the New First Lien Notes other than amounts treated as "qualified stated interest" ("**QSI**"). The issue price of a New First Lien Note will equal its fair market value if the First Lien Notes or New First Lien Notes are considered "publicly traded" for United States federal income tax purposes. U.S. Holders of New First Lien Notes will be required to include accrued OID in gross income over the period that they hold the New First Lien Notes, regardless of such U.S. Holder's regular method of accounting and possibly in advance of the receipt of cash attributable thereto. U.S. Holders will include QSI in income in accordance with their regular method of accounting. U.S. Holders of New First Lien Notes should consult their tax advisors regarding the OID consequences to them of holding New First Lien Notes.

2.     U.S. Holders of Class 4 – First Lien Notes Claims That Are Chatham Subordinated Notes Claims

Pursuant to the Plan, each U.S. Holder of an Allowed Class 4 Claim that is a Chatham Subordinated Notes Claim will receive (1) its Pro Rata share of, to the extent not already paid as adequate protection, Cash in an amount equal to any accrued and unpaid interest (including any interest on interest) on the First Lien Notes that was due as of the Petition Date, and (2) its Pro Rata amount of the Exit 1.5L Facility in exchange for such U.S. Holder's Allowed Class 4 Claim.

The United States federal income tax consequences to such U.S. Holders will depend on whether such U.S. Holders' Allowed Class 4 Claims and the Exit 1.5L Facility constitute "securities" for United States federal income tax purposes. Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances. Most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in

determining whether such instrument is a security for United States federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are other factors that may be relevant to the determination, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into equity of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.

The Debtors intend to take the position that each of the Allowed Class 4 Claims and the Exit 1.5L Facility constitute "securities" for United States federal income tax purposes. The remainder of this discussion assumes that each of the Allowed Class 4 Claims and the Exit 1.5L Facility constitute "securities" for United States federal income tax purposes. Each U.S. Holder should consult its tax advisor regarding the treatment of such obligations as "securities."

If the Allowed Class 4 Claims and the Exit 1.5L Facility are characterized as "securities" for United States federal income tax purposes, the exchange of the Allowed Class 4 Claims for the Exit 1.5L Facility and Cash, if any, should be treated as a "recapitalization" for United States federal income tax purposes. In such event, a U.S. Holder generally should recognize gain (but not loss) on the exchange, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized in the exchange or (ii) the amount of any "boot" received in the exchange, provided, however, that to the extent any Cash or any of the Exit 1.5L Facility is treated as received in exchange for accrued but untaxed interest, the U.S. Holder generally will recognize interest income to that extent. For purposes of the preceding sentence, the amount of gain realized should be equal to the difference between (a) the sum of (x) the issue price of the Exit 1.5L Facility received pursuant to the Plan (except any of the Exit 1.5L Facility treated as received in exchange for accrued but unpaid interest) and (y) the amount of Cash received pursuant to the Plan (except Cash treated as received in exchange for accrued but unpaid interest) and (b) the U.S. Holder's adjusted tax basis in the Allowed Class 4 Claim surrendered (except for any tax basis of the Allowed Class 4 Claim attributable to accrued but unpaid interest). The amount of any "boot" received in the exchange should be equal to the sum of (a) the fair market value of the excess of the "principal amount" of the Exit 1.5L Facility received pursuant to the Plan (except any of the Exit 1.5L Facility treated as received in exchange for accrued but unpaid interest) over the "principal amount" of the Allowed Class 4 Claims surrendered in exchange therefor, and (b) the amount of any Cash received in the exchange (except Cash treated as received in exchange for accrued but unpaid interest). Any gain recognized should be capital in character, subject to the "market discount" rules described below, and should be long-term capital gain if the U.S. Holder's holding period for the surrendered Allowed Class 4 Claim exceeded one year. Each U.S. Holder should consult its tax advisor regarding the treatment of Cash, and the calculation of boot, received pursuant to the Plan.

A U.S. Holder's aggregate tax basis in the Exit 1.5L Facility should be equal to the tax basis of the Allowed Class 4 Claims surrendered in exchange therefor increased by the amount of any gain recognized and decreased by the amount of any Cash received in the exchange (except Cash treated as received in exchange for accrued but unpaid interest), provided, however, that to the extent any Cash or any of the Exit 1.5L Facility is treated as received in exchange for accrued

but unpaid interest, the tax basis of such amount of the Exit 1.5L Facility should equal the amount of such accrued interest decreased by the amount of Cash so received.

A U.S. Holder's holding period for its amount of the Exit 1.5L Facility generally should include its holding period for the Allowed Class 4 Claims exchanged therefor, provided, however, that to the extent any of the Exit 1.5L Facility is treated as received in exchange for accrued but unpaid interest, the holding period for such amount of the Exit 1.5L Facility should begin on the day following the Effective Date.

(a)     Market Discount

If a U.S. Holder of an Allowed Class 4 Claim had purchased its First Lien Note at a price less than such First Lien Note's "revised issue price" (generally, the issue price increased by all previous holders' inclusions of original issue discount), the difference would constitute "market discount" for United States federal income tax purposes. Gain recognized by a U.S. Holder in the exchange of an Allowed Class 4 Claim bearing market discount pursuant to the Plan should generally be treated as ordinary interest income to the extent of the market discount accrued on such Allowed Class 4 Claim during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include accrued market discount in taxable income currently. Any accrued market discount in respect of the Allowed Class 4 Claim in excess of the gain recognized in the exchange should carry over to such portion of the Exit 1.5L Facility received in exchange therefor pursuant to the Plan, and any gain recognized by the U.S. Holder on a subsequent taxable disposition of such Exit 1.5L Facility may be treated as ordinary income to the extent of any such accrued market discount not previously included in income.  U.S. Holders should consult their tax advisors regarding the potential application of the market discount rules.

