REDACTED

<u>**Proposed Hearing Date and Time**</u>**: July 1, 2020, at 11:00 a.m. (prevailing Eastern Time)**
<u>**Objection Deadline and Time**</u>**: June 26, 2020, at 12:00 p.m. (prevailing Eastern Time)**
<u>**Reply Deadline and Time**</u>**: June 29, 2020 at 9:00 a.m. (prevailing Eastern Time)**

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Frank A. Merola
Erez E. Gilad
Daniel A. Fliman
Isaac S. Sasson
180 Maiden Lane
New York, NY 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Counsel for the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
*In re:*                                                 :
                                                         :        Chapter 11
                                                         :
THE McCLATCHY COMPANY, *et al.*,            :        Case No. 20-10418 (MEW)
                                                         :
            Debtors.[1]                                  :        (Jointly Administered)
                                                         :
------------------------------------------------------------- x

**MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**FOR (I) LEAVE, STANDING AND AUTHORITY TO COMMENCE AND**
**PROSECUTE CERTAIN CLAIMS AND CAUSES OF ACTION ON BEHALF**
<u>**OF DEBTORS' ESTATES AND (II) EXCLUSIVE SETTLEMENT AUTHORITY**</u>

---

[1]  The last four digits of Debtor The McClatchy Company's tax identification number are 0478.  Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/McClatchy.  The location of the Debtors' service address for purposes of these chapter 11 cases is: 2100 Q Street, Sacramento, California 95816.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...............................................................................................................3

   A.     The Refinancing Process...........................................................................3

      i.      Early Refinancing Efforts .............................................................3

      ii.     Spring 2018 Negotiations .............................................................5

      iii.    The Suspect Transactions .............................................................7

      iv.    Solvency ......................................................................................10

   B.     The Bankruptcy Cases .............................................................................10

   C.     The Committee's Investigation and Demand ...........................................13

JURISDICTION AND VENUE .....................................................................................14

RELIEF REQUESTED....................................................................................................14

ARGUMENT ...................................................................................................................14

   I.      Each of The Proposed Claims Is Colorable..............................................16

      a.     The Suspect Transactions Should Be Unwound as Fraudulent Transfers .................16

         i.     The Constructive Fraudulent Transfer Claims Are Colorable ...................16

            1.     The Debtors Did Not Receive Reasonably Equivalent Value ......................17

            2.     The Debtors Were Insolvent At All Relevant Times...................................19

         ii.    The Actual Fraudulent Transfer Claims Are Colorable.....................................20

      b.     Negotiation Of And Entry Into The Suspect Transactions Constitute Breaches Of Fiduciary Duty ...............................................23

         i.     The Committee Has Alleged Colorable Claims for Breach Of Fiduciary Duty...................................................23

         ii.    The Committee Has Alleged Colorable Aiding And Abetting Claims...............26

      c.     Chatham's Claims Should Be Equitably Subordinated ...........................................27

      d.     Claims For Unmatured Interest Should Be Disallowed...........................................29

      e.     The Unencumbered Assets Are Not Subject To Any Security Interests And Any Liens On The Non-Perfected Assets Assets Should Be Avoided....................29

      f.     No Applicable Premium Or Make-Whole Amounts Are Due And Payable ...........30

   II.     The Debtors' Unwillingness To Pursue The Proposed Claims Is Unjustified.............31

      a.     The Debtors Unjustifiably Failed To Bring Suit......................................................31

      b.     Prosecution Of The Proposed Claims Would Benefit The Estates............................33

   III.The Committee Should Be Granted Exclusive Authority To Settle ......................................35

CONCLUSION.................................................................................................................36

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  330 B.R. 364 (Bankr. S.D.N.Y. 2005) ............................................................ *passim*

*Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns Corp.)*,
  365 B.R. 24 (Bankr. S.D.N.Y. 2007) ................................................................ 28, 29

*Bayou Accredited Fund, LLC v. Redwood Growth Partners*
  *(In re Bayou Grp.), LLC*,
  396 B.R. 810 (Bankr. S.D.N.Y. 2008) ...................................................................20

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) ......................................................................................25

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*,
  491 B.R. 335 (S.D.N.Y. 2013) ...............................................................................28

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993) .......................................................................................24

*Cooper v. Centar Investments Ltd. (In re TriGem Am. Corp.)*,
  431 B.R. 855 (Bankr. C.D. Cal. 2010) ...................................................................19

*Devon Mobile Commc'ns Liquidating Tr. v. Adelphia Commc'ns Corp. (In re*
  *Adelphia Commc'n. Corp.)*, No. 02-41729 (REG),
  2006 WL 687153 (Bankr. S.D.N.Y. Mar. 6, 2006) ...............................................17

*In re Dewey & Leboeuf LLP*, No. 12-12321 MG,
  2012 WL 5985445 (Bankr. S.D.N.Y. Nov. 29, 2012) ......................................15, 35

*Feiner Family Tr. v. VBI Corp.*,
  No. 07 Civ. 1914 (RPP), 2007 WL 2615448 (S.D.N.Y. Sept. 11, 2017) ...............23

*Feltman v. Wells Fargo Bank, N.A. (In re TS Employment, Inc.)*,
  597 B.R. 494 (Bankr. S.D.N.Y 2019) ....................................................................19

*Harrison v. New Jersey Community Bank (In re Jesup & Lamont, Inc.)*,
  507 B.R. 452 (Bankr. S.D.N.Y. 2014) .............................................................18, 19

*Hobby Ctr. v. Hudson United Bank (In re Am.'s Hobby Ctr., Inc.)*,
  223 B.R. 275 (Bankr. S.D.N.Y. 1998) .............................................................15, 16

*Hosking v. TPG Capital Management, L.P. (In re Hellas Telecommunications*
  *(Luxembourg) II SCA)*, 526 B.R. 499 (Bankr. S.D.N.Y. 2015) ..............................21

ii

*Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*,
    78 F.3d 30 (2d Cir. 1996) ...................................................................................19

*Lehman Bros. Holdings, Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros.*
    *Holdings Inc.)*, 541 B.R. 551 (Bankr. S.D.N.Y. 2015) ..........................................27

*LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) ................................................................29

*LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.)*,
    961 F.2d 378 (2d Cir. 1992) ...............................................................................29

*Mackenzie v. Dye (In re AFI Holding, Inc.)*, No. CV 05-3232 PA,
    2005 WL 8167477 (C.D. Cal. Dec. 5, 2005) ........................................................17

*Marino v. Grupo Mundial Tenedora, S.A.*,
    810 F. Supp. 2d 601 (S.D.N.Y. 2011) ...................................................................26

*Matter of MPM Silicones, L.L.C.*,
    874 F.3d 787 (2d Cir. 2017) ...............................................................................31

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
    930 A.2d 92 (Del. 2007) ....................................................................................24

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) ........................................................... *passim*

*Official Comm. of Unsecured Creditors of Cybergenics Corp.*
    *ex rel. Cybergenics Corp. v. Chinery*,
    330 F.3d 548 (3d Cir. 2003) ...............................................................................31

*Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec.*
    *Corp.*, No. 00 CIV. 8688 (WHP),
    2002 WL 362794 (S.D.N.Y. Mar. 6, 2002) ..........................................................26

*Official Comm. of Unsecured Creditors of Joyanna Holitogs, Inc. v. I. Hyman*
    *Corp. (In re Joyanna Holitogs, Inc.)*,
    21 B.R. 323 (Bankr. S.D.N.Y. 1982) ...................................................................15

*Pereira v. Grecogas Ltd. (In re Saba Enterprises, Inc.)*,
    421 B.R. 626 (Bankr. S.D.N.Y. 2009) .................................................................21

*In re Primedia, Inc. S'holders Litig.*,
    67 A.3d 455 (Del. Ch. 2013) ..............................................................................26

*Quadrant Structured Prod. Co. v. Vertin*,
    102 A.3d 155 (Del. Ch. 2014) ............................................................................25

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
    115 A.3d 535 (Del. Ch. 2015) .................................................................................24

*Rabkin v. Philip A. Hunt Chem. Corp.*,
    498 A.2d 1099 (Del. 1985) ....................................................................................25

*In re Recoton Corp.*,
    307 B.R. 751 (Bankr. S.D.N.Y. 2004) ...................................................................31

*Rosa v. TCC Commc'ns, Inc.*, No. 15CV1665,
    2017 WL 980338 (S.D.N.Y. Mar. 13, 2017) .........................................................21

*In re Sabine Oil & Gas Corp.*,
    547 B.R. 503 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) ................23

*Sama v. Mullaney, et al. (In re Wonderwork, Inc.)*,
    611 B.R. 169 (Bankr. S.D.N.Y. 2020) ...................................................................20

*Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors
(In re TOUSA, Inc.)*,
    680 F.3d 1298 (11th Cir. 2012) .............................................................................19

*Shapiro v. Wilgus*,
    287 U.S. 348 (1932) ..............................................................................................21

*Silverman v. Paul's Landmark, Inc (In re Nirvana Rest., Inc.)*,
    337 B.R. 495 (Bankr. S.D.N.Y. 2006) ...................................................................17

*Smart World Technologies, LLC v. Juno Online Servs., Inc.
(In re Smart World Technologies, LLC)*,
    423 F.3d 166 (2d Cir. 2005) ..................................................................................31

*In re Solutia Inc.*,
    379 B.R. 473 (Bankr. S.D.N.Y. 2007)art ...............................................................29

*Tronox, Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*,
    429 B.R. 73 (Bankr. S.D.N.Y. 2010) .....................................................................22

*Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes
(In re STN Enters.)*,
    779 F.2d 901 (2d Cir. 1985) .....................................................................15, 16, 31

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) .............................24

*Wiggains v. Reed (In re Wiggains)*, No. 13-22757-SGJ-7,
    2015 WL 1954438 (Bankr. N.D. Tex. Apr. 28, 2015) ..........................................21

**Statutes**

11 U.S.C. § 101(32) ........................................................................................................19

11 U.S.C. § 502(b)(2) ......................................................................................................30

11 U.S.C. § 510(c) ...........................................................................................................27

11 U.S.C. § 544 ........................................................................................................ *passim*

11 U.S.C. § 548 ........................................................................................................ *passim*

11 U.S.C. § 550 ...............................................................................................................17

11 U.S.C. § 551 ...............................................................................................................17

11 U.S.C. § 552 ...............................................................................................................30

11 U.S.C. § 1103 .............................................................................................................14

11 U.S.C. § 1109 .............................................................................................................14

28 U.S.C. § 157 ...............................................................................................................14

28 U.S.C. § 1334 .............................................................................................................14

28 U.S.C. § 1408 .............................................................................................................14

28 U.S.C. § 1409 .............................................................................................................14

**Other Authorities**

U.C.C § 9-108 ..................................................................................................................30

U.C.C § 9-203(b)(3)(A) ...................................................................................................30

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Bankruptcy Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors" or the "Company"), by and through the undersigned counsel, hereby moves this Court for the entry of an order: (i) granting the Committee standing to commence and to prosecute certain claims and causes of action on behalf of the Debtors' estates (the "Estates"); and (ii) granting the Committee exclusive authority to settle such claims on behalf of the Estates (the "Motion"). In support of this Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1.    Prior to the filing of these Bankruptcy Cases, Chatham and the Debtors orchestrated a series of transactions designed to generate a windfall for Chatham while protecting the interests of the McClatchy family and other shareholders at the expense of the Company's unsecured creditors. Since the Petition Date, the Committee has been conducting an Investigation into these transactions. Based on the results of the Investigation -- which has not yet concluded -- the Committee has determined that there exist several colorable and valuable claims (the "Proposed Claims") arising from the negotiation and implementation of the Suspect Transactions described in more detail below. The Proposed Claims include claims to avoid actual and constructive fraudulent transfers, for breaches of fiduciary duties (and aiding and abetting thereof), and for equitable subordination. In order to protect the interests of the Debtors' estates and their creditors, the Committee seeks standing to prosecute, and the authority to settle, the Proposed Claims.

2.    Over the course of approximately eighteen months, beginning in the fall of 2017, Chatham negotiated and implemented a series of transactions with the Debtors -- who were

---

[1]  Capitalized terms used in this Preliminary Statement but not herein defined shall have the meanings otherwise ascribed to them herein.

insolvent at all relevant times -- whereby Chatham ultimately exchanged $350 million of structurally subordinated, Parent-only, unsecured debt for a like amount of second and third lien debt secured by substantially all of Parent's and the Subsidiaries' assets. In exchange, the Debtors received a meaningless maturity extension and $60 million in new money financing (at a substantial OID) that was primarily used to pay for fees and premiums necessitated by the transactions. While Chatham offered the Debtors little to nothing of value, it was able to position itself to benefit from these Bankruptcy Cases that followed less than two years later.

3.    The Committee's discovery thus far has revealed that, in implementing the Suspect Transactions, the directors and officers of Parent and Subsidiaries, rather than being disinterested fiduciaries driven by the interests of their estates, had two major institutional objectives that motivated their decisions. First, they were willing to █████████████

████████████████████████████████████████████████████████████████████

Second, they were laser-focused on refinancing the Company's 2022 Notes, without regarding to any corresponding burdens and costs. Chatham reaped the benefits of both mis-executed objectives.

4.    The Parent Fiduciaries abdicated their duties to the Debtors' estates (and directed the Subsidiary Fiduciaries to do the same) and struck an indefensible deal with Chatham. Through their negotiations, the Board and Chatham devised a strategy wherein they would (a) knowingly manipulate the CDS markets to Chatham's benefit, (b) uptier, for no meaningful consideration, nearly all of Chatham's unsecured indebtedness, so it became purportedly secured by substantially all assets of Parent and Subsidiaries, and (c) make previously unencumbered assets available as collateral for the 1L Notes, thereby locking up any remaining value that would have otherwise benefited the unsecured creditors. Critically, the Debtors received **no** benefit

from the implementation of this strategy; there was no discount to the face amount of debt exchanged, no interest rate savings, and no basis for the valuable upstream pledges and guarantees now being offered by the Subsidiaries.

5.    Of course, ████████████████████████████████████████ net effect of the Suspect Transactions would be to place the Debtors' unsecured creditors behind Chatham and the New 1L Liens, thereby hindering and delaying any possible repayment of their debt.  They nonetheless proceeded, causing massive harm to unsecured creditors.

6.    As discussed more fully below, the Committee satisfies all the requirements for granting derivative standing.  Prosecution of the Proposed Claims is critical to the success of these Bankruptcy Cases, and the resolution would, among other things, provide hundreds of millions of dollars in distributable value to unsecured creditors.  The Debtors -- who remain under the control of many of the same officers and directors who negotiated, approved, and implemented the Suspect Transactions -- are both unable and, as a result of their insurmountable conflict, unwilling to bring the Proposed Claims.

7.    Accordingly, the Debtors can no longer be relied upon to be faithful stewards of the Proposed Claims, and it is imperative that the Committee be granted standing to preserve those critical assets for the benefit of all unsecured creditors.

## BACKGROUND[2]

A.    **The Refinancing Process**

    i.    Early Refinancing Efforts

8.    ████████████████████████████████████████████████

---

[2]  Annexed hereto as **Exhibit A** is a draft of the Committee's proposed complaint (the "Proposed Complaint") against the various defendants described therein (the "Proposed Defendants").  A brief recitation of the relevant facts is included herein for the Court's convenience.  A detailed factual background underlying each of the Proposed Claims is set forth in the Proposed Complaint, which is incorporated herein by reference.

3

██████████████████████████████████████████████████████████████████

████████████  At that time, the Company's closest maturity -- its $65 million revolving cash

flow facility (the "<u>Cash Flow Facility</u>") -- was over two years away.[3]

9.    Thus, The McClatchy Company's ("<u>Parent</u>") board of directors (the "<u>Board</u>")

appointed    a    subcommittee    ██  ████████  ████████  ████████  ███  ████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████.[4]  The

Committee understands that the focus of the Board at that time was to refinance its first lien

notes due 2022 (the "<u>2022 Notes</u>"), which, in the Board's opinion, would buy it a couple of years

of additional runway to support its planned digital transformation.  ████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████

10.    ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[3] ██████████████████████████████████████████████████████████████████

[4] As used herein, the "Board" refers to the entire Board or the Refinancing Subcommittee, as applicable.

[5] ██████████████████████████████████████████████████████████████████
████████████████████████

4

11. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

12. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

13.     Ultimately, as a result of external market factors, no transaction was agreed to at

that time and the Company's refinancing efforts were placed on pause. ████████████████

████████████████████████████████████████████

ii.    <u>Spring 2018 Negotiations</u>

14. ██████████████████████████████████████████████

████[6] ██████████████████████████████████████████████

---

[6] ████████████████████████████████████████████████████

5

███████████████████████████████████████████████████████

████████████████████████████████████████████████ Orphaning" the

CDS would have provided Chatham with a windfall on account of the CDS it had sold.

15.    ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████    ████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

16.    On April 28, 2018, Chatham and the Company entered into a term sheet framework agreement (the "April 2018 Framework Agreement") that laid out the terms for the transaction. The April 2018 Framework Agreement was problematic from the start and ultimately ill-fated. It faced immense negative publicity given the "orphaning" structure. It also drew attention and inquiries from regulators, like the CFTC.

17.    As a result of the external pressure, the Company and Chatham abandoned the April 2018 Framework Agreement in May 2018. Although not consummated, the April 2018 Framework Agreement had two principal effects. *First*, it caused the market for CDS to tighten from approximately 12.5 points to .5 points, allowing Chatham to recognize significant gains on its position in the event it "covered its short." *Second*, and more importantly, the Company's willingness to manipulate its debt in order to "orphan" its CDS (for no benefit to itself) and to

████████████████████████████████████████████████████████
██████████████████████████████████

6

transact with Chatham scared off potential investors who, upon information and belief, did not want to do business with a company that was ready to engage in potential market manipulation.

     iii.    The Suspect Transactions

18. ████████████████████████████████████████

████████████████████████████████   ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

19. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Thereafter, the Board approved an exchange of Chatham's Unsecured Debentures for new secured debt. ████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████
█████████████████ Moreover, the Committee understands that no solvency analysis was commissioned, and thus the Board was woefully unaware to whom it owed fiduciary duties.

7

20.     The Committee understands that in approving the exchange, the Board -- which sat only at Parent -- directed each of Parent's subsidiaries (the "Subsidiaries") to similarly approve the incurrence of up to $425 million of new secured indebtedness (including $75 million in new 2L Loans and the exchange of $350 million of Unsecured Debentures) without offering *any consideration to such Subsidiaries*.  The Committee understands that none of the boards of directors at the Subsidiary levels (the "Subsidiary Boards") considered whether they owed independent fiduciary duties to their estates prior to approving the transaction.  Nor did the Subsidiary Boards hire independent counsel or financial advisors to aid them in evaluating the exchange offer or determining the solvency of the Company.

21.     On June 26, 2018, the Company and Chatham entered into an amendment to the April 2018 Framework Agreement (the "June 2018 Amended and Restated Framework Agreement") to include the terms of a refinancing transaction.  In July 2018, the Company and Chatham consummated the transaction (the "July 2018 Transaction"), pursuant to which:

- Approximately $82 million of Chatham's Parent-only 2027 Debentures were exchanged into secured second lien Tranche A term loans guaranteed by each Subsidiary and secured by liens on their assets; those loans, together with an additional $60 million of term loans issued to Chatham, plus $15 million of original issue discount ("OID"), eventually became the $157 million of second lien term loans due 2030 (the "2L Loans");

- Approximately $193 million of Chatham's Parent-only 2029 Debentures were exchanged into secured second lien Tranche B term loans guaranteed by each Subsidiary and secured by liens on their assets; those loans, together with an additional $75 million of 2029 Debentures exchanged by Chatham in March 2019 (the "March 2019 Transaction"), eventually became the $268 million of third lien notes due 2031 (the "3L Notes")[8]; and

---

[8]  Even after consummation of the July 2018 Transaction, the Committee understands that Chatham continued to make equitization proposals to the Company.  Nevertheless, in December of 2018, Chatham exchanged $193.5 million of the Tranche B term loans for an equal principal amount of new 3L Notes (the "December 2018 Transaction" and, together with the July 2018 Transaction and the March 2019 Transaction, the "Suspect Transactions") and three months later consummated the March 2019 Transaction.

- The Company refinanced its 2022 Notes with certain first lien notes due 2026 (the "1L Notes") and with the 2L Loans and 3L Notes, the "Prepetition Secured Debt"), which were issued at a slight OID and contained new liens on, among other things, "Principal Property" (as defined in the Unsecured Debentures) that were not previously provided to the 2022 Notes (the "New 1L Liens") in a total amount of $310 million, of which Chatham purchased $100 million.

