Andrew N. Rosenberg
William A. Clareman
John T. Weber
**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019-6064

James C. Tecce
Deborah Newman
Lindsay Weber
**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
52 Madison Avenue, 22nd Floor
New York, New York  10010

*Attorneys for Chatham Asset Management, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 11 |
| **THE McCLATCHY COMPANY, *et al.*,** | Case No. 20-10418 (MEW) |
| Debtors. | (Jointly Administered) |

**OBJECTION OF CHATHAM ASSET MANAGEMENT, LLC TO MOTION OF**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR (I) LEAVE,**
**STANDING AND AUTHORITY TO COMMENCE AND PROSECUTE CERTAIN**
**CLAIMS AND CAUSES OF ACTION ON BEHALF OF DEBTORS' ESTATES AND (II)**
**EXCLUSIVE SETTLEMENT AUTHORITY**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...........................................................................1

    A.    COMPLAINT FAILS TO STATE CLAIMS UPON WHICH RELIEF CAN BE GRANTED ....................................................................................................4

        1.    EQUITABLE SUBORDINATION (COUNT 6) ...................................7

        2.    FRAUDULENT CONVEYANCE (COUNT 1, COUNT 2) ....................8

        3.    BREACH OF FIDUCIARY DUTY (COUNT 4, COUNT 5) ..................9

    B.    COMMITTEE HAS NOT DEMONSTRATED BENEFIT TO ESTATES.............10

II.    RELEVANT FACTUAL BACKGROUND ....................................................11

    A.    TERMINATION OF OLD-CASH FLOW FACILITY ......................................11

    B.    COMPANY COVENANTED IN UNSECURED DEBENTURES TO PLEDGE COLLATERAL ON AN EQUAL-AND-RATABLE BASIS...............................12

    C.    CHATHAM'S ███████████████████████████ ........................13

    D.    CHATHAM'S ████████████████████████ ..............................14

    E.    JULY 2018 REFINANCING & CHATHAM'S ███████████████ ██████████ ...................................................................................16

    F.    BANKRUPTCY CASES ...........................................................................18

III.    OBJECTION ..................................................................................................18

    A.    COMMITTEE HAS NOT CARRIED ITS BURDEN .....................................18

    B.    EXTRAORDINARY REMEDY OF SUBORDINATION IS UNWARRANTED .....19

        1.    CHATHAM IS NOT AN INSIDER................................................20

        2.    ALLEGED CONDUCT DOES NOT RISE TO LEVEL OF EGREGIOUSNESS REQUIRED .........................................................................22

    C.    COMMITTEE HAS NOT PLED AN ACTUAL INTENT CLAIM ......................26

    D.    COMMITTEE CANNOT STATE A CLAIM FOR CONSTRUCTIVE FRAUDULENT TRANSFER AS A MATTER OF LAW ........................................................28

    E.    NO CLAIM STANDS FOR AIDING & ABETTING BREACH OF FIDUCIARY DUTY ........30

    F.    REMAINING COUNTS ...........................................................................33

        1.    ORIGINAL ISSUE DISCOUNT (COUNT 7)....................................33

        2.    UNENCUMBERED ASSETS (COUNT 8, 9, 10) ..............................33

        3.    PREMIUM PAYMENTS (COUNT 11) ..........................................36

CONCLUSION.......................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)
   169 B.R. 832, 837 ........................................................................................................... 19, 25

Ashcroft v. Iqbal
   556 U.S. 662 (2009)..................................................................................................... 4

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.
   493 F.3d 87 (2d Cir. 2007)........................................................................................... 18

Badger Freightways, Inc. v. Cont'l Ill. Nat'l Bank & Trust Co. (In re Badger Freightways, Inc.)
   106 B.R. 971 (Bankr. N.D. Ill. 1989) ......................................................... 20, 21, 25

BancorpSouth Bank v. Hazelwood Logistics Ctr., LLC
   706 F.3d 888 (8th Cir. 2013) ...................................................................................... 34

Bell Atl. Corp. v. Twombly
   550 U.S. 544 (2007)..................................................................................................... 4

Citibank, N.A. v. Tele/Res., Inc.
   724 F.2d 266 (2d Cir. 1983)........................................................................................ 34

Connelly v. Marine Midland Bank, N.A.
   61 B.R. 748 (W.D.N.Y. 1986) ..................................................................................... 34

Creditors' Comm. of Jumer's, Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge, Inc.)
   338 B.R. 344 (C.D. Ill. 2006) ..................................................................................... 29

Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)
   No. 01 Civ. 6209, 2002 WL 31412465........................................................................ 28

Davis v. Carroll
   937 F. Supp. 2d 390 (S.D.N.Y. 2013)......................................................................... 27

Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)
   453 B.R. 499 (Bankr. S.D.N.Y. 2011)........................................................ 19, 20, 21, 25

HSBC Bank USA, Nat. Ass'n v. Adelphia Communications Corp.
   No. 07 Civ. 553, 2009 WL 385474 (W.D.N.Y. Feb. 12, 2009)............................................ 28

In re Adelphia Commc'ns. Corp.
   544 F.3d 420 (2d Cir. 2008)........................................................................................ 5

In re Adelphia Recovery Trust
   634 F.3d 678 (2d Cir.2011)......................................................................................... 28

In re Aeropostale
   555 B.R. 369 (Bankr. S.D.N.Y. 2016) ............................................................... 6, 21, 24

In re Am. Int'l Grp., Inc. Consol. Derivative Litig.
   976 A.2d 872 (Del. Ch. 2009)..................................................................................... 31

In re AMR Corp.
   730 F.3d 88 (2d Cir. 2013)..................................................................................... 36

In re Appalachian Energy Industries, Inc.
   25 B.R. 515 (Bankr. M.D. Tenn. 1982) ................................................................ 34

In re BJ's Wholesale Club, Inc. Shareholders Litig.
   No. CIV.A. 6623-VCN, 2013 WL 396202 (Del. Ch. Jan. 31, 2013) ..................... 31

In re Chateaugay Corp.
   961 F.2d 378 (2d Cir. 1992)................................................................................... 33

In re DeLancey
   94 B.R. 311 (Bankr. S.D.N.Y. 1988) .................................................................... 34

In re Dura Auto. Sys.
   No. 19-12378 (Bankr. D. Del. June 9, 2020) ................................................... 18-19

In re Eureka Upholstering Co.
   48 F.2d 95 (2d Cir. 1931)....................................................................................... 5

In re Gulf Fleet Holdings, Inc.
   491 B.R. 747 (Bankr. W.D. La. 2013) .................................................................. 29

In re Image Worldwide
   139 F.3d 574 (7th Cir. 1998) ................................................................................ 29

In re Kopel
   232 B.R. 57 (Bankr. E.D.N.Y. 1999) ................................................................... 34

In re Lawrence Paperboard Corp.
   76 B.R. 866 (Bankr. D. Mass. 1987) .................................................................... 30

In re Lehman Bros. Holdings. v. JPMorgan Chase Bank N.A.
   541 B.R. 551 (S.D.N.Y. 2015) ................................................................. 20, 21, 27

In re M. Fabrikant & Sons, Inc.
   394 B.R. 721 (Bankr. S.D.N.Y. 2008) .................................................................. 28

In re M. Silverman Laces, Inc.
   2002 U.S. Dist. LEXIS 20288 (S.D.N.Y. Oct. 23, 2002) ................................. 28, 29

In re Mammoth Spring Distributing Co., Inc.
   139 B.R. 205 (W. Ark. 1992)................................................................................ 35

In re MarketXT Holdings Corp.
   361 B.R. 369 (Bankr. S.D.N.Y. 2007)............................................................. 27, 29

In re McCorhill Pub., Inc.
   86 B.R. 783 (Bankr. S.D.N.Y. 1988) .................................................................... 34

In re Metric Metals Int'l, Inc.
   20 B.R. 633 (S.D.N.Y. 1981)................................................................................ 34

In re Mobile Steel Co.
   563 F.2d 692 (5th Cir. 1977) ................................................................................ 19

In re Old CarCo LLC
   435 B.R. 169 (Bankr. S.D.N.Y. 2010) ...................................................... 26

In re Pajaro Dunes Rental Agency, Inc.
   174 B.R. 557 (Bankr. N.D. Cal. 1994) .................................................... 28

In re Pfeifer
   2013 Bankr. LEXIS 2950 (Bankr. S.D.N.Y. July 23, 2013) ................................. 29

In re Protocol Servs., Inc.
   2005 WL 6485180 (Bankr. S.D. Cal. Dec. 23, 2005) ...................................... 35

In re Racing Servs. Inc.
   540 F.3d 892 (8th Cir. 2008) ............................................................ 18

In re Rubin Bros. Footwear, Inc.
   119 B.R. 416 (S.D.N.Y. 1990) ............................................................ 27

In re Sabine Oil & Gas Corp.
   547 B.R. 503 (Bankr. S.D.N.Y.), aff'd, 562 B.R. 211 (S.D.N.Y. 2016) ................ 10, 18

In re Sharp Int'l
   403 F.3d 43 (2d Cir. 2003) ............................................................. 26

In re STN Enterprises
   779 F.2d 901 (2d Cir. 1985) .......................................................... 5, 18

In re Tele/Res., Inc.
   21 B.R. 358 (Bankr. S.D.N.Y. 1982) ..................................................... 34

In re TMCI Elecs.
   279 B.R. 552 (Bankr. N.D. Cal. 1999) ................................................... 35

Liquidation Trust v. Daimler AG (In re Old CarCo LLC)
   454 B.R. 38, 59 (Bankr. S.D.N.Y. 2011) ............................................. 29-30

Matter of Teltronics Servs., Inc.
   29 B.R. 139 (Bankr. E.D.N.Y. 1983) .................................................. 20, 26

Mellon Bank, N.A. v. Metro Communications, Inc.
   945 F.2d 635 (3d Cir. 1991) ............................................................ 29

O'Toole v. Karnani (In re Trinsum Grp., Inc.)
   460 B.R. 379 (Bankr. S.D.N.Y. 2011) .................................................... 4

Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP
   322 F.3d 147 (2d Cir. 2003) ............................................................ 32

Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Bolmen (In re Hydrogen, L.L.C.)
   431 B.R. 337 (Bankr. S.D.N.Y. 2010) .................................................... 4