(b)     Characterization of the Exit 1.5L Facility

The Debtors' obligation to make payments of interest in-kind or, at a different interest rate, in cash under the Exit 1.5L Facility may implicate provisions of the Treasury Regulations relating to contingent payment debt instruments (the "**CPDI Regulations**") and AHYDOs.  For United States federal income tax purposes, the Debtors intend to treat the Exit 1.5L Facility as indebtedness that is a contingent payment debt instrument. The remainder of this discussion assumes that the Exit 1.5L Facility is governed by the CPDI Regulations. Each U.S. Holder should consult its tax advisor regarding the treatment of the Exit 1.5L Facility as indebtedness subject to the CDPI Regulations and as an AHYDO. If the Exit 1.5L Facility is not indebtedness subject to the CDPI Regulations, the amount, timing, and character of income, gain, deduction or loss with respect to the Exit 1.5L Facility may differ from those described in the remainder of this discussion.

(i)     Interest Income

Under the CPDI Regulations, a U.S. Holder generally should be required to accrue interest income on the Exit 1.5L Facility on a constant yield to maturity basis based on the adjusted issue price of the Exit 1.5L Facility and the comparable yield (as defined below), regardless of whether the U.S. Holder uses the cash or accrual method of tax accounting.  The comparable yield for the Exit 1.5L Facility is the annual yield the Reorganized Debtors would incur, as of the initial issue date, on a fixed rate debt instrument with no contingent payments, but with terms and conditions

otherwise comparable to those of the Exit 1.5L Facility. The Reorganized Debtors will make available to U.S. Holders of the Exit 1.5L Facility the Reorganized Debtors' determination of the "comparable yield" and the "projected payment schedule" under the Exit 1.5L Facility, which generally will be binding on a U.S. Holder, unless the U.S. Holder discloses a contrary position on its United States federal income tax return in accordance with the Treasury Regulations. The comparable yield and the projected payment schedule are not determined for any purpose other than for the determination of a U.S. Holder's interest accruals and adjustments thereof in respect of the Exit 1.5L Facility for United States federal income tax purposes and do not constitute a projection or representation regarding the actual amounts payable to U.S. Holders.

If a U.S. Holder receives actual payments with respect to the Exit 1.5L Facility in a taxable year that, in the aggregate, exceed the total amount of the projected payments for that taxable year, the U.S. Holder will have a "net positive adjustment" equal to the amount of such excess. The U.S. Holder may be required to treat the "net positive adjustment" as additional interest income for the taxable year. If a U.S. Holder receives actual payments with respect to the Exit 1.5L Facility in a taxable year that, in the aggregate, are less than the amount of the projected payments for that taxable year, the U.S. Holder will have a "net negative adjustment" equal to the amount of such deficit. This adjustment may (a) reduce the U.S. Holder's interest income on the Exit 1.5L Facility for that taxable year, and (b) to the extent of any excess after the application of (a), give rise to an ordinary loss to the extent of the U.S. Holder's interest income on the Exit 1.5L Facility during prior taxable years, reduced to the extent such interest income was offset by prior net negative adjustments. Any negative adjustment in excess of the amounts described in (a) and (b) may be carried forward to offset future interest income in respect of the Exit 1.5L Facility or to reduce the amount realized upon a sale, exchange, redemption, or other taxable disposition of the Exit 1.5L Facility.

If the Exit 1.5L Facility is an AHYDO, then a portion of the interest income recognized by a corporate U.S. Holder may be treated as a dividend for purposes of the dividends received deduction generally available under the Internal Revenue Code.

(ii) Sale, Exchange, Redemption or Other Taxable Disposition of the Exit 1.5L Facility

Upon a sale, exchange, redemption or other taxable disposition of the Exit 1.5L Facility, a U.S. Holder generally should recognize gain or loss in an amount equal to the difference between (a) the amount of cash plus the fair market value of any other property received by the U.S. Holder, reduced by any negative adjustment carryforward as described above, and (b) the U.S. Holder's adjusted tax basis in the Exit 1.5L Facility. Gain recognized upon a sale, exchange, redemption, or other taxable disposition of the Exit 1.5L Facility generally should be treated as ordinary interest income. Loss recognized upon a sale, exchange, redemption, or other taxable disposition of the Exit 1.5L Facility generally should be treated as ordinary loss to the extent that previous interest inclusions exceed the total net negative adjustments previously taken into account as ordinary loss, and, thereafter, as capital loss (which should be long-term capital loss if the U.S. Holder's holding period with respect to the Exit 1.5L Facility is more than one year at the time of disposition). The deductibility of capital loss is subject to limitations. U.S. Holders are urged to consult their tax advisors regarding such limitations and the treatment of the Exit 1.5L Facility as indebtedness subject to the CDPI Regulations and as an AHYDO.

3. <u>U.S. Holders of Class 5 – Second Lien/Third Lien Claims</u>

Pursuant to the Plan, each U.S. Holder of an Allowed Class 5 Claim will receive its Pro Rata share, based on the aggregate amount of Allowed Second Lien Notes Claims and Allowed Third Lien Notes Claims, of 97% of the Reorganized Equity, subject to dilution by the MIP Equity and the Warrant Equity, in exchange for such U.S. Holder's Allowed Class 5 Claim.

The United States federal income tax consequences to such U.S. Holders will depend on whether such U.S. Holders' Allowed Class 5 Claims constitute "securities" for United States federal income tax purposes. Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances. Most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for United States federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are other factors that may be relevant to the determination, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into equity of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.

The Debtors intend to take the position that the Allowed Class 5 Claims constitute "securities" for United States federal income tax purposes. The remainder of this discussion assumes that the Allowed Class 5 Claims constitute "securities" for United States federal income tax purposes.