22.    The Suspect Transactions provided no discernable benefit or value to the Company. The 2022 Notes and Unsecured Debentures were not maturing for 4-11 years and did not need to be refinanced in 2018. The Cash Flow Facility likewise was not maturing for another 18 months and, in any event, was too small to make a dent in the Company's capital structure. Moreover, the 2L Loans and 3L Notes were not provided at a discount to face amount (i.e., Chatham exchanged an equivalent amount of unsecured debt for secured debt) and did not have a lower interest rate than the Unsecured Debentures; rather, on a weighted basis, the new secured debt carried a higher interest rate than the unsecured debt that it replaced. Finally, more than two-thirds of the "new money" financing offered by Chatham was used to pay transaction fees and premiums necessitated by the Suspect Transactions, and so provided little, if any, incremental liquidity to the Company.

23.    Chatham, on the other hand, benefitted immensely from the Suspect Transactions. The Suspect Transactions permitted Chatham to achieve its goals of moving ahead of the Company's structurally senior unsecured indebtedness and causing the CDS market to tighten.

24.    Thus, it appears as if the Suspect Transactions were implemented principally to grant Chatham preferential treatment over the Debtors' unsecured creditors in these cases.[9]

25.    Critically, throughout the periods covering Chatham's and the Company's negotiations, Chatham, as a sizable holder of the Company's equity and debt securities -- holding

---

[9]    ██████████████████████████████████████████████████
██████████████████████████████████████████████

between 19% and 23% of the Debtors' outstanding shares of Class A common stock and approximately ███ of the Company's funded indebtedness -- was able to exert outsized pressure over the Debtors.  Indeed, the Committee understands that Chatham had unprecedented access to the Company's management, including regular communication via telephone, text, and email as well as one-on-one meetings.  Chatham was able to use its control over the Company, *inter alia*, to obtain measures and concessions falling well outside the debtor-creditor relationship, for instance, ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

iv.    Solvency

26.    As set forth more fully in the Proposed Complaint, Parent was insolvent at all relevant times.  The Company's own SEC filings showed that prior to entry into each of the Suspect Transactions, the Company was insolvent on a balance sheet basis.  And, Company's management believed that, without a waiver of their minimum required pension contributions, they would not be able to meet their debt and pension contributions starting in 2020.  Similarly, the Subsidiaries were clearly rendered insolvent upon entry into the Suspect Transactions, when they incurred an additional $425 million of debts they previously did not owe.

B.    **The Bankruptcy Cases**

27.    On February 13, 2020 (the "Petition Date"), the Debtors commenced the Bankruptcy Cases by filing voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession.  On February 26, 2020, the Office of the United States Trustee for the Southern District of New York appointed the Committee.

10

28.     One day prior to the Petition Date, the Debtors commenced solicitation of their proposed plan of reorganization (the "Proposed Plan").    (*See Declaration of Sean M. Harding in Support of Chapter 11 Petitions and First Day Papers* [Docket No. 23].)

29.     The Proposed Plan, which was negotiated among the Debtors, Chatham, and certain holders of 1L Notes, provides, among other things, that:

- Chatham will receive (i) 97% of the equity of the reorganized Debtors on account of its purported 2L Loans and 3L Notes, and (ii) $45 million in 1.5 lien debt (comprised of a $30 million new money component and a 7% fee in the form of original issue discount) on account of its 1L Notes;

- The majority of general unsecured creditors -- including, we understand, the PBGC on account of its massive unfunded liability claim, beneficiaries of the non-qualified pension plans, litigation claimants, trade claimants, and other unsecured creditors of unknown amount -- will have the choice of either $3 million in cash or warrants to purchase 2.5% of illiquid equity in the reorganized Debtors (which will be a private company controlled exclusively by Chatham) at a strike price that has not yet been determined, resulting in a recovery of less than 1%;[10]

- The PBGC's recovery for $91 million in termination premiums, which the PBGC has asserted is non-dischargeable, will be limited to a $33 million secured note (with a 10-13-year term) and 3% of the equity of the reorganized Debtors;

- All holders of 1L Notes (other than Chatham) will receive a premium in the form of new first lien secured debt with tighter covenants and more expensive terms; and

- Chatham, the Prepetition Agents (as defined therein) and the Fiduciaries (as defined herein), among others, will receive broad releases of their prepetition misconduct.

(*See Disclosure Statement with Respect to the Joint Chapter 11 Plan of Reorganization of The McClatchy Company and its Affiliated Debtors and Debtors In Possession* [Docket No. 27] (the "Disclosure Statement") at Preamble.)

---

[10]   The Disclosure Statement provides that general unsecured creditors will receive a 1.6% recovery, but after taking into account the PBGC's asserted general unsecured claim in an amount in excess of $1 billion, the recovery will be reduced to far less than 1%.

30.     Put simply, the Proposed Plan purports to hand the keys to the reorganized Debtors over to Chatham, while simultaneously granting the Proposed Defendants broad releases from their prepetition conduct for no consideration.

31.     Similarly, on the Petition Date, the Debtors filed their motion for, among other things, debtor-in-possession financing.  (*See* [Docket No. 11] (the "DIP Motion").)  As was evident in the DIP Motion, and as this Court recognized, the Debtors were willing to stipulate to the validity of liens and claims granted as part of the Suspect Transactions without any consideration and prior to finalizing their investigation into the same.  (*See* Transcript of Hr'g. Feb. 14, 2020 at 27:6-12.)

32.     Driven by the Court's comments at the first day hearing, the Debtors ultimately agreed to a narrower set of stipulations and releases as part of the Debtors' final DIP order.  (*See Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 233]. (the "Final DIP Order").)

33.     Nevertheless, the Final DIP Order stipulates to the validity of the Subsidiary-level guarantees (the "New Guarantees") granted to the 2L Loans and the 3L Notes as part of the Suspect Transactions.  (*See Final DIP Order* at ¶¶ E (iii) and (iv).)  Moreover, the Final DIP Order sets June 24, 2020 as the deadline for the Committee to challenge the claims and liens granted as part of the Suspect Transactions (the "Challenge Deadline").  (*See id.* at ¶ 43.)

34.     On February 25, 2020 -- prior to the Committee's formation -- the Court entered the *Order Establishing Terms for Plan Mediation* [Docket No. 107] (the "Mediation Order").

12

Among other things, the Mediation Order appointed a mediator to facilitate negotiations concerning the Proposed Plan and related matters. (*See* Mediation Order at ¶¶ 1, 4.)

35.    On May 11, 2020, the Court entered the an order, approving, among other things, bidding procedures (the "Bidding Procedures")   (*See* [Docket No. 432].)   The Bidding Procedures set forth procedures for the sale of all or substantially all of the Debtors' assets and sets July 1, 2020 as the deadline to submit a bid in furtherance of the same (the "Bid Deadline"). The Committee understands that certain holders of Prepetition Secured Debt who are the subject of the Investigation have already submitted an indication of interest and further intend to submit formal a credit bid for all of the Debtors' assets, including the Proposed Claims.

**C.    The Committee's Investigation and Demand**

36.    On March 3, 2020, the Committee filed its *ex parte* application authorizing its examination of the Debtors, Chatham and Leon Cooperman (the "2004 Application").   (*See* [Docket No. 132].) On March 11, 2020, this Court entered an Order approving, in part, the 2004 Application (the "2004 Order").   (*See* [Docket No. 180].)   The 2004 Order authorized the Committee's investigation (the "Investigation") into the Debtors' prepetition conduct and provided a mechanism for the Committee to seek documents from Chatham.

37.    Over the past three-plus months, the Committee has conducted an Investigation into the Suspect Transactions, which includes a review of publicly available documents, certain documents produced by the Debtors, Leon Cooperman and Chatham, and conversations with the Debtors' advisors and officers.   Based on the results of the Investigation -- which has not yet concluded[11] -- the Committee has determined that there are colorable and valuable causes of action arising from the negotiation and implementation of the Suspect Transactions.

---

[11]   The Committee notes that, to date, it has disagreed with the scope of Chatham's and the Debtors' productions (regarding both the date range, topics, and custodians, for which all rights are reserved), and still requires additional

38.     On May 19, 2020, the Committee sent the Debtors a letter requesting that the Debtors grant it standing to pursue and settle the Proposed Claims.  On June 2, 2020, the Debtors responded by declining to consent to the Committee's standing, claiming the Proposed Claims lacked merit and also asserting the Debtors' belief (which the Committee vigorously disagrees with) that prosecuting the Proposed Claims at this time would not make sense.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

40.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

41.     The statutory predicates for relief requested herein are sections 1103 and 1109 of the Bankruptcy Code.

## RELIEF REQUESTED

42.     By this Motion, the Committee requests that the Court grant it leave, standing, and authority to (a) prosecute the Proposed Claims and (b) if appropriate, propose and effectuate settlements for all or a portion of the Proposed Claims, subject to further order of this Court.

## ARGUMENT

43.     The Bankruptcy Code authorizes the establishment of an official committee of unsecured creditors and empowers that committee to protect the rights of all unsecured creditors.  *See* 11 U.S.C. § 1103(c).  Likewise, the Bankruptcy Code provides that a committee "may raise and may appear and be heard *on any issue* in a case under this chapter."  11 U.S.C. § 1109(b)

---

information related to the Suspect Transactions.  Indeed, Chatham and the Debtors have refused to cooperate with many of the Committee's requests.  Nevertheless, the Investigation to date demonstrates the colorability of the Proposed Claims and, given the looming Challenge Deadline and Bid Deadline, along with the potential purchase and release of the Proposed Claims, the Committee felt it prudent to file this Motion now before its investigation is complete.  The Committee reserves all rights with respect to any additional discovery it deems necessary and/or any potential claims and causes of action not addressed in this Motion.

(emphasis added). The right to be heard "includes the right to sue where a trustee or debtor in possession will not." *Official Comm. of Unsecured Creditors of Joyanna Holitogs, Inc. v. I. Hyman Corp. (In re Joyanna Holitogs, Inc.)*, 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982).

44.    To that end, the Second Circuit has long recognized that there is "a qualified right for creditors' committees to sue on behalf of an estate with bankruptcy court approval." *In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 373 (Bankr. S.D.N.Y. 2005) (*citing Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir. 1985) ("*STN*")). Prior to bringing suit, a committee must typically satisfy a two-part test. *See STN*, 779 F.2d at 905. First, a committee must present colorable claims for relief "that on appropriate proof would support a recovery." *Id.* Second, the committee must establish that the "debtor unjustifiably failed to bring suit" and, whether "by evidentiary hearing or otherwise," the "action asserting such claim(s) is likely to benefit the . . . estate." *Id.*

45.    The requisite showing for establishing that claims are colorable is a "relatively easy one to make." *Adelphia Commc'ns Corp.*, 330 B.R. at 376. The Court need not engage in an extensive merits review or conduct a mini-trial. *Id.*; *see also STN*, 779 F.2d at 905. Rather, standing should be denied only if the claims are "facially defective." *Adelphia Commc'ns Corp.*, 330 B.R. at 376. Courts have thus analogized the inquiry to that undertaken when "a defendant moves to dismiss a complaint for failure to state a claim." *Id.* (citing *Official Comm. of Unsecured Creditors of Am.'s Hobby Ctr. v. Hudson United Bank (In re Am.'s Hobby Ctr., Inc.)*, 223 B.R. 275, 288 (Bankr. S.D.N.Y. 1998)); *see also In re Dewey & LeBeouf LLP*, No. 12-12321 MG, 2012 WL 5985445, at *6 (Bankr. S.D.N.Y. Nov. 29, 2012).

46.    If such colorable claims are "likely to benefit the reorganization estate," the Committee can obtain standing to prosecute them. *In re Am.'s Hobby Ctr., Inc.*, 223 B.R. at 282;

15

*see also STN*, 779 F.2d at 905. This test involves "the weighing of the probability of success and financial recovery, whether it is preferable to appoint a trustee to bring suit instead of the creditors' committee, and 'the terms relative to attorneys' fees on which suit might be brought.'" *In re Am.'s Hobby Ctr., Inc.*, 223 B.R. at 282 (quoting *STN*, 779 F.2d at 905).

47.    As explained below, each of the Proposed Claims are colorable and highly valuable. As such, prosecuting them would unquestionably benefit the Estates and the Debtors' refusal to bring them is unjustified. Indeed, such refusal is not surprising given the Debtors' inherent conflicts of interest and previous rush to release the Proposed Claims.

48.    Accordingly, the Motion should be granted.

## I.    <u>Each of The Proposed Claims Is Colorable</u>

### a.    <u>The Suspect Transactions Should Be Unwound as Fraudulent Transfers</u>

49.    Colorable bases exist to unwind the Suspect Transactions as both actual and constructive fraudulent transfers. Specifically, as set forth more fully in the Proposed Complaint, the Committee has colorable claims pursuant to sections 544 and 548 of the Bankruptcy Code against, among others, The Bank of New York Melon as Trustee, Administrative Agent and/or Collateral Agent for:

- the 1L Notes, to avoid the liens granted by Parent and the Subsidiaries with respect to the 1L Notes;

- the 2L Loans and the 3L Notes, to avoid any liens granted by Parent with respect to the 2L Loans or the 3L Notes; and

- the 2L Loans and the 3L Notes, to avoid any liens granted, and guarantees incurred, by each Subsidiary (the "<u>New Guarantors</u>") with respect to the 2L Loans or the 3L Notes. (collectively, the "<u>Fraudulent Transfer Claims</u>").

### i.    *The Constructive Fraudulent Transfer Claims Are Colorable*

50.    Section 548 of the Bankruptcy Code provides that a transfer or an obligation is avoidable if it can be shown that: (i) the transfer or obligation was for less than reasonably

equivalent value, and (ii) the debtor was (x) insolvent at the date of the transaction or was rendered insolvent thereby, (y) had unreasonably small capital, or (z) intended to incur, or reasonably should have known it would incur, debts that it could not pay as they matured. 11 U.S.C. § 548(a)(1)(B).  Section 544(b) similarly gives the Debtors the right to avoid any transfer or obligations pursuant to state fraudulent transfer law.  *Id.* § 544(b).  Here, the applicable state law is either New York (the governing law in the relevant debt documents) or California (Debtors' principal place of business).  Both New York and California impose requirements similar or identical to those set forth in section 548 of the Bankruptcy Code.  *See Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest., Inc.)*, 337 B.R. 495, 501 (Bankr. S.D.N.Y. 2006); *Mackenzie v. Dye (In re AFI Holding, Inc.)*, No. CV 05-3232 PA, 2005 WL 8167477, at *2 (C.D. Cal. Dec. 5, 2005).[12]

51.    The Proposed Complaint presents colorable grounds to support the claims for avoidance of the liens granted and obligations incurred pursuant to the Suspect Transactions.

1.    The Debtors Did Not Receive Reasonably Equivalent Value

52.    The term "reasonably equivalent value" is not defined in the Bankruptcy Code. Rather, "value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."  11 U.S.C. § 548(d)(2)(A).  In determining reasonably equivalent value, the Court conducts a two-fold inquiry: "whether the debtor received any value at all in exchange for the transfer, i.e. any realizable commercial value as a result of the transaction, and whether that value was in fact reasonably equivalent."  *Devon Mobile Commc'ns Liquidating Tr. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'n. Corp.)*, No. 02-41729 (REG), 2006 WL

---

[12]  Pursuant to sections 550 and 551 of the Bankruptcy Code, any liens avoided will be avoided "for the benefit of the estate" while the new obligations avoided will cease to exist.  *See* 11 U.S.C. §§ 550, 551.

687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006). "A finding of reasonably equivalent value does not require an exact equivalent exchange of consideration. However, the benefits the debtor receives from the transfer must approximate its expected costs." *Harrison v. New Jersey Community Bank (In re Jesup & Lamont, Inc.)*, 507 B.R. 452, 472 (Bankr. S.D.N.Y. 2014). Whether the debtor received reasonably equivalent value is a question of fact. *Id.* at 470.

53.    The Company received little to no value, let alone reasonably equivalent value, in exchange for the liens granted and obligations incurred as part of the Suspect Transactions. A central component of the Suspect Transactions was the granting of the New 1L Liens on previously unencumbered assets for no new value and the incurrence of up to $425 million of new secured obligations by the New Guarantors for no Subsidiary-level consideration. As set forth more fully in the Proposed Complaint, the fact that there was no interest rate or principal reduction in connection with the refinanced debt, coupled with the fees, OID, and call premiums associated with the Suspect Transactions, rendered the Company ***worse off*** following the Suspect Transactions than prior to entry thereto. Indeed, the only potential benefit of the Suspect Transactions – "additional runway" -- was unnecessary, as the Company was forced to file these Bankruptcy Cases within the original maturity profile of the 2022 Notes.

54.    The Committee understands that the Company has sought to justify the purported value it received from the Suspect Transactions by arguing that (a) the Company was responding to the Cash Flow Facility lenders' decision not to extend its maturity, which, through a series of circuitous steps, "required" the Company to uptier the structurally subordinated Unsecured Debentures into new second and third lien secured debt, and (b) the Company required additional runway to implement its digital transformation.

18

55.    Such asserted justification (even if true) is facially insufficient to establish reasonably equivalent value for the hundreds of millions of new liens and the $425 million in new secured obligations incurred as part of the Suspect Transactions.[13]  *See Feltman v. Wells Fargo Bank, N.A. (In re TS Employment, Inc.),* 597 B.R. 494, 528-29 (Bankr. S.D.N.Y 2019) (holding that agreements entered into by subsidiaries did not confer reasonably equivalent value because, among other things, as a general principle, "the opportunity to avoid . . . bankruptcy may not necessarily constitute 'reasonably equivalent value'" and, in any event, the "value resulting from the [facility] as a more cost-effective financing option" did not approximate the cost to the debtors); *In re Jesup & Lamont, Inc.*, 507 B.R. at 472 (recognizing same); *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1311-13 (11th Cir. 2012) (upholding the voiding of liens on assets granted by subsidiaries to secure the debt of a parent corporation where the "costs of the transaction . . . far outweighed any perceived benefits" and, like here, "the potential benefits of the transaction . . . were nowhere close to its expected costs"); *Cooper v. Centar Investments Ltd.* (*In re TriGem Am. Corp.)*, 431 B.R. 855, 868 (Bankr. C.D. Cal. 2010) ("Merely delaying the consequence of insolvency is not a measurable benefit to the subsidiary.").

## 2.    The Debtors Were Insolvent At All Relevant Times

56.    The Bankruptcy Code defines insolvent as "the sum of such entity's debts is greater than all of such entity's property, at fair valuation," exclusive of exempt property and any property transferred in actual fraudulent transfers.  11 U.S.C. § 101(32).  Section 101(32) is often referred to as the "balance sheet" test of insolvency.  *See, e.g.*, *Lawson v. Ford Motor Co. (In re*

---

[13]   In any event, the Company's justification does not stand up to scrutiny.  Initially, the Company began its refinancing efforts ***prior to*** learning that the Cash Flow Facility was not going to be extended.  Moreover, the Committee understands that the Company did not look for a new cash flow facility (which was permissible under the 2022 Notes) or try to negotiate an amendment to its 2022 Notes' indenture to permit a replacement facility before embarking on a wholesale refinancing of its capital structure to permit the same.

*Roblin Indus., Inc.)*, 78 F.3d 30, 35 (2d Cir. 1996).  A transfer or obligation may also be avoidable if the debtor was left with "unreasonably small capital," which courts have interpreted to encompass financial difficulties short of equitable insolvency.  *Sama v. Mullaney, et al. (In re Wonderwork, Inc.)*, 611 B.R. 169, 212 (Bankr. S.D.N.Y. 2020).

57.      As described herein and in more detail in the Proposed Complaint, given the Company's massive underfunded pension liability and funded indebtedness, the Company both (x) had unreasonably small capital and (y) was unquestionably insolvent (or, as to the Subsidiaries, at the least rendered insolvent) prior to entry into the Suspect Transactions.  *See, e.g., Id.* at 213 (finding that complaint pled sufficient facts to support inference that the Debtor was balance-sheet insolvent).

58.      Thus, the Committee has colorable claims for constructive fraudulent transfer.

ii.      *The Actual Fraudulent Transfer Claims Are Colorable*

59.      Section 548(a)(1)(A) of the Bankruptcy Code provides that a bankruptcy trustee may avoid a transfer of an interest of the debtor in property, or an obligation incurred by the debtor, that was made or incurred with "actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted."  11 U.S.C. § 548(a)(1)(A).  Similarly, pursuant to section 544(b) of the Bankruptcy Code, a bankruptcy trustee may avoid a transfer of property or obligation that is voidable under state fraudulent transfer law.  11 U.S.C. § 544(b).