Official Comm. of Unsecured Creditors v. Nat'l Amusements Inc. (In re Midway Games, Inc.)
   428 B.R. 303 (Bankr. D. Del. 2010) .................................................... 30

Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.
   267 F.3d 340 (3d Cir. 2001) ......................................................... 31-32

Official Comm. Of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)
    501 B.R. 549 (Bankr. S.D.N.Y. 2013) .................................................................................... 32

Orix Credit Alliance v. Phillups-Mahnen, Inc.
    No. 89 Civ. 8376, 1993 WL 183766 (S.D.N.Y. May 26, 1993) ............................................. 28

Saito v. McCall
    No. Civ. A. 17132-NC, 2004 WL 3029876 (Del. Ch. Dec. 20, 2004) .................................... 30

Solus Alternative Asset Mgmt. LP v. GSO Capital Partners L.P.
    No. 18 CV 232-LTS-BCM, 2018 WL 620490 (S.D.N.Y. Jan. 29, 2018) .............................. 22

Trenwick Am. Litig. Trust v. Billett
    931 A.2d 438 (Del. 2007) ....................................................................................................... 30

Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.
    906 A.2d 168 (Del. Ch. 2006) ................................................................................................ 30

Walker v. Sonafi Pasteur (In re Aphton Corp.)
    423 B.R. 76 (Bankr. D. Del. 2010) ......................................................................................... 29

Williams v. Calderoni
    11 Civ. 3020, 2012 WL 691832 (S.D.N.Y. Mar. 1, 2012) ..................................................... 25

## Statutory Authorities

11 U.S.C. § 548(a)(1)(B) ............................................................................................................ 28

11 U.S.C. § 548(c) ...................................................................................................................... 26

Cal. Civ. Code § 3439.04 ........................................................................................................... 28

UCC § 9–102 .............................................................................................................................. 35

Chatham Asset Management, LLC ("**Chatham**")[1] submits this objection to the Standing Motion[2] and in support thereof respectfully represents as follows:

## I. PRELIMINARY STATEMENT

1. One of the most expensive investigations in Southern-District history has ended with a dud. After three months of extensive, Court-Ordered Rule-2004 discovery from the Debtors and a robust voluntary production from Chatham, the Committee cannot state a plausible claim whose prosecution will benefit the estates. The result is unsurprising. Many of the facts purportedly "revealed" by the Committee's costly mission already were publicly known, and none of them supports a finding of actionable wrongs committed by the Debtors' board of directors or Chatham. At bottom, the Committee criticizes what it believes were decisions made with bad judgment—nothing more. Whatever the merits of Committee's supposed hindsight, its disagreement with the Debtors "mis-executed objectives"[3] does not state a claim.

2. Chatham has been a long-term investor in McClatchy (since 2009), whose unwavering investment thesis has been to maximize the Company's value. During the last decade, it faithfully executed on that thesis by investing hundreds of millions of dollars to meet

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in (a) the *Final Order (I) Authorizing Debtors To (A) Obtain Postpetition Financing And (B) Use Cash Collateral, (II) Granting (A) Liens And Providing Superpriority Administrative Expense Status And (B) Adequate Protection To Certain Prepetition Lenders, (III) Modifying Automatic Stay, And (IV) Granting Related Relief* [ECF No. 233] ("**Final DIP Order**"); (b) *Objection Of Chatham Asset Management , LLC To Application For Order Authorizing Retention Of Dundon Advisers LLC As Co-Financial Advisor For Official Committee Of Unsecured Creditors Of McClatchy Company, LLC, Et Al.* [ECF No. 322] (the "**Dundon Objection**"); or (c) The Mot. And Compl. (as defined below). The "**Company**" and "**McClatchy**" each means The McClatchy Company (the "**Parent**") and its subsidiaries, collectively.

[2]    *Motion Of Official Committee Of Unsecured Creditors For (I) Leave, Standing And Authority To Commence And Prosecute Certain Claims And Causes Of Action On Behalf Of Debtors' Estates And (II) Exclusive Settlement Authority* [ECF No. 546] ("**Mot.**") and *Proposed Compl.* ("**Compl.**")

[3]    Mot. ¶ 3.

the Company's goals for future success in a changing industry.  The July 2018 Refinancing (as

defined herein) that is the focus of the Committee's challenge is a prime example of this strategy.

3.



4.      The terms of the Unsecured Debentures restricted the Company's ability to pledge

collateral in connection with a refinancing of the Old First-Lien Notes.  They obligated

McClatchy to provide collateral to the holders of Unsecured Debentures on an equal-and-ratable

basis to that pledged by the Parent and its subsidiaries.  Contrary to the Committee's assertion

that the Debtors executed an "indefensible deal" by "locking up" unencumbered assets for which

there was "no basis,"[4] the Debtors were contractually required to shore up their Unsecured

Debentures if they wanted to address the looming maturity of the Old Cash-Flow Facility.

5.      As an alternative, Chatham—which was a substantial holder of Unsecured

Debentures—█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████. And, the parties

briefly considered the publicly-disclosed April 2018 Framework Agreement (which would have

---

[4]    Mot. ¶ 4.

included the so-called "orphan CDS" transaction)—but "abandoned"[5] it; that transaction *never happened*.  In June 2018, Chatham ████████████████████████████████████ ████████████████████████████████████

6.    ████████████████████████████, the Company consummated the July 2018 Refinancing, under which Chatham facilitated the new $65 million Wells Fargo ABL facility due 2023 (the "**New ABL**") and satisfaction of the antecedent Old First-Lien Notes with the proceeds from $310 million in First Lien Notes due 2026.  Specifically, Chatham invested an additional $60 million of new money on a second-lien basis (the "**2018 2L New Money Debt**") and agreed to subordinated liens on Principal Property to collateralize the Second-Lien Term Loan and Third-Lien Notes notwithstanding the covenants in the Unsecured Debentures.  The proceeds from those notes satisfied the antecedent Unsecured Debentures (due 2027 and 2029), which have later maturity dates, i.e., 2030 and 2031.

7.    The Committee posits the transaction was "suspect" because the Company had two more years to refinance.[6]  Yet, it cannot point to any unlawful dividends or corporate maneuvers.  The Committee also neglects to mention that the new financing provided runway for McClatchy at a crucial time as print media companies need capital to stay competitive in the digital age.  The additional liquidity enabled continued operations and the implementation of a business transformation away from print media to digital news circulation, subscriptions, advertising, and other products and offerings.[7]  The Committee is simply substituting its own (legally irrelevant) business judgement for that of the Company's board.

---

[5]    Compl. ¶ 68.

[6]    Compl. ¶¶ 45-47, 120.

[7]    See Declaration Of Sean M. Harding In Support Of Chapter 11 Petitions And First Day Papers (the "**First Day Decl.**") [ECF No. 23] at 13-15 (¶¶ 36-45).

8.      What is more, the Committee does not want to put the estates back into the position they were prior to the July 2018 Refinancing.  At that time, the Old-Cash Flow Facility ($65 million) and the Old-First Lien Notes ($345 million) were first-priority, secured indebtedness of the Company "ahead" of unsecured creditors.  The result advocated by the Committee is a superior outcome to the status quo before the refinancing.  The Committee asks the Court to order that the first-lien debt, i.e., the New ABL ($65 million) and First-Lien Notes ($262 million as of the Petition Date), is the only senior debt ahead of unsecured creditors and to subordinate Chatham's 2L New Money Debt, the Second-Lien Term Loan, and the Third Lien Notes.  That outcome **enhances** by at least $83 million the position of unsecured creditors from what it would have been the July 2018 Refinancing never taken place.

### A.    COMPLAINT FAILS TO STATE CLAIMS UPON WHICH RELIEF CAN BE GRANTED

9.      After months of discovery, the material facts surrounding the July 2018 Refinancing are undisputed and do not support any colorable claims.  Tacitly acknowledging this problem, the Committee urges the Court to consider extensive unsupported allegations "upon information and belief" and unabashedly suggests its investigation "has not yet concluded."[8] The United States Supreme Court authorizes the dismissal of lawsuits at the pleading stage when they lack "enough factual matter (taken as true)" to raise the "right to relief above the speculative level" and "state[] a plausible claim for relief."[9]  Courts in the Southern District direct that "[j]udicial experience and common sense will be required in determining the plausibility of a claim."[10]  For nearly 100 years, courts have performed a critical "gatekeeper" function when

---

[8]    Mot. ¶ 1.

[9]    Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (citing Twombly, 550 U.S. at 556).

[10]    Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Bolmen (In re Hydrogen, L.L.C.), 431 B.R. 337, 346 (Bankr. S.D.N.Y. 2010); see also O'Toole v. Karnani (In re Trinsum Grp., Inc.), 460 B.R. 379, 387 (Bankr. S.D.N.Y. 2011) ("Plausibility ... depends on ... the full factual picture presented by the complaint, the

faced with requests for derivative standing to pursue estate claims that debtors have concluded are ineligible for prosecution.[11]  Review of the Committee's challenge reveals several debilitating themes that beg the exercise of the Court's discretion.

10.      *First*, the central tenet of the Committee's challenge, i.e., that the Company and Chatham acted improperly by accepting collateral that placed Chatham's debt it in a senior position vis-à-vis other unsecured creditors, most notably the Pension Benefit Guaranty Corporation (the "**PBGC**"), provides no legal footing for a claim.  Even if such an intent existed, it is well-established that an intent to prefer some creditors over others does not support a claim for fraudulent conveyance or equitable subordination.  Importantly, the Committee's thesis suffers from an incurable schizophrenia.  The Committee pleads that Chatham sought to enrich itself improperly by using the July 2018 Refinancing to prime the PBGC and other unsecured creditors.  Yet, the Committee also asserts that Chatham's ███████████████████████ ███████████████████████████████████████████████████████████ ███████████████—presented the Company with its highest and best options.  In point of fact, the Committee views Chatham's proposals so favorably that it argues the board's failure to

---

particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable").