If the Allowed Class 5 Claims are characterized as "securities" for United States federal income tax purposes, the exchange of the Allowed Class 5 Claims for Reorganized Equity should be treated as a "recapitalization" for United States federal income tax purposes. In such event, a U.S. Holder generally should not recognize any gain or loss on the exchange (except to the extent any part of the Reorganized Equity is treated as received in exchange for accrued but untaxed interest, in which case the U.S. Holder generally will recognize interest income to that extent). A U.S. Holder's aggregate tax basis in the Reorganized Equity should be equal to the tax basis of the Allowed Class 5 Claims surrendered in exchange therefor, <u>provided</u>, <u>however</u>, that to the extent any of the Reorganized Equity is treated as received in exchange for accrued but untaxed interest, the tax basis of such Reorganized Equity should equal the amount of such accrued interest. In such event, a U.S. Holder's holding period for its Reorganized Equity generally should include its holding period for the Allowed Class 5 Claims exchanged therefor, <u>provided</u>, <u>however</u>, that to the extent any Reorganized Equity is treated as received in exchange for accrued but untaxed interest, the holding period for such Reorganized Equity should begin on the day following the Effective Date.

(a) Market Discount

If a U.S. Holder of an Allowed Class 5 Claim had purchased its Second Lien Note or Third Lien Note, as applicable, at a price less than such Second Lien Note's or Third Lien Note's stated redemption price at maturity, for any Second Lien Note or Third Lien Note treated as not issued

with OID, or "revised issue price" (generally, the issue price increased by all previous holders' inclusions of original issue discount), for any Second Lien Note or Third Lien Note treated as issued with OID, the difference would constitute "market discount" for United States federal income tax purposes. Any accrued market discount in respect of an Allowed Class 5 Claim may carry over to such U.S. Holder's Reorganized Equity received pursuant to the Plan, and any gain recognized by the U.S. Holder on a subsequent taxable disposition of such Reorganized Equity may be treated as ordinary income to the extent of any such accrued market discount not previously included in income. U.S. Holders should consult their tax advisors regarding the potential application of the market discount rules.

4.     U.S. Holders of Class 7 – PBGC Claims

Pursuant to the Plan, each U.S. Holder of the Allowed Class 7 Claims will receive its share of (i) the PBGC Note, provided, however, that if the Effective Date occurs within forty-five (45) days of the Petition Date, then the PBGC Note shall be due on the tenth anniversary of the Effective Date and the annual amortization payments shall commence on the one month anniversary of the Effective Date; and (ii) 3% of the Reorganized Equity (subject to dilution by the MIP Equity and the Warrant Equity).

The receipt by a U.S. Holder that is subject to United States federal income tax of any property in exchange for an Allowed Class 7 Claim pursuant to the Plan should be treated as a taxable transaction for United States federal income tax purposes. As a result, such a U.S. Holder generally should recognize income or loss for United States federal income tax purposes in an amount equal to the difference between (i) the fair market value on the date of receipt of its share of the PBGC Note and Reorganized Equity received pursuant to the Plan and (ii) such U.S. Holder's adjusted tax basis in its Allowed Class 7 Claim. The character of any income or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. If a U.S. Holder of an Allowed Class 7 Claim receives its share of the PBGC Note in exchange for an Allowed Class 7 Claim, the imputed interest provisions of the Internal Revenue Code may apply to treat a portion of the value attributable to such PBGC Note as imputed interest. U.S. Holders of Allowed Class 7 Claims are urged to consult their tax advisors regarding the tax consequences of the Plan to them.

A U.S. Holder's tax basis in its share of the PBGC Note and Reorganized Equity received pursuant to the Plan generally should be equal to the fair market values of each such consideration on the date of receipt, and the holding period with respect to each such consideration will begin on the day following the relevant date of receipt.

5.     Accrued But Unpaid Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, the Debtors intend to take the position that such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the

consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest, provided, however, any distribution under the Plan of Cash in an amount equal to any accrued and unpaid interest (including any interest on interest) on the First Lien Notes that was due as of the Petition Date, shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes solely to the portion of such Claim representing accrued but unpaid interest. No assurances can be made in this regard. If any distribution under the Plan is treated as being allocated first to accrued but unpaid interest, a U.S. Holder of such an Allowed Claim would realize ordinary income with respect to the distribution in an amount equal to the accrued but unpaid interest not already taken into income under the U.S. Holder's method of accounting, regardless of whether the U.S. Holder otherwise realizes a loss as a result of the Plan.

C.      Information Reporting and Backup Withholding

Certain payments, including the distributions or payments in respect of Claims pursuant to the Plan, generally are subject to information reporting by the payor to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of twenty-four percent (24%)) under certain circumstances. Under the Internal Revenue Code's backup withholding rules, a U.S. Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the U.S. Holder of a Claim (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) timely provides a correct United States taxpayer identification number and makes certain certifications under penalties of perjury.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder of a Claim's United States federal income tax liability, and such U.S. Holder of a Claim may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS.

D.      Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE UNITED STATES FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN OR CONTEMPLATED BY THE PLAN.**

# ARTICLE XI.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Cases; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

A.      Continuation of the Bankruptcy Cases

If the Debtors remain in chapter 11, they could continue to operate their business and manage their properties as debtor in possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could survive as a going concern in protracted chapter 11 cases.  In particular, the Debtors could have difficulty sustaining the high costs and the erosion of market confidence which may be caused if the Debtors remains a chapter 11 debtor in possession and gaining access to sufficient liquidity to allow it to continue their operations as a going concern.  And as further discussed herein, the Debtors believe that they have accomplished the goals that chapter 11 has allowed them to achieve, and that the Company's key remaining challenges are operational and therefore do not require that the Company remain in chapter 11.