60.      Given that section 548(a)(1)(A) is written in the disjunctive, it is well accepted that the Committee need only prove that the Company acted with the "intent to hinder or delay" its creditors; "intent to defraud need not be proven."  *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 402-03 (Bankr. S.D.N.Y. 2007); *see also Bayou Accredited Fund, LLC v. Redwood Growth Partners LLC,* (*In re Bayou Grp.)*, 396 B.R. 810, 826 (Bankr. S.D.N.Y. 2008) (subsequent history omitted).  A scheme to hinder or delay does not

20

require an intent not to pay creditors at all; rather, a debtor acts with an intent to hinder "if he or

she acts with an intent to impede or obstruct creditors" and an intent to delay "if he or she acts

with an intent to slow or postpone creditors." *Wiggains v. Reed (In re Wiggains)*, No. 13-22757-

SGJ-7, 2015 WL 1954438, at *17 (Bankr. N.D. Tex. Apr. 28, 2015), *aff'd sub nom*, *Matter of

Wiggains*, 848 F.3d 655 (5th Cir. 2017) (citing dictionary definitions of "hinder" and "delay").[14]

61.     Even if the transferor intended to hinder or delay the creditors for the greater good

of the enterprise, the transaction is "not immunized by the transferor's conviction." *In re

MarketXT Holdings Corp.*, 376 B.R. at 408 (citing *Shapiro v. Wilgus*, 287 U.S. 348 (1932)); *see

also Rosa v. TCC Commc'ns, Inc.*, No. 15CV1665, 2017 WL 980338, at *5 (S.D.N.Y. Mar. 13,

2017) (recognizing that, under DCL § 276, a "deliberate attempt to stave off creditors by putting

property in such a form and place that creditors cannot reach it, even when the purpose of that

action is . . . only to obtain enough time to restore the debtor's affairs," "comes within the

meaning of 'hinder' and 'delay'"). Rather, ***any*** transaction made with the intent to hinder or

delay one's creditors is avoidable. *Id.* Whether a debtor acted with actual intent to hinder, delay,

or defraud is a fact-specific inquiry. *See*, *e.g.*, *In re Saba Enterprises, Inc.*, 421 B.R. at 642-44.

62.     As set forth herein and in the Proposed Complaint, the Company embarked on the

refinancing process with the stated goal, among other things, of refinancing the 2022 Notes to

extend its runway. However, to achieve that goal, the Board ceded all control over the process to

Chatham. ████████████████████████████

████████████████████████████████████

---

[14] While, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure (the "Federal Rules"), fraud must typically be pled with particularity, courts within the Second Circuit have taken a "more liberal view" of such standards where, like here, they are "examining allegations of actual fraud that are pleaded by a bankruptcy trustee in the context of a fraudulent conveyance, since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." *Pereira v. Grecogas Ltd. (In re Saba Enterprises, Inc.)*, 421 B.R. 626, 640-41 (Bankr. S.D.N.Y. 2009) (collecting cases); *Hosking v. TPG Capital Management, L.P. (In re Hellas Telecommunications (Luxembourg) II SCA)*, 526 B.R. 499, 511 (Bankr. S.D.N.Y. 2015).

21

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████

63.     Accordingly, there is direct evidence that the Suspect Transactions were conducted with the intent to, at the least, hinder and delay the Company's creditors. *See In re MarketXT Holdings Corp.*, 376 B.R. at 408; *Tronox, Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 94 (Bankr. S.D.N.Y. 2010) (finding that where, as here, there are allegations of "a knowing intent on the part of the defendant to damage creditors," the complaint adequately alleges actual fraudulent transfer).

64.     Even assuming, *arguendo*, that the Company's repeated admissions regarding the Suspect Transactions were insufficient to prove an intent to hinder or delay, the Company's intent may be inferred through "badges of fraud," including, without limitation:

(1) the financial condition of the transferor at the time of the transfer;

(2) concealment of facts and false pretenses by the transferor;

(3) an unconscionable discrepancy between the value of the property transferred and the consideration received;

(4) a close relationship between the parties to the alleged fraudulent transaction;

(5) the reservation of rights in or control over the transferred property after the alleged conveyance;

(6) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(7) the general chronology of the events and transactions under inquiry.

*In re MarketXT Holdings Corp.,* 376 B.R. at 405-06; *In re Sabine Oil & Gas Corp.*, 547 B.R.

503, 553, n.144 (Bankr. S.D.N.Y.), *aff'd,* 562 B.R. 211 (S.D.N.Y. 2016).

65.    As set forth more fully in the Proposed Complaint, numerous badges of fraud

establish that the Company entered into the Suspect Transactions with the intent to hinder or

delay its creditors, including, without limitation: the financial condition of the transferor at the

time of the transfer, the unconscionable discrepancy between the value of the property

transferred and the consideration received, the close relationship between the parties to the

alleged fraudulent transaction, the reservation of rights in or control over the transferred property

after the conveyance, and the general chronology of the events and transactions under inquiry.

   b.   <u>Negotiation Of And Entry Into The Suspect Transactions Constitute Breaches Of
        Fiduciary Duty</u>

66.    The Investigation thus far has uncovered two categories of claims for breach of

fiduciary duty. *First*, Parent's directors and officers (the "<u>Parent Fiduciaries</u>") breached their

duties of care and loyalty in rejecting Chatham's ███████████ and/or approving the

Suspect Transactions in order to, among other things, protect the McClatchy family and other

shareholders. *Second*, Parent Fiduciaries and each of the Subsidiary's directors and officers (the

"<u>Subsidiary Fiduciaries</u>" and with the Parent Fiduciaries, the "<u>Fiduciaries</u>") breached their duties

of care and loyalty in approving the Suspect Transactions, allowing the Subsidiaries to incur up

to $425 million of new secured debt for no subsidiary-level consideration.

   i.   *The Committee Has Alleged Colorable Claims For Breach Of Fiduciary Duty*

67.    Directors and officers of a Delaware corporation, like Parent, have a duty to act in

the best interest of the estate.[15] Ordinarily, when an entity is solvent, the estate includes only the

---

[15]   Pursuant to the internal affairs doctrine, the law of incorporation for Parent and each Subsidiary governs the
Fiduciaries' duties. *See Feiner Family Tr. v. VBI Corp.*, No. 07 Civ. 1914 (RPP), 2007 WL 2615448, at *5

entity's shareholders. However, upon insolvency, Delaware law recognizes that the best interests of the estate includes all of the estate's residual claimants, including its creditors. *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 546 (Del. Ch. 2015); *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007). Here, as detailed above, Parent and each Subsidiary were insolvent at all relevant times, and so the Fiduciaries' duties inured to the benefit of the unsecured creditors.

68.     Directors and officers typically owe the corporation two duties: the duty of care and loyalty. "The fiduciary duty of due care requires that directors of a Delaware corporation use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (citations and internal quotations omitted). The duty of care is violated when the directors and officers act with gross negligence or demonstrate a "reckless indifference to or a deliberate disregard of" their duties or undertake "actions which are without the bounds of reason." *Id*. at 750 (citations and internal quotations omitted).

69.     The duty of loyalty generally obligates a fiduciary to act in "good faith" and to refrain from conflicts and from putting its interests ahead of those of the corporation. Typically, the duty of loyalty is violated where either a director or officer "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties" or appears on both sides of a transaction, expects to derive personal financial benefit from the transaction in the sense of self-dealing, or is beholden to an interested party. *Walt Disney Co. Derivative Litig.*, 907 A.2d at 755; *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993) (subsequent

---

(S.D.N.Y. Sept. 11, 2017). As set forth in the Proposed Complaint, the Subsidiary Fiduciaries breached their duties under each of the 17 jurisdictions whose law may apply.

history omitted). Individuals who serve in a dual capacity -- for instance, as an officer and/or director at both the parent and its subsidiaries -- must fulfill their duties of loyalty and care to *both* entities. *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1106 (Del. 1985).

70.    Although pursuant to the business judgment rule there is a presumption that the directors of a corporation act on an informed basis and in good faith, *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014), the presumption can be overcome by demonstrating that the directors or officers "are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Brehm v. Eisner*, 746 A.2d 244, 264 n. 66 (Del. 2000).

71.    As described herein and more fully in the Proposed Complaint, the Committee has colorable claims for breaches of the duty of care and loyalty against the Fiduciaries, none of whom are insulated by the business judgment rule in this case.

72.    *First*, the Parent Fiduciaries breached their duties of care and loyalty by ███████ ████████████████████████████████████████████████████ and/or approving the Suspect Transactions: (a) for no consideration; (b) without retaining independent counsel (until June 2018) or an independent financial advisor to aid them in evaluating the relative costs and benefits of such proposed transactions; (c) following a grossly negligent process by which they failed to obtain or consider reasonably available material information, including whether Parent was insolvent, and as such, to whom they owed their fiduciary duties; and (d) while they were not disinterested, inasmuch as (x) they were beholden to, and acted in the interest of, the McClatchy family and the other shareholders and (y) certain members were simultaneously directors and/or officers of both Subsidiaries and Parent.

73.    *Second*, the Subsidiary Fiduciaries breached their duties of care and loyalty by approving the Suspect Transactions: (a) for no consideration; (b) without conducting any process to evaluate the Suspect Transactions prior to entry thereto, including, without limitation, without retaining any independent counsel or any independent financial advisor to aid them in evaluating the relative costs and benefits of such transaction, and without determining whether each Subsidiary was insolvent, and as such, to whom the Subsidiary Fiduciaries owed their fiduciary duties; and (c) while they were not disinterested, inasmuch as they were simultaneously directors and/or officers of both the Subsidiaries and Parent, thereby owing fiduciary duties to both. Indeed, given their dual loyalties, the Subsidiary Fiduciaries could not, and did not, make an informed, neutral, good-faith, independent determination to approve the Suspect Transactions.

       ii.    *The Committee Has Alleged Colorable Aiding And Abetting Claims*

74.    In addition to the direct breach of fiduciary duty claims, the Committee believes the Estates may have colorable claims against Chatham, among others, for aiding and abetting the foregoing breaches of fiduciary duty. Generally, to sustain a claim for aiding and abetting a breach of fiduciary duty under Delaware, New York, and California law,[16] the claimant must demonstrate (1) an underlying breach of fiduciary duty; (2) that the target knowingly participated in the breach; and (3) damages resulted therefrom. *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 496 (Del. Ch. 2013); *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 CIV. 8688 (WHP), 2002 WL 362794, at *10 (S.D.N.Y. Mar. 6, 2002) ("To plead aiding and abetting breach of fiduciary duty under New York law, the Committee must set forth facts showing (i) a breach by a fiduciary of obligations to another;

---

[16]  "New York courts have taken three approaches to deciding which state's law applies to an aiding and abetting breach of fiduciary duty claim: an internal affairs approach, a torts based 'greatest interest' approach, and a hybrid approach." *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 612 (S.D.N.Y. 2011). The Committee reserves all rights with respect to which law applies.

(ii) that the aider and abettor knowingly induced or participated in the breach; and (iii) that the

plaintiff suffered damages as a result of the breach" and noting that "California law does not

differ substantively from New York law.")

75.    As set forth more fully in the Proposed Complaint, Chatham, ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████

76.    Moreover, while the Investigation is ongoing, the Committee believes that with

additional discovery it will identify colorable claims for aiding and abetting the foregoing

breaches of fiduciary duty against others, including potentially, certain of the Company's

professionals.    Given the overlap of facts between an aiding-and-abetting claim and a direct

breach claim, the Committee respectfully requests that it be granted standing to pursue any and

all aiding and abetting claims, even as it continues to identify all other relevant defendants.[17]

c.    Chatham's Claims Should Be Equitably Subordinated

77.    Pursuant to section 510(c) of the Bankruptcy Code, a court has the power to

equitably subordinate an allowed claim where (a) the claimant engaged in inequitable conduct,

(b) the misconduct injured other creditors or conferred an unfair advantage, and (c) equitable

subordination is not otherwise inconsistent with the Bankruptcy Code.    *Lehman Bros. Holdings,*

*Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros. Holdings Inc.*), 541 B.R. 551, 582-83

(Bankr. S.D.N.Y. 2015).    By its nature, equitable subordination claims require a fact-intensive

---

[17] Indeed, as recognized by the Court in *Adelphia Commc'ns Corp.*, standing should be granted where, as here, the committee has demonstrated that their proposed litigation in toto is a "sensible endeavor," even where some claims at the margins may not be fully developed.  *See* 330 B.R. at 379-381, 386 (granting motion for derivative standing despite recognizing that certain claims asserted may ultimately not be colorable).

inquiry. *Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 68-70 (Bankr. S.D.N.Y. 2007).

78.    As described herein and in more detail in the Proposed Complaint, Chatham -- who exercised control over the Company at all relevant times -- engaged in wrongful and inequitable conduct by, among other things:  (a) orchestrating and negotiating the Suspect Transactions in a non-arm's-length manner; ██████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████ -- something that Chatham has used in these Bankruptcy Cases in an attempt to provide itself with far greater recoveries than unsecured creditors; ████████████

████████████████████████████████████████████████████████████████████

(d) aiding and abetting the Fiduciaries' breach of fiduciary duty and the Company's fraudulent transfers;  and██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.[18]

79.    The Debtors were unquestionably damaged by Chatham's wrongful and inequitable conduct, and equitable subordination of Chatham's claims is not inconsistent with any provision of the Bankruptcy Code.

80.    Accordingly, the Committee's proposed equitable subordination claims are colorable. *See Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 354 (S.D.N.Y. 2013) (recognizing that a key factor courts consider in analyzing equitable subordination claims is "whether the relationship between the debtor and lender was the result of

---

[18]  The Committee notes that, since at least September 2017, Chatham has also been actively trading in and out of the Company's common stock, notes, bank debt, and CDS, and, to date, the Committee has been unable to confirm whether it did so while in possession of the Company's material, non-public information, which could form an independent basis for equitable subordination.  The Committee has requested Chatham's trading history; however, Chatham has categorically refused to produce this information.

an arm's-length transaction") (quoting *In re MarketXT Holdings Corp.*, 361 B.R. at 387); *In re Adelphia Commc'ns Corp.*, 365 B.R. at 68-70 (upholding equitable subordination claim where, as here, the defendants "knowingly or recklessly assisted" the "siphoning value out of the Debtors"); *cf. LightSquared LP v. SP Special Opportunities LLC,* (*In re LightSquared Inc.*), 511 B.R. 253, 352-53 (Bankr. S.D.N.Y. 2014) (finding "perfectly lawful" conduct that violates spirit of applicable documents may constitute inequitable conduct sufficient to warrant subordination).

   d.   Claims For Unmatured Interest Should Be Disallowed

81.    The 1L Notes and the 2L Loans were each issued with original issue discount. Pursuant to section 502(b)(2) of the Bankruptcy Code, unaccreted original issue discount is considered unmatured interest and, as such, is impermissible. *See LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d 378, 380 (2d Cir. 1992) (finding that unamortized OID is "unmatured interest" within the meaning of section 502(b)(2)); *In re Solutia Inc.*, 379 B.R. 473, 487 (Bankr. S.D.N.Y. 2007) (same).

82.    Accordingly, the Proposed Complaint clearly states a colorable claim for disallowance of the $6.9 million of unaccreted original issue discount of the 1L Notes and $13.0 million of unaccreted original issue discount of the 2L Loans.

   e.   The Unencumbered Assets Are Not Subject To Any Security Interests And Any Liens On The Non-Perfected Assets Should Be Avoided

83.    Pursuant to the applicable loan documentation, holders of the Prepetition Secured Debt do not hold any liens on the Unencumbered Assets (as defined in the Proposed Complaint). Thus, the Committee has colorable claims for a declaration that such assets are unencumbered by liens securing the Prepetition Secured Debt.

84.    Similarly, as set forth below, any purported lien on the Non-Perfected Assets (as defined in the Proposed Complaint) are avoidable under section 544(a) of the Bankruptcy Code.

- As to commercial tort claims, pursuant to sections 9-108 and 9-203(b)(3)(A) of the Uniform Commercial Code (the "UCC"), a security agreement covering commercial tort claims must provide a detailed description of the collateral to properly pledge and perfect a lien on commercial tort claims. Here, the Prepetition Secured Debt is not secured by a perfected lien in commercial tort claims because there is no specific description of the claims in the relevant debt documents or financing statements.

- As to the real property identified in Schedule D to the Proposed Complaint, applicable law requires that a mortgage, deed of trust or similar instrument be executed by the borrower and recorded in the county land records in which the property is located. The Debtors and the lenders have not produced any such filings for the forgoing property.

- As to the 1L Notes' lien in registered copyrights, pursuant to 17 U.S.C. § 205, registered copyrights can only be perfected via recordation in the United States' Copyright Office. The Debtors and certain lenders have not produced any such recordation.

- As to the Non-Perfected Tax Attributes (as defined in the Proposed Complaint), the Committee is not aware of any document which purports to properly perfect the same.

85.    Finally, the Committee has a colorable basis to seek a declaration that any lien that purportedly extends to property acquired by the Debtors post-petition, including, without limitation, proceeds recovered from Unencumbered Assets or Non-Perfected Assets (whether by insurance or otherwise), would constitute after-acquired property and be terminated by section 552 of the Bankruptcy Code. Section 552(a) of the Bankruptcy Code sets forth the general rule that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). While the operative security agreements purport to extend to property, whenever acquired, such extension cannot apply to recovery on account of the foregoing pursuant to section 552 of the Bankruptcy Code. And, even if such property could be considered proceeds of the Debtors' prepetition collateral pursuant to section 552(b), the equities of the case militate against applying that exception here.

f.    No Applicable Premium Or Make-Whole Amounts Are Due And Payable

86.    As set forth in the Proposed Complaint, while the documents governing the Prepetition Secured Debt provide that in the event that the Debtors make a voluntary redemption

30

or prepayment of the Prepetition Secured Debt, in addition to the principal then outstanding, an

"Applicable Premium" (in the case of the 1L Notes) or "Make-Whole Amount" (in the case of

the 2L Loans or 3L Notes) will be due and payable, such amounts are not payable, where, as

here, the Prepetition Secured Debt has been accelerated and the express terms of the contract do

not require payment of such premium upon acceleration.  *See Matter of MPM Silicones, L.L.C.*,

874 F.3d 787, 802 (2d Cir. 2017).

87.     Accordingly, the Committee has a colorable basis to seek a declaration that no

Applicable Premium or Make-Whole Amount is due and payable.

## II.     **The Debtors' Unwillingness To Pursue The Proposed Claims Is Unjustified**

88.     Where, as here, proposed claims are colorable, a presiding court moves on to the

second step in the *STN* analysis:  whether the "debtor unjustifiably failed to bring suit" and

whether, "by evidentiary hearing or otherwise," the "action asserting such claim(s) is likely to

benefit the reorganization estate."  *STN*, 779 F.2d at 904-05.

### a.   The Debtors Unjustifiably Failed To Bring Suit

89.     The Second Circuit has recognized that "[d]erivative standing . . . may be

necessary to avoid the inherent conflict of interest that exists when those with the power to

pursue a claim are those who may be the target of such a claim."  *Smart World Technologies,*

*LLC v. Juno Online Servs., Inc. (In re Smart World Technologies, LLC),* 423 F.3d 166, 177 (2d

Cir. 2005); *see also In re Recoton Corp.,* 307 B.R. 751, 760-61 (Bankr. S.D.N.Y. 2004)

(recognizing that, in many chapter 11 cases, "it may not be feasible" for a debtor to investigate

its own prepetition activities).  This is because "if managers can devise any opportunity to avoid

bringing a claim that would amount to reputational self-immolation, they will seize it."  *Official*

*Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330

F.3d 548, 573 (3d Cir. 2003).

31

90.     The Debtors -- who are managed by the same directors and nearly all the same officers who negotiated and approved the Suspect Transactions -- are conflicted from pursuing claims against the Proposed Defendants, and thus derivative standing is necessary.