[11]  See In re Adelphia Commc'ns. Corp., 544 F.3d 420 (2d Cir. 2008) (Sotomayor, J.) ("Although STN Enterprises, Commodore and Housecraft expanded the scope of derivative standing, our precedent did not undermine either the debtor's central role in handling the estate's legal affairs or the court's responsibility to monitor for abuses by the parties .... The debtor-in-possession may not always fulfill its responsibilities, and we have recognized that a debtor-in-possession may unjustifiably fail to bring valid claims or abuse its discretion by not suing .... Yet it is the court's role ... to check any potential for abuse by the parties.").  The gatekeeper function predates In re STN Enters., 779 F.2d 901 (2d Cir. 1985).  See In re Eureka Upholstering Co., 48 F.2d 95, 96 (2d Cir. 1931) (L. Hand, J.) ("If any creditor, petitioning or other, learns facts which lead him to suppose that property has been concealed, he … should, advise the receiver [trustee], and if the receiver [trustee] prove slack, he may apply to the referee [bankruptcy judge] to stir him to action.  The referee [bankruptcy judge] or the [district] judge may then authorize the creditor to proceed, and he will be entitled to his [reward under [§ 64a(1)], but not otherwise.").

accept them constituted a breach of its fiduciary obligations. The duality of these allegations confirms the claims are not colorable.

11.    ***Second***, the Committee makes little effort to state a plausible theory with respect to the First-Lien Notes and the 2L 2018 New Money Debt. Apart from obliquely clumping that debt with the balance of the Second-Lien Term Loan and the Third-Lien Notes in its actual-intent and subordination allegations, none of the Committee's factual assertions, <u>e.g.</u>, equitable subordination and lack of reasonably equivalent value, bear on the First-Lien Notes or the 2L 2018 New Money Debt. The Company used the proceeds of the First-Lien Notes to satisfy antecedent debt, <u>i.e.</u>, the Old-First Lien Notes, that always ranked ahead of McClatchy's other unsecured debt. Both the old and new first-lien notes were guaranteed and collateralized by the Parent and subsidiary companies.

12.    Instead, the Committee focuses on the subsidiaries' incurring obligations in connection with the Second-Lien Term Loan and Third-Lien Notes. But, without Chatham's consent, the Parent and its subsidiaries could not have issued or guaranteed first-lien debt secured by the Principal Property without also affording the Unsecured Debentures the same collateral protection.

13.    ***Third***, the Committee's outlandish allegations of manipulative conduct in connection with CDS transactions and Chatham's trading in the Company's funded debt are legally irrelevant (in addition to being factually inaccurate). Chatham has long argued that conduct associated with trading has no bearing on estate claims (especially equitable subordination) because harm to the Company and creditors cannot be shown. This Court decided the issue in <u>Aeropostale</u>, which is directly on point and which Chatham argued extensively in connection with the Dundon Objection. <u>See</u> <u>In re Aeropostale</u>, 555 B.R. 369, 411

(Bankr. S.D.N.Y. 2016) (insider trading "is not the type of harm that courts are concerned about when determining whether to equitably subordinate a claim" because alleged misconduct did not "result … in injury to the creditors of the bankrupt or confer[ ] an unfair advantaged on the claimant."). The Committee's failure to cite contrary authority ends the analysis.

14.     In any event, there is nothing impermissible about participating in the market for CDS and trading in securities issued by the reference entity. In point of fact, the CDS contracts specifically provide for it. Because the April 2018 Framework Agreement was never consummated, the Committee is left speculating "upon information and belief" that ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮."[12] But, the Complaint's own allegations belie that assertion: the Committee concedes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮.[13] And, the Committee's claim that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮ does not mean the Company (or its creditors) were harmed.[14] To the contrary, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15.     Putting aside the Complaint's structural infirmities which are individually dispositive, the individual Counts in the Complaint fail to state claims upon which relief could be granted.

### 1.     EQUITABLE SUBORDINATION (COUNT 6)

16.     The Committee alleges the existence of wrongful conduct warrants the subordination of Chatham's claims. But, Chatham is not and never has been a non-statutory insider. It owns approximately 5% of the ***voting*** stock and never appointed a designee to the

---

[12]   Compl. ¶ 67 & n. 8.

[13]   Compl. ¶¶ 69, 71.

[14]   Compl. ¶ 67.

Board.  The Complaint does not allege otherwise and instead focuses merely on access to

management and information.  The Complaint also fails to set forth allegations of conduct that

rise to the requisite level of egregiousness:

- *First,* other than possibly supporting a preference (if made within 90 days of the Petition Date), there is nothing inappropriate about granting collateral in a way that elevates certain creditors above others in the capital structure—especially when it followed ████████████████, included a new-money investment, and satisfied antecedent debt.

- *Second*, the there is no evidence Chatham knew the Company would not be able to satisfy the debt incurred in the July 2018 Refinancing.  Its ██████████████ and continued investment in the Company after the fact, which the Committee does not deny, undermine the allegation.

- *Third*, the subordination allegations rest on the misconception that Chatham cannot invest in the company's funded debt while at the same time selling CDS protection to third parties.  That is entirely permissible.  The weakness of the argument has reduced the Committee to making reckless "upon-information-and-belief" allegations about ███████████████████ which are legally irrelevant (and factually inaccurate).  The same holds for the ██████████████████████████████████████████ ████████████████████████████████████████

- *Finally*, Chatham has claims against various subsidiaries that guaranteed its debt.  The Committee has failed to explain how each claim should be subordinated based on alleged conduct at each estate.  For example, the Parent is the only relevant Debtor with respect to April 2018 Framework Agreement.  Even if subordination of Chatham's claim in the Parent-Debtor's case is proper—which it is not—conduct in the Parent's chapter 11 case is not a basis to subordinate Chatham's claims in the chapter 11 cases of the subsidiary Debtors absent substantive consolidation.

## 2.    FRAUDULENT CONVEYANCE (COUNT 1, COUNT 2)

17.    Without distinguishing between the First-Lien Notes, the 2L New Money Debt,

the Second-Lien Term Loans, and Third-Lien Notes, or the respective obligors, the Committee

alleges both actual and constructive fraudulent transfer in connection with the Company's

incurrence of those obligations.  Neither theory stands.

18.    The actual intent claims contain no facts specific to either the First-Lien Notes or

the 2L 2018 New Money Debt.  Allegations about an impermissible intent to prime the PBGC

have no application to the First-Lien Notes, which always were in a secured, first position.

Chatham initially acquired its First-Lien Notes from J.P. Morgan Securities, LLC, who served as

their "Initial Purchaser." The Committee's constructive fraudulent transfer claims also focus on

the Second-Lien Term Loan and the Third-Lien Notes to the exclusion of the First Lien Notes—

complaining specifically about the impact of the July 2018 Refinancing on the Debtors'

subsidiaries. (The First-Lien Notes refinanced the Old First-Lien Notes, which already were

secured obligations of the Company's subsidiaries). The July 2018 Refinancing provided a

significant benefit to the subsidiaries, including: $60 million of new money from Chatham;

access to a new revolving facility; both the satisfaction of antecedent debt and an extension of

maturity dates—each of which independently constitutes reasonably equivalent value as a matter

of law; new financing without any incremental interest burden; Chatham's agreement to accept

junior liens with respect to Principal Property securing the Second-Lien Term Loan and Third-

Lien Notes; and operational runway to focus on future growth.

### 3. BREACH OF FIDUCIARY DUTY (COUNT 4, COUNT 5)

19. The Complaint's allegations of "control" over the Company are contradicted by

the Complaint's various examples of arm's-length negotiations, ███████████████

████████████████████████████████████████████████████████

██████████████████. The Standing Motion is a loud criticism of the Debtors and

Chatham for trying to afford the Company (through publicly-disclosed transactions) additional

runway to complete its digital transformation. That criticism amounts to no more than a

difference of judgment, or at worst a mistake by the board in exercising its duty of care (for

which there is no liability and, by extension, no aiding and abetting claim).

20. The Committee may have preferred that the Company ████████████████

████████████████████, or even that the Company assume the risk in 2018 of waiting

until the very last minute, i.e., the eve of the Old Cash-Flow Facility's 2019 maturity, to refinance. But that prerogative did not belong to the Company's creditors in 2018. And, the Committee's disagreement with the board's judgment now—from the perspective of a subset of those creditors—does not create a colorable cause of action.

### B.    COMMITTEE HAS NOT DEMONSTRATED BENEFIT TO ESTATES

21.    The Committee contends benefit to the estate can be shown because it may recover "in excess of $120 million in distributable value" as a result of its claims.[15] Nothing in the Standing Motion or the Complaint suggests those amounts are in prospect. The Committee does not focus on the First-Lien Notes or the 2L 2018 New Money Debt—which together total approximately $330 million in face amount. There is an appreciable chance the Committee's constituents will not receive a recovery even if it prevails with respect to its challenges to the Second-Lien Term Loan and Third-Lien Notes. Millions in legal fees will be spent prosecuting unsustainable claims that will not benefit the estates. The litigation also promises to delay the cases. The Committee surely will raise these issues in connection with any attempt by Chatham or other secured lenders to credit-bid their debt at the auction. If unchecked, the litigation will needlessly deplete estate, judicial, and private resources. See, e.g., In re Sabine Oil & Gas Corp., 547 B.R. 503 (Bankr. S.D.N.Y.), aff'd, 562 B.R. 211 (S.D.N.Y. 2016) (no estate benefit where any recovery by committee would be offset by lenders' adequate protection claim, when cost of pursuing claims was estimated to be between $10 and $15 million dollars; and when consideration of cost and benefits along with litigation risk compelled conclusion pursuing claim would not be in estates' best interests).

---

[15]    Mot. ¶ 98.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    TERMINATION OF OLD CASH FLOW FACILITY



22.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[16]▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮.[17] In September 2017, the Board of Directors of The McClatchy

Company (the "**Board**") formed the "**Refinancing Subcommittee**" to consider refinancing

alternatives.[18]

23.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[19] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[16]    See Compl. ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[17]    Compl. ¶ 45.

[18]    Compl. ¶¶ 47, 72.

[19]    Compl. ¶ 46 & n. 4.