B.      Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest in the Chapter 11 Cases could propose a different plan or plans.  Such plans might involve either a reorganization and continuation of the Debtors' businesses, a sale of the Debtors' assets as a going concern, in whole or in part, an orderly liquidation of its assets, or a combination thereof. In addition,  pursuant to the Plan, the Holders of Second Lien/Third Lien Claims have waived any Second Lien/Third Lien Deficiency Claims solely for purposes of the Plan. Under a different plan, the Holders of Second Lien/Third Lien Claims may not waive such claims, thereby diluting recoveries to other Holders of Claims.

C.      Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In chapter 7 cases, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims or Interests.

However, the Debtors believe that creditors would lose the materially higher going concern value if the Debtors were forced to liquidate.  In addition, the Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estate.  The assets available for distribution to creditors would be reduced by such additional expenses and by claims,

some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a chapter 11 plan. In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. However, any distribution to the Holders of Claims or Interests under a chapter 11 liquidation plan probably would be delayed substantially. In addition, as with a chapter 7 liquidation, the Debtors believe that creditors would lose the materially higher going concern value if the Debtors were forced to liquidate under a chapter 11 plan.

The Liquidation Analysis is premised upon a hypothetical liquidation in a chapter 7 case. In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests. The likely form of any liquidation in a chapter 7 proceeding would be the sale of individual assets. Based on this analysis, it is likely that a chapter 7 liquidation of the Debtor's assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the Debtors' opinion, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford Holders of Claims and Interests as great a realization potential as does the Plan.

## ARTICLE XII.

## RECOMMENDATION

A.     Hearing on and Objections to Confirmation
      1.     Confirmation Hearing

The Confirmation Hearing has been scheduled for [Month] [Day], 2020 at [__:__] a.m. / p.m. (Eastern). Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties-in-interest, and the Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of the Confirmation Hearing, without further notice to other parties-in-interest.

      2.     Date Set for Filing Objections to Confirmation of the Plan

The time by which all objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for [Month] [Day], 2020 at 4:00 p.m. (prevailing Eastern). A copy of the Confirmation Hearing Notice is enclosed with this Disclosure Statement.

B.        <u>Recommendation</u>

The Debtors recommend the Plan because it provides for greater distributions to the Holders of Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to the Holders of Claims.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation and vote to accept the Plan.

[*Signature Page to Follow*]

Dated: February 13, 2020

Respectfully submitted,

THE McCLATCHY COMPANY, on behalf of itself and its affiliates listed below

By: */s/ R. Elaine Lintecum*
Name: R. Elaine Lintecum
Title: Vice President, Assistant Secretary and Treasurer

Cypress Media, Inc.
Aboard Publishing, Inc.
Bellingham Herald Publishing, LLC
Belton Publishing Company, Inc.
Biscayne Bay Publishing, Inc.
Cass County Publishing Company
Columbus-Ledger Enquirer, Inc.
Cypress Media, LLC
East Coast Newspapers, Inc.
El Dorado Newspapers
Gulf Publishing Company, Inc.
Herald Custom Publishing of Mexico, S. de R.L. de C.V.
HLB Newspapers, Inc.
Idaho Statesman Publishing, LLC
Keltatim Publishing Company, Inc.
Keynoter Publishing Company, Inc.
Lee's Summit Journal, Incorporated
Lexington H-L Services, Inc.
Macon Telegraph Publishing Company
Mail Advertising Corporation
McClatchy Big Valley, Inc.
McClatchy Interactive LLC
McClatchy Interactive West
McClatchy International Inc.
McClatchy Investment Company
McClatchy Management Services, Inc.
McClatchy Newspapers, Inc.
McClatchy News Services, Inc.
McClatchy Property, Inc.
McClatchy Resources, Inc.
McClatchy Shared Services, Inc.
McClatchy U.S.A., Inc.
Miami Herald Media Company
N & O Holdings, Inc.
Newsprint Ventures, Inc.

*[Signature Page to Disclosure Statement]*

Nittany Printing and Publishing Company
Nor-Tex Publishing, Inc.
Olympian Publishing, LLC
Olympic-Cascade Publishing, Inc.
Pacific Northwest Publishing Company, Inc.
Quad County Publishing, Inc.
San Luis Obispo Tribune, LLC
Star-Telegram, Inc.
Tacoma News, Inc.
The Bradenton Herald, Inc.
The Charlotte Observer Publishing Company
The News and Observer Publishing Company
The State Media Company
The Sun Publishing Company, Inc.
Tribune Newsprint Company
Tru Measure, LLC
Wichita Eagle and Beacon Publishing Company, Inc.
Wingate Paper Company

## EXHIBIT A

**Joint Chapter 11 Plan of Reorganization of The McClatchy Company and its Affiliated Debtors and Debtors in Possession**

[Plan Filed Under Separate Cover]

# EXHIBIT B

## Financial Projections

# Income Statement

| Income Statement (\$ in millions) | | 2020 | | 2021 | | 2022 |
|---|---|---|---|---|---|---|
| **Total Revenue** | \$ | **635.7** | \$ | **594.6** | \$ | **571.0** |
| Total Operating Expenses | | 596.7 | | 528.7 | | 511.7 |
| **EBITDA** | \$ | **39.0** | \$ | **66.0** | \$ | **59.2** |
| *% margin* | | *6.1%* | | *11.1%* | | *10.4%* |
| Asset Write-Downs | | - | | - | | - |
| Depreciation & Amortization | | 16.3 | | 14.4 | | 13.2 |
| Operating Income | | 22.7 | | 51.6 | | 46.1 |
| Total Non-Operating Expenses | | 26.3 | | 43.7 | | 43.8 |
| Pre-Tax Income | | (3.7) | | 7.9 | | 2.3 |
| Taxes | | - | | - | | - |
| **Net Income** | \$ | **(3.7)** | \$ | **7.9** | \$ | **2.3** |
| | | | | | | |
| **EBITDA** | | **39.0** | | **66.0** | | **59.2** |
| (+) One-Time Rx Fees | | 20.2 | | - | | - |
| (+) Exit Fees | | 17.1 | | - | | - |
| (+) Severance, SBC, other | | 16.0 | | 8.8 | | 6.7 |
| **Adj. EBITDA** | \$ | **92.3** | \$ | **74.8** | \$ | **65.9** |

1. Total operating expenses inclusive of one-time fees, severance, stock-based compensation, and other expenses
2. Assumes no income tax, which is subject to change pursuant to additional analysis and final transaction structure
3. The projection does not depict years beyond FY2022, however, in line with its current estimates and consistent with industry trends, the Company believes that revenue and EBITDA will decline further.