91.     Initially, starting even prior to the Petition Date, the Debtors have made clear they are prepared to absolve all Fiduciaries and lenders from liability in connection with the Suspect Transactions.  Early on, the Debtors agreed to waive nearly all of the Proposed Claims via their Proposed Plan, which the Debtors solicited prepetition.  (*Supra* ¶ 29.)  The Proposed Plan also purported to grant broad releases to the Fiduciaries.  (*Id.*)  Similarly, in connection with the DIP financing, the Debtors stipulated to the validity of the subsidiary guarantees granted to the 2L Loans and the 3L Notes. (*Id.* at ¶ 33.)  More recently, the Debtors openly embraced a credit bid proposal from holders of the 1L Notes that, again, confirmed the Debtors' already-made decision to quell challenges to the Suspect Transactions.  (*See* Form 8-K, April 16, 2020, *available at  https://www.sec.gov/Archives/edgar/data/1056087/000105608720000019/mni-20200416x8k. htm.*)[19]  Indeed, it is apparent from the manner in which the Debtors have been conducting these cases -- the pre-solicitation of the Chatham-sponsored plan, the disenfranchisement of unsecured creditors, the imposition of mediation prior to the Committee's formation or investigation, the embrace of the credit bid followed by an attempt to move forward with a sale process without court-approved sale procedures, and various tactics designed to pressure the Committee -- that the Debtors have run these cases for the primary benefit of the lenders.

---

[19]  The retention of Togut, Segal & Segal LLP ("<u>Togut</u>") as counsel for the Debtors did nothing to absolve that conflict.  In the first instance, it seems that Togut is not investigating any claims pertaining to the 1L Notes or breaches of fiduciary duty.  Moreover, while Togut has suggested that it does not report to any particular party, Togut is not "independent."  As an estate professional (and not an examiner or a trustee), it can only advise its clients (the Debtors), who must then decide how to proceed.   The Committee's understanding is that the four-member strategic subcommittee consists of two members ████████████████████████████████████████ ████████████████████████████████████████████████████████  Thus, by definition, Togut's investigation -- even if thorough and comprehensive -- cannot be independent because it is reporting to a conflicted audience.

92.      In their June 2, 2020 letter (declining the Committee's request for standing), the Debtors, not surprisingly, claim that their Fiduciaries did nothing wrong and therefore the breach of fiduciary duty claims lack merit.    Tellingly, however, the letter does not address the colorability of the fraudulent conveyance or equitable subordination claims.    Rather, the Debtors justify their refusal to consent to the Committee's standing by arguing that: (1) prosecution of the claims would interfere with the ongoing mediation process, and (2) it would be harmful to litigate the Proposed Claims in the middle of the sale process.    Both points miss the mark.

93.      For starters, parties often litigate and mediate in tandem and, indeed, here, the Debtors never sought any stay pending mediation.    Moreover, leaving aside what is or is not happening in mediation (which is confidential and subject to the Mediation Order), the Committee's decision to file this motion speaks volumes about the present state of the mediation.

94.      Concerning the sale process:    it is precisely because the sale process is ongoing that the Committee requires standing now.    The Debtors are proposing to sell the Proposed Claims and have already endorsed a credit bid by certain of the Proposed Defendants that purports to purchase and release same.    As set forth herein, the credit bid is subject to significant litigation risk, and it is important that the Committee tee those issues up sooner rather than later.

95.      It is thus evident that the Debtors have already made up their minds (whether as a result of their conflicts or otherwise) and attempting to prevent the Committee from pursuing the Proposed Claims is just wasting time.

        b.    <u>Prosecution Of The Proposed Claims Would Benefit The Estates</u>

96.      Prosecution of the Proposed Claims would unquestionably benefit the estates.    In determining whether the action would benefit the estates, a court should engage in a limited assessment to ensure "that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will

likely produce." *Adelphia Commc'ns Corp.*, 330 B.R. at 374.  A court need only assure itself that the proposed litigation is not a "hopeless fling" and that the "prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost." *Id.* at 386.

97.    Here, the Proposed Claims are not only viable, but also have significant potential value and could improve the recoveries of unsecured creditors materially, outweighing any delay and cost associated with litigating them.  Indeed, the Proposed Claims could result in a finding that a significant portion of the Debtors' property is unencumbered, dramatically shifting the recoveries and materially increasing the recoveries for the unsecured creditors.

98.    Specifically, assuming a fair valuation, the Committee submits that it may recover in excess of $120 million in distributable value as a result of its Fraudulent Transfer Claims against the 1L Notes and in excess of $40 million in distributable value resulting from its Fraudulent Transfer Claims against the 2L Loans and 3L Notes.  Similarly, if the Committee is successful on its equitable subordination claims against Chatham, in excess of $120 million in distributable value could be freed up for the benefit of the unsecured creditors, even if the Committee were unsuccessful on its Fraudulent Transfer Claims.  Finally, the Committee understands that the Debtors have approximately $70 million of D&O coverage, providing a significant source of independent recoverable value for the Committee's colorable breach of fiduciary duty claims.[20]

99.    Accordingly, any delay and expense that would be incurred in prosecuting the Proposed Claims is more than outweighed by the hundreds of millions of dollars in recovery, and

---

[20]    The Committee's review of the Debtors' primary insurance policy from Great American Insurance Group ("GAIC") further supports our conviction that the estates are best served by allowing the Committee to bring the Proposed Claims.  We expect that if the Debtors were to assert or prosecute fiduciary duty claims, GAIC and other carriers in the tower would deny coverage based on the "insured vs. insured" exclusions in the policies.  Inasmuch as this exclusion expressly carves out creditors' committees, the Committee is ideally situated to access the policy tower in any settlement or litigation of the breach of fiduciary duty claims.

there is no legitimate reason to refrain from asserting the Proposed Claims immediately.

## III.    The Committee Should Be Granted Exclusive Authority To Settle

100.    The Debtors' inability to bring the claims also makes the Debtors unable to effectively manage or settle any resulting litigation.  Indeed, the Debtors have shown, repeatedly throughout these Bankruptcy Cases, that they are willing to settle and/or sell the Proposed Claims for little or no consideration.  Moreover, it is indisputable that any decision to settle any of the Proposed Claims, and at what level, will have a disproportionate economic impact on the Debtors' unsecured creditors, whose interests the Committee represents in these cases.  As a result, the Committee should be granted the exclusive right to settle and compromise the Proposed Claims.  *See*, *e.g.*, *In re Dewey & LeBeouf LLP*, 2012 WL 5985445 at *7 (recognizing that "several courts have entered orders providing a creditors' committee with standing to settle certain claims on behalf of the estate").

## NOTICE

101.    Notice of this Motion will be given to all parties entitled to notice pursuant to the Case Management Order.  (*See* [Docket No. 106].)

## NO PRIOR REQUEST

102.    No prior request for the relief sought in this Motion has been made by the Committee or any other party in these proceedings.

## RESERVATION OF RIGHTS

103.    The Committee reserves all rights with respect to the Motion and these Bankruptcy Cases, including the right to amend and/or supplement this Motion, the right to participate in additional briefing, and the right to be heard at any hearing or trial related to the Motion.  Nothing contained herein shall constitute a waiver of any of the rights or remedies of the Committee, each of which is expressly reserved.

35

## CONCLUSION

WHEREFORE, for the reasons stated herein, the Committee respectfully requests that this Court enter an Order in the form attached hereto as **Exhibit B**, (a) granting the Committee standing to pursue the Proposed Claims, (b) granting the Committee exclusive settlement authority with respect to the Proposed Claims, and (c) granting to the Committee such other and further relief as this Court may deem just and proper.

Dated: June 22, 2020
      New York, New York

STROOCK & STROOCK & LAVAN LLP

*/s/ Daniel A. Fliman*
Kristopher M. Hansen
Frank A. Merola
Erez E. Gilad
Daniel A. Fliman
Isaac S. Sasson
180 Maiden Lane
New York, New York  10038
Telephone:    (212) 806-5400
Facsimile:    (212) 806-6006

*Counsel for the Official
Committee of Unsecured Creditors*

# **EXHIBIT  A**

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Frank A. Merola
Erez E. Gilad
Daniel A. Fliman
Isaac S. Sasson
180 Maiden Lane
New York, NY 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Counsel for the Official Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

*In re:*                                                  :
                                                          :     Chapter 11
THE MCCLATCHY COMPANY, *et al.*,                          :
                                                          :     Case No. 20-10418 (MEW)
          *Debtors.*[1]                                   :
                                                          :     (Jointly Administered)
---------------------------------------------------------- :
                                                          :
OFFICIAL COMMITTEE OF UNSECURED                           :     Adversary Proceeding No.
CREDITORS OF THE MCCLATCHY                                :     _____
COMPANY, *et al.*, on behalf of the estates of the        :
Debtors,                                                  :     **[PROPOSED] COMPLAINT**
                                                          :
          *Plaintiff,*                                    :
                                                          :
          *v.*                                            :
                                                          :
CHATHAM ASSET MANAGEMENT LLC,                             :
CHATHAM ASSET HIGH YIELD MASTER                           :
FUND, LTD., CHATHAM FUND, LP,                             :
CHATHAM EVEREST FUND, LP, CHATHAM                         :
ASSET PRIVATE DEBT AND STRATEGIC                          :
CAPITAL FUND, LP, THE BANK OF NEW                         :
YORK MELLON, as indenture trustee, collateral            :
agent, and administrative agent, CRAIG I.                 :

---

[1]   The last four digits of Debtor The McClatchy Company's tax identification number are 0478. Due to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities (collectively, the "Debtors") and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/McClatchy. The location of the Debtors' service address for purposes of these chapter 11 cases is: 2100 Q Street, Sacramento, California 95816.

FORMAN, ELIZABETH BALLANTINE,            :
LEROY BARNES JR., MOLLY MALONEY          :
EVANGELISTI, ANJALI JOSHI, BROWN         :
MCCLATCHY MALONEY, KEVIN S.              :
MCCLATCHY, WILLIAM MCCLATCHY,            :
THEODORE R. MITCHELL, CLYDE W.           :
OSTLER, MARIA THOMAS, ELAINE             :
LINTECUM, BILLIE MCCONKEY, MARK          :
ZIEMAN, ANDREW PERGRAM, TIM              :
GRIEVE, JEANNE SEGAL; JOHN DOES 1-10,    :
                                         :
              *Defendants*.              :
-------------------------------------------------- x

   Plaintiff, the Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in

the Chapter 11 bankruptcy cases of The McClatchy Company (with its affiliates, the "<u>Company</u>"

or "<u>McClatchy</u>") and other above-captioned Debtors, by and through its undersigned counsel, on

behalf of and as the representative of the estates of the debtors (the "<u>Debtors</u>") in the above-

captioned Chapter 11 bankruptcy cases (the "<u>Chapter 11 Cases</u>"), and based upon knowledge,

information, belief, and its investigation to date, alleges as follows:

### NATURE OF ACTION[2]

   1.  This adversary proceeding asserts claims on behalf of the Debtors' estates arising

from the negotiation and implementation of certain prepetition transactions designed by the

Debtors and Chatham -- which, at all relevant times, was a non-statutory insider of the Debtors

and the Debtors' largest shareholder (outside of the McClatchy family) -- to Chatham's benefit.

Such transactions provided no meaningful value or benefit to the Debtors and were purposefully

calculated to saddle the Debtors' Subsidiaries with substantial new secured indebtedness for no

meaningful consideration, to generate an unjust economic windfall for Chatham, and to render it

---

[2] Capitalized terms used and not otherwise defined in this section shall have the meanings ascribed to them herein.

difficult, if not impossible, for the unsecured creditors of the Debtors (the "Unsecured Creditors")

to realize the value of their unsecured claims.

2.    Specifically, through a scheme spanning approximately 18 months, Chatham, along

with the directors, officers, and agents of the Debtors, orchestrated and implemented a series of

lopsided refinancing and exchange transactions -- while the Debtors were insolvent --pursuant to

which, among other things, parent-only unsecured debt held by Chatham was exchanged for $350

million in new secured, subsidiary-guaranteed debt for no discount or reduction in coupon rate.

The purpose of these Suspect Transactions was to unlawfully cause the structurally subordinated

unsecured debt held by Chatham to leapfrog ahead of the Unsecured Creditors' claims and to cause

the Subsidiaries to incur more than $425 million in new secured indebtedness (including $350

million of exchanged Unsecured Debentures and $75 million in 2L Loans) without receiving any

reasonably equivalent value in exchange. ████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████  Thus, the Suspect

Transactions were clearly designed to prioritize the interests of the Company's controlling

shareholders, and to unjustly benefit Chatham, at the expense of the Unsecured Creditors to whom

fiduciary duties were owed.

3.    By this Complaint, the Committee seeks to pursue claims for (i) breaches of

fiduciary duties of care and loyalty owed by the directors and certain senior officers of the Parent

and Subsidiaries in connection with (a) ████████████████████████████

███████████████████, and (b) their approval of the Suspect Transactions; (ii)

aiding and abetting breaches of fiduciary duties by Chatham through, *inter alia*, its knowing and

purposeful orchestration and implementation of the Suspect Transactions; (iii) constructive and

2

actual fraudulent conveyances arising from the Suspect Transactions; (iv) equitable subordination

of the Chatham Secured Claims to the *pari passu* or structurally senior claims of the Unsecured

Creditors; (v) disallowance of certain Original Issue Discount ("OID") constituting unmatured

interest; (vi) a declaratory judgment that liens asserted by BNYM (in its capacities as 1L Trustee,

2L Agent, and 3L Trustee) against certain of the Debtors' assets are not in fact subject to a validly

perfected lien; and (vii) avoidance of certain liens that were unperfected as of the Petition Date.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and

1334.

5.      This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b),

and an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), which relates to the Chapter 11 Cases.

6.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      Pursuant to Rule 7008 of the Bankruptcy Rules, Plaintiff consents to entry of final

orders and judgments by the Court if it is determined that the Court, absent the consent of the

parties, cannot enter final orders or judgments consistent with Article III of the United States

Constitution.

## PARTIES

A.    Plaintiff

8.      The Committee is the Official Committee of Unsecured Creditors appointed in the

Chapter 11 Cases on February 26, 2020 pursuant to section 1102(a) of Title 11 of the United States

Code (the "Bankruptcy Code") by the Office of the United States Trustee for the Southern District

of New York.  The Committee is vested with, among other things, the powers described in section

1103 of the Bankruptcy Code, including the power to investigate the acts, conduct, assets,

3

liabilities, and financial condition of the Debtors, and any other matter relevant to the case. Section 1109(b) of the Bankruptcy Code provides that a committee "may raise and may appear and be heard *on any issue* in a case under this chapter." 11 U.S.C. § 1109(b) (emphasis added).

9.    The Committee brings this action derivatively, on behalf of the estates of each of the Debtors (collectively, the "Estates"). Standing to commence this action was granted on

_____ __, 2020, by order of the United States Bankruptcy Court for the Southern District of New York.

B.    Entity Defendants

10.    Defendant The Bank of New York Mellon Trust Company, N.A. ("BNYM") is a national banking association, organized in the State of California. BNYM is the indenture trustee and notes collateral agent ("1L Trustee") of the 9.000% senior secured notes due 2026 (the "1L Notes"). BNYM is also the administrative agent of and collateral agent (the "2L Agent") under the second lien term loan agreement dated as of July 16, 2018 (the "2L Loans"), as well as the trustee and notes collateral agent (the "3L Trustee") under the 6.875% senior secured notes due 2031 (the "3L Notes" and together, with the 1L Notes and 2L Loan, the "Prepetition Secured Debt").

11.    Defendant Chatham Asset Management, LLC is a limited liability company, organized in the state of Delaware, with its principal business office located in Chatham, New Jersey 07928. At all relevant times, Chatham Asset Management, LLC was the Debtors' largest shareholder (outside of the McClatchy family) and a significant holder of the Debtors' Prepetition Secured Debt. Chatham Asset Management, LLC was party to and directly or indirectly involved with several prepetition transactions that are the subject of the causes of action alleged herein.

4

12.     Defendant Chatham Asset High Yield Master Fund, Ltd. is a limited company, organized in the state of Delaware, with its principal business office located in Chatham, New Jersey 07928, and an affiliate of Chatham Asset Management, LLC.

13.     Defendant Chatham Fund, LP is a limited partnership, organized in the state of Delaware, with its principal business office located in Chatham, New Jersey 07928, and an affiliate of Chatham Asset Management, LLC.

14.     Defendant Chatham Everest Fund, LP is a limited partnership, organized in the state of Delaware, with its principal business office located in Chatham, New Jersey 07928, and an affiliate of Chatham Asset Management, LLC.

15.     Defendant Chatham Asset Private Debt and Strategic Capital Fund, LP (collectively with Chatham Asset Management, LLC, Chatham Asset High Yield Master Fund, Ltd., Chatham Fund, LP, and Chatham Everest Fund, LP, "Chatham") is a limited partnership, organized in the state of Delaware, with its principal business office located in Chatham, New Jersey 07928, and an affiliate of Chatham Asset Management, LLC.

16.     As of the Petition Date (defined herein), Chatham held certain of the Company's 1L Notes, 2L Loans, and 3L Notes (collectively, the "Chatham Claims").

C.      Individual Defendants

17.     Defendant Craig I. Forman, a citizen of California, was named president and chief executive officer of McClatchy on January 25, 2017 and was a director of McClatchy at all relevant times.  At all relevant times, Mr. Forman was also a director of the following subsidiaries of the Company: Aboard Publishing, Inc., Bellingham Herald Publishing, LLC, Belton Publishing Company, Inc., Biscayne Bay Publishing, Inc., Cass County Publishing Company, Columbus Ledger-Enquirer, Inc., Cypress Media, Inc., Cypress Media, LLC, East Coast Newspapers, Inc., El Dorado Newspapers, Gulf Publishing Company, Inc., HLB Newspapers, Inc., Idaho Statesman

5

Publishing, LLC, Keltatim Publishing Company, Inc., Keynoter Publishing Company, Inc., Lee's Summit Journal, Inc., Lexington H-L Services, Inc., Macon Telegraph Publishing Company, Mail Advertising Corporation, McClatchy Big Valley, Inc., McClatchy Interactive LLC, McClatchy Interactive West, McClatchy International, Inc., McClatchy Investment Company, McClatchy Management Services, Inc., McClatchy News Services, Inc., McClatchy Newspapers, Inc., McClatchy Property, Inc., McClatchy Resources, Inc., McClatchy Shared Services, Inc., McClatchy U.S.A., Inc., Miami Herald Media Company, N & O Holdings, Inc., Newsprint Ventures, Inc., Nittany Printing and Publishing Company, Nor-Tex Publishing, Inc., Oak Street Redevelopment Corporation, Olympian Publishing, LLC, Olympic-Cascade Publishing, Inc., Pacific Northwest Publishing Company, Inc., Quad County Publishing, Inc., San Luis Obispo Tribune, LLC, Star-Telegram, Inc., Tacoma News, Inc., The Bradenton Herald, Inc., The Charlotte Observer Publishing Company, The Herald Charities, Inc., The McClatchy Company Foundation, The News and Observer Publishing Company, The State Media Company, The Sun Publishing Company, Inc., Tribune Newsprint Company, Wichita Eagle and Beacon Publishing Company, Inc., and Wingate Paper Company.

18.     Defendant Elizabeth Ballantine, a citizen of Virginia, was a director of the Company at all relevant times.

19.     Defendant Leroy Barnes Jr., a citizen of California, was a director of the Company at all relevant times.  Mr. Barnes served on the Company's Refinancing Subcommittee (defined herein).  Mr. Barnes previously served as a trustee of a trust created for the benefit of McClatchy family members.

20.     Defendant Molly Maloney Evangelisti, a citizen of California, was a director of the Company at all relevant times.

21.     Defendant Anjali Joshi, a citizen of California, was a director of the Company at all relevant times.

22.     Defendant Brown McClatchy Maloney, a citizen of Washington, was a director of the Company at all relevant times.

23.     Defendant Kevin S. McClatchy, a citizen of Pennsylvania, was a director of the Company and non-executive chairman of the board of the Company at all relevant times.

24.     Defendant William McClatchy, a citizen of Maine, was a director of the Company at all relevant times.

25.     Defendant Theodore R. Mitchell, a citizen of Washington D.C., was a director of the Company at all relevant times.

26.     Defendant Clyde W. Ostler, a citizen of New York, was a director of the Company at all relevant times, and served on the Company's Refinancing Subcommittee (defined herein).

27.     Defendant Maria Thomas, a citizen of Washington D.C., was a director of the Company at all relevant times, and served on the Company's Refinancing Subcommittee (defined herein).