[20]    Debtors' Second Obj. to Committee Rule 2004 Mot. [ECF No. 142] ¶ 6 ("[T]he timing of the refinancing was
driven by the Debtors' need to refinance their cash-flow revolver facility that was due in 2019, and which the
Debtors learned in November 2017 would not be extended.  In order to address short term liquidity needs, the
Debtors required an ABL Facility to replace the cash flow revolver, but, given the covenants in the then-
existing first lien notes due in 2022 and the 2027 and 2029 Unsecured Debentures, obtaining such facility would
require a refinancing and/or modification of the covenants under the 2022 notes indenture and the 2027 and
2029 Unsecured Debentures"); First Day Decl. ¶ 47 ("McClatchy entered into an arrangement pursuant to
which loans secured from Chatham helped McClatchy redeem its first lien debt due in 2022, pay refinancing
costs and issue $310 million of first lien 9.0% bonds due in 2026.  This again extended the maturities of
McClatchy's first lien debt"); Tecce Decl. Ex. 1 (New ABL Credit Agreement at 31 ("'Maturity Date' means
July 16, 2023," which is three years before the maturity date of the new First-Lien Notes); at 37 ("Permitted
Indebtedness" includes "(b) Indebtedness as of the Closing Date … and any Refinancing Indebtedness in
respect of such Indebtedness."); at 48 ("Refinancing Indebtedness" may not "(b) … result in a shortening of the
final stated maturity or the average weighted maturity … of the Indebtedness so refinanced…."); at 38
(permitting certain "(f) unsecured Indebtedness … so long as … such unsecured Indebtedness does not have a

████████████████████████████████████████████████████████████████████

████████████████████████████████████ [21]    The Old First-Lien Notes would need to

be refinanced in connection with the New ABL.

### B.    COMPANY COVENANTED IN UNSECURED DEBENTURES TO PLEDGE COLLATERAL ON AN EQUAL-AND-RATABLE BASIS

24.    Refinancing the Old-First Lien Notes with new debt guaranteed and collateralized

by the Parent's subsidiaries did not require a change to the structure of the Old First-Lien Notes.

The Parent's subsidiaries guaranteed the repayment of the Old First-Lien Notes and provided

collateral to secure those obligations.[22]  Those subsidiaries would provide guarantees and

security for the new notes.

25.    The Unsecured Debentures contained a covenant prohibiting McClatchy from

pledging Principal Property[23] without providing the Unsecured Debentures with equal-and-

ratable collateral coverage.  Specifically, section 1007 of the Unsecured Debentures states

> [t]he Company will not, nor will it permit any Subsidiary to issue, assume or guarantee any Debt secured by a Mortgage upon any Principal Property of the Company or any Restricted Subsidiary or on any shares of stock or indebtedness of any Restricted Subsidiary (whether such Principal Property, shares of stock or indebtedness is now owned or hereinafter acquired) without in any such case making or causing to be made effective provision (and the Company covenants that that in any such case it shall make or cause to be made effective provision) whereby the Securities of each Series then Outstanding, other than series which by their terms were not entitled to the benefit of this

---

stated maturity date (or otherwise provide for the maturity thereof on a non-accelerated basis) date prior to the date that is 12 months after the Maturity Date.")).

[21]    Compl. ¶¶ 39, 84.

[22]    Compl. ¶¶ 39, 82, 120 (referring only to Unsecured Debentures as Parent-only debt; noting collateral extended with respect to First-Lien Notes differed only with respect to "Principal Property" and not with respect to guarantors or obligors); Tecce Decl. Ex. 2 (Old First-Lien Notes Indenture among The McClatchy Company and Subsidiary Guarantors).

[23]    "**Principal Property**" means all land, buildings, machinery and equipment, and leasehold interests and improvements in respect of the foregoing, which would be reflected on a consolidated balance sheet of the Company and its Subsidiaries prepared in accordance with generally accepted accounting principles, excluding all such tangible property located outside the United States of America and excluding any such property which, in the opinion of the Board of Directors set forth in a Board Resolution, is not material to the Company and its Subsidiaries consolidated."  See Tecce Dec. Ex. 3 (1997 Indenture p. 6).

Section, will be secured equally and ratably with, or prior to, such Debt or guarantee; it being understood that in such event, the Company may also so secure any other Debt of the Company or such Subsidiary entitled thereto, subject to any applicable priority of payment.[24]

26.    The Old First-Lien Notes were not secured by liens on Principal Property.  But, to the extent any new financing was secured by Principal Property, whether it be the new ABL financing facility or the First-Lien Notes, holders of Unsecured Debentures like Chatham were entitled to the same collateral pledge.[25]

**C.    CHATHAM'S** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27.    On three separate occasions during the refinancing negotiations—▮▮▮▮▮▮



[26]

28.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮.[27]▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[28]▮▮▮▮▮▮▮▮▮▮▮

---

[24]    Tecce Decl. Ex. 3 (1997 Indenture p. 57 (§ 1007)).  The 1997 Indenture was supplemented pursuant to the Fourth Supplemental Indenture among The McClatchy Company, JPMorgan (as Trustee), and The Bank of New York Trust Company, N.A. (as Series Trustee) dated June 27, 2006.

[25]    Compl. ¶¶ 39, 82, 120 (noting collateral extended with respect to First-Lien Notes differed only with respect to "Principal Property" and not with respect to guarantors or obligors).

[26]    Compl. ¶ 51.

[27]    Compl. ¶ 46 & n. 4 (claiming BofA announced it would not extend maturity date "[a]pproximately two months later" than September 1, 2018).

[28]    Compl. ¶ 53.



.[29]  The Committee considers

**D.   CHATHAM'S**

29.

"[31]  That proposal was ***not***

accepted.  Instead, the parties proceeded to the April 2018 Framework Agreement on April 26,

2018, which was reflected in a term sheet filed with the Securities and Exchange Commission

("**SEC**").[32]  The April 2018 Framework Agreement contemplated Chatham would loan

approximately $418 million to a new subsidiary of the Parent and that those loans would be used

---

[29]   Compl. ¶ 56                               ¶ 57
                                                              ¶ 151
(Board breached its fiduciary duties by being "beholden to, and [acting] in the interest of, the shareholders of
the Company by acting for the purpose of                                          .

[30]   Compl. ¶ 63

[31]   Compl. ¶ 64.

[32]   Compl. ¶ 65; Tecce Decl. Ex. 4 (Form 8-K dated April 26, 2018).

to satisfy the Parent's bond and term-loan indebtedness.[33]  Critically, that agreement was never

consummated.[34]

30.     While the Committee alleges the April 2018 Framework Agreement



The

Committee claims "upon information and belief" that the Company

. Regardless,

[34]

---

[33]   Id. at Item 1.01 ("Chatham will make loans (the 'Loans') to a wholly-owned subsidiary of the Company that
       will be the same subsidiary that will incur the New Lien First Debt (as defined below) in connection with the
       Refinancing … comprised of a $250.0 million Tranche A Term Loan Facility and an approximately $168.5
       million Tranche B Term Loan Facility …. The Loans plus certain premiums set forth in the Framework
       Agreement to repurchase approximately $82.1 million aggregate principal amount of the Company's 7.15%
       Debentures due November 1, 2027 … and approximately $274.0 million aggregate principal amount of the
       6.875% Debentures due March 15, 2029 … in each case, held by Chatham, with the remaining proceeds used
       for the refinancing of the Company's 9.00% Senior Secured Notes due 2022").

[34]   Compl. ¶ 68.

[35]   Compl. ¶ 69.

[36]   Compl. ¶ 71.

[37]   Compl. ¶ 73.



E.    **JULY 2018 REFINANCING & CHATHAM'S**

31.

"[38]

, but ultimately decided to consummate the "**July 2018 Refinancing**" on

July 16, 2018.  The July 2018 Refinancing was announced to the market on June 27, 2018

through a filing with the SEC.[39]  Under the July 2018 Refinancing:

- notwithstanding covenants in the Unsecured Debentures restricting the Company's ability to pledge Principal Property as first-lien security without providing an equal-and-ratable pledge, Chatham agreed to subordinated liens on Principal Property granted in connection with second-lien and third-lien debt;

- Chatham contributed $60 million of new money and received $75 million in 2L 2018 New Money Debt (maturing 2030);

- the Company refinanced the existing ABL facility (maturity 2019) with the New ABL (maturing 2023);

- the Company satisfied the $345 million Old First Lien Notes (maturing 2022) and issued the new First Lien Notes (maturing 2026) totaling $310 million, which were secured by liens on the same property pledged in connection with the Old First Lien Notes **and** a lien on the Parent and subsidiaries' Principal Property;

- J.P. Morgan Securities, LLC and Credit Suisse Securities (USA) LLC were the "Initial Purchasers" of the First-Lien Notes, and Chatham purchased its $100 million of First-Lien Notes from J.P. Morgan Securities, LLC;[40]

- the Company exchanged $82 million of Unsecured Debentures (due 2027) into Tranche A Second Lien Term Loans due 2030 (bringing the total Tranche A Second Lien Term Loan (with the 2L 2018 New Money Debt) to $157.1 million as of the Petition Date);

- the Company did not experience any incremental interest burden.  The Old First-Lien Notes and First Lien Notes both have a 9.00% rate.  The Unsecured Debentures due

---

[38]  Compl. ¶ 75.

[39]  See Tecce Decl. Ex. 5 (Form 8-K) (Item 9.01).

[40]  Compl. ¶ 82.C. (alleging Chatham purchased $100 million First-Lien Notes); Tecce Decl. Ex. 6 (Purchase Agreement for First-Lien Notes, defining J.P. Morgan Securities, LLC and Credit Suisse Securities (USA) LLC as the "Initial Purchaser" on Schedule 1-1).

2029 and the Third-Lien Notes both have a 6.875% rate.  The Tranche A Second Lien Term Loan ($82 million) have the same rate as the Unsecured Debentures due 2027 (7.150%).  And, while the Second-Lien Term Loan has a rate on a ***weighted*** basis that is higher than that of the Unsecured Debentures due 2027, that is because the higher interest rate on the 2L 2018 New Money Debt when blended with the 7.150% on the Tranche A Second Lien Term Loan results in the 7.795% rate; and

- the Company exchanged $193.5 million of Unsecured Debentures (due 2029) into Tranche B Second Lien Terms Loans due 2030—keeping $75 million of Unsecured Debentures due 2029 outstanding (the "**Outstanding Debentures**").  (In December 2018, the Company converted the $193.5 million of Second Lien Term Loans due 2030 into $193.5 million in Third Lien Notes due 2031).[41]

32.    With respect to the Outstanding Debentures, the Company converted them into Third Lien Notes due 2031 in March 2019.  But before that happened, on "



"[42]

[43] Thereafter the Company converted the Tranche B Second Lien Term Loan ($193.5 million) into Third Lien Notes in December 2018 and converted the Outstanding Debentures ($75 million) into Third Lien Notes.[44]

---

[41]    Compl. ¶¶ 82-83, 93-97, 119.C., 120.B.  <u>See also</u> First Day Decl. ¶¶ 17-29.