1

# Balance Sheet

| Balance Sheet<br>($ in millions) | | 2020 | | 2021 | | 2022 |
|---|---|---|---|---|---|---|
| Cash | | 22.6 | | 53.0 | | 58.6 |
| Total Current Assets | $ | 135.8 | $ | 165.2 | $ | 168.2 |
| | | | | | | |
| PPE/Intangibles (Net) | | 183.2 | | 161.4 | | 151.8 |
| Goodwill | | 522.9 | | 522.9 | | 522.9 |
| Other Long-Term Assets | | 103.7 | | 103.7 | | 103.7 |
| **Total Assets** | **$** | **945.6** | **$** | **953.3** | **$** | **946.6** |
| | | | | | | |
| Total Current Liabilities | $ | 147.4 | $ | 147.5 | $ | 146.7 |
| | | | | | | |
| New 1L Note, inc'l ABL | | 187.1 | | 176.1 | | 155.6 |
| New 1.5L Note | | 83.1 | | 95.6 | | 109.7 |
| New Pension Note | | 29.7 | | 26.4 | | 23.1 |
| **Total Liabilities** | **$** | **574.5** | **$** | **572.8** | **$** | **562.3** |
| | | | | | | |
| **Total Equity** | **$** | **371.1** | **$** | **380.5** | **$** | **384.3** |
| | | | | | | |
| **Total Liabilities & Equity** | **$** | **945.6** | **$** | **953.3** | **$** | **946.6** |



1.  Equity in this balance sheet represents only a mathematical calculation of book assets on exit minus estimated liabilities on exit and is not the subject of an independent valuation of projected equity values which are subject to a number of contingencies and risk factors as explained in the Disclosure Statement.

2

# Cash Flow Statement

| Cash Flow & Liquidity ($ in millions) | | 2020 | | 2021 | | 2022 |
|---|---|---|---|---|---|---|
| Cash From Operations | | 479.9 | | 37.3 | | 32.8 |
| Cash From Investing | | 26.7 | | 7.6 | | (3.5) |
| Cash From Financing | | (483.6) | | (14.4) | | (23.7) |
| **Total Change In Cash** | $ | **23.1** | $ | **30.5** | $ | **5.6** |
| | | | | | | |
| Beginning Cash & Restricted | | 37.2 | | 60.3 | | 90.7 |
| Ending Cash & Restricted | | 60.3 | | 90.7 | | 96.3 |
| Less: Restricted Cash | | 37.7 | | 37.7 | | 37.7 |
| **Ending Non-Restricted Cash** | $ | **22.6** | $ | **53.0** | $ | **58.6** |

| ($ in millions) | | 2020 | | 2022 | | 2022 |
|---|---|---|---|---|---|---|
| *Adj. EBITDA* | $ | *92.3* | $ | *74.8* | $ | *65.9* |
| *Adj. EBITDA, net lease* | $ | *79.2* | $ | *62.1* | $ | *53.1* |
| *Net 1L / Adj. EBITDA, net lease* | | *2.1x* | | *2.0x* | | *1.8x* |
| *Net Debt / Adj. EBITDA, net lease* | | *3.5x* | | *3.9x* | | *4.3x* |
| *Cash Interest Coverage (net lease pmt.)* | | *3.7x* | | *3.3x* | | *3.2x* |



# EXHIBIT C

## Liquidation Analysis

**Project News**
**Preliminary Assessment of Liquidation Values**
**Balance Sheet Values as of 2019 P11 End Date**
**($ in 000s)**