28.     Defendant Elaine Lintecum, a citizen of California, is currently a special advisor to the chief executive officer of the Company, and was the chief financial officer of the Company from May 2012 until March 2020.  At all relevant times, Ms. Lintecum was also a director of the following subsidiaries of the Company: Aboard Publishing, Inc., Bellingham Herald Publishing, LLC, Belton Publishing Company, Inc., Biscayne Bay Publishing, Inc., Cass County Publishing Company, Columbus Ledger-Enquirer, Inc., Cypress Media, Inc., Cypress Media, LLC, East Coast Newspapers, Inc., El Dorado Newspapers, Gulf Publishing Company, Inc., HLB Newspapers, Inc., Idaho Statesman Publishing, LLC, Keltatim Publishing Company, Inc., Keynoter Publishing

Company, Inc., Lee's Summit Journal, Inc., Lexington H-L Services, Inc., Macon Telegraph Publishing Company, Mail Advertising Corporation, McClatchy Big Valley, Inc., McClatchy Interactive LLC, McClatchy Interactive West, McClatchy International, Inc., McClatchy Investment Company, McClatchy Management Services, Inc., McClatchy News Services, Inc., McClatchy Newspapers, Inc., McClatchy Property, Inc., McClatchy Resources, Inc., McClatchy Shared Services, Inc., McClatchy U.S.A., Inc., Miami Herald Media Company, N & O Holdings, Inc., Newsprint Ventures, Inc., Nittany Printing and Publishing Company, Nor-Tex Publishing, Inc., Oak Street Redevelopment Corporation, Olympian Publishing, LLC, Olympic-Cascade Publishing, Inc., Pacific Northwest Publishing Company, Inc., Quad County Publishing, Inc., San Luis Obispo Tribune, LLC, Star-Telegram, Inc., Tacoma News, Inc., The Bradenton Herald, Inc., The Charlotte Observer Publishing Company, The Herald Charities, Inc., The McClatchy Company Foundation, The News and Observer Publishing Company, The State Media Company, The Sun Publishing Company, Inc., Tribune Newsprint Company, Wichita Eagle and Beacon Publishing Company, Inc., and Wingate Paper Company.

29.    Defendant Billie McConkey (collectively, with Defendants Craig I. Forman and Elaine Lintecum, the "Parent Senior Officers"), a citizen of California, has been the vice president of human resources for the Company since 2015.  Ms. McConkey has also been the corporate secretary of the Company since January 2016 and in-house counsel since July 2017.  At all relevant times, Ms. McConkey was also a director of the following subsidiaries of the Company: McClatchy International, Inc., McClatchy Newspapers, Inc., McClatchy Property, Inc., McClatchy Resources, Inc., McClatchy Shared Services, Inc., McClatchy U.S.A., Inc., Miami Herald Media Company, N & O Holdings, Inc., Newsprint Ventures, Inc., Nittany Printing and Publishing Company, Nor-Tex Publishing, Inc., Oak Street Redevelopment Corp., Olympian Publishing,

8

LLC, Olympic-Cascade Publishing, Inc., Pacific Northwest Publishing Company, Inc., Quad County Publishing, Inc., San Luis Obispo Tribune, LLC, Star-Telegram, Inc., Tacoma News, Inc., The Brandenton Herald, Inc., The Charlotte Observer Publishing Company, The Herald Charities, Inc., The McClatchy Company Foundation, The News and Observer Publishing Company, The State Media Company, The Sun Publishing Company, Inc., Tribune Newsprint Company, Wichita Eagle and Beacon Publishing Company, Inc., and Wingate Paper Company.

30.     Defendant Mark Zieman, a citizen of California, was a director of the following subsidiaries of the Company at all relevant times: Aboard Publishing, Inc., Bellingham Herald Publishing, LLC, Belton Publishing Company, Inc., Biscayne Bay Publishing, Inc., Cass County Publishing Company, Columbus Ledger-Enquirer, Inc., Cypress Media, Inc., Cypress Media, LLC, East Coast Newspapers, Inc., El Dorado Newspapers, Gulf Publishing Company, Inc., HLB Newspapers, Inc., Idaho Statesman Publishing, LLC, Keltatim Publishing Company, Inc., Keynoter Publishing Company, Inc., Lee's Summit Journal, Inc., Lexington H-L Services, Inc., Macon Telegraph Publishing Company, Mail Advertising Corporation, McClatchy Big Valley, Inc., McClatchy Investment Company, McClatchy Management Services, Inc., and McClatchy Newspapers, Inc.

31.     Defendant Andrew Pergram, a citizen of California, was a director of the following subsidiaries of the Company at all relevant times: McClatchy Interactive LLC and McClatchy Interactive West.

32.     Defendant Tim Grieve, a citizen of Washington D.C., was a director of the following subsidiaries of the company at all relevant times: McClatchy News Services, Inc. and The McClatchy Company Foundation.

33.     Defendant Jeanne Segal (collectively, with Defendants Craig I. Forman, Elaine

Lintecum, Billie McConkey, Mark Zieman, Andrew Pergram, and Tim Grieve, the "Subsidiary

Fiduciaries"), a citizen of Washington D.C., was a director of The McClatchy Company

Foundation, a subsidiary of the Company, at all relevant times.

34.     Defendants John Does 1-10 were executive officers and/or directors of one or more

Company Subsidiaries at all relevant times.

## STATEMENT OF FACTS

A.     General Background

35.     McClatchy is a 163-year old public company that provides local journalism as well

as national news coverage.  The Company's businesses are comprised of websites and mobile

applications, mobile news and advertising, video products, a digital marketing agency, daily

newspapers, niche publications, other print and digital direct marketing services, and community

newspapers.

36.     Historically, the Company has been controlled by the McClatchy family through

class B common stock that is not publicly traded and can only be held by lineal descendants of

James McClatchy, one of the founders of the Company.  The Company also has class A common

stock, which was listed on the New York Stock Exchange under the symbol "MNI" through

September 12, 2017, switched its listing to the NYSE American on September 12, 2017 (retaining

the symbol "MNI"), and, following delisting effective February 14, 2020, has been quoted over

the counter under symbol "MNIQQ."  Holders of class B common stock are entitled to one vote

per share and to elect, as a class, 75% of the board of directors of the Company, rounded down to

the nearest whole number.  Holders of class A common stock are entitled to one-tenth of a vote

per share and to elect, as a class, 25% of the board of directors of the Company, rounded up to the

nearest whole number. The class B common stock is convertible at the option of the holder into class A common stock on a share-for-share basis.

37.     The Company's organizational structure includes a parent company (the "Parent") and numerous subsidiaries (the "Subsidiaries" or, individually, a "Subsidiary"). A corporate organization chart is attached hereto as Schedule A. A chart listing the Subsidiaries is attached hereto as Schedule B.

38.     At all relevant times, the Parent board of directors (the "Parent Board") consisted of the following directors: Craig I. Forman, Elizabeth Ballantine, Leroy Barnes Jr., Molly Maloney Evangelisti, Anjali Joshi, Brown McClatchy Maloney, Kevin S. McClatchy, William McClatchy, Theodore R. Mitchell, Clyde W. Ostler, and Maria Thomas (the "Parent Directors").

39.     In September 2017, the Company's capital structure included a revolving cash flow facility maturing in December 2019 (the "Cash Flow Facility"), approximately $476 million of first lien notes due in 2022 (the "2022 Notes"), approximately $89 million of debentures maturing in 2027 (the "2027 Debentures"), and approximately $276 million of debentures maturing in 2029 (the "2029 Debentures," and collectively with the 2027 Debentures, the "Unsecured Debentures"). Only the Parent—and none of its Subsidiaries—was obligated on the Unsecured Debentures.

40.     At all relevant times, the Company was also obligated under a pension plan for its eligible current and former employees (the "Company Pension"). At all relevant times, the Company Pension was woefully underfunded. As of December 25, 2016, the Company Pension was underfunded by approximately $487 million; as of December 31, 2017, the Company Pension was underfunded by approximately $476.7 million; and as of March 31, 2019, the Company Pension had a total unfunded liability estimated to be $535 million, in each case under accounting principles generally accepted in the United States ("GAAP").

11

41.    ████████████████████████████████████████████████████    In
the summer of 2017, Chatham held approximately ████ of the 2022 Notes, approximately ████ of
the 2027 Debentures, and approximately ████ of the 2029 Debentures.  As of February 14, 2018,
Chatham owned 19.60% of the Company's class A common stock.

42.    At all relevant times, Chatham was also heavily involved in the market for credit
default swaps ("CDS") referencing the Parent's debt obligations, primarily as a seller of such
CDS.[3]

43.    Chatham had an especially close relationship with the Company and was highly
involved in the Company's affairs ████████████████████████████████████████

████████████████████████████████████████████████████████

████    Chatham was able to use its access to and influence over the Company, *inter alia*, to
obtain measures and concessions falling well outside the debtor-creditor relationship, ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

44.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████    ████

---

[3] CDS contracts are similar to insurance in that they permit the purchaser of the contract, after the occurrence of one or more defined adverse credit events (including the commencement of bankruptcy proceedings) to deliver a designated quantity of eligible debt obligations to the seller, and, in exchange, be paid 100% of the face amount of such obligations, without regard to the market value or fair value of such obligations at the time of delivery.  A seller of CDS is compensated for the risk of the loss it would incur after a defined credit event by receiving periodic payments from the purchaser for the life of the CDS contract.  Critically, the purchaser's obligation to make these periodic payment obligations is non-cancelable unless a credit event occurs.  The intrinsic value and corresponding trading price of a CDS instrument erodes materially upon any significant decline in the expected risk of a credit event because, while the purchaser remains obligated to make periodic payments, the insured event will likely never occur.

B.      Formation of the Refinancing Subcommittee

45.

46.     By September 1, 2017, the Company's closest debt maturity, i.e., the Cash Flow Facility, was over two years away (although no amounts were then drawn under the Cash Flow Facility).[4]  The next debt maturities, i.e., the 2027 Debentures and the 2029 Debentures, were ten to twelve years away.

47.     Nonetheless, about the same time, the Parent Board appointed a subcommittee (the "Refinancing Subcommittee")

48.     The Refinancing Subcommittee was purportedly formed to be independent. However, it did not maintain independence from the McClatchy family.  Mr. Barnes had previously served as a trustee of a trust created for the benefit of McClatchy family members.

---

y.

███████████████████████████████████████████████████████

███████████████████████████████████████████████

C.    Early Refinancing Efforts

49.    Over the ensuing months, numerous parties approached McClatchy to express interest in the Company's refinancing.  However, serious negotiations only developed with Chatham.

50.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████[5]

51.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

52.    ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[5] ████████████████████████████████████████████████████

███████████████████.

14

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

53.     ████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

54.     ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████.

55.     ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████.  ██

---

6 ██████████████████████████████████████████████
██████████  At the occurrence of a credit event under such circumstance, a CDS purchaser would receive no benefit regardless of the severity of loss to creditors generally because the old eligible obligations would no longer exist, and the new subsidiary debt had not become an eligible obligation under the CDS contracts.  Market participants label such a transaction an "orphaning" of CDS.  As noted above, a decline in the risk of a credit event or of the value of the CDS payments due at a credit event can cause a decline in the value of CDS to purchasers.  This decline permits CDS sellers (here, Chatham) to realize a profit because they can buy back the same or a matching CDS contract at a lower price than they received at its sale, realizing a profit.



56. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

57. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████

58.    On or about December 27, 2017, the Company, ███████████████

redeemed $75 million of its existing 2022 Notes.

59. ███████████████████████████████████

████████████████████████████████████████

█████████████████████████

---

[7] ████████████████████████████████████
██████████████████████████████.

[8] Upon information and belief, the manipulation of the CDS market was detrimental to the Company. The CDS and "cash" (i.e., bond and loan) credit markets are tightly aligned, and the demonstration that the Company's management would contort its capital structure to serve Chatham's position created significant reluctance in other market participants to extend new cash credit to the Company, for fear of being victim of the next round of such manipulation.

16

60. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

61.     On or about February 14, 2018, Chatham filed a 13-G indicating it beneficially owned 19.6% of the Company's class A common stock.

D.     Spring 2018 Negotiations With Chatham

62. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████.

63. ████████████████████████████████████

████████████████████████████████████

████████████████████

64. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

65.     On or about April 26, 2018, Chatham and the Company entered into a term sheet framework agreement (the "April 2018 Framework Agreement").[9]  Pursuant to the terms of the April 2018 Framework Agreement, Chatham would provide a new $250 million tranche A term loan facility and an approximately $168.5 million tranche B term loan facility plus $50 million to repurchase Chatham's Unsecured Debentures at the prevailing market price and to refinance the 2022 Notes.  The April 2018 Framework Agreement, if ultimately consummated, would achieve Chatham's dual goals of orphaning the CDS and moving Chatham's Unsecured Debentures ahead of the Unsecured Creditors.

66.     Despite the fact that the April 2018 Framework Agreement required the Subsidiaries to guarantee the new debt, upon information and belief, none of the Subsidiaries' boards of directors (the "Subsidiary Boards") considered the proposed transaction, let alone approved it.   Furthermore, upon information and belief, neither the Parent Board nor the Refinancing Subcommittee ever considered whether (a) the Company was solvent prior to, or as a result of, the April 2018 Framework Agreement, or (b) the Subsidiaries were solvent prior to, or would become insolvent as a result of, the April 2018 Framework Agreement.  Upon information and belief, the Parent Board and the Refinancing Subcommittee also never considered to whom they owed fiduciary duties.

67.     The announcement of the April 2018 Framework Agreement had three principal effects.  First, it caused the Company's CDS price to plummet from 12.5 points to 0.5 points,

---

[9]  ██████████████████████████████████████████████████████
████████████████████████████████

██████████████████████████████████████████.[10]  Second, the Company's

willingness to "orphan" its debt scared off potential investors who did not want to do business with

a company that was ready to engage in such market machinations.  Third, the orphaning element

of the April 2018 Framework Agreement brought significant unwanted scrutiny to the Company

from the press and regulators, including the Commodity Futures Trading Commission.

68.     In mid-May 2018, as a result of the unwanted attention, the Company and Chatham

abandoned the April 2018 Framework Agreement.  By that time, as described below, Chatham had

already received many of the key benefits offered to it by the April Framework Agreement.

E.     Summer 2018 Negotiations With Chatham

69.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

70.     ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

71.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[10]  The April 2018 Framework Agreement had virtually no impact on the Company's stock price, however.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

72.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.

73.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

74.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

75. 

76.    On June 26, 2018, the Company and Chatham entered into an amendment to the April 2018 Framework Agreement (the "June 2018 Amended and Restated Framework Agreement").

77.    Under the June 2018 Amended and Restated Framework Agreement, Chatham would provide an approximately $157 million tranche A term loan facility and an approximately $194 million tranche B term loan facility, the proceeds of which would be used to repurchase $82 million of 2027 Debentures and $194 million of 2029 Debentures, in each case held by Chatham.

78.    The Company also announced that it proposed to offer $310 million of first lien notes due 2026, which would be guaranteed by the Company's Subsidiaries and secured by first-priority liens on certain of the Company's and the Subsidiary guarantors' assets, and by second-priority liens on certain other assets.  The Company intended to use the net proceeds (together with cash available under the asset-based lending facility, junior lien term loan financing, and cash on hand) to fund transaction-related expenses, premiums, and the redemption of all outstanding 2022 Notes.

79.    Also on June 26, 2018, Chatham filed a 13-D indicating that it owned 19.7% of class A common stock, $269 million of 2029 Debentures, and $31 million of 2022 Notes, and that Chatham was party to CDS transactions.

80.    Once again, even though the June 2018 Amended and Restated Framework Agreement required the Subsidiaries to guarantee the Company's debt, upon information and belief, none of the Subsidiaries' boards considered the proposed transaction, let alone approved the transaction.  Furthermore, upon information and belief, the Parent Board and the Refinancing Subcommittee never considered whether (a) the Company was solvent prior to, or as a result of, the June 2018 Amended and Restated Framework Agreement, or (b) the Subsidiaries were solvent prior to, or as a result of, the June 2018 Amended and Restated Framework Agreement.  Upon information and belief, the Parent Board and the Refinancing Subcommittee also never considered to whom they owed fiduciary duties.

81.    ████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████

82.    In July 2018, the Company and Chatham consummated the June 2018 Amended and Restated Framework Agreement (the "July 2018 Transaction"), which formed the predicate of the Suspect Transactions (defined herein).  Pursuant to the July 2018 Transaction:

A.    Approximately $82 million of Chatham's Parent-only 2027 Debentures were exchanged into secured second lien tranche A term loans guaranteed by each of the Subsidiaries and secured by liens on their assets; those loans, together with an

additional $75 million of term loans issued to Chatham (on account of $60 million of new money), eventually became the $157 million of 2L Loans due 2030;

B.    Approximately $193 million of Chatham's Parent-only 2029 Debentures were exchanged into secured second lien tranche B term loans guaranteed by each Subsidiary and secured by liens on their assets; those loans, together with an additional $75 million of 2029 Debentures later exchanged by Chatham, eventually became the $268 million of 3L Notes due 2031; and

C.    The Company refinanced its 2022 Notes with certain 1L Notes due 2026, which were issued at an original issuance discount and contained new liens on, among other things, "Principal Property" (as defined in the Unsecured Debentures) that were not previously provided to the pre-existing 2022 Notes.  Chatham purchased $100 million of 1L Notes.

83.    Upon information and belief, in consummating the July 2018 Transaction, the Parent Board directed each of the Subsidiaries to similarly approve the incurrence of up to $425 million of new secured indebtedness (including $75 million in new 2L Loans and the exchange of $350 million of Unsecured Debentures) for no subsidiary-level consideration.  Upon information and belief, none of the Subsidiary Boards considered whether they owed independent fiduciary duties to their estates prior to approving the transaction or whether the Subsidiaries were solvent at the time of, or were rendered insolvent as a result of, the July 2018 Transaction.  Nor did the Subsidiary Boards hire independent counsel or financial advisors to aid them in evaluating the July 2018 Transaction.

84.    The July 2018 Transaction provided no discernable benefits or value to the Company.  The 2022 Notes and the Unsecured Debentures were not maturing for 4-11 years and

did not need to be refinanced in 2018. The Cash Flow Facility likewise was not maturing for another 18 months—it, too, did not need to be refinanced in 2018.

85.      Moreover, the 2L Loans and 3L Notes were not provided at a discount to face amount (i.e., Chatham exchanged an equivalent amount of unsecured debt for secured debt) and did not have a lower interest rate than the Unsecured Debentures; rather, on a weighted basis, the new secured debt carried a higher interest rate than the unsecured debt that it replaced. Finally, of the $60 million the Company received in new money from Chatham, at least ██████████ was used to pay transaction fees and premiums necessitated by the transaction, thereby actually increasing the Company's leverage (especially, after accounting for the $15 million in OID).

86.      Accordingly, the July 2018 Transaction provided minimal incremental liquidity to the Company, certainly not enough to justify the pledge of substantially all of the Company's assets or other lopsided terms of the exchange transactions.

87.      The Subsidiaries similarly received no direct or indirect consideration or benefit from the July 2018 Transaction, despite incurring $425 million of new secured indebtedness.

88.      Indeed, the fact that there was no interest rate or principal reduction in connection with the refinanced debt, coupled with the fees, OID, and call premiums associated with the Suspect Transactions, rendered the Company *worse off* following the Suspect Transactions than prior to entry thereto. To that end, the only potential benefit of the Suspect Transactions— "additional runway"—was unnecessary, as the Company was forced to file these Bankruptcy Cases within the original maturity profile of the 2022 Notes.

89.      Chatham, on the other hand, benefitted immensely from the July 2018 Transaction. The July 2018 Transaction permitted Chatham to achieve its goal of priming the PBGC and the

Company's other Unsecured Creditors. ████████████████████████████

████████████████████████████████████████

90.    The July 2018 Transaction hindered the Unsecured Creditors by deeply subordinating their claims to Chatham's claims. ████████████████████████████

████████████████████████████████

91.    Upon information and belief, none of the Subsidiary Boards voted on the July 2018 Transaction.  Furthermore, upon information and belief, the Parent Board and the Refinancing Subcommittee never considered whether the Company was solvent prior to, or as a result of, the July 2018 Transaction.  Upon information and belief, the Parent Board and the Refinancing Subcommittee also never considered to whom they owed fiduciary duties.

92.    At around the time the July 2018 Transaction was consummated, the Company Pension was underfunded by approximately $477 million.