[42]    Compl. ¶ 93.

[43]    Compl. ¶¶ 93-94.  <u>See also</u> First Day Decl. ¶¶ 17-29.

[44]    Compl. ¶¶ 94-95.  <u>See also</u> First Day Decl. ¶¶ 17-29.

### F.    BANKRUPTCY CASES

33.    In March 2020, the Committee filed its Rule 2004 Motion[45] which originally

requested relief with respect to both Chatham and the Debtors.  While the Debtors agreed to

Rule-2004 discovery, the Committee adjourned its request with respect to Chatham and engaged

in voluntary discovery through the mediation process.  Ultimately, Chatham reviewed its files

over an 11-month period and produced nearly 14,000 pages from 2,800 custodial documents,

including tens of thousands of emails and chats.  Chatham's production accompanied the

Debtors' Rule-2004 production consisting of more than 28,000 custodial documents and over

56,000 pages spanning three years (2017 to 2020).  The Debtors currently are conducting a sale

of their businesses under section 363 of the Bankruptcy Code.  The bid deadline is July 1, 2020.

## III.    OBJECTION

### A.    COMMITTEE HAS NOT CARRIED ITS BURDEN

34.    To secure derivative standing, the Committee first must "present… colorable

claims for relief that on appropriate proof would support a recovery, and second …

demonstrate[] that the debtor unjustifiably failed to bring suit."  In re Sabine Oil And Gas Corp.,

547 B.R. 503, 515 (Bankr. S.D.N.Y. 2016) (citing In re STN Enterprises, 779 F.2d 901, 905 (2d

Cir. 1985)) (internal quotation marks omitted).  The colorability inquiry "is similar to that

undertaken by the court on a motion to dismiss …. [T]he movant must state a claim for relief that

is plausible on its face."  Id.  (Notably, on a motion to dismiss, the court may consider "legally

required public disclosure documents filed with the SEC."  ATSI Commc'ns, Inc. v. Shaar Fund,

Ltd., 493 F.3d 87, 98 (2d Cir. 2007)).  "[T]he court must also examine, on affidavit and other

---

[45]    See Committee's Ex Parte Application For Entry Of An Order Pursuant To Federal Rule of Bankruptcy Procedure 2004 And 9016 Authorizing Examination Of Debtors, Chatham Asset Management, LLC, And Leon Cooperman [ECF No. 132] ("**Committee Rule 2004 Motion**").

submission, by evidentiary hearing or otherwise, whether an action asserting such claim(s) is likely to benefit the reorganization estate ….," weigh[ing] the "probabilities of legal success and financial recovery…," as well as the anticipated costs of litigation, as part of a cost/benefit analysis.  In re STN Enters., 779 F.2d at 905.  See also  In re Racing Servs. Inc., 540 F.3d 892, 900 n.8 (8th Cir. 2008) ("A creditor's request for derivative standing must be supported by competent evidence, for example, in the form of affidavits or through oral testimony at an evidentiary hearing.").

35.    Absent substantive consolidation, the Committee must satisfy this burden with respect to each Debtor entity.  While the Committee cannot satisfy it with respect to any entity, it is worth noting that a number of the Debtors are limited liability companies organized under Delaware law.  The recent Dura Automotive decision from the Delaware Bankruptcy Court makes clear statutory creditors' committees cannot obtain derivative standing when the debtor in possession is a Delaware limited liability company.[46]  While the Committee makes no attempt to articulate the specific Debtor on whose behalf it seeks derivative standing, the Standing Motion should be denied as a matter of law to the extent it seeks derivative standing on behalf of any Debtor that is a limited liability company.

### B.    EXTRAORDINARY REMEDY OF SUBORDINATION IS UNWARRANTED

36.    The remedy of equitable subordination requires the Committee to plead that Chatham "a) engaged in some type of inequitable conduct … b) [that] caused injury to the creditors or conferred an unfair advantage on [Chatham] … c) [e]quitable subordination of the claim is consistent with bankruptcy law."  80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re

---

[46]    See In re Dura Auto. Sys., No. 19-12378 (Bankr. D. Del. June 9, 2020) (citing CML V, LLC v. Bax, 28 A.3d 1037, 1041 (Del. 2011), as corrected (Sept. 6, 2011) and finding committee is neither a member nor assignee of limited liability company).

80 Nassau Assocs.), 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (quoting In re Mobile Steel Co.,

563 F.2d 692, 700 (5th Cir. 1977)).

### 1.    CHATHAM IS NOT AN INSIDER

37.    To find Chatham committed inequitable conduct sufficient to satisfy the first

prong of the test, the Court initially must determine whether the defendant is an insider of the

debtor.  See Gowan v. Wachovia Bank, N.A. (In re Dreier LLP), 453 B.R. 499, 516 (Bankr.

S.D.N.Y. 2011).  If the defendant is an insider, then the first prong may be satisfied by a finding

of "(1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, or (3) control or use

of the debtor as an alter ego for the benefit of the claimant."  80 Nassau Assocs., 169 B.R. at 838.

Where the defendant is not an insider, however, the plaintiff "must plead and prove that the non-

insider engaged in gross and egregious conduct tantamount to fraud, misrepresentation,

overreaching or spoliation."  Gowan, 453 B.R. at 516.

38.    The Committee argues only that Chatham is a non-statutory insider.[47]  To that end,

Chatham only can be considered an "insider" in the event it "has dominated or controlled the

debtor."  In re Glob. Serv. Grp., 316 B.R. 451, 462 (Bankr. S.D.N.Y. 1994).  Exerting "dominion

and control" means that the lender must "exercise sufficient authority over the corporate debtor so

as to unqualifiably dictate corporate policy and the disposition of assets."  Badger Freightways,

Inc. v. Cont'l Ill. Nat'l Bank & Trust Co. (In re Badger Freightways, Inc.), 106 B.R. 971, 982

(Bankr. N.D. Ill. 1989).  "[A]n 'insider' must, in every case, exercise dominion and control

sufficient to create a 'merger of identity' to the point where the 'creditor has become, in effect, the

alter ego of the debtor.'"  Lehman Bros. Holdings, Inc. v. JPMorgan Chase Bank, N.A. (In re

Lehman Bros. Holdings Inc.), 541 B.R. 551, 582 (S.D.N.Y. 2015); Matter of Teltronics Servs.,

---

[47]    Compl. ¶ 1.

20

Inc., 29 B.R. 139, 171 (Bankr. E.D.N.Y. 1983) (Parties will be deemed insiders where their "ability

to command the [D]ebtor[]s['] obedience to [their] policy directives is so overwhelming that there

has been, to some extent, a merger of identity'").

39.     The proposed Complaint does not even come close to meeting this standard.  The

Committee alleges only that Chatham, by virtue of its debt and equity holdings in the Company,

had superior influence and access to information.[48]  By its own terms, the Complaint

conclusively establishes Chatham **lacked** the "ability to command the Debtors' obedience to its

policy directives." ████████████████████████████████████████████

█████████████████████████████████████████████████████[49]  The

Committee imprecisely describes Chatham as owning 19-25% of the Company's stock, but in

point of fact Chatham owns approximately 5% of the ***voting*** stock.[50]  Chatham never appointed a

designee to sit on the Board of Directors—the Committee does not allege otherwise.

40.     As a matter of law, these allegations fall far short of the "domination" and

"merger of identity" necessary to allege that Chatham was an insider.  See, e.g., In re

Aeropostale, 555 B.R. at 410-11 (Sycamore was not insider even though it extended $150

million in loans, held 8% of equity; and owned sourcing company with material contracts with

debtor); In re Lehman Bros., Inc., 541 B.R. at 576 (JPMorgan Chase, Lehman Brother's

principal clearing bank and one of its largest creditors, which cleared nearly $100 billion of

---

[48]  Compl. ¶¶ 162-163.

[49]  Compl. ¶¶ 51-56; 71-74.

[50]  See *Debtors' Second Amended Response to Committee Rule 2004 Mot.* [ECF No. 142] ¶ 13 ("As set forth in
the Company's public securities filings, Class A stock is entitled to only 1/10 of a vote per share and to elect as
a class 25% of the Board of Directors, whereas Class B is entitled to one vote per share and to elect as a class
75% of the Board of Directors.  The Committee asserts that Chatham holds between 19% and 23% of the
Company's Class A stock …. However, owning 19% to 23% of the Class A common is not the same as owning
19% to 23% of all of the common stock and effectively equates to approximately 5% of the voting control of
the common stock.").

trades each day, was not insider); <u>In re Badger Freightways, Inc.</u>, 106 B.R. at, 982 (no insider

status even though management personnel that were hired at bank's recommendation later

negotiated agreement to convert its unsecured debt to secured debt).

### 2. ALLEGED CONDUCT DOES NOT RISE TO LEVEL OF EGREGIOUSNESS REQUIRED

41.    The failure to establish "insider" status precludes the Committee from asserting a

colorable subordination claim.  A non-insider "can act strategically to protect its interest to the

potential detriment of similarly situated claimants," and may engage in "sharp dealing."  <u>In re

Badger Freightways, Inc.</u>, 106 B.R. at 976.  <u>See also</u> <u>Gowan</u>, 453 B.R. at 516 ("Although

equitable subordination can apply to an ordinary creditor, the circumstances are few and far

between.").

42.    None of the conduct alleged by the Committee rises to a level of wrongfulness

that warrants subordination.  No transactions were concealed.  The July 2018 Refinancing was

disclosed in a filing with the SEC.[51]  Chatham purchased its $100 million of First-Lien Notes

from J.P. Morgan Securities, LLC, the "Initial Purchaser."[52]  The other approximately $200

million of First-Lien Notes were purchased by third parties from the Initial Purchsaers.  The

Complaint acknowledges that in addition to the (abandoned) April 2018 Framework Agreement,

Chatham openly disclosed its CDS positions in filings with the SEC.[53]

43.    Chatham's participation in the CDS market is entirely appropriate.  The market

consists of sophisticated parties.  Those buyers of CDS protection from Chatham agree, in the

CDS contract itself, Chatham can extend further credit to McClatchy—even if that renders less

---

[51]    Tecce Decl. Ex. 5.