| # | Asset | Date of Est. | Trial Balance Amounts | Hypothetical Recovery Percentage Estimates | | Hypothetical Liquidated Value (Unaudited) | |
|---|---|---|---|---|---|---|---|
| | | | | Low | High | Low | High |
| **Hypothetical Liquidation Scenario** | | | | | | | |
| 1 | Cash & Cash Equivalents | 12/1/19 | $ - | 100.0% | 100.0% | $ - | $ - |
| 2 | Acct Rec - Advertising | 12/1/19 | 54,395 | 80.0% | 90.0% | 43,516 | 48,956 |
| 3 | Acct Rec - Single Copy Circulation | 12/1/19 | 2,713 | 80.0% | 90.0% | 2,170 | 2,442 |
| 4 | Acct Rec - Other | 12/1/19 | 6,826 | 73.0% | 93.0% | 4,983 | 6,348 |
| 5 | Inventory - Newsprint | 12/1/19 | 4,040 | 30.0% | 40.0% | 1,212 | 1,616 |
| 6 | Inventory - Other | 12/1/19 | 1,349 | - | 10.0% | - | 135 |
| 7 | Deposits | 12/1/19 | 33,752 | - | - | - | - |
| 8 | Retainers | 12/1/19 | 600 | 100.0% | 100.0% | 600 | 600 |
| 9 | Other Prepaid Assets | 12/1/19 | 23,623 | - | 5.0% | - | 1,181 |
| 10 | Owned RE [FN1] | 12/1/19 | 26,273 | 87.5% | 175.0% | 23,000 | 46,000 |
| 11 | FF&E | 12/1/19 | 75,170 | 2.0% | 5.0% | 1,503 | 3,758 |
| 12 | Vehicles | 12/1/19 | 385 | 75.0% | 125.0% | 288 | 481 |
| 13 | IP / Intangibles | 12/1/19 | 82,097 | 47.5% | 74.3% | 39,000 | 61,000 |
| 14 | Goodwill | 12/1/19 | 447,098 | - | - | - | - |
| 15 | Equity Investments | 12/1/19 | 2,976 | - | 25.0% | - | 744 |
| | **Liquidation Proceeds** | | **$ 761,297** | **12.0%** | **17.8%** | **$ 116,273** | **$ 173,261** |
| **Possible Deductions:** | | | | | | | |
| 16 | Chapter 7 Trustee Fee | n/a | | | | $ (3,488) | $ (5,198) |
| 17 | RE / IP Sale Commissions | 2/9/20 | | | | (5,050) | (8,400) |
| 18 | 503(b)9 | 2/9/20 | | | | (2,510) | (2,510) |
| 19 | Professional Wind-down Fees | 2/9/20 | | | | (3,000) | (3,000) |
| 20 | Accrued Payroll and Wind-down Payroll | 2/9/20 | | | | (10,089) | (10,089) |
| 21 | Accrued Property Tax | 12/1/19 | | | | (2,510) | (2,510) |
| 22 | Sales, Use & Indirect Taxes | 12/1/19 | | | | (1,063) | (1,063) |
| | **Total Deductions** | | | | | **$ (27,710)** | **$ (32,770)** |
| **Net Proceeds** | | | | | | **$ 88,563** | **$ 140,491** |
| **Recovery Waterfall** | | | | | | | |
| 23 | ABL Revolver | 12/1/19 | $ - | | | 100.0% | 100.0% |
| **24** | **1st Lien** | **12/29/19** | **262,851** | | | **33.7%** | **53.4%** |
| 25 | 2nd Lien | 12/29/19 | 157,083 | | | - | - |
| 26 | 3rd Lien | 12/29/19 | 268,423 | | | - | - |
| 27 | Unsecured Claims | n/a | ~190,000 | | | - | - |
| 28 | Equity | n/a | n/a | | | - | - |

[FN1] - Amount reflected does not reflect the amount on the trial balance because some non-owned real estate (i.e pension properties) is on the balance
sheet, but is not Company property that could be sold in a liquidation

**Project News**
**Preliminary Assessment of Liquidation Values**
**Balance Sheet Values as of 2019 P11 End Date**
**($ in 000s)**

**Notes:**

1. Ending book cash per trial balance is negative $547k due to float. Amount rounded up to zero for purposes of presentation.
2. Eligible advertising AR per borrowing base certificate advanced at 85% for billed and 80% for unbilled.
3. Collectible AR related to single-copy circulation delivered to stores.
4. Other accounts receivable per trial balance. Management estimates of receivables collectability by category.
5. Balance is advanced per borrowing base certificate at 50%. Percentage recoveries adjusted to remove inventory not physically held at debtor controlled facilities.
6. Non-newsprint inventory. Management expects nominal to no recoveries due to specialized nature of inventory. Prior plant shutdowns validate approach.
7. Primarily related to letters of credit and deposits. No recoveries are anticipated.
8. Retainers held by restructuring professionals.
9. Nominal recoveries expected. Primarily relates to prepaid insurance, software, and rent. Significant portion relates to multi year contract and capitalized costs.
10. Most recent fair market value for properties where available; book value if no FMV available. Amount reflected does not reflect the amount on the trial balance because some non-owned real estate (i.e pension properties) is on the balance sheet but is not Company property that could be sold in a liquidation
11. FF&E is primarily comprised of printing machinery, which has been demonstrated to have no value. Possible recoveries primarily relate to camera/studio equipment.
12. Vehicles are depreciated over 5 years, and per management, generally do not have significant excess residual value as compared to book.
13. Value comprised of customer lists, advertiser lists, and mastheads. Value derived by applying discounts to EBITDA and revenue multiples based on market position and market penetration of individual newspapers. Recoveries decrease over time based on duration of time assets remain dark during liquidation process.
14. There is no expectation of recovery related to Goodwill.
15. Relates to early stage venture funding that may have possible payouts, but potential amounts/probabilities are unknown.
16. 3% fee charged by Chapter 7 Trustee.
17. Assumes 10% commissions fee on sale of IP / intangibles and 5% commission fee on sale of real estate.

**Debtors' Corporate Structure Chart**

# The McClatchy Company (DE)



**McClatchy Newspapers, Inc.** (DE)
*The Fresno Bee, The Modesto Bee, The Sacramento Bee, Vida En El Valle Tri-City Herald, Wine Press Northwest, Livingston Chronicle, Atwater Signal, Merced Sun-Star, Los Banos Enterprise, Chowchilla News, Sierra Star, M.V.P.*

**Olympic-Cascade Publishing, Inc.** (WA)
*The Herald, The Peninsula Gateway*

**Tacoma News, Inc.** (WA)
*The News Tribune*

**McClatchy Big Valley, Inc.** (CA)
*Mahoning Matters*

**El Dorado Newspapers** (CA)

**The News & Observer Publishing Co.** (NC)
*The Herald-Sun, The Insider, The News & Observer, Walter, Nando Media Company*

**East Coast Newspapers, Inc.** (SC)
*The Beaufort Gazette, The Herald, Fort Mill Times, The Island Packet, The Island Packet, Lowcountry Newspapers, The Bluffton Packet*