F.    Subsequent Dealings With Chatham

93.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

94.    Instead, on or about December 12, 2018, the Company and Chatham consummated an exchange transaction pursuant to which Chatham exchanged approximately $193 million of the 3L Notes for an equal principal amount of newly issued 6.875% third lien notes due 2031, thereby

25

extinguishing the 3L Notes (the "December 2018 Transaction").  At the time of the December

2018 Transaction, Chatham held approximately 19.8% of McClatchy's class A common stock.

95.    On March 15, 2019, Chatham elected to convert $75 million of 2029 Debentures

into an equal amount of 3L Notes (the "March 2019 Transaction" and, collectively with the July

2018 Transaction and the December 2018 Transaction, the "Suspect Transactions").  At the time

of the March 2019 Transaction, Chatham held approximately 22.35% of McClatchy's class A

common stock.

96.    On April 4, 2019, Chatham filed a 13-D/A indicating it owned 23.8% of class A

common stock, $153.9 million in 1L Notes, $157.1 million in 2L Loans, and $268.4 million in 3L

Notes.  Chatham also disclosed that it was a party to CDS transactions both as a buyer counterparty

and seller counterparty.  Thus, Chatham may have positioned itself to benefit from further credit

deterioration of the Company.[11]

97.    On December 27, 2019, Chatham held approximately $89 million of 1L Notes and

all of the Company's 2L Loans and 3L Notes.

G.    The Company Was Insolvent At All Relevant Times

98.    As of 2017, the Company was insolvent.  The Company's own SEC filings showed,

as of September 24, 2017, a consolidated balance sheet with approximately $1.605 billion of

liabilities, but only $1.515 billion of asset value.

99.    The Company was insolvent at the time of the July 2018 Transaction.  The

Company's form 10-Q for the second quarter of 2018 includes a balance sheet that lists, as of July

---

[11] Because the July 2018 Transaction retained significant eligible obligations for CDS, compared to the April 2018 Proposed Framework orphaning, CDS prices increased significantly.  To the extent that Chatham had repurchased its exposure after the CDS plummeted following the announcement of the April 2018 Framework Agreement, it was not impacted by that increase in prices.  If Chatham had actually taken itself to a *net purchaser* position after the April 2018 Framework Agreement, it would have had—and would have anticipated in negotiating the terms of the July 2018 Transactions—further gains as those contracts appreciated.

1, 2018, approximately $1.62 billion of liabilities and only $1.365 billion of asset value.  The asset value also includes $705 million of goodwill.

100.    The Company was also insolvent at the time of the December 2018 Transaction. The Company's form 10-K for 2018 reports, as of December 30, 2018, approximately $1.637 billion of liabilities compared to $1.295 billion of asset value.  The asset value also includes $705 million of goodwill.

101.    The Company was still insolvent at the time of the March 2019 Transaction.  The Company's form 10-Q for the first quarter of 2019 includes a balance sheet that lists, as of March 31, 2019, approximately $1.661 billion of liabilities and $1.301 billion of asset value.  The asset value also includes $705 million of goodwill.

102.    Moreover, the Company has had a negative book equity value every year since at least 2017.  Thus, the Company's own filings indicate that the Company was insolvent at the time of each of the Suspect Transactions.

103.    Moreover, the Company Pension was woefully underfunded, and the underfunded liability was increasing year over year.  Specifically, as of June 25, 2017, the Company Pension was underfunded by $487 million under GAAP.  Despite this, the Company did not make any cash contributions to the Company Pension during 2017 or 2018 to satisfy the plan's minimum required contribution.[12]  As of March 31, 2019, the Company Pension had a total unfunded liability estimated to be $535 million under GAAP.  The Company Pension liability was likely even larger if measured on a termination basis, as, generally, underfunding liability on a termination basis is much higher than underfunding liability measured under GAAP.

---

[12] Instead, the Company satisfied the Company Pension's minimum required contributions in 2017 and 2018 by applying credits earned in prior years in which they made contributions in excess of the minimum.

104.    Indeed, given the Company's massive underfunded pension liability, by May 2018, the Company's own projections showed that, without a waiver from the IRS, the Company would likely not generate sufficient operating profit to be able to service its debt and be able to meet its minimum required pension contributions in 2020 (which lack of waiver, indeed, was one of the precipitating factors for the filing of these Bankruptcy Cases).[13]

105.    ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

106.    Furthermore, during the relevant time period, the Company continued to underperform relative to management's long-term outlook.  Indeed, the Company's actual adjusted EBITDA was lower than projected adjusted EBITDA from the long-range plan prepared by management in May of 2018 by approximately ███████████████ in 2019.

107.    The Suspect Transactions did nothing to remedy the Parent's insolvency, as the exchanges were done at par (not a discount) and, indeed, with significant OID components, caused the Parent to incur even more debt.  The Suspect Transactions certainly caused the Company Subsidiaries to be further insolvent by saddling them with $425 million of debt that previously they had no obligations to pay, and without providing any direct or indirect consideration or benefit to the Subsidiaries.

---

[13] On or about July 19, 2019, the Company filed a form 8-K stating that the minimum required contributions under the Company Pension for the Company's fiscal year 2020 are estimated to be approximately $120 million and that the Company submitted an application for a waiver of the minimum required contributions in accordance with section 412 of the Internal Revenue Code for the 2019, 2020, and 2021 plan years with the Internal Revenue Service ("IRS"). On or about November 13, 2019, the Company issued a form 8-K stating that the IRS declined to grant the Company's three-year waiver request.

H.      The Bankruptcy

108.    On February 13, 2020 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under Chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The

Chapter 11 Cases are jointly administered.  The Debtors continue to operate their business and

manage their properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

109.    On February 26, 2020, the Office of the United States Trustee for the Southern

District of New York appointed the Committee pursuant to section 1102 of the Bankruptcy Code.

110.    As of the Petition Date, the Debtors' funded debt consisted of (a) $26.7 million of

101% cash-collateralized standby letters of credit under a $35.0 million cash secured letter of credit

facility (but there were no principal amounts outstanding under the Debtors' ABL facility), (b)

$262.9 million of 1L Notes, (c) $157.1 million 2L Loans, (d) $268.5 million of 3L Notes, (e) $7.1

million of 2027 Debentures, and (f) $7.8 million of 2029 Debentures.

111.    On March 26, 2020, the Bankruptcy Court entered the *Order (I) Authorizing the*

*Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens*

*and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to*

*Certain Prepetition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related Relief*

[Docket No. 233] (the "Final DIP Order").

112.    Among other things, the Final DIP Order stipulates to the liens and claims granted

to the 1L Notes, 2L Loans and the 3L Notes as part of the Suspect Transactions.  (*See* Final DIP

Order at ¶¶ E (ii)-(iv).)  Moreover, the Final DIP Order sets June 24, 2020 as the deadline for the

Committee to challenge the claims or liens granted as part of the Suspect Transactions (the

"Challenge Deadline").   (*See id.* at ¶ 43.)

29

113.    On June 8, 2020, counsel to the Committee reached out to counsel to the major holders of the 1L Notes, 2L Loans, and 3L Notes, and requested that they stipulate that the Unencumbered Assets and Unperfected Assets (each as defined herein), are not encumbered by any lien.  To date, they have not received any response.

## FIRST CAUSE OF ACTION
### Constructive Fraudulent Conveyance
### Under Bankruptcy Code §§ 544, 548, 550, and 551 and Applicable New York and California Law
### (Against Chatham and BNYM, In Its Capacities As 1L Trustee, 2L Agent, and 3L Trustee)

114.    The Committee repeats and realleges all of the preceding paragraphs as though fully set forth herein.

115.    As parts of the Suspect Transactions, the Debtors caused the following transfers to be made and obligations to be incurred (collectively, the "Fraudulent Transfers"):

A.    liens granted by the Parent and the Subsidiaries to the holders of the 1L Notes covering assets that were not pledged to the holders the 2022 Notes, including, without limitation, liens on Principal Property (as defined in the Unsecured Debentures) (the "New 1L Liens");

B.    liens granted by the Parent to or in favor of the holders of the 2L Loans and/or 3L Notes; and

C.    liens granted, as well as guarantees incurred, by each of the Subsidiaries to or in favor of the holders of the 2L Loans and/or 3L Notes.

116.    On the dates the Fraudulent Transfers were made and the obligations arising therefrom were incurred, the Company and Subsidiaries were insolvent.  In the alternative, (i) the Company and Subsidiaries became insolvent as a result of the Fraudulent Transfers and the obligations incurred thereby; (ii) the Company and Subsidiaries were engaged in business or a transaction for which any property remaining with the Company and Subsidiaries was an

30

unreasonably small capital; and (iii) the Company and Subsidiaries intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

117.    Specifically, before, on, and after the dates of the Fraudulent Transfers, the sum of the Company's debts exceeded the fair value of its assets, and the fair value of its assets was less than the amount required to pay its liabilities on existing debts as they became absolute and matured.  The Company had massive underfunded pension liabilities and funded indebtedness before the consummation of each of the Fraudulent Transfers.  And, upon information and belief, both the Company and Subsidiaries knew at the time the Fraudulent Transfers were made that they could not reasonably satisfy their liabilities and indebtedness, as they matured or accrued, with either existing assets (including any reserve fund, if any) or with revenue they could reasonably generate as a going concern.

118.    The Company and Subsidiaries did not receive fair consideration, or reasonably equivalent value, in exchange for the Fraudulent Transfers.  The benefits received by the Company and Subsidiaries (if any) were far outweighed by—and did not come close to approximating—the value lost and burdens incurred in making the Fraudulent Transfers.

119.    Specifically, the Company did not receive any discernable value or benefit in exchange for its granting of the 1L Notes because, among other reasons:

A.    at the time of the July 2018 Transaction, the 2022 Notes were not maturing for an extended period of time (at least 4 years) and, accordingly, it was unnecessary to refinance the 2022 Notes (and incur various transaction costs associated with the refinancing) at that time;

31

B.      by virtue of the July 2018 Transaction, the holders of the 1L Notes received liens

covering collateral that was not pledged to the holders of the 2022 Notes, including,

without limitation, liens on Principal Property; and

C.      the interest rate for the 1L Notes was the same as the interest rate for the 2022 Notes

and, with the payment of a call premium on the 2022 Notes (approximately 4

points) and OID on the 1L Notes (approximately 3 points), it cost the Company

approximately 7 points to effectuate the exchange.

120.    Likewise, the Company did not receive any discernable value or benefit in

exchange for granting—and the Subsidiaries did not receive any discernable value or benefit,

direct or indirect, in exchange for securing or guaranteeing—the liens with respect to the 2L Loans

and/or 3L Notes because, among other reasons:

A.      the Unsecured Debentures were not maturing for a number of years at the time the

Fraudulent Transfers were effectuated and, accordingly, it was unnecessary to

refinance at that time (or incur costs associated with such refinancing);

B.      the 2L Loans and 3L Notes did not have a lower interest rate than—and, on a

weighted basis, had a higher interest rate than—the Unsecured Debentures;

C.      the 2L Loans and 3L Notes were not provided at a discount to face amount, as set

forth above;

D.      ████████████████████ $60 million in new money that the Company

received from Chatham was used to pay transaction fees, expenses, and premiums

necessitated by the July 2018 Transaction, many of which inured to the benefit of

the Parent only, resulting in minimal incremental liquidity to the Company;

32

E.      the new money that the Company received from Chatham was issued at a significant OID, thus serving to actually increase the Company's leverage;

F.      whereas the Unsecured Debentures were unsecured and issued by the Parent only, the 2L Loans and 3L Notes were secured and guaranteed by the Subsidiaries, which incurred $425 million of new secured obligations for no consideration; and

G.      the Subsidiaries did not receive any indirect benefit, including receiving no reasonably equivalent value, from the effectuation of the Fraudulent Transfers.

121.    Indeed, the fact that there was no interest rate or principal reduction in connection with the refinanced debt, coupled with the fees, OID, and call premiums associated with the Fraudulent Transfers, rendered the Company worse off following the Fraudulent Transfers than prior to entry thereto.

122.    The Fraudulent Transfers were made within two years before the Debtors' filing for bankruptcy.

123.    Accordingly, each of the Fraudulent Transfers should be avoided under section 548 of the Bankruptcy Code and, in accordance with section 544(b) of the Bankruptcy Code, under the substantially similar fraudulent conveyance provisions of New York's Uniform Fraudulent Conveyance Act ("UFCA") and/or California's Uniform Fraudulent Transfer Act ("UFTA").

124.    Pursuant to sections 550(a) and 551 of the Bankruptcy Code, the Committee seeks (1) to recover the property conveyed through the Fraudulent Transfers, or the value thereof, for the benefit of the Company's and Subsidiaries' estates, and (2) for the Estates to step into the shoes of the former lienholders.

**SECOND CAUSE OF ACTION**
**Actual Fraudulent Conveyance**
**Under Bankruptcy Code §§ 544(b), 548, 550, and 551 and Applicable New York and California Law**
**(Against Chatham and BNYM, In Its Capacities as 1L Trustee, 2L Agent, and 3L Trustee)**

125.     The Committee repeats and realleges all of the preceding paragraphs as though fully set forth herein.

126.     Chatham caused the above-described Fraudulent Transfers to be made, and obligations incurred, by the Debtors.

127.     The Fraudulent Transfers were made with actual intent to hinder and/or delay the Unsecured Creditors in realizing the value of their unsecured claims.  Such transfers were made with the intention to impede or obstruct the Unsecured Creditors' enforcement and collection of such claims, and with the knowledge that the natural consequence and effect of the transfers would be to encumber certain assets of the Company and Subsidiaries that would otherwise be available for collection by the Unsecured Creditors.

128.     Specifically, to effectuate the Fraudulent Transfers, the Company was willing to incur virtually any cost, including but not limited to burdening the Company and Subsidiaries with up to $425 million in new secured indebtedness for no consideration and incurring millions in call premiums and transaction fees, in order to induce Chatham to enter into the transactions.

129.     The Fraudulent Transfers were designed, in part, to cause Chatham's structurally subordinated Unsecured Debentures to move ahead of the Unsecured Creditors' *pari passu* and/or structurally senior debt and, thereby, to hinder, delay, and stall the ability of the Unsecured Creditors to realize the value of their structurally senior unsecured claims.

130.     █████████████████████████████████████

█████████████████

34

131.    The intent to hinder and/or delay the Unsecured Creditors in realizing the value of their unsecured claims is further established by the following badges of fraud:

A.    Parent's and Subsidiaries' insolvency before, on, and/or after the dates the Fraudulent Transfers were made, as set forth above;

B.    Parent's and Subsidiaries' failure to receive reasonably equivalent value in consideration for the Fraudulent Transfers, as set forth above;

C.    the close relationship between Parent and Subsidiaries, on the one hand, and Chatham, on the other hand, and the failure of such parties to negotiate and transact at arm's length;

D.    the general chronology of events giving rise to the Fraudulent Transfers, which chronology establishes that the Fraudulent Transfers were part and parcel of the same approximately 18-month-long scheme by Chatham, the Company, the Subsidiaries, and their agents to advance their own economic interests to the detriment of the Unsecured Creditors; and

E.    the fact that the fraudulently transferred assets were the only assets sufficient to satisfy obligations owed by the Company and/or Subsidiaries to the Unsecured Creditors.

132.    Accordingly, the Fraudulent Transfers should be avoided under section 548 of the Bankruptcy Code and, in accordance with section 544(b) of the Bankruptcy Code, under the substantially similar provisions of New York's UFCA and/or California's UFTA.

133.    Pursuant to sections 550(a) and 551 of the Bankruptcy Code, the Committee seeks (1) to recover the property conveyed through the Fraudulent Transfers, or the value thereof, for the

benefit of the Company's and Subsidiaries' estates, and (2) for the Estates to step into the shoes of

the former lienholders.

### THIRD CAUSE OF ACTION
**Breach of Fiduciary Duty**
**Under Delaware Law**
**(Against Parent Directors and Parent Senior Officers)**

134.    The Committee repeats and realleges all of the preceding paragraphs as though fully

set forth herein.

135.    At all relevant times, as set forth above, the Parent was insolvent.  Its debts and

liabilities exceeded the reasonable fair value of its assets, and it did not have the ability to meet its

maturing obligations, or to satisfy its existing or probable liabilities, as they came due in the

ordinary course of its business.

136.    The Parent Directors and Parent Senior Officers (collectively, the "Parent

Fiduciaries") therefore owed both the Parent and residual claimants, including but not limited to

the Unsecured Creditors, a fiduciary duty of loyalty, including the duty to act in good faith and in

the best interest of the Parent's estate and, at all times, to subordinate their personal interests to the

interests of the Parent.

137.    The Parent Fiduciaries also owed both the Parent and residual claimants, including

but not limited to the Unsecured Creditors, a fiduciary duty, in good faith, to exercise the care that

an ordinarily careful and prudent person would use in similar circumstances, and to act on an

informed basis after considering relevant and reasonably available information, including but not

limited to the input of financial and legal experts.  Such duty included the obligation to preserve

the assets of the Parent's estate for the benefit of creditors.

138.    The Parent Fiduciaries breached their fiduciary duty of loyalty to the Parent as well

as residuary claimants, including but not limited to the Unsecured Creditors, by acting in bad faith,

failing to act in the best interest of the Parent as a whole, and failing to subordinate their personal

interests to the interests of the Parent, both in ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

and/or approving the Suspect Transactions.

139.    Specifically, among other acts and omissions in breach of their fiduciary duty of

loyalty, the Parent Fiduciaries, in determining to ████████████████    and to

approve the Suspect Transactions:

A.    were not disinterested, or independent of persons directly interested, ██████

████████████████████ and Suspect Transactions.  Upon information

and belief, the Parent Fiduciaries were beholden to, and acting in the interests of,

members of the McClatchy family who were the controlling shareholders of the

Parent;

B.    were beholden to, and acted at the behest and for the sole benefit of, the

shareholders of the Parent by ████████████████████████████

████████████████████████████████████████████

██████, while failing to act in the best interest of the insolvent Parent as a whole;

and

C.    placed their personal interests in satisfying the interests of the Parent's shareholders

to whom they were beholden ahead of the interests of the Parent and the Unsecured

Creditors.

140.    In addition, numerous Parent Fiduciaries were simultaneously directors of the

Subsidiaries, thereby owing fiduciary duties to both the Parent and Subsidiaries at the same time.

37

Given their dual loyalties, the Parent Fiduciaries could not, and did not, make an informed, neutral,

good-faith, independent determination to approve the Suspect Transactions.

141.    The Parent Fiduciaries also breached their fiduciary duty of care both in ███████

█████████████████████████ and/or approving the Suspect Transactions in bad faith,

without exercising the care that an ordinarily careful and prudent person would exercise in similar

circumstances; by not considering relevant and reasonably available material information; and in

acting with gross negligence or reckless indifference to the interests of the Unsecured Creditors.

142.    Specifically, among other acts and omissions in breach of their fiduciary duty of

care, the Parent Fiduciaries ███████████████████████ and/or approved the

Suspect Transactions:

A.    without retaining an independent financial advisor—and, ████████████

████████████████████, also without retaining independent counsel

(until June 2018)—to aid them in evaluating the relative costs and benefits of such

transactions;

B.    following deficient processes by which they failed to seek or obtain all reasonably

available material information;

C.    without first commissioning any solvency analysis; and

D.    upon information and belief, without knowing to whom they owed fiduciary duties

(in light of, among other things, their failure to commission a solvency analysis).

143.    The Parent Fiduciaries therefore did not have a reasonably informed basis for, or

exercise the requisite care in, determining █████████████████████ and/or

to approve the Suspect Transactions.

144.    The Parent Fiduciaries, by such aforementioned breaches of fiduciary duties, did not act to maximize the value, or the long-term wealth-creating capacity, of the insolvent Parent as a whole for the benefit of all stakeholders.

145.    The Parent Fiduciaries' breaches of their fiduciary duties caused substantial damage to the Unsecured Creditors, in an amount to be proven at trial.  But for such breaches of fiduciary duty, the Unsecured Creditors would not have suffered such damage.

### FOURTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
**Under New York, Delaware, Washington, Missouri, North Carolina, South Carolina, Utah, Florida, Georgia, Mississippi, Pennsylvania, Kansas, Kentucky, Michigan, Texas, Illinois, and California Law**
**(Against Subsidiary Directors)**

146.    The Committee repeats and realleges all of the preceding paragraphs as though fully set forth herein.

147.    At all relevant times, as set forth above, the Subsidiaries were insolvent.

148.    The Subsidiary Fiduciaries therefore owed both the Subsidiaries and residual claimants, including but not limited to the Unsecured Creditors, an independent fiduciary duty of loyalty, including the duty to act in good faith and in the best interest of the Subsidiaries and, at all times, to subordinate their personal interests to the interests of the Subsidiaries.