[52]    Tecce Decl. Ex. 6 (Purchase Agreement); Compl. ¶ 82.C.

[53]    Compl. ¶¶ 79, 96.

valuable the buyer's bet that McClatchy will suffer a credit event.[54]  To be clear, despite the

Committee's attempt to blur this line,  the Debtor does not participate in, nor can it control, the

CDS market at all, nor is it affected by its trades – it is simply a reference entity for insurance

contracts between institutional investors.  And, no case has found "orphan CDS" transactions are

impermissible.[55]  There is nothing unusual about an investor like Chatham, who is a long-term

investor in McClatchy, agreeing to extend additional credit to secure the company's financial

footing.  Moreover, the Committee's conclusory allegation that ███████████████████

█████████████████████████████████████████[56] is undercut by the

Complaint's express acknowledgment █████████████████████████████████

████████████████████████████████████████████.[57]  The

Committee also argues the April 2018 Framework Agreement—which never went forward—

███████████████████████████[58] ███████████████████████████████

---

[54]  The 2014 International Securities Dealers Association's Credit Derivatives Definitions (the "**2014 Definitions**")
govern CDS transactions.  See, e.g., Solus Alternative Asset Mgmt. LP v. GSO Capital Partners L.P., No. 18
CV 232-LTS-BCM, 2018 WL 620490 (S.D.N.Y. Jan. 29, 2018), 2018 WL 620490, at *2 ("CDS contracts are
governed by standard form documentation published by the International Swaps and Derivatives Association
('ISDA');" noting CDS contracts are "actively traded in an over the counter CDS market …. [and, the
community of] CDS market participants, consisting of CDS traders and dealers, is a relatively insular and
sophisticated subset of the public"); 2014 Definitions § 11.1(b)(3) ("On the Trade Date, Buyer and Seller shall
each be deemed to agree with the other that, so long as either party has or may have any obligation under the
Credit Derivative Transaction … each party … may deal in the Reference Obligation … and may, where
permitted …, make loans or otherwise extend credit to, and generally engage in any kind of commercial or
investment banking or other business with, the Reference Entity …, and may act (but is not obliged to act) with
respect to such business in the same manner as each of them would if such Credit Derivative Transaction did
not exist, regardless of whether any such action might have an adverse effect on … the position of the other
party to such Credit Derivative Transaction or otherwise.").

[55]  See, e.g., Gina-Gail S. Fletcher, Engineered Credit Default Swaps:  Innovative or Manipulative, 94 N.Y.U.
L. Rev.  1073, 1125-26 (2019) ("Providing a loan to a distressed company does not fit the standard definition of
fraud or misrepresentation in anti-manipulation law …. [Likewise, although] orphan CDS transactions may
seem unfair, they are contractually permitted and, legally, do not constitute fraud or misrepresentation.  Thus, a
primary avenue for proving market manipulation is not available in holding CDS counterparties liable for
engineered transactions.").

[56]  Compl. ¶ 67.

[57]  Compare Compl. ¶ 67 with Compl. ¶ 69.

[58]  Compl. ¶ 67.



██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ ᵗ"59

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████. If anything, ████████████████████████████ increased financing

options in a way that may have lowered the cost of financing to the Company.

44.     While the Committee submits Chatham's trading in the Company's funded debt

provides a basis to subordinate its claims,[60] the Complaint's own allegations underscore the

fallacy of the Committee's position.  There was no concealment.  The Complaint alleges the

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.[61]

45.     The Court's decision in <u>Aeropostale</u> is directly on point and provides instruction.

There, the equity sponsor (Sycamore) had various relationships with debtor.  It "had invested $54

million in equity in the Company and loaned another $150 million …. [and] had a majority

ownership stake in an entity with significant monetary exposure to Aeropostale through the

Sourcing Agreement."  555 B.R. at 408.  The <u>Aeropostale</u> debtors tried to subordinate the

sponsor's debt claims, arguing they "traded stock while in possession of material non-public

---

[59]   Compl. ¶ 42 & n.3.

[60]   Compl. ¶ 50.  ███████████████████████████████████████████████
██████████████████████████████████████████████████████████
█████████████████████████████████████████

[61]   Compare. ¶¶ 50 & n. 5, 162C, with ¶¶ 62 ████████████ and 69 ████████████.

information." <u>Id.</u> at 410.  According to the <u>Aeropostale</u> debtors, the trading harmed them

because "(1) the sell-off sent a negative message to the market; and (2) trading the shares was

part of an overall scheme by the Sycamore Parties to push the Debtors into bankruptcy." <u>Id.</u> at

411.  Additionally, the <u>Aeropostale</u> debtors claimed "an insider's unauthorized use of

information to trade sends a signal to the world that something important (albeit unknown to the

general public) is happening at the company, harming the company by artificially manipulating

its financial condition." <u>Id.</u>  The trades allegedly "undermined the integrity of the public's

regard of the debtors." <u>Id.</u>  The Court rejected all of these arguments and declined to subordinate

the equity sponsor's claims.  It noted "this is not the type of harm that courts are concerned about

when determining whether to equitably subordinate a claim." <u>Id.</u> at 410 ("[T]he Debtors' theory

around the stock trade fails because it does not satisfy the requirements for equitable

subordination …. [T]he Debtors have failed to demonstrate harm to the creditors or the Debtors,

or that the Sycamore Parties obtained an unfair advantage").

       46.    The Committee similarly contends "upon information and belief"



.[62]  It is unclear from this

vague allegation what the Committee is even claiming.  Instead it appears designed to cast

aspersions.  As has already been explained to the Committee,

. Nonetheless, as a legal matter, the Committee's conclusory allegation also fails to

state a claim for equitable subordination.  <u>See</u>, <u>e.g.</u>, <u>Gowan</u>, 453 B.R. at 507 ("[P]laintiff must

plead sufficient factual content to allow the court to draw the reasonable inference that the

---

[62]   Compl. ¶ 165.

defendant is liable for the misconduct alleged") (internal quotation marks omitted); Williams v. Calderoni, 11 Civ. 3020, 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012) ("While a plaintiff is entitled to plead on information and belief," in order to survive dismissal, it still must point to "'information' that will render [its] statements .... more than a speculative claim.").

47.     Ultimately, none of this conduct is wrongful as a matter of law.  C.f., e.g., 80 Nassau Assocs., 169 B.R. at 838, 841 (bank's inducing debtor to pay real estate taxes on property securing bank's debt by promising to engage in "meaningful negotiations" to restructure were insufficient absent allegation that when promise was made bank knew it was false); In re Badger Freightways, Inc., 106 B.R. at 979 (allegations that management personnel hired at bank's recommendation agreed to convert bank's unsecured debt into secured debt did "not show that [bank] owed a duty to IRS or other creditors and was not free to enter a deal to secure the [debtor] indebtedness"); Matter of Teltronics Servs., Inc., 29 B.R. 139, 173 (creditor induced debtor to discourage overtures of potential investors, failed to arrange for loan, planned detailed default scenario; no subordination when "the court [wa]s convinced that [the creditor's] actions were generally motivated by sound business judgment rather than by the illicit takeover scheme depicted by the trustee.").

48.     Finally, the Committee has failed to explain how each claim should be subordinated based on alleged misconduct at each estate.  Even if subordination of Chatham's claim in the Parent-Debtor's case is proper—which it is not—conduct in the Parent's chapter 11 case is not a basis to subordinate Chatham's claims in the chapter 11 cases of the subsidiary Debtors absent substantive consolidation.

### C.     COMMITTEE HAS NOT PLED AN ACTUAL INTENT CLAIM

49.     "A claim seeking to avoid an intentional fraudulent conveyance must comply with the pleading requirements of Rule 9(b)."  In re Old CarCo LLC, 435 B.R. 169, 191 (Bankr.

S.D.N.Y. 2010). "Fraud" with respect to the July 2018 Refinancing has not even been alleged. The Complaint makes clear the refinancing was disclosed publicly, was a refinancing of existing debt, ███████████████████████████████████████████████████████████

████████████) participated with respect to the First-Lien Notes. See, e.g., 11 U.S.C. § 548(c).

50.    Instead, the Committee complains the Company acted with an intent to elevate the Unsecured Debentures over the PBGC's unsecured, contingent claims. An intent to prefer some creditors over others does not make out a claim for actual fraudulent conveyance. See In re Sharp Int'l, 403 F.3d 43, 54 (2d Cir. 2003) ("The decisive principle in this case is that a mere preference between creditors does not constitute bad faith: [E]ven the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors…"); In re Lehman Bros. Holdings. v. JPMorgan Chase Bank N.A., 541 B.R. 551, 575 (S.D.N.Y. 2015) (dismissing actual intent claim: "something more than just an intent to prefer one creditor over another" is necessary to satisfy intent element).

51.    With respect to the First-Lien Notes, the Old First Lien Notes they satisfied already were secured on a senior basis. With respect to the Second-Lien Term Loan and the Third Lien Notes, there is no allegation the Debtors' intended to "hinder" and "delay" the PBGC, as those terms are applied. See, e.g., In re Rubin Bros. Footwear, Inc., 119 B.R. 416, 423–24 (S.D.N.Y. 1990) ("Mere intent to prefer one creditor over another, although incidentally hindering or delaying creditors, will not establish a fraudulent transfer under section 548(a)(1)") (gathering cases). Committee's authorities do not dictate a contrary result.[63]

---

[63]    The Committee's cases demonstrate that a heightened form of actual intent must be alleged to bring actual fraudulent transfer claims. See Mot. ¶ 63. For example, in Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.), 376 B.R. 390 (Bankr. S.D.N.Y. 2007), the court allowed claims of actual fraudulent transfer where (i) the debtor's fund manager submitted an affidavit confirming he made transfers "with intent to delay" creditors, (ii) at the time of the transfers, the debtor "had no cash, bills could not be paid" and (iii) at the time "a multitude of lawsuits" against the debtor were "proceeding and rapidly resulting in default judgments." Id. at 404. In Tronox, Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.), 429 B.R. 73

52.     The PBGC, which far-and-away is the largest unsecured creditor and the primary

beneficiary of the litigation, arguably ratified the July 2018 Financing.  ██████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████.  C.f. Davis. v. Carroll, 937 F. Supp.