**Newsprint Ventures, Inc.** (CA)

**McClatchy Management Services, Inc.** (DE) A

**McClatchy Interactive LLC** (DE)

**McClatchy International Inc.** (DE) (i)

66.664%

**McClatchy U.S.A., Inc.** (DE)

**Biscayne Bay Publishing Inc.** (FL)

**Aboard Publishing, Inc.** (FL)
*HCP Media*

1%

**Herald Custom Publishing of Mexico, S. de R.L. de C.V.** (MEX)
(Note 1)

99%

**N & O Holdings, Inc.** (DE)

**Tribune Newsprint Company** (UT)

13.5%

**Ponderay Newsprint Company** (WA)

10%

3.5%

**Wingate Paper Company** (DE)

**McClatchy Shared Services, Inc.** (FL)
*McClatchy, Excelerate, McClatchy New Ventures Lab, McClatchy Studios, Creative Lab*

**McClatchy Resources, Inc.** (FL)

**Keynoter Publishing Company, Inc.** (FL)
*flkeysnews.com*

**McClatchy Property, Inc.** (FL)

**McClatchy Investment Company** (DE)

**Miami Herald Media Company** (DE)
*The Miami Herald , El Nuevo Herald, Indulge*

**Macon Telegraph Publishing Company** (GA) *The Telegraph, The Sun News*

**Columbus-Ledger Enquirer, Inc.** (GA) *Columbus Ledger-Enquirer, Ledger-Enquirer*

**Gulf Publishing Company, Inc.** (MS)
*Sun Herald*

**The Bradenton Herald, Inc.** (FL)
*The Bradenton Herald*

**The Sun Publishing Company, Inc.** (SC)
*The Sun News*

**Nittany Printing and Publishing Company** (PA)
*Centre Daily Times*

**The State Media Company** (SC)
*The State*

**The Charlotte Observer Publishing Company** (DE)
*The Charlotte Observer, Lake Norman Magazine, Carolina Bridge, Living Here*

**Wichita Eagle And Beacon Publishing Company, Inc.** (KS)
*The Wichita Eagle*

**Pacific Northwest Publishing Company, Inc.** (FL)

**Idaho Statesman Publishing, LLC** (DE) *The Idaho Statesman, Idaho Outdoors*

**Bellingham Herald Publishing, LLC** (DE) *The Bellingham Herald*

**Olympian Publishing, LLC** (DE) *The Olympian*

**Lexington H-L Services, Inc.** (KY) *Lexington Herald-Leader*

**San Luis Obispo Tribune, LLC** (DE) *The Tribune, The Cambrian, Vintages*

**McClatchy News Services, Inc.** (MI)

**McClatchy Interactive West** (DE) *McClatchy New Ventures Fund*

**Tru Measure, LLC** (DE)

**Cypress Media, Inc.** (NY)

**Cypress Media, LLC** (DE)
*Kansas City Star, Grand Communications, Kansas City Spaces, KC Weddings, Belleville News-Democrat, Highland News Leader, The Legal Reporter, O'Fallon Progress, Middle of the Map Fest*

**HLB Newspapers, Inc.** (MO)

**Lee's Summit Journal, Incorporated** (MO) *Lee's Summit Journal*

**Belton Publishing Company, Inc.** (MO)

**Cass County Publishing Company** (MO) *The Cass County Democrat Missourian*

**Nor-Tex Publishing, Inc.** (TX)

**Keltatim Publishing Company, Inc.** (KS) *The Olathe News*

**Mail Advertising Corporation** (TX)

**Star-Telegram, Inc.** (DE)
*La Estrella, Star-Telegram, Coupon Saver, Star Values*

**Quad County Publishing, Inc.** (IL)

100%

**Oak Street Redevelopment Company/Non-Debtor** (MO)
(Urban Redevelopment Corporation)

---

**Notes and Legend:**

Note 1 – Similar to an LLC

*Ownership is 100% unless otherwise noted*

Corporation

LLC

Partnership

Redevelopment Company/Non-Debtor

| (i) Subsidiary | % Owned |
|---|---|
| The Bradenton Herald, Inc. | 1.235% |
| Gulf Publishing Company, Inc. | 1.235% |
| The Charlotte Observer Publishing Company | 9.877% |
| Lexington H-L Services, Inc. | 3.704% |
| Macon Telegraph Publishing Company | 2.469% |
| Columbus Ledger-Enquirer, Inc. | 1.235% |

| Subsidiary | % Owned |
|---|---|
| Nittany Printing and Publishing Company | 1.235% |
| The State Media Company | 4.938% |
| The Sun Publishing Company, Inc. | 1.235% |
| Pacific Northwest Publishing Company, Inc. | 2.469% |
| Wichita Eagle and Beacon Publishing Company, Inc. | 3.704% |

| A Subsidiary | % Owned |
|---|---|
| McClatchy Big Valley, Inc. | 1.7% |
| East Coast Newspapers, Inc. | 5.3% |
| McClatchy Newspapers, Inc. | 60.9% |
| N & O Holdings, Inc. | 22.5% |
| Olympic-Cascade Publishing, Inc. | 0.7% |
| Tacoma News, Inc. | 8.9% |

## EXHIBIT E

## New First Lien Notes Term Sheet for Modified Terms

# New First Lien Notes Term Sheet For Modified Terms

This summary of proposed modified terms sets forth certain terms that shall govern the New First Lien Notes. The Debtors, the Brigade Parties and the Chatham Parties expressly reserve the right to further modify the terms of the New First Lien Notes in all respects, and the terms set forth herein are subject to material change based on further diligence and negotiation of definitive documentation.