149.    The Subsidiary Fiduciaries also owed both the Subsidiaries and residual claimants, including but not limited to the Unsecured Creditors, an independent fiduciary duty, in good faith, to exercise the care that an ordinarily careful and prudent person would use in similar circumstances, and to act on an informed basis after considering relevant and reasonably available information, including but not limited to the input of financial and legal experts.  Such duty included the obligation to preserve the assets of the Subsidiaries' estates for the benefit of creditors.

150.    The Subsidiary Fiduciaries breached their fiduciary duty of loyalty to the Subsidiaries and residuary claimants, including but not limited to the Unsecured Creditors, by acting in bad faith, failing to act in the best interest of the Subsidiaries, and failing to subordinate their personal interests to the interests of the Subsidiaries as a whole in determining to approve the Suspect Transactions.

151.    Specifically, among other conduct in breach of their fiduciary duties, the Subsidiary Fiduciaries (or a majority thereof), in determining to approve the Suspect Transactions:

A.    were not disinterested, or independent of persons directly interested, in such transactions.  Upon information and belief, certain of the Subsidiary Fiduciaries were beholden to, and acted in the interest of, shareholders who controlled both the Company and the Subsidiaries;

B.    were simultaneously directors of the Subsidiaries and officers of the Parent, thereby owing fiduciary duties to both the Subsidiaries and the Parent.  Given their dual loyalties, the Subsidiary Fiduciaries could not, and did not, make an informed, neutral, good-faith, independent determination to approve the Suspect Transactions;

C.    were beholden to, and acted in the interest of, the shareholders of the Company by acting for the purpose of ███████████████████████████████████ █████████████████████████████████████ while failing to act in the best interest of the insolvent Subsidiaries as a whole; and

D.    placed their personal interests in acting at the behest of the Company's shareholders ahead of the interests of the Subsidiaries as a whole and the Unsecured Creditors.

40

152.    The Subsidiary Fiduciaries also breached their fiduciary duty of care to the Subsidiaries and residual claimants, including but not limited to the Unsecured Creditors, by approving the Suspect Transactions in bad faith, without exercising the care that an ordinarily careful and prudent person would exercise in similar circumstances; by not considering relevant and reasonably available information; and with gross negligence or reckless indifference to the interests of the Unsecured Creditors.

153.    Specifically, among other actions and omissions in breach of their fiduciary duty of care, the Subsidiary Fiduciaries approved the Suspect Transactions:

A.    without retaining any independent counsel or any independent financial advisor to aid them in evaluating the relative costs and benefits of such transactions;

B.    without forming any committee to evaluate, or delegating to any existing committee the obligation or authority to evaluate, the costs and benefits of such transactions;

C.    without following any process and without obtaining or considering reasonably available material information;

D.    without first commissioning any solvency analysis; and

E.    upon information and belief, without knowing to whom they owed fiduciary duties (in light of, among other things, their failure to commission a solvency analysis).

154.    Upon information and belief, the Subsidiary Fiduciaries did not even consider whether they owed independent fiduciary obligations to the Subsidiaries and their stakeholders, including the Unsecured Creditors, prior to approving the Suspect Transactions.  Upon information and belief, they did not, prior to such approval, conduct, or cause to be conducted, any substantive analysis of the terms of the Suspect Transactions, their impact on the solvency or viability of the Subsidiaries, or the interests of the Unsecured Creditors.  Accordingly, the Subsidiary Fiduciaries

41

did not have a reasonably informed basis for, or exercise the requisite care in, approving the Suspect Transactions.

155.    The Subsidiary Fiduciaries, by such aforementioned breaches of fiduciary duties, did not act to maximize the value, or the long-term wealth-creating capacity, of the insolvent Subsidiaries as a whole for the benefit of all stakeholders.

156.    The Subsidiary Fiduciaries' breaches of their fiduciary duties caused substantial damage to the Unsecured Creditors, in an amount to be proven at trial.  But for such breaches of fiduciary duty, the Unsecured Creditors would not have suffered such damage.

### FIFTH CAUSE OF ACTION
**Aiding and Abetting Breach of Fiduciary Duty**
**Under New York, Delaware, Washington, Missouri, North Carolina, South Carolina, Utah, Florida, Georgia, Mississippi, Pennsylvania, Kansas, Kentucky, Michigan, Texas, Illinois, and California Law**
**(Against Chatham)**

157.    The Committee repeats and realleges all of the preceding paragraphs as though fully set forth herein.

158.    At all relevant times, Chatham had actual knowledge (i) that the Parent and the Subsidiaries were insolvent, (ii) that the Parent Fiduciaries and Subsidiary Fiduciaries (together, the "Fiduciaries") owed fiduciary duties of care and loyalty to, among others, the Unsecured Creditors, and (iii) that the Fiduciaries breached their fiduciary duties of care and loyalty, as set forth above.

159.    Chatham, by and through its control of the Company, knowingly participated in and substantially aided, abetted, induced, and encouraged the Fiduciaries in their above-alleged breaches of fiduciary duties by, among other things, (i) directing and orchestrating the negotiation, formulation, and effectuation of the Suspect Transactions, and (ii) doing so with the knowledge that the Suspect Transactions would unlawfully cause Chatham's structurally subordinated

Unsecured Debentures to move ahead of the Unsecured Creditors' *pari passu* or structurally senior unsecured claims.

160.    Chatham's aiding and abetting of the above-specified breaches of fiduciary duty caused, or were a substantial factor in causing, damage to the Unsecured Creditors, in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**Equitable Subordination**
**Bankruptcy Code § 510**
**(Against Chatham and BNYM, In Its Capacities As 1L Trustee, 2L Agent and 3L Trustee)**

161.    The Committee repeats and realleges all of the preceding paragraphs as though fully set forth herein.

162.    At all relevant times, Chatham had the ability to control and did control the Company, including the Company's refinancing process, by virtue of, among other things:

A.    

B.    Chatham's substantial holdings of the Company's indebtedness, substantial holdings of the Company's equity securities (including, at all relevant times, approximately 23% of the outstanding shares of class A common stock), and outsized position in the Company's CDS;

C.    Chatham's purchase of the Unsecured Debentures through trades that ███████ ██████████████ for the purpose of making it more difficult for the Company to transact with others, thereby causing Chatham to be indispensable to the Company's subsequent refinancing efforts; and

43

D.    Chatham's failure to deal at arm's length in connection with, and exercise of control over the negotiation of and strategy for, the Suspect Transactions that were designed to cause Chatham's structurally subordinated Unsecured Debentures to move ahead of the Unsecured Creditors' claims.

163.    Chatham was able to use its control over the Company, *inter alia*, to obtain measures and concessions falling well outside the debtor-creditor relationship, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

164.    By virtue of Chatham's control of the Company, during the relevant time period, Chatham was a non-statutory insider of the Company.

165.    Chatham engaged in wrongful and inequitable conduct in connection with the Suspect Transactions by, among other acts and omissions:

A.    orchestrating and directing the negotiation, formulation, and effectuation of such transactions, which were not an arm's length, for the purpose of causing Chatham's structurally subordinated Unsecured Debentures to unlawfully move ahead of the Unsecured Creditors' *pari passu* and/or structurally senior claims and ████████

████████████████████████████████████████████████████████

████████████████████████████

B.    engaging in the above-described scheme with the knowledge that doing so would cause the Company and the Subsidiaries to be unable to satisfy the Unsecured Creditors' claims;

44

C.    knowingly causing the Company to effectuate, and knowingly receiving the benefits of, the Fraudulent Transfers, as set forth above;

D.    Chatham's aiding and abetting the breaches of fiduciary duties committed by the Fiduciaries; and

E.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████

166.    The wrongful and inequitable conduct of Chatham directly caused substantial damage to the Unsecured Creditors, including but not limited to a reduction in, and an impeded ability to realize, the value of the Unsecured Creditors' claims due to the unlawful subordination of such claims.  But for the above-specified wrongful and inequitable conduct, the Unsecured Creditors would not have suffered the damages alleged.

167.    The wrongful conduct of Chatham also resulted in unjust benefits to Chatham, including but not limited to Chatham's structurally subordinated Unsecured Debentures moving ahead of the Company's structurally senior unsecured indebtedness.

168.    The wrongful conduct of Chatham, the resulting harm to the Unsecured Creditors, and the resulting unjust benefit to Chatham merit equitable subordination of Chatham's Claims to the Unsecured Creditor's claims.

169.    The equitable subordination requested herein is not inconsistent with the Bankruptcy Code.

170.    Pursuant to section 510(c) of the Bankruptcy Code, Chatham's Claims should be subordinated to all Unsecured Creditors and the Unsecured Creditors should be decreed to step into the shoes of the liens granted to secure Chatham's Claims.

45

## SEVENTH CAUSE OF ACTION
### Disallowance of Claims
### Bankruptcy Code § 502(b)(2)
### (Against BNYM, In Its Capacities As 1L Trustee and 2L Agent)

171.    The Committee repeats and realleges all of the preceding paragraphs as though fully set forth herein.

172.    Section 502(b)(2) of the Bankruptcy Code provides, *inter alia*, that a claim shall not be allowed "to the extent that . . . such claim is for unmatured interest."

173.    The 1L Notes were issued to the holders thereof with an OID of $8,549,800, set to amortize and accrete over time.

174.    The 2L Loans were issued to the holders thereof with an OID of $15,000,000, set to amortize and accrete over time.

175.    The OID awarded to the holders of the 1L Notes, and the OID awarded to the holders of the 2L Loans, to the extent unamortized and unaccreted, constitute unmatured interest under section 502(b)(2) of the Bankruptcy Code.

176.    The Committee, accordingly, seeks disallowance of the claims under the 1L Notes and 2L Loans to the extent of the unamortized OID awarded to the holders thereof.

## EIGHTH CAUSE OF ACTION
### Declaratory Judgment That Debtors' Unencumbered Assets Are Not Subject to a Valid Pledge
### 28 U.S.C. § 2202
### (Against BNYM, In Its Capacities as 1L Trustee, 2L Agent and 3L Trustee)

177.    The Committee repeats and realleges all of the preceding paragraphs as though fully set forth herein.

178.    By their terms, the documents governing the 1L Notes, 2L Loans, and 3L Notes (collectively, the "Debt Documents") limit the holders' liens on certain "excluded collateral," including, without limitation, all Excluded Accounts, Excluded Property and Excluded Swap

Obligations (each as defined in their respective Debt Documents), including, without limitation, (1) each of the accounts identified in Scheduled C hereto, and (2) all real property identified in Schedule D hereto (collectively, the "Excluded Collateral").

179.    Moreover, the Debtors did not receive a pledge via any mortgage, deed of trust, or similar instrument for the real property identified in Schedule D hereto.

180.    Similarly, as to the proceeds of potential commercial tort claims, including but not limited to the claims set forth herein (the "Tort Claims" and, with the Excluded Collateral, the "Unencumbered Assets"), the operative Debt Documents do not create security interests that extend to the Tort Claims under applicable non-bankruptcy law.  None of the Defendants have perfected, or can lawfully perfect, a lien on the Tort Claims because no lien was filed specifically describing such Tort Claims as required by Uniform Commercial Code §§ 9-108(e) and 9-203(b)(3)(A).

181.    An actual, substantial, and justifiable controversy exists regarding the extent of liens on or security interests in the Unencumbered Assets.

182.    Accordingly, the Committee seeks a declaration that the Unencumbered Assets do not constitute a portion of the collateral package for the 1L Notes, 2L Loans, and 3L Notes and thus remain unencumbered.

**NINTH CAUSE OF ACTION**
**Judgment That Any Lien is Avoided to the Extent It Extends to the Unperfected Assets**
**Bankruptcy Code § 544(a), 17 U.S.C. § 205**
**(Against BNYM, In Its Capacities as 1L Trustee, 2L Agent, and 3L Trustee)**

183.    The Committee repeats and realleges all of the preceding paragraphs as though fully set forth herein.

184.    The assets of the Debtors' estates include certain assets that are unperfected, including the Debtors' registered copyrights (unperfected as to the 1L Notes only), tax refunds,

and/or other tax attributes, including, without limitation, net operating losses (collectively, the "Tax Attributes") and, in the alternative, the Tort Claims and the real property identified in Annex B hereto (collectively, the "Unperfected Assets").

185.    Upon information and belief, none of the Defendants has recorded a lien on the Unperfected Assets, via a UCC financing statement, a mortgage, filing a Copyright Security Agreement with the U.S. Copyright Office (as to the 1L Notes only), or otherwise.

186.    Accordingly, the Committee seeks a judgment, pursuant to Bankruptcy Code § 544(a), avoiding any lien to the extent it extends to the Unperfected Assets.  Pursuant to sections 550(a) and 551 of the Bankruptcy Code, the Committee seeks to recover the avoided liens, or the value thereof, for and on behalf of the Estates and/or for preservation for the benefit of the Estates.

**TENTH CAUSE OF ACTION**
**Declaratory Judgment That No Lien Extends to the After Acquired Property**
**Bankruptcy Code § 552, 28 U.S.C. § 2202**
**(Against BNYM, In Its Capacities as 1L Trustee, 2L Agent, and 3L Trustee)**

187.    The Committee repeats and realleges all of the preceding paragraphs as though fully set forth herein.

188.    The Committee seeks a judgment that any lien that purportedly extends to property acquired by the Debtors post-petition, including, without limitation, proceeds recovered on account of the Tort Claims and the Tax Attributes (collectively, the "After Acquired Property"), cannot attach to the foregoing pursuant to section 552(a) of the Bankruptcy Code.

189.    Section 552(a) of the Bankruptcy Code provides, in relevant part, that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."

48

190.    While the operative security agreements purport to extend to After Acquired Property, pursuant to section 552(a) of the Bankruptcy Code, the security agreements cannot extend to property acquired by the Debtors post-petition, including, without limitation, recovery on account of Tort Claims and the Tax Attributes.

191.    An actual, substantial, and justifiable controversy exists regarding the extent of liens on or security interests in the After Acquired Property.

192.    Accordingly, the Committee seeks a declaration that the property acquired by the Debtors post-petition, including, without limitation, proceeds recovered on account of the Tort Claims and the Tax Attributes, are not subject to any valid, perfected lien pursuant to section 552(a) of the Bankruptcy Code.

## ELEVENTH CAUSE OF ACTION
### Declaratory Judgment No Premium Payments Are Payable
### 28 U.S.C. § 2202
### (Against BNYM, In Its Capacities as 1L Trustee, 2L Agent, and 3L Trustee)

193.    The Committee repeats and realleges all of the preceding paragraphs as though fully set forth herein.

194.    The Committee seeks a judgment that no prepayment, redemption, make-whole or similar premiums or payments are due on the Prepetition Secured Debt.

195.    Each of the Debt Documents purport to provide that in the event that the Debtors make a voluntary redemption or prepayment of the Prepetition Secured Debt, then, in addition to the principal then outstanding, an "Applicable Premium" (in the case of the 1L Notes) or "Make-Whole Amount" (in the case of the "2L Loans" or "3L Notes") will be due and payable.

196.    However, according to their terms, by virtue of the filing of these Bankruptcy Cases, each of the 1L Notes, 2L Loans, and 3L Notes were automatically accelerated, which had the effect of changing the maturity date of the Prepetition Secured Debt to the Petition Date.

49

197.    Inasmuch as (a) the maturity date of the Prepetition Secured Debt was accelerated to the Petition Date, and (b) the Prepetition Secured Debt was not repaid or redeemed prepetition, no future repayment can trigger an Applicable Premium or Make-Whole Amounts and, thus, neither is due and payable.

198.    An actual, substantial, and justifiable controversy exists regarding whether the Applicable Premium and Make-Whole Amounts are due and payable.

199.    Accordingly, the Committee seeks a declaration that the Applicable Premium and Make-Whole Amounts are not due and payable.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, the Committee respectfully demands judgment against Defendants, as follows:

1.    Judgment against Chatham and BNYM, in its capacities as 1L Trustee, 2L Agent, and 3L Trustee avoiding the Fraudulent Transfers as constructively fraudulent;

2.    Judgment against Chatham and BNYM, in its capacities as 1L Trustee, 2L Agent, and 3L Trustee avoiding the Fraudulent Transfers as intentionally fraudulent;

3.    Judgment against the Parent Fiduciaries for breaches of fiduciary duties and resulting damages in an amount to be determined at trial;

4.    Judgment against the Subsidiary Fiduciaries for breaches of fiduciary duties and resulting damages in an amount to be determined at trial;

5.    Judgment against Chatham for aiding and abetting the Fiduciaries' breaches of fiduciary duties and resulting damages in an amount to be determined at trial;

6.    Equitably subordinating Chatham's Claims to the Unsecured Creditors' unsecured claims, either pursuant to the standalone claim in the Sixth Cause of Action or as a remedy for the

wrongful, inequitable, or fraudulent conduct set forth in the Third, Fourth, and Fifth Causes of

Action, and permitting the Unsecured Creditors to step into the shoes of the subordinated liens

pursuant to Bankruptcy Code § 510(c);

7.      Disallowing the claims with respect to the 1L Notes and 2L Loans to the extent of

the unamortized OID awarded to the holders thereof;

8.      Judgment (i) declaring the Unencumbered Assets are not subject to any lien

resulting from the operative Debt Documents, (ii) avoiding any unperfected lien to the extent it

extends to the Unperfected Assets, and (iii) declaring that any lien, if applicable, on property

acquired by the Debtors post-petition, including, without limitation, proceeds recovered on

account of the Tort Claims and the Tax Attributes is invalid pursuant to Bankruptcy Code § 552;

9.      Declaratory judgment that the Applicable Premium and Make-Whole Amounts are

not due and payable; and

10.     Providing such other relief as justice and equity may require.


Dated:    June __, 2020                      **STROOCK & STROOCK & LAVAN LLP**
          New York, New York


          By:    */s/ Draft* _____
                 Kristopher M. Hansen
                 Frank A. Merola
                 Erez E. Gilad
                 Daniel A. Fliman
                 Isaac S. Sasson
                 180 Maiden Lane
                 New York, NY 10038-4982
                 Telephone: (212) 806-5400
                 Facsimile: (212) 806-6006

                 *Counsel for the Official Committee of*
                 *Unsecured Creditors*

# SCHEDULE A

Redacted





**Notes and Legend:**

Note 1 – Similar to an LLC

Ownership is 100% unless otherwise noted

- Corporation
- LLC
- Partnership
- Redevelopment Company/Non-Debtor

| (i) Subsidiary | % Owned |
| --- | --- |
| The Bradenton Herald, Inc. | 1.235% |
| Gulf Publishing Company, Inc. | 1.235% |
| The Charlotte Observer Publishing Company | 9.877% |
| Lexington H-L Services, Inc. | 3.704% |
| Macon Telegraph Publishing Company | 2.469% |
| Columbus Ledger-Enquirer, Inc. | 1.235% |

| Subsidiary | % Owned |
| --- | --- |
| Nittany Printing and Publishing Company | 1.235% |
| The State Media Company | 4.938% |
| The Sun Publishing Company, Inc. | 1.235% |
| Pacific Northwest Publishing Company, Inc. | 2.469% |
| Wichita Eagle and Beacon Publishing Company, Inc. | 3.704% |

| A Subsidiary | % Owned |
| --- | --- |
| McClatchy Big Valley, Inc. | 1.7% |
| East Coast Newspapers, Inc. | 5.3% |
| McClatchy Newspapers, Inc. | 60.9% |
| N & O Holdings, Inc. | 22.5% |
| Olympic-Cascade Publishing, Inc. | 0.7% |
| Tacoma News, Inc. | 8.9% |