2d 390, 426 (S.D.N.Y. 2013) ("Ratification is the express or implied adoption, i.e., recognition

and approval, of the unauthorized acts of another.") (citation omitted); Orix Credit Alliance v.

Phillups–Mahnen, Inc., No. 89 Civ. 8376, 1993 WL 183766, at *4 (S.D.N.Y. May 26, 1993)

("[R]atification occurs when a principal, having knowledge of the material facts in a transaction,

evidences an intention to affirm or adopt the transaction of his agent through his acts or words.");

HSBC Bank USA, Nat. Ass'n v. Adelphia Communications Corp., No. 07 Civ. 553, 2009 WL

385474, at *6 (W.D.N.Y. Feb. 12, 2009), aff'd sub nom, In re Adelphia Recovery Trust, 634 F.3d

678 (2d Cir. 2011) ("The doctrine of ratification applies to transactions sought to be avoided as

fraudulent transfers.").

**D.     COMMITTEE CANNOT STATE A CLAIM FOR CONSTRUCTIVE FRAUDULENT TRANSFER AS A MATTER OF LAW**

53.     The Committee argues that the Company received "little to no value" in

connection with the July 2018 Refinancing.  However, to avoid a constructive fraudulent transfer

pursuant to section 548(a)(1)(B) of the Bankruptcy Code or applicable state law[64] the trustee

---

(Bankr. S.D.N.Y. 2010) the court found the complaint had sufficiently alleged actual fraudulent transfer claims under Oklahoma law where (i) the defendants transferred substantially all of their assets to a newly formed business; (ii) the assets were described "2005 Assignment Agreements" that were **backdated** to December 31, 2002; and (iii) as the Committee's Standing Motion notes, the Court found "**a knowing intent** on the part of the defendant **to damage** creditors"). Id. at 92, 94 (emphasis added).  These types of intent allegations are not in the Complaint.

[64]   Compl. ¶¶ 114-24; see also Standing Motion ¶ 49.  Solely for purposes of this Opposition Chatham assumes that New York and California law applies to the Committee's section 544 claims, but otherwise reserves any and all rights.

must show that the debtor did not receive reasonably equivalent value in exchange for the challenged debt.[65]  The Committee cannot meet this requirement as a matter of law.

54.      With respect to the First-Lien Notes, the new liens and guarantees issued by the Parent and its subsidiaries took place in connection with satisfying antecedent debt that the Parent and subsidiaries had guaranteed and collateralized, i.e., the Old First-Lien Notes.  They provided reasonably equivalent value as a matter of law.  See M. Fabrikant, 394 B.R. at 732 ("A valid antecedent debt provides adequate consideration to support the grant of a security interest"); Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.), No. 01 Civ. 6209, 2002 WL 31412465, at *6 (S.D.N.Y. Oct. 24, 2002) ("debtor received reasonably equivalent value when it secured an antecedent debt owed to the lender"); In re MarketXT Holdings Corp., 361 B.R. 369, 398 (Bankr. S.D.N.Y. 2007) ("grant of collateral for a legitimate antecedent debt is not, without more, a constructive fraudulent conveyance."); Walker v. Sonafi Pasteur (In re Aphton Corp.), 423 B.R. 76, 89 (Bankr. D. Del. 2010) ("[W]hen a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent."); In re Gulf Fleet Holdings, Inc., 491 B.R. 747, 770 (Bankr. W.D. La. 2013) ("[a] transfer that results in a new security interest—in other words, the conversion of an unsecured loan to a secured loan—is not by itself sufficient to support a finding that the debtor did not receive reasonably equivalent value.").

55.      The Committee focuses on the Second-Lien Term Loan and the Third-Lien Notes—particularly complaining about the impact of the July 2018 Refinancing on the Debtors' subsidiaries.  While the Committee argues the subsidiaries did not have any antecedent debt with

---

[65]    11 U.S.C. § 548(a)(1)(B); In re M. Fabrikant & Sons, Inc., 394 B.R. 721, 734 (Bankr. S.D.N.Y. 2008) (citing New York Debtor & Creditor Law, §§ 273-75); In re Pajaro Dunes Rental Agency, Inc., 174 B.R. 557, 572 (Bankr. N.D. Cal. 1994) (citing Cal. Civ. Code § 3439.04(b)).

respect to the Second-Lien Term Loan and Third Lien Notes, the July 2018 Refinancing

provided a significant benefit to the subsidiaries, including $60 million of new money from

Chatham, access to a new revolving facility, maturity-date extensions,[66] no incremental interest

expense, and operational runway. Indeed, "enterprise" benefits can constitute reasonably

equivalent value.[67] See, e.g., Liquidation Trust v. Daimler AG (In re Old Carco LLC), 454 B.R.

38, 56, 59 (Bankr. S.D.N.Y. 2011) (dismissing trustee's fraudulent transfer complaint when

allegations of lack of reasonably equivalent value were "not supported by the record and are

implausible as a general matter;" and when "the Trust's theory is implausible because of the

participation of third-parties, which parties placed substantial amounts of capital at risk

dependent upon the performance of CarCo").

### E.    NO CLAIM STANDS FOR AIDING & ABETTING BREACH OF FIDUCIARY DUTY

56.    In order to establish a colorable claim for aiding and abetting, the Committee

must show (1) the existence of a fiduciary relationship; (2) breach of a fiduciary duty; (3)

knowing participation in the breach by a defendant who is not a fiduciary; and (4) damages

proximately caused by the breach. Official Comm. of Unsecured Creditors v. Nat'l Amusements

Inc. (In re Midway Games, Inc.), 428 B.R. 303, 320–21 (Bankr. D. Del. 2010). The test for

---

[66]  See In re Pfeifer, 2013 Bankr. LEXIS 2950, at *13 (Bankr. S.D.N.Y. July 23, 2013) ("[C]ourts find fair consideration where, in exchange for the grant of collateral, a debtor obtains maturity date extensions."); In re M. Silverman Laces, Inc., 2002 U.S. Dist. LEXIS 20288, at *15 (S.D.N.Y. Oct. 23, 2002) (affirming dismissal on summary judgment because debtor "received 'value' when its antecedent debt was extended and collateralized.").

[67]  See, e.g., In re Image Worldwide, 139 F.3d 574, 578 (7th Cir. 1998) (citing Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 646–48 (3d Cir. 1991)) (guarantees and collateral securing restructured debt "strengthen[ed] the corporate group as a whole."); Creditors' Comm. of Jumer's, Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge, Inc.), 338 B.R. 344, 354 (C.D. Ill. 2006) ("'[I]ndirect benefits' constitute 'value' and can include a wide range of intangibles such as:  a corporation's goodwill or increased ability to borrow working capital; the general relationship between affiliates or 'synergy' within a corporate group as a whole; and a corporation's ability to retain an important source of supply or an important customer."); In re Lawrence Paperboard Corp., 76 B.R. 866, 874 (Bankr. D. Mass. 1987) ("[I]ndirect benefits in the form of funds flowing from the parent to the guarantor subsidiary, or intangible benefits in the form of maintenance of the parent's financial strength, may constitute fair consideration.").

stating an aiding and abetting claim is a "stringent" one, and conclusory assertions of liability will not suffice.  See Saito v. McCall, No. Civ. A. 17132-NC, 2004 WL 3029876, at *9 n.84 (Del. Ch. Dec. 20, 2004).  An underlying breach of fiduciary duty is a necessary element of an aiding and abetting claim.  Thus, where a plaintiff fails to state an affirmative claim for breach of fiduciary duty, it necessarily also fails to state a claim for aiding and abetting.  Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 215 (Del. Ch. 2006), aff'd sub nom. Trenwick Am. Litig. Trust v. Billett, 931 A.2d 438 (Del. 2007).

57.     The alleged "breach," which consists of the Company's decision ███████

████████████████████████████████████████████████████████████

██████, reflects nothing more than the Committee's substituting its judgment for that of the board.  The fiduciary duty allegations do not include any illegal distributions and instead rest exclusively on the Committee's second-guessing of the board's exercise of its business judgment.  This alone dooms the Committee's aiding and abetting claim.

58.     The Committee has also failed to set forth facts sufficient to allege that Chatham knowingly participated in any breach of fiduciary duty.  "[A]n arms-length transaction" such as the July 2018 Refinancing "does not constitute knowing participation in a fiduciary breach."  In re BJ's Wholesale Club, Inc. Shareholders Litig., No. CIV.A. 6623-VCN, 2013 WL 396202, at *14-15 (Del. Ch. Jan. 31, 2013).  Rather, where such a transaction has been consummated, "knowing participation" may be inferred only where it is alleged that a third party played a role in the board's decision to enter into the transaction, or used the knowledge of a breach to their bargaining advantage.  Id.

59.     The Complaint's factual allegations conclusively demonstrate that the July 2018 Refinancing Transaction was conducted at arms' length.  It alleges, among other things, that the

Company ████████████████████████████████████████████████████
████████████████████████████████████████.[68]

60.    Finally, even if the Committee had met its pleading requirements (which it has

not), the Complaint still would fail to state a colorable claim for aiding and abetting, because the

claim is barred by the doctrine of in pari delicto.  "Delaware, like most American jurisdictions

and our federal common law (where applicable), embraces to some extent the venerable in pari

delicto doctrine."  In re Am. Int'l Grp., Inc. Consol. Derivative Litig., 976 A.2d 872, 882 (Del.

Ch. 2009).  A plaintiff "may not assert a claim against a defendant if the plaintiff bears fault for

the claim."  Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340,

354 (3d Cir. 2001).  Where the plaintiff is a third party "standing in the shoes of the debtor" as

the Committee seeks to do here, the plaintiff is subject to the in pari delicto defense to the same

extent as the debtor would be.  Id. at 355.  In R.F. Lafferty, the Third Circuit held that the

doctrine bars claims brought by an unsecured creditors' committee suing in a debtor's stead to

the same extent as if the claims were brought by the debtor itself, "without regard to whether the

committee is an innocent successor."  Id. at 357; see also Color Tile, Inc., 322 F.3d 147, 167 (2d

Cir. 2003) (finding district court did not abuse its discretion in dismissing unsecured creditors'

committee's breach of fiduciary duty claims on the ground that the affirmative defense of in pari

delicto had been established under Texas law).

61.    Here, the to the extent the alleged conduct forming the basis for the Committee's

proposed aiding and abetting claim was wrongful, then it was committed by the Debtors'

directors, and, as a matter of law, should be imputed to the Debtors and the Committee seeking

derivative standing in their stead.  This provides a unilateral basis to dismiss the aiding and

---

[68]    See, e.g., Compl. ¶¶ 51-56, 71-74.

abetting claim.  See, e.g., Zazzali v. Hirschler Fleischer, P.C., 482 B.R. 495, 513 (finding in pari delicto defense barred Trustee from asserting claims against debtor's outside counsel, including aiding and abetting breach of fiduciary duty when misconduct was imputed to directors and officers).

### F.    REMAINING COUNTS

#### 1.    ORIGINAL ISSUE DISCOUNT (COUNT 7)

62.    The Committee assert the original issue discount ("**OID**") on the First-Lien Notes and Second-Lien Term Loan should be disallowed under section 502(b)(2) of the Bankruptcy Code.  But the OID was part of a broader exchange transaction and therefore does not constitute disallowed unmatured interest.  See Official Comm. Of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC), 501 B.R. 549, 586 (Bankr. S.D.N.Y. 2013) ("**ResCap**").  In ResCap, the court held that junior secured noteholders' claims should be allowed in full and not reduced by any OID.  Id. at 586 (debt exchanges "do not generate OID that is disallowable as unmatured interest for purposes of section 502(b)(2)" (citing In re Chateaugay Corp., 961 F.2d 378, 382-83 (2d Cir. 1992) (reasoning that "[i]f unamortized OID is unallowable in bankruptcy, and if exchanging debt increases the amount of OID, then creditors will be disinclined to cooperate in a consensual workout that might otherwise have rescued a borrower from the precipice of bankruptcy")).

#### 2.    UNENCUMBERED ASSETS (COUNT 8, 9, 10)

63.    The Committee contends certain of the Debtors' (i) real property assets, (ii) commercial tort claims, (iii) registered copyrights, and (iv) tax refunds and other tax attributes, are not encumbered by prepetition liens.  With respect to the first three categories identified above, the assets at issue have no material value and are therefore incapable of delivering any meaningful benefit to the estate.  The cost associated with litigation would greatly exceed their

value.  The only item that remains a source of disagreement is the tax refunds and other

attributes, which are unencumbered assets as a matter of law.  Specifically,

- **Real Property**.  "Excluded Property" (as defined in the First Lien Security Agreement dated as of July 16, 2018 (the "**Security Agreement**")) includes, among other things: "any owned real property *not* constituting Mortgaged Real Property and any leasehold interest in real property where the Issuer or any Subsidiary Guarantor is a tenant."  Security Agreement § 3.  "Mortgaged Real Property" as defined in the Security Agreement *excludes* real property valued less than $2,000,000, so the excluded real property is considered to be low-value.  Security Agreement § 6(f). The vast majority of the real property assets identified by the Committee as unencumbered are leasehold interests which do not have meaningful value, can be difficult to foreclose on, are understood by the market to lack value when standing alone.

- **Commercial Tort Claims**.  "Commercial tort claims" are not among the "Excluded Assets."  However, the Security Agreement provides for liens over all commercial tort claims listed on "Schedule 1."  No claims are listed or described on this schedule.

- **Copyrights**.  The Committee notes that the copyrights in question are encumbered by liens on behalf of the Second-Lien Term Loan and Third-Lien Notes.  Pursuing standing to avoid the liens on these copyrights would be an imprudent use of resources.  Case law in this district has made clear that where a trustee (or debtor in possession) avoids and then preserves a lien under section 551, other secured liens on the property still come ahead of the lien preserved for the estate.[69]  Even if there is a defect, section 551 does not cure it.  So, the estate steps into the shoes of the avoided lien subject to those defects.[70]  Here, there is no benefit to the estate in avoiding the allegedly deficient liens on the copyright assets in question as there are other liens encumbering the assets that will be senior to the liens preserved for the estate, and the copyrights are of minimal value.

64.    The Debtors' tax attributes are *not* unencumbered property.  Tax refunds are

explicitly included the Security Agreement's definition of "General Intangibles," which

---

[69]  See In re DeLancey, 94 B.R. 311, 313 (Bankr. S.D.N.Y. 1988) ("[An] avoided lien which is sought to be preserved is inferior to subsequent valid liens [and] the inferior lien cannot be enhanced by its preservation under 11 U.S.C. § 551."); In re McCorhill Pub., Inc., 86 B.R. 783, 795 (Bankr. S.D.N.Y. 1988) (same); see also In re Kopel, 232 B.R. 57, 70 (Bankr. E.D.N.Y. 1999) ("When a debtor in possession preserves the lien for the benefit of the estate, the debtor in possession steps into the shoes of the avoided lienor, and **acquires** the same priority that such avoided lienor's lien had with respect to other creditors' liens.") (citations omitted).

[70]  See Connelly v. Marine Midland Bank, N.A., 61 B.R. 748, 750 (W.D.N.Y. 1986) (Avoided unperfected lien was junior to a subsequent secured lien that was perfected); In re Appalachian Energy Industries, Inc., 25 B.R. 515, 517 (Bankr. M.D. Tenn. 1982) (lien avoided because unperfected lien was junior to after-acquired property interest lien which was subsequent in time, but perfected).

constitute pledged collateral.  Security Agreement § 1(xiv) ("'General Intangibles' means

general intangibles (as that term is defined in the Code), and includes payment intangibles ...

rights to payment ... rights arising under common law, statutes, or regulations ... tax refunds, and

tax refund claims ... and any other personal property").  Additionally, New York courts have held

that under New York's adoption of the Uniform Commercial Code (which governs the Security

Agreement), tax refunds are general intangibles, even if tax refunds are not specifically named in

the security agreement.  See e.g., In re Metric Metals Int'l, Inc., 20 B.R. 633, 636 (S.D.N.Y.

1981) (holding anticipated tax refund constitutes a general intangible); In re Tele/Res., Inc., 21

B.R. 358, 363 (Bankr. S.D.N.Y. 1982), reversed on other grounds Citibank, N.A. v. Tele/Res.,

Inc., 724 F.2d 266 (2d Cir. 1983) (same).  See also BancorpSouth Bank v. Hazelwood Logistics

Ctr., LLC, 706 F.3d 888, 899 (8th Cir. 2013) ("We are not aware of any jurisdiction that has

concluded a tax refund is not a general intangible under the [Uniform Commercial Code]").

65.    Nor is the Debtors' 2019 tax refund property acquired after the commencement of

the case such that section 552 of the Bankruptcy Code would operate to remove the liens from

the tax refund.  The Debtors' right to receive the tax refund existed at the close of the tax year,

well before commencement of these chapter 11 cases.  The right to a tax refund vests at the end

of the tax year, since by that point "all events necessary to establish Debtor's tax liability ha[ve]

occurred," and the debtor's tax liability is "fixed, albeit unliquidated."  In re TMCI Elecs., 279

B.R. 552, 555 (Bankr. N.D. Cal. 1999) (citations omitted).  While the CARES Act may have

been passed after the petition date, the income and losses giving rise to the tax refund were

already settled.  The Debtors' rights in the tax refund vested at the close of tax year 2019.

66.    The Debtors' other tax attributes, such as net operating losses, are also

encumbered.  The definition of "General Intangibles" in the Security Agreement does not

explicitly list "net operating losses," but it adopts the Uniform Commercial Code's definition of the term.  The official commentary to the Uniform Commercial Code indicates that "'General intangible' is the residual category of personal property. . . that is not included in the other defined types of collateral."  See Uniform Commercial Code § 9–102, cmt. 5(d).  Numerous courts have held that net operating losses, which create the right to offset taxable income and trigger a tax refund, are general intangibles.  See, e.g.,  In re Protocol Servs., Inc., 2005 WL 6485180, at *2 (Bankr. S.D. Cal. Dec. 23, 2005) ("NOL [(net operating loss)] is a general intangible to which their lien attaches"); In re Mammoth Spring Distributing Co., Inc., 139 B.R. 205, 207 (W. D. Ark. 1992) (same).  These assets remain subject to liens as well.  Just as the Debtors had rights in the 2019 tax refund at the close of the tax year, the Debtors also had rights in any and all taxable attributes related to the 2019 tax year (as well as prior tax years).  Section 552 cannot strip the liens securing the First-Lien Notes.

### 3.     PREMIUM PAYMENTS (COUNT 11)

67.     The First-Lien Notes Indenture provides that upon a bankruptcy filing, "the principal of, premium (if any), and accrued and unpaid interest on all the Notes shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holders."[71]  The commencement of these chapter 11 cases caused an immediate acceleration of the outstanding debt under the First-Lien Notes.  Courts in the Second Circuit consistently decline to enforce make-whole provisions in chapter 11 cases.  See, e.g.,  Matter of MPM Silicones, L.L.C. (Momentive), 874 F.3d 787, 802 (2d Cir. 2017); In re AMR Corp., 730 F.3d 88, 98 (2d Cir. 2013).  The First Lien Lenders do not intend to include any make-whole premiums in their credit bid.

---

[71]     See Indenture § 6.2.

36

## **CONCLUSION**

WHEREFORE, for the forgoing reasons, Chatham respectfully requests that the Court

deny the Standing Motion, sustain this Objection, and award such further relief that the Court

considers proper.

Dated: June 26, 2020
      New York, New York

By: */s/ Andrew N. Rosenberg*
Andrew N. Rosenberg
Elizabeth R. McColm
William A. Clareman
John T. Weber
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064

- and -

By: */s/ James C. Tecce*
James C. Tecce
Deborah Newman
Lindsay Weber
QUINN EMANUEL URQUHART
& SULLIVAN LLP
52 Madison Avenue, 22nd Floor
New York, New York  10010

*Attorneys for Chatham Asset Management, LLC*