| Financial Terms | |
|---|---|
| **Principal** | The principal amount outstanding on the First Lien Notes as of the Petition Date, less the amount of the Chatham Subordinated Notes Claims. |
| **Interest Rate** | 10.0% per annum. |
| **Maturity** | No change. |
| **Call Protection** | None. |
| **Change of Control Put Option** | Change of Control definition shall be consistent with usual and customary market definitions of such provisions and, among other things, shall be defined to occur in the event the Chatham Parties hold less than 50% of the Reorganized Equity. |
| **Free Cash Flow Sweep** | No change; provided, however, for the avoidance of doubt, the only set-off to mandatory redemptions from excess cash flow will be the amount of the New First Lien Notes retired by the Company through open market purchases (but not privately negotiated transactions), tender offers or optional redemptions (but not mandatory redemptions from asset dispositions). |
| Covenants | |
| **Permitted Indebtedness** | The Reorganized Debtors shall not be permitted to incur any obligations secured by a first-priority lien on the Notes Priority Collateral other than those arising under the New First Lien Notes. <br><br> Other than the obligations arising under the Exit ABL Facility (which shall be in an amount not to exceed $50 million), the Reorganized Debtors shall not be permitted to incur any obligations secured by a lien on the ABL Priority Collateral that is senior to the lien on such ABL Priority Collateral granted to the holders of the New First Lien Notes. |

| | |
|---|---|
| **Exit ABL Facility Use of Proceeds** | Proceeds of the Exit ABL Facility shall be used solely for general corporate purposes. |
| **Maintenance[3] Covenants** | The Reorganized Debtors must maintain a Net First Lien Debt /EBITDA ratio no greater than 3.50x.<br><br>"EBITDA" to include cash impact of operating leases.<br><br>Ratio to be tested quarterly. |
| **Other Negative Covenants** | Same as existing negative covenants, with the size of the numerical baskets to be adjusted to conform to current operations, and certain non-ordinary course baskets to be eliminated or otherwise modified consistent with this term sheet. |
| **Restricted Payments** | None, subject to ordinary course exceptions to be agreed upon by the Debtors and the Required RSA Parties. |
| **Information Rights** | The Reorganized Debtors shall provide financial reporting to holders of the New First Lien Notes including, but not limited to, (i) unaudited quarterly financial statements and quarterly reports to include MD&A-type disclosure and appropriate notes; and (ii) audited annual financial statements and an annual report to include MD&A-type disclosure and appropriate notes.<br><br>Such reporting will be posted to an online datasite accessible to each holder of New First Lien Notes and prospective transferees who agree (i) to acceptable confidentiality arrangements, and (ii) not to use the information for competitive purposes. The Reorganized Debtors will also host quarterly conference calls between the Company and holders of New First Lien Notes. |
| **Other** | |
| **Chatham Voting Restrictions** | So long as the Chatham Parties beneficially own greater than one-fourth of the issued and outstanding Reorganized Equity, for the purposes of voting its holdings of the New First Lien Notes, all such New First Lien Notes held by the Chatham Parties shall be considered as though not outstanding. |
| **Other Terms Consistent with First Lien Notes** | Unless otherwise agreed to by the Required RSA Parties and the Debtors, all other terms shall, in all material respects, be substantially the same as those governing the existing First Lien Notes. |

---

[3] The definitions of Net First Lien Debt and EBITDA subject to further review and diligence.

# EXHIBIT F

## Exit 1.5L Facility Term Sheet

# EXIT 1.5L FACILITY TERM SHEET

| Financial Terms | |
|---|---|
| **Net Amount** | $75 million, consisting of the $45 million of the Chatham Subordinated Notes Claims, and $30 million of new money financing. |
| **OID** | 7.00% ($5.65 million). |
| **Gross Amount** | $80.65 million |
| **Interest Rate**[4] | 10.0% per annum; <u>provided</u>, that, if the Net First Lien Debt/EBITDA ratio is greater than 1.75x, the interest rate shall be 12.5% paid-in-kind. <br><br> "EBITDA" to include cash impact of operating leases. <br><br> Ratio to be tested quarterly. |
| **Maturity** | One year after the maturity date of the New First Lien Notes. |
| **Collateral/Priority** | Same as New First Lien Notes; <u>provided</u>, that such liens and security interests shall be junior to the liens and security interests granted under the New First Lien Notes, but senior to all other liens on or security interests in the Reorganized Debtors' assets. |

---

[4] The definitions of Net First Lien Debt and EBITDA subject to further review and diligence.

## EXHIBIT G

**Identities of Key Executives and Nature of Their Compensation**

## Identities of Key Executives and Nature of Their Compensation

Prior to the Petition Date, and in the ordinary course of business, the Debtors used certain short-term and long-term incentive plans and other forms of compensation to drive business outperformance from senior executives and certain key employees. Specifically, the Debtors historically compensated senior executives and certain key employees with a combination of the following: (i) base/guaranteed annual cash compensation, (ii) a key employee incentive plan ("**KEIP**"), (iii) a long-term incentive plan, (iv) severance pay, which varied depending on whether a termination was for cause, and (v) a non-qualified pension plan.

Upon emergence, the Key Executives shall be comprised of the following:

| Title | Name |
|---|---|
| President & Chief Executive Officer | Craig I. Forman |
| Vice President, Customer & Product | Scott Manuel |
| General Counsel, Vice President of People, Corporate Secretary | Billie S. McConkey |
| Vice President of News | Kristin Roberts |
| Chief Financial Officer | Peter Farr |

The Key Executives shall be employed by the Reorganized Debtors for a term of years as agreed to by the Key Executives in their employment agreements. Such employment agreements will include compensation consistent with the past practices of the Company, including the following:

- Guaranteed annual cash compensation in an aggregate amount consistent with past practices;

- The continuation of existing severance programs, which contemplate a 1-year payout for termination without cause, and a 2-year payout for termination in connection with a change in control; and

- A management incentive plan, as described in Article 6.16(b) of the Plan, which will replace the former KEIP for insiders that was approved by the Existing Board in October 2019 and will expire at the end of the performance period in which emergence occurs and be paid out at such time.

The long term incentive program that was effective prior to the Chapter 11 Cases will no longer be available to the Key Executives upon emergence. Additionally, upon emergence, the Key Executives will also forfeit any and all future earnings under the non-qualified pension plan.