# SCHEDULE B

| Subsidiary Name | Entity Type | State of Incorporation |
|---|---|---|
| Aboard Publishing, Inc. | Corporation | Florida |
| Bellingham Herald Publishing, LLC | Limited Liability Company | Delaware |
| Belton Publishing Company, Inc. | Corporation | Missouri |
| Biscayne Bay Publishing, Inc. | Corporation | Florida |
| Cass County Publishing Company | Corporation | Missouri |
| Columbus Ledger-Enquirer, Inc. | Corporation | Georgia |
| Cypress Media, Inc. | Corporation | New York |
| Cypress Media, LLC | Limited Liability Company | Delaware |
| East Coast Newspapers, Inc. | Corporation | South Carolina |
| El Dorado Newspapers | Corporation | California |
| Gulf Publishing Company, Inc. | Corporation | Mississippi |
| HLB Newspapers, Inc. | Corporation | Missouri |
| Idaho Statesman Publishing, LLC | Limited Liability Company | Delaware |
| Keltatim Publishing Company, Inc. | Corporation | Kansas |
| Keynoter Publishing Company, Inc. | Corporation | Florida |
| Lee's Summit Journal, Inc. | Corporation | Missouri |
| Lexington H-L Services, Inc. | Corporation | Kentucky |
| Macon Telegraph Publishing Company | Corporation | Georgia |
| Mail Advertising Corporation | Corporation | Texas |
| McClatchy Big Valley, Inc. | Corporation | California |
| McClatchy Interactive LLC | Limited Liability Company | Delaware |
| McClatchy Interactive West | Corporation | Delaware |
| McClatchy International, Inc. | Corporation | Delaware |
| McClatchy Investment Company | Corporation | Delaware |
| McClatchy Management Services, Inc. | Corporation | Delaware |
| McClatchy News Services, Inc. | Corporation | Michigan |
| McClatchy Newspapers, Inc. | Corporation | Delaware |
| McClatchy Property, Inc. | Corporation | Florida |
| McClatchy Resources, Inc. | Corporation | Florida |
| McClatchy Shared Services, Inc. | Corporation | Florida |
| McClatchy U.S.A., Inc. | Corporation | Delaware |
| Miami Herald Media Company | Corporation | Delaware |
| N & O Holdings, Inc. | Corporation | Delaware |
| Newsprint Ventures, Inc. | Corporation | California |
| Nittany Printing and Publishing Company | Corporation | Pennsylvania |
| Nor-Tex Publishing, Inc. | Corporation | Texas |
| Oak Street Redevelopment Corporation | Urban Redevelopment Corporation | Missouri |

| Subsidiary Name | Entity Type | State of Incorporation |
|---|---|---|
| Olympian Publishing, LLC | Limited Liability Company | Delaware |
| Olympic-Cascade Publishing, Inc. | Corporation | Washington |
| Pacific Northwest Publishing Company, Inc. | Corporation | Florida |
| Quad County Publishing, Inc. | Corporation | Illinois |
| San Luis Obispo Tribune, LLC | Limited Liability Company | Delaware |
| Star-Telegram, Inc. | Corporation | Delaware |
| Tacoma News, Inc. | Corporation | Washington |
| The Bradenton Herald, Inc. | Corporation | Florida |
| The Charlotte Observer Publishing Company | Corporation | Delaware |
| The Herald Charities, Inc. | 501(c)(3) Nonprofit | Florida |
| The McClatchy Company Foundation | 501(c)(3) Nonprofit | Minnesota |
| The News and Observer Publishing Company | Corporation | North Carolina |
| The State Media Company | Corporation | South Carolina |
| The Sun Publishing Company, Inc. | Corporation | South Carolina |
| Tribune Newsprint Company | Corporation | Utah |
| Wichita Eagle and Beacon Publishing Company, Inc. | Corporation | Kansas |
| Wingate Paper Company | Corporation | Delaware |

# SCHEDULE C

## Unencumbered Accounts

| Checking, Savings, Money Market or Financial Brokerage Accounts | | | |
|---|---|---|---|
| Debtor | Description | Name of Holder of Deposit | Acct Last 4 Digits |
| Herald Custom Publishing of Mexico, S. DE R.L. DE C.V. | BBVA Bancomer, S.A. | Depository (MXN) | 1361 |
| Herald Custom Publishing of Mexico, S. DE R.L. DE C.V. | BBVA Bancomer, S.A. | Depository (USD) | 4217 |

| Deposit, Including Security Deposits | | |
|---|---|---|
| Debtor | Description | Name of Holder of Deposit |
| The News & Observer Publishing Co. | Lease | Guess Road Station, Inc. |
| Cypress Media, LLC | Lease | WRB, LLC |
| McClatchy Newspapers, Inc. | Benefits | CA Dept. of Industrial Relations |
| McClatchy Newspapers, Inc. | Benefits | Cigna |
| McClatchy Newspapers, Inc. | Benefits | CMI |
| McClatchy Newspapers, Inc. | Benefits | Travelers |
| McClatchy Newspapers, Inc. | Bond | Associated Press |
| McClatchy Newspapers, Inc. | Lease | 112 South Main Street Owner |
| McClatchy Newspapers, Inc. | Lease | 1235 Glenhaven Court LLC |
| McClatchy Newspapers, Inc. | Lease | 13915 West 106th Street Owner |
| McClatchy Newspapers, Inc. | Lease | 3715 1st Ave Ower |
| McClatchy Newspapers, Inc. | Lease | BARNARD PARTNERS XLIII, LTD |
| McClatchy Newspapers, Inc. | Lease | BCC Puyallup, LLC |
| McClatchy Newspapers, Inc. | Lease | Berry Avenue, Inc., John Jackson, Jr., John Jackson, Sr., Donald Ekstrom, Joanne Latona, Francine Jackson dba 8200 Berry Associates |
| McClatchy Newspapers, Inc. | Lease | Bitwise |
| McClatchy Newspapers, Inc. | Lease | Blake Real Estate, Inc. |
| McClatchy Newspapers, Inc. | Lease | C & L Properties |
| McClatchy Newspapers, Inc. | Lease | Cherry Street Properties, LLC |
| McClatchy Newspapers, Inc. | Lease | Chiquita Brands L.L.C. |
| McClatchy Newspapers, Inc. | Lease | City of Sacramento |
| McClatchy Newspapers, Inc. | Lease | COECO Financial Services |
| McClatchy Newspapers, Inc. | Lease | D.J. Harrison Holdings, LLC |
| McClatchy Newspapers, Inc. | Lease | Dunham Regus |
| McClatchy Newspapers, Inc. | Lease | Edna Valley Office Building, LLC |
| McClatchy Newspapers, Inc. | Lease | Edward Cabrera |

| Deposit, Including Security Deposits | | |
| --- | --- | --- |
| Debtor | Description | Name of Holder of Deposit |
| McClatchy Newspapers, Inc. | Lease | Escallier-Kalijan, LLC |
| McClatchy Newspapers, Inc. | Lease | Fiduciary Properties, Inc. |
| McClatchy Newspapers, Inc. | Lease | FJM Sunrise Associates SPE, LLC |
| McClatchy Newspapers, Inc. | Lease | Haggen Talbot Co Limited Partnership |
| McClatchy Newspapers, Inc. | Lease | Highwoods Realty |
| McClatchy Newspapers, Inc. | Lease | JMVZ Enterprises, LLC |
| McClatchy Newspapers, Inc. | Lease | Karbank Holdings LLC |
| McClatchy Newspapers, Inc. | Lease | Lampton Realty Co. |
| McClatchy Newspapers, Inc. | Lease | Larry Williams Bussey |
| McClatchy Newspapers, Inc. | Lease | LS & SD, LLC |
| McClatchy Newspapers, Inc. | Lease | Miller Enterprise of Manatee, Inc. |
| McClatchy Newspapers, Inc. | Lease | Minnix Ltd. |
| McClatchy Newspapers, Inc. | Lease | Modesto City Center Holdings, LLC |
| McClatchy Newspapers, Inc. | Lease | MPM Properties, LLC |
| McClatchy Newspapers, Inc. | Lease | Nolabari, Inc. |
| McClatchy Newspapers, Inc. | Lease | OlivePark Professional Center LLC |
| McClatchy Newspapers, Inc. | Lease | Orlin C. Munns |
| McClatchy Newspapers, Inc. | Lease | Paul & Susan R. Minck |
| McClatchy Newspapers, Inc. | Lease | Principal Real Estate Investors |
| McClatchy Newspapers, Inc. | Lease | Quincey E. Cargile |
| McClatchy Newspapers, Inc. | Lease | Railside Industrial Park |
| McClatchy Newspapers, Inc. | Lease | Ralph Stancil |
| | | Richard Gerbi2,500.00 |
| McClatchy Newspapers, Inc. | Lease | Robert DiNapoli, Trustee and Karin DiNapoli, Trustee |
| McClatchy Newspapers, Inc. | Lease | Rock Hill City Plaza, LLC |
| McClatchy Newspapers, Inc. | Lease | Ronald E. Toomajian and Gloria E. Toonajian Declaration Trust  dated June 25, 2003 |
| McClatchy Newspapers, Inc. | Lease | Ronald E. Toomajian and Gloria E. Toonajian Declaration Trust  dated June 25, 2003 |
| McClatchy Newspapers, Inc. | Lease | Seagis CPK 1 LLC |
| McClatchy Newspapers, Inc. | Lease | Sean Profit Sharing and Agent for Lyon Trust |
| McClatchy Newspapers, Inc. | Lease | Southern Commercial Properties |
| McClatchy Newspapers, Inc. | Lease | Sundance Investments, LLLP. |
| McClatchy Newspapers, Inc. | Lease | The Graham Companies |
| McClatchy Newspapers, Inc. | Lease | Trivest Properties, LLC |
| | | W & B Properties |
| McClatchy Newspapers, Inc. | Lease | W. Kenan Rand, Jr. |
| McClatchy Newspapers, Inc. | Lease | Westcore Northgate LP |

**Deposit, Including Security Deposits**

| Debtor | Description | Name of Holder of Deposit |
| --- | --- | --- |
| McClatchy Newspapers, Inc. | | City of Bradenton |
| McClatchy Newspapers, Inc. | Utility | Dominion Energy |
| McClatchy Newspapers, Inc. | Utility | Duke Energy |
| McClatchy Newspapers, Inc. | Utility | FPL Bradenton |
| McClatchy Newspapers, Inc. | Utility | FPL Miami |
| McClatchy Newspapers, Inc. | Utility | PG&E |
| McClatchy Newspapers, Inc. | Utility | PG&E |
| McClatchy Newspapers, Inc. | Utility | Town of Selma |

# SCHEDULE D

**Unencumbered Real Property**

| Debtor | Real Property Address | Real Property Description |
|---|---|---|
| Aboard Publishing, Inc. | | |
| Bellingham Herald Publishing, LLC | 2211 Rimland Drive, Bellingham, WA 98226-5664 | Leasehold Improvements |
| Belton Publishing Company, Inc. | | |
| Biscayne Bay Publishing, Inc. | | |
| The Bradenton Herald, Inc. | 111 3Rd Ave W, Brandenton, FL 34205-8810 | Leasehold Improvements |
| Cass County Publishing Company | | |
| The Charlotte Observer Publishing Company | 1001 Pressley Rd., Charlotte, NC 28217-0910 | Building and Building Improvements |
| | 1001 Pressley Rd., Charlotte, NC 28217-0910 | Land and Land Improvements |
| | 9140 Research Dr, Charlotte, NC 28262-8544 | Leasehold Improvements |
| Columbus-Ledger Enquirer, Inc. | 3715 1St Ave, Suite 4-B, Columbus, GA 31901-5254 | Leasehold Improvements |
| Cypress Media, Inc. | | |
| East Coast Newspapers, Inc. | P.O. Box 5727, Hilton Head Island, SC 29938-5727 | Building and Building Improvements |
| | P.O. Box 5727, Hilton Head Island, SC 29938-5727 | Land and Land Improvements |
| | 140 E Main, Suite 420, Rock Hill, SC 29730-4430 | Leasehold Improvements |
| El Dorado Newspapers | | |
| Gulf Publishing Company, Inc. | 205 - Debuys Rd, Gulfport, MS 39507-2838 | Leasehold Improvements |
| Herald Custom Publishing of Mexico, S. DE R.L. DE C. | | |
| HLB Newspapers, Inc. | | |
| | | |
| Keltatim Publishing Company, Inc. | | |
| Keynoter Publishing Company, Inc. | | |
| Lee's Summit Journal, Incorporated | | |
| Lexington H-L Services, Inc. | 100 Midland Ave, Lexington, KY 40508-1943 | Building and Building Improvements |
| | 100 Midland Ave, Lexington, KY 40508-1943 | Land and Land Improvements |
| | 1007 Primrose Ct, Lexington, KY 40509 | Leasehold Improvements |
| Macon Telegraph Publishing Company | 1675 Montpelier Ave., Macon, GA 31201-6615 | Leasehold Improvements |
| Mail Advertising Corporation | | |
| McClatchy Big Valley, Inc. | | |
| McClatchy Interactive LLC | | |
| McClatchy Interactive West | | |
| McClatchy International Inc. | | |
| McClatchy Investment Company | | |
| McClatchy Management Services, Inc. | | |
| McClatchy News Services, Inc. | 401 I Street, Suite 200, Sacramento, CA 95814-2308 | Leasehold Improvements |

*Continued on Following Page*

| Debtor | Real Property Address | Real Property Description |
|---|---|---|
| McClatchy Newspapers, Inc. | 2100 Q Street, Sacramento, CA 95816-6816 | CIP - Leasehold Improvements |
| | 2100 Q Street, Sacramento, CA 95816-6816 | Land and Land Improvements |
| | 2100 Q Street, Sacramento, CA 95816-6816 | Leasehold Improvements |
| | 111 W. Hargett St, Raleigh NC 27601-1313 | Building and Building Improvements |
| | 111 W. Hargett St, Raleigh NC 27601-1313 | Land and Land Improvements |
| | 1401 Shop Rd, Columbia, SC 29201-4843 | Building and Building Improvements |
| | 1401 Shop Rd, Columbia, SC 29201-4843 | Land and Land Improvements |
| | 1402 Mechanical Blvd, Garner, NC 27529-2539 | Building and Building Improvements |
| | 1402 Mechanical Blvd, Garner, NC 27529-2539 | Land and Land Improvements |
| | 1601 Mcgee St, Kansas City, MO 64108 | Building and Building Improvements |
| | 1601 Mcgee St, Kansas City, MO 64108 | Land and Land Improvements |
| | 1626 E Street, Fresno, CA 93706-2006 | Building and Building Improvements |
| | 1626 E Street, Fresno, CA 93706-2006 | Land and Land Improvements |
| | 205 Debuys Rd, Gulfport, MS 39507-2838 | Building and Building Improvements |
| | 205 Debuys Rd, Gulfport, MS 39507-2838 | Land and Land Improvements |
| | 2100 Q Steet, Sacramento, CA 95816-6816 | Building and Building Improvements |
| | 2100 Q Steet, Sacramento, CA 95816-6816 | Land and Land Improvements |
| | 914 Frontage Rd E, Myrtle Beach, SC 29577-6700 | Building and Building Improvements |
| | 914 Frontage Rd E, Myrtle Beach, SC 29577-6700 | Land and Land Improvements |
| | 9140 Research Dr, Charlotte, NC 28262-8544 | Building and Building Improvements |
| | 9140 Research Dr, Charlotte, NC 28262-8544 | Land and Land Improvements |
| | One Herald Plaza, Miami, FL 33132 | Building and Building Improvements |
| | One Herald Plaza, Miami, FL 33132 | Land and Land Improvements |
| | 132 West Main, Rock Hill, SC 29730-4430 | Land and Land Improvements |
| McClatchy Property, Inc. | | |
| McClatchy Resources, Inc. | | |
| McClatchy Shared Services, Inc. | | |
| McClatchy U.S.A., Inc. | | |
| Miami Herald Media Company | Btwn 301 - 302 St. S. Dixie Hwy, Homestead, FL 33032-2302 | Land and Land Improvements |
| | 3511 Nw 91St Ave, Doral, FL 33172-1203 | Leasehold Improvements |
| N & O Holdings, Inc. | | |

*Continued on Following Page*

| Debtor | Real Property Address | Real Property Description |
|---|---|---|
| Newsprint Ventures, Inc. | | |
| Nittany Printing and Publishing Company | 3400 E College Ave, State College, PA 16801-7528 | Building and Building Improvements |
| | 3400 E College Ave, State College, PA 16801-7528 | Land and Land Improvements |
| Nor-Tex Publishing, Inc. | | |
| Oak Street Redevelopment Corporation | | |
| Olympian Publishing, LLC | 522 Franklin St Se, Olympia, WA 98501-1336 | Leasehold Improvements |
| Olympic-Cascade Publishing, Inc. | 3326 Rosedale St, Ste 100, Gig Harbor, WA 98335-1806 | Building and Building Improvements |
| | 3326 Rosedale St, Ste 100, Gig Harbor, WA 98335-1806 | Land and Land Improvements |
| Pacific Northwest Publishing Company, Inc. | | |
| San Luis Obispo Tribune, LLC | 735 Tank Farm Rd Ste 220, San Luis Obispo, CA 93401-707 | Leasehold Improvements |
| Star-Telegram, Inc. | 113 Nw Hillery, Burleson, TX 76028-4105 | Building and Building Improvements |
| | 4871 N. Beach St, Forth Worth, TX 76137-3402 | Building and Building Improvements |
| | 4871 N. Beach St, Forth Worth, TX 76137-3402 | Land and Land Improvements |
| | 113 Nw Hillery, Burleson, TX 76028-4105 | Land and Land Improvements |
| | 808 Throckmorton St., Fort Worth, TX 76102-4701 | Leasehold Improvements |
| The Sun Publishing Company, Inc. | 914 Frontage Rd E, Myrtle Beach, SC 29577-6700 | Leasehold Improvements |
| The News & Observer Publishing Co. | 2100 Q Street, Sacramento, CA 95816-6816 | CIP - Leasehold Improvements |
| | 215 S Mcdowell St, Raleigh, NC 27601-3010 | Land and Land Improvements |
| | 215 S Mcdowell St, Raleigh, NC 27601-3010 | Leasehold Improvements |
| The State Media Company | 2100 Q Street, Sacramento, CA 95816-6816 | CIP - Leasehold Improvements |
| | 1401 Shop Rd, Columbia, SC 29201-4843 | Leasehold Improvements |
| Tribune Newsprint Company | | |
| Tru Measure, LLC | | |
| Wichita Eagle and Beacon Publishing Company, Inc. | 330 N Mead St, Wichita, KS 67202-2830 | Leasehold Improvements |
| Wingate Paper Company | | |
| Cypress Media, LLC | 11 Premier Dr, Belleville, IL 62220-3422 | Building and Building Improvements |
| | 1601 Mcgee St, Kansas City, MO 64108-1413 | Building and Building Improvements |
| | 11 Premier Dr, Belleville, IL 62220-3422 | Land and Land Improvements |
| | 1601 Mcgee St, Kansas City, MO 64108-1413 | Leasehold Improvements |
| Quad County Publishing, Inc. | | |
| The McClatchy Company | | |

# EXHIBIT  B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| The McClatchy Company, *et al.*,[1] | ) | Case No. 20-10418 (MEW) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## OREDER GRANTING MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR (I) LEAVE, STANDING AND AUTHORITY TO COMMENCE AND PROSECUTE CERTAIN CLAIMS AND CAUSES OF ACTION ON BEHALF OF DEBTORS' ESTATES AND (II) EXCLSUIVE SETTLEMENT AUTHORITY

Upon the motion (the "Motion") of the Official Committee of Unsecured Creditors (the "Committee") appointed in the jointly administered chapter 11 cases of the above-captioned debtors and debtors-in-possession (the "Debtors"), for entry of an order pursuant to sections 1103(c) and 1109(b) of title 11 of the United States Code (the "Bankruptcy Code") granting the Committee standing to commence and to prosecute certain claims and causes of action specified in the Motion and the attached draft adversary complaint (the "Proposed Claims") and, granting the Committee exclusive authority to settle such claims on behalf of the Debtors' estates; it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; it appearing that venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; it appearing that notice of the Motion and opportunity for a hearing on the Motion were appropriate

---

[1] The last four digits of Debtor The McClatchy Company's tax identification number are 0478. Due to the large number of debtor entities in these jointly administered chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/McClatchy.

under the circumstances and no other notice need be provided; and after due deliberation thereon and this Court having concluded that upon the legal and factual bases set forth in the Motion, the Committee has established good and sufficient cause for the relief granted herein, now, it is hereby ORDERED that:

1.      The Motion is GRANTED as set forth herein.

2.      All objections, if any, to the Motion or the relief requested therein, that have not been withdrawn, waived, or settled, are overruled;

3.      The Committee shall be, and hereby is, granted, on behalf of the Debtors' estates, leave and standing to commence and prosecute the Proposed Claims (as defined in the Motion);

4.      The Committee shall be, and hereby is, granted, on behalf of the Debtors' estates, exclusive settlement authority to negotiate, and if applicable, settle the Proposed Claims, subject to further order of this Court approving such settlements; and

5.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the construction, performance, enforcement, and implementation of the terms of this Order.

Dated: July __, 2020
          New York, New York

_____
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE