SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Shana A. Elberg
Bram A. Strochlic
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

TOGUT, SEGAL & SEGAL LLP
Albert Togut
Kyle J. Ortiz
Amy Oden
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Fax: (212) 967-4258

– and –

Van C. Durrer, II
Destiny N. Almogue (admitted *pro hac vice*)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Fax: (213) 687-5600

– and –

Jennifer Madden (admitted *pro hac vice*)
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Fax: (650) 470-4570

*Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------- x | | |
| *In re* | : | **Chapter 11** |
| | : | |
| **THE McCLATCHY COMPANY,** *et al.*, | : | **Case No. 20-10418 (MEW)** |
| | : | |
| **Debtors.**[1] | : | **(Jointly Administered)** |
| | : | |
| ------------------------------------------------------- x | | **Related Docket Nos. 418, 432, 674 & 693** |

<u>**NOTICE OF FILING OF REVISED ASSET PURCHASE AGREEMENT**</u>

---

[1]    The last four digits of Debtor The McClatchy Company's tax identification number are 0478.  Due to the large number of debtor entities in these jointly administered chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/McClatchy.  The location of the Debtors' service address for purposes of these chapter 11 cases is: 2100 Q Street, Sacramento, California 95816.

**PLEASE TAKE NOTICE** that on May 5, 2020, The McClatchy Company and its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") filed the *Debtors' Motion for Orders: (A)(I) Establishing Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (II) Establishing Procedures for the Debtors to Enter Into Stalking Horse Agreement With Bid Protections in Connection With a Sale of Substantially All of the Debtors Assets; (III) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (IV) Approving Form and Manner of Notice of All Procedures, Protections, Schedules and Agreements, and (V) Scheduling a Hearing to Consider the Proposed Sale, and (B)(I) Approving the Sale of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Certain Related Relief* [Docket No. 418] (the "**Motion**").

**PLEASE TAKE FURTHER NOTICE** that on May 7, 2010, the Court held a hearing (the "**Hearing**") on the Motion approving the bidding procedures, and on May 11, 2020 entered an Order  (I) Establishing Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (II) Establishing Procedures for the Debtors to Enter Into Stalking Horse Agreement With Bid Protections in Connection With a Sale of Substantially All of the Debtors' Assets; (III) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (IV) Approving Form and Manner of Notice of All Procedures, Protections, Schedules and Agreements; (V) Scheduling a Hearing to Consider the Proposed Sale and (VI) Granting Certain Related Relief [Docket No. 432] (the "**Bidding Procedures Order**").

**PLEASE TAKE FURTHER NOTICE** that on July 10, 2020, the Debtors held the Auction pursuant to the Bidding Procedures Order and announced that the Purchaser submitted the highest or best bids for the Acquired Assets.

**PLEASE TAKE FURTHER NOTICE** that on July 24, 2020, the Debtors filed the *Notice of Successful Bid Asset Purchase Agreement* [Docket No. 693] which attached the Asset Purchase Agreement and a proposed form of order.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **<u>Exhibit A</u>** is a revised Asset Purchase Agreement and attached hereto as **<u>Exhibit B</u>** is a redline reflecting changes to the Asset Purchase Agreement filed at Docket No. 693.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **<u>Exhibit C</u>** is the Framework Agreement referenced in the Asset Purchase Agreement and the revised proposed form of order filed at Docket No. 728.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **<u>Exhibit D</u>** is the form of New First Lien Term Loan Credit Agreement referenced in the Asset Purchase Agreement and the revised form or order filed at Docket No. 728.

*[Remainder of Page Intentionally Left Blank]*

Dated: New York, New York
       August 3, 2020

                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                    */s/ Van C. Durrer, II*
                    Shana A. Elberg
                    Bram A. Strochlic
                    One Manhattan West
                    New York, New York 10001
                    Telephone: (212) 735-3000
                    Fax: (212) 735-2000

                    – and –

                    Van C. Durrer, II
                    Destiny N. Almogue (admitted *pro hac vice*)
                    300 S. Grand Avenue, Suite 3400
                    Los Angeles, CA 90071-3144
                    Telephone: (213) 687-5000
                    Fax: (213) 687-5600

                    – and –

                    Jennifer Madden (admitted *pro hac vice*)
                    525 University Avenue
                    Palo Alto, California 94301
                    Telephone: (650) 470-4500
                    Fax: (650) 470-4570

                    *Counsel to Debtors and Debtors in Possession*

## EXHIBIT A

**Revised Asset Purchase Agreement**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**AMONG**

**THE MCCLATCHY COMPANY,**

**THE SUBSIDIARIES LISTED ON THE SIGNATURE PAGES HERETO,**

**SIJ HOLDINGS, LLC,**

**AND, SOLELY FOR SECTIONS 5.19 AND 5.20,**

**CHATHAM ASSET MANAGEMENT, LLC,**

**AND, SOLELY FOR PURPOSES OF SECTION 8.3,**

**CHATHAM ASSET HIGH YIELD MASTER FUND, LTD.**

**DATED AS OF JULY 24, 2020**

# TABLE OF CONTENTS

Page

ARTICLE I THE ACQUISITION ................................................................ 2

Section 1.1     Acquired Assets ................................................................2

Section 1.2     Excluded Assets ...............................................................6

Section 1.3     Assumed Liabilities .........................................................6

Section 1.4     Excluded Liabilities .........................................................8

Section 1.5     Assignment of Assigned Contracts ..................................9

Section 1.6     Purchase Price ................................................................13

Section 1.7     Withholding ....................................................................13

Section 1.8     Purchase Price Allocation ..............................................14

Section 1.9     Limitations on Purchaser's Liability ..............................14

ARTICLE II THE CLOSING ................................................................. 15

Section 2.1     Closing ...........................................................................15

Section 2.2     Deliveries at the Closing ...............................................15

Section 2.3     Purchaser Designees ......................................................17

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS .................. 17

Section 3.1     Qualification, Organization, etc. ....................................18

Section 3.2     Ownership .......................................................................18

Section 3.3     Authority of the Sellers ..................................................19

Section 3.4     Consents and Approvals .................................................19

Section 3.5     No Violations ..................................................................19

Section 3.6     Financial Statements ......................................................20

Section 3.7     Title to Property; Sufficiency of Assets ..........................20

Section 3.8     Absence of Certain Changes ..........................................21

Section 3.9     Brokers or Finders .........................................................21

Section 3.10    Litigation ........................................................................21

Section 3.11    Intellectual Property .......................................................21

Section 3.12    Real Property ..................................................................22

Section 3.13    Assigned Contracts ........................................................23

Section 3.14    Executory Contracts; Material Contracts ........................23

Section 3.15    Insurance ........................................................................24

i

Section 3.16    Affiliate Interests ..................................................................................24

Section 3.17    Bank Accounts ......................................................................................24

Section 3.18    Undue Influence ....................................................................................24

Section 3.19    Compliance with Laws; Permits ...........................................................24

Section 3.20    Employee Benefit Matters .....................................................................25

Section 3.21    Labor Matters ........................................................................................26

Section 3.22    Environmental Matters...........................................................................27

Section 3.23    Taxes .....................................................................................................28

Section 3.24    Customers and Suppliers........................................................................29

Section 3.25    Inventory ................................................................................................29

Section 3.26    Parent SEC Documents ..........................................................................30

Section 3.27    Qualifying Cash Proposal ......................................................................30

Section 3.28    No Other Representations ......................................................................30

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER .............. 30

Section 4.1    Qualification; Organization ....................................................................31

Section 4.2    Authority of the Purchaser .....................................................................31

Section 4.3    Consents and Approvals .........................................................................31

Section 4.4    No Violations ..........................................................................................31

Section 4.5    Brokers ...................................................................................................32

Section 4.6    Financing.................................................................................................32

Section 4.7    Investment Purpose ................................................................................32

Section 4.8    Acknowledgment by the Purchaser ........................................................32

ARTICLE V COVENANTS......................................................................................... 33

Section 5.1    Conduct of Business Pending the Closing ..............................................33

Section 5.2    Access and Information ..........................................................................38

Section 5.3    Approvals and Consents; Cooperation; Notification ...............................39

Section 5.4    Further Assurances..................................................................................41

Section 5.5    Debtors-in-Possession ............................................................................41

Section 5.6    The Sale Motion ......................................................................................41

Section 5.7    Sale Order ...............................................................................................41

Section 5.8    Cooperation with Respect to Bankruptcy Court Approvals .....................44

Section 5.9    Bankruptcy Court Filings........................................................................44

Section 5.10    Communications with Customers and Suppliers ......................................44

ii

Section 5.11    Employee Matters ..................................................................44

Section 5.12    Payments Received ................................................................46

Section 5.13    Use of Names and Marks ......................................................46

Section 5.14    Parent Confidentiality Agreements .......................................47

Section 5.15    Payroll Liabilities .................................................................47

Section 5.16    Employment Agreements ......................................................47

Section 5.17    Financial Obligations ...........................................................47

Section 5.18    DIP Facility ..........................................................................48

Section 5.19    New First and 1.5 Lien Debt ................................................48

Section 5.20    Releases ................................................................................49

Section 5.21    No Successor Liability ..........................................................50

Section 5.22    Notice of Developments .......................................................50

Section 5.23    Transition of Business ..........................................................51

Section 5.24    Casualty Loss .......................................................................51

Section 5.25    Confidentiality .....................................................................51

Section 5.26    Financing Cooperation .........................................................52

Section 5.27    Exclusivity ...........................................................................53

Section 5.28    Sale Contract Proceeds ........................................................53

Section 5.29    Proceeds of Herald Custom Publishing of Mexico, S. de R.L. de C.V. ..........53

ARTICLE VI CONDITIONS PRECEDENT ..........................................................53

Section 6.1     Conditions Precedent to Obligation of the Sellers and the Purchaser ...........53

Section 6.2     Conditions Precedent to Obligation of the Sellers ...........54

Section 6.3     Conditions Precedent to Obligation of the Purchaser ...........55

ARTICLE VII TERMINATION ..............................................................................56

Section 7.1     Termination ..........................................................................56

Section 7.2     Effect of Termination ...........................................................57

ARTICLE VIII GENERAL PROVISIONS .............................................................57

Section 8.1     Tax Matters ..........................................................................57

Section 8.2     Bulk Sales ............................................................................60

Section 8.3     Guarantee .............................................................................60

Section 8.4     Survival of Representations, Warranties and Covenants ...........60

Section 8.5     Public Announcements .........................................................60

Section 8.6     Notices .................................................................................61

iii

Section 8.7    Descriptive Headings; Interpretative Provisions ...............................................63

Section 8.8    No Strict Construction ......................................................................................64

Section 8.9    Entire Agreement; Assignment.........................................................................64

Section 8.10    Governing Law; Submission of Jurisdiction; Waiver of Jury Trial................64

Section 8.11    Expenses ...........................................................................................................65

Section 8.12    Amendment........................................................................................................65

Section 8.13    Waiver................................................................................................................65

Section 8.14    Counterparts; Effectiveness ..............................................................................65

Section 8.15    Severability; Validity; Parties in Interest ..........................................................65

Section 8.16    Specific Performance ........................................................................................65

Section 8.17    No Recourse.......................................................................................................66

Section 8.18    Seller Representative ........................................................................................66

ARTICLE IX DEFINITIONS.................................................................................................... 68

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Form of Intellectual Property Assignment Agreement |
| Exhibit D | Form of Sale Order |
| Exhibit E | Management Incentive Plan Term Sheet |
| Exhibit F | Employment Agreement Term Sheet |
| Exhibit G | New 1.5 Lien Notes Term Sheet |
| Exhibit H | New First Lien Term Loan Credit Agreement |

| | |
|---|---|
| Schedule 1.1(c) | Assigned Contracts |
| Schedule 1.1(g) | Seller Intellectual Property |
| Schedule 1.2(f) | Excluded Contracts |
| Schedule 5.1(b)(viii) | Professional Fees |
| Schedule A | Certain Excluded Claims |
| Schedule B | Purchased Ownership Interests |

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated July 24, 2020 (this "Agreement"), is made by and among The McClatchy Company, a Delaware corporation (the "Parent"), and the Subsidiaries of the Parent that are indicated on the signature pages attached hereto (together with the Parent, in their capacities as debtors and debtors in possession, the "Sellers"), Parent (in its capacity as the representative of the Sellers, the "Seller Representative"), SIJ Holdings, LLC a Delaware limited liability company (the "Purchaser") and, solely for purposes of Sections 5.19 and 5.20, Chatham Asset Management, LLC, a Delaware limited liability company ("Chatham") and, solely for purposes of Section 8.3, Chatham Asset High Yield Master Fund, Ltd., a Cayman Islands exempted company (the "Guarantor"). Each of the Sellers and the Purchaser is referred to individually herein as a "party" and collectively as the "parties." Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in Article IX.

## RECITALS

A.      The Sellers are engaged in the business of providing independent local journalism (such business, as conducted by the Sellers as of the date hereof, the "Business").

B.      The Sellers filed voluntary petitions for relief commencing cases (collectively, the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on February 13, 2020 (the "Petition Date").

C.      Pursuant to the Bidding Procedures and subject to the entry of the Sale Order by the Bankruptcy Court, the Purchaser desires to purchase and accept, and the Sellers desire to sell, convey, assign, transfer and deliver to the Purchaser, all of the Acquired Assets, and the Purchaser is willing to assume, and the Sellers desire to assign and delegate to the Purchaser, all of the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code (such sale and purchase of the Acquired Assets and such assignment and assumption of the Assumed Liabilities, the "Acquisition").

D.      The Acquired Assets shall be purchased pursuant to the Sale Order, free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

E.      The Purchaser, in partial consideration of the Acquired Assets, may credit bid up to (100%) of the First Lien Notes Claims (the "Credit Bid"), in each case, pursuant to Section 363(k) of the Bankruptcy Code, in and against the Acquired Assets in which it holds a valid, perfected, unavoidable priority lien.

F.      At the Closing, the Purchaser shall (i) make the Cash Payment to the Sellers and (ii) in its capacity as a borrower or issuer (as applicable), shall issue the New First Lien Term Loans and New 1.5 Lien Notes.

G.  The board of directors (or similar governing body) of each Seller has determined that (i) it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the Acquisition and (ii) the Release is an integral part of the transactions provided for herein and is given for fair consideration and in the best interest of the Sellers, and each has approved the same.

H.  The parties acknowledge and agree that the purchase by the Purchaser of the Acquired Assets, and the assumption by the Purchaser of the Assumed Liabilities, are being made at arm's length and in good faith.

I.  The execution and delivery of this Agreement and the Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code.

J.  The parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

The parties agree as follows:

## ARTICLE I

## THE ACQUISITION

Section 1.1    Acquired Assets.  On the terms and subject to the conditions set forth in this Agreement and, subject to approval of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing, the Sellers shall sell, assign, transfer, convey and deliver to the Purchaser and/or to one or more Purchaser Designees, and Purchaser and/or such Purchaser Designees shall purchase and accept from the Sellers, free and clear of all Encumbrances of any and every kind, nature and description, other than Permitted Post-Closing Encumbrances (and the Purchased Ownership Interests free and clear of all Encumbrances, other than restrictions on transfers in the applicable organizational documents which cannot be discharged by the Sale Order), all right, title and interest of the Sellers in, to or under the Business and all of the rights, properties and assets of the Sellers of every kind and description, wherever situated or located, whether real, personal, or mixed, tangible or intangible, whether identifiable or contingent, whether owned, leased, licensed, used, occupied or held for use in or relating to the Business, and whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date, other than the Excluded Assets (collectively, the "Acquired Assets"), including all right, title and interest of the Sellers in, to and under the following:

(a)    other than as set forth in Section 1.2(h), all of the Accounts Receivable;

(b)    all credits, claims for refunds, deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise), advances, prepaid expenses, prepayments, rights under warranties or guarantees, vendor rebates, credits and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent) (other than credits, claims for refunds, deposits, prepaid amounts, with respect to

2

Excluded Taxes or that relate exclusively to any of the Excluded Assets or the Excluded Liabilities; *provided*, that any federal, state or local income tax refunds from the carryback of any net operating loss or capital loss (or similar attribute) from the taxable year that includes the Closing Date (the "Specified Refunds") shall be an Acquired Asset);

(c)       the Contracts, including Leases and all contracts for the sale of the Deeded Real Property or any portion thereof (the "Sale Contracts"), listed, described or otherwise identified on Schedule 1.1(c), as such schedule may be amended from time to time pursuant to Section 1.5(g) (such Contracts, the "Assigned Contracts") and the rights thereunder;

(d)       all inventory of any kind or nature, merchandise and goods, including raw materials, work-in-process, finished goods, supplies, components, packaging materials, and other inventories to which the Sellers have title, that are in the possession of the Sellers or any third party or located upon or within the Real Property and related, used or held for use in connection with the Business or an Acquired Asset, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including any goods in transit (collectively, "Inventory");

(e)       all furniture, fixtures, vehicles, machinery, equipment, apparatus, appliances, computers and computer-related hardware, network and internet and information technology systems-related equipment and all other tangible personal property of every kind and description and wherever located, used or held for use in the conduct of the Business;

(f)       the Purchased Ownership Interests; provided, that between the date hereof and the Closing Date, the Purchaser may, in its sole discretion, add or remove any of the entities from Schedule B and, upon such addition or such removal, such entity shall be deemed an Excluded Asset or Acquired Assets, as applicable, and any Liabilities associated with such entity shall be deemed Excluded Liabilities or Assumed Liabilities, as applicable;

(g)       all Seller Intellectual Property, including Seller Registered Intellectual Property (including the items listed on Schedule 1.1(g)) and all of the Sellers' rights therein, including all rights to sue for and recover and retain damages for present and past infringement thereof and, in the case of Trademarks that are Seller Intellectual Property, all goodwill appurtenant thereto;

(h)       all rights under non-disclosure, confidentiality, invention, Intellectual Property assignment covenants, non-compete, or non-solicitation agreements or key employee retention plans or similar arrangements executed for the benefit of the Sellers, including with current or former employees, consultants, agents or contractors of the Sellers or with third parties (in the case of rights under the Parent Confidentiality Agreement, solely to the extent provided in Section 5.14);

(i)       all Books and Records, other than Retained Books and Records;

(j)       to the extent transferable, all Permits and all pending applications therefor;

3

(k)    to the extent transferable, all insurance policies and rights thereunder;

(l)    all goodwill, customer and referral relationships, other intangible property and all privileges, set-offs and benefits of the Sellers associated with the Business, the Acquired Assets and the Assumed Liabilities;

(m)    all rights, claims (other than Avoidance Actions which shall be addressed solely by <u>Section 1.1(n)</u>), interests, rebates, refunds, causes of action, actions, suits or proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) arising under or related to the Business, the Acquired Assets or the Assumed Liabilities (including any claims for past infringement or misappropriation) (excluding (i) all claims or causes of action of any of the Sellers set forth in <u>Sections 1.2(d)</u>, <u>1.2(e)</u>, and <u>1.2(h)</u>, (ii) all claims or causes of action of any of the Sellers against any director, officer or employee of such Seller who will not serve as a director, officer or employee of the Purchaser immediately following the Closing and (iii) excluding credits, claims for refunds, deposits, prepaid amounts, with respect to Excluded Taxes or that relate exclusively to any of the Excluded Assets or the Excluded Liabilities; *provided*, that the Specified Refunds shall be an Acquired Asset);

(n)    all avoidance claims or causes of action available to the Sellers under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (collectively, "<u>Avoidance Actions</u>") against the following (collectively, the "<u>Designated Parties</u>"): (i) any of the Sellers' vendors, suppliers, customers, trade creditors and other business relationships with whom the Purchaser continues to conduct business in regard to the Acquired Assets or the Assumed Liabilities after the Closing, (ii) any of the Sellers' counterparties under any licenses of Intellectual Property that are Assigned Contracts or counterparties under any other Assigned Contracts, (iii) any Agent, (iv) any holders of Existing Secured Claims, (v) any lenders or agents under the DIP Facility and the DIP Credit Agreement, (vi) officer, manager or employee of the Sellers that is a Transferred Employee, and any of the Persons whose equity is being acquired as Purchased Ownership Interests and any director, officer, manager or employee thereof, and (vii) any Affiliates of any of the Persons listed in clauses (i) through (vi); *provided*, that the Purchaser shall not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense (to the extent permitted under applicable Law) against any claim or cause of action raised by such Designated Party;

(o)    any and all insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any of the Acquired Assets or relating to the Assumed Liabilities, and all rights and claims of the Sellers to any such insurance proceeds, condemnation awards or other compensation;

(p)    all telephone, telex and telephone facsimile numbers and other directory listings;

4

(q)     the Benefit Plans listed or described on Section 3.20(a) of the Seller Disclosure Letter (the "Assumed Benefit Plans") and any interests of the Sellers in the assets of such Benefit Plans, including (i) with respect to any Assumed Benefit Plan that is funded by a trust (other than a so-called "rabbi trust"), the assets of such related trust; (ii) with respect to any Assumed Benefit Plan that is funded by an insurance policy, the related insurance policy (to the extent transferrable); and (iii) with respect to any Assumed Benefit Plan, to the extent applicable and subject to conformity with applicable Law, the administrative service agreements and other contracts, files and records in respect thereof (to the extent transferrable);

(r)     the real property, together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, owned in fee by each Seller (the "Deeded Real Property"); provided, that the Purchaser may, in its sole discretion, designate any Deeded Real Property as an Excluded Asset;

(s)     all Cash, including any and all rights of the Sellers in and to (i) any restricted cash, security deposits and cash collateral (including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit) given or paid by (A) tenants, subtenants or other occupants of the Deeded Real Property to the applicable Sellers owning the Deeded Real Property or (B) subtenants or other occupants of the Leased Real Property to the applicable Sellers leasing, using or otherwise occupying the Leased Real Property, and (ii) any escrow deposits;

(t)     any and all proceeds from the sale of Real Property pursuant to or in connection with any Sale Contract; and

(u)     all proceeds and products of any and all of the foregoing Acquired Assets.

EXCEPT AS SPECIFICALLY AND EXPRESSLY SET FORTH IN ARTICLE III (I) THE SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) THE SELLERS MAKE NO, AND HEREBY DISCLAIM ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES, AND (III) THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE PURCHASER SHALL RELY UPON ITS OWN EXAMINATION THEREOF.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE SELLERS MAKE NO REPRESENTATION OR WARRANTY REGARDING ANY BUSINESS OTHER THAN THE BUSINESS, ANY ASSETS OTHER THAN THE ACQUIRED ASSETS OR ANY LIABILITIES OTHER THAN THE ASSUMED LIABILITIES, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

Section 1.2    <u>Excluded Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, except as otherwise set forth in this <u>Section 1.2</u>, the Acquired Assets shall not include any of the following (collectively, the "<u>Excluded Assets</u>"):

(a)    any and all credits, claims for refunds, deposits and prepaid amounts, with respect to Excluded Taxes or that relate exclusively to any of the Excluded Assets or the Excluded Liabilities, other than the Specified Refunds;

(b)    all shares of capital stock or other equity interests of any Seller or any Affiliate thereof or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any Affiliate thereof, in each case other than the Purchased Ownership Interests;

(c)    all Retained Books and Records; *provided*, that copies of such books and records, except Tax Returns and other books, records and work papers that are not primarily related to Acquired Assets or Assumed Liabilities or that are subject to any privilege or similar protection under applicable Law, shall be delivered to the Purchaser (including for copying) upon reasonable request to the extent permitted by applicable Law;

(d)    any Avoidance Actions against any Person other than any of the Designated Parties;

(e)    all rights, claims or causes of action of any Seller arising under this Agreement and the Ancillary Documents or arising under the Parent Confidentiality Agreements (to the extent not assigned to the Purchaser pursuant to <u>Section 5.14</u>);

(f)    all Contracts that are not Assigned Contracts, including the Contracts listed or described on <u>Schedule 1.2(f)</u>, which Schedule may be modified in accordance with <u>Section 1.5(g)</u>;

(g)    all Benefit Plans other than the Assumed Benefit Plans and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(h)    all receivables, claims or causes of action that relate exclusively to any of the Excluded Assets or the Excluded Liabilities;

(i)    all intercompany accounts receivable as to which any Seller is an obligor or is otherwise responsible or liable and which are owed or payable to any of the Sellers;

(j)    any and all assets of Quad County Publishing, Inc.; and

(k)    the Rejected Leases.

Section 1.3    <u>Assumed Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Acquired Assets to the Purchaser and/or the Purchaser Designees, the Purchaser and/or each relevant Purchaser Designee shall assume from the Sellers and agree to

6

pay, perform and discharge, when due, in accordance with their respective terms, only the following liabilities and obligations (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of the Sellers solely with respect to, arising out of or relating to the following (collectively, the "Assumed Liabilities") and no other liabilities or obligations:

(a)    the ownership, possession or use of the Acquired Assets and the operation of the Business, in each case from and after the Closing, to the extent arising out of an event, fact, act, omission or condition to the extent occurring from and after the Closing;

(b)    liabilities and obligations under the Assigned Contracts, to the extent arising out of an event, fact, act, omission or condition occurring from and after the Closing;

(c)    (i) all liabilities in respect of the DIP Facility (or, in the alternative, modification and assumption of the DIP Facility (as agreed between the Purchaser and the lenders under the DIP Facility) as of Closing, or (ii) satisfaction of the payoff of the DIP Facility as of the Closing, as set forth in Section 5.18);

(d)    all accounts payable and other trade obligations arising in the ordinary course of the Business incurred from and after the Petition Date, in each case solely to the extent not paid prior to the Closing Date and to the extent such obligations exclusively relate to the Acquired Assets (collectively, "Trade Payables");

(e)    liabilities arising out of the employment or termination following the Closing of any Transferred Employees or liabilities under any Assumed Benefit Plan;

(f)    all payroll liabilities with respect to Transferred Employees that have accrued since the Petition Date in the ordinary course of business consistent with past practice that remain unpaid as of immediately prior to the Closing Date (which amount as of July 15, 2020 was approximately $15,240,000) and the post-Closing Date portion of payroll liabilities with respect to Transferred Employees;

(g)    all Cure Costs (subject to Section 5.1(a)(x));

(h)    any and all liabilities, obligations and commitments with respect to Taxes (i) imposed with respect to, arising out of, or relating to the Business, the Acquired Assets, the Assumed Liabilities (other than any Excluded Taxes) for any Post-Closing Tax Period (including, in the case of any Straddle Period, the portion of such Straddle Period beginning after the Closing Date) as determined pursuant to Section 8.1(b), (ii) that are California state Income Taxes imposed with respect to, arising out of, or relating to the transactions contemplated by this Agreement equal to approximately $1,700,000, and (iii) for which Purchaser is liable under Section 8.1;

(i)    liabilities and obligations arising out of the Deeded Real Property to the extent arising out of an event, fact, act, omission or condition occurring on or after the Closing Date; and

(j)      any Environmental Liabilities required to be assumed pursuant to Section 363(f) of the Bankruptcy Code.

Section 1.4    Excluded Liabilities.  Notwithstanding anything contained in this Agreement to the contrary, neither the Purchaser nor any of its Affiliates shall assume, be obligated to assume, be deemed to have assumed, or be obliged to pay, perform or otherwise discharge, and the Sellers shall be solely and exclusively liable with respect to, any liabilities or obligations (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of the Sellers and any Affiliate thereof other than the Assumed Liabilities (such liabilities and obligations other than Assumed Liabilities, the "Excluded Liabilities").  Without limiting the foregoing, the Purchaser (including any Purchaser Designee) does not (nor do any of their Affiliates) assume or agree to pay, perform or otherwise discharge the liabilities or obligations of the Sellers or their Affiliates with respect to, arising out of or relating to, the following Excluded Liabilities:

(a)      all Indebtedness of the Sellers (other than obligations with respect to the Guarantees as expressly set forth in Section 5.17(a) and capitalized leases that are Assigned Contracts);

(b)      except with respect to the Guarantees as expressly set forth in Section 5.17(a), all guarantees of third-party Indebtedness made by the Sellers and reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit or other similar agreements or instruments;

(c)      all Actions pending on or before the Closing Date against the Sellers or to the extent against or giving rise to liabilities or obligations of the Business, based on acts or omissions prior to the Closing Date even if instituted after the Closing Date, including, for the avoidance of doubt, all Actions set forth on Section 3.10 of the Seller Disclosure Letter;

(d)      all liabilities or obligations to any current or former holder or owner of capital stock or other equity interests of the Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of the Sellers or any current or former holder of Indebtedness of the Sellers (other than liabilities or obligations with respect to the Guarantees as expressly set forth in Section 5.17(a));

(e)      all drafts or checks outstanding at the Closing under which the Sellers are obligated;

(f)      any and all liabilities, obligations and commitments with respect to Excluded Taxes;

(g)      all fees, charges, expenditures, expenses, costs and other payments incurred or otherwise payable by any of the Sellers or their respective Affiliates, or for which any of the Sellers or their respective Affiliates is liable, in connection with the administration of the Chapter 11 Cases or the negotiation, execution and consummation of the transactions contemplated by this Agreement or any Ancillary Document (including any preparation for a transaction process, bankruptcy process, any sale process involving other potential buyers or any

8

contemplated public offering or financing), including the Retained Professional Fees and all fees and charges assessed against the Sellers under section 1930, chapter 123, of title 28, United States Code, whether incurred, accrued or payable on or prior to or after the Closing Date;

(h)    all liabilities or obligations with respect to any of the Excluded Assets;

(i)    indemnification or advancement of expenses for any current or former officer or director of any Seller or any of the Subsidiaries of the Sellers;

(j)    all liabilities related to pre-Closing employee related obligations other than as set forth in Sections 1.3(e) and 1.3(f);

(k)    all claims set forth on Schedule A;

(l)    any and all liabilities or obligations of the Ponderay Newsprint Company;

(m)    any and all liabilities, obligations and commitments with respect to the Rejected Leases;

(n)    any and all liabilities or obligations of Quad County Publishing, Inc.;

(o)    any Environmental Liabilities with respect to any assets owned or operated by, or any operations or business conducted by, any of the Sellers or any corporate predecessor of any of the Sellers at any time prior to the Closing Date, except to the extent assumption of such Environmental Liabilities is required by Section 363(f) of the Bankruptcy Code;

(p)    for the avoidance of doubt, any and all liabilities or obligations arising with respect to or from the termination of The McClatchy Company Retirement Plan; and

(q)    any payment obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby, including to the entities listed on Section 3.9 of the Seller Disclosure Letter.

Section 1.5    Assignment of Assigned Contracts.

(a)    Schedule 1.5(a) sets forth a list of all executory Contracts (including all leases (but excluding Rejected Leases), customer agreements, supply agreements, joint venture agreements, insurance policies and administrative services agreements or similar contracts relating to the Business, the Acquired Assets or the Assumed Liabilities or to which one or more of Sellers are party (the "Available Contracts").  Schedule 1.5(a) sets forth with respect to each Available Contract, the Sellers' good-faith estimate of the amount required to be paid with respect to each Available Contract to cure all monetary defaults under such Contract to

the extent required by Section 365(b) and otherwise satisfy all requirements imposed by Section 365(d) of the Bankruptcy Code (the actual amount of such costs, the "Cure Costs").

(b)    The Sellers shall use reasonable best efforts to assume and assign, or cause to be assigned, any Available Contracts that Purchaser identifies as an Assigned Contract, including commencing appropriate proceedings before the Bankruptcy Court and otherwise taking all (i) commercially reasonable actions in order to determine the Cure Costs with respect to any Assigned Contract entered into prior to the Petition Date, including the right (subject to Section 5.1) to negotiate in good faith and litigate, if necessary, with any Contract counterparty the Cure Costs needed to cure all monetary defaults under such Assigned Contract and (ii) all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to the Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code.  If the Sellers, the Purchaser, and the counterparty to an Assigned Contract are unable to reach mutual agreement regarding any dispute with respect to Cure Costs, the Sellers shall promptly seek a hearing before the Bankruptcy Court, which hearing may be the Sale Hearing or, if requested by Purchaser, a hearing occurring after the Closing, to determine Cure Costs (such dispute, the "Cure Cost Dispute").  Notwithstanding the foregoing, if the Bankruptcy Court allows a Cure Cost in excess of the amount listed on Schedule 1.5(a), then Purchaser shall be entitled, in its sole discretion, to re-designate the Contract as an Excluded Asset.

(c)    If prior to or following the Closing, it is discovered by the Purchaser or Sellers that a Contract should have been listed on Schedule 1.5(a) but was not listed on Schedule 1.5(a) (any such Contract, a "Previously Omitted Contract"), the party discovering such omission (the "Discovering Party") shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify the other parties in writing of such Previously Omitted Contract and within two (2) Business Days following notice of such discovery, the Sellers shall provide to Purchaser all Cure Costs (if any) for such Previously Omitted Contract.  Purchaser shall thereafter deliver written notice to the Sellers, no later than seven (7) Business Days following notification of such Previously Omitted Contract from the Discovering Party, whether the Purchaser is designating such Previously Omitted Contract as an "Assigned Contract." If the Purchaser designates a Previously Omitted Contract as an "Assigned Contract" in accordance with this Section 1.5(c), the Sellers shall promptly (and in any event within two (2) Business Days following the Purchaser's delivery of the aforementioned written notice) serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and the Seller's intention to assume and assign such Previously Omitted Contract in accordance with this Section 1.5.  The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with fifteen (15) days to object, in writing to the Sellers and Purchaser, to the Cure Costs or the assumption of its Contract.  If the counterparties, the Sellers and the Purchaser are unable to reach a consensual resolution with respect to the objection, the Sellers will promptly seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption.  If no objection is served on the Sellers and the Purchaser, the Sellers shall obtain an order of the Bankruptcy Court fixing the Cure Costs and approving the assignment and assumption of the Previously Omitted Contract.

(d)      To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 1.5, on the Closing Date, the Sellers shall assign to the Purchaser the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to the provision of adequate assurance by the Purchaser as may be required under Section 365 of the Bankruptcy Code and payment by the Sellers of the Cure Costs in respect of the Assigned Contracts.  All Cure Costs in respect of all of the Assigned Contracts shall promptly (including following the Closing to the extent the Cure Costs are not paid at the Closing) be paid by the Sellers.

(e)      To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 1.5, the Sellers shall transfer and assign all of the Acquired Assets to the Purchaser and the Purchaser shall assume all of the Acquired Assets from the Sellers, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code and the Sale Order.  Each Seller shall transfer and assign the Acquired Assets of such Seller directly to the Purchaser in full or partial satisfaction, as applicable, of the First Lien Notes Claims or guarantees thereof made by the applicable Seller and in exchange for its share of the Cash Payment.  Notwithstanding any other provision of this Agreement or in any Ancillary Document to the contrary (but subject to Section 1.5(f)), this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), would constitute a breach.

(f)      Notwithstanding anything in this Agreement to the contrary, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer, assignment, conveyance or delivery to the Purchaser of any asset that would be an Acquired Asset or any claim or right or any benefit arising thereunder or resulting therefrom is prohibited by any applicable Law or would require any Necessary Consent (as defined below) and such Necessary Consent shall not have been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), the Closing shall proceed without any reduction in Purchase Price (as defined below) without the sale, transfer, assignment, conveyance or delivery of such asset.  In the event that any failed condition is waived and the Closing proceeds without the transfer or assignment of any such asset, then for a period of six (6)  months following the Closing, the Sellers shall use their reasonable best efforts at the Purchaser's sole expense, and subject to any approval of the Bankruptcy Court that may be required, and the Purchaser shall use commercially reasonable efforts to cooperate with the Sellers, to obtain such Necessary Consent as promptly as practicable following the Closing.  Pending the receipt of such Necessary Consent, for such six (6)-month period following the Closing, the parties shall, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other to provide the Purchaser with all of the benefits and burdens of use of such asset.  Once Necessary Consent for the sale, transfer, assignment, conveyance or delivery of any such asset not sold, transferred, assigned, conveyed or delivered at the Closing is obtained, the Sellers shall promptly transfer, assign, convey and deliver such asset to the Purchaser for no additional consideration.  To the extent that any such asset cannot be transferred or the full benefits and burdens of use of any such asset cannot be provided to the Purchaser, then as promptly as practicable following the Closing, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, the Purchaser and the Sellers shall enter into such arrangements (including subleasing, sublicensing or subcontracting),

and shall, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other, to provide the Purchaser with all of the benefits and burdens of use of such asset for a period of six (6) months following the Closing. For such six (6)-month period following the Closing, the Sellers shall hold in trust for, and pay to the Purchaser, promptly (and in any event within three (3) Business Days) following receipt thereof, all income, proceeds and other monies received by the Sellers derived from their use of any asset that would be an Acquired Asset in connection with the arrangements under this Section 1.5(f). If and when the Necessary Consent, the absence of which caused the deferral of transfer of any Acquired Asset pursuant to this Section 1.5(f), is obtained, the transfer of the applicable Acquired Asset to Purchaser shall automatically and without further action or consideration be effected in accordance with the terms of this Agreement. The parties agree to treat any asset the benefits of which are transferred pursuant to this Section 1.5(f) as having been sold to Purchaser for Tax purposes to the extent permitted by Law. To the extent that Law does not permit the parties to treat any asset the benefits of which are transferred pursuant to this Section 1.5(f) as having been sold to Purchaser for Tax purposes, the Purchaser shall indemnify and hold harmless the applicable Seller for any Taxes imposed on such Seller or any of its Affiliates with respect to any such Acquired Asset for any Post-Closing Tax Period net of any Tax benefits realized by such Seller or any of its Affiliates as an actual reduction of cash Taxes otherwise payable with respect to any such Acquired Asset for any Post-Closing Tax Period; provided that the applicable Seller shall promptly (and in any event within ten (10) Business Days) pay to Purchaser the amount of any Tax assets, benefits, refunds or similar items received by such Seller or any of its Affiliates with respect to any such indemnified Taxes for any Post-Closing Tax Period.

(g)     Notwithstanding anything in this Agreement to the contrary, the Purchaser may (i) in its sole and absolute discretion, amend or revise Schedule 1.1(c) setting forth the Assigned Contracts, in order to add any Contract to, or eliminate any Contract from, such Schedule, in each case at any time during the period commencing from the date hereof and ending at the date that is two (2) Business Days before the Closing Date (the "Determination Date"); provided, however, that if an Available Contract is subject to a Cure Cost Dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of the Purchaser and Sellers prior to the Determination Date, then the Determination Date shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of the Purchaser and the Sellers, (B) forty-five (45) days following the Closing Date, (C) the date on which such Available Contract is deemed rejected by operation of 11 U.S.C. § 365(d)(4), (D) the date on which the Sellers confirm a plan of reorganization or liquidation, and (E) the date on which the Sellers' Chapter 11 Cases are dismissed (the "Extended Contract Period"). If such Available Contract is not expressly assumed by the Purchaser in writing by the end of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Asset. Automatically upon the addition of any Contract to Schedule 1.1(c) or designation of any new Acquired Asset pursuant to the first sentence of this Section 1.5(g), it shall be an Assigned Contract or Acquired Asset, as the case may be, for all purposes of this Agreement. Automatically upon the removal of any Contract from Schedule 1.1(c) or designation of any new Excluded Asset pursuant to the first sentence of this Section 1.5(g) (without limiting Purchaser's right to redesignate any such Contract or asset as an Acquired Asset), it shall be an Excluded Asset for all purposes of this Agreement, and no liabilities arising

12

thereunder shall be assumed or borne by the Purchaser unless such liability is otherwise specifically assumed pursuant to <u>Section 1.3</u>.

Section 1.6    <u>Purchase Price</u>.  At the Closing, in consideration for the Acquired Assets, the Purchaser shall, in addition to the assumption of the Assumed Liabilities, (i) Credit Bid and release each Seller from the corresponding portion of the First Lien Notes Claims, in an amount equal to $262,851,000, pursuant to a release letter, in form and substance reasonably acceptable to the Sellers and the Purchaser and (ii) pay an amount equal to $49,152,903, (the "<u>Cash Payment</u>") to the Parent, as agent for each Seller (and each Seller hereby appoints Parent as its agent for this purpose). The amounts in clauses (i) and (ii) of the immediately preceding sentence, collectively with the assumption by Purchaser of the Assumed Liabilities from Sellers, are referred to herein as the "Purchase Price."  The Cash Payment shall be used as follows: (a) first, to repay or cause to be repaid all indebtedness, liabilities and other obligations outstanding under the DIP Credit Agreement (other than contingent obligations for which a claim has not been made), as contemplated by <u>Section 5.18</u> (or, if the Purchaser chooses to assume all of the Parent's right, title, interest, liabilities, duties and obligations in, to and under the DIP Credit Agreement in accordance with clause (ii) of <u>Section 5.18</u>, the Cash Payment shall be reduced by the amount of such liabilities), (b) second, to pay any accrued and unpaid interest on the First Lien Notes through the Closing Date (the "<u>First Lien Notes Interest</u>"), (c) third, subject to Section 5.1(b)(viii), to repay the Retained Professional Fees, Wind-Down Fees and the First Lien AP Professionals Fees and Expenses (each as defined in the DIP Orders) that are accrued and unpaid as of the Closing Date and (d) fourth, any remaining amount of the Cash Payment (the "<u>Cash Remainder</u>"), to satisfy Excluded Liabilities of the Sellers. In addition, each Seller shall use any payments or reimbursements received by such Seller pursuant to this Agreement, and the Excluded Assets of such Seller, if any, to satisfy any remaining Excluded Liabilities of such Seller when due, and then all shares of capital stock or other equity interests of each Seller other than the Parent shall thereafter be canceled for no consideration; *provided*, that the Cash Remainder shall only be used to pay expenses of a Seller other than the Parent to the extent the Excluded Liabilities of such Seller exceed the sum of (1) the amount of such payments received by such Seller pursuant to this Agreement, (2) the amount of such reimbursements received by such Seller pursuant to this Agreement, and (3) the Excluded Assets of such Seller.

Section 1.7    <u>Withholding</u>.  Notwithstanding anything to the contrary in this Agreement, the Purchaser and its Affiliates shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld under applicable Tax Law. Except for any amounts that are withheld by reason of the failure to provide the form described in <u>Section 2.2(a)(iv)</u>, if the Purchaser reasonably believes that any withholding of Tax is required with respect to any payment under this Agreement, then the Purchaser shall use commercially reasonable efforts to give written notice to the Parent describing the basis for such withholding in reasonable detail at least five (5) Business Days prior to the Closing Date, and the Purchaser shall provide the Parent with a reasonable opportunity to provide any applicable certificate, form or documentation that would reduce or eliminate the requirement to deduct and withhold Tax with respect to such payment, and the Purchaser shall otherwise cooperate with the Parent and take such steps as the entity may reasonably request to reduce or eliminate such withholding obligation to the extent permitted by applicable Law. To the extent that amounts are so deducted and withheld pursuant to this <u>Section 1.7</u>, such deducted and withheld amounts (i) shall be timely remitted by the Purchaser to the

applicable Taxing Authority in accordance with applicable Law and (ii) upon such remittance, shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

      Section 1.8    <u>Purchase Price Allocation</u>. Within ninety (90) days after the Closing Date, Purchaser shall prepare and deliver to the Parent a proposed allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes) as of the Closing Date among the Acquired Assets determined on a Seller-by-Seller basis in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder ("<u>Purchaser's Allocation</u>"). If the Parent disagrees with Purchaser's Allocation, the Parent may, within thirty (30) days after delivery of Purchaser's Allocation, deliver a notice (the "<u>Parent's Allocation Notice</u>") to the Purchaser to such effect, specifying those items as to which the Parent disagrees, the basis for such disagreement, and setting forth the Parent's proposed allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes) determined on a Seller-by-Seller basis in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder. If the Parent's Allocation Notice is duly and timely delivered, the Parent and the Purchaser shall, during the twenty (20) days immediately following such delivery, use commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine the allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes). If the Parent and the Purchaser are unable to reach such agreement, they shall promptly thereafter engage the Designated Accounting Firm to resolve any remaining disputes. The fees and expenses relating to the work, if any, to be performed by the Designated Accounting Firm in connection with the Allocation shall be borne equally by the Parent and Purchaser. The allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes), as prepared by the Purchaser if no Parent's Allocation Notice has been given, as adjusted pursuant to any agreement between the Parent and the Purchaser, or as determined by the Designated Accounting Firm in accordance with this <u>Section 1.8</u> (the "<u>Allocation</u>"), shall be conclusive and binding on the parties absent manifest error. The Allocation shall be adjusted, as necessary, by the Purchaser to reflect any subsequent adjustments to the Purchase Price, any liabilities assumed, and any other amounts treated as consideration for U.S. federal income Tax purposes. Each of the Sellers and Purchaser agree (and agree to cause their respective Affiliates) to prepare and file all relevant U.S. federal, state, local and non-U.S. Tax Returns (including Internal Revenue Service Form 8594) in accordance with the Allocation. None of the Sellers or Purchaser shall (and each of the Sellers and Purchaser shall cause their Affiliates not to) take any position inconsistent with the Allocation on any Tax Return or in connection with any Tax proceeding, in each case, except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any applicable analogous provision of state, local or non-U.S. law). In the event that the Allocation is disputed by any Taxing Authority, the party receiving notice of such dispute shall promptly notify the other party in writing of such notice, and the parties shall cooperate in good faith to resolve such dispute. The parties acknowledge that the Allocation is prepared for Tax purposes and is not necessarily indicative of the valuation of each Acquired Asset.

      Section 1.9    <u>Limitations on Purchaser's Liability</u>. For the avoidance of doubt, except for amounts deposited at Closing pursuant to <u>Section 2.2(b)</u> (to the extent such amounts

are required to be deposited pursuant to this Agreement) or as otherwise expressly provided in this Agreement, Purchaser shall have no liability with respect to the Retained Professional Fees and the Wind-Down Fees.

ARTICLE II

THE CLOSING

Section 2.1    Closing.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, NY 10001, at 10:00 a.m. local time as soon as possible (and in any event within two (2) Business Days) after the conditions set forth in Article VI shall have been satisfied or (if permissible) waived (except for such conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver thereof at the Closing), or at such time, date and place (which may be virtual) as the parties hereto may mutually agree in writing (the date of the Closing being herein referred to as the "Closing Date").  Each Seller and the Purchaser shall use commercially reasonable efforts to consummate the Closing on or prior to September 4, 2020.  Notwithstanding anything to the contrary in this Section 2.1, in no event shall the Closing take place prior to August 31, 2020.  The purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities shall be deemed to have occurred on 11:59 p.m. local time on the Closing Date.

Section 2.2    Deliveries at the Closing.

(a)    At the Closing, the Sellers shall deliver to the Purchaser:

(i)    the bill of sale transferring the Acquired Assets to the Purchaser substantially in the form of Exhibit A attached hereto (the "Bill of Sale"), duly executed by the Sellers;

(ii)    the assignment and assumption agreement to be entered into between the Sellers and the Purchaser substantially in the form of Exhibit B attached hereto (the "Assignment and Assumption Agreement"), duly executed by the Sellers;

(iii)    assignments of the Seller Intellectual Property, including the Seller Registered Intellectual Property, substantially in the forms of Exhibit C attached hereto (the "Intellectual Property Assignment Agreements"), duly executed by the Sellers;

(iv)    an Internal Revenue Service Form W-9, duly completed and executed by each Seller and dated as of the Closing Date;

(v)    the certificate described in Section 6.3(c);

(vi)    a quitclaim deed or local equivalent in statutory or customary form for each Deeded Real Property with changes reasonably required by applicable Law to record or register transfer of title in each applicable jurisdiction (each a "Deed"), duly executed by each applicable Seller;

15

(vii)    such other bills of sale, Deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Purchaser, as Purchaser may reasonably request to vest in Purchaser all of the right, title and interest of Sellers in, to or under any or all of the Acquired Assets, including all Real Property, subject only to Permitted Post-Closing Encumbrances and Assumed Liabilities;

(viii)    such ordinary and customary documents (including affidavits, but excluding, for the avoidance of doubt, any non-imputation affidavits) as may be required by a title insurance company to issue owners' title insurance policies (or "pro formas" or marked up commitments having the same effect of a title insurance policy), in form reasonably acceptable to Seller (including that any such affidavit or similar documentation shall not impart on Seller any continuing liability or indemnification obligations other than, if requested, for the intentional misrepresentation of statements made therein), at Purchaser's sole election and Purchaser's sole cost and expense, insuring title to any or all of the Real Property included in the Acquired Assets (in any event, subject to Permitted Post-Closing Encumbrances and Assumed Liabilities); *provided*, *however*, that the ability of Purchaser to obtain such owners' title insurance policies, pro formas or commitments (including, without limitation, any extended or affirmative coverage contained therein or any endorsements thereto requested by Purchaser) shall not be a condition to Closing and that nothing in this Section 2.2(a)(viii) shall prohibit any Seller from ceasing operations or winding up its affairs following the Closing; and

(ix)    such other documents as Purchaser may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

(b)    At the Closing, the Purchaser shall deliver to the Sellers:

(i)    an amount equal to the Cash Remainder, determined in good faith by Sellers in consultation with the Purchaser, by wire transfer of immediately available funds to an account or accounts designated by the Sellers at least two (2) Business Days prior to the Closing;

(ii)    subject to Section 5.1(b)(viii) with respect to Retained Professional Fees, an amount determined in good faith by Sellers in consultation with the Purchaser equal to the Retained Professional Fees into the Committee Retained Professional Fees Escrow and Seller Retained Professional Fees Escrow to such account as directed by the applicable escrow agent at least two (2) Business Days prior to Closing, as applicable, for the purpose of paying the Retained Professional Fees in accordance with the Sale Order;

(iii)    the Wind-Down Fees into the Wind-Down Fees Escrow to such account as directed by the applicable escrow agent at least two (2) Business Days prior to Closing, for the purpose of paying the Wind-Down Fees;

(iv)    the Assignment and Assumption Agreement, duly executed by the Purchaser;

(v)    the certificate described in Section 6.2(c);

16

(vi)    the Bill of Sale, duly executed by the Purchaser;

(vii)    each Deed, duly executed by the Purchaser to the extent required by applicable Law;

(viii)    evidence reasonably satisfactory to the Parent of the Payoff to the extent required under Section 5.18; and

(ix)    such other documents as the Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

Section 2.3    Purchaser Designees.  The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.3, one or more Affiliates of Purchaser to (i) purchase specified Acquired Assets; (ii) assume specified Assumed Liabilities; and/or (iii) employ Transferred Employees, in each case, as of the Closing Date (any Person that shall be properly designated by Purchaser in accordance with this clause, a "Purchaser Designee"); it being understood and agreed, however, that any such right of Purchaser to designate a Purchaser Designee is conditioned upon such Purchaser Designee being able to perform the applicable covenants under this Agreement and, as applicable, any other transaction agreement to which Purchaser is party and demonstrate satisfaction of the requirements of Section 365 of the Bankruptcy Code (to the extent applicable).  As soon as reasonably practicable and in no event later than three (3) Business Days prior to the Closing, Purchaser shall make any such designations of Purchaser Designees by way of a written notice to be delivered to the Sellers.  No such designation shall relieve Purchaser of any of its obligations hereunder and any breach hereof by a Purchaser Designee shall be deemed a breach by Purchaser.  Purchaser and Purchaser Designees shall be jointly and severally liable for any obligations of Purchaser and such Purchaser Designees hereunder.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, all Purchaser Designees appointed in accordance with this Section 2.3 shall be included in the definition of "Purchaser" *mutatis mutandis* for all purposes under this Agreement and all such Purchaser Designees shall be deemed to have made all of the representations and warranties of Purchaser set forth in this Agreement.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as disclosed in (x) the Parent SEC Documents publicly available prior to the date hereof (but excluding any predictive, cautionary or forward looking disclosures contained or referenced under the captions "Risk Factors," "Forward Looking Statements," "Quantitative and Qualitative Disclosures About Market Risk" or any similar precautionary sections and any other disclosures contained or referenced therein of information, factors or risks, in each case, that are predictive, cautionary or forward looking in nature) (it being understood that this clause (x) will not apply to any of Section 3.1, Section 3.2, Section 3.3, Section 3.4, Section 3.5, Section 3.8 or Section 3.27) or (y) the disclosure letter delivered by the Sellers to the Purchaser immediately prior to the execution of this Agreement (the "Seller

Disclosure Letter") (it being understood that any information set forth in one section or subsection of the Seller Disclosure Letter shall be deemed to apply to and qualify the representation and warranty set forth in this Agreement to which it corresponds in number and, whether or not an explicit reference or cross-reference is made, each other representation and warranty set forth in this Article III for which it is reasonably apparent on its face that such information is relevant to such other section), each of the Sellers jointly and severally represents and warrants to the Purchaser that, as of the date hereof and as of the Closing:

Section 3.1    Qualification, Organization, etc. Each Seller is a legal entity duly organized, validly existing and in good standing (with respect to jurisdictions that recognize such concept) under the Laws of its respective jurisdiction of organization and each Seller has all requisite corporate, limited liability or similar power and authority to own, lease and operate its properties and assets and to carry on its business (including the Business) as presently conducted in all material respects. Each Seller is duly qualified or authorized to do business and is in good standing (with respect to jurisdictions that recognize such concept) as a foreign corporation or other entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified, authorized or, where relevant, in good standing, has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Sellers have made available to the Purchaser a complete, true and correct copy of the organizational documents of each Seller as in effect on the date hereof. None of the Sellers is in violation of any of the provisions of its certificate of incorporation or bylaws (or equivalent organizational documents).

Section 3.2    Ownership. All of the outstanding capital stock or other voting securities of or other ownership interests in each Subsidiary of the Sellers are owned by the Sellers, directly or indirectly, and all of the outstanding capital stock or other voting securities of or other ownership interests in each of the Purchased Entities set forth on Section 3.2 of the Seller Disclosure Letter are owned by the Sellers, directly or indirectly. Section 3.2 of the Seller Disclosure Letter sets forth (i) a true, complete and correct organizational chart of the Sellers and their Subsidiaries, including, for each of the Sellers and Subsidiaries, (x) its name, (y) its jurisdiction of organization and (z) its ownership interest (including type, amount and percentage) by the Sellers, as well as its ownership interest (including type, amount and percentage) by any other Person or Persons and (ii) a true, compete and correct chart of the Purchased Ownership Interests, including, for each Purchased Ownership Interest, (y) its name and (z) its ownership interest (including percentage) by the relevant Seller. Each Subsidiary of the Sellers is directly or indirectly wholly owned by the Sellers. Other than the capital stock or other ownership interests that the Sellers own of their Subsidiaries and the Purchased Entities as set forth on Section 3.2 of the Seller Disclosure Letter, none of the Sellers own, directly or indirectly, any capital stock or other ownership interests of any other Person. None of the Sellers or their Subsidiaries is obligated to make any investment in or capital contribution to any Person. There are no restrictions on the Sellers' ability to transfer Sellers' ownership in the Purchased Entities to Purchaser at Closing free and clear of all Encumbrances (other than restrictions on transfers in the applicable organizational documents which cannot be discharged by the Sale Order).

Section 3.3    <u>Authority of the Sellers</u>.  Each Seller has, subject to the entry and effectiveness of the Sale Order, all requisite corporate or limited liability company power and authority necessary to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Documents to which each such Seller is a party and to consummate the transactions contemplated hereby and thereby.  Subject to the entry and effectiveness of the Sale Order, the execution, delivery and performance of this Agreement and such Ancillary Documents by each Seller and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite corporate (or equivalent) action of such Seller, including with respect to the Parent, by the Board of Directors of Parent, and no other corporate proceedings (pursuant to any Seller's organizational documents or otherwise) on the part of any Seller is necessary to authorize the consummation of, and to consummate, the transactions contemplated hereby and thereby.  Subject to the entry and effectiveness of the Sale Order, this Agreement and each such Ancillary Document has been, or at or prior to Closing (as the case may be) will be, duly and validly executed and delivered by each Seller, and, assuming the due authorization, execution and delivery of this Agreement and each such Ancillary Document by the parties hereto and thereto, as applicable, constitute a legal, valid and binding obligation of each Seller, enforceable against each such Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and similar Laws affecting creditors' rights generally now or hereafter in effect and to general equitable principles (collectively, the "<u>Enforceability Limitations</u>").

Section 3.4    <u>Consents and Approvals</u>.  Subject to the entry and effectiveness of the Sale Order and except (i) as required to comply with the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>") and (ii) for notices, filings and consents required in connection with the Chapter 11 Cases, including the requirements of the Bidding Procedures Order, no notice, consent, approval, permit or authorization of, or declaration, filing or registration with, any Governmental Entity or any third party is necessary or required to be made or obtained by any Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Documents to which a Seller is a party and the consummation of the transactions contemplated hereby and thereby, except for such notices, consents, approvals, permits, authorizations, declarations, filings or registrations, which, if not made or obtained, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.5    <u>No Violations</u>.  Neither the execution, delivery or performance of this Agreement and the Ancillary Documents by the Sellers nor the consummation by the Sellers of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order and the Bidding Procedures Order, compliance by it with any of the provisions hereof or thereof, do or will (a) conflict with or result in any violation or breach of any provisions of the certificate of incorporation, bylaws or other organizational documents of any Seller, (b) with or without notice or lapse of time or both, conflict with or result in any breach or violation of or constitute a default or change of control under, or give rise to a right of, or result in, termination, modification, cancellation, first offer, first refusal or acceleration of any obligation or to the loss of a benefit under any (i) Contract to which any Seller is a party or by or to which any of their respective properties, rights or assets are bound or subject or (ii) license, Permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Entity, (c) result in the creation or imposition of any Encumbrance on any Acquired Asset other

19

than (x) with respect to the execution and delivery of this Agreement, Permitted Pre-Closing Encumbrances and (y) with respect to the execution and delivery of the Ancillary Documents and with respect to the performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, the Permitted Post-Closing Encumbrances, in each case, on any properties, rights or assets of the Sellers or (d) conflict with or violate any Order or Law applicable to any Seller or their respective properties, rights or assets except in the case of the foregoing clauses (b) and (c), for breaches, violations, defaults, rights, creations or impositions that (y) have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (z) are excused by or unenforceable as a result of the entry or effectiveness of the Sale Order.

Section 3.6    Financial Statements.  The Sellers have made available to the Purchaser copies of the audited consolidated balance sheet and the related consolidated statements of operations, comprehensive income, changes in stockholders' equity and cash flows of the Parent and its consolidated Subsidiaries as of and for the fiscal years ended December 29, 2019 and December 30, 2018, respectively (collectively the "Audited Financial Statements"). Subject to the notes thereto, the Audited Financial Statements were prepared, in all material respects, in accordance with GAAP consistently applied in accordance with the Parent's accounting policies and past practices throughout the periods indicated.  The Sellers have made available to Purchaser unaudited consolidated balance sheets for the Parent and its Subsidiaries as of May 31, 2020 and the related condensed consolidated statements of operations, stockholder's equity (deficit) and cash flows for the five (5)-month period ending May 31, 2020 (collectively, the "Unaudited Financial Statements").  The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied except for the absence of footnotes and customary year-end adjustments.  The Audited Financial Statements and the Unaudited Financial Statements (together the "Financial Statements") (i) were prepared based on the books and records of the Sellers and (ii) fairly present in all material respects the financial position of the Sellers at and as of the dates specified and the results of their operations for the period covered, subject to customary year-end adjustments.  The copies of the Financial Statements made available to the Purchaser are true, correct and complete copies of such Financial Statements and present fairly, in all material respects, the consolidated financial position, results of operations, changes in stockholders' equity (deficit) and cash flows of the Parent and the consolidated Parent Subsidiaries as of the respective dates and for the respective periods referred to in the Financial Statements.

Section 3.7    Title to Property; Sufficiency of Assets.

(a)    The Sellers have good and marketable title to, or, in the case of property leased or licensed by the Sellers, a valid leasehold interest in or all rights to use, all of the Acquired Assets (other than the Real Property), free and clear of all Encumbrances other than Permitted Pre-Closing Encumbrances.  Upon the entry and effectiveness of the Sale Order, and, with respect to certain of the Deeded Real Property, subject to the Sale Contracts, the Sellers will have the power and right to sell, assign, transfer, convey and deliver, as the case may be, to the Purchaser the Acquired Assets, and at the Closing, the Sellers will sell, assign, transfer, convey and deliver to the Purchaser good title to, or, in the case of tangible personal property leased by the Sellers, a valid leasehold interest in, the Acquired Assets, free and clear of all Encumbrances other than Permitted Post-Closing Encumbrances.

(b)     The Acquired Assets (i) constitute substantially all of the assets used by or held for use by the Sellers in connection with or otherwise related to the Business, other than the Excluded Assets; (ii) will permit the Purchaser to conduct the Business substantially as it is being conducted on the date hereof, except as a result of any assets being Excluded Assets; (iii) are in adequate working order and are suitable for the uses for which they are intended; and (iv) to the Knowledge of the Sellers, will permit the Purchaser to comply as of the Closing Date in all material respects with all Laws, Permits and Orders applicable as of the Closing Date to the Business and the ownership and use of the Acquired Assets.

Section 3.8     Absence of Certain Changes.

(a)     Except to the extent arising out of or relating to the Chapter 11 Cases, this Agreement or the transactions contemplated hereby, from the Petition Date through the date hereof:  (i) the Business has been conducted in all material respects in the ordinary course of business consistent with past practice and (ii) none of the Sellers has taken any action that, if taken after the date hereof, would constitute a material breach of, or require the consent of the Purchaser under, Section 5.1.

(b)     From the Petition Date, there has not occurred any Effect that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.9     Brokers or Finders.  Except as set forth on Section 3.9 of the Seller Disclosure Letter, none of the Sellers have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby.

Section 3.10     Litigation.  Except as would not, individually or in the aggregate, have a Material Adverse Effect, and except for the Chapter 11 Cases, there are no Actions, Claim or Orders pending, outstanding or, to the Knowledge of the Sellers, threatened against the Business or the Sellers or any of their respective properties, rights or assets, whether at law or in equity or whether civil or criminal in nature, and there are no orders, judgments or decrees of or settlement agreements, by or before any arbitrator or Governmental Entity.  To the Knowledge of the Sellers, there are no investigations relating to the Business pending or threatened in writing by or before any arbitrator or any Governmental Entity, which would reasonably be expected to be material to the Business or the Acquired Assets, taken as a whole.

Section 3.11     Intellectual Property.

(a)     Section 3.11(a) of the Seller Disclosure Letter sets forth the (i) issued Patents and Patent applications, (ii) Trademark registrations and applications and (iii) registered domain names, in each case ((i)-(iii)), that are owned as of the date hereof by a Seller.  All of the Seller Registered Intellectual Property is subsisting and, all such Seller Registered Intellectual Property (for clarity, excluding any applications for registration) are valid and enforceable.

21

(b)      The Seller Intellectual Property constitutes all of the Intellectual Property owned by any Seller that is used in the conduct of their business as currently conducted, except as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)      The operation of the Business as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property of any other Person, except as would not, individually or in the aggregate, have a Material Adverse Effect.  There are no Actions currently pending or, to the Knowledge of the Sellers, currently threatened in writing against any Sellers alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any such other Person in any material respect.

(d)      To the Knowledge of the Sellers, no Person is infringing, misappropriating or otherwise violating any of the Intellectual Property owned by, or any Intellectual Property exclusively licensed to, the Sellers, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect there are no Actions currently pending or threatened in writing by the Sellers alleging that any Person is infringing, misappropriating or otherwise violating any Intellectual Property owned by, or Intellectual Property exclusively licensed to, the Sellers.

(e)      Each Seller has taken commercially reasonable measures to maintain the confidentiality of material Trade Secrets that the Sellers intend to maintain as confidential, except as would not, individually or in the aggregate, have a Material Adverse Effect.

(f)      To the Knowledge of the Sellers, for the past three (3) years the Sellers have been in compliance in all material respects with applicable Laws relating to privacy, data protection, and the collection and use of personal information collected, used, or held for use by any of the Sellers.  As of the date hereof, no claims are pending, or, to the Knowledge of the Sellers as of the date hereof, currently threatened in writing against any of the Sellers alleging a violation of any Person's privacy or personal information.  To the Knowledge of the Sellers, no Person has gained unauthorized access to or made any unauthorized use of any information technology systems or software owned by any of the Sellers or any personal information collected, used, or held for use by any of the Sellers, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the Knowledge of the Sellers, (i) the consummation of the transactions contemplated hereby and the transfer of the personal information in connection therewith will not violate any privacy policies of the Sellers, and (ii) upon Closing, Purchaser will own and continue to have the right to use all personal information collected, used, or held for use by any of the Sellers on substantially similar terms as Sellers enjoyed immediately prior to the Closing, except, in each case of (i) and (ii), as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.12    Real Property.

22

(a)      Section 3.12(a) of the Seller Disclosure Letter sets forth a true and complete list of each Deeded Real Property. Seller has valid fee simple title to the Deeded Real Property, free and clear of all Encumbrances, other than Permitted Pre-Closing Encumbrances. Other than as set forth on Section 3.12(a) of the Seller Disclosure Letter, none of the Sellers have leased, or otherwise granted the right to use or occupy, any portion of the Owned Real Property to any Person.

(b)      Section 3.12(b) of the Seller Disclosure Letter sets forth a true and complete list of the Leased Real Property (as hereinafter defined) which is subject to Leases with a current base rental amount of $15,000 per month or greater. The Leases are in full force and effect, and each Seller has a good and valid leasehold interest in or contractual rights to use or occupy, the real property leased, used or otherwise occupied by each Seller (other than pursuant to a Rejected Lease), as applicable (the "Leased Real Property") subject to the terms of the applicable Lease, free and clear of all Encumbrances, other than Permitted Pre-Closing Encumbrances.

(c)      The Deeded Real Property and the Leased Real Property (together, the "Real Property") constitute all real property currently used in the Business.  To the Knowledge of the Sellers, there are no pending or threatened condemnation, eminent domain or similar proceedings affecting the Real Property.

(d)      Except as set forth on Section 3.12(d) of the Seller Disclosure Letter, the Rejected Leases set forth on Section 3.8(a) of the Seller Disclosure Letter are not material to the operations of the Business, the Acquired Assets or the Assumed Liabilities.

Section 3.13    Assigned Contracts.  Subject to the entry of the Sale Order, each Assigned Contract is in full force and effect and is a valid, binding and enforceable obligation of the applicable Seller party thereto and, to the Knowledge of the Sellers, the other parties thereto, in accordance with its terms and conditions, in each case subject to the Enforceability Limitations.  True, complete and correct copies of each Available Contract that are material to the Business have been made available to the Purchaser.

Section 3.14    Executory Contracts; Material Contracts.  Schedule 1.5(a) sets forth a true, correct and complete list, as of the date hereof, of the Available Contracts. Each Material Contract is in full force and effect and is a valid and binding obligation of each Seller party thereto in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity and (y) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Upon entry of the Sale Order, other than the payment of Cure Costs (i) none of the Sellers will be in breach or default of its obligations under any Material Contract; (ii) to the Knowledge of the Sellers, no condition exists that with notice or lapse of time or both would or would reasonably be expected to constitute a default by any of the Sellers under any Material Contract; and (iii) to the Knowledge of the Sellers, no other party to any Material Contract is in breach or default thereunder, except in the case of clauses (i), (ii) and (iii) for any breaches or defaults that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

23

Section 3.15    Insurance.  Section 3.15 of the Seller Disclosure Letter sets forth all insurance policies held by the Sellers covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage).  Such policies are in full force and effect (subject to periodic renewals thereof).  The Sellers have paid all premiums on such policies due and payable prior to the date hereof, or, if not yet due, have properly accrued for such payables.  Since the Petition Date, to the Knowledge of the Sellers, the Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

Section 3.16    Affiliate Interests.  Other than any Benefit Plan and travel advances entered into the ordinary course of business consistent with past practice, there are no Contracts between any of the Sellers and any Affiliate of any of the Sellers (but not including another Seller or a Subsidiary of a Seller).  Other than employment arrangements, compensation benefits and travel advances entered into in the ordinary course of business consistent with past practice, and other than arrangements or relationships that would not be required to be disclosed in the Parent SEC Documents filed pursuant to Regulation S-K of the Securities Act of 1933, as amended (the "Securities Act"), to the Knowledge of the Sellers, no such Affiliate of any of the Sellers controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from or has the right to participate in the profits of, other than through the ownership of any publicly traded entity, (i) any Person which does business with any Seller or is competitive with the Business in any material respect, or (ii) any material property, asset or right which is used by any of the Sellers.  There exists no Indebtedness of any such Affiliate to any Seller, nor any Indebtedness of any Seller to any such Affiliate of any of the Sellers.

Section 3.17    Bank Accounts.  Section 3.17 of the Seller Disclosure Letter sets forth a complete list of all bank accounts and lockboxes (including any deposit accounts, securities accounts and any sub-accounts) of the Sellers.  The Sellers own all right, title and interest in and to such bank accounts and lockboxes free and clear of all Encumbrances (other than Permitted Pre-Closing Encumbrances).

Section 3.18    Undue Influence.  In connection with the operation of the Business, none of the Sellers or, to the Knowledge of the Sellers, any director, officer, agent, employee or Affiliate of any of the Sellers, has taken any action, directly or indirectly, with respect to the Business that would result in a violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "FCPA").  The Sellers, and, to the Knowledge of the Sellers, their Affiliates, have conducted the Business in compliance with the FCPA in all material respects and maintain procedures which are reasonably expected to ensure compliance therewith.

Section 3.19    Compliance with Laws; Permits.

(a)        The Sellers are in possession of all franchises, grants, authorizations, business licenses, permits, consents, waivers, filings, accreditations, certifications, certificates of occupancy, easements, rights of way, notifications, exemptions, approvals, registrations, clearances and orders, together with all modifications, renewals, amendments, supplements and extensions thereof and applications therefor, of or from any Governmental Entity or pursuant to any applicable Law (the "Permits") necessary for the

24

operation and conduct of the Business or the Acquired Assets in compliance with Law, except where the failure to have any of the Permits has not been and would not reasonably be expected to be, individually or in the aggregate, material to the operation of the Business or the Acquired Assets.  The Permits set forth on Section 3.19(a) of the Seller Disclosure Letter are all of the Permits held by the Sellers with respect to the current operation and conduct of the Business and the Acquired Assets, the absence of which would be reasonably expected to adversely affect the operation of the Business or the Acquired Assets from and after the Closing.

(b)    Except as would not reasonably be expected to be material to the Business or the Acquired Assets, the Sellers have conducted the Business for the past three (3) years and currently own and operate the Acquired Assets in accordance, with all Laws, Orders and Permits applicable to Sellers and the Acquired Assets during such period, and the Business is in compliance with all applicable Laws, Orders and Permits (including any anti-bribery legal requirements) and has obtained all approvals necessary for owning and operating its assets and has made all necessary filings with all Governmental Entities having jurisdiction necessary for owning and operating its assets.

(c)    Except as would not be material to the Business or the Acquired Assets none of the Sellers, nor to the Knowledge of the Sellers, any of their Representatives have received within the past three (3) years any written notice or other communication from a Governmental Entity that alleges that the Business is not in compliance with any Law, Order or Permit applicable to the Business or the operations or properties of the Business or the Acquired Assets or that threatens or states the intention on the part of any issuing authority to revoke, cancel, suspend or modify any Permit necessary for the current operation and conduct of the Business and the Acquired Assets (except with respect to regular periodic expirations and renewals thereof).  Except as would not be material to the Business or the Acquired Assets: (i) no Seller has had any Permits that are necessary for the operation and conduct of the Business and the Acquired Assets appealed, denied, revoked, restricted or suspended during the past three (3) years; and (ii) no Seller is currently a party to any proceedings involving the possible appeal, denial, revocation, restriction or suspension of any Permits that are necessary for the current operation and conduct of the Business and the Acquired Assets or any of the privileges granted thereunder (except where the obligation to hold such a Permit is being contested in good faith by appropriate proceedings diligently conducted or is excused by the Bankruptcy Code).

(d)    Subject to the entry of the Sale Order, the Sellers have complied in all material respects with all requirements of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Acquired Assets (including the assumption and assignment to the Purchaser of any Assigned Contracts) to the Purchaser pursuant to this Agreement.

Section 3.20    Employee Benefit Matters.

(a)    Section 3.20(a) of the Seller Disclosure Letter sets forth a complete and correct list of each Assumed Benefit Plan. Correct and complete copies of the following documents, with respect to each of the Assumed Benefit Plans, as applicable, have been made available to the Purchaser: (i) any plan documents, and all material amendments thereto, (ii) the

most recent Forms 5500 and (iii) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(b)    Except as would not, individually or in the aggregate, have a Material Adverse Effect: (i) each Assumed Benefit Plan has been administered in accordance with its terms and in compliance with applicable Law; (ii) all contributions and payments required to be made by the Sellers to any Assumed Benefit Plan have been paid when due; and (iii) no Action (other than routine claims for benefits) is currently pending or, to the Knowledge of the Sellers, is currently threatened, against or with respect to any Assumed Benefit Plan, including any audit or inquiry by the Internal Revenue Service or United States Department of Labor.

(c)    None of the Assumed Benefit Plans promises or provides retiree medical or other retiree welfare benefits to any person except as required by applicable Law.

(d)    No Assumed Benefit Plan is (i) subject to Title IV of ERISA or (ii) a multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA).

(e)    Each Assumed Benefit Plan intended to be qualified under Section 401(a) of the Code, has received a favorable determination letter from the Internal Revenue Service and, to the Knowledge of the Sellers, circumstances do not exist that are likely to result in the loss of the qualification of such plan under Section 401(a) of the IRC.

(f)    The consummation of the Acquisition, whether alone or in combination with any other event, will not (i) entitle any current or former employee of the Sellers or any ERISA Affiliate to severance benefits or any other payment (including unemployment compensation, golden parachute, bonus or benefits) under any Assumed Benefit Plan; or (ii) accelerate the time of payment or vesting of any such benefits or increase the amount of compensation due any such current or former employee under any Assumed Benefit Plan.

Section 3.21    <u>Labor Matters</u>.

(a)    Except as set forth on <u>Section 3.21(a)</u> of the Seller Disclosure Letter, no Seller is a party to, or bound by, any agreement with respect to its employees with any labor union or any other employee organization, group or association organized for purposes of collective bargaining.  Except as set forth on <u>Section 3.21(a)</u> of the Seller Disclosure Letter, no employees of the Sellers are represented by any labor union or any other employee organization, group or association organized for purposes of collective bargaining with respect to their employment with the Sellers.  As of the date hereof, there is no pending or, to the Knowledge of the Sellers, threatened labor strike, slowdown, lockout or work stoppage involving the Sellers or any of their respective employees, which would, individually or in the aggregate, have a Material Adverse Effect.  As of the date hereof, the Sellers are not the subject of any material proceeding that seeks to compel the Sellers to bargain with any labor union or labor organization.

(b)    As of the date hereof, the Sellers are not the subject of any material proceeding that asserts that any Seller has committed an unfair labor practice with respect any employees of the Sellers.

(c)    The Sellers are in material compliance with all labor Laws with respect to all current and former employees and service providers of the Sellers, and no current or former employee or service provider of the Sellers has been improperly included in or excluded from any Benefit Plan.

(d)    Each Seller is and, during the preceding ninety (90) days, has been, in compliance in all material respects with the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state, local or foreign Law relating to plant closings or mass layoffs (the "WARN Act").

(e)    To the Knowledge of the Sellers, no Seller is party to a settlement agreement with a current or former officer, employee or independent contractor of the Sellers that involves allegations relating to sexual harassment by either (i) an officer of the Sellers or (ii) an employee of the Sellers at the level of Vice President or above.  To the Knowledge of the Sellers, no material allegations of sexual harassment are pending against (i) any officer of the Sellers or (ii) an employee of the Sellers at a level of Vice President or above.

(f)    Section 3.21(f) of the Seller Disclosure Letter sets forth a true, correct and complete redacted list of each employee of the Sellers, including date of hire, position, wage rate, bonus amount, location, and classification as exempt vs. non-exempt as well as the date of any approved leave and the estimated return date from such approved leave.

Section 3.22    Environmental Matters.

(a)    Except for matters that have not been and would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Acquired Assets:

(i)    the Sellers' operation of the Business, and the Real Property related thereto, have complied during the previous three (3) years and are in compliance with all Environmental Laws;

(ii)    Sellers have not received any written notice, written report or other written information from any Person alleging any pending or, to the Knowledge of the Sellers, threatened violation, non-compliance, liability or potential liability under Environmental Laws with regard to any of the Real Property or the Business, or any prior business for which the Sellers have retained, assumed or otherwise become subject to liability, including under any Contract or Environmental Law, nor have the Sellers received written notice of, nor do the Sellers have, any pending or, to Knowledge of the Sellers, threatened claims alleging any violations of Environmental Law with regard to any of the Real Property or the Business, or any prior business for which the Sellers have retained, assumed or otherwise become subject to liability, including under any Contract or Environmental Law;

(iii)    to the Knowledge of the Sellers, the Real Property does not contain any Hazardous Substances in amounts or concentrations which (a) constitute a violation of, or (b) would give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under, any Environmental Law;

27

(iv)    to Knowledge of the Sellers, no Seller or any other Person, has treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled, exposed any Person to, or discharged any Hazardous Substances except as authorized by Environmental Permits, or owned or operated any property or facility contaminated by any Hazardous Substances, in each case as has given or could reasonably be expected to give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, with respect to the Acquired Assets or the Business, under any Environmental Law;

(v)    no Action is pending or, to Knowledge of the Sellers, threatened under any Environmental Law against the Sellers or with respect to the Acquired Assets, including the Real Property, or the Business, nor are there any Orders outstanding under any Environmental Law with respect to the Acquired Assets, including the Real Property or the Business;

(vi)    the Sellers (a) hold, maintain and are in compliance with all material Environmental Permits required for the Business, any of their operations, or required for their ownership, operation or use of the Real Property; (b) are, and have been for the past three years, in compliance with all Environmental Permits, in all material respects; and (c) have not received any written notice that the Environmental Permits will not be renewed;

(vii)    the Sellers have made available copies of all material environmental or employee health and safety assessments, audits (including compliance audits) and evaluations within their possession or under their reasonable control which have been completed within the past three (3) years;

(viii)    to the Knowledge of the Sellers, there are no underground storage tanks, transformers or other equipment containing PCBs, underground injection wells, non-naturally occurring radioactive materials or septic tanks or waste disposal pits (to the extent such tanks or pits constitute Acquired Assets) associated with or located on the Acquired Assets or the Business, in each case as would reasonably be expected to give rise to liability under Environmental Laws; and

(ix)    to the Knowledge of the Sellers, neither the execution of this Agreement and the Ancillary Documents nor consummation of the transactions contemplated hereby and thereby shall trigger any investigation or remediation obligations pursuant to Environmental Laws, which reasonably would be expected, individually or in the aggregate, to result in material Environmental Liability.

Section 3.23    Taxes.

(a)    The Parent and its Affiliates have timely filed all income Tax and other material Tax Returns required to be filed (taking into account requests for extensions to file such Tax Returns) with respect to the Acquired Assets and the Business, and have timely paid all material amount of Taxes due and owing with respect to the Acquired Assets and the Business whether or not included in any Tax Return for all periods through and including the date of this

Agreement.  All such Tax Returns were true, correct, and complete in all material respects as they related to the Acquired Assets or the Business.

(b)    No deficiencies for any material Taxes with respect to the Acquired Assets or the Business have been proposed, asserted or assessed in writing against the Parent and its Affiliates that are still pending and there are no material current disputes related to the Acquired Assets or the Business with any Taxing Authority.

(c)    There is no pending material Action by any Taxing Authority with respect to Taxes with respect to the Acquired Assets or the Business and no such Action has been threatened in writing.

(d)    No written claim has been made by a Taxing Authority in a jurisdiction where the Parent or any of its Affiliates does not file Tax Returns that any such entity is subject to taxation in that jurisdiction with respect to the Acquired Assets or the Business.

(e)    There is no waiver currently in effect relating to any statute of limitations with respect to the Acquired Assets or the Business with respect to any Taxes.

(f)    There are no tax liens upon any Acquired Assets or the Business other than Permitted Pre-Closing Encumbrances.

(g)    The Parent and each of its Affiliates has complied in all material respects with its withholding obligations for all Taxes required to have been withheld and paid with respect to the Acquired Assets or the Business in connection with amounts owing to any employee, or independent contractor associated with the Acquired Assets or the Business and has paid all material payroll and similar Taxes required to have been paid by the Parent and its Affiliates with respect to any employee, or independent contractor associated with the Acquired Assets or the Business.

Section 3.24    Customers and Suppliers.  Section 3.24 of the Seller Disclosure Letter lists, as of the date of this Agreement, each of the top 20 customers and suppliers of the Business based on revenue and expenditures during the 2019 fiscal year and the five (5) month period ended May, 31, 2020 (each, a "Material Customer" or "Material Supplier", as applicable.).  Since January 1, 2018, no Material Customer or Material Supplier has terminated, cancelled, materially decreased the volume or materially reduced its business, and (i) for suppliers, materially increased the pricing, or materially altered other terms of its business with any of the Sellers in respect of the Business, or, to the Knowledge of the Sellers, indicated an intention to terminate, cancel, materially reduce its business, materially increase its pricing, or materially alter other terms of its business with any of the Sellers in respect of the Business, as applicable and (ii) for customers, materially altered other terms of its business with any of the Sellers in respect of the Business, or, to the Knowledge of the Sellers, indicated an intention to terminate, cancel, materially reduce the volume, materially reduce its business or materially alter other terms of its business with any of the Sellers in respect of the Business.

Section 3.25    Inventory.  All Inventory included in the Acquired Assets consists of a quantity and quality that is in all material respects usable and salable in the ordinary course

of business consistent with past practice, subject only to the reserves for Inventory write-downs or unmarketable, obsolete, defective or damaged Inventory included in the latest balance sheet included in the Financial Statements.

Section 3.26    Parent SEC Documents.  Parent has filed or furnished with the SEC all of the Parent SEC Documents it has been required to file or furnish since January 1, 2017. As of their respective filing dates, the Parent SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act, as applicable.  None of the Parent SEC Documents filed under the Exchange Act as of their filing dates contained any untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, except to the extent corrected by a subsequently filed document with the SEC.  None of the Parent SEC Documents filed under the Securities Act contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein in light of the circumstances in which they were made not misleading at the time such Parent SEC Documents became effective under the Securities Act.

Section 3.27    Qualifying Cash Proposal.  Since June 30, 2020, neither Sellers nor Parent have received any written proposal or written offer from a Qualified Bidder (as defined in the Bidding Procedures) relating to the acquisition of any assets of the Business that are Acquired Assets (including any acquisition structured as a merger, consolidation, or share exchange) which provides for an aggregate amount of cash consideration of no less than $315,000,000 (a "Qualifying Cash Proposal").

Section 3.28    No Other Representations.  Except for the representations and warranties contained in Article IV, each of the Sellers acknowledges that it (a) has had an opportunity to conduct any and all due diligence with respect to the Purchaser and any of their respective Subsidiaries in connection with the transactions contemplated hereby, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents in connection with the transactions contemplated hereby, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Purchaser or any of its Subsidiaries or with respect to any other information provided or made available to such Seller in connection with the transactions contemplated hereby, or the completeness of any information provided in connection therewith.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Except as disclosed in the disclosure letter delivered by the Purchaser to the Sellers immediately prior to the execution of this Agreement (the "Purchaser Disclosure Letter") (it being understood that any information set forth in one section or subsection of the Purchaser Disclosure Letter shall be deemed to apply to and qualify the representation and warranty set forth in this Agreement to which it corresponds in number and, whether or not an explicit reference or cross-reference is made, each other representation and warranty set forth in this

Article IV for which it is reasonably apparent on its face that such information is relevant to such other section), the Purchaser represents and warrants to the Sellers as follows:

Section 4.1    Qualification; Organization.  The Purchaser is a legal entity duly organized, validly existing and in good standing (with respect to jurisdictions that recognize such concept) under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted, except where the failure to be so existing and in good standing or to have such power and authority would not, individually or in the aggregate, materially impair or materially delay its ability to perform its obligations under this Agreement. The Purchaser is qualified to do business and is in good standing (with respect to jurisdictions that recognize such concept) as a foreign corporation or other entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or, where relevant, in good standing, would not, individually or in the aggregate, materially impair or materially delay its ability to perform its obligations under this Agreement.

Section 4.2    Authority of the Purchaser.  The Purchaser has all requisite corporate power and authority necessary to execute and deliver and perform its obligations under this Agreement and each of the Ancillary Documents to which it is a party (subject to entry of the Sale Order).  Subject to the entry and effectiveness of the Sale Order, the execution, delivery and performance of this Agreement and such Ancillary Documents by the Purchaser and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite corporate action of the Purchaser, as applicable, and no other corporate proceedings (pursuant to any of the Purchaser's organizational documents or otherwise) on the part of the Purchaser is necessary to authorize the consummation of, and to consummate the transactions contemplated hereby and thereby.  This Agreement and each such Ancillary Document has been, or at or prior to Closing (as the case may be) will be, duly and validly executed and delivered by the Purchaser to the extent a party thereto, and, assuming the due authorization, execution and delivery of this Agreement and each such Ancillary Document by the parties hereto and thereto, as applicable, constitute a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to the Enforceability Limitations.

Section 4.3    Consents and Approvals.  Subject to the entry and effectiveness of the Sale Order, except as required to comply with the HSR Act, no consent, approval, permit or authorization of, or declaration, filing or registration with, any Governmental Entity is necessary or required to be made or obtained by the Purchaser in connection with the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, except in connection with or compliance with the HSR Act, except for such consents, approvals, permits, authorizations, declarations, filings or registrations that would not, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement.

Section 4.4    No Violations.  Except as described in Sections 3.4 and 4.3, neither the execution, delivery or performance of this Agreement and the Ancillary Documents by the Purchaser to the extent a party thereto nor the consummation by the Purchaser of the transactions

31

contemplated hereby or thereby will (a) conflict with or result in any violation or breach of any provisions of the certificate of incorporation, bylaws or other organizational documents of the Purchaser, (b) with or without notice or lapse of time or both, conflict with or result in any breach or violation of or constitute a default or change of control under, or give rise to a right of, or result in, termination, modification, cancellation, first offer, first refusal or acceleration of any obligation or to the loss of a benefit under any Contract to which the Purchaser is a party or by or to which any of its respective properties, rights or assets are bound or subject or (c) conflict with or violate any Order or Law applicable to the Purchaser or its properties, rights or assets, except in the case of the preceding clauses (b) and (c), for breaches, violations, defaults, rights, creations or impositions that would not reasonably be expected to, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement.

Section 4.5    Brokers.  The Purchaser has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby for which the Sellers are or will become liable, and the Purchaser shall indemnify and hold harmless the Sellers from any claims with respect to any such fees or commissions.

Section 4.6    Financing.  The Purchaser shall, at the Closing (after giving effect to the Credit Bid), have sufficient funds available to deliver the Purchase Price to the Sellers and consummate the transactions contemplated by this Agreement to the extent payable on the Closing Date, including the timely satisfaction of the Assumed Liabilities.

Section 4.7    Investment Purpose.  The Purchaser is acquiring the Purchased Ownership Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof.  The Purchaser acknowledges that the Purchased Ownership Interests are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Purchased Ownership Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable.  The Purchaser has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

Section 4.8    Acknowledgment by the Purchaser.  The Purchaser has conducted such investigations of the Sellers and its Subsidiaries as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the Ancillary Documents to which the Purchaser is a party and the consummation of the transactions contemplated hereby and thereby.  The Purchaser acknowledges that it and its Representatives have been permitted access to the books and records, facilities, equipment, Contracts, insurance policies (or summaries thereof) and other properties and assets of the Sellers, and that it and its Representatives have had an opportunity to meet with the officers and employees of the Sellers to discuss the Business.  Neither the Sellers nor any other Person (including any officer, director, member or partner of the Sellers or any of their Affiliates) shall have or be subject to any liability to the Purchaser, or any other Person, resulting from the Purchaser's use of any information,

32

documents or material made available to the Purchaser in any "data rooms", management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby or by this Agreement and the Ancillary Documents, except as otherwise expressly set forth in this Agreement or to the extent that such information, documents or material are incorporated by reference into this Agreement or the Seller Disclosure Letter.

ARTICLE V

COVENANTS

Section 5.1    Conduct of Business Pending the Closing.

(a)    From the date hereof and the earlier of the Closing or the date, if any, on which this Agreement is validly terminated pursuant to Article VII, except as set forth in Section 5.1(a) of the Seller Disclosure Letter, and except (i) as expressly set forth in this Agreement or any Ancillary Document, (ii) as required by applicable Law (including the Bankruptcy Code), (iii) as consented to in writing by the Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed) or (iv) as required by, arising out of, relating to or resulting from the Chapter 11 Cases or otherwise required or approved by any Order of the Bankruptcy Court, the Sellers shall and shall cause their Subsidiaries (including, for the avoidance of doubt, the Purchased Entities to the extent the Sellers have such control) to:

(i)    carry on the Business in the ordinary course of business consistent with past practice (including respecting cash management and the collection of receivables and management of and the timing of the payment of payables) and use commercially reasonable efforts to maintain, preserve and protect the Acquired Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the ordinary course of business consistent with past practice and to manage any Assumed Liabilities in the ordinary course of business consistent with past practice;

(ii)    maintain their books, accounts and records in the ordinary course of business consistent with past practice;

(iii)    pay all post-petition Trade Payables and collect all Accounts Receivable after the Petition Date in the ordinary course of business consistent with past practice;

(iv)    use commercially reasonable efforts to (A) retain the services of its current executive officers (or their successors) who are in good standing and who are necessary to conduct the Business as it is currently being conducted in all material respects and (B) maintain their relationships with and preserve for the Business the goodwill of their key suppliers and customers in all material respects (it being understood that no increases to any payments or compensation, including any incentive, retention or similar compensation, shall be required in respect of either clause (A) or (B) hereof or other expenditures of funds (other than pursuant to the existing terms of any Contracts) or modification of Contract terms);

33

(v)    (A) comply in all material respects with all Laws applicable to them or having jurisdiction over the Business or any Acquired Asset, (B) comply in all material respects with contractual obligations applicable to or binding upon them pursuant to any Material Contracts (other than those obligations the compliance with which is excused during the Chapter 11 Cases), and (C) maintain in full force and effect all material Permits and comply with the terms of each such Permit (but only to the extent such Permits are necessary for the Business, the Acquired Assets and the Assumed Liabilities in the ordinary course of business consistent with past practice);

(vi)    cause any of their current property insurance policies with respect to the Business or any of the Acquired Assets or Assumed Liabilities not to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect, to the extent such coverage is reasonably available;

(vii)    maintain each Assumed Benefit Plan in accordance with their terms and applicable Law;

(viii)    file all material Tax Returns and pay or deposit all material Taxes on a timely basis in the ordinary course of business consistent with past practice;

(ix)    maintain, preserve and protect in full force and effect the existence of all material Intellectual Property owned by Sellers and included in the Acquired Assets, except for abandonment of Intellectual Property that is de minimis to the Business in the Sellers' reasonable business judgment;

(x)    pay no less than $6,106,897 of Cure Costs in accordance with the Sellers' budget; and

(xi)    use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing, (ii) that would reasonably be expected to impair the ability of Sellers or Purchaser to consummate the Closing in accordance with the terms hereof or to materially delay such consummation or (iii) that would reasonably be expected to increase the amount of Assumed Liabilities.

(b)    From the date hereof and the earlier of the Closing or the date, if any, on which this Agreement is validly terminated pursuant to Article VII, except as set forth in Section 5.1(b) of the Seller Disclosure Letter, and except (i) as expressly contemplated by this Agreement or any Ancillary Document, (ii) as required by applicable Law (including the Bankruptcy Code), (iii) as consented to in writing by the Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed) or (iv) as required by, arising out of, relating to or resulting from the Chapter 11 Cases or otherwise required or approved by any Order of the Bankruptcy Court, the Sellers shall not and shall not permit any of their Subsidiaries (including, for the avoidance of doubt, the Purchased Entities to the extent the Sellers have such control) to:

(i)    amend their certificate of incorporation, bylaws or other organizational documents;

(ii)    issue or sell any shares of capital stock or equity interests, or options, warrants, calls, subscriptions or other rights or agreements to acquire shares of capital stock or equity interests, or securities convertible into, exchangeable or exercisable for any of the foregoing;

(iii)    vote any Purchased Ownership Interests in a manner that would reasonably be expected to be adverse to Purchaser;

(iv)    acquire, sell, lease, license, transfer, abandon, allow to lapse or otherwise dispose of any of (a) the Purchased Ownership Interests, (b) any material Acquired Assets, including, for the avoidance of doubt, any Real Property, or the material properties or material assets of any Seller or (c) any other Acquired Assets (other than in the ordinary course of business consistent with past practice, taking into account the Sellers' status as debtors in possession, including purchases of Inventory in the ordinary course of business consistent with past practice);

(v)    declare or pay any dividends or distributions or redeem or repurchase any Purchased Ownership Interests;

(vi)    create, permit or allow any Encumbrance (other than Permitted Pre-Closing Encumbrances which will be discharged with no liability to Purchaser or its Affiliates following the Closing) of any of the Acquired Assets, tangible or intangible or remove any material equipment or other material assets (other than Inventory) from the Real Property;

(vii)    (A) incur or assume any Indebtedness or capitalized lease obligations or issue any debt securities, except for borrowings under the DIP Credit Agreement or (B) make any loans, advances or capital contributions to, or investments in, any other Person other than loans and advances to employees for travel and business expenses pursuant to a Benefit Plan in the ordinary course of business consistent with past practice;

(viii)    make any payments of (a) fees to Professionals retained by the Committee in excess of $12,415,000, (b) fees to Professionals retained by the Sellers in excess of $18,481,000 (it being understood that this Section 5.1(b)(viii)(b) shall not include any Professionals retained by the Sellers other than: Evercore Group L.L.C.; FTI Consulting, Inc.; Groom Law Group, Chartered; Togut, Segal & Segal LLP and Skadden, Arps, Slate, Meagher & Flom LLP), (c) First Lien AP Professionals Fees and Expenses (each as defined in the DIP Orders) for professionals retained by Chatham and its Affiliates in excess of $7,599,000, and (d) First Lien AP Professionals Fees and Expenses (each as defined in the DIP Orders) for professionals retained by Brigade and its Affiliates in excess of $5,080,092 during the period beginning on the Petition Date and ending on the Closing Date; provided that Sellers shall be permitted to pay an amount (determined in good faith in consultation with the Purchaser) not to exceed $1,605,908 of additional Retained Professional Fees and First Lien AP Professionals Fees and Expenses (each as defined in the DIP Orders) for professionals retained by Chatham and its

35

Affiliates and not professionals retained by Brigade and its Affiliates (it being understood that (1) solely for purposes of the proviso of this Section 5.1(b)(viii), the term "Retained Professional Fees" shall not include any Professionals retained by the Sellers other than: Evercore Group L.L.C.; FTI Consulting, Inc.; Groom Law Group, Chartered; Togut, Segal & Segal LLP and Skadden, Arps, Slate, Meagher & Flom LLP) and (2) the parties acknowledge that the numbers in this Section 5.1(b)(viii) were developed based upon the budget attached as Schedule 5.1(b)(viii));

(ix)    change in any material respect their accounting methods, principles or practices other than required by changes in GAAP;

(x)    acquire (by merger, consolidation or acquisition of stock or assets) any corporation, partnership or other business organization or division thereof or any equity interest therein (other than purchases of marketable securities in the ordinary course of business consistent with past practice);

(xi)    except for executory contracts and unexpired leases rejected by Sellers with the prior written consent of Purchaser, assume, reject or assign any Available Contract, other than Available Contracts that are deemed rejected by operation of Section 365(d)(4) of the Bankruptcy Code;

(xii)    except for (i) executory contracts and unexpired leases rejected by Sellers with the prior written consent of Purchaser and (ii) with respect to any Available Contract (or group of related Available Contracts) with aggregate payments of less than $100,000 in the 2019 calendar year and with expected aggregate payments in the 2020 calendar year of less than $100,000, terminate, modify or amend in any material respect, or waive any material rights or remedies under, any Available Contract, other than due to the expiration of the term or automatic renewals, in each case, in accordance with the terms of any such Available Contract;

(xiii)    sell, transfer, license, abandon or permit to lapse any material Seller Intellectual Property;

(xiv)    disclose any Trade Secrets to any Person, other than in the ordinary course of business consistent with past practice pursuant to a written confidentiality agreement;

(xv)    commence, settle, compromise or waive any Action with respect to the Business, the Acquired Assets or the Assumed Liabilities other than any Action respecting an amount in controversy that does not exceed $25,000;

(xvi)    fail to maintain existing insurance policies included in the Acquired Assets or to renew or replace existing insurance policies included in the Acquired Assets following their termination;

(xvii)    amend or modify or allow any material Permit to terminate, expire or lapse;

(xviii)  terminate, enter into or amend any Assumed Benefit Plan or any collective bargaining agreement;

(xix)    (i) other than in an immaterial manner, increase the compensation or benefits (including severance) payable to employees of the Sellers; or (ii) grant or pay any bonus, severance, retention or termination pay, other than pursuant to applicable Assumed Benefit Plans in effect as of the date hereof;

(xx)     hire any employees at or above the level of Vice President (other than employees hired to fill vacancies open on the date of this Agreement and for the maximum base compensation amount as set forth on Section 5.1(b)(xx) of the Seller Disclosure Letter));

(xxi)    make, change or revoke any material election relating to Taxes, change any annual accounting period for applicable Tax purposes, adopt or change any Tax accounting method, file any material amended Tax Return (other than an amended Tax Return to obtain any federal, state or local Income Tax refund), enter into any closing agreement with respect to material Taxes, settle any claim or assessment with respect to material Taxes, surrender any right to claim a material refund, offset or other reduction in Tax liability, or request or consent to any extension or waiver of the limitation periods applicable to any claim or assessment with respect to material Taxes (other than an extension granted in the ordinary course of business in connection with an extension for the filing of Tax Returns), in each case that adversely affects the Business, the Acquired Assets or the Assumed Liabilities;

(xxii)   enter into or renew any Material Contract (other than automatic renewals of Material Contracts in the ordinary course of business consistent with past practice in accordance with the terms thereof as in effect on the date hereof) or modify, amend or waive any right or obtain a modification, amendment or waiver of any obligation or fail to exercise any reserved right under any Material Contract;

(xxiii)  enter into any commitment for capital expenditures of the Business in excess of $1,000,000 for all such commitments in the aggregate;

(xxiv)  enter into any Contract which would materially restrict the Purchaser from competing in the industry in which the Business operates or in any geographic area;

(xxv)   terminate (other than for cause) any employee with a base compensation equal to or greater than $55,000; or

(xxvi)  agree or authorize, in writing or otherwise, to take any of the foregoing actions.

Without in any way limiting any party's rights or obligations under this Agreement, the parties understand and agree that (i) nothing contained in this Agreement shall give the Purchaser, directly or indirectly, the right to control or direct the operations of the Sellers, or the Business prior to the Closing and (ii) prior to the Closing, the Sellers shall

exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and their operations.

Section 5.2    Access and Information.

(a)    Subject to the Bidding Procedures and applicable Law, from the date hereof and the earlier of the Closing or the date, if any, on which this Agreement is validly terminated pursuant to Article VII, the Sellers shall (i) afford to the Purchaser and its Representatives reasonable access during normal business hours and upon reasonable advance notice to all of the Sellers' properties, offices, personnel, Permits, Contracts and Books and Records, (ii) furnish as promptly as practicable to the Purchaser all information (financial or otherwise) the Purchaser may reasonably request, (iii) permit Purchaser to make such reasonable inspections of Sellers' and their Subsidiaries' books and records and, at Purchaser's sole cost and expense, copies thereof as Purchaser may require, and (iv) instruct the executive officers and senior business managers, counsel, Representatives, auditors and advisors of Sellers to reasonably cooperate with Purchaser and its Representatives regarding the same in each case, related to the Business, the Acquired Assets or the Assumed Liabilities, for any purpose related to the consummation of the transactions contemplated by this Agreement.  Notwithstanding the foregoing, the Sellers shall not be required by this Section 5.2(a) to provide the Purchaser or its Representatives with access to or to disclose information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Parent (i) is prohibited from being disclosed pursuant to the terms of a confidentiality agreement with a third party entered into prior to the date hereof, (ii) the disclosure of which would violate applicable Law or (iii) the disclosure of which would cause the loss of any attorney-client, attorney work product or other legal privilege; provided, that, in the case of clauses (i) (ii) and (iii) in this sentence above, the parties shall reasonably cooperate in seeking to allow disclosure of such information to the extent doing so would not (in the good faith belief of Parent (after consultation with counsel, which may be in-house counsel)) violate any such applicable Law or confidentiality agreement or cause the loss of such privilege with respect to such information. For the avoidance of doubt, information obtained pursuant to this Section 5.2(a) shall be subject to the Confidentiality Agreement.

(b)    From and after the Closing until the latest to occur of (i) three (3) years following the Closing Date (or, if later, the closing of the Chapter 11 Cases), (ii) sixty (60) days following the expiration of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) with respect to relevant Taxes and Tax Returns, or (iii) the completion of all relevant Tax audits and other Tax proceedings, including any appeals and period for filing any appeals, the Purchaser will provide the Sellers and their Representatives with reasonable access, during normal business hours in a manner so as not to interfere unreasonably with the normal business operations of Purchaser, at Sellers' sole expense and upon reasonable advance notice, to the Books and Records relating to the Acquired Assets or the Assumed Liabilities with respect to periods or occurrences prior to the Closing for legitimate business purposes relating to the Chapter 11 Cases, the wind-down of the operations of Sellers and their estates, prosecuting or defending legal Actions (other than Actions against Purchaser and its Affiliates which shall be governed by applicable rules of discovery) to which any Seller is a party, insurance claims, Tax payments, Tax Returns or audits (or other Tax proceedings), the functions of any trusts established under a Chapter 11 plan of Sellers or any other successors of

38

Sellers.  Unless otherwise consented to in writing by the other party, no party will, for the latest to occur of (x) three (3) years following the Closing Date and (y) sixty (60) days following the expiration of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) with respect to relevant Taxes and Tax Returns, destroy, alter or otherwise dispose of any of the material Books and Records or Retained Books and Records, as applicable, (other than additional copies thereof) without first offering to surrender to the other party such Books and Records or Retained Books and Records, as applicable, or any portion thereof that the other party may intend to destroy, alter or dispose of.  For purposes of this Section 5.2(b), references to "Sellers" shall be construed, where applicable, to include any liquidating trust, plan administrator, or comparable person or body bearing responsibility for the administration and wind-down of the Sellers' operations, estates and Chapter 11 Cases.

Section 5.3        Approvals and Consents; Cooperation; Notification.

(a)        Subject to the terms and conditions of this Agreement, each party hereto shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated hereby as soon as practicable after the date hereof and cause the conditions set forth in Article VI to be satisfied, including (i) preparing and filing or otherwise providing, in consultation with the other parties and as promptly as practicable and advisable after the date hereof, all documentation to effect all necessary applications, notices, petitions, filings, and other documents and to obtain as promptly as practicable all waiving period expirations or terminations, consents (including any consents to transfer or waivers with respect to the Purchased Ownership Interests), clearances, waivers, licenses, orders, registrations, approvals, permits, and authorizations necessary or advisable to be obtained from any third party and/or any Governmental Entity in order to consummate the transactions contemplated hereby (each such consent, a "Necessary Consent"), and (ii) taking all steps as may be reasonably necessary to obtain all Necessary Consents.  In furtherance and not in limitation of the foregoing, each party agrees to (x) make an appropriate filing of a Notification and Report Form pursuant to the HSR Act with respect to the Acquisition as promptly as practicable, and in any event within two (2) Business Days after the entry of the Sale Order by the Bankruptcy Court (or such other date as may be mutually agreed by the parties), and to supply as promptly as practicable and advisable any additional information and documentary materials that may be requested pursuant to the HSR Act and to take all other actions necessary to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable and (y) make all other necessary filings as promptly as practicable after the date hereof, and to supply as promptly as practicable and advisable any additional information and documentary materials that may be requested under any Antitrust Laws.  The Purchaser shall have responsibility for the filing fees associated with the HSR filings and each party shall be responsible for any other payment of its own respective costs and expenses incurred by such party (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.  In furtherance of the foregoing, the Purchaser shall, and the Sellers shall, upon the prior written consent of the Purchaser and subject to any approval of the Bankruptcy Court that may be required, take any and all steps and make any and all undertakings necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Governmental Entity with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably possible, including, without limitation, to:

39

(A) sell, license, assign, transfer, divest, hold separate or otherwise dispose of any assets, business or portion of business of any Seller, the Purchaser or any Subsidiary of any of the foregoing, (B) conduct, restrict, operate, invest or otherwise change the assets, the business or portion of the business of any Seller, the Purchaser or any Subsidiary of any of the foregoing in any manner, (C) impose any restriction, requirement or limitation on the operation of the business or portion of the business of any Seller, the Purchaser or any Subsidiary of any of the foregoing or (D) contest, administratively or in court, any ruling, order, or other action of any Governmental Entity or any other Person with respect to the proposed transaction; provided, that Sellers shall not take any such action without the prior written consent of Purchaser.

(b)     Each of the parties hereto shall, in connection with and without limiting the efforts referenced in Section 5.3(a) to obtain all waiting period expirations or terminations, consents, clearances, waivers, licenses, orders, registrations, approvals, permits, and authorizations for the Acquisition under the HSR Act or any other Antitrust Law, (i) cooperate in all respects and consult with the other parties in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party, including by allowing the other parties to have a reasonable opportunity to review in advance and comment on drafts of filings and submissions and reasonably considering in good faith comments of the other parties and providing the other parties with copies of filings and submissions, (ii) promptly inform the other parties of any communication received by such party from, or given by such party to, the Antitrust Division of the Department of Justice (the "DOJ"), the Federal Trade Commission (the "FTC") or any other Governmental Entity, by promptly providing copies to the other parties of any such written communications, and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated hereby and (iii) permit the other parties to review in advance any communication that it gives to, and consult with each other in advance of any meeting, substantive telephone call or conference with, the DOJ, the FTC or any other Governmental Entity, or, in connection with any proceeding by a private party, with any other Person, and to the extent permitted by the DOJ, the FTC or other applicable Governmental Entity or other Person, give the other parties the opportunity to attend and participate in any in-person meetings, substantive telephone calls or conferences with the DOJ, the FTC or other Governmental Entity or other Person; provided, however, that materials required to be provided pursuant to the foregoing clauses (i)-(iii) may be redacted (A) to remove references concerning the valuation of any of the parties or any of their respective Subsidiaries, (B) as necessary to comply with contractual arrangements and (C) as necessary to address reasonable privilege or confidentiality concerns; provided, further, that any of the parties may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.3(b) as "Outside Counsel Only Material" and materials so designated shall only be provided to each party's outside counsel.

(c)     In connection with and without limiting the foregoing, the Sellers shall, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with the Purchaser in endeavoring to obtain third-party consents to any Assigned Contracts that cannot be transferred or assigned effectively without the consent of such third parties (after giving effect to the Sale Order and the Bankruptcy Code). Nothing in this Section 5.3(c) shall require any Seller or any Affiliate thereof to make any

expenditure or incur any obligation on its own or on behalf of the Purchaser unless funds in the full amount thereof are advanced to the Sellers in cash.

(d)    Each of the Sellers and the Purchaser shall give prompt notice to the other of the occurrence or failure to occur of an event that would, or with or without notice or lapse of time or both would, cause any condition to the consummation of the transactions contemplated hereby for the benefit of the other party hereto not to be satisfied.

(e)    Notwithstanding the foregoing, the obligations of the parties hereto to obtain any consent, approval or waiver from the Bankruptcy Court shall be governed exclusively by Section 5.6, Section 5.7, Section 5.8 and Section 5.9.

Section 5.4    Further Assurances.  In addition to the provisions of this Agreement, from and after the date hereof, the Sellers and the Purchaser shall use reasonable best efforts to (i) execute and deliver such other instruments of conveyance, transfer or assumption, as the case may be, (ii) retitle the Acquired Assets in the name of the Purchaser or the Purchaser Designees and (iii) take such other action as may be reasonably requested to implement more effectively the conveyance and transfer of the Acquired Assets to the Purchaser and the assumption of the Assumed Liabilities by the Purchaser; *provided*, that, nothing in this Section 5.4 shall (a) require the Sellers or any of their Affiliates to make any expenditure or incur any obligation on their own or on behalf of the Purchaser (unless funds in the full amount thereof are advanced to the Sellers in cash) or (b) prohibit the Sellers or any of their Affiliates from ceasing operations or winding up its affairs following the Closing.  If, following the Closing, any Seller receives or becomes aware that it holds any asset, property or right which constitutes an Acquired Asset, then Sellers shall transfer such asset, property or right to the Purchaser and/or, as applicable, one or more designees of the Purchaser as promptly as practicable for no additional consideration.  If, following the Closing, the Purchaser receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then the Purchaser shall transfer such asset, property or right to the Sellers as promptly as practicable for no additional consideration.

Section 5.5    Debtors-in-Possession.  From the commencement of the Chapter 11 Cases through the Closing, the Sellers shall continue to operate their business as debtors-in-possession pursuant to the Bankruptcy Code.

Section 5.6    The Sale Motion.  On or prior to the third business day after the signing date, the Sellers shall file a sale motion with the Bankruptcy Court (the "Sale Motion"), in form and substance reasonably acceptable to the Purchaser and the Sellers (and shall thereafter use their commercially reasonable efforts to cause the Bankruptcy Court to enter an Order or Orders granting the relief sought therein, including the Sale Order in substantially the form of Exhibit D and otherwise in form and substance reasonably acceptable to the Purchaser and the Sellers).

Section 5.7    Sale Order.  The Sale Order shall be substantially in the form attached hereto as Exhibit D or otherwise in form and substance reasonably acceptable to the Purchaser and the Sellers and shall include the following findings of fact, conclusions of Law

41

and ordering provisions; *provided*, that any modifications to the form of the Sale Order attached hereto as <u>Exhibit D</u> shall require the prior written consent of the Purchaser and the Sellers:

(a)    find that the Notice of Sale, and the parties who were served with copies of such Notice of Sale, were in compliance with Sections 102 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9014 and any other applicable provision of the Bankruptcy Code, the Bankruptcy Rules, or any local bankruptcy rule governing the sale of assets free and clear of Encumbrances and other interests;

(b)    find that all requirements imposed by Section 363(f) of the Bankruptcy Code for the sale of the Acquired Assets free and clear of Encumbrances and other applicable interests, other than Permitted Post-Closing Encumbrances, have been satisfied;

(c)    find that the Purchaser is a purchaser of the Acquired Assets in "good faith" pursuant to Section 363(m) of the Bankruptcy Code, and the sale is entitled to the protections of Section 363(m) of the Bankruptcy Code;

(d)    find that the Purchaser and the Sellers did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code;

(e)    find that the consideration provided by the Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets;

(f)    approve this Agreement, including the Credit Bid pursuant to Section 363(k) of the Bankruptcy Code and the consummation of the sale upon the terms and subject to the conditions of this Agreement;

(g)    approve the Framework Agreement and the consummation of the transaction contemplated thereby;

(h)    order that, as of the Closing Date, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Acquired Assets to the Purchaser and shall vest the Purchaser with title to such assets free and clear of all Encumbrances (except for Assumed Liabilities and Permitted Post-Closing Encumbrances);

(i)    (A) authorize the Sellers to assume and assign to the Purchaser each of the Assigned Contracts, and (B) find that, subject to the terms of the Sale Order and provision of adequate assurance of future performance by the Purchaser, as of the Closing Date, the Assigned Contracts will have been duly assigned to the Purchaser in accordance with Section 365 of the Bankruptcy Code;

(j)    find that neither the Purchaser nor any of its Affiliates is acquiring any of the Excluded Assets or assuming any of the Excluded Liabilities;

(k)    order that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in any

42

such contract or any requirement of applicable Law (including those described in Sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, conditions, restricts or limits in any way such assignment or transfer;

(l)    find that the Purchaser has satisfied all requirements under Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance of the Assigned Contracts;

(m)    approve the Release in a manner acceptable to the Releasing Parties;

(n)    approve any other agreement to the extent provided by this Agreement;

(o)    except as expressly set forth in the Sale Order, enjoin and forever bar the non-debtor party or parties to each Assigned Contract from asserting against the Purchaser or any Affiliate or designee of the Purchaser:  (i) any default, action, liability or other cause of action existing as of the date of the Closing, whether asserted or not, and (ii) any objection to the assumption and assignment of such non-debtor party's Assigned Contract (except to the extent any such objection was sustained by the Order of the Bankruptcy Court);

(p)    find that, to the extent permitted by applicable Law, none of the Purchaser nor any Affiliate of the Purchaser nor any designee of the Purchaser is a successor to the Sellers or the bankruptcy estate by reason of any theory of Law or equity, and none of the Purchaser nor any Affiliate of the Purchaser nor any designee of the Purchaser shall assume or in any way be responsible for any liability of the Sellers or the bankruptcy estate, except for the Assumed Liabilities;

(q)    provide that the Sellers are authorized to consummate the transactions contemplated by this Agreement and the Ancillary Documents and to comply in all respects with the terms of this Agreement and the Ancillary Documents;

(r)    be made expressly binding (based upon language reasonably satisfactory to the Purchaser) upon any trustee or other estate representative in the event of conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code, or upon appointment of a Chapter 11 trustee in the Chapter 11 Cases;

(s)    enjoin assertion of any Excluded Liabilities against the Purchaser or any of its Affiliates or any assignees, designees, transferees or successors thereof or against any of the Acquired Assets;

(t)    order that each Seller transfer and assign the Acquired Assets of such Seller to the Purchaser or a Purchaser Designee in full or partial satisfaction, as applicable, of the First Lien Notes Claims or guarantees thereof made by the applicable Seller, and in addition, that the Cash Payment be paid to the Parent, as agent for each Seller;

(u)    order that, subject to Section 1.6, each Seller use any payments or reimbursements received by such Seller pursuant to this Agreement and any Excluded Assets of

43

such Seller to satisfy any Excluded Liabilities of such Seller, and that the Cash Remainder only be used to pay expenses of a Seller other than the Parent to the extent the Excluded Liabilities of such Seller exceed the sum of (i) the amount of such payments received by such Seller pursuant to this Agreement, (ii) the amount of such reimbursements received by such Seller pursuant to this Agreement, and (iii) the Excluded Assets of such Seller; and

(v)    order that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry.

Section 5.8    Cooperation with Respect to Bankruptcy Court Approvals.    Each party shall take such actions as are reasonably requested by the other parties to assist in obtaining entry by the Bankruptcy Court of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes of, among other things: (a) demonstrating that the Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and (b) establishing "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code.

Section 5.9    Bankruptcy Court Filings.    The Sellers shall consult with the Purchaser concerning the Sale Order, which shall be in form and substance acceptable to the Purchaser and Sellers, in each case in their respective sole discretion, and any other Orders of the Bankruptcy Court relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and provide the Purchaser with copies of any material applications, pleadings, notices, proposed Orders and other documents to be filed by the Sellers in the Chapter 11 Cases that relate in any way to this Agreement, the Acquisition or the Purchaser at least two (2) Business Days prior to the making of any such filing or submission to the Bankruptcy Court.

Section 5.10    Communications with Customers and Suppliers.    Prior to the Closing, the Purchaser shall not, and shall cause its Affiliates and instruct its Representatives not to, contact, or engage in any discussions or otherwise communicate with, the Sellers' customers, suppliers, licensors, licensees and other Persons with which the Sellers have commercial dealings without obtaining the prior written consent of the Sellers (other than any such communication in the ordinary course of business of the Purchaser or its Affiliates without reference to or any purpose relating to the Business, the Acquired Assets, the Assumed Liabilities or the transactions contemplated by this Agreement), which consent shall not be unreasonably withheld, conditioned or delayed.

Section 5.11    Employee Matters.

(a)    As of the Closing, the Purchaser shall assume the Assumed Benefit Plans and thereafter shall perform or cause to be performed all obligations of the Sellers with respect to each Assumed Benefit Plan in accordance with the terms thereof.

(b)    Each of the Sellers' employees identified on Section 5.11 of the Seller Disclosure Letter, as such list may be updated by mutual agreement between the parties hereto, shall receive an offer of employment from the Purchaser at least fifteen (15) days prior to

44

the anticipated Closing Date, or within five (5) Business Days of the applicable date of hire with respect to any such individual hired by the Sellers within the fifteen (15)-day period prior to the Closing Date. Subject to the provisions of this Section 5.11(b), each offer of employment shall provide for the same position such individual held, a primary work location or territory no more than fifty (50) miles from the location or territory in which the individual primarily worked and substantially the same terms and conditions in the aggregate as provided to such individual by the Sellers as of immediately prior to the Closing and provide that employment with the Purchaser or one of its Affiliates shall commence effective as of the Closing. Each individual who accepts the offer of employment pursuant to this Section 5.11(b) shall be deemed a "Transferred Employee" as of the Closing. For a period of one (1) year following the Closing Date, the Purchaser shall or shall cause one of its Affiliates to provide each Transferred Employee with (i) base salary or wage rates and incentive compensation opportunity (not including equity compensation) that are, in the aggregate, not less than those in effect for each such Transferred Employee immediately prior to the Closing, and (ii) employee benefits, that, in the aggregate, are substantially comparable to those in effect for each such Transferred Employee immediately prior to the Closing. The Sellers shall cease to employ the Transferred Employees immediately prior to the Closing. Notwithstanding anything to the contrary in the foregoing, to the extent that any of the employees identified on Section 5.11 of the Seller Disclosure Letter are represented by a union, the obligation to provide such an offer of employment shall be subject to an agreement with the applicable union representing the applicable Sellers' employees that no severance obligation will be triggered under the applicable collective bargaining agreement or any existing company policy or status quo obligation with respect to such employees as a result of the transactions contemplated by this Agreement.

(c)     The Purchaser shall, or shall cause one of its Affiliates to, use commercially reasonable efforts to provide to each Transferred Employee full credit for such Transferred Employee's service with the Sellers prior to the Closing for all purposes, including for purposes of eligibility, vesting, benefit accruals and determination of the level of benefits (including vacation and severance (other than defined benefit pension accruals)), under any benefit plan in which such Transferred Employee participates on or following the Closing; *provided*, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits or coverage. The Purchaser shall, or shall cause one of its Affiliates to use commercially reasonable efforts to: (i) waive any limitation on health and welfare coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements, and requirements to show evidence of good health under any applicable health and welfare plan of the Purchaser or any of its Affiliates to the extent such Transferred Employees were covered under a similar Benefit Plan and (ii) credit each such Transferred Employee with all eligible payments, co-payments and co-insurance paid by such employee under any Benefit Plan prior to the Closing Date during the year in which the Closing occurs for the purpose of determining the extent to which any such employee has satisfied any applicable deductible and whether such employee has reached the out-of-pocket maximum under any benefit plan of the Purchaser or any Affiliate for such year.

(d)     Promptly after the Closing Date, the Purchaser's board of directors shall establish a management equity incentive plan on the terms set forth in Exhibit E, under which 10% of the Purchaser Common Equity as of the Closing Date on a fully-diluted basis will

be reserved for grants made from time to time to the directors, officers, and other management and employees of the Purchaser.

(e)     On or before the Closing Date, the Sellers shall provide a list of the name and site of employment of any and all employees of the Sellers who have experienced, or will experience, an employment loss or layoff (as defined by the WARN Act) within ninety (90) days prior to the Closing Date.  The Sellers shall update this list up to and including the Closing Date.  For a period of ninety (90) days after the Closing Date, the Purchaser shall not engage in any conduct which would result in an employment loss or layoff for a sufficient number of employees of the Purchaser which, if aggregated with any such conduct on the part of the Sellers prior to the Closing Date, would trigger the WARN Act.

(f)     Nothing in this <u>Section 5.11</u> shall constitute or be construed (i) as an amendment, termination or other modification of any employee benefit or compensation plan or arrangement, or a restriction or other limitation on the right of any party hereto to amend, terminate or otherwise modify any such plans or arrangements, (ii) as a guarantee of employment for any period, or a restriction or other limitation on the right of any party hereto to terminate the employment of any individual at any time, or (iii) to create any third party rights in any Person other than the direct parties to this Agreement, including any current or former service provider of the Sellers (or any beneficiaries or dependents thereof).

(g)     The Purchaser shall employ Transferred Employees who are foreign nationals working in the United States in non-immigrant visa status (the "<u>Foreign National Employees</u>"), under terms and conditions such that Purchaser qualifies as a "successor-in-interest" under applicable United States immigration laws effective as of the Closing Date. The Purchaser agrees to assume all immigration-related liabilities and responsibilities under applicable United States immigration laws with respect to such Foreign National Employees.

Section 5.12    <u>Payments Received</u>.  The Sellers and the Purchaser each agree that after the Closing they will hold and will promptly transfer and deliver to the other, from time to time as and when received by them or their respective Affiliates, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other party hereto or its Affiliates and will account to the other for all such receipts.

Section 5.13    <u>Use of Names and Marks</u>.  Promptly following the Closing, the Sellers shall, and shall cause its direct and indirect Subsidiaries to, as promptly as reasonably possible, change their current corporate names (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes any of the words set forth on <u>Section 5.13</u> of the Seller Disclosure Letter without the prior written consent of Purchaser, and each Seller shall cause the names of Sellers in the caption of the Chapter 11 Cases to be changed to the new names of each Seller as provided in the last sentence of this <u>Section 5.13</u>; *provided*, *however*, that the Sellers shall be entitled to use and refer to names and marks included in the Acquired Assets in filings with Governmental Entities, for factual or historical reference, references to such names and marks in historical, Tax, and similar records and for any other purposes that do not constitute trademark infringement and are required or not otherwise

prohibited by applicable Law, <u>provided</u> that when utilizing such materials, other than in incidental respects, each Seller and each of its direct and indirect Subsidiaries shall use commercially reasonable efforts to indicate its new name and reference its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct Subsidiaries) as "formally known as" or similar designation.  From and after the Closing, except as otherwise set forth in this Agreement (including this <u>Section 5.13</u>), each Seller covenants and agrees not to use or otherwise employ any Trademark that is likely to cause confusion with any Trademarks included in the Seller Intellectual Property.  Within thirty (30) days following the Closing, Sellers shall file all necessary organizational amendments with the applicable Secretary of State or equivalent Governmental Entity of each Seller's jurisdiction of formation and in each jurisdiction in which each such Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

Section 5.14    <u>Parent Confidentiality Agreements</u>.  Effective at the Closing, the Parent hereby assigns to the Purchaser the rights under the Parent Confidentiality Agreements to enforce the terms thereof against the applicable counterparty; provided, that the Parent retains the right to enforce any provisions thereunder solely to the extent such provisions relate to the Excluded Assets or Excluded Liabilities.

Section 5.15    <u>Payroll Liabilities</u>.  One (1) Business Day prior to the Closing Date, the Sellers shall deliver to the Purchaser a notice containing the final amount of all payroll liabilities with respect to Transferred Employees that have accrued since the Petition Date in the ordinary course of business consistent with past practice that remain unpaid as of immediately prior to the Closing Date.

Section 5.16    <u>Employment Agreements</u>.  The parties shall take all actions necessary such that, effective at the Closing, employment agreements shall be entered into between the Purchaser, on the one hand, and each of the individuals listed on <u>Section 5.16</u> of the Seller Disclosure Letter, on the other hand, on the terms attached hereto as <u>Exhibit F</u> (the "<u>Employment Agreements</u>").

Section 5.17    <u>Financial Obligations</u>.

(a)    At or prior to the Closing, the Purchaser shall use commercially reasonable efforts to, at its sole expense, (i) arrange for substitute letters of credit and guarantees to replace the outstanding letters of credit and guarantees entered into by or on behalf of any Seller or any Seller's Affiliate in connection with or relating to the Business that are set forth on <u>Section 5.17(a)</u> of the Seller Disclosure Letter (except to the extent relating to Excluded Assets or Excluded Liabilities) (such arrangements, the "<u>Guarantees</u>") or (ii) assume all obligations under each Guarantee, and in the case of each of clause (i) and (ii), obtain from the creditor or other counterparty a full and irrevocable release of each Seller and each Seller's Affiliate that is liable, directly or indirectly, for reimbursement to the creditor or fulfillment of any liabilities or obligations (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) to a counterparty in connection with the Guarantees. In the event the counterparty to a Guarantee does not accept such replacement, the Sellers shall cause such Guarantee to remain in place following the Closing; *provided*, *however*, the foregoing

shall not prohibit the Sellers or any of their Affiliates from ceasing operations or winding up their respective affairs following the Closing.  Purchaser further agrees that to the extent any Seller or any Seller's Affiliate incurs any cost or expense, or is required to make any payment, in connection with such Guarantees that are not so replaced on or after the Closing, Purchaser shall indemnify, defend and hold harmless such Seller and such Seller's Affiliate against, and reimburse such Seller and such Seller's Affiliate for, any and all amounts paid, including reasonable, documented out-of-pocket costs or expenses incurred by the Sellers in connection with the applicable counterparty's enforcement of such Guarantees, and shall in any event promptly and in no event later than five (5) Business Days after written demand therefor from the Parent, reimburse the applicable Seller or Seller's Affiliate if any Guarantee is called upon and to the extent such Seller or such Seller's Affiliate makes any payment in respect of any such Guarantee.

      Section 5.18    DIP Facility.  Prior to the Closing, the Sellers shall have borrowed no less than $8,535,000 under the DIP Credit Agreement such that as of immediately prior to Closing, the outstanding indebtedness under the DIP Credit Agreement is no less than $8,535,000.  At the Closing, the Purchaser shall, at the Purchaser's option, either:  (i) (w) repay or cause to be repaid all indebtedness, liabilities and other obligations outstanding under the DIP Credit Agreement (other than contingent obligations for which a claim has not been made) pursuant to Section 1.6, (x) terminate or cause to be terminated all commitments of the lenders to lend under the DIP Credit Agreement, (y) replace, cash collateralize or otherwise backstop (in each case in a manner reasonably acceptable to the applicable letter of credit issuer) any outstanding letters of credit issued under the DIP Credit Agreement and (z) terminate or release, or cause to be terminated and released, any and all guarantees of, and liens securing, the indebtedness, liabilities and obligations under the DIP Credit Agreement, including obtaining customary payoff letters and causing the filing of any UCC-3 termination statements, mortgage releases, intellectual property security agreement releases, control agreement terminations or similar documents evidencing termination or release of such indebtedness and liens (and in connection with the foregoing, each Seller shall use its reasonable best efforts to cooperate with the Purchaser to cause to be terminated and released any and all guarantees of, and liens securing, such indebtedness, liabilities and obligations outstanding under the DIP Credit Agreement and the applicable Sellers shall promptly, and in any case, prior to the Closing Date, execute any payoff letter or other agreements or instruments evidencing such termination at the reasonable request of Purchaser (provided that, the effectiveness of such agreements or instruments may be contingent on the Closing)) (items (w)-(z) collectively, the "Payoff"); or (ii) (x) assume all of the Parent's right, title, interest, liabilities, duties and obligations in, to and under the DIP Credit Agreement and the other "Loan Documents" (as defined in the DIP Credit Agreement) and covenant to perform all of the Parent's agreements, obligations and covenants as "Borrower" thereunder (collectively, the "Assumption") and (y) cause the DIP Credit Agreement (and each applicable Loan Document) to be modified, amended or amended and restated in form and substance reasonably satisfactory to the Parent in order to (1) permit the consummation of the Acquisition pursuant to this Agreement and each of the transactions contemplated by this Agreement, and (2) consummate the Assumption.

      Section 5.19    New First and 1.5 Lien Debt.  Effective as of the Closing, consistent in all respects with the terms of the Framework Agreement: (A) the Purchaser shall issue the New 1.5 Lien Notes to Chatham (or Affiliates thereof), in their capacity as holders for

First Lien Notes Claims, in an amount equal to the principal amount First Lien Notes Claims held by Chatham (or Affiliates thereof), plus the applicable original issue discount amount; (B) the Purchaser shall have entered into the New First Lien Term Loan Facility and shall be deemed to have borrowed the New First Lien Term Loans from all holders of First Lien Notes Claims (excluding Chatham (and its Affiliates) in an amount equal to the principal amount of First Lien Notes Claims held by such holders of the First Lien Notes Claims; and (C) the Sellers (or the Purchaser as directed by the Sellers) shall pay in cash in an amount equal to the First Lien Notes Interest to the First Lien Notes Trustee for distribution to the holders of First Lien Notes Claims. The Purchaser will use reasonable best efforts to, and the Sellers will use reasonable best efforts to cooperate with the Purchaser to, enter into each of the New 1.5L Indenture and the New First Lien Term Loan Facility in accordance with the Framework Agreement and satisfy all conditions precedent to the effectiveness of such documents.

Section 5.20    Releases.

(a)    Effective as of the Closing Date, and subject to entry of the Sale Order, each of Chatham (solely in its capacity as holder of First Lien Notes), the Purchaser and the Sellers (each of the foregoing on their own behalf and on behalf of each of their Affiliates, officers, directors, Subsidiaries, employees, representatives, partners, managers and other agents, a "Releasing Party") hereby agrees to irrevocably and unconditionally release and forever discharge to the fullest extent permitted by Law each other Releasing Party and each Releasing Party's Affiliates, funds, current and former officers, managers, directors, equity holders, predecessors, successors, assigns, Subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (each, a "Released Party") of and from all Actions, causes of action, suits, proceedings, executions, judgments, duties, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever, whether known or unknown, whether in law or equity which such Releasing Party may have against each Released Party, now or in the future, in each case in respect of any cause, matter or thing based on or relating to, or in any manner arising from, in whole or in part, the Sellers (including the management, ownership, or operation thereof), the Sellers' restructuring efforts, the formulation, preparation, dissemination, negotiation of this Agreement and the Ancillary Documents, the First Lien Notes Documents, the Chapter 11 Cases, the implementation of the transactions contemplated by this Agreement and the Ancillary Documents, the Credit Bid, any Prior Event, and any other act or omissions, transaction, agreement, event or other occurrence taking place on or before the Closing related to the foregoing (collectively, the "Released Claims"); provided, that the term "Released Party" shall not include any director of the Sellers nor any officer, manager or employee of the Sellers that is not a Transferred Employee.  Each Released Party shall be an intended third-party beneficiary of this Agreement with respect to this Section 5.20.  The provisions substantially in the form of this Section 5.20 shall be reflected in the Sale Order in a manner acceptable to each Releasing Party and to the extent there exists any discrepancy between the release provided in the Sale Order and this Section 5.20, the Sale Order shall control.

(b)    To the extent that, notwithstanding the New York choice of law provisions in this Agreement, California law is deemed to apply to the release and

49

indemnification provisions set forth herein, the Releasing Parties each warrant, represent and agree that they are fully aware of California Civil Code Section 1542, which provides as follows:

**SECTION 1542. GENERAL RELEASE**.  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Releasing Parties each hereby knowingly and voluntarily waive and relinquish the provisions, rights and benefits of Section 1542 and all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction that may be applicable herein, and any rights they may have to invoke the provisions of any such law now or in the future with respect to the Released Claims, and such Releasing Parties hereby agree and acknowledge that this is an essential term of the releases set forth herein.  In connection with such releases, the Releasing Parties acknowledge that they are aware that they or their attorneys or others may hereafter discover claims or facts presently unknown or unsuspected in addition to or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims.  Nevertheless, it is the intention of the Releasing Parties in executing this Agreement to fully, finally, and forever settle and release all matters and all claims relating thereto, which exist, hereafter may exist or might have existed (whether or not previously or currently asserted in any action) constituting Released Claims.

Section 5.21    No Successor Liability.  The parties intend that, except where expressly prohibited under applicable Law, upon the Closing, the Purchaser shall not be deemed to: (i) be the successor or successor employer to any of the Sellers, including with respect to any Environmental Liabilities ,(ii) have, *de facto*, or otherwise, merged with or into the Sellers, (iii) have any common law successor liability in relation to any multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA), including with respect to withdrawal liability or contribution obligations or with respect to any Environmental Liabilities, (iv) be a mere continuation or substantial continuation of the Sellers or the enterprise(s) of the Sellers, or (v) be liable for any acts or omissions of the Sellers in the conduct of the Business or operation or administration of the Benefit Plans or arising under or related to the Acquired Assets other than as set forth in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that the Purchaser shall not be liable for any Encumbrances (other than Assumed Liabilities and Permitted Post-Closing Encumbrances) against any Seller or any of its predecessors or Affiliates, and the Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the operation or administration of the Benefit Plans, the Acquired Assets or any Liabilities of any Seller arising prior to the Closing Date. The parties agree that the provisions substantially in the form of this Section 5.21 shall be reflected in the Sale Order.

Section 5.22    Notice of Developments.  Each of the Parent and the Purchaser shall promptly notify the other party in writing after becoming aware of, and furnish the other party any information it may reasonably request with respect to, any event that would reasonably

be expected to cause any of the conditions set forth in <u>Article VI</u> not to be fulfilled on or prior to the Outside Date or upon the Sellers becoming aware of any material breach of the representations and warranties set forth in <u>Article III</u>, with respect to notice by the Parent, and <u>Article IV</u>, with respect to notice by the Purchaser.

Section 5.23    <u>Transition of Business</u>.  From and after the date of this Agreement until the Closing Date or earlier termination of this Agreement, Sellers shall use commercially reasonable efforts to assist Purchaser in accomplishing a smooth transition of the Business from Sellers to Purchaser, including, holding discussions with respect to personnel policies and procedures, and other operational matters relating to the Business.

Section 5.24    <u>Casualty Loss</u>.  Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is condemned or taken by eminent domain, or is damaged or destroyed by fire, flood or other casualty, Sellers shall notify Purchaser promptly in writing of such fact, and (a) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any condemnation or taking proceeds thereof (of which are payable to Sellers) to Purchaser at the Closing, and (b) in the case of fire, flood or other casualty to the Acquired Assets, Sellers shall, at Purchaser's option, either use insurance proceeds to restore such damage, or to the extent such proceeds were not previously applied, assign the insurance proceeds therefrom to Purchaser at Closing, in each case, in full or partial satisfaction, as applicable, of the First Lien Notes Claims or guarantees thereof made by the applicable Seller and in exchange for its share of the Cash Payment.

Section 5.25    <u>Confidentiality</u>.  Following the Closing, each Seller agrees not to, to instruct its Representatives not to, and to cause its Subsidiaries not to, disclose any confidential or non-public information concerning the Acquired Assets, the Business, the negotiation or existence and terms of this Agreement or the business affairs of Purchaser or the Assumed Liabilities ("<u>Confidential Information</u>") except disclosure of Confidential Information that (a) was or is lawfully obtained from a source that, to the knowledge of such Seller, was not under an obligation of confidentiality to Purchaser with respect to such information or (b) is or becomes available to the public other than as the result of a breach of this <u>Section 5.25</u> or any other duty or Contract of confidentiality by the Sellers, their Representatives or their Subsidiaries.  Notwithstanding the foregoing, a Seller may disclose Confidential Information if such Seller believes (upon the advice of counsel) it is legally required to make such disclosure in order to comply with applicable Law, regulation, rule or legal, judicial or administrative process (including any rule, regulation or policy statement of (i) any organized securities exchange, market or automated quotation system on which the Parent's securities are listed or quoted, (ii) any self-regulatory organization of which a party is a member) or (iii) in connection with the Chapter 11 Cases.  If a Seller or any of its Representatives becomes required (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) or it becomes necessary in connection with the Chapter 11 Cases to disclose any of the Confidential Information, such Seller or Representative shall use reasonable efforts to provide Purchaser with prompt notice, to the extent allowed by law, rule and regulation, of such requirement.  Each Seller agrees to disclose only that portion of the Confidential Information which it believes it is necessary or required to disclose and to use commercially reasonable efforts to obtain confidential treatment (at the Purchaser's sole cost and expense) of such Confidential Information.  At the Closing, the Confidentiality Agreement will terminate and shall

be of no further force and effect.  Notwithstanding anything to the contrary in the foregoing, nothing in this <u>Section 5.25</u> shall prohibit the Sellers or any of their Affiliates from ceasing operations or winding up its affairs following the Closing

Section 5.26    <u>Financing Cooperation</u>.

(a)    The Sellers shall use their reasonable best efforts to, and to cause their respective Representatives to provide all cooperation and assistance reasonably requested by the Purchaser in connection with the Payoff to obtain a new asset-based revolving facility as part of the Payoff (the "<u>ABL Financing</u>"), which cooperation and assistance shall include:

(i)    providing reasonable cooperation and assistance, at reasonable times and upon reasonable notices, to permit the providers, or potential providers, of the amounts required for such ABL Financing (the "<u>ABL Lenders</u>") to evaluate the Sellers' current assets, cash management and accounting systems, policies and procedures relating thereto for the purposes of establishing collateral arrangements as of Closing and to assist with other collateral audits and due diligence examinations;

(ii)    providing reasonable cooperation and assistance to (A) prepare and execute any definitive loan and security documentation in connection with the ABL Financing, including any borrowing base certificate reasonably requested by the ABL Lender, and (B) furnish the Purchaser and the ABL Lenders with copies of any historic borrowing base certificates; and

(iii)    providing all documentation and other information as is required by applicable "know your customer", beneficial ownership regulations and anti-money laundering rules and regulations including the USA PATRIOT Act at least three (3) Business Days prior to the Closing Date to the extent reasonably requested by Purchaser or the ABL Lenders;

<u>provided</u>, that, (A) the Sellers shall not be required to commit to take any action in connection with the ABL Financing that is not contingent upon the Closing, (B) neither the Sellers nor any of their respective officers, directors or managing members shall be required to take any action or provide any approval in respect of the ABL Financing prior to the Closing (other than those actions contemplated to be taken prior to the Closing pursuant to <u>Section 5.17</u> or this <u>Section 5.26</u>), (C) none of the Sellers nor any of their Representatives shall be required to deliver or cause the delivery of any (x) legal opinions or accountants' comfort letters or reliance letters,(y) landlord waivers or estoppels, non-disturbance agreements, surveys or title insurance or (z) Tax Returns and other books, records and work papers that are not primarily related to Acquired Assets or Assumed Liabilities or that are subject to any privilege or similar protection under applicable Law, (D) none of the Sellers nor any of their Representatives shall be required to pass resolutions or consents to approve or authorize the execution of the ABL Financing or execute or deliver any definitive agreements related to the ABL Financing, (E) such assistance shall not require the giving of representations or warranties to any third parties or the indemnification thereof, (F) such assistance shall not require the waiver or amendment of any terms of this Agreement, and (G) such assistance shall not cause any director, officer or

52

employee of the Sellers to incur any personal liability. Nothing contained in this Section 5.26 or otherwise shall require the Sellers, prior to the Closing, to be an issuer or other obligor with respect to the ABL Financing.  In addition, nothing in this Section 5.26 shall require the Sellers or their Representatives to provide access to or copies of any information the disclosure of which would jeopardize any attorney-client or attorney work product privilege or any similar protection (provided that the Sellers will use commercially reasonable efforts to provide such information in a manner that does not jeopardize such privilege or protection).

(b)    Purchaser may reasonably request the cooperation of the Sellers under this Section 5.26, upon reasonable notice and at reasonable times, from time to time and on multiple occasions, between the date hereof and the Closing to effect the ABL Financing.

Section 5.27    Exclusivity.  During the period from the date of this Agreement through the earlier to occur of the Closing Date or the termination of this Agreement pursuant to Article VII, the Sellers will not, and will use their reasonable best efforts to cause all of their Representatives and controlled Affiliates not to solicit, initiate or encourage the submission of any inquiry, proposal or offer from any Person relating to the acquisition of any assets of the Business that are Acquired Assets (including any acquisition structured as a merger, consolidation, or share exchange) (each such transaction or series of transactions other than those contemplated by this Agreement, an "Alternative Transaction").

Section 5.28    Sale Contract Proceeds.  During the period from the date of this Agreement through the Closing Date, to the extent any sale contemplated by any of the Sale Contracts is consummated prior to the Closing, the Sellers will hold the proceeds from any such sale in escrow for the benefit of the Purchaser, which proceeds, for the avoidance of doubt, shall be an Acquired Asset.

Section 5.29    Proceeds of Herald Custom Publishing of Mexico, S. de R.L. de C.V..  Prior to the Closing Date, the Sellers shall hold in escrow for the benefit of the Purchaser any proceeds received from the collection of Accounts Receivables or other assets of Herald Custom Publishing of Mexico, S.de R.L. de C.V., which proceeds, for the avoidance of doubt, shall be an Acquired Asset.

ARTICLE VI

CONDITIONS PRECEDENT

Section 6.1    Conditions Precedent to Obligation of the Sellers and the Purchaser.  The respective obligations of each party hereto to effect the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing of the following conditions:

(a)    *Approvals*.  Any waiting period (and extensions thereof) applicable to the Acquisition under the HSR Act shall have expired or been terminated;

(b)    *No Orders.*  No Governmental Entity of competent jurisdiction shall have enacted, enforced or entered any Law and no Order shall be in effect and no

proceeding seeking an Order shall be pending on the Closing Date that prohibits or materially restrains or delays the consummation of the Closing;

(c)    *DIP Facility*.  No "default" or "Event of Default" shall have occurred under the DIP Orders or the DIP Credit Agreement and the Sellers shall have delivered to Purchaser evidence in form and substance reasonably satisfactory to Purchaser, that the borrowed amount under the DIP Credit Agreement as of immediately prior to Closing is no less than $8,535,000;

(d)    *New Facilities*.  Each of the New 1.5L Indenture and the New First Lien Term Loan Facility  shall have been entered into by each of the parties thereto and all conditions precedent to the effectiveness of such documents shall have been satisfied or waived in accordance therewith; *provided*, *however*, that the Purchaser shall not be permitted to assert the failure of the condition set forth in this Section 6.1(d) unless both Brigade Capital Management, LP ("Brigade") and Chatham have used reasonable best efforts to cause the satisfaction of the condition set forth in this Section 6.1(d), subject to the applicable terms of the Framework Agreement as in effect on the date hereof relating thereto, including with respect to the terms set forth on Exhibit G and Exhibit H hereto; and

(e)    *Sale Order*.  The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to the Purchaser and the Sellers, no later than twenty-five (25) days after the date of this Agreement or such later date as may be determined by the parties with the prior written consent of the Purchaser and such order shall have become final and not have been stayed, stayed pending appeal, reversed or vacated as of the Closing Date.

Section 6.2    Conditions Precedent to Obligation of the Sellers.  The obligation of the Sellers to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver (to the extent permitted by applicable Law) by the Sellers at or prior to the Closing of the following conditions:

(a)    *Representations and Warranties*.  The representations and warranties of the Purchaser contained in this Agreement shall be true and correct (disregarding any exception or qualification in such representations and warranties relating to "material" or "materiality") as of the Closing Date as if made at and as of such date (except to the extent such representations and warranties speak as of another date, in which case such representations and warranties shall be true and correct as of such other date), except where the failure of such representations and warranties to be so true and correct (disregarding any exception or qualification in such representations and warranties relating to "material" or "materiality") has not and would not reasonably be expected to, individually or in the aggregate, have a material adverse effect on the Purchaser's ability to perform its obligations under this Agreement or the Ancillary Documents, or the consummation of the transactions contemplated hereby or thereby;

(b)    *Covenants*.  The covenants and obligations of the Purchaser to be performed or complied with at or prior to the Closing pursuant to this Agreement shall have been duly performed and complied with in all material respects;

(c)    *Officer's Certificate*.  The Purchaser shall have delivered to the Sellers a certificate duly executed by an authorized officer of the Purchaser certifying to the effect that the conditions set forth in <u>Section 6.2(a)</u> and <u>Section 6.2(b)</u> have been satisfied; and

(d)    *Deliverables*.  Each of the deliveries required to be made to the Sellers pursuant to <u>Section 2.2(b)</u> shall have been so delivered.

Section 6.3    <u>Conditions Precedent to Obligation of the Purchaser</u>.  The obligation of the Purchaser to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver (to the extent permitted by applicable Law) by the Purchaser at or prior to the Closing of the following conditions:

(a)    *Representations and Warranties*.  (i) The representations and warranties of the Sellers contained in <u>Sections 3.1</u>, <u>3.2</u>, <u>3.3</u>, <u>3.9</u>, <u>3.16</u> and <u>3.27</u> shall be true and correct as of the date hereof and as of the Closing Date as if made at and as of the Closing Date; (ii) the representation and warranty of the Sellers contained in <u>Section 3.8(b)</u> shall be true and correct as of the date hereof and as of the Closing Date as if made at and as of the Closing Date and (iii) the representations and warranties of the Sellers contained in this Agreement (other than <u>Sections 3.1</u>, <u>3.2</u>, <u>3.3</u>, <u>3.9</u>, <u>3.16</u>, <u>3.8(b)</u> and <u>3.27</u>) shall be true and correct as of the date hereof and as of the Closing Date as if made at and as of the Closing Date (except to the extent such representations and warranties are made as of another date, in which case such representations and warranties shall be true and correct as of such other date), except where the failure of such representations and warranties to be so true and correct (disregarding any exception or qualification in such representations and warranties relating to "material," "materiality" or "Material Adverse Effect") has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    *Covenants*.  The covenants and obligations of the Sellers to be performed or complied with at or prior to the Closing pursuant to this Agreement shall have been duly performed and complied with in all material respects;

(c)    *Officer's Certificates*.  Each of the Sellers shall have delivered to the Purchaser a certificate duly executed by an executive officer of each Seller certifying to the effect that the conditions set forth in <u>Section 6.3(a)</u> and <u>Section 6.3(b)</u> have been satisfied;

(d)    *Payoff*.  The Sellers shall have delivered to the Purchaser evidence reasonably satisfactory to the Purchaser of the Payoff, to the extent required under <u>Section 5.18</u>;

(e)    *Deliverables*.  Each of the deliveries required to be made to the Purchaser pursuant to <u>Section 2.2(a)</u> shall have been so delivered; and

(f)    *Retitled Assets*.  Substantially all of the Acquired Assets, including bank accounts, lockboxes, insurance policies and benefits plans have been retitled in the name of the Purchaser or the applicable Purchaser Designee to the Purchaser's reasonable satisfaction.

# ARTICLE VII

## TERMINATION

Section 7.1    <u>Termination</u>.

(a)    This Agreement may be terminated by either the Purchaser or the Sellers in the event that the Closing has not occurred on or before the date that is one hundred twenty (120) days after the date of this Agreement, or such later date as may be agreed in writing by the parties in their sole discretion (as such date may be extended in accordance with the terms of this Agreement, the "<u>Outside Date</u>") unless as of such date all conditions to the Closing set forth in <u>Article VI</u> shall have been satisfied or waived or shall be capable of being satisfied at the Closing (but subject to the satisfaction or waiver at or prior to the Closing of all such conditions), except for <u>Section 6.1(a)</u> or, solely in respect of the HSR Act, <u>Section 6.1(b)</u>, unless the failure of the Closing to occur prior to such date results from the failure of the party seeking to terminate this Agreement to perform any of its obligations under this Agreement required to be performed by it at or prior to the Closing or a breach of any representation or warranty of such party to this Agreement; *provided*, that, notwithstanding anything to the contrary herein, if on the initial Outside Date the approval of the transactions contemplated by this Agreement by any Governmental Entity is pending, the Outside Date may be extended once by either the Purchaser or the Sellers by up to thirty (30) days.

(b)    This Agreement may also be terminated prior to the Closing:

(i)    at any time by the mutual written agreement of the Purchaser and the Sellers;

(ii)    by the Purchaser, if (x) there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of the Sellers which breach, either individually or in the aggregate with other breaches by the Sellers, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in <u>Section 6.3(a)</u> or <u>Section 6.3(b)</u>, as the case may be, or (y) there has been any material breach by the Sellers of the Bidding Procedures Order or the Sale Order, in each case of the foregoing clauses (x) and (y) which is not cured within ten (10) Business Days following written notice to the Sellers thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided*, that the Purchaser is not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement or in the Sale Order on the part of the Purchaser);

(iii)    by the Sellers, if (x) there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of the Purchaser which breach, either individually or in the aggregate with other breaches by the Purchaser, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u>, as the case may be, or (y) there has been any material breach by the Purchaser of the Bidding Procedures Order or the Sale Order, in each case of the foregoing clauses (x) and (y) which is not cured within ten (10)

Business Days following written notice to the Purchaser thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided*, that the Sellers are not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement or in the Sale Order on the part of the Sellers);

        (iv)     by either the Sellers or the Purchaser, if a Governmental Entity issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated by this Agreement; *provided*, *however*, that the right to terminate this Agreement pursuant to this <u>Section 7.1(b)(iv)</u> shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such ruling or Order;

        (v)     by the Purchaser, if the Framework Agreement shall have been terminated in accordance with its terms as in effect on the date hereof; *provided*, *however*, that the Purchaser shall not be permitted to terminate this Agreement pursuant to this <u>Section 7.1(b)(v)</u> unless both Brigade and Chatham have used reasonable best efforts to satisfy their respective obligations under the Framework Agreement; *provided, further* that Brigade shall be entitled to grant or withhold its consent to any amendment or modification of this Agreement, or any waiver of any covenant or condition of this Agreement, in each case as contemplated by, and in accordance with, the terms of the Framework Agreement as in effect on the date hereof; or

        (vi)     by the Purchaser, if there shall have been a default or "Event of Default" under the DIP Facility.

        Section 7.2     <u>Effect of Termination</u>.

        (a)     Except as otherwise provided in this <u>Section 7.2</u>, in the event of termination of this Agreement by either party hereto in accordance with <u>Section 7.1</u>, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other parties hereto, except for liability for fraud or intentional breach of this Agreement prior to such termination, and the Release granted in <u>Section 5.20</u> shall be of no force and effect.  The final sentence of <u>Section 5.2(a)</u>, this <u>Section 7.2</u>, <u>Article VIII</u> (other than <u>Section 8.1</u>, <u>Section 8.2</u> and <u>Section 8.4</u>) and, with respect to any defined terms used in the foregoing Sections or Article, <u>Article IX</u> shall expressly survive the termination of this Agreement.

ARTICLE VIII

<u>GENERAL PROVISIONS</u>

        Section 8.1     <u>Tax Matters</u>.

        (a)     Notwithstanding anything to the contrary in this Agreement, the Parent and the Purchaser shall each pay, when due, and be responsible for, fifty percent (50%) of all sales, use, transfer (including real estate transfer), documentary, stamp, recording, conveyance, goods and services or similar Taxes and fees imposed on or payable in connection with the transfer of the Acquired Assets, the Assumed Liabilities and the Business contemplated by this Agreement ("<u>Transfer Taxes</u>").  The party hereto responsible under applicable Law for

57

filing a Tax Return with respect to any such Transfer Taxes shall prepare and timely file (or cause to be prepared and timely filed) such Tax Return (and the Purchaser shall provide timely payment thereof, if any payment is due) and promptly provide a copy of such Tax Return to the other parties.  The Purchaser and the Parent shall, and shall cause their respective Affiliates to, reasonably cooperate to timely prepare and file any Tax Returns or other filings relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes to the extent permitted by applicable Law.

(b)    For purposes of this Agreement, with respect to the Business or any Acquired Asset or Assumed Liability, the Sellers and the Purchaser shall apportion the liability for Property Taxes, ad valorem Taxes, and similar Taxes ("Periodic Taxes") and for Taxes that are either (x) based upon or related to income or receipts, (y) imposed in connection with any sale, transfer or assignment or any deemed sale, transfer or assignment of property (real or personal, tangible or intangible), or (z) payroll or similar Taxes with respect to any employee, or independent contractor associated with the Business or the Acquired Assets ("Non-Periodic Taxes") for Straddle Periods applicable to the Business or such Acquired Asset or Assumed Liability in accordance with this Section 8.1(b).  The Periodic Taxes described in this Section 8.1(b) shall be apportioned between the Sellers and the Purchaser as of the Closing Date, with the Purchaser liable for that portion of the Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Post-Closing Tax Period) equal to the Periodic Taxes for such Straddle Period *multiplied by* a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of calendar days in such entire Straddle Period. The Non-Periodic Taxes described in this Section 8.1(b) shall be apportioned between the Sellers and the Purchaser as of the Closing Date, with the Purchaser liable for (i) California state Income Taxes imposed with respect to, arising out of, or relating to the transactions contemplated by this Agreement equal to approximately $1,700,000, and (ii) that portion of the other Non-Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Post-Closing Tax Period) equal to the amount that would be payable in the Post-Closing Tax Period if the taxable year or period ended at the end of the day on the Closing Date; *provided*, *however*, that exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for amortization or depreciation, shall be allocated to the Post-Closing Tax Period (notwithstanding that such exemptions, allowances or deductions may under applicable Law be determined solely at the end of the Straddle Period) by multiplying the total amount of such exemption, allowance, or deduction for such Straddle Period by a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of calendar days in such entire Straddle Period.  The Sellers shall be liable for that portion of the Periodic Taxes and Non-Periodic Taxes for a Straddle Period for which the Purchaser is not liable under the preceding sentences (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Pre-Closing Tax Period); *provided* that Periodic Taxes attributable to the Pre-Closing Tax Period shall not include any reassessment or revaluation of any property occurring in connection with the transactions contemplated by this Agreement.  The party hereto responsible under applicable Law for paying a Tax described in this Section 8.1(b) shall be responsible for administering the payment of such Tax.  For purposes of this Section 8.1(b), the Straddle Period for ad valorem Taxes and Property Taxes shall be the fiscal period for which such Taxes were assessed by the applicable Tax jurisdiction.  With

58

respect to any Periodic Taxes or Non-Periodic Taxes imposed with respect to the Business or any Acquired Asset or Assumed Liability for a Post-Closing Tax Period, to the extent such Periodic Taxes or Non-Periodic Taxes were paid by any Seller or any Affiliate thereof, Purchaser shall pay to the Sellers such Periodic Taxes or Non-Periodic Taxes no later than ten (10) Business Days following receipt of written notice from the Sellers and with respect to any Periodic Taxes or Non-Periodic Taxes imposed with respect to the Business or any Acquired Asset or Assumed Liability for a Pre-Closing Tax Period to the extent such Periodic Taxes or Non-Periodic Taxes were paid by Purchaser or any Affiliate thereof, Seller shall pay to the Purchaser such Periodic Taxes or Non-Periodic Taxes no later than ten (10) Business Days following receipt of written notice from the Purchaser. For the avoidance of doubt, nothing in this Agreement shall allocate to any Seller or to Purchaser, or to any Affiliate of any Seller or Purchaser, any Taxes of any Purchased Entity or any Subsidiary thereof.

(c)    The parties shall, and shall cause their respective Affiliates to, cooperate and (at the expense of the requesting party to the extent that any out-of-pocket expenses or costs are incurred) provide to the other party and any Affiliate thereof such documentation, information, and assistance as may reasonably be requested by any of them in connection with (i) the preparation of any Tax Return relating to the Business, the Acquired Assets or the Assumed Liabilities, (ii) the determination of any liability in respect of Taxes or the right to any refund, credit or prepayment in respect of Taxes (including pursuant to this Agreement), or (iii) any audit or other examination by any Taxing Authority, or any judicial or administrative proceeding with respect to any Taxes relating to the Business, the Acquired Assets or the Assumed Liabilities. Notwithstanding anything herein to the contrary, in no event shall any Seller or any Affiliate thereof be required to provide any Person with a copy of, or otherwise disclose the contents of, its Tax Returns.

(d)    Notwithstanding anything to the contrary in this Agreement, the Sellers shall have the exclusive right to control in all respects, and neither Purchaser nor any of its Affiliates shall be entitled to participate in, any Tax proceeding with respect to any Tax Return of any Seller or any Affiliate thereof; provided, that the Purchaser shall have the right to review and provide comments on any Tax Return related to the Specified Refunds and the Sellers shall incorporate any reasonable comments related to the Specified Refunds. The Sellers shall promptly file all Tax Return of any Seller related to the Specified Refunds. Additionally, the Purchaser shall have the right to participate in any Tax proceeding related to the Specified Refunds and the Sellers shall not be permitted to settle, compromise, concede or take any material action with respect to the Specified Refunds without the consent of the Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed. No later than ten (10) Business Days after receipt by any Seller of any amounts constituting the Specified Refunds, the Seller shall pay to the Purchaser such amounts. The Purchaser shall bear all costs and expenses of preparing and filing Tax Returns related to the Specified Refunds and of any Tax proceedings related to the Specified Refunds. In the event that any amount of the Specified Refunds paid over to the Purchaser pursuant to this Section 8.1(d) is required to be repaid to the applicable Governmental Authority by the Sellers prior to their dissolution, the Purchaser shall repay such amount to the Sellers.

(e)    The parties intend that the dispositions by the Sellers to Purchaser as contemplated by this Agreement shall be treated as taxable transactions governed by

Section 1001 of the Code (the "Intended Tax Treatment"). Each of the Sellers and Purchaser agree (and agree to cause their respective Affiliates) to prepare and file all relevant U.S. federal, state, local and non-U.S. Tax Returns in accordance with the Intended Tax Treatment. None of the Sellers or Purchaser shall (and each of the Sellers and Purchaser shall cause their Affiliates not to) take any position inconsistent with the Intended Tax Treatment on any Tax Return or in connection with any Tax proceeding, in each case, except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any applicable analogous provision of state, local or non-U.S. law). In the event that the Intended Tax Treatment is disputed by any Taxing Authority, the party receiving notice of such dispute shall promptly notify the other party in writing of such notice, and the parties shall cooperate in good faith to resolve such dispute.

Section 8.2     Bulk Sales.  The Sale Order shall provide either that (i) Sellers have complied with the requirements of any Law relating to bulk sales and transfer or (ii) compliance with the Laws relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

Section 8.3     Guarantee.  To induce the Sellers and the Parent to enter into this Agreement, subject to the satisfaction of the closing conditions set forth in Article VI, the Guarantor hereby absolutely, irrevocably and unconditionally guarantees to the Sellers and the Parent, the due and punctual payment of the Cash Payment (the "Guaranteed Obligation"). Subject to the satisfaction of the closing conditions set forth in Article VI, the guarantee pursuant to this Section 8.3, (i) is absolute, irrevocable and unconditional and shall not be impaired, discharged or terminated by any act or omission by the Purchaser or the Guarantor that may affect the enforceability of this guarantee, and (ii) shall not be affected by the bankruptcy, insolvency or inability to pay of the Purchaser or the Guarantor. The Guarantor, in its capacity as guarantor of the Guaranteed Obligation, hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Sellers or the Parent exhaust any right, power or remedy or proceed against the Purchaser. If the Guarantor makes a payment or performs an action in full satisfaction of the Guaranteed Obligation, such satisfaction shall be deemed to be a satisfaction of such obligation in full by the Purchaser for purposes of this Agreement. The Guarantor has all necessary power and authority to execute and deliver this Agreement and to perform the Guaranteed Obligation hereunder. This Agreement has been duly authorized, executed and delivered by the Guarantor and, assuming the due and valid authorization, execution and delivery of this Agreement by the other parties hereto, this Agreement constitutes the legal, valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms.

Section 8.4     Survival of Representations, Warranties and Covenants.  No representations or warranties in this Agreement or in any Ancillary Document shall survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach or inaccuracy thereof.  No covenants in this Agreement or in any Ancillary Document shall survive the Closing and shall thereupon terminate, except (1) to the extent the terms thereof expressly contemplate performance following the Closing and (2) any covenants in Section 8.1.

Section 8.5     Public Announcements.  Unless otherwise required by applicable Law or by obligations of the Sellers or the Purchaser or their respective Affiliates pursuant to any

listing agreement with or rules of any securities exchange or in order to enforce a party's rights or remedies under this Agreement, the Sellers, on the one hand, and the Purchaser, on the other hand, shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed).  From and after the Closing, the parties may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement except where such terms and conditions have already been disclosed as required by Law or by obligations of the Purchaser or the Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or in order to enforce a party's rights or remedies under this Agreement; provided, that the issuing party shall use its commercially reasonable efforts to consult with the other party with respect to the text thereof to the extent practicable.  Notwithstanding the foregoing, Purchaser may disclose information regarding the transactions contemplated by the Agreement or the other Ancillary Documents (a) to any of its direct or indirect equity holders, Affiliates, Representatives and its and their respective Affiliates' financing sources, so long as such Persons are informed of the confidential nature of such information and Purchaser shall be liable for any failure by such Person to hold in confidence such information under this Section 8.5, (b) for purposes of compliance with its or their respective Affiliates' financial reporting obligations or (c) in connection with its or their respective Affiliates' fundraising or marketing activities, so long as such Persons are informed of the confidential nature of such information and Purchaser shall be liable for any failure by such Person to hold in confidence such information under this Section 8.5.

Section 8.6    Notices.  All notices, requests, claims, demands or other communications hereunder shall be deemed to have been duly given and made if in writing and (a) at the time personally delivered if served by personal delivery upon the party hereto for whom it is intended, (b) at the time received if delivered by registered or certified mail (postage prepaid, return receipt requested) or by a national courier service (delivery of which is confirmed), or (c) upon confirmation if sent by facsimile or email; in each case to the Person at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such Person:

(a)    if to the Purchaser, to:

SIJ Holdings, LLC
c/o Chatham Asset Management, LLC
26 Main Street, Suite 204
Chatham, New Jersey 07928
Email:      barry@chathamasset.com
            feisal@chathamasset.com
            jim@chathamasset.com
Attention:  Barry Schwartz
            Feisal Alibhai
            James Ruggerio, Jr.

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Email:          arosenberg@paulweiss.com
                ctheil@paulweiss.com
                jweber@paulweiss.com
Attention:      Andrew N. Rosenberg
                Chaim P. Theil
                John Weber

with a copy (which shall not constitute notice) to:

Brigade Capital Management
399 Park Avenue, 16th Floor
New York, New York 10022
Email: JCB@brigadecapital.com
Attention:      John Baylis

with a copy (which shall not constitute notice) to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Email:          dmannal@kramerlevin.com
Attention:      Douglas Mannal

and

(b)     if to the Sellers, to:

The McClatchy Company
2100 Q Street
Sacramento, California 95816
Email: pfarr@mcclatchy.com
Attention:      Peter Farr

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Facsimile:      (213) 687-5600
Email:          van.durrer@skadden.com
Attention:      Van C. Durrer II

and

Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Palo Alto, California 94301
Facsimile:       (650) 798-6504
Email:           thomas.ivey@skadden.com
Attention:       Thomas J. Ivey

Brigade Capital Management
399 Park Avenue, 16th Floor
New York, New York 10022
Email: JCB@brigadecapital.com
Attention:       John Baylis

with a copy (which shall not constitute notice) to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Email:           dmannal@kramerlevin.com
Attention:       Douglas Mannal

(c)      Brigade shall be an intended third-party beneficiary of this Agreement with respect to this <u>Section 8.6</u> and <u>Section 8.12</u>.

Section 8.7      <u>Descriptive Headings; Interpretative Provisions</u>.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.  Unless otherwise stated in this Agreement, references to any Contract are to that Contract as amended, modified or supplemented from time to time in accordance with the terms thereof.  Any reference to any law in this Agreement means such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.  The words "to the extent" shall be interpreted to mean "to the extent (but only to the extent)".  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.  Any reference in this Agreement to "made available" shall mean (i) the Parent SEC Documents publicly available prior to the date hereof (excluding items which are cross-referenced, footnoted or only referred to in such documents except to the extent such cross-referenced or footnoted items are otherwise included as Parent SEC Documents publicly

available prior to the date hereof) and (ii) with respect to any other documents or information, that such documents or information referenced shall have been provided in the dataroom for Purchaser and its Representatives at least two (2) Business Days prior to the date of this Agreement. Whenever the last day for the exercise of any right or the discharge of any duty under this Agreement falls on other than a Business Day, the party hereto having such right or duty shall have until the next Business Day to exercise such right or discharge such duty. Unless otherwise indicated, the word "day" shall be interpreted as a calendar day. References to "dollars" or "$" mean United States dollars, unless otherwise clearly indicated to the contrary. No summary of this Agreement prepared by or on behalf of any party hereto shall affect the meaning or interpretation of this Agreement.

Section 8.8     No Strict Construction. The Sellers, on the one hand, and the Purchaser, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Sellers, the Purchaser, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any person with respect to this Agreement.

Section 8.9     Entire Agreement; Assignment. This Agreement, the Ancillary Documents and the Confidentiality Agreement constitute the entire agreement and supersede all other prior agreements and understandings, both written and oral, among the parties hereto or any of them, with respect to the subject matter hereof and thereof. Neither this Agreement nor any of the rights, interests or obligations under it may be directly or indirectly assigned, delegated, sublicensed or transferred by any of the parties hereto, in whole or in part, to any other Person by operation of law or otherwise, without the prior written consent of the other parties, and any attempted or purported assignment in violation of this Section 8.9 will be null and void; provided, however, that, subject to compliance with Section 2.3, Purchaser shall be permitted to assign all or part of its rights or obligations hereunder to (a) one or more Purchaser Designees, (b) at or following the Closing, any of its rights to any of Purchaser's financing sources as collateral or (c) following the Closing, to any successor or purchaser of all or part of the business of Purchaser or any of its Subsidiaries without the prior consent of Sellers. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns and shall not be binding upon, inure to the benefit of, or be enforceable by, any other Person.

Section 8.10     Governing Law; Submission of Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto. Each of the parties hereto irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated thereby (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court), and waives any objection to the laying of venue of any such litigation in the Bankruptcy Court. Each party hereto hereby consents to service of process in the

64

manner and at the address set forth in <u>Section 8.6</u>.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.11    <u>Expenses</u>.  Except as otherwise expressly provided herein, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated thereby shall be paid by the party hereto incurring such expenses.

Section 8.12    <u>Amendment</u>.  This Agreement may not be amended, modified or supplemented except by an instrument in writing signed on behalf of all the parties hereto; provided that <u>Section 8.6</u> and this <u>Section 8.12</u> shall not be amended in a manner that affects the rights of Brigade thereunder without the prior written consent of Brigade.

Section 8.13    <u>Waiver</u>.  At any time prior to the Closing, the parties hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions contained herein.  Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

Section 8.14    <u>Counterparts; Effectiveness</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by.pdf,.tif,.gif or similar attachment to electronic mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

Section 8.15    <u>Severability; Validity; Parties in Interest</u>.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other Persons or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable.  Except with respect to the parties released pursuant to <u>Section 5.20</u>, this Agreement, the Allocation and the other Ancillary Documents are for the sole benefit of the parties and their permitted assigns and nothing in this Agreement, express or implied, is intended to confer upon any Person not a party to this Agreement any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 8.16    <u>Specific Performance</u>.  The parties recognize that if any party breaches this Agreement or refuses to perform under the provisions of this Agreement, monetary damages alone would not be adequate to compensate the other parties for their injuries.  Accordingly, a non-breaching party shall be entitled, in addition to any other remedies that may be available, to equitable relief, including an injunction or injunctions or Orders for specific performance, to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including, for the avoidance of doubt, the obligation of a party to consummate the transactions contemplated by this Agreement),

without proof of actual damages or the posting of a bond or other undertaking.  If any Action is brought by a party to enforce this Agreement, the other party shall waive the defense that there is an adequate remedy at Law. The rights set forth in this <u>Section 8.16</u> shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

Section 8.17    <u>No Recourse</u>.  This Agreement may only be enforced against the named parties hereto (subject to the terms, conditions and other limitations set forth herein). Subject to the limitations contained herein, (i) all claims or causes of action that may be based upon, arise out of or relate to this Agreement may be made only against the Persons that are expressly identified as parties hereto and (ii) except for any express obligations hereunder or under another Ancillary Document, no Person other than a named party hereto shall have any liability or obligation with respect to this Agreement or with respect any claim or cause of action that may arise out of or relate to this Agreement.

Section 8.18    <u>Seller Representative</u>.

(a)    Each of the Sellers hereby irrevocably appoints the Seller Representative as the sole agent of the Sellers to act on behalf of such Person regarding any matter relating to or arising under this Agreement and the Ancillary Documents, including for the purposes of: (i) receiving any payments due from the Purchaser that are required under the terms of this Agreement or the other Ancillary Documents; (ii) taking any action on behalf of the Sellers that may be necessary or desirable, as determined by the Seller Representative in its sole discretion, in connection with any provision of this Agreement or the Ancillary Documents in accordance with their terms; (iii) accepting notices on behalf of the Sellers in accordance with <u>Section 8.6</u>; (iv) executing and delivering, on behalf of the Sellers, any notices, documents or certificates to be executed by the Sellers in connection with this Agreement or the Ancillary Documents; and (v) granting any consent or approval on behalf of the Sellers under this Agreement or the Ancillary Documents.  As the representative of the Sellers, the Seller Representative shall act as the agent for such parties and shall have authority to bind the Sellers with respect to all matters arising under or relating to this Agreement and the Ancillary Documents.  The Seller Representative shall only disburse the Cash Remainder or any portion thereof to a Seller other than the Parent to the extent the Excluded Liabilities of such Seller exceed the sum of (1) the amount of payments received by such Seller pursuant to this Agreement, (2) the amount of reimbursements received by such Seller pursuant to this Agreement, and (3) the Excluded Assets of such Seller.

(b)    The Purchaser may rely exclusively, without independent verification or investigation, upon all decisions, communications or writings made, given or executed by the Seller Representative in connection with this Agreement and the Ancillary Documents.  The Purchaser is entitled to deal exclusively with the Seller Representative on all matters arising under or relating to this Agreement, the Ancillary Documents and the transactions contemplated by this Agreement and the Ancillary Documents (the "<u>Contemplated Transactions</u>").  Any action taken or not taken or decisions, payments, communications or writings made, given or executed by the Seller Representative for or on behalf of the Sellers shall be deemed an action taken or not taken or decisions, payments, communications or writings made, given or executed by the Sellers.  Any notice or communication delivered in accordance with this Agreement by the Purchaser to the Seller Representative shall be deemed to have been

delivered to each of the Sellers. The Purchaser shall be entitled to disregard any decisions, communications or writings made, given or executed by any of the Sellers in connection with this Agreement, the Ancillary Documents and the Contemplated Transactions unless the same is made, given or executed by Seller Representative. Any reference in this agreement to a notice or information to be provided to, consent required by, or consultation with, payments made to or by and decisions, communications or writings made to or by any Seller, shall be deemed to refer to the Seller Representative and any such notice or information to, consent from, consultation with or decisions, payments made to or by, and communications or writings made to or by the Seller Representative, as applicable, shall satisfy any such notice, information, consent and consultation requirement in all respects and shall be final, binding and conclusive upon each of the Sellers, and the other parties hereto.

(c)     Each Seller hereby appoints the Seller Representative as such Person's true and lawful attorney-in-fact and agent with full powers of substitution and resubstitution, in such Person's name, place and stead, in any and all capacities, in connection with this Agreement, the Ancillary Documents and the Contemplated Transactions, granting unto said attorney-in-fact and agent, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection with this Agreement, the Ancillary Documents and the Contemplated Transactions as fully to all intents and purposes as such Person might or could do in person.

(d)     The Seller Representative shall be entitled to retain counsel and to incur such fees, costs and expenses (including reasonable attorneys' fees, costs and expenses) as the Seller Representative deems to be necessary or appropriate in connection with the performance of its obligations under this Agreement. The Seller Representative shall be reimbursed for all such fees, costs and expenses (including reasonable attorneys' fees, costs and expenses) by the Parent, as agent for the Sellers, from the Cash Remainder. For clarity, the Purchaser shall not be required to reimburse the Sellers or the Seller Representative for any such fees, costs or expenses.

(e)     All of the immunities, powers and rights granted to the Seller Representative under this Agreement shall survive the Closing. The grant of authority provided for herein is coupled with an interest and shall be irrevocable and shall survive the death, incompetency, bankruptcy, dissolution, winding up or liquidation of any Seller.

(f)     Notwithstanding anything to the contrary set forth herein, the Purchaser shall not be liable for and shall be held harmless from any loss to any Person, including any Seller, for any action taken or not taken by the Seller Representative or for any act or omission taken or not taken in reliance upon the actions taken or not taken or decisions, communications or writings made, given or executed by the Seller Representative, including any failure of the Seller Representative to distribute, or to distribute or subdivide in the correct amounts, any payments made to the Seller Representative by the Purchaser for distribution to any Seller or any other Person; it being understood that once the Purchaser has made such a payment to the Seller Representative for distribution to a Seller or to such other Person, such payment shall constitute a complete discharge of the relevant payment obligation of the Purchaser.

(g)        The Seller Representative may be removed by unanimous action of the Sellers and such removal shall be effective upon written notice to the Seller Representative and the Purchaser.  If the Seller Representative (i) is so removed, (ii) terminates its legal existence, or (iii) resigns from its position as Seller Representative, then the Sellers shall, as promptly as practicable thereafter, appoint a replacement Seller Representative, which replacement Seller Representative shall be reasonably acceptable to the Purchaser.  Such appointment shall be effective upon delivery of at least two (2) Business Days' prior written notice to the Purchaser and, thereafter, the replacement Seller Representative shall be deemed to be the Seller Representative for all purposes of this Agreement and the Ancillary Documents.  Any obligation of the Purchaser to take any action in respect of the Seller Representative shall be suspended during any period that the position of Seller Representative is vacant.

## ARTICLE IX

## DEFINITIONS

As used herein, the terms below shall have the following meanings:

"Accounts Receivable" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that has not been billed, chattel paper, notes and other rights to payment (whether current or non-current), including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"Action" means any action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter by or before any Governmental Entity.

"Affiliate" of a specified Person means a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Agents" means, collectively, the First Lien Notes Agent, the Second Lien Term Loan Agent, and the Third Lien Notes Agent.

"Agreement" has the meaning set forth in the Preamble and shall include the Exhibits and Schedules annexed hereto or referred to herein.

"Ancillary Documents" means the Bill of Sale, Assignment and Assumption Agreement, Intellectual Property Assignment Agreements, the Escrow Agreements, each Deed and each other agreement, document or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"<u>Antitrust Laws</u>" means any applicable supranational, national, federal, state, county, local or foreign antitrust, competition or trade regulation Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition, including the HSR Act, the Sherman Act, the Clayton Act and the Federal Trade Commission Act, in each case, as amended, and other similar antitrust, competition or trade regulation Laws of any jurisdiction other than the United States.

"<u>Benefit Plan</u>" means a plan, program, agreement or other arrangement providing for employment, compensation, retirement, deferred compensation, severance, separation, relocation, repatriation, expatriation, termination pay, performance awards, bonus, incentive, stock option, stock purchase, stock bonus, phantom stock, stock appreciation right, supplemental retirement or other pension or welfare benefits, whether written or unwritten, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, (i) which is or has been sponsored, maintained, contributed to, or required to be contributed to by the Sellers or any of their ERISA Affiliates for the benefit of any employee or former employee of the Purchased Entities, the Sellers or any of their Subsidiaries (or to which any Seller is a party) or (ii) with respect to which the Sellers or any of their ERISA Affiliates would reasonably be expected to have any liability.

"<u>Bidding Procedures</u>" means the bidding procedures set forth in the Bidding Procedures Order.

"<u>Bidding Procedures Order</u>" means the *Order (I) Establishing Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (II) Establishing Procedures for the Debtors to Enter into Stalking Horse Agreement with Bid Protections in Connection with a Sale of Substantially All of the Debtors' Assets; (III) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (IV) Approving Form and Manner of Notice of All Procedures, Protections, Schedules and Agreements; (V) Scheduling a Hearing to Consider the Proposed Sale; and (VI) Granting Certain Related Relief* entered at Docket No. 432 in the Chapter 11 Cases.

"<u>Books and Records</u>" means all documents of, or otherwise in the possession, custody or control of, or used by, the Sellers in connection with, or relating to, the Business, the Acquired Assets, the Assumed Liabilities, or the operations of the Sellers, including all files, instruments, papers, books, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, lists of past, present and/or prospective customers, supplier lists, regulatory filings, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), data, reports (including environmental reports and assessments), plans, mailing lists, price lists, marketing information and procedures, advertising and promotional materials, equipment records, warranty information, architects agreements, construction contracts, drawings, plans and specifications, records of operations, standard forms of documents, and related books, records and workpapers, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information), in each case whether or not in electronic form; *provided,* that the Books and Records shall not include Tax Returns and other books, records and work papers

related to Taxes paid or payable by the Sellers or their Affiliates but shall include copies of Tax Returns primarily related to Taxes of the Business, the Acquired Assets or the Assumed Liabilities).

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of Delaware or the State of New York or is a day on which banking institutions located in the State of Delaware or the State of New York are authorized or required by applicable Law or other governmental action to close.

"Cash" means all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and marketable securities, and any bank accounts and lockbox arrangements of the Sellers as of the Closing.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, against any Seller.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means Official Committee of Unsecured Creditors appointed by the Office of the U.S. Trustee in the Chapter 11 Cases, as may be reconstituted from time to time.

"Committee Retained Professional Fees" means an aggregate amount equal to (a) the reasonable and documented out-of-pocket fees and expenses incurred by Professionals retained by the Committee, pursuant to section 327 of the Bankruptcy Code, in each case, to the extent such out-of-pocket fees and expenses are accrued and unpaid as of the Closing Date and (b) a good faith estimate, prepared by each applicable Professional retained by the Committee, of out-of-pocket fees and expenses anticipated to incurred by such Professional following the Closing Date with respect to the Chapter 11 Cases.

"Committee Retained Professional Fees Escrow" means the escrow account established pursuant to the Committee Retained Professional Fees Escrow Agreement with subaccounts for each such Professional.

"Committee Retained Professional Fees Escrow Agreement" means a customary escrow agreement reasonably acceptable to the parties and the Committee by and among the Purchaser, the Sellers and the escrow agent for the disbursement of the amount payable by the Purchaser pursuant to Section 1.6 in connection with the Committee Retained Professional Fees.

"Confidentiality Agreement" means the Confidentiality Agreement, between Chatham and the Parent, dated May 22, 2020, as may be amended from time to time.

"Contract" means any oral or written agreement, contract, subcontract, settlement agreement, lease, sublease, use agreement, occupancy agreement, instrument, permit, concession, franchise, binding understanding, note, option, bond, mortgage, indenture, trust document, loan or credit agreement, license, sublicense, insurance policy or other legally binding commitment or instrument.

"Copyrights" means all copyrights, mask works, designs and other copyrightable subject matter, including any source code and object code.

"Designated Accounting Firm" means any nationally recognized independent public accounting firm, or any successor thereto, as shall be mutually agreed upon by the parties.

"DIP Credit Agreement" means that certain debtor-in-possession credit agreement, dated as of February 12, 2020, by and among Encina Business Credit, LLC, as administrative agent for each member of the Lender Group (as defined in the DIP Credit Agreement) and the Bank Product Providers (as defined in the DIP Credit Agreement), the Company (as defined in the DIP Credit Agreement), as a debtor and debtor-in-possession, and certain of the Borrowers party thereto, as the same may be subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

"DIP Facility" means the secured debtor-in-possession credit facility with Encina Business Credit, LLC in an aggregate principal amount up to $50,000,000 on terms consistent with the DIP Credit Agreement.

"DIP Orders" means, collectively, the (i) *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 64] entered by the Bankruptcy Court on February 14, 2020 and (ii) *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 233] entered by the Bankruptcy Court on March 26, 2020.

"Discharge" means, except as authorized by a valid Permit issued under Environmental Law, (i) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, emitting, leaching of any Hazardous Substance into the outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata, and (b) migration of Hazardous Substances into or out of any of the Real Property through soil, surface water, or groundwater.

"Effect" means any change, effect, development, circumstance, condition, fact, state of facts, event or occurrence.

"Encumbrance" means any "interest" as that term is used in Section 363(f) of the Bankruptcy Code, mortgage, deed of trust, pledge, security interest, encumbrance, easement, condition, reservation, lien (statutory or otherwise), mechanics lien, Claim, covenant, encroachment, lease, right of use or possession, or other similar third party interest, or other survey defect, charge, hypothecation, deemed trust, action, easement, right-of-way or covenant on real property, other than any license of Intellectual Property, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether voluntarily incurred, imposed by Contract or arising by operation of Law or otherwise.

"Environmental Laws" means any and all applicable Laws which (a) concern, regulate, govern or relate to (i) public health and safety, as may be affected by the use, treatment, storage, transportation, handling, disposal or Discharge of, or exposure to, Hazardous Substances, (ii) pollution or protection of the environment or natural resources, including those relating to (x) the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, distribution, importing, labeling, testing, processing, discharge, Discharge, threatened Discharge, control, cleanup, or other action or failure to act involving pollutants, contaminants, chemicals, or industrial, toxic or hazardous materials, substances or wastes and (y) human health as affected by hazardous or toxic substance or (b) impose liability or responsibility with respect to any of the foregoing, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), or any other Law of similar effect.

"Environmental Liabilities" means all Liabilities arising from any impairment or damage to the environment or natural resources, failure to comply with Environmental Laws, or the Discharge of or exposure to Hazardous Substances:  (a) in connection with the prior or ongoing ownership or operation of the Business; or (b) on, in, under, to or from the Real Property or any other real property currently or formerly owned, operated, occupied or leased in connection with the ongoing or prior ownership or operation of the Business, including Liabilities related to:  (i) the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Substances; (ii) the Discharge of or exposure to Hazardous Substances; (iii) any other pollution or contamination of the environment; (iv) any other obligations imposed under Environmental Laws with respect to the Business or the Real Property; and (v) all other damages and losses arising under applicable Law as a result of any of the matters identified in clauses (i) – (iv) of this definition.

"Environmental Permit" means any and all Permits, Governmental Authorizations, licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, notifications, exemptions, clearances and any other authorization required by or issued under any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"Escrow Agreements" means, collectively, the Committee Retained Professional Fees Escrow Agreement, the Seller Retained Professional Fees Escrow Agreement and the Wind-Down Fees Escrow Agreement.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Taxes" means (i) any Taxes imposed with respect to the Acquired Assets, the Assumed Liabilities or the Business for any Pre-Closing Tax Period (as determined pursuant to Section 8.1(b)), including, for the avoidance of doubt, any Income Taxes arising from the transactions contemplated by this Agreement other than California state Income Taxes resulting from the transactions contemplated by this Agreement equal to approximately $1,700,000; (ii) Taxes payable to the extent arising out of or related to the Excluded Assets or with respect to the business or activities of Seller or any Affiliate of Seller (including any divested or discontinued business or activities of Seller or any Seller or any Affiliate of Seller) other than the Business or the Acquired Assets or the Assumed Liabilities; and (iii) Taxes for which the Sellers are liable under Section 8.1.

"Existing Secured Claims" means, collectively, the First Lien Notes Claims, the Second Lien Term Loan Claims, and the Third Lien Notes Claims.

"First Lien Notes" means those certain 9.000% Senior Secured Notes due 2026 issued pursuant to the First Lien Notes Indenture.

"First Lien Notes Agent" means The Bank of New York Mellon Trust Company, N.A. in its capacities as Trustee and Collateral Agent under the First Lien Notes Indenture.

"First Lien Notes Claim" means any claims or obligations arising under the First Lien Notes Documents.

"First Lien Notes Documents" means the First Lien Notes Indenture and all related amendments, supplements, notes, pledges, collateral agreements, loan and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the First Lien Notes Indenture, in each case as amended, restated, supplemented, or modified from time to time.

"First Lien Notes Indenture" means that certain Indenture dated July 16, 2018, by and among Parent, as issuer, the subsidiary guarantor parties thereto, and the First Lien Notes Agent, as amended, supplemented, or otherwise modified from time to time.

"Framework Agreement" means that certain Framework Agreement dated as of July 1, 2020, by and among Chatham and each of its managed funds or accounts that is a beneficial holder of the First Lien Notes, Brigade Capital Management, LP and each of its managed funds or accounts that is a beneficial holder of the First Lien Notes, and the Purchaser.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authorization" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Entity.

"Governmental Entity" means (a) any supranational, national, federal, state, county, municipal, local, or foreign government or any entity exercising executive, legislative, judicial, regulatory, taxing, or administrative functions of or pertaining to government, (b) any public international governmental organization or (c) any agency, division, bureau, department,

commission, board, arbitral or other tribunal, branch or other political subdivision of any government, entity or organization described in the foregoing clause (a) or (b) of this definition (including patent and trademark offices and self-regulatory organizations).

"Hazardous Substance" means any pollutant, chemical, substance and any toxic, infectious, carcinogenic, reactive, corrosive, ignitable or flammable chemical, chemical compound, contaminant, hazardous substance, material or waste, or any other substance whether solid, liquid or gas, that is subject to regulation, investigation, control, corrective action or remediation under any Environmental Laws.

"Income Tax" means any Tax that is imposed on or measured by net income, including franchise Taxes.

"Indebtedness" means, with respect to any Person, (a) all obligations for borrowed money; (b) all obligations evidenced by bonds, debentures, notes or similar instruments, (c) all guarantees (or any other arrangement having the economic effect of a guarantee) of Indebtedness of others; (d) all obligations, contingent or otherwise, of such Person as an account party in respect of financial guaranties, letters of credit, letters of guaranty, surety bonds and other similar instruments; (e) all obligations, contingent or otherwise, in respect of bankers' acceptances; (f) net cash payment obligations of such Person under swaps, options, derivatives and other hedging agreements or arrangements that will be payable upon termination thereof (assuming they were terminated on the date of determination); (g) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (h) all indebtedness of such Person for the deferred purchase price of assets, securities, or services in respect of which any Person is liable, contingently or otherwise (including "earn-outs," indemnities and "notes" payable with respect to the acquisition of any business, assets or securities) (other than Trade Payables, other expense accruals and deferred compensation items arising in the ordinary course of business consistent with past practice); (i) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded; (j) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities; (k) pension and other similar post-retirement obligations; (l) obligations with respect to bonuses or other forms of compensation to any Person as a result of or in connection with the transactions contemplated by this Agreement pursuant to any change in control, retention, transaction, severance, discretionary or similar bonuses or other similar payment or obligation; (m) all Indebtedness of others referred to in clauses (a) through (l) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness; (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness; (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered); or (iv) otherwise to assure a creditor against loss in respect of such Indebtedness; and (n) all Indebtedness referred to in clauses (a) through (m) above secured by (or for which the holder of such Indebtedness has an existing right, contingent

74

or otherwise, to be secured by) any lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Intellectual Property" means all intellectual property rights, including all U.S. and foreign:  (a) Patents; (b) Trademarks; (c) Trade Secrets; (d) Copyrights; (e) internet domain names and social media identifiers; and (f) all applications for, and registrations of, of any of the foregoing.

"Knowledge of the Sellers" means, with respect to any matter in question, the actual knowledge after due inquiry of any of the individuals set forth on Article IX of the Seller Disclosure Letter.

"Law" means any law (including common law), statute, requirement, code, rule, regulation, order, ordinance, judgment or decree or other pronouncement of any Governmental Entity.

"Lease" means any Contract pursuant to which any Seller leases, uses or otherwise occupies any Leased Real Property.

"Liability" means a Claim or Encumbrance of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any Effect that, individually or in the aggregate (taking into account all other such Effects), has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (1) the Acquired Assets, the Assumed Liabilities or the assets, properties, financial condition or results of operations of the Business, in each case taken as a whole or (2) the ability of Sellers to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement; *provided*, *however*, that for purposes of the foregoing clause (1), no Effects resulting or arising from the following shall be deemed to constitute a Material Adverse Effect or shall be taken into account when determining whether a Material Adverse Effect exists or has occurred:  (i) changes in general economic, financial or securities markets or geopolitical conditions, (ii) general changes or developments in business, regulatory or macroeconomic conditions or trends or the industries and markets in which the Business operates, (iii) the execution and delivery of this Agreement, the announcement of the Acquisition or the consummation of the transactions contemplated by this Agreement, including termination of, reduction in or similar negative impact on business relationships with any customers, suppliers, distributors, licensors, licensees, partners or employees of the Business, assuming such termination of, reduction in or similar negative impact does not result from a breach of the terms of this Agreement by the Sellers or any of their Affiliates (iv) any actions expressly required to be taken or omitted by the Sellers under this Agreement (other than the actions contemplated by Section 5.1(a)) or any action or omission by the Purchaser in breach of this Agreement, (v) any action taken (or omitted) by the Sellers which is expressly requested in writing by the Purchaser, (vi) changes in any applicable Laws or applicable accounting regulations or principles or the enforcement or interpretation thereof, (vii) any outbreak or escalation of hostilities or war, act of terrorism, natural disaster,

epidemic, pandemic (including the COVID-19 virus) or act of God and (viii) any failure of the Business to meet any budgets, plans projections or forecasts (internal or otherwise), in each case of clauses (i), (ii), (vi) and (vii) solely to the extent that such conditions do not disproportionately affect the Business, the Acquired Assets and the Assumed Liabilities, taken as a whole, as compared to other companies that are principally engaged in the same business as the Sellers.

"<u>Material Contract</u>" means (i) any Contract that is material to the Business and (ii) any Contract with a Material Customer or Material Supplier.

"<u>New 1.5 Lien Indenture</u>" means the indenture (as may be amended, modified or otherwise supplemented) governing the terms of the New 1.5 Lien Notes.

"<u>New 1.5 Lien Notes</u>" means the 1.5 lien notes issued by the Purchaser pursuant to the New 1.5 Lien Notes Indenture, which shall be on terms consistent in form and substance with the term sheet attached hereto as <u>Exhibit G</u>.

"<u>New First Lien Term Loan Facility</u>" means the first lien term loan facility to be entered into by the Purchaser, as borrower, and the holders of First Lien Notes Claims (excluding Chatham and its Affiliates), as lenders, on the Closing Date, which shall be in the form attached hereto as <u>Exhibit H</u>.

"<u>New First Lien Term Loans</u>" means the first lien term loans deemed borrowed by the Purchaser pursuant to the New First Lien Term Loan Facility in exchange for the First Lien Notes Claims (excluding First Lien Notes Claims of Chatham and its Affiliates).

"<u>Notice of Sale</u>" means a notice of the sale of the Acquired Assets and the Sale Hearing.

"<u>Order</u>" means any order, injunction, judgment, decree, ruling, writ, assessment or award of a Governmental Entity.

"<u>Parent Confidentiality Agreements</u>" means those agreements by and between the Parent, on the one hand, and Persons expressing an interest in acquiring an ownership interest in the Parent or the Business, on the other hand, with respect to the use and confidentiality of information about the Parent and its Affiliates and the Business and certain other obligations.

"<u>Parent SEC Documents</u>" means all forms, statements, documents and reports filed or furnished prior to the date hereof by the Parent with the SEC since January 1, 2017, as amended through the date hereof.

"<u>Patents</u>" means patents and patent applications, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof.

"<u>Permitted Post-Closing Encumbrances</u>" means any Encumbrance that is specifically permitted by the Sale Order under applicable Law to survive the Closing, it being understood that the Sale Order shall extinguish Encumbrances to the maximum extent permissible under applicable Law.

"<u>Permitted Pre-Closing Encumbrances</u>" means, prior to the Closing Date, (i) liens for Taxes not yet due or delinquent or being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP, (ii) statutory or common law liens (including statutory or common law liens of landlords) and rights of set-off of carriers, warehousemen, mechanics, repairmen, workmen, suppliers and materialmen, in each case, incurred in the ordinary course of business consistent with past practice (A) for amounts not yet overdue, (B) for amounts that are overdue and that are being contested in good faith by appropriate proceedings, or (C) for amounts as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court, (iii) liens securing rental payments under capitalized lease obligations disclosed to the Purchaser, (iv) pledges or deposits under worker's compensation, unemployment insurance and social security Laws, to the extent required by applicable Law, (v) rights of third party purchasers to acquire Real Property pursuant to the Sale Contracts, ground leases, leases, subleases, licenses, concessions or similar agreements, (vi) easements, covenants, conditions, restrictions and other matters of record or defects or imperfections of title with respect to any Deeded Real Property, Leased Real Property or personal property, <u>provided</u>, <u>however</u>, that (with respect to clause (v) and (vi) only) any such right or item does not, individually or in the aggregate, materially interfere with the ordinary conduct of the Business or materially impair the continued use and operation of such real property for the purpose for which it is used as of the date of this Agreement or as of the Closing, (vii) local, county, state and federal ordinances, regulations, building codes, variances, exceptions or permits (including such ordinances, regulations, building codes, variances, exceptions or permits relating to zoning), now or hereafter in effect, relating to any Deeded Real Property or Leased Real Property, (viii) restrictions or requirements set forth in any Permits relating to the Business, (ix) Encumbrances caused by or resulting solely from the acts or omissions of the Purchaser or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees, (x) Encumbrances arising by operation of Law under Article 2 of any state's Uniform Commercial Code (or successor statute) in favor of a seller of goods or buyer of goods in the ordinary course of business consistent with past practice, (xi) Encumbrances extinguished by the Sale Order and (xii) licenses or other grants of rights to use or obligations with respect to Intellectual Property.

"<u>Person</u>" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Entity or other entity or organization.

"<u>Post-Closing Tax Period</u>" means any taxable period or portion thereof beginning after the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period beginning after the Closing Date.

"<u>Pre-Closing Tax Period</u>" means any taxable period ending on or before the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period ending at the end of the Closing Date.

"<u>Prior Event</u>" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, in each case, which occurred, existed, or was taken prior to the consummation of the transactions contemplated hereunder.

"<u>Professional</u>" means any Person retained by the Sellers or a statutory committee of unsecured creditors in the Chapter 11 Cases pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code.

"<u>Property Taxes</u>" means real, personal and intangible *ad valorem* property Taxes.

"<u>Purchased Entity</u>" means each entity the equity of which comprises the Purchased Ownership Interests.

"<u>Purchased Ownership Interests</u>" means one hundred percent (100%) of the equity ownership interests held by any of the Sellers in entities which are not Sellers (other than with respect to Ponderay Newsprint Company), including those set forth on <u>Schedule B</u> hereto.

"<u>Purchaser Common Equity</u>" means the common stock, restricted stock units, options or other instruments (including "profits interests"), or some combination of the foregoing, in the sole discretion of the Purchaser.

"<u>Registered Intellectual Property</u>" means all applications, registrations and filings for Intellectual Property that have been registered or filed with or by any state, government or other public or quasi-public legal authority anywhere in the world, including the United States Patent and Trademark Office or United States Copyright Office, including issued Patents and Patent applications, registered Trademarks and Trademark applications, registered Copyrights and Copyright applications, and internet domain name registrations.

"<u>Rejected Leases</u>" shall have the meaning set forth on <u>Section 3.8(a)</u> of the Seller Disclosure Letter.

"<u>Release</u>" means the release set forth in <u>Section 5.20</u> herein and as approved by the Bankruptcy Court pursuant to the Sale Order.

"<u>Representatives</u>" means, when used with respect to any Person, the directors, officers, employees, consultants, financial advisors, accountants, legal counsel, investment bankers and other agents, advisors and representatives of such Person and its Subsidiaries and Affiliates.

"<u>Retained Books and Records</u>" means the company seal, minute books, stock certificates, stock or equity record books, Tax Returns and other books, records and work papers related to Taxes paid or payable by the Sellers or their Affiliates other than copies of Tax Returns primarily related to Taxes of the Business, the Acquired Assets or the Assumed Liabilities, work papers and such other books and records as pertain to the organization, qualification to do business, existence or capitalization of any Seller or any Affiliate thereof, books and records that the Sellers are required to retain under applicable Law and books and records that relate primarily to an Excluded Asset or Excluded Liability.

"<u>Retained Professional Fees</u>" means the Committee Retained Professional Fees and Seller Retained Professional Fees.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Order" means an Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit D, with such changes as the Purchaser and the Sellers find reasonably acceptable, that has not been stayed, vacated or stayed pending appeal, authorizing and approving the sale of the Acquired Assets to the Purchaser on the terms and conditions set forth herein.

"SEC" means the United States Securities and Exchange Commission.

"Second Lien Term Loan Agent" means The Bank of New York Mellon, in its capacities as Agent and Collateral Agent under the Second Lien Term Loan Agreement.

"Second Lien Term Loan Agreement" means that certain Junior Lien Term Loan Credit Agreement, dated as of July 16, 2018, by and among Parent, as borrower, the subsidiary guarantor parties thereto, the lenders party thereto and the Second Lien Term Loan Agent, as amended, supplemented, or otherwise modified from time to time.

"Second Lien Term Loan Claim" means any claims or obligations arising under the Second Lien Term Loan Documents.

"Second Lien Term Loan Documents" means the Second Lien Term Loan Agreement and all related amendments, supplements, assignments, pledges, collateral agreements, loan and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the Second Lien Term Loan Agreement, in each case as amended, restated, supplemented, or modified from time to time.

"Seller Intellectual Property" means all Intellectual Property owned or purported to be owned by any Seller, other than Intellectual Property that is an Excluded Asset.

"Seller Registered Intellectual Property" means all Registered Intellectual Property included in the Seller Intellectual Property.

"Seller Retained Professional Fees" means an aggregate amount equal to (a) the reasonable and documented out-of-pocket fees and expenses incurred by Professionals retained by the Sellers pursuant to section 327 of the Bankruptcy Code, in each case, to the extent such out-of-pocket fees and expenses are accrued and unpaid as of the Closing Date and (b) a good faith estimate, prepared by each applicable Professional retained by the Sellers, of out-of-pocket fees and expenses anticipated to incurred by such Professional following the Closing Date with respect to the Chapter 11 Cases.

"Seller Retained Professional Fees Escrow" means the escrow account established pursuant to the Seller Retained Professional Fees Escrow Agreement with subaccounts for each such Professional.

"<u>Seller Retained Professional Fees Escrow Agreement</u>" means a customary escrow agreement reasonably acceptable to the parties by and among the Purchaser, the Sellers and the escrow agent for the disbursement of the amount payable by the Purchaser pursuant to <u>Section 1.6</u> in connection with the Seller Retained Professional Fees.

"<u>Straddle Period</u>" means a taxable period that includes but does not end on the Closing Date.

"<u>Subsidiary</u>" means with respect to any Person, any corporation, limited liability company, partnership or other organization, whether incorporated or unincorporated, of which (a) outstanding shares of capital stock of, or other equity interests, having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation, limited liability company, partnership or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries, or (b) with respect to a partnership, such Person or any other Subsidiary of such Person is a general partner of such partnership.

"<u>Tax</u>" *or* "<u>Taxes</u>" means (a) any and all U.S. federal, state, local and non-U.S. taxes, assessments, levies, duties, tariffs, imposts and other similar charges and fees imposed by any Governmental Entity, including income, franchise, windfall or other profits, gross receipts, property, sales, use, net worth, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, excise, withholding, ad valorem, stamp, transfer, value-added, occupation, environmental, disability, real property, personal property, registration, alternative or add-on minimum, or estimated tax, including any interest, penalty, additions to tax and any additional amounts imposed with respect thereto; and (b) any liability for or in respect of any amounts described in clause (a) under a Tax sharing, indemnity, assumption, succession, allocation or similar agreement, as a result of having filed any Tax Return on a combined, unitary, affiliated or similar basis, or as a transferee or a successor by Contract or operation of Law.

"<u>Tax Return</u>" means any report, return, certificate, claim for refund, election, estimated Tax filing or declaration filed or required to be filed with any Governmental Entity with respect to Taxes, including any schedule or attachment thereto, and including any amendments thereof.

"<u>Taxing Authority</u>" means any U.S. federal, state, local or non-U.S. Governmental Entity or authority responsible for the imposition, collection or administration of any Tax.

"<u>Third Lien Notes Agent</u>" means The Bank of New York Mellon Trust Company, N.A. in its capacities as Trustee and Collateral Agent under the Third Lien Notes Indenture.

"<u>Third Lien Notes Claim</u>" means any claims or obligations arising under the Third Lien Notes Documents.

"<u>Third Lien Notes Documents</u>" means the Third Lien Notes Indenture and all related amendments, supplements, notes, pledges, collateral agreements, loan and security

agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the Third Lien Notes Indenture, in each case as amended, restated, supplemented, or modified from time to time.

"Third Lien Notes Indenture" means that certain Indenture, dated as of December 18, 2018, by and among Parent, as issuer, the subsidiary guarantor parties thereto, and the Third Lien Notes Agent, as amended, supplemented, or otherwise modified from time to time.

"Trade Secrets" means trade secrets, confidential or proprietary information, inventions, processes, procedures, databases, algorithms and know-how.

"Trademarks" means trademarks, trade names, service marks, trade dress, logos, design rights and other similar designations of origin, together with the goodwill symbolized by any of the foregoing.

"Wind-Down Fees" means an aggregate amount equal to $2,000,000, which shall be used to fund the wind down and dissolution of the Sellers' estates.

"Wind-Down Fees Escrow" means the escrow account established pursuant to the Wind-Down Fees Escrow Agreement.

"Wind-Down Fees Escrow Agreement" means a customary escrow agreement reasonably acceptable to the parties by and among the Purchaser, the Sellers and the escrow agent for the disbursement of the amount payable by the Purchaser pursuant to Section 1.6 in connection with the Wind-Down Fees, and which shall provide that any amount not so used to satisfy such fees shall be promptly paid to the Sellers.

Terms Defined Elsewhere.  The following terms are defined elsewhere in this Agreement, as indicated below:

| **Term** | **Section** |
|---|---|
| ABL Financing | 5.26 |
| ABL Lenders | 5.26 |
| Acquired Assets | 1.1 |
| Acquisition | Recitals |
| Agreement | Preamble |
| Allocation | 1.8 |
| Alternative Transaction | 5.27 |
| Assigned Contract | 1.5(c) |
| Assigned Contracts | 1.1(c) |
| Assignment and Assumption Agreement | 2.2(a)(ii) |
| Assumed Benefit Plans | 1.1(q) |
| Assumed Liabilities | 1.3 |
| Assumption | 5.18 |
| Audited Financial Statements | 3.6 |
| Available Contracts | 1.5(a) |
| Avoidance Actions | 1.1(n) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bill of Sale | 2.2(a)(i) |
| Brigade | 6.1(d) |
| Business | Recitals |
| Cash Payment | 1.6 |
| Cash Remainder | 1.6 |
| Chapter 11 Cases | Recitals |
| Chatham | Preamble |
| Closing | 2.1 |
| Closing Date | 2.1 |
| Confidential Information | 5.25 |
| Contemplated Transactions | 8.18(b) |
| Credit Bid | Recitals |
| Cure Cost Dispute | 1.5(b) |
| Cure Costs | 1.5(a) |
| Deed | 2.2(a)(vi) |
| Deeded Real Property | 1.1(r) |
| Designated Parties | 1.1(n) |
| Determination Date | 1.5(g) |
| Discovering Party | 1.5(c) |
| DOJ | 5.3(b) |
| Employment Agreements | 5.16 |
| Enforceability Limitations | 3.3 |
| Excluded Assets | 1.2 |
| Excluded Liabilities | 1.4 |

| **Term** | **Section** |
|---|---|
| Extended Contract Period | 1.5(g) |
| FCPA | 3.18 |
| Financial Statements | 3.6 |
| First Lien Notes Interest | 1.6 |
| Foreign National Employees | 5.11(g) |
| FTC | 5.3(b) |
| Guaranteed Obligation | 8.3 |
| Guarantees | 5.17(a) |
| Guarantor | Preamble |
| HSR Act | 3.4 |
| Intellectual Property Assignment Agreements | 2.2(a)(iii) |
| Intended Tax Treatment | 8.1(e) |
| Inventory | 1.1(d) |
| Leased Real Property | 3.12(b) |
| Material Customer | 3.24 |
| Material Supplier | 3.24 |
| materiality | 6.2(a) |
| Necessary Consent | 5.3(a) |
| Non-Periodic Taxes | 8.1(b) |
| Outside Date | 7.1(a) |
| Parent | Preamble |
| Parent's Allocation Notice | 1.8 |
| parties | Preamble |
| party | Preamble |
| Payoff | 5.18 |
| Periodic Taxes | 8.1(b) |
| Permits | 3.19(a) |
| Petition Date | Recitals |
| Previously Omitted Contract | 1.5(c) |
| Previously Omitted Contract Notice | 1.5(c) |
| Purchase Price | 1.6 |
| Purchaser | Preamble |
| Purchaser Designee | 2.3 |
| Purchaser Disclosure Letter | IV |
| Purchaser's Allocation | 1.8 |
| Qualifying Cash Proposal | 3.27 |
| Real Property | 3.12(c) |
| Released Claims | 5.20(a) |
| Released Party | 5.20(a) |
| Releasing Party | 5.20(a) |
| Sale Contracts | 1.1(c) |
| Sale Motion | 5.6 |
| Securities Act | 3.16 |
| Seller Disclosure Letter | III |
| Sellers | Preamble |

| **Term** | **Section** |
| --- | --- |
| Specified Refunds | 1.1(b) |
| Trade Payables | 1.3(d) |
| Transfer Taxes | 8.1(a) |
| Transferred Employee | 5.11(b) |
| Unaudited Financial Statements | 3.6 |
| WARN Act | 3.21(d) |

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Sellers and the Purchaser have caused this Agreement to be executed on their behalf as of the date first written above.

**PARENT:**

**The McClatchy Company**

By: /s/ Peter Farr
        Name:    Peter Farr
        Title:    Vice President, Finance and Chief Financial Officer

**SELLER REPRESENTATIVE:**

**The McClatchy Company, in its capacity as a Seller and the Seller Representative**

By: /s/ Peter Farr
        Name:    Peter Farr
        Title:    Vice President, Finance and Chief Financial Officer

*[Signature Page to Asset Purchase Agreement]*

**SELLER:**


**Aboard Publishing, Inc.**


By:    /s/ Peter Farr

Name:  Peter Farr

Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Bellingham Herald Publishing, LLC**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Belton Publishing Company, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

**SELLER:**

**Biscayne Bay Publishing, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

**SELLER:**


**Cass County Publishing Company, Inc.**


By:    /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Columbus Ledger-Enquirer, Inc.**

By:     /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Cypress Media, Inc.**

By:      /s/ Peter Farr

Name: Peter Farr

Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Cypress Media, LLC**

By:      /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**East Coast Newspapers, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
          Treasurer

**SELLER:**

**El Dorado Newspapers**

By:    <u>/s/ Peter Farr</u>
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Gulf Publishing Company, Inc.**

By:      /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
          Treasurer

**SELLER:**

**Herald Custom Publishing of Mexico, S. de. R.L. de C.V.**

By:     /s/ Peter Richard Farr
Name:  Peter Richard Farr
Title:   Attorney-in-fact

**SELLER:**

**HLB Newspapers, Inc.**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

**SELLER:**

**Idaho Statesman Publishing, LLC**

By:     /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
          Treasurer

**SELLER:**

**Keltatim Publishing Company, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Keynoter Publishing Company, Inc.**

By:   /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Lee's Summit Journal, Incorporated**

By:      /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Lexington H-L Services, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Mail Advertising Corporation**

By:     /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**McClatchy Big Valley, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

**SELLER:**

**McClatchy Interactive LLC**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

**SELLER:**

**McClatchy Interactive West**

By:     /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
           Treasurer

**SELLER:**

**McClatchy International, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**McClatchy Investment Company**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**McClatchy Management Services, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**McClatchy News Services, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**McClatchy Newspapers, Inc.**

By:      /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**McClatchy Property, Inc.**


By:     /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**McClatchy Resources, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**McClatchy Shared Services, Inc.**

By:     /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**McClatchy U.S.A., Inc.**

By:      /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Miami Herald Media Company**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**N & O Holdings, Inc.**

By:     /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
          Treasurer

**SELLER:**

**Newsprint Ventures, Inc.**

By:    <u>/s/ Peter Farr</u>

Name:  Peter Farr

Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Nittany Printing and Publishing Company**

By:      /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

*[Signature Page to Asset Purchase Agreement]*

**SELLER:**

**Nor-Tex Publishing, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Oak Street Redevelopment Corporation**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Olympian Publishing, LLC**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**


**Olympic-Cascade Publishing, Inc.**


By:    /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Pacific Northwest Publishing Company, Inc.**

By:     /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**San Luis Obispo Tribune, LLC**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Star-Telegram, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

**SELLER:**


**Tacoma News, Inc.**


By:      /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
          Treasurer

**SELLER:**

**The Bradenton Herald, Inc.**

By:    /s/ Peter Farr

Name:  Peter Farr

Title:  Vice President, Assistant Secretary and Treasurer

**SELLER:**

**The Charlotte Observer Publishing Company**

By:      /s/ Peter Farr

Name: Peter Farr

Title:   Vice President, Assistant Secretary and
Treasurer

**SELLER:**

**The Macon Telegraph Publishing Company**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**


**The News and Observer Publishing Company**


By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**The State Media Company**

By:    /s/ Peter Farr

Name: Peter Farr

Title:  Vice President, Assistant Secretary and
Treasurer

**SELLER:**

**The Sun Publishing Company, Inc.**

By:   /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

*[Signature Page to Asset Purchase Agreement]*

**SELLER:**

**Tribune Newsprint Company**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
          Treasurer

**SELLER:**

**Tru Measure, LLC**

By:     /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Wichita Eagle and Beacon Publishing Company, Inc.**

By:    <u>/s/ Peter Farr</u>
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Wingate Paper Company**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**PURCHASER:**

**SIJ Holdings, LLC**

By: /s/ James Ruggerio, Jr.
      Name: James Ruggerio, Jr.
      Title:  President and CEO

**SOLELY FOR SECTIONS 5.19 AND 5.20:**

**Chatham Asset Management, LLC**

By: /s/ Anthony R. Melchiorre
      Name: Anthony R. Melchiorre
      Title:  Managing Member

**SOLELY FOR SECTION 8.3:**

**Chatham Asset High Yield Master Fund, Ltd.**

By: Chatham Asset Management, LLC
Its: Investment Advisor

By: /s/ Anthony R. Melchiorre
      Name: Anthony R. Melchiorre
      Title: Managing Member

*[Signature Page to Asset Purchase Agreement]*

Project News
Administrative and Priority Claims Forecast
Assumes Transaction Close of August 31, 2020

| Administrative and Priority Claims Estimate | Admin Claims |
|---|---|
| ($USD 000's) | 8/31/2020 |
| **Funding Sources:** | |
| Cash Contribution | $ 30,000 |
| ABL Cash Funding | 19,153 |
| CAM Settlement GUC Trust Funding | 1,000 |
| **Total Funding Sources** | $ 50,153 |
| | |
| **Administrative Claims** | |
| Accrued and Unpaid Estate Professional Fees | 4,645 |
| Accrued and Unpaid Non-Estate Professional Fees | 900 |
| Est. Incremental Fees for Jul/Aug | 1,900 |
| Indenture Trustee Fee Estimate | 315 |
| Post-Closing Fees | 10,921 |
| Pre-Petition 1st Lien Interest | 14,447 |
| Outstanding 1st Lien Adequate Protection | 986 |
| DIP Revolver Balance | 8,535 |
| 503(b)(9) Claims | 163 |
| **Total Administrative Claims** | 42,812 |
| | |
| **Priority Claims** | |
| Other Tax Claims | 4,476 |
| Tax Adjustments | 1,000 |
| **Total Priority Claims** | 5,476 |
| | |
| **Total Administrative and Priority Claims** | 48,288 |
| | |
| **Excess (Shortfall) for Wind-Down Budget** | $ 1,865 |
| | |
| Wind-Down Budget | 2,000 |
| | |
| **Excess (Shortfall) After Wind-Down Budget** | $ (135) |
| | |
| Paul Weiss/Ducera Professional Fee Deferral to Tax Refund | 500 |
| UCC Professsional Fee Deferral to Tax Refund | 100 |
| GUC Trust funding deferral to Tax Refund | 600 |
| | |
| **Excess/(Shortfall) After Fee Deferral (GUC Trust Funding)** | $ 1,065 |

**Project News**
**Professional Fees Caps**
*($ in thousands)*

| | Professional Fee Caps |
|---|---|
| | **P2 - P8** |
| **Debtors** | |
| Skadden | $ 7,397 |
| FTI | 3,432 |
| Togut | 2,552 |
| Groom | 664 |
| Evercore | 979 |
| Evercore Post-Closing Fee | 3,456 |
| **Subtotal** | **18,481** |
| | |
| **UCC Professionals** | |
| Stroock | 6,045 |
| BRG | 1,770 |
| Dundon | 79 |
| Moelis | 640 |
| Moelis Post-Closing Fee | 2,933 |
| Forecast Fees | 950 |
| **Subtotal** | **12,415** |
| | |
| **CAM Professionals** | |
| Paul Weiss | 2,631 |
| Quinn Emanuel | 905 |
| Ducera | 857 |
| Ducera Post-Closing Fee | 3,206 |
| **Subtotal** | **7,599** |
| | |
| **Brigade Professionals** | |
| Kramer Levin | 2,937 |
| GLC | 861 |
| GLC Post-Closing Fee | 1,283 |
| **Subtotal** | **5,081** |
| | |
| **Professional fees in excess of budget Jul/Aug [FN1]** | **1,606** |
| | |
| **Grand Total** | **45,182** |

**[FN1]** Excludes Brigade Professionals.

**Project News**
**DIP Forecast**
*($ in 000s)*

| | | Filing/Emergence | | | | | | 1 |
| | | Fiscal Month | 7 | 8 | 8 | 8 | 8 | 5 |
| | | Fiscal Week | 31 | 32 | 33 | 34 | 35 | **Total** |
| | | Week Number | 1 | 2 | 3 | 4 | 5 | **Weeks** |
| | | Week Ending | 8/2/2020 | 8/9/2020 | 8/16/2020 | 8/23/2020 | 8/30/2020 | **1 thru 5** |

**I. Cash Flows**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| A | 1 | Operating Receipts | $ 9,342 | $ 9,230 | $ 8,288 | $ 9,157 | $ 12,688 | $ 48,706 |
| | | | | | | | | |
| B | | **Operating Disbursements** | | | | | | |
| | 2 | Payroll & Benefits | $ (2,909) | $ (5,762) | $ (1,269) | $ (6,060) | $ (1,008) | $ (17,009) |
| | 4 | Newsprint & Ink | - | - | (2,436) | - | - | (2,436) |
| | 5 | Rent | (410) | (78) | (345) | (401) | (508) | (1,742) |
| | 6 | Insurance (excl. personnel) | - | - | - | - | - | - |
| | 7 | Taxes | (3) | (1) | (12) | (641) | (0) | (657) |
| | 8 | Trade AP and Others | (7,379) | (6,612) | (5,973) | (7,379) | (6,621) | (33,965) |
| | 9 | **Total Operating Disbursements** | $ (10,701) | $ (12,454) | $ (10,035) | $ (14,482) | $ (8,137) | $ (55,808) |
| | | | | | | | | |
| | 10 | **Operating Cash Flows** | $ (1,359) | $ (3,223) | $ (1,746) | $ (5,325) | $ 4,551 | $ (7,102) |
| | | | | | | | | |
| C | | **Non-Operating Disbursements** | | | | | | |
| | 11 | Capital Expenditures | $ (169) | $ (171) | $ (368) | $ (144) | $ (151) | $ (1,003) |
| | 12 | Lease Payments | - | (663) | - | - | - | (663) |
| | 13 | Debt Payments | (59) | - | (1,971) | - | - | (2,031) |
| | 14 | **Total Non-Operating Disbursements** | $ (228) | $ (833) | $ (2,340) | $ (144) | $ (151) | $ (3,697) |
| | | | | | | | | |
| D | | **Restructuring Disbursements** | | | | | | |
| | 15 | Restructuring Professional Fees | $ - | $ - | $ (2,587) | $ (5,509) | $ - | $ (8,095) |
| | 16 | US Trustee | (775) | - | - | - | - | (775) |
| | 17 | **Total Restructuring Disbursements** | $ (775) | $ - | $ (2,587) | $ (5,509) | $ - | $ (8,870) |
| | | | | | | | | |
| | 18 | **Net Cash Flow** | $ (2,362) | $ (4,057) | $ (6,673) | $ (10,978) | $ 4,400 | $ (19,669) |

**II. Liquidity**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| E | | **Cash Balance** | | | | | | |
| | 19 | Beg. Book Cash (Restricted + Unrestricted) | $ 52,733 | $ 50,371 | $ 46,314 | $ 39,641 | $ 34,075 | $ 52,733 |
| | 20 | *Add: Net Cash Flow* | (2,362) | (4,057) | (6,673) | (10,978) | 4,400 | (19,669) |
| | 21 | *Add: Cash Float* | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| | 22 | Cash Before Revolver Activity | 52,871 | 48,814 | 42,141 | 31,163 | 40,976 | 35,564 |
| | 23 | *Add: Borrowing / (Paydown)* | - | - | - | 5,412 | 3,123 | 8,535 |
| | 24 | Ending Bank Cash (Restricted + Unrestricted) | 52,871 | 48,814 | 42,141 | 36,575 | 44,099 | 44,099 |
| | 25 | *Less: Restricted Cash* | (39,941) | (39,941) | (39,941) | (36,575) | (36,575) | (36,575) |
| | 26 | *Ending Bank Cash Balance (Unrestricted)* | $ 12,929 | $ 8,873 | $ 2,200 | $ - | $ 7,523 | $ 7,523 |
| | | | | | | | | |
| F | | **Revolver Balance** | | | | | | |
| | 28 | Beginning Revolver Balance (Borrowing) | $ - | $ - | $ - | $ - | $ 5,412 | $ - |
| | 29 | *Borrowing / Paydown [Net Cash Flow]* | - | - | - | 5,412 | 3,123 | 8,535 |
| | 30 | *Adjustment* | | | | | | - |
| | 31 | Ending Revolver Balance (Borrowing) | $ - | $ - | $ - | $ 5,412 | $ 8,535 | $ 8,535 |
| | | | | | | | | |
| G | | **Revolver Availability** | | | | | | |
| | 32 | Borrowing Base | $ 1,147 | $ 1,171 | $ 7,082 | $ 12,056 | $ 12,455 | $ 12,455 |
| | 33 | *Less: Revolver Balance* | - | - | - | *(5,412)* | *(8,535)* | *(8,535)* |
| | 34 | Revolver Availability | $ 1,147 | $ 1,171 | $ 7,082 | $ 6,644 | $ 3,920 | $ 3,920 |
| | | | | | | | | |
| H | | **Total Liquidity** | | | | | | |
| | 35 | Liquidity (Availability + Unrestricted Bank Cash) | $ 14,076 | $ 10,044 | $ 9,281 | $ 6,644 | $ 11,444 | $ 11,444 |

## **EXHIBIT B**

**Redline of Revised Asset Purchase Agreement**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**AMONG**

**THE MCCLATCHY COMPANY,**

**THE SUBSIDIARIES LISTED ON THE SIGNATURE PAGES HERETO,**

**SIJ HOLDINGS, LLC,**

**AND, SOLELY FOR SECTIONS 5.19 AND 5.20,**

**CHATHAM ASSET MANAGEMENT, LLC,**

**AND, SOLELY FOR PURPOSES OF SECTION 8.3,**

**CHATHAM ASSET HIGH YIELD MASTER FUND, LTD.**

**DATED AS OF JULY 24, 2020**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I THE ACQUISITION ................................................................ 2

    Section 1.1    Acquired Assets ........................................................ 2

    Section 1.2    Excluded Assets ........................................................ 6

    Section 1.3    Assumed Liabilities .................................................. 6

    Section 1.4    Excluded Liabilities .................................................. 8

    Section 1.5    Assignment of Assigned Contracts ............................ 9

    Section 1.6    Purchase Price ......................................................... 13

    Section 1.7    Withholding ............................................................. 13

    Section 1.8    Purchase Price Allocation ......................................... 14

    Section 1.9    Limitations on Purchaser's Liability ........................... 14

ARTICLE II THE CLOSING ...................................................................... 15

    Section 2.1    Closing ................................................................... 15

    Section 2.2    Deliveries at the Closing .......................................... 15

    Section 2.3    Purchaser Designees ................................................ 17

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS ..................... 17

    Section 3.1    Qualification, Organization, etc. ................................ 18

    Section 3.2    Ownership ............................................................... 18

    Section 3.3    Authority of the Sellers ............................................ 19

    Section 3.4    Consents and Approvals ............................................ 19

    Section 3.5    No Violations .......................................................... 19

    Section 3.6    Financial Statements ................................................ 20

    Section 3.7    Title to Property; Sufficiency of Assets ...................... 20

    Section 3.8    Absence of Certain Changes ...................................... 21

    Section 3.9    Brokers or Finders ................................................... 21

    Section 3.10    Litigation ............................................................... 21

    Section 3.11    Intellectual Property ................................................. 21

    Section 3.12    Real Property .......................................................... 22

    Section 3.13    Assigned Contracts .................................................. 23

    Section 3.14    Executory Contracts; Material Contracts ...................... 23

i

Section 3.15    Insurance ...................................................................................24

Section 3.16    Affiliate Interests .........................................................................24

Section 3.17    Bank Accounts .............................................................................24

Section 3.18    Undue Influence ...........................................................................24

Section 3.19    Compliance with Laws; Permits ..................................................24

Section 3.20    Employee Benefit Matters ............................................................25

Section 3.21    Labor Matters ...............................................................................26

Section 3.22    Environmental Matters..................................................................27

Section 3.23    Taxes ............................................................................................28

Section 3.24    Customers and Suppliers...............................................................29

Section 3.25    Inventory ......................................................................................29

Section 3.26    Parent SEC Documents ................................................................30

Section 3.27    Qualifying Cash Proposal .............................................................30

Section 3.28    No Other Representations .............................................................30

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............. 30

Section 4.1    Qualification; Organization ..........................................................31

Section 4.2    Authority of the Purchaser ............................................................31

Section 4.3    Consents and Approvals ................................................................31

Section 4.4    No Violations ................................................................................31

Section 4.5    Brokers .........................................................................................32

Section 4.6    Financing.......................................................................................32

Section 4.7    Investment Purpose ......................................................................32

Section 4.8    Acknowledgment by the Purchaser ..............................................32

ARTICLE V COVENANTS.........................................................................................33

Section 5.1    Conduct of Business Pending the Closing ....................................33

Section 5.2    Access and Information .................................................................37

Section 5.3    Approvals and Consents; Cooperation; Notification .....................39

Section 5.4    Further Assurances........................................................................41

Section 5.5    Debtors-in-Possession ..................................................................41

Section 5.6    The Sale Motion............................................................................41

Section 5.7    Sale Order .....................................................................................41

Section 5.8    Cooperation with Respect to Bankruptcy Court Approvals ...........43

ii

Section 5.9    Bankruptcy Court Filings ........................................................44

Section 5.10    Communications with Customers and Suppliers ...........................44

Section 5.11    Employee Matters .................................................................44

Section 5.12    Payments Received ...............................................................46

Section 5.13    Use of Names and Marks ........................................................46

Section 5.14    Parent Confidentiality Agreements ...........................................46

Section 5.15    Payroll Liabilities .................................................................47

Section 5.16    Employment Agreements ........................................................47

Section 5.17    Financial Obligations .............................................................47

Section 5.18    DIP Facility .........................................................................47

Section 5.19    New First and 1.5 Lien Debt ....................................................48

Section 5.20    Releases ..............................................................................48

Section 5.21    No Successor Liability ............................................................50

Section 5.22    Notice of Developments .........................................................50

Section 5.23    Transition of Business ............................................................50

Section 5.24    Casualty Loss .......................................................................50

Section 5.25    Confidentiality .....................................................................51

Section 5.26    Financing Cooperation ...........................................................51

Section 5.27    Exclusivity ..........................................................................52

Section 5.28    Sale Contract Proceeds ..........................................................53

Section 5.29    Proceeds of Herald Custom Publishing of Mexico, S. de R.L. de C.V. ..........53

ARTICLE VI CONDITIONS PRECEDENT ...............................................................53

Section 6.1    Conditions Precedent to Obligation of the Sellers and the Purchaser ............53

Section 6.2    Conditions Precedent to Obligation of the Sellers ...........................54

Section 6.3    Conditions Precedent to Obligation of the Purchaser ......................54

ARTICLE VII TERMINATION ...............................................................................55

Section 7.1    Termination .........................................................................55

Section 7.2    Effect of Termination .............................................................57

ARTICLE VIII GENERAL PROVISIONS ..................................................................57

Section 8.1    Tax Matters .........................................................................57

Section 8.2    Bulk Sales ...........................................................................59

Section 8.3    Guarantee ............................................................................60

iii

Section 8.4     Survival of Representations, Warranties and Covenants ................................60

Section 8.5     Public Announcements ..................................................................................60

Section 8.6     Notices .........................................................................................................61

Section 8.7     Descriptive Headings; Interpretative Provisions ..........................................63

Section 8.8     No Strict Construction ..................................................................................63

Section 8.9     Entire Agreement; Assignment .....................................................................64

Section 8.10    Governing Law; Submission of Jurisdiction; Waiver of Jury Trial ...............64

Section 8.11    Expenses ......................................................................................................64

Section 8.12    Amendment ..................................................................................................64

Section 8.13    Waiver ..........................................................................................................65

Section 8.14    Counterparts; Effectiveness .........................................................................65

Section 8.15    Severability; Validity; Parties in Interest ......................................................65

Section 8.16    Specific Performance ...................................................................................65

Section 8.17    No Recourse .................................................................................................65

Section 8.18    Seller Representative ....................................................................................65

ARTICLE IX DEFINITIONS.................................................................................... 68

## EXHIBITS AND SCHEDULES

Exhibit A          Form of Bill of Sale
Exhibit B          Form of Assignment and Assumption Agreement
Exhibit C          Form of Intellectual Property Assignment Agreement
Exhibit D          Form of Sale Order
Exhibit E          Management Incentive Plan Term Sheet
Exhibit F          Employment Agreement Term Sheet
Exhibit G          New 1.5 Lien Notes Term Sheet
Exhibit H          New First Lien Term Loan ~~Facility Term Sheet~~Credit Agreement


Schedule 1.1(c)    Assigned Contracts
Schedule 1.1(g)    Seller Intellectual Property
Schedule 1.2(f)    Excluded Contracts
Schedule 5.1(b)(viii)  Professional Fees
Schedule A         Certain Excluded Claims
Schedule B         Purchased Ownership Interests

Redline MNI - CAM APA (Court Filing) 631790v3 and MNI - CAM APA (Execution Version)
632032v7 8/3/2020 4:05:50 PM

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated July 24, 2020 (this "Agreement"), is made by and among The McClatchy Company, a Delaware corporation (the "Parent"), and the Subsidiaries of the Parent that are indicated on the signature pages attached hereto (together with the Parent, in their capacities as debtors and debtors in possession, the "Sellers"), Parent (in its capacity as the representative of the Sellers, the "Seller Representative"), SIJ Holdings, LLC a Delaware limited liability company (the "Purchaser") and, solely for purposes of Sections 5.19 and 5.20, Chatham Asset Management, LLC, a Delaware limited liability company ("Chatham") and, solely for purposes of Section 8.3, Chatham Asset High Yield Master Fund, Ltd., a Cayman Islands exempted company (the "Guarantor"). Each of the Sellers and the Purchaser is referred to individually herein as a "party" and collectively as the "parties." Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in Article IX.

## RECITALS

A.   The Sellers are engaged in the business of providing independent local journalism (such business, as conducted by the Sellers as of the date hereof, the "Business").

B.   The Sellers filed voluntary petitions for relief commencing cases (collectively, the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on February 13, 2020 (the "Petition Date").

C.   Pursuant to the Bidding Procedures and subject to the entry of the Sale Order by the Bankruptcy Court, the Purchaser desires to purchase and accept, and the Sellers desire to sell, convey, assign, transfer and deliver to the Purchaser, all of the Acquired Assets, and the Purchaser is willing to assume, and the Sellers desire to assign and delegate to the Purchaser, all of the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code (such sale and purchase of the Acquired Assets and such assignment and assumption of the Assumed Liabilities, the "Acquisition").

D.   The Acquired Assets shall be purchased pursuant to the Sale Order, free and clear of all Encumbrances (other than Permitted Post-Closing Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

E.   The Purchaser, in partial consideration of the Acquired Assets, may credit bid up to (100%) of the First Lien Notes Claims (the "Credit Bid"), in each case, pursuant to Section 363(k) of the Bankruptcy Code, in and against the Acquired Assets in which it holds a valid, perfected, unavoidable priority lien.

F.   At the Closing, the Purchaser shall (i) make the Cash Payment to the Sellers and (ii) in its capacity as a borrower or issuer (as applicable), shall issue the New First Lien Term Loans and New 1.5 Lien Notes.

G.      The board of directors (or similar governing body) of each Seller has determined that (i) it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the Acquisition and (ii) the Release is an integral part of the transactions provided for herein and is given for fair consideration and in the best interest of the Sellers, and each has approved the same.

H.      The parties acknowledge and agree that the purchase by the Purchaser of the Acquired Assets, and the assumption by the Purchaser of the Assumed Liabilities, are being made at arm's length and in good faith.

I.      The execution and delivery of this Agreement and the Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code.

J.      The parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

The parties agree as follows:

## ARTICLE I

## THE ACQUISITION

Section 1.1      Acquired Assets.  On the terms and subject to the conditions set forth in this Agreement and, subject to approval of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing, the Sellers shall sell, assign, transfer, convey and deliver to the Purchaser and/or to one or more Purchaser Designees, and Purchaser and/or such Purchaser Designees shall purchase and accept from the Sellers, free and clear of all Encumbrances of any and every kind, nature and description, other than Permitted Post-Closing Encumbrances (and the Purchased Ownership Interests free and clear of all Encumbrances, other than restrictions on transfers in the applicable organizational documents which cannot be discharged by the Sale Order), all right, title and interest of the Sellers in, to or under the Business and all of the rights, properties and assets of the Sellers of every kind and description, wherever situated or located, whether real, personal, or mixed, tangible or intangible, whether identifiable or contingent, whether owned, leased, licensed, used, occupied or held for use in or relating to the Business, and whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date, other than the Excluded Assets (collectively, the "Acquired Assets"), including all right, title and interest of the Sellers in, to and under the following:

(a)      other than as set forth in Section 1.2(h), all of the Accounts Receivable;

(b)      all credits, claims for refunds, deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise), advances, prepaid expenses, prepayments, rights under warranties or guarantees, vendor rebates, credits and other refunds of every kind and nature (whether or not known or unknown or contingent or non-

2

contingent) (other than credits, claims for refunds, deposits, prepaid amounts, with respect to Excluded Taxes or that relate exclusively to any of the Excluded Assets or the Excluded Liabilities; *provided*, that any federal, state or local income tax refunds from the carryback of any net operating loss or capital loss (or similar attribute) from the taxable year that includes the Closing Date (the "<u>Specified Refunds</u>") shall be an Acquired Asset);

(c)    the Contracts, including Leases and all contracts for the sale of the Deeded Real Property or any portion thereof (the "<u>Sale Contracts</u>"), listed, described or otherwise identified on <u>Schedule 1.1(c)</u>, as such schedule may be amended from time to time pursuant to <u>Section 1.5(g)</u> (such Contracts, the "<u>Assigned Contracts</u>") and the rights thereunder;

(d)    all inventory of any kind or nature, merchandise and goods, including raw materials, work-in-process, finished goods, supplies, components, packaging materials, and other inventories to which the Sellers have title, that are in the possession of the Sellers or any third party or located upon or within the Real Property and related, used or held for use in connection with the Business or an Acquired Asset, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including any goods in transit (collectively, "<u>Inventory</u>");

(e)    all furniture, fixtures, vehicles, machinery, equipment, apparatus, appliances, computers and computer-related hardware, network and internet and information technology systems-related equipment and all other tangible personal property of every kind and description and wherever located, used or held for use in the conduct of the Business;

(f)    the Purchased Ownership Interests; <u>provided</u>, that between the date hereof and the Closing Date, the Purchaser may, in its sole discretion, add or remove any of the entities from <u>Schedule B</u> and, upon such addition or such removal, such entity shall be deemed an Excluded Asset or Acquired Assets, as applicable, and any Liabilities associated with such entity shall be deemed Excluded Liabilities or Assumed Liabilities, as applicable;

(g)    all Seller Intellectual Property, including Seller Registered Intellectual Property (including the items listed on <u>Schedule 1.1(g)</u>) and all of the Sellers' rights therein, including all rights to sue for and recover and retain damages for present and past infringement thereof and, in the case of Trademarks that are Seller Intellectual Property, all goodwill appurtenant thereto;

(h)    all rights under non-disclosure, confidentiality, invention, Intellectual Property assignment covenants, non-compete, or non-solicitation agreements or key employee retention plans or similar arrangements executed for the benefit of the Sellers, including with current or former employees, consultants, agents or contractors of the Sellers or with third parties (in the case of rights under the Parent Confidentiality Agreement, solely to the extent provided in <u>Section 5.14</u>);

(i)    all Books and Records, other than Retained Books and Records;

(j)    to the extent transferable, all Permits and all pending applications therefor;

3

(k)    to the extent transferable, all insurance policies and rights thereunder;

(l)    all goodwill, customer and referral relationships, other intangible property and all privileges, set-offs and benefits of the Sellers associated with the Business, the Acquired Assets and the Assumed Liabilities;

(m)    all rights, claims (other than Avoidance Actions which shall be addressed solely by <u>Section 1.1(n)</u>), interests, rebates, refunds, causes of action, actions, suits or proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) arising under or related to the Business, the Acquired Assets or the Assumed Liabilities (including any claims for past infringement or misappropriation) (excluding (i) all claims or causes of action of any of the Sellers set forth in <u>Sections 1.2(d)</u>, <u>1.2(e)</u>, and <u>1.2(h)</u>, (ii) all claims or causes of action of any of the Sellers against any director, officer or employee of such Seller who will not serve as a director, officer or employee of the Purchaser immediately following the Closing and (iii) excluding credits, claims for refunds, deposits, prepaid amounts, with respect to Excluded Taxes or that relate exclusively to any of the Excluded Assets or the Excluded Liabilities; *provided*, that the Specified Refunds shall be an Acquired Asset);

(n)    all avoidance claims or causes of action available to the Sellers under Chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law (collectively, "<u>Avoidance Actions</u>") against the following (collectively, the "<u>Designated Parties</u>"): (i) any of the Sellers' vendors, suppliers, customers, trade creditors and other business relationships with whom the Purchaser continues to conduct business in regard to the Acquired Assets or the Assumed Liabilities after the Closing, (ii) any of the Sellers' counterparties under any licenses of Intellectual Property that are Assigned Contracts or counterparties under any other Assigned Contracts, (iii) any Agent, (iv) any holders of Existing Secured Claims, (v) any lenders or agents under the DIP Facility and the DIP Credit Agreement, (vi) officer, manager or employee of the Sellers that is a Transferred Employee, and any of the Persons whose equity is being acquired as Purchased Ownership Interests and any director, officer, manager or employee thereof, and (vii) any Affiliates of any of the Persons listed in clauses (i) through (vi); *provided*, that the Purchaser shall not pursue or cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense (to the extent permitted under applicable Law) against any claim or cause of action raised by such Designated Party;

(o)    any and all insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any of the Acquired Assets or relating to the Assumed Liabilities, and all rights and claims of the Sellers to any such insurance proceeds, condemnation awards or other compensation;

4

(p)     all telephone, telex and telephone facsimile numbers and other directory listings;

(q)     the Benefit Plans listed or described on Section 3.20(a) of the Seller Disclosure Letter (the "Assumed Benefit Plans") and any interests of the Sellers in the assets of such Benefit Plans, including (i) with respect to any Assumed Benefit Plan that is funded by a trust (other than a so-called "rabbi trust"), the assets of such related trust; (ii) with respect to any Assumed Benefit Plan that is funded by an insurance policy, the related insurance policy (to the extent transferrable); and (iii) with respect to any Assumed Benefit Plan, to the extent applicable and subject to conformity with applicable Law, the administrative service agreements and other contracts, files and records in respect thereof (to the extent transferrable);

(r)     the real property, together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, owned in fee by each Seller (the "Deeded Real Property"); provided, that the Purchaser may, in its sole discretion, designate any Deeded Real Property as an Excluded Asset;

(s)     all Cash, including any and all rights of the Sellers in and to (i) any restricted cash, security deposits and cash collateral (including cash collateral given to obtain or maintain letters of credit and cash drawn or paid on letters of credit) given or paid by (A) tenants, subtenants or other occupants of the Deeded Real Property to the applicable Sellers owning the Deeded Real Property or (B) subtenants or other occupants of the Leased Real Property to the applicable Sellers leasing, using or otherwise occupying the Leased Real Property, and (ii) any escrow deposits;

(t)     any and all proceeds from the sale of Real Property pursuant to or in connection with any Sale Contract; and

(u)     all proceeds and products of any and all of the foregoing Acquired Assets.

EXCEPT AS SPECIFICALLY AND EXPRESSLY SET FORTH IN ARTICLE III (I) THE SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) THE SELLERS MAKE NO, AND HEREBY DISCLAIM ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE BUSINESS, THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES, AND (III) THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE PURCHASER SHALL RELY UPON ITS OWN EXAMINATION THEREOF.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE SELLERS MAKE NO REPRESENTATION OR WARRANTY REGARDING ANY BUSINESS OTHER THAN THE BUSINESS, ANY ASSETS OTHER THAN THE

5

ACQUIRED ASSETS OR ANY LIABILITIES OTHER THAN THE ASSUMED LIABILITIES, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

Section 1.2    Excluded Assets.  Notwithstanding anything contained in this Agreement to the contrary, except as otherwise set forth in this Section 1.2, the Acquired Assets shall not include any of the following (collectively, the "Excluded Assets"):

(a)    any and all credits, claims for refunds, deposits and prepaid amounts, with respect to Excluded Taxes or that relate exclusively to any of the Excluded Assets or the Excluded Liabilities, other than the Specified Refunds;

(b)    all shares of capital stock or other equity interests of any Seller or any Affiliate thereof or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any Seller or any Affiliate thereof, in each case other than the Purchased Ownership Interests;

(c)    all Retained Books and Records; *provided*, that copies of such books and records, except Tax Returns and other books, records and work papers that are not primarily related to Acquired Assets or Assumed Liabilities or that are subject to any privilege or similar protection under applicable Law, shall be delivered to the Purchaser (including for copying) upon reasonable request to the extent permitted by applicable Law;

(d)    any Avoidance Actions against any Person other than any of the Designated Parties;

(e)    all rights, claims or causes of action of any Seller arising under this Agreement and the Ancillary Documents or arising under the Parent Confidentiality Agreements (to the extent not assigned to the Purchaser pursuant to Section 5.14);

(f)    all Contracts that are not Assigned Contracts, including the Contracts listed or described on Schedule 1.2(f), which Schedule may be modified in accordance with Section 1.5(g);

(g)    all Benefit Plans other than the Assumed Benefit Plans and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect thereof;

(h)    all receivables, claims or causes of action that relate exclusively to any of the Excluded Assets or the Excluded Liabilities;

(i)    all intercompany accounts receivable as to which any Seller is an obligor or is otherwise responsible or liable and which are owed or payable to any of the Sellers;

(j)    any and all assets of Quad County Publishing, Inc.; and

(k)    the Rejected Leases.

6

Section 1.3    <u>Assumed Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Acquired Assets to the Purchaser and/or the Purchaser Designees, the Purchaser and/or each relevant Purchaser Designee shall assume from the Sellers and agree to pay, perform and discharge, when due, in accordance with their respective terms, only the following liabilities and obligations (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of the Sellers solely with respect to, arising out of or relating to the following (collectively, the "<u>Assumed Liabilities</u>") and no other liabilities or obligations:

(a)    the ownership, possession or use of the Acquired Assets and the operation of the Business, in each case from and after the Closing, to the extent arising out of an event, fact, act, omission or condition to the extent occurring from and after the Closing;

(b)    liabilities and obligations under the Assigned Contracts, to the extent arising out of an event, fact, act, omission or condition occurring from and after the Closing;

(c)    (i) all liabilities in respect of the DIP Facility (or, in the alternative, modification and assumption of the DIP Facility (as agreed between the Purchaser and the lenders under the DIP Facility) as of Closing, or (ii) satisfaction of the payoff of the DIP Facility as of the Closing, as set forth in <u>Section 5.18</u>);

(d)    all accounts payable and other trade obligations arising in the ordinary course of the Business incurred from and after the Petition Date, in each case solely to the extent not paid prior to the Closing Date and to the extent such obligations exclusively relate to the Acquired Assets (collectively, "<u>Trade Payables</u>");

(e)    liabilities arising out of the employment or termination following the Closing of any Transferred Employees or liabilities under any Assumed Benefit Plan;

(f)    all payroll liabilities with respect to Transferred Employees that have accrued since the Petition Date in the ordinary course of business consistent with past practice that remain unpaid as of immediately prior to the Closing Date (which amount as of July 15, 2020 was approximately $15,240,000) and the post-Closing Date portion of payroll liabilities with respect to Transferred Employees;

(g)    all Cure Costs (subject to <u>Section 5.1(a)(x)</u>);

(h)    any and all liabilities, obligations and commitments with respect to Taxes (i) imposed with respect to, arising out of, or relating to the Business, the Acquired Assets, the Assumed Liabilities (other than any Excluded Taxes) for any Post-Closing Tax Period (including, in the case of any Straddle Period, the portion of such Straddle Period beginning after the Closing Date) as determined pursuant to <u>Section 8.1(b)</u>, (ii) that are California state Income Taxes imposed with respect to, arising out of, or relating to the transactions contemplated by this

7

Agreement equal to approximately $1,700,000, and (iii) for which Purchaser is liable under Section 8.1;

(i)      liabilities and obligations arising out of the Deeded Real Property to the extent arising out of an event, fact, act, omission or condition occurring on or after the Closing Date; and

(j)      any Environmental Liabilities required to be assumed pursuant to Section 363(f) of the Bankruptcy Code.

Section 1.4      Excluded Liabilities.  Notwithstanding anything contained in this Agreement to the contrary, neither the Purchaser nor any of its Affiliates shall assume, be obligated to assume, be deemed to have assumed, or be obliged to pay, perform or otherwise discharge, and the Sellers shall be solely and exclusively liable with respect to, any liabilities or obligations (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of the Sellers and any Affiliate thereof other than the Assumed Liabilities (such liabilities and obligations other than Assumed Liabilities, the "Excluded Liabilities").  Without limiting the foregoing, the Purchaser (including any Purchaser Designee) does not (nor do any of their Affiliates) assume or agree to pay, perform or otherwise discharge the liabilities or obligations of the Sellers or their Affiliates with respect to, arising out of or relating to, the following Excluded Liabilities:

(a)      all Indebtedness of the Sellers (other than obligations with respect to the Guarantees as expressly set forth in Section 5.17(a) and capitalized leases that are Assigned Contracts);

(b)      except with respect to the Guarantees as expressly set forth in Section 5.17(a), all guarantees of third-party Indebtedness made by the Sellers and reimbursement obligations to guarantors of the Sellers' obligations or under letters of credit or other similar agreements or instruments;

(c)      all Actions pending on or before the Closing Date against the Sellers or to the extent against or giving rise to liabilities or obligations of the Business, based on acts or omissions prior to the Closing Date even if instituted after the Closing Date, including, for the avoidance of doubt, all Actions set forth on Section 3.10 of the Seller Disclosure Letter;

(d)      all liabilities or obligations to any current or former holder or owner of capital stock or other equity interests of the Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of the Sellers or any current or former holder of Indebtedness of the Sellers (other than liabilities or obligations with respect to the Guarantees as expressly set forth in Section 5.17(a));

(e)      all drafts or checks outstanding at the Closing under which the Sellers are obligated;

8

(f)       any and all liabilities, obligations and commitments with respect to Excluded Taxes;

(g)       all fees, charges, expenditures, expenses, costs and other payments incurred or otherwise payable by any of the Sellers or their respective Affiliates, or for which any of the Sellers or their respective Affiliates is liable, in connection with the administration of the Chapter 11 Cases or the negotiation, execution and consummation of the transactions contemplated by this Agreement or any Ancillary Document (including any preparation for a transaction process, bankruptcy process, any sale process involving other potential buyers or any contemplated public offering or financing), including the Retained Professional Fees and all fees and charges assessed against the Sellers under section 1930, chapter 123, of title 28, United States Code, whether incurred, accrued or payable on or prior to or after the Closing Date;

(h)       all liabilities or obligations with respect to any of the Excluded Assets;

(i)       indemnification or advancement of expenses for any current or former officer or director of any Seller or any of the Subsidiaries of the Sellers;

(j)       all liabilities related to pre-Closing employee related obligations other than as set forth in Sections 1.3(e) and 1.3(f);

(k)       all claims set forth on Schedule A;

(l)       any and all liabilities or obligations of the Ponderay Newsprint Company;

(m)       any and all liabilities, obligations and commitments with respect to the Rejected Leases;

(n)       any and all liabilities or obligations of Quad County Publishing, Inc.;

(o)       any Environmental Liabilities with respect to any assets owned or operated by, or any operations or business conducted by, any of the Sellers or any corporate predecessor of any of the Sellers at any time prior to the Closing Date, except to the extent assumption of such Environmental Liabilities is required by Section 363(f) of the Bankruptcy Code;

(p)       for the avoidance of doubt, any and all liabilities or obligations arising with respect to or from the termination of The McClatchy Company Retirement Plan; and

(q)       any payment obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby, including to the entities listed on Section 3.9 of the Seller Disclosure Letter.

9

Section 1.5    Assignment of Assigned Contracts.

(a)    Schedule 1.5(a) sets forth a list of all executory Contracts (including all leases (but excluding Rejected Leases), customer agreements, supply agreements, joint venture agreements, insurance policies and administrative services agreements or similar contracts relating to the Business, the Acquired Assets or the Assumed Liabilities or to which one or more of Sellers are party (the "Available Contracts").  Schedule 1.5(a) sets forth with respect to each Available Contract, the Sellers' good-faith estimate of the amount required to be paid with respect to each Available Contract to cure all monetary defaults under such Contract to the extent required by Section 365(b) and otherwise satisfy all requirements imposed by Section 365(d) of the Bankruptcy Code (the actual amount of such costs, the "Cure Costs").

(b)    The Sellers shall use reasonable best efforts to assume and assign, or cause to be assigned, any Available Contracts that Purchaser identifies as an Assigned Contract, including commencing appropriate proceedings before the Bankruptcy Court and otherwise taking all (i) commercially reasonable actions in order to determine the Cure Costs with respect to any Assigned Contract entered into prior to the Petition Date, including the right (subject to Section 5.1) to negotiate in good faith and litigate, if necessary, with any Contract counterparty the Cure Costs needed to cure all monetary defaults under such Assigned Contract and (ii) all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to the Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code.  If the Sellers, the Purchaser, and the counterparty to an Assigned Contract are unable to reach mutual agreement regarding any dispute with respect to Cure Costs, the Sellers shall promptly seek a hearing before the Bankruptcy Court, which hearing may be the Sale Hearing or, if requested by Purchaser, a hearing occurring after the Closing, to determine Cure Costs (such dispute, the "Cure Cost Dispute").  Notwithstanding the foregoing, if the Bankruptcy Court allows a Cure Cost in excess of the amount listed on Schedule 1.5(a), then Purchaser shall be entitled, in its sole discretion, to re-designate the Contract as an Excluded Asset.

(c)    If prior to or following the Closing, it is discovered by the Purchaser or Sellers that a Contract should have been listed on Schedule 1.5(a) but was not listed on Schedule 1.5(a) (any such Contract, a "Previously Omitted Contract"), the party discovering such omission (the "Discovering Party") shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify the other parties in writing of such Previously Omitted Contract and within two (2) Business Days following notice of such discovery, the Sellers shall provide to Purchaser all Cure Costs (if any) for such Previously Omitted Contract.  Purchaser shall thereafter deliver written notice to the Sellers, no later than seven (7) Business Days following notification of such Previously Omitted Contract from the Discovering Party, whether the Purchaser is designating such Previously Omitted Contract as an "Assigned Contract." If the Purchaser designates a Previously Omitted Contract as an "Assigned Contract" in accordance with this Section 1.5(c), the Sellers shall promptly (and in any event within two (2) Business Days following the Purchaser's delivery of the aforementioned written notice) serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and the Seller's intention to assume and

10

assign such Previously Omitted Contract in accordance with this <u>Section 1.5</u>. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with fifteen (15) days to object, in writing to the Sellers and Purchaser, to the Cure Costs or the assumption of its Contract. If the counterparties, the Sellers and the Purchaser are unable to reach a consensual resolution with respect to the objection, the Sellers will promptly seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is served on the Sellers and the Purchaser, the Sellers shall obtain an order of the Bankruptcy Court fixing the Cure Costs and approving the assignment and assumption of the Previously Omitted Contract.

(d)     To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this <u>Section 1.5</u>, on the Closing Date, the Sellers shall assign to the Purchaser the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to the provision of adequate assurance by the Purchaser as may be required under Section 365 of the Bankruptcy Code and payment by the Sellers of the Cure Costs in respect of the Assigned Contracts. All Cure Costs in respect of all of the Assigned Contracts shall promptly (including following the Closing to the extent the Cure Costs are not paid at the Closing) be paid by the Sellers.

(e)     To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this <u>Section 1.5</u>, the Sellers shall transfer and assign all of the Acquired Assets to the Purchaser and the Purchaser shall assume all of the Acquired Assets from the Sellers, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code and the Sale Order. Each Seller shall transfer and assign the Acquired Assets of such Seller directly to the Purchaser in full or partial satisfaction, as applicable, of the First Lien Notes Claims or guarantees thereof made by the applicable Seller and in exchange for its share of the Cash Payment. Notwithstanding any other provision of this Agreement or in any Ancillary Document to the contrary (but subject to <u>Section 1.5(f)</u>), this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), would constitute a breach.

(f)     Notwithstanding anything in this Agreement to the contrary, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer, assignment, conveyance or delivery to the Purchaser of any asset that would be an Acquired Asset or any claim or right or any benefit arising thereunder or resulting therefrom is prohibited by any applicable Law or would require any Necessary Consent (as defined below) and such Necessary Consent shall not have been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), the Closing shall proceed without any reduction in Purchase Price (as defined below) without the sale, transfer, assignment, conveyance or delivery of such asset. In the event that any failed condition is waived and the Closing proceeds without the transfer or assignment of any such asset, then for a period of six (6)  months following the Closing, the Sellers shall use their reasonable best efforts at the Purchaser's sole expense, and subject to any approval of the Bankruptcy Court that may be required, and the Purchaser shall use commercially reasonable efforts to cooperate with the Sellers, to obtain such Necessary Consent as promptly as practicable following the Closing. Pending the receipt of such Necessary

11

Consent, for such six (6)-month period following the Closing, the parties shall, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other to provide the Purchaser with all of the benefits and burdens of use of such asset.  Once Necessary Consent for the sale, transfer, assignment, conveyance or delivery of any such asset not sold, transferred, assigned, conveyed or delivered at the Closing is obtained, the Sellers shall promptly transfer, assign, convey and deliver such asset to the Purchaser for no additional consideration.  To the extent that any such asset cannot be transferred or the full benefits and burdens of use of any such asset cannot be provided to the Purchaser, then as promptly as practicable following the Closing, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, the Purchaser and the Sellers shall enter into such arrangements (including subleasing, sublicensing or subcontracting), and shall, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with each other, to provide the Purchaser with all of the benefits and burdens of use of such asset for a period of six (6) months following the Closing.  For such six (6)-month period following the Closing, the Sellers shall hold in trust for, and pay to the Purchaser, promptly (and in any event within three (3) Business Days) following receipt thereof, all income, proceeds and other monies received by the Sellers derived from their use of any asset that would be an Acquired Asset in connection with the arrangements under this Section 1.5(f).  If and when the Necessary Consent, the absence of which caused the deferral of transfer of any Acquired Asset pursuant to this Section 1.5(f), is obtained, the transfer of the applicable Acquired Asset to Purchaser shall automatically and without further action or consideration be effected in accordance with the terms of this Agreement.  The parties agree to treat any asset the benefits of which are transferred pursuant to this Section 1.5(f) as having been sold to Purchaser for Tax purposes to the extent permitted by Law.  To the extent that Law does not permit the parties to treat any asset the benefits of which are transferred pursuant to this Section 1.5(f) as having been sold to Purchaser for Tax purposes, the Purchaser shall indemnify and hold harmless the applicable Seller for any Taxes imposed on such Seller or any of its Affiliates with respect to any such Acquired Asset for any Post-Closing Tax Period net of any Tax benefits realized by such Seller or any of its Affiliates as an actual reduction of cash Taxes otherwise payable with respect to any such Acquired Asset for any Post-Closing Tax Period; provided that the applicable Seller shall promptly (and in any event within ten (10) Business Days) pay to Purchaser the amount of any Tax assets, benefits, refunds or similar items received by such Seller or any of its Affiliates with respect to any such indemnified Taxes for any Post-Closing Tax Period.

(g)      Notwithstanding anything in this Agreement to the contrary, the Purchaser may (i) in its sole and absolute discretion, amend or revise Schedule 1.1(c) setting forth the Assigned Contracts, in order to add any Contract to, or eliminate any Contract from, such Schedule, in each case at any time during the period commencing from the date hereof and ending at the date that is two (2) Business Days before the Closing Date (the "Determination Date"); provided, however, that if an Available Contract is subject to a Cure Cost Dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of the Purchaser and Sellers prior to the Determination Date, then the Determination Date shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of the Purchaser and the Sellers, (B) forty-five (45) days following the Closing Date,

12

(C) the date on which such Available Contract is deemed rejected by operation of 11 U.S.C. § 365(d)(4), (D) the date on which the Sellers confirm a plan of reorganization or liquidation, and (E) the date on which the Sellers' Chapter 11 Cases are dismissed (the "Extended Contract Period"). If such Available Contract is not expressly assumed by the Purchaser in writing by the end of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Asset. Automatically upon the addition of any Contract to Schedule 1.1(c) or designation of any new Acquired Asset pursuant to the first sentence of this Section 1.5(g), it shall be an Assigned Contract or Acquired Asset, as the case may be, for all purposes of this Agreement. Automatically upon the removal of any Contract from Schedule 1.1(c) or designation of any new Excluded Asset pursuant to the first sentence of this Section 1.5(g) (without limiting Purchaser's right to redesignate any such Contract or asset as an Acquired Asset), it shall be an Excluded Asset for all purposes of this Agreement, and no liabilities arising thereunder shall be assumed or borne by the Purchaser unless such liability is otherwise specifically assumed pursuant to Section 1.3.

Section 1.6    Purchase Price.  At the Closing, in consideration for the Acquired Assets, the Purchaser shall, in addition to the assumption of the Assumed Liabilities, (i) Credit Bid and release each Seller from the corresponding portion of the First Lien Notes Claims, in an amount equal to $262,851,000, pursuant to a release letter, in form and substance reasonably acceptable to the Sellers and the Purchaser and (ii) pay an amount equal to $49,152,903, (the "Cash Payment") to the Parent, as agent for each Seller (and each Seller hereby appoints Parent as its agent for this purpose). The amounts in clauses (i) and (ii) of the immediately preceding sentence, collectively with the assumption by Purchaser of the Assumed Liabilities from Sellers, are referred to herein as the "Purchase Price."  The Cash Payment shall be used as follows: (a) first, to repay or cause to be repaid all indebtedness, liabilities and other obligations outstanding under the DIP Credit Agreement (other than contingent obligations for which a claim has not been made), as contemplated by Section 5.18 (or, if the Purchaser chooses to assume all of the Parent's right, title, interest, liabilities, duties and obligations in, to and under the DIP Credit Agreement in accordance with clause (ii) of Section 5.18, the Cash Payment shall be reduced by the amount of such liabilities), (b) second, to pay any accrued and unpaid interest on the First Lien Notes through the Closing Date (the "First Lien Notes Interest"), (c) third, subject to Section 5.1(b)(viii), to repay the Retained Professional Fees, Wind-Down Fees and the First Lien AP Professionals Fees and Expenses (each as defined in the DIP Orders) that are accrued and unpaid as of the Closing Date and (d) fourth, any remaining amount of the Cash Payment (the "Cash Remainder"), to satisfy Excluded Liabilities of the Sellers. In addition, each Seller shall use any payments or reimbursements received by such Seller pursuant to this Agreement, and the Excluded Assets of such Seller, if any, to satisfy any remaining Excluded Liabilities of such Seller when due, and then all shares of capital stock or other equity interests of each Seller other than the Parent shall thereafter be canceled for no consideration; *provided*, that the Cash Remainder shall only be used to pay expenses of a Seller other than the Parent to the extent the Excluded Liabilities of such Seller exceed the sum of (1) the amount of such payments received by such Seller pursuant to this Agreement, (2) the amount of such reimbursements received by such Seller pursuant to this Agreement, and (3) the Excluded Assets of such Seller.

Section 1.7    Withholding.  Notwithstanding anything to the contrary in this Agreement, the Purchaser and its Affiliates shall be entitled to deduct and withhold from any

13

amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld under applicable Tax Law. Except for any amounts that are withheld by reason of the failure to provide the form described in <u>Section 2.2(a)(iv)</u>, if the Purchaser reasonably believes that any withholding of Tax is required with respect to any payment under this Agreement, then the Purchaser shall use commercially reasonable efforts to give written notice to the Parent describing the basis for such withholding in reasonable detail at least five (5) Business Days prior to the Closing Date, and the Purchaser shall provide the Parent with a reasonable opportunity to provide any applicable certificate, form or documentation that would reduce or eliminate the requirement to deduct and withhold Tax with respect to such payment, and the Purchaser shall otherwise cooperate with the Parent and take such steps as the entity may reasonably request to reduce or eliminate such withholding obligation to the extent permitted by applicable Law. To the extent that amounts are so deducted and withheld pursuant to this <u>Section 1.7</u>, such deducted and withheld amounts (i) shall be timely remitted by the Purchaser to the applicable Taxing Authority in accordance with applicable Law and (ii) upon such remittance, shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

   Section 1.8 <u>Purchase Price Allocation</u>. Within ninety (90) days after the Closing Date, Purchaser shall prepare and deliver to the Parent a proposed allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes) as of the Closing Date among the Acquired Assets determined on a Seller-by-Seller basis in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder ("<u>Purchaser's Allocation</u>"). If the Parent disagrees with Purchaser's Allocation, the Parent may, within thirty (30) days after delivery of Purchaser's Allocation, deliver a notice (the "<u>Parent's Allocation Notice</u>") to the Purchaser to such effect, specifying those items as to which the Parent disagrees, the basis for such disagreement, and setting forth the Parent's proposed allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes) determined on a Seller-by-Seller basis in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder. If the Parent's Allocation Notice is duly and timely delivered, the Parent and the Purchaser shall, during the twenty (20) days immediately following such delivery, use commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine the allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes). If the Parent and the Purchaser are unable to reach such agreement, they shall promptly thereafter engage the Designated Accounting Firm to resolve any remaining disputes. The fees and expenses relating to the work, if any, to be performed by the Designated Accounting Firm in connection with the Allocation shall be borne equally by the Parent and Purchaser. The allocation of the Purchase Price (and other amounts treated as additional consideration for U.S. federal income Tax purposes), as prepared by the Purchaser if no Parent's Allocation Notice has been given, as adjusted pursuant to any agreement between the Parent and the Purchaser, or as determined by the Designated Accounting Firm in accordance with this <u>Section 1.8</u> (the "<u>Allocation</u>"), shall be conclusive and binding on the parties absent manifest error. The Allocation shall be adjusted, as necessary, by the Purchaser to reflect any subsequent adjustments to the Purchase Price, any liabilities assumed, and any other amounts treated as consideration for U.S. federal income Tax purposes. Each of the Sellers and Purchaser agree (and agree to cause their respective Affiliates) to prepare and file all relevant

14

U.S. federal, state, local and non-U.S. Tax Returns (including Internal Revenue Service Form 8594) in accordance with the Allocation.  None of the Sellers or Purchaser shall (and each of the Sellers and Purchaser shall cause their Affiliates not to) take any position inconsistent with the Allocation on any Tax Return or in connection with any Tax proceeding, in each case, except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any applicable analogous provision of state, local or non-U.S. law).  In the event that the Allocation is disputed by any Taxing Authority, the party receiving notice of such dispute shall promptly notify the other party in writing of such notice, and the parties shall cooperate in good faith to resolve such dispute.  The parties acknowledge that the Allocation is prepared for Tax purposes and is not necessarily indicative of the valuation of each Acquired Asset.

Section 1.9    Limitations on Purchaser's Liability.  For the avoidance of doubt, except for amounts deposited at Closing pursuant to Section 2.2(b) (to the extent such amounts are required to be deposited pursuant to this Agreement) or as otherwise expressly provided in this Agreement, Purchaser shall have no liability with respect to the Retained Professional Fees and the Wind-Down Fees.

ARTICLE II

THE CLOSING

Section 2.1    Closing.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, NY 10001, at 10:00 a.m. local time as soon as possible (and in any event within two (2) Business Days) after the conditions set forth in Article VI shall have been satisfied or (if permissible) waived (except for such conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver thereof at the Closing), or at such time, date and place (which may be virtual) as the parties hereto may mutually agree in writing (the date of the Closing being herein referred to as the "Closing Date").  Each Seller and the Purchaser shall use commercially reasonable efforts to consummate the Closing on or prior to September 4, 2020.  Notwithstanding anything to the contrary in this Section 2.1, in no event shall the Closing take place prior to August 31, 2020.  The purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities shall be deemed to have occurred on 11:59 p.m. local time on the Closing Date.

Section 2.2    Deliveries at the Closing.

(a)    At the Closing, the Sellers shall deliver to the Purchaser:

(i)    the bill of sale transferring the Acquired Assets to the Purchaser substantially in the form of Exhibit A attached hereto (the "Bill of Sale"), duly executed by the Sellers;

15

(ii)    the assignment and assumption agreement to be entered into between the Sellers and the Purchaser substantially in the form of <u>Exhibit B</u> attached hereto (the "<u>Assignment and Assumption Agreement</u>"), duly executed by the Sellers;

(iii)    assignments of the Seller Intellectual Property, including the Seller Registered Intellectual Property, substantially in the forms of <u>Exhibit C</u> attached hereto (the "<u>Intellectual Property Assignment Agreements</u>"), duly executed by the Sellers;

(iv)    an Internal Revenue Service Form W-9, duly completed and executed by each Seller and dated as of the Closing Date;

(v)    the certificate described in <u>Section 6.3(c)</u>;

(vi)    a quitclaim deed or local equivalent in statutory or customary form for each Deeded Real Property with changes reasonably required by applicable Law to record or register transfer of title in each applicable jurisdiction (each a "<u>Deed</u>"), duly executed by each applicable Seller;

(vii)    such other bills of sale, Deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Purchaser, as Purchaser may reasonably request to vest in Purchaser all of the right, title and interest of Sellers in, to or under any or all of the Acquired Assets, including all Real Property, subject only to Permitted Post-Closing Encumbrances and Assumed Liabilities;

(viii)    such ordinary and customary documents (including affidavits, but excluding, for the avoidance of doubt, any non-imputation affidavits) as may be required by a title insurance company to issue owners' title insurance policies (or "pro formas" or marked up commitments having the same effect of a title insurance policy), in form reasonably acceptable to Seller (including that any such affidavit or similar documentation shall not impart on Seller any continuing liability or indemnification obligations other than, if requested, for the intentional misrepresentation of statements made therein), at Purchaser's sole election and Purchaser's sole cost and expense, insuring title to any or all of the Real Property included in the Acquired Assets (in any event, subject to Permitted Post-Closing Encumbrances and Assumed Liabilities); *provided*, *however*, that the ability of Purchaser to obtain such owners' title insurance policies, pro formas or commitments (including, without limitation, any extended or affirmative coverage contained therein or any endorsements thereto requested by Purchaser) shall not be a condition to Closing and that nothing in this <u>Section 2.2(a)(viii)</u> shall prohibit any Seller from ceasing operations or winding up its affairs following the Closing; and

(ix)    such other documents as Purchaser may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

(b)    At the Closing, the Purchaser shall deliver to the Sellers:

(i)    an amount equal to the Cash Remainder, determined in good faith by Sellers in consultation with the Purchaser, by wire transfer of immediately

16

available funds to an account or accounts designated by the Sellers at least two (2) Business Days prior to the Closing;

(ii)    subject to <u>Section 5.1(b)(viii)</u> with respect to Retained Professional Fees, an amount determined in good faith by Sellers in consultation with the Purchaser equal to the Retained Professional Fees into the Committee Retained Professional Fees Escrow and Seller Retained Professional Fees Escrow to such account as directed by the applicable escrow agent at least two (2) Business Days prior to Closing, as applicable, for the purpose of paying the Retained Professional Fees in accordance with the Sale Order;

(iii)    the Wind-Down Fees into the Wind-Down Fees Escrow to such account as directed by the applicable escrow agent at least two (2) Business Days prior to Closing, for the purpose of paying the Wind-Down Fees;

(iv)    the Assignment and Assumption Agreement, duly executed by the Purchaser;

(v)    the certificate described in <u>Section 6.2(c)</u>;

(vi)    the Bill of Sale, duly executed by the Purchaser;

(vii)    each Deed, duly executed by the Purchaser to the extent required by applicable Law;

(viii)    evidence reasonably satisfactory to the Parent of the Payoff to the extent required under <u>Section 5.18</u>; and

(ix)    such other documents as the Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

Section 2.3    <u>Purchaser Designees</u>.  The Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this <u>Section 2.3</u>, one or more Affiliates of Purchaser to (i) purchase specified Acquired Assets; (ii) assume specified Assumed Liabilities; and/or (iii) employ Transferred Employees, in each case, as of the Closing Date (any Person that shall be properly designated by Purchaser in accordance with this clause, a "<u>Purchaser Designee</u>"); it being understood and agreed, however, that any such right of Purchaser to designate a Purchaser Designee is conditioned upon such Purchaser Designee being able to perform the applicable covenants under this Agreement and, as applicable, any other transaction agreement to which Purchaser is party and demonstrate satisfaction of the requirements of Section 365 of the Bankruptcy Code (to the extent applicable).  As soon as reasonably practicable and in no event later than three (3) Business Days prior to the Closing, Purchaser shall make any such designations of Purchaser Designees by way of a written notice to be delivered to the Sellers.  No such designation shall relieve Purchaser of any of its obligations hereunder and any breach hereof by a Purchaser Designee shall be deemed a breach by Purchaser.  Purchaser and Purchaser Designees shall be jointly and severally liable for any obligations of Purchaser and such Purchaser Designees hereunder.  For the avoidance of doubt,

17

and notwithstanding anything to the contrary herein, all Purchaser Designees appointed in accordance with this Section 2.3 shall be included in the definition of "Purchaser" *mutatis mutandis* for all purposes under this Agreement and all such Purchaser Designees shall be deemed to have made all of the representations and warranties of Purchaser set forth in this Agreement.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as disclosed in (x) the Parent SEC Documents publicly available prior to the date hereof (but excluding any predictive, cautionary or forward looking disclosures contained or referenced under the captions "Risk Factors," "Forward Looking Statements," "Quantitative and Qualitative Disclosures About Market Risk" or any similar precautionary sections and any other disclosures contained or referenced therein of information, factors or risks, in each case, that are predictive, cautionary or forward looking in nature) (it being understood that this clause (x) will not apply to any of Section 3.1, Section 3.2, Section 3.3, Section 3.4, Section 3.5, Section 3.8 or Section 3.27) or (y) the disclosure letter delivered by the Sellers to the Purchaser immediately prior to the execution of this Agreement (the "Seller Disclosure Letter") (it being understood that any information set forth in one section or subsection of the Seller Disclosure Letter shall be deemed to apply to and qualify the representation and warranty set forth in this Agreement to which it corresponds in number and, whether or not an explicit reference or cross-reference is made, each other representation and warranty set forth in this Article III for which it is reasonably apparent on its face that such information is relevant to such other section), each of the Sellers jointly and severally represents and warrants to the Purchaser that, as of the date hereof and as of the Closing:

Section 3.1    Qualification, Organization, etc. Each Seller is a legal entity duly organized, validly existing and in good standing (with respect to jurisdictions that recognize such concept) under the Laws of its respective jurisdiction of organization and each Seller has all requisite corporate, limited liability or similar power and authority to own, lease and operate its properties and assets and to carry on its business (including the Business) as presently conducted in all material respects.  Each Seller is duly qualified or authorized to do business and is in good standing (with respect to jurisdictions that recognize such concept) as a foreign corporation or other entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified, authorized or, where relevant, in good standing, has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Sellers have made available to the Purchaser a complete, true and correct copy of the organizational documents of each Seller as in effect on the date hereof.  None of the Sellers is in violation of any of the provisions of its certificate of incorporation or bylaws (or equivalent organizational documents).

Section 3.2    Ownership.  All of the outstanding capital stock or other voting securities of or other ownership interests in each Subsidiary of the Sellers are owned by the Sellers, directly or indirectly, and all of the outstanding capital stock or other voting securities of

18

or other ownership interests in each of the Purchased Entities set forth on <u>Section 3.2</u> of the Seller Disclosure Letter are owned by the Sellers, directly or indirectly.  <u>Section 3.2</u> of the Seller Disclosure Letter sets forth (i) a true, complete and correct organizational chart of the Sellers and their Subsidiaries, including, for each of the Sellers and Subsidiaries, (x) its name, (y) its jurisdiction of organization and (z) its ownership interest (including type, amount and percentage) by the Sellers, as well as its ownership interest (including type, amount and percentage) by any other Person or Persons and (ii) a true, compete and correct chart of the Purchased Ownership Interests, including, for each Purchased Ownership Interest, (y) its name and (z) its ownership interest (including percentage) by the relevant Seller.  Each Subsidiary of the Sellers is directly or indirectly wholly owned by the Sellers.  Other than the capital stock or other ownership interests that the Sellers own of their Subsidiaries and the Purchased Entities as set forth on <u>Section 3.2</u> of the Seller Disclosure Letter, none of the Sellers own, directly or indirectly, any capital stock or other ownership interests of any other Person.  None of the Sellers or their Subsidiaries is obligated to make any investment in or capital contribution to any Person.  There are no restrictions on the Sellers' ability to transfer Sellers' ownership in the Purchased Entities to Purchaser at Closing free and clear of all Encumbrances (other than restrictions on transfers in the applicable organizational documents which cannot be discharged by the Sale Order).

       Section 3.3    <u>Authority of the Sellers</u>.  Each Seller has, subject to the entry and effectiveness of the Sale Order, all requisite corporate or limited liability company power and authority necessary to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Documents to which each such Seller is a party and to consummate the transactions contemplated hereby and thereby.  Subject to the entry and effectiveness of the Sale Order, the execution, delivery and performance of this Agreement and such Ancillary Documents by each Seller and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite corporate (or equivalent) action of such Seller, including with respect to the Parent, by the Board of Directors of Parent, and no other corporate proceedings (pursuant to any Seller's organizational documents or otherwise) on the part of any Seller is necessary to authorize the consummation of, and to consummate, the transactions contemplated hereby and thereby.  Subject to the entry and effectiveness of the Sale Order, this Agreement and each such Ancillary Document has been, or at or prior to Closing (as the case may be) will be, duly and validly executed and delivered by each Seller, and, assuming the due authorization, execution and delivery of this Agreement and each such Ancillary Document by the parties hereto and thereto, as applicable, constitute a legal, valid and binding obligation of each Seller, enforceable against each such Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and similar Laws affecting creditors' rights generally now or hereafter in effect and to general equitable principles (collectively, the "<u>Enforceability Limitations</u>").

       Section 3.4    <u>Consents and Approvals</u>.  Subject to the entry and effectiveness of the Sale Order and except (i) as required to comply with the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>") and (ii) for notices, filings and consents required in connection with the Chapter 11 Cases, including the requirements of the Bidding Procedures Order, no notice, consent, approval, permit or authorization of, or declaration, filing or registration with, any Governmental Entity or any third party is necessary or

19

required to be made or obtained by any Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Documents to which a Seller is a party and the consummation of the transactions contemplated hereby and thereby, except for such notices, consents, approvals, permits, authorizations, declarations, filings or registrations, which, if not made or obtained, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.5    No Violations.  Neither the execution, delivery or performance of this Agreement and the Ancillary Documents by the Sellers nor the consummation by the Sellers of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order and the Bidding Procedures Order, compliance by it with any of the provisions hereof or thereof, do or will (a) conflict with or result in any violation or breach of any provisions of the certificate of incorporation, bylaws or other organizational documents of any Seller, (b) with or without notice or lapse of time or both, conflict with or result in any breach or violation of or constitute a default or change of control under, or give rise to a right of, or result in, termination, modification, cancellation, first offer, first refusal or acceleration of any obligation or to the loss of a benefit under any (i) Contract to which any Seller is a party or by or to which any of their respective properties, rights or assets are bound or subject or (ii) license, Permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Entity, (c) result in the creation or imposition of any Encumbrance on any Acquired Asset other than (x) with respect to the execution and delivery of this Agreement, Permitted Pre-Closing Encumbrances and (y) with respect to the execution and delivery of the Ancillary Documents and with respect to the performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, the Permitted Post-Closing Encumbrances, in each case, on any properties, rights or assets of the Sellers or (d) conflict with or violate any Order or Law applicable to any Seller or their respective properties, rights or assets except in the case of the foregoing clauses (b) and (c), for breaches, violations, defaults, rights, creations or impositions that (y) have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (z) are excused by or unenforceable as a result of the entry or effectiveness of the Sale Order.

Section 3.6    Financial Statements.  The Sellers have made available to the Purchaser copies of the audited consolidated balance sheet and the related consolidated statements of operations, comprehensive income, changes in stockholders' equity and cash flows of the Parent and its consolidated Subsidiaries as of and for the fiscal years ended December 29, 2019 and December 30, 2018, respectively (collectively the "Audited Financial Statements"). Subject to the notes thereto, the Audited Financial Statements were prepared, in all material respects, in accordance with GAAP consistently applied in accordance with the Parent's accounting policies and past practices throughout the periods indicated.  The Sellers have made available to Purchaser unaudited consolidated balance sheets for the Parent and its Subsidiaries as of May 31, 2020 and the related condensed consolidated statements of operations, stockholder's equity (deficit) and cash flows for the five (5)-month period ending May 31, 2020 (collectively, the "Unaudited Financial Statements").  The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied except for the absence of footnotes and customary year-end adjustments.  The Audited Financial Statements and the Unaudited Financial Statements (together the "Financial Statements") (i) were prepared based on the books

20

and records of the Sellers and (ii) fairly present in all material respects the financial position of the Sellers at and as of the dates specified and the results of their operations for the period covered, subject to customary year-end adjustments.  The copies of the Financial Statements made available to the Purchaser are true, correct and complete copies of such Financial Statements and present fairly, in all material respects, the consolidated financial position, results of operations, changes in stockholders' equity (deficit) and cash flows of the Parent and the consolidated Parent Subsidiaries as of the respective dates and for the respective periods referred to in the Financial Statements.

Section 3.7    Title to Property; Sufficiency of Assets.

(a)    The Sellers have good and marketable title to, or, in the case of property leased or licensed by the Sellers, a valid leasehold interest in or all rights to use, all of the Acquired Assets (other than the Real Property), free and clear of all Encumbrances other than Permitted Pre-Closing Encumbrances.  Upon the entry and effectiveness of the Sale Order, and, with respect to certain of the Deeded Real Property, subject to the Sale Contracts, the Sellers will have the power and right to sell, assign, transfer, convey and deliver, as the case may be, to the Purchaser the Acquired Assets, and at the Closing, the Sellers will sell, assign, transfer, convey and deliver to the Purchaser good title to, or, in the case of tangible personal property leased by the Sellers, a valid leasehold interest in, the Acquired Assets, free and clear of all Encumbrances other than Permitted Post-Closing Encumbrances.

(b)    The Acquired Assets (i) constitute substantially all of the assets used or held for use by the Sellers in connection with or otherwise related to the Business, other than the Excluded Assets; (ii) will permit the Purchaser to conduct the Business substantially as it is being conducted on the date hereof, except as a result of any assets being Excluded Assets; (iii) are in adequate working order and are suitable for the uses for which they are intended; and (iv) to the Knowledge of the Sellers, will permit the Purchaser to comply as of the Closing Date in all material respects with all Laws, Permits and Orders applicable as of the Closing Date to the Business and the ownership and use of the Acquired Assets.

Section 3.8    Absence of Certain Changes.

(a)    Except to the extent arising out of or relating to the Chapter 11 Cases, this Agreement or the transactions contemplated hereby, from the Petition Date through the date hereof:  (i) the Business has been conducted in all material respects in the ordinary course of business consistent with past practice and (ii) none of the Sellers has taken any action that, if taken after the date hereof, would constitute a material breach of, or require the consent of the Purchaser under, Section 5.1.

(b)    From the Petition Date, there has not occurred any Effect that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.9    Brokers or Finders.  Except as set forth on Section 3.9 of the Seller Disclosure Letter, none of the Sellers have incurred any obligation or liability, contingent or

21

otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby.

Section 3.10    Litigation.  Except as would not, individually or in the aggregate, have a Material Adverse Effect, and except for the Chapter 11 Cases, there are no Actions, Claim or Orders pending, outstanding or, to the Knowledge of the Sellers, threatened against the Business or the Sellers or any of their respective properties, rights or assets, whether at law or in equity or whether civil or criminal in nature, and there are no orders, judgments or decrees of or settlement agreements, by or before any arbitrator or Governmental Entity.  To the Knowledge of the Sellers, there are no investigations relating to the Business pending or threatened in writing by or before any arbitrator or any Governmental Entity, which would reasonably be expected to be material to the Business or the Acquired Assets, taken as a whole.

Section 3.11    Intellectual Property.

(a)    Section 3.11(a) of the Seller Disclosure Letter sets forth the (i) issued Patents and Patent applications, (ii) Trademark registrations and applications and (iii) registered domain names, in each case ((i)-(iii)), that are owned as of the date hereof by a Seller.  All of the Seller Registered Intellectual Property is subsisting and, all such Seller Registered Intellectual Property (for clarity, excluding any applications for registration) are valid and enforceable.

(b)    The Seller Intellectual Property constitutes all of the Intellectual Property owned by any Seller that is used in the conduct of their business as currently conducted, except as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)    The operation of the Business as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property of any other Person, except as would not, individually or in the aggregate, have a Material Adverse Effect.  There are no Actions currently pending or, to the Knowledge of the Sellers, currently threatened in writing against any Sellers alleging that any Seller is infringing, misappropriating or otherwise violating the Intellectual Property of any such other Person in any material respect.

(d)    To the Knowledge of the Sellers, no Person is infringing, misappropriating or otherwise violating any of the Intellectual Property owned by, or any Intellectual Property exclusively licensed to, the Sellers, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect there are no Actions currently pending or threatened in writing by the Sellers alleging that any Person is infringing, misappropriating or otherwise violating any Intellectual Property owned by, or Intellectual Property exclusively licensed to, the Sellers.

(e)    Each Seller has taken commercially reasonable measures to maintain the confidentiality of material Trade Secrets that the Sellers intend to maintain as

22

confidential, except as would not, individually or in the aggregate, have a Material Adverse Effect.

(f)    To the Knowledge of the Sellers, for the past three (3) years the Sellers have been in compliance in all material respects with applicable Laws relating to privacy, data protection, and the collection and use of personal information collected, used, or held for use by any of the Sellers.  As of the date hereof, no claims are pending, or, to the Knowledge of the Sellers as of the date hereof, currently threatened in writing against any of the Sellers alleging a violation of any Person's privacy or personal information.  To the Knowledge of the Sellers, no Person has gained unauthorized access to or made any unauthorized use of any information technology systems or software owned by any of the Sellers or any personal information collected, used, or held for use by any of the Sellers, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the Knowledge of the Sellers, (i) the consummation of the transactions contemplated hereby and the transfer of the personal information in connection therewith will not violate any privacy policies of the Sellers, and (ii) upon Closing, Purchaser will own and continue to have the right to use all personal information collected, used, or held for use by any of the Sellers on substantially similar terms as Sellers enjoyed immediately prior to the Closing, except, in each case of (i) and (ii), as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.12    Real Property.

(a)    Section 3.12(a) of the Seller Disclosure Letter sets forth a true and complete list of each Deeded Real Property. Seller has valid fee simple title to the Deeded Real Property, free and clear of all Encumbrances, other than Permitted Pre-Closing Encumbrances. Other than as set forth on Section 3.12(a) of the Seller Disclosure Letter, none of the Sellers have leased, or otherwise granted the right to use or occupy, any portion of the Owned Real Property to any Person.

(b)    Section 3.12(b) of the Seller Disclosure Letter sets forth a true and complete list of the Leased Real Property (as hereinafter defined) which is subject to Leases with a current base rental amount of $15,000 per month or greater. The Leases are in full force and effect, and each Seller has a good and valid leasehold interest in or contractual rights to use or occupy, the real property leased, used or otherwise occupied by each Seller (other than pursuant to a Rejected Lease), as applicable (the "Leased Real Property") subject to the terms of the applicable Lease, free and clear of all Encumbrances, other than Permitted Pre-Closing Encumbrances.

(c)    The Deeded Real Property and the Leased Real Property (together, the "Real Property") constitute all real property currently used in the Business.  To the Knowledge of the Sellers, there are no pending or threatened condemnation, eminent domain or similar proceedings affecting the Real Property.

(d)    Except as set forth on <u>Section 3.12(d)</u> of the Seller Disclosure Letter, the Rejected Leases set forth on <u>Section 3.8(a)</u> of the Seller Disclosure Letter are not material to the operations of the Business, the Acquired Assets or the Assumed Liabilities.

Section 3.13    <u>Assigned Contracts</u>.  Subject to the entry of the Sale Order, each Assigned Contract is in full force and effect and is a valid, binding and enforceable obligation of the applicable Seller party thereto and, to the Knowledge of the Sellers, the other parties thereto, in accordance with its terms and conditions, in each case subject to the Enforceability Limitations.  True, complete and correct copies of each Available Contract that are material to the Business have been made available to the Purchaser.

Section 3.14    <u>Executory Contracts; Material Contracts</u>.  <u>Schedule 1.5(a)</u> sets forth a true, correct and complete list, as of the date hereof, of the Available Contracts.  Each Material Contract is in full force and effect and is a valid and binding obligation of each Seller party thereto in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity and (y) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Upon entry of the Sale Order, other than the payment of Cure Costs (i) none of the Sellers will be in breach or default of its obligations under any Material Contract; (ii) to the Knowledge of the Sellers, no condition exists that with notice or lapse of time or both would or would reasonably be expected to constitute a default by any of the Sellers under any Material Contract; and (iii) to the Knowledge of the Sellers, no other party to any Material Contract is in breach or default thereunder, except in the case of clauses (i), (ii) and (iii) for any breaches or defaults that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.15    <u>Insurance</u>.  <u>Section 3.15</u> of the Seller Disclosure Letter sets forth all insurance policies held by the Sellers covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage).  Such policies are in full force and effect (subject to periodic renewals thereof).  The Sellers have paid all premiums on such policies due and payable prior to the date hereof, or, if not yet due, have properly accrued for such payables.  Since the Petition Date, to the Knowledge of the Sellers, the Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

Section 3.16    <u>Affiliate Interests</u>.  Other than any Benefit Plan and travel advances entered into the ordinary course of business consistent with past practice, there are no Contracts between any of the Sellers and any Affiliate of any of the Sellers (but not including another Seller or a Subsidiary of a Seller).  Other than employment arrangements, compensation benefits and travel advances entered into in the ordinary course of business consistent with past practice, and other than arrangements or relationships that would not be required to be disclosed in the Parent SEC Documents filed pursuant to Regulation S-K of the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), to the Knowledge of the Sellers, no such Affiliate of any of the Sellers controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from or has the right to participate in the profits of, other than through the ownership of

24

any publicly traded entity, (i) any Person which does business with any Seller or is competitive with the Business in any material respect, or (ii) any material property, asset or right which is used by any of the Sellers.  There exists no Indebtedness of any such Affiliate to any Seller, nor any Indebtedness of any Seller to any such Affiliate of any of the Sellers.

Section 3.17    <u>Bank Accounts</u>.  <u>Section 3.17</u> of the Seller Disclosure Letter sets forth a complete list of all bank accounts and lockboxes (including any deposit accounts, securities accounts and any sub-accounts) of the Sellers.  The Sellers own all right, title and interest in and to such bank accounts and lockboxes free and clear of all Encumbrances (other than Permitted Pre-Closing Encumbrances).

Section 3.18    <u>Undue Influence</u>.  In connection with the operation of the Business, none of the Sellers or, to the Knowledge of the Sellers, any director, officer, agent, employee or Affiliate of any of the Sellers, has taken any action, directly or indirectly, with respect to the Business that would result in a violation of the Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder (the "<u>FCPA</u>").  The Sellers, and, to the Knowledge of the Sellers, their Affiliates, have conducted the Business in compliance with the FCPA in all material respects and maintain procedures which are reasonably expected to ensure compliance therewith.

Section 3.19    <u>Compliance with Laws; Permits</u>.

(a)    The Sellers are in possession of all franchises, grants, authorizations, business licenses, permits, consents, waivers, filings, accreditations, certifications, certificates of occupancy, easements, rights of way, notifications, exemptions, approvals, registrations, clearances and orders, together with all modifications, renewals, amendments, supplements and extensions thereof and applications therefor, of or from any Governmental Entity or pursuant to any applicable Law (the "<u>Permits</u>") necessary for the operation and conduct of the Business or the Acquired Assets in compliance with Law, except where the failure to have any of the Permits has not been and would not reasonably be expected to be, individually or in the aggregate, material to the operation of the Business or the Acquired Assets.  The Permits set forth on <u>Section 3.19(a)</u> of the Seller Disclosure Letter are all of the Permits held by the Sellers with respect to the current operation and conduct of the Business and the Acquired Assets, the absence of which would be reasonably expected to adversely affect the operation of the Business or the Acquired Assets from and after the Closing.

(b)    Except as would not reasonably be expected to be material to the Business or the Acquired Assets, the Sellers have conducted the Business for the past three (3) years and currently own and operate the Acquired Assets in accordance, with all Laws, Orders and Permits applicable to Sellers and the Acquired Assets during such period, and the Business is in compliance with all applicable Laws, Orders and Permits (including any anti-bribery legal requirements) and has obtained all approvals necessary for owning and operating its assets and has made all necessary filings with all Governmental Entities having jurisdiction necessary for owning and operating its assets.

25

(c)     Except as would not be material to the Business or the Acquired Assets none of the Sellers, nor to the Knowledge of the Sellers, any of their Representatives have received within the past three (3) years any written notice or other communication from a Governmental Entity that alleges that the Business is not in compliance with any Law, Order or Permit applicable to the Business or the operations or properties of the Business or the Acquired Assets or that threatens or states the intention on the part of any issuing authority to revoke, cancel, suspend or modify any Permit necessary for the current operation and conduct of the Business and the Acquired Assets (except with respect to regular periodic expirations and renewals thereof).  Except as would not be material to the Business or the Acquired Assets: (i) no Seller has had any Permits that are necessary for the operation and conduct of the Business and the Acquired Assets appealed, denied, revoked, restricted or suspended during the past three (3) years; and (ii) no Seller is currently a party to any proceedings involving the possible appeal, denial, revocation, restriction or suspension of any Permits that are necessary for the current operation and conduct of the Business and the Acquired Assets or any of the privileges granted thereunder (except where the obligation to hold such a Permit is being contested in good faith by appropriate proceedings diligently conducted or is excused by the Bankruptcy Code).

(d)     Subject to the entry of the Sale Order, the Sellers have complied in all material respects with all requirements of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Acquired Assets (including the assumption and assignment to the Purchaser of any Assigned Contracts) to the Purchaser pursuant to this Agreement.

Section 3.20    Employee Benefit Matters.

(a)     Section 3.20(a) of the Seller Disclosure Letter sets forth a complete and correct list of each Assumed Benefit Plan. Correct and complete copies of the following documents, with respect to each of the Assumed Benefit Plans, as applicable, have been made available to the Purchaser: (i) any plan documents, and all material amendments thereto, (ii) the most recent Forms 5500 and (iii) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(b)     Except as would not, individually or in the aggregate, have a Material Adverse Effect: (i) each Assumed Benefit Plan has been administered in accordance with its terms and in compliance with applicable Law; (ii) all contributions and payments required to be made by the Sellers to any Assumed Benefit Plan have been paid when due; and (iii) no Action (other than routine claims for benefits) is currently pending or, to the Knowledge of the Sellers, is currently threatened, against or with respect to any Assumed Benefit Plan, including any audit or inquiry by the Internal Revenue Service or United States Department of Labor.

(c)     None of the Assumed Benefit Plans promises or provides retiree medical or other retiree welfare benefits to any person except as required by applicable Law.

(d)     No Assumed Benefit Plan is (i) subject to Title IV of ERISA or (ii) a multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA).

26

(e)        Each Assumed Benefit Plan intended to be qualified under Section 401(a) of the Code, has received a favorable determination letter from the Internal Revenue Service and, to the Knowledge of the Sellers, circumstances do not exist that are likely to result in the loss of the qualification of such plan under Section 401(a) of the IRC.

(f)        The consummation of the Acquisition, whether alone or in combination with any other event, will not (i) entitle any current or former employee of the Sellers or any ERISA Affiliate to severance benefits or any other payment (including unemployment compensation, golden parachute, bonus or benefits) under any Assumed Benefit Plan; or (ii) accelerate the time of payment or vesting of any such benefits or increase the amount of compensation due any such current or former employee under any Assumed Benefit Plan.

Section 3.21    Labor Matters.

(a)        Except as set forth on Section 3.21(a) of the Seller Disclosure Letter, no Seller is a party to, or bound by, any agreement with respect to its employees with any labor union or any other employee organization, group or association organized for purposes of collective bargaining.  Except as set forth on Section 3.21(a) of the Seller Disclosure Letter, no employees of the Sellers are represented by any labor union or any other employee organization, group or association organized for purposes of collective bargaining with respect to their employment with the Sellers.  As of the date hereof, there is no pending or, to the Knowledge of the Sellers, threatened labor strike, slowdown, lockout or work stoppage involving the Sellers or any of their respective employees, which would, individually or in the aggregate, have a Material Adverse Effect.  As of the date hereof, the Sellers are not the subject of any material proceeding that seeks to compel the Sellers to bargain with any labor union or labor organization.

(b)        As of the date hereof, the Sellers are not the subject of any material proceeding that asserts that any Seller has committed an unfair labor practice with respect any employees of the Sellers.

(c)        The Sellers are in material compliance with all labor Laws with respect to all current and former employees and service providers of the Sellers, and no current or former employee or service provider of the Sellers has been improperly included in or excluded from any Benefit Plan.

(d)        Each Seller is and, during the preceding ninety (90) days, has been, in compliance in all material respects with the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state, local or foreign Law relating to plant closings or mass layoffs (the "WARN Act").

(e)        To the Knowledge of the Sellers, no Seller is party to a settlement agreement with a current or former officer, employee or independent contractor of the Sellers that involves allegations relating to sexual harassment by either (i) an officer of the Sellers or (ii) an employee of the Sellers at the level of Vice President or above.  To the Knowledge of the Sellers, no material allegations of sexual harassment are pending against (i) any officer of the Sellers or (ii) an employee of the Sellers at a level of Vice President or above.

27

(f)      Section 3.21(f) of the Seller Disclosure Letter sets forth a true, correct and complete redacted list of each employee of the Sellers, including date of hire, position, wage rate, bonus amount, location, and classification as exempt vs. non-exempt as well as the date of any approved leave and the estimated return date from such approved leave.

Section 3.22    Environmental Matters.

(a)      Except for matters that have not been and would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Acquired Assets:

(i)      the Sellers' operation of the Business, and the Real Property related thereto, have complied during the previous three (3) years and are in compliance with all Environmental Laws;

(ii)      Sellers have not received any written notice, written report or other written information from any Person alleging any pending or, to the Knowledge of the Sellers, threatened violation, non-compliance, liability or potential liability under Environmental Laws with regard to any of the Real Property or the Business, or any prior business for which the Sellers have retained, assumed or otherwise become subject to liability, including under any Contract or Environmental Law, nor have the Sellers received written notice of, nor do the Sellers have, any pending or, to Knowledge of the Sellers, threatened claims alleging any violations of Environmental Law with regard to any of the Real Property or the Business, or any prior business for which the Sellers have retained, assumed or otherwise become subject to liability, including under any Contract or Environmental Law;

(iii)      to the Knowledge of the Sellers, the Real Property does not contain any Hazardous Substances in amounts or concentrations which (a) constitute a violation of, or (b) would give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, under, any Environmental Law;

(iv)      to Knowledge of the Sellers, no Seller or any other Person, has treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled, exposed any Person to, or discharged any Hazardous Substances except as authorized by Environmental Permits, or owned or operated any property or facility contaminated by any Hazardous Substances, in each case as has given or could reasonably be expected to give rise to material liability, including liability for response costs, corrective action costs, personal injury, property damage or natural resources damage, with respect to the Acquired Assets or the Business, under any Environmental Law;

(v)      no Action is pending or, to Knowledge of the Sellers, threatened under any Environmental Law against the Sellers or with respect to the Acquired Assets, including the Real Property, or the Business, nor are there any Orders outstanding under any Environmental Law with respect to the Acquired Assets, including the Real Property or the Business;

28

(vi)     the Sellers (a) hold, maintain and are in compliance with all material Environmental Permits required for the Business, any of their operations, or required for their ownership, operation or use of the Real Property; (b) are, and have been for the past three years, in compliance with all Environmental Permits, in all material respects; and (c) have not received any written notice that the Environmental Permits will not be renewed;

(vii)     the Sellers have made available copies of all material environmental or employee health and safety assessments, audits (including compliance audits) and evaluations within their possession or under their reasonable control which have been completed within the past three (3) years;

(viii)     to the Knowledge of the Sellers, there are no underground storage tanks, transformers or other equipment containing PCBs, underground injection wells, non-naturally occurring radioactive materials or septic tanks or waste disposal pits (to the extent such tanks or pits constitute Acquired Assets) associated with or located on the Acquired Assets or the Business, in each case as would reasonably be expected to give rise to liability under Environmental Laws; and

(ix)     to the Knowledge of the Sellers, neither the execution of this Agreement and the Ancillary Documents nor consummation of the transactions contemplated hereby and thereby shall trigger any investigation or remediation obligations pursuant to Environmental Laws, which reasonably would be expected, individually or in the aggregate, to result in material Environmental Liability.

Section 3.23     <u>Taxes</u>.

(a)     The Parent and its Affiliates have timely filed all income Tax and other material Tax Returns required to be filed (taking into account requests for extensions to file such Tax Returns) with respect to the Acquired Assets and the Business, and have timely paid all material amount of Taxes due and owing with respect to the Acquired Assets and the Business whether or not included in any Tax Return for all periods through and including the date of this Agreement.  All such Tax Returns were true, correct, and complete in all material respects as they related to the Acquired Assets or the Business.

(b)     No deficiencies for any material Taxes with respect to the Acquired Assets or the Business have been proposed, asserted or assessed in writing against the Parent and its Affiliates that are still pending and there are no material current disputes related to the Acquired Assets or the Business with any Taxing Authority.

(c)     There is no pending material Action by any Taxing Authority with respect to Taxes with respect to the Acquired Assets or the Business and no such Action has been threatened in writing.

(d)     No written claim has been made by a Taxing Authority in a jurisdiction where the Parent or any of its Affiliates does not file Tax Returns that any such entity is subject to taxation in that jurisdiction with respect to the Acquired Assets or the Business.

29

(e)       There is no waiver currently in effect relating to any statute of limitations with respect to the Acquired Assets or the Business with respect to any Taxes.

(f)       There are no tax liens upon any Acquired Assets or the Business other than Permitted Pre-Closing Encumbrances.

(g)       The Parent and each of its Affiliates has complied in all material respects with its withholding obligations for all Taxes required to have been withheld and paid with respect to the Acquired Assets or the Business in connection with amounts owing to any employee, or independent contractor associated with the Acquired Assets or the Business and has paid all material payroll and similar Taxes required to have been paid by the Parent and its Affiliates with respect to any employee, or independent contractor associated with the Acquired Assets or the Business.

Section 3.24    Customers and Suppliers.  Section 3.24 of the Seller Disclosure Letter lists, as of the date of this Agreement, each of the top 20 customers and suppliers of the Business based on revenue and expenditures during the 2019 fiscal year and the five (5) month period ended May, 31, 2020 (each, a "Material Customer" or "Material Supplier", as applicable.).  Since January 1, 2018, no Material Customer or Material Supplier has terminated, cancelled, materially decreased the volume or materially reduced its business, and (i) for suppliers, materially increased the pricing, or materially altered other terms of its business with any of the Sellers in respect of the Business, or, to the Knowledge of the Sellers, indicated an intention to terminate, cancel, materially reduce its business, materially increase its pricing, or materially alter other terms of its business with any of the Sellers in respect of the Business, as applicable and (ii) for customers, materially altered other terms of its business with any of the Sellers in respect of the Business, or, to the Knowledge of the Sellers, indicated an intention to terminate, cancel, materially reduce the volume, materially reduce its business or materially alter other terms of its business with any of the Sellers in respect of the Business.

Section 3.25    Inventory.  All Inventory included in the Acquired Assets consists of a quantity and quality that is in all material respects usable and salable in the ordinary course of business consistent with past practice, subject only to the reserves for Inventory write-downs or unmarketable, obsolete, defective or damaged Inventory included in the latest balance sheet included in the Financial Statements.

Section 3.26    Parent SEC Documents.  Parent has filed or furnished with the SEC all of the Parent SEC Documents it has been required to file or furnish since January 1, 2017. As of their respective filing dates, the Parent SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act, as applicable.  None of the Parent SEC Documents filed under the Exchange Act as of their filing dates contained any untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, except to the extent corrected by a subsequently filed document with the SEC.  None of the Parent SEC Documents filed under the Securities Act contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein in light of the circumstances in which they were made

30

not misleading at the time such Parent SEC Documents became effective under the Securities Act.

Section 3.27    Qualifying Cash Proposal.  Since June 30, 2020, neither Sellers nor Parent have received any written proposal or written offer from a Qualified Bidder (as defined in the Bidding Procedures) relating to the acquisition of any assets of the Business that are Acquired Assets (including any acquisition structured as a merger, consolidation, or share exchange) which provides for an aggregate amount of cash consideration of no less than $315,000,000 (a "Qualifying Cash Proposal").

Section 3.28    No Other Representations.  Except for the representations and warranties contained in Article IV, each of the Sellers acknowledges that it (a) has had an opportunity to conduct any and all due diligence with respect to the Purchaser and any of their respective Subsidiaries in connection with the transactions contemplated hereby, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents in connection with the transactions contemplated hereby, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Purchaser or any of its Subsidiaries or with respect to any other information provided or made available to such Seller in connection with the transactions contemplated hereby, or the completeness of any information provided in connection therewith.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Except as disclosed in the disclosure letter delivered by the Purchaser to the Sellers immediately prior to the execution of this Agreement (the "Purchaser Disclosure Letter") (it being understood that any information set forth in one section or subsection of the Purchaser Disclosure Letter shall be deemed to apply to and qualify the representation and warranty set forth in this Agreement to which it corresponds in number and, whether or not an explicit reference or cross-reference is made, each other representation and warranty set forth in this Article IV for which it is reasonably apparent on its face that such information is relevant to such other section), the Purchaser represents and warrants to the Sellers as follows:

Section 4.1    Qualification; Organization.  The Purchaser is a legal entity duly organized, validly existing and in good standing (with respect to jurisdictions that recognize such concept) under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted, except where the failure to be so existing and in good standing or to have such power and authority would not, individually or in the aggregate, materially impair or materially delay its ability to perform its obligations under this Agreement. The Purchaser is qualified to do business and is in good standing (with respect to jurisdictions that recognize such concept) as a foreign corporation or other entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or, where relevant, in good

31

standing, would not, individually or in the aggregate, materially impair or materially delay its ability to perform its obligations under this Agreement.

Section 4.2    Authority of the Purchaser.  The Purchaser has all requisite corporate power and authority necessary to execute and deliver and perform its obligations under this Agreement and each of the Ancillary Documents to which it is a party (subject to entry of the Sale Order).  Subject to the entry and effectiveness of the Sale Order, the execution, delivery and performance of this Agreement and such Ancillary Documents by the Purchaser and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all requisite corporate action of the Purchaser, as applicable, and no other corporate proceedings (pursuant to any of the Purchaser's organizational documents or otherwise) on the part of the Purchaser is necessary to authorize the consummation of, and to consummate the transactions contemplated hereby and thereby.  This Agreement and each such Ancillary Document has been, or at or prior to Closing (as the case may be) will be, duly and validly executed and delivered by the Purchaser to the extent a party thereto, and, assuming the due authorization, execution and delivery of this Agreement and each such Ancillary Document by the parties hereto and thereto, as applicable, constitute a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to the Enforceability Limitations.

Section 4.3    Consents and Approvals.  Subject to the entry and effectiveness of the Sale Order, except as required to comply with the HSR Act, no consent, approval, permit or authorization of, or declaration, filing or registration with, any Governmental Entity is necessary or required to be made or obtained by the Purchaser in connection with the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, except in connection with or compliance with the HSR Act, except for such consents, approvals, permits, authorizations, declarations, filings or registrations that would not, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement.

Section 4.4    No Violations.  Except as described in Sections 3.4 and 4.3, neither the execution, delivery or performance of this Agreement and the Ancillary Documents by the Purchaser to the extent a party thereto nor the consummation by the Purchaser of the transactions contemplated hereby or thereby will (a) conflict with or result in any violation or breach of any provisions of the certificate of incorporation, bylaws or other organizational documents of the Purchaser, (b) with or without notice or lapse of time or both, conflict with or result in any breach or violation of or constitute a default or change of control under, or give rise to a right of, or result in, termination, modification, cancellation, first offer, first refusal or acceleration of any obligation or to the loss of a benefit under any Contract to which the Purchaser is a party or by or to which any of its respective properties, rights or assets are bound or subject or (c) conflict with or violate any Order or Law applicable to the Purchaser or its properties, rights or assets, except in the case of the preceding clauses (b) and (c), for breaches, violations, defaults, rights, creations or impositions that would not reasonably be expected to, individually or in the aggregate, materially impair or materially delay the Purchaser's ability to perform its obligations under this Agreement.

32

Section 4.5    Brokers.  The Purchaser has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby for which the Sellers are or will become liable, and the Purchaser shall indemnify and hold harmless the Sellers from any claims with respect to any such fees or commissions.

Section 4.6    Financing.  The Purchaser shall, at the Closing (after giving effect to the Credit Bid), have sufficient funds available to deliver the Purchase Price to the Sellers and consummate the transactions contemplated by this Agreement to the extent payable on the Closing Date, including the timely satisfaction of the Assumed Liabilities.

Section 4.7    Investment Purpose.  The Purchaser is acquiring the Purchased Ownership Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof.  The Purchaser acknowledges that the Purchased Ownership Interests are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Purchased Ownership Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable.  The Purchaser has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

Section 4.8    Acknowledgment by the Purchaser.  The Purchaser has conducted such investigations of the Sellers and its Subsidiaries as it deems necessary and appropriate in connection with the execution and delivery of this Agreement and the Ancillary Documents to which the Purchaser is a party and the consummation of the transactions contemplated hereby and thereby.  The Purchaser acknowledges that it and its Representatives have been permitted access to the books and records, facilities, equipment, Contracts, insurance policies (or summaries thereof) and other properties and assets of the Sellers, and that it and its Representatives have had an opportunity to meet with the officers and employees of the Sellers to discuss the Business.  Neither the Sellers nor any other Person (including any officer, director, member or partner of the Sellers or any of their Affiliates) shall have or be subject to any liability to the Purchaser, or any other Person, resulting from the Purchaser's use of any information, documents or material made available to the Purchaser in any "data rooms", management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby or by this Agreement and the Ancillary Documents, except as otherwise expressly set forth in this Agreement or to the extent that such information, documents or material are incorporated by reference into this Agreement or the Seller Disclosure Letter.

ARTICLE V

COVENANTS

Section 5.1    Conduct of Business Pending the Closing.

33

(a)    From the date hereof and the earlier of the Closing or the date, if any, on which this Agreement is validly terminated pursuant to Article VII, except as set forth in Section 5.1(a) of the Seller Disclosure Letter, and except (i) as expressly set forth in this Agreement or any Ancillary Document, (ii) as required by applicable Law (including the Bankruptcy Code), (iii) as consented to in writing by the Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed) or (iv) as required by, arising out of, relating to or resulting from the Chapter 11 Cases or otherwise required or approved by any Order of the Bankruptcy Court, the Sellers shall and shall cause their Subsidiaries (including, for the avoidance of doubt, the Purchased Entities to the extent the Sellers have such control) to:

(i)    carry on the Business in the ordinary course of business consistent with past practice (including respecting cash management and the collection of receivables and management of and the timing of the payment of payables) and use commercially reasonable efforts to maintain, preserve and protect the Acquired Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the ordinary course of business consistent with past practice and to manage any Assumed Liabilities in the ordinary course of business consistent with past practice;

(ii)    maintain their books, accounts and records in the ordinary course of business consistent with past practice;

(iii)    pay all post-petition Trade Payables and collect all Accounts Receivable after the Petition Date in the ordinary course of business consistent with past practice;

(iv)    use commercially reasonable efforts to (A) retain the services of its current executive officers (or their successors) who are in good standing and who are necessary to conduct the Business as it is currently being conducted in all material respects and (B) maintain their relationships with and preserve for the Business the goodwill of their key suppliers and customers in all material respects (it being understood that no increases to any payments or compensation, including any incentive, retention or similar compensation, shall be required in respect of either clause (A) or (B) hereof or other expenditures of funds (other than pursuant to the existing terms of any Contracts) or modification of Contract terms);

(v)    (A) comply in all material respects with all Laws applicable to them or having jurisdiction over the Business or any Acquired Asset, (B) comply in all material respects with contractual obligations applicable to or binding upon them pursuant to any Material Contracts (other than those obligations the compliance with which is excused during the Chapter 11 Cases), and (C) maintain in full force and effect all material Permits and comply with the terms of each such Permit (but only to the extent such Permits are necessary for the Business, the Acquired Assets and the Assumed Liabilities in the ordinary course of business consistent with past practice);

(vi)    cause any of their current property insurance policies with respect to the Business or any of the Acquired Assets or Assumed Liabilities not to be canceled

34

or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect, to the extent such coverage is reasonably available;

       (vii)    maintain each Assumed Benefit Plan in accordance with their terms and applicable Law;

       (viii)    file all material Tax Returns and pay or deposit all material Taxes on a timely basis in the ordinary course of business consistent with past practice;

       (ix)    maintain, preserve and protect in full force and effect the existence of all material Intellectual Property owned by Sellers and included in the Acquired Assets, except for abandonment of Intellectual Property that is de minimis to the Business in the Sellers' reasonable business judgment;

       (x)    pay no less than $6,106,897 of Cure Costs in accordance with the Sellers' budget; and

       (xi)    use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing, (ii) that would reasonably be expected to impair the ability of Sellers or Purchaser to consummate the Closing in accordance with the terms hereof or to materially delay such consummation or (iii) that would reasonably be expected to increase the amount of Assumed Liabilities.

       (b)    From the date hereof and the earlier of the Closing or the date, if any, on which this Agreement is validly terminated pursuant to Article VII, except as set forth in Section 5.1(b) of the Seller Disclosure Letter, and except (i) as expressly contemplated by this Agreement or any Ancillary Document, (ii) as required by applicable Law (including the Bankruptcy Code), (iii) as consented to in writing by the Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed) or (iv) as required by, arising out of, relating to or resulting from the Chapter 11 Cases or otherwise required or approved by any Order of the Bankruptcy Court, the Sellers shall not and shall not permit any of their Subsidiaries (including, for the avoidance of doubt, the Purchased Entities to the extent the Sellers have such control) to:

       (i)    amend their certificate of incorporation, bylaws or other organizational documents;

       (ii)    issue or sell any shares of capital stock or equity interests, or options, warrants, calls, subscriptions or other rights or agreements to acquire shares of capital stock or equity interests, or securities convertible into, exchangeable or exercisable for any of the foregoing;

       (iii)    vote any Purchased Ownership Interests in a manner that would reasonably be expected to be adverse to Purchaser;

35

(iv)    acquire, sell, lease, license, transfer, abandon, allow to lapse or otherwise dispose of any of (a) the Purchased Ownership Interests, (b) any material Acquired Assets, including, for the avoidance of doubt, any Real Property, or the material properties or material assets of any Seller or (c) any other Acquired Assets (other than in the ordinary course of business consistent with past practice, taking into account the Sellers' status as debtors in possession, including purchases of Inventory in the ordinary course of business consistent with past practice);

(v)    declare or pay any dividends or distributions or redeem or repurchase any Purchased Ownership Interests;

(vi)    create, permit or allow any Encumbrance (other than Permitted Pre-Closing Encumbrances which will be discharged with no liability to Purchaser or its Affiliates following the Closing) of any of the Acquired Assets, tangible or intangible or remove any material equipment or other material assets (other than Inventory) from the Real Property;

(vii)    (A) incur or assume any Indebtedness or capitalized lease obligations or issue any debt securities, except for borrowings under the DIP Credit Agreement or (B) make any loans, advances or capital contributions to, or investments in, any other Person other than loans and advances to employees for travel and business expenses pursuant to a Benefit Plan in the ordinary course of business consistent with past practice;

(viii)    make any payments of (a) fees to Professionals retained by the Committee in excess of $~~11,208,000~~12,415,000, (b) fees to Professionals retained by the Sellers in excess of $18,481,000~~,~~ (it being understood that this Section 5.1(b)(viii)(b) shall not include any Professionals retained by the Sellers other than: Evercore Group L.L.C.; FTI Consulting, Inc.; Groom Law Group, Chartered; Togut, Segal & Segal LLP and Skadden, Arps, Slate, Meagher & Flom LLP), (c) First Lien AP Professionals Fees and Expenses (each as defined in the DIP Orders) for professionals retained by Chatham and its Affiliates in excess of $7,599,000, and (d) First Lien AP Professionals Fees and Expenses (each as defined in the DIP Orders) for professionals retained by Brigade and its Affiliates in excess of $~~4,702,000~~5,080,092 during the period beginning on the Petition Date and ending on the Closing Date; provided that Sellers shall be permitted to pay an amount (determined in good faith in consultation with the Purchaser) not to exceed $~~1,900,000~~1,605,908 of additional Retained Professional Fees and First Lien AP Professionals Fees and Expenses (each as defined in the DIP Orders)~~;~~ for professionals retained by Chatham and its Affiliates and not professionals retained by Brigade and its Affiliates (it being understood that (1) solely for purposes of the proviso of this Section 5.1(b)(viii), the term "Retained Professional Fees" shall not include any Professionals retained by the Sellers other than: Evercore Group L.L.C.; FTI Consulting, Inc.; Groom Law Group, Chartered; Togut, Segal & Segal LLP and Skadden, Arps, Slate, Meagher & Flom LLP) and (2) the parties acknowledge that the numbers in this Section 5.1(b)(viii) were developed based upon the budget attached as Schedule 5.1(b)(viii));

(ix)    change in any material respect their accounting methods, principles or practices other than required by changes in GAAP;

36

(x)     acquire (by merger, consolidation or acquisition of stock or assets) any corporation, partnership or other business organization or division thereof or any equity interest therein (other than purchases of marketable securities in the ordinary course of business consistent with past practice);

(xi)     except for executory contracts and unexpired leases rejected by Sellers with the prior written consent of Purchaser, assume, reject or assign any Available Contract, other than Available Contracts that are deemed rejected by operation of Section 365(d)(4) of the Bankruptcy Code;

(xii)     except for (i) executory contracts and unexpired leases rejected by Sellers with the prior written consent of Purchaser and (ii) with respect to any Available Contract (or group of related Available Contracts) with aggregate payments of less than $100,000 in the 2019 calendar year and with expected aggregate payments in the 2020 calendar year of less than $100,000, terminate, modify or amend in any material respect, or waive any material rights or remedies under, any Available Contract, other than due to the expiration of the term or automatic renewals, in each case, in accordance with the terms of any such Available Contract;

(xiii)     sell, transfer, license, abandon or permit to lapse any material Seller Intellectual Property;

(xiv)     disclose any Trade Secrets to any Person, other than in the ordinary course of business consistent with past practice pursuant to a written confidentiality agreement;

(xv)     commence, settle, compromise or waive any Action with respect to the Business, the Acquired Assets or the Assumed Liabilities other than any Action respecting an amount in controversy that does not exceed $25,000;

(xvi)     fail to maintain existing insurance policies included in the Acquired Assets or to renew or replace existing insurance policies included in the Acquired Assets following their termination;

(xvii)     amend or modify or allow any material Permit to terminate, expire or lapse;

(xviii)     terminate, enter into or amend any Assumed Benefit Plan or any collective bargaining agreement;

(xix)     (i) other than in an immaterial manner, increase the compensation or benefits (including severance) payable to employees of the Sellers; or (ii) grant or pay any bonus, severance, retention or termination pay, other than pursuant to applicable Assumed Benefit Plans in effect as of the date hereof;

(xx)     hire any employees at or above the level of Vice President (other than employees hired to fill vacancies open on the date of this Agreement and for the

37

maximum base compensation amount as set forth on Section 5.1(b)(xx) of the Seller Disclosure Letter));

(xxi)    make, change or revoke any material election relating to Taxes, change any annual accounting period for applicable Tax purposes, adopt or change any Tax accounting method, file any material amended Tax Return (other than an amended Tax Return to obtain any federal, state or local Income Tax refund), enter into any closing agreement with respect to material Taxes, settle any claim or assessment with respect to material Taxes, surrender any right to claim a material refund, offset or other reduction in Tax liability, or request or consent to any extension or waiver of the limitation periods applicable to any claim or assessment with respect to material Taxes (other than an extension granted in the ordinary course of business in connection with an extension for the filing of Tax Returns), in each case that adversely affects the Business, the Acquired Assets or the Assumed Liabilities;

(xxii)    enter into or renew any Material Contract (other than automatic renewals of Material Contracts in the ordinary course of business consistent with past practice in accordance with the terms thereof as in effect on the date hereof) or modify, amend or waive any right or obtain a modification, amendment or waiver of any obligation or fail to exercise any reserved right under any Material Contract;

(xxiii)    enter into any commitment for capital expenditures of the Business in excess of $1,000,000 for all such commitments in the aggregate;

(xxiv)    enter into any Contract which would materially restrict the Purchaser from competing in the industry in which the Business operates or in any geographic area;

(xxv)    terminate (other than for cause) any employee with a base compensation equal to or greater than $55,000; or

(xxvi)    agree or authorize, in writing or otherwise, to take any of the foregoing actions.

Without in any way limiting any party's rights or obligations under this Agreement, the parties understand and agree that (i) nothing contained in this Agreement shall give the Purchaser, directly or indirectly, the right to control or direct the operations of the Sellers, or the Business prior to the Closing and (ii) prior to the Closing, the Sellers shall exercise, consistent with, and subject to, the terms and conditions of this Agreement, complete control and supervision over the Business and their operations.

Section 5.2    Access and Information.

(a)    Subject to the Bidding Procedures and applicable Law, from the date hereof and the earlier of the Closing or the date, if any, on which this Agreement is validly terminated pursuant to Article VII, the Sellers shall (i) afford to the Purchaser and its Representatives reasonable access during normal business hours and upon reasonable advance notice to all of the Sellers' properties, offices, personnel, Permits, Contracts and Books and

38

Records, (ii) furnish as promptly as practicable to the Purchaser all information (financial or otherwise) the Purchaser may reasonably request, (iii) permit Purchaser to make such reasonable inspections of Sellers' and their Subsidiaries' books and records and, at Purchaser's sole cost and expense, copies thereof as Purchaser may require, and (iv) instruct the executive officers and senior business managers, counsel, Representatives, auditors and advisors of Sellers to reasonably cooperate with Purchaser and its Representatives regarding the same in each case, related to the Business, the Acquired Assets or the Assumed Liabilities, for any purpose related to the consummation of the transactions contemplated by this Agreement.  Notwithstanding the foregoing, the Sellers shall not be required by this Section 5.2(a) to provide the Purchaser or its Representatives with access to or to disclose information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Parent (i) is prohibited from being disclosed pursuant to the terms of a confidentiality agreement with a third party entered into prior to the date hereof, (ii) the disclosure of which would violate applicable Law or (iii) the disclosure of which would cause the loss of any attorney-client, attorney work product or other legal privilege; provided, that, in the case of clauses (i) (ii) and (iii) in this sentence above, the parties shall reasonably cooperate in seeking to allow disclosure of such information to the extent doing so would not (in the good faith belief of Parent (after consultation with counsel, which may be in-house counsel)) violate any such applicable Law or confidentiality agreement or cause the loss of such privilege with respect to such information. For the avoidance of doubt, information obtained pursuant to this Section 5.2(a) shall be subject to the Confidentiality Agreement.

(b)     From and after the Closing until the latest to occur of (i) three (3) years following the Closing Date (or, if later, the closing of the Chapter 11 Cases), (ii) sixty (60) days following the expiration of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) with respect to relevant Taxes and Tax Returns, or (iii) the completion of all relevant Tax audits and other Tax proceedings, including any appeals and period for filing any appeals, the Purchaser will provide the Sellers and their Representatives with reasonable access, during normal business hours in a manner so as not to interfere unreasonably with the normal business operations of Purchaser, at Sellers' sole expense and upon reasonable advance notice, to the Books and Records relating to the Acquired Assets or the Assumed Liabilities with respect to periods or occurrences prior to the Closing for legitimate business purposes relating to the Chapter 11 Cases, the wind-down of the operations of Sellers and their estates, prosecuting or defending legal Actions (other than Actions against Purchaser and its Affiliates which shall be governed by applicable rules of discovery) to which any Seller is a party, insurance claims, Tax payments, Tax Returns or audits (or other Tax proceedings), the functions of any trusts established under a Chapter 11 plan of Sellers or any other successors of Sellers.  Unless otherwise consented to in writing by the other party, no party will, for the latest to occur of (x) three (3) years following the Closing Date and (y) sixty (60) days following the expiration of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) with respect to relevant Taxes and Tax Returns, destroy, alter or otherwise dispose of any of the material Books and Records or Retained Books and Records, as applicable, (other than additional copies thereof) without first offering to surrender to the other party such Books and Records or Retained Books and Records, as applicable, or any portion thereof that the other party may intend to destroy, alter or dispose of.  For purposes of this Section 5.2(b), references to "Sellers" shall be construed, where applicable, to include any liquidating trust, plan

39

administrator, or comparable person or body bearing responsibility for the administration and wind-down of the Sellers' operations, estates and Chapter 11 Cases.

Section 5.3  Approvals and Consents; Cooperation; Notification.

(a) Subject to the terms and conditions of this Agreement, each party hereto shall use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated hereby as soon as practicable after the date hereof and cause the conditions set forth in Article VI to be satisfied, including (i) preparing and filing or otherwise providing, in consultation with the other parties and as promptly as practicable and advisable after the date hereof, all documentation to effect all necessary applications, notices, petitions, filings, and other documents and to obtain as promptly as practicable all waiting period expirations or terminations, consents (including any consents to transfer or waivers with respect to the Purchased Ownership Interests), clearances, waivers, licenses, orders, registrations, approvals, permits, and authorizations necessary or advisable to be obtained from any third party and/or any Governmental Entity in order to consummate the transactions contemplated hereby (each such consent, a "Necessary Consent"), and (ii) taking all steps as may be reasonably necessary to obtain all Necessary Consents.  In furtherance and not in limitation of the foregoing, each party agrees to (x) make an appropriate filing of a Notification and Report Form pursuant to the HSR Act with respect to the Acquisition as promptly as practicable, and in any event within two (2) Business Days after the entry of the Sale Order by the Bankruptcy Court (or such other date as may be mutually agreed by the parties), and to supply as promptly as practicable and advisable any additional information and documentary materials that may be requested pursuant to the HSR Act and to take all other actions necessary to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable and (y) make all other necessary filings as promptly as practicable after the date hereof, and to supply as promptly as practicable and advisable any additional information and documentary materials that may be requested under any Antitrust Laws.  The Purchaser shall have responsibility for the filing fees associated with the HSR filings and each party shall be responsible for any other payment of its own respective costs and expenses incurred by such party (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.  In furtherance of the foregoing, the Purchaser shall, and the Sellers shall, upon the prior written consent of the Purchaser and subject to any approval of the Bankruptcy Court that may be required, take any and all steps and make any and all undertakings necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Governmental Entity with respect to the transactions contemplated by this Agreement so as to enable the Closing to occur as soon as reasonably possible, including, without limitation, to: (A) sell, license, assign, transfer, divest, hold separate or otherwise dispose of any assets, business or portion of business of any Seller, the Purchaser or any Subsidiary of any of the foregoing, (B) conduct, restrict, operate, invest or otherwise change the assets, the business or portion of the business of any Seller, the Purchaser or any Subsidiary of any of the foregoing in any manner, (C) impose any restriction, requirement or limitation on the operation of the business or portion of the business of any Seller, the Purchaser or any Subsidiary of any of the foregoing or (D) contest, administratively or in court, any ruling, order, or other action of any

40

Governmental Entity or any other Person with respect to the proposed transaction; provided, that Sellers shall not take any such action without the prior written consent of Purchaser.

(b)    Each of the parties hereto shall, in connection with and without limiting the efforts referenced in Section 5.3(a) to obtain all waiting period expirations or terminations, consents, clearances, waivers, licenses, orders, registrations, approvals, permits, and authorizations for the Acquisition under the HSR Act or any other Antitrust Law, (i) cooperate in all respects and consult with the other parties in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party, including by allowing the other parties to have a reasonable opportunity to review in advance and comment on drafts of filings and submissions and reasonably considering in good faith comments of the other parties and providing the other parties with copies of filings and submissions, (ii) promptly inform the other parties of any communication received by such party from, or given by such party to, the Antitrust Division of the Department of Justice (the "DOJ"), the Federal Trade Commission (the "FTC") or any other Governmental Entity, by promptly providing copies to the other parties of any such written communications, and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated hereby and (iii) permit the other parties to review in advance any communication that it gives to, and consult with each other in advance of any meeting, substantive telephone call or conference with, the DOJ, the FTC or any other Governmental Entity, or, in connection with any proceeding by a private party, with any other Person, and to the extent permitted by the DOJ, the FTC or other applicable Governmental Entity or other Person, give the other parties the opportunity to attend and participate in any in-person meetings, substantive telephone calls or conferences with the DOJ, the FTC or other Governmental Entity or other Person; provided, however, that materials required to be provided pursuant to the foregoing clauses (i)-(iii) may be redacted (A) to remove references concerning the valuation of any of the parties or any of their respective Subsidiaries, (B) as necessary to comply with contractual arrangements and (C) as necessary to address reasonable privilege or confidentiality concerns; provided, further, that any of the parties may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.3(b) as "Outside Counsel Only Material" and materials so designated shall only be provided to each party's outside counsel.

(c)    In connection with and without limiting the foregoing, the Sellers shall, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with the Purchaser in endeavoring to obtain third-party consents to any Assigned Contracts that cannot be transferred or assigned effectively without the consent of such third parties (after giving effect to the Sale Order and the Bankruptcy Code). Nothing in this Section 5.3(c) shall require any Seller or any Affiliate thereof to make any expenditure or incur any obligation on its own or on behalf of the Purchaser unless funds in the full amount thereof are advanced to the Sellers in cash.

(d)    Each of the Sellers and the Purchaser shall give prompt notice to the other of the occurrence or failure to occur of an event that would, or with or without notice or lapse of time or both would, cause any condition to the consummation of the transactions contemplated hereby for the benefit of the other party hereto not to be satisfied.

41

(e)      Notwithstanding the foregoing, the obligations of the parties hereto to obtain any consent, approval or waiver from the Bankruptcy Court shall be governed exclusively by Section 5.6, Section 5.7, Section 5.8 and Section 5.9.

Section 5.4      Further Assurances.  In addition to the provisions of this Agreement, from and after the date hereof, the Sellers and the Purchaser shall use reasonable best efforts to (i) execute and deliver such other instruments of conveyance, transfer or assumption, as the case may be, (ii) retitle the Acquired Assets in the name of the Purchaser or the Purchaser Designees and (iii) take such other action as may be reasonably requested to implement more effectively the conveyance and transfer of the Acquired Assets to the Purchaser and the assumption of the Assumed Liabilities by the Purchaser; *provided*, that, nothing in this Section 5.4 shall (a) require the Sellers or any of their Affiliates to make any expenditure or incur any obligation on their own or on behalf of the Purchaser (unless funds in the full amount thereof are advanced to the Sellers in cash) or (b) prohibit the Sellers or any of their Affiliates from ceasing operations or winding up its affairs following the Closing.  If, following the Closing, any Seller receives or becomes aware that it holds any asset, property or right which constitutes an Acquired Asset, then Sellers shall transfer such asset, property or right to the Purchaser and/or, as applicable, one or more designees of the Purchaser as promptly as practicable for no additional consideration.  If, following the Closing, the Purchaser receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then the Purchaser shall transfer such asset, property or right to the Sellers as promptly as practicable for no additional consideration.

Section 5.5      Debtors-in-Possession.  From the commencement of the Chapter 11 Cases through the Closing, the Sellers shall continue to operate their business as debtors-in-possession pursuant to the Bankruptcy Code.

Section 5.6      The Sale Motion.  On or prior to the third business day after the signing date, the Sellers shall file a sale motion with the Bankruptcy Court (the "Sale Motion"), in form and substance reasonably acceptable to the Purchaser and the Sellers (and shall thereafter use their commercially reasonable efforts to cause the Bankruptcy Court to enter an Order or Orders granting the relief sought therein, including the Sale Order in substantially the form of Exhibit D and otherwise in form and substance reasonably acceptable to the Purchaser and the Sellers).

Section 5.7      Sale Order.  The Sale Order shall be substantially in the form attached hereto as Exhibit D or otherwise in form and substance reasonably acceptable to the Purchaser and the Sellers and shall include the following findings of fact, conclusions of Law and ordering provisions; *provided*, that any modifications to the form of the Sale Order attached hereto as Exhibit D shall require the prior written consent of the Purchaser and the Sellers:

(a)      find that the Notice of Sale, and the parties who were served with copies of such Notice of Sale, were in compliance with Sections 102 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9014 and any other applicable provision of the Bankruptcy Code, the Bankruptcy Rules, or any local bankruptcy rule governing the sale of assets free and clear of Encumbrances and other interests;

42

(b)     find that all requirements imposed by Section 363(f) of the Bankruptcy Code for the sale of the Acquired Assets free and clear of Encumbrances and other applicable interests, other than Permitted Post-Closing Encumbrances, have been satisfied;

(c)     find that the Purchaser is a purchaser of the Acquired Assets in "good faith" pursuant to Section 363(m) of the Bankruptcy Code, and the sale is entitled to the protections of Section 363(m) of the Bankruptcy Code;

(d)     find that the Purchaser and the Sellers did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code;

(e)     find that the consideration provided by the Purchaser pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets;

(f)     approve this Agreement, including the Credit Bid pursuant to Section 363(k) of the Bankruptcy Code and the consummation of the sale upon the terms and subject to the conditions of this Agreement;

(g)     approve the Framework Agreement and the consummation of the transaction contemplated thereby;

(h)     order that, as of the Closing Date, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Acquired Assets to the Purchaser and shall vest the Purchaser with title to such assets free and clear of all Encumbrances (except for Assumed Liabilities and Permitted Post-Closing Encumbrances);

(i)     (A) authorize the Sellers to assume and assign to the Purchaser each of the Assigned Contracts, and (B) find that, subject to the terms of the Sale Order and provision of adequate assurance of future performance by the Purchaser, as of the Closing Date, the Assigned Contracts will have been duly assigned to the Purchaser in accordance with Section 365 of the Bankruptcy Code;

(j)     find that neither the Purchaser nor any of its Affiliates is acquiring any of the Excluded Assets or assuming any of the Excluded Liabilities;

(k)     order that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in any such contract or any requirement of applicable Law (including those described in Sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, conditions, restricts or limits in any way such assignment or transfer;

(l)     find that the Purchaser has satisfied all requirements under Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance of the Assigned Contracts;

43

(m)    approve the Release in a manner acceptable to the Releasing Parties;

(n)    approve any other agreement to the extent provided by this Agreement;

(o)    except as expressly set forth in the Sale Order, enjoin and forever bar the non-debtor party or parties to each Assigned Contract from asserting against the Purchaser or any Affiliate or designee of the Purchaser:  (i) any default, action, liability or other cause of action existing as of the date of the Closing, whether asserted or not, and (ii) any objection to the assumption and assignment of such non-debtor party's Assigned Contract (except to the extent any such objection was sustained by the Order of the Bankruptcy Court);

(p)    find that, to the extent permitted by applicable Law, none of the Purchaser nor any Affiliate of the Purchaser nor any designee of the Purchaser is a successor to the Sellers or the bankruptcy estate by reason of any theory of Law or equity, and none of the Purchaser nor any Affiliate of the Purchaser nor any designee of the Purchaser shall assume or in any way be responsible for any liability of the Sellers or the bankruptcy estate, except for the Assumed Liabilities;

(q)    provide that the Sellers are authorized to consummate the transactions contemplated by this Agreement and the Ancillary Documents and to comply in all respects with the terms of this Agreement and the Ancillary Documents;

(r)    be made expressly binding (based upon language reasonably satisfactory to the Purchaser) upon any trustee or other estate representative in the event of conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code, or upon appointment of a Chapter 11 trustee in the Chapter 11 Cases;

(s)    enjoin assertion of any Excluded Liabilities against the Purchaser or any of its Affiliates or any assignees, designees, transferees or successors thereof or against any of the Acquired Assets;

(t)    order that each Seller transfer and assign the Acquired Assets of such Seller to the Purchaser or a Purchaser Designee in full or partial satisfaction, as applicable, of the First Lien Notes Claims or guarantees thereof made by the applicable Seller, and in addition, that the Cash Payment be paid to the Parent, as agent for each Seller;

(u)    order that, subject to Section 1.6, each Seller use any payments or reimbursements received by such Seller pursuant to this Agreement and any Excluded Assets of such Seller to satisfy any Excluded Liabilities of such Seller, and that the Cash Remainder only be used to pay expenses of a Seller other than the Parent to the extent the Excluded Liabilities of such Seller exceed the sum of (i) the amount of such payments received by such Seller pursuant to this Agreement, (ii) the amount of such reimbursements received by such Seller pursuant to this Agreement, and (iii) the Excluded Assets of such Seller; and

44

(v)     order that, notwithstanding the provisions of Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry.

Section 5.8     <u>Cooperation with Respect to Bankruptcy Court Approvals</u>.  Each party shall take such actions as are reasonably requested by the other parties to assist in obtaining entry by the Bankruptcy Court of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes of, among other things: (a) demonstrating that the Purchaser is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and (b) establishing "adequate assurance of future performance" within the meaning of Section 365 of the Bankruptcy Code.

Section 5.9     <u>Bankruptcy Court Filings</u>.  The Sellers shall consult with the Purchaser concerning the Sale Order, which shall be in form and substance acceptable to the Purchaser and Sellers, in each case in their respective sole discretion, and any other Orders of the Bankruptcy Court relating to the transactions contemplated herein, and the bankruptcy proceedings in connection therewith, and provide the Purchaser with copies of any material applications, pleadings, notices, proposed Orders and other documents to be filed by the Sellers in the Chapter 11 Cases that relate in any way to this Agreement, the Acquisition or the Purchaser at least two (2) Business Days prior to the making of any such filing or submission to the Bankruptcy Court.

Section 5.10    <u>Communications with Customers and Suppliers</u>.  Prior to the Closing, the Purchaser shall not, and shall cause its Affiliates and instruct its Representatives not to, contact, or engage in any discussions or otherwise communicate with, the Sellers' customers, suppliers, licensors, licensees and other Persons with which the Sellers have commercial dealings without obtaining the prior written consent of the Sellers (other than any such communication in the ordinary course of business of the Purchaser or its Affiliates without reference to or any purpose relating to the Business, the Acquired Assets, the Assumed Liabilities or the transactions contemplated by this Agreement), which consent shall not be unreasonably withheld, conditioned or delayed.

Section 5.11    <u>Employee Matters</u>.

(a)     As of the Closing, the Purchaser shall assume the Assumed Benefit Plans and thereafter shall perform or cause to be performed all obligations of the Sellers with respect to each Assumed Benefit Plan in accordance with the terms thereof.

(b)     Each of the Sellers' employees identified on <u>Section 5.11</u> of the Seller Disclosure Letter, as such list may be updated by mutual agreement between the parties hereto, shall receive an offer of employment from the Purchaser at least fifteen (15) days prior to the anticipated Closing Date, or within five (5) Business Days of the applicable date of hire with respect to any such individual hired by the Sellers within the fifteen (15)-day period prior to the Closing Date. Subject to the provisions of this <u>Section 5.11(b)</u>, each offer of employment shall provide for the same position such individual held, a primary work location or territory no more than fifty (50) miles from the location or territory in which the individual primarily worked and

45

substantially the same terms and conditions in the aggregate as provided to such individual by the Sellers as of immediately prior to the Closing and provide that employment with the Purchaser or one of its Affiliates shall commence effective as of the Closing.  Each individual who accepts the offer of employment pursuant to this Section 5.11(b) shall be deemed a "Transferred Employee" as of the Closing.  For a period of one (1) year following the Closing Date, the Purchaser shall or shall cause one of its Affiliates to provide each Transferred Employee with (i) base salary or wage rates and incentive compensation opportunity (not including equity compensation) that are, in the aggregate, not less than those in effect for each such Transferred Employee immediately prior to the Closing, and (ii) employee benefits, that, in the aggregate, are substantially comparable to those in effect for each such Transferred Employee immediately prior to the Closing.  The Sellers shall cease to employ the Transferred Employees immediately prior to the Closing.  Notwithstanding anything to the contrary in the foregoing, to the extent that any of the employees identified on Section 5.11 of the Seller Disclosure Letter are represented by a union, the obligation to provide such an offer of employment shall be subject to an agreement with the applicable union representing the applicable Sellers' employees that no severance obligation will be triggered under the applicable collective bargaining agreement or any existing company policy or status quo obligation with respect to such employees as a result of the transactions contemplated by this Agreement.

(c)    The Purchaser shall, or shall cause one of its Affiliates to, use commercially reasonable efforts to provide to each Transferred Employee full credit for such Transferred Employee's service with the Sellers prior to the Closing for all purposes, including for purposes of eligibility, vesting, benefit accruals and determination of the level of benefits (including vacation and severance (other than defined benefit pension accruals)), under any benefit plan in which such Transferred Employee participates on or following the Closing; *provided*, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits or coverage.  The Purchaser shall, or shall cause one of its Affiliates to use commercially reasonable efforts to: (i) waive any limitation on health and welfare coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements, and requirements to show evidence of good health under any applicable health and welfare plan of the Purchaser or any of its Affiliates to the extent such Transferred Employees were covered under a similar Benefit Plan and (ii) credit each such Transferred Employee with all eligible payments, co-payments and co-insurance paid by such employee under any Benefit Plan prior to the Closing Date during the year in which the Closing occurs for the purpose of determining the extent to which any such employee has satisfied any applicable deductible and whether such employee has reached the out-of-pocket maximum under any benefit plan of the Purchaser or any Affiliate for such year.

(d)    Promptly after the Closing Date, the Purchaser's board of directors shall establish a management equity incentive plan on the terms set forth in Exhibit E, under which 10% of the Purchaser Common Equity as of the Closing Date on a fully-diluted basis will be reserved for grants made from time to time to the directors, officers, and other management and employees of the Purchaser.

(e)    On or before the Closing Date, the Sellers shall provide a list of the name and site of employment of any and all employees of the Sellers who have experienced, or

46

will experience, an employment loss or layoff (as defined by the WARN Act) within ninety (90) days prior to the Closing Date. The Sellers shall update this list up to and including the Closing Date. For a period of ninety (90) days after the Closing Date, the Purchaser shall not engage in any conduct which would result in an employment loss or layoff for a sufficient number of employees of the Purchaser which, if aggregated with any such conduct on the part of the Sellers prior to the Closing Date, would trigger the WARN Act.

(f)      Nothing in this <u>Section 5.11</u> shall constitute or be construed (i) as an amendment, termination or other modification of any employee benefit or compensation plan or arrangement, or a restriction or other limitation on the right of any party hereto to amend, terminate or otherwise modify any such plans or arrangements, (ii) as a guarantee of employment for any period, or a restriction or other limitation on the right of any party hereto to terminate the employment of any individual at any time, or (iii) to create any third party rights in any Person other than the direct parties to this Agreement, including any current or former service provider of the Sellers (or any beneficiaries or dependents thereof).

(g)      The Purchaser shall employ Transferred Employees who are foreign nationals working in the United States in non-immigrant visa status (the "<u>Foreign National Employees</u>"), under terms and conditions such that Purchaser qualifies as a "successor-in-interest" under applicable United States immigration laws effective as of the Closing Date. The Purchaser agrees to assume all immigration-related liabilities and responsibilities under applicable United States immigration laws with respect to such Foreign National Employees.

Section 5.12   <u>Payments Received</u>. The Sellers and the Purchaser each agree that after the Closing they will hold and will promptly transfer and deliver to the other, from time to time as and when received by them or their respective Affiliates, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other party hereto or its Affiliates and will account to the other for all such receipts.

Section 5.13   <u>Use of Names and Marks</u>. Promptly following the Closing, the Sellers shall, and shall cause its direct and indirect Subsidiaries to, as promptly as reasonably possible, change their current corporate names (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes any of the words set forth on <u>Section 5.13</u> of the Seller Disclosure Letter without the prior written consent of Purchaser, and each Seller shall cause the names of Sellers in the caption of the Chapter 11 Cases to be changed to the new names of each Seller as provided in the last sentence of this <u>Section 5.13</u>; *provided*, *however*, that the Sellers shall be entitled to use and refer to names and marks included in the Acquired Assets in filings with Governmental Entities, for factual or historical reference, references to such names and marks in historical, Tax, and similar records and for any other purposes that do not constitute trademark infringement and are required or not otherwise prohibited by applicable Law, <u>provided</u> that when utilizing such materials, other than in incidental respects, each Seller and each of its direct and indirect Subsidiaries shall use commercially reasonable efforts to indicate its new name and reference its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct Subsidiaries) as

47

"formally known as" or similar designation.  From and after the Closing, except as otherwise set forth in this Agreement (including this <u>Section 5.13</u>), each Seller covenants and agrees not to use or otherwise employ any Trademark that is likely to cause confusion with any Trademarks included in the Seller Intellectual Property.  Within thirty (30) days following the Closing, Sellers shall file all necessary organizational amendments with the applicable Secretary of State or equivalent Governmental Entity of each Seller's jurisdiction of formation and in each jurisdiction in which each such Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

Section 5.14    <u>Parent Confidentiality Agreements</u>.  Effective at the Closing, the Parent hereby assigns to the Purchaser the rights under the Parent Confidentiality Agreements to enforce the terms thereof against the applicable counterparty; provided, that the Parent retains the right to enforce any provisions thereunder solely to the extent such provisions relate to the Excluded Assets or Excluded Liabilities.

Section 5.15    <u>Payroll Liabilities</u>.  One (1) Business Day prior to the Closing Date, the Sellers shall deliver to the Purchaser a notice containing the final amount of all payroll liabilities with respect to Transferred Employees that have accrued since the Petition Date in the ordinary course of business consistent with past practice that remain unpaid as of immediately prior to the Closing Date.

Section 5.16    <u>Employment Agreements</u>.  The parties shall take all actions necessary such that, effective at the Closing, employment agreements shall be entered into between the Purchaser, on the one hand, and each of the individuals listed on <u>Section 5.16</u> of the Seller Disclosure Letter, on the other hand, on the terms attached hereto as <u>Exhibit F</u> (the "<u>Employment Agreements</u>").

Section 5.17    <u>Financial Obligations</u>.

(a)    At or prior to the Closing, the Purchaser shall use commercially reasonable efforts to, at its sole expense, (i) arrange for substitute letters of credit and guarantees to replace the outstanding letters of credit and guarantees entered into by or on behalf of any Seller or any Seller's Affiliate in connection with or relating to the Business that are set forth on <u>Section 5.17(a)</u> of the Seller Disclosure Letter (except to the extent relating to Excluded Assets or Excluded Liabilities) (such arrangements, the "<u>Guarantees</u>") or (ii) assume all obligations under each Guarantee, and in the case of each of clause (i) and (ii), obtain from the creditor or other counterparty a full and irrevocable release of each Seller and each Seller's Affiliate that is liable, directly or indirectly, for reimbursement to the creditor or fulfillment of any liabilities or obligations (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) to a counterparty in connection with the Guarantees. In the event the counterparty to a Guarantee does not accept such replacement, the Sellers shall cause such Guarantee to remain in place following the Closing; *provided*, *however*, the foregoing shall not prohibit the Sellers or any of their Affiliates from ceasing operations or winding up their respective affairs following the Closing.  Purchaser further agrees that to the extent any Seller or any Seller's Affiliate incurs any cost or expense, or is required to make any payment, in

48

connection with such Guarantees that are not so replaced on or after the Closing, Purchaser shall indemnify, defend and hold harmless such Seller and such Seller's Affiliate against, and reimburse such Seller and such Seller's Affiliate for, any and all amounts paid, including reasonable, documented out-of-pocket costs or expenses incurred by the Sellers in connection with the applicable counterparty's enforcement of such Guarantees, and shall in any event promptly and in no event later than five (5) Business Days after written demand therefor from the Parent, reimburse the applicable Seller or Seller's Affiliate if any Guarantee is called upon and to the extent such Seller or such Seller's Affiliate makes any payment in respect of any such Guarantee.

Section 5.18    DIP Facility.  Prior to the Closing, the Sellers shall have borrowed no less than $8,535,000 under the DIP Credit Agreement such that as of immediately prior to Closing, the outstanding indebtedness under the DIP Credit Agreement is no less than $8,535,000.  At the Closing, the Purchaser shall, at the Purchaser's option, either:  (i) (w) repay or cause to be repaid all indebtedness, liabilities and other obligations outstanding under the DIP Credit Agreement (other than contingent obligations for which a claim has not been made) pursuant to Section 1.6, (x) terminate or cause to be terminated all commitments of the lenders to lend under the DIP Credit Agreement, (y) replace, cash collateralize or otherwise backstop (in each case in a manner reasonably acceptable to the applicable letter of credit issuer) any outstanding letters of credit issued under the DIP Credit Agreement and (z) terminate or release, or cause to be terminated and released, any and all guarantees of, and liens securing, the indebtedness, liabilities and obligations under the DIP Credit Agreement, including obtaining customary payoff letters and causing the filing of any UCC-3 termination statements, mortgage releases, intellectual property security agreement releases, control agreement terminations or similar documents evidencing termination or release of such indebtedness and liens (and in connection with the foregoing, each Seller shall use its reasonable best efforts to cooperate with the Purchaser to cause to be terminated and released any and all guarantees of, and liens securing, such indebtedness, liabilities and obligations outstanding under the DIP Credit Agreement and the applicable Sellers shall promptly, and in any case, prior to the Closing Date, execute any payoff letter or other agreements or instruments evidencing such termination at the reasonable request of Purchaser (*provided* that, the effectiveness of such agreements or instruments may be contingent on the Closing)) (items (w)-(z) collectively, the "Payoff"); or (ii) (x) assume all of the Parent's right, title, interest, liabilities, duties and obligations in, to and under the DIP Credit Agreement and the other "Loan Documents" (as defined in the DIP Credit Agreement) and covenant to perform all of the Parent's agreements, obligations and covenants as "Borrower" thereunder (collectively, the "Assumption") and (y) cause the DIP Credit Agreement (and each applicable Loan Document) to be modified, amended or amended and restated in form and substance reasonably satisfactory to the Parent in order to (1) permit the consummation of the Acquisition pursuant to this Agreement and each of the transactions contemplated by this Agreement, and (2) consummate the Assumption.

Section 5.19    New First and 1.5 Lien Debt.  Effective as of the Closing, consistent in all respects with the terms of the Framework Agreement: (A) the Purchaser shall issue the New 1.5 Lien Notes to Chatham (or Affiliates thereof), in their capacity as holders for First Lien Notes Claims, in an amount equal to the principal amount First Lien Notes Claims held by Chatham (or Affiliates thereof), plus the applicable original issue discount amount; (B)

49

the Purchaser shall have entered into the New First Lien Term Loan Facility and shall be deemed to have borrowed the New First Lien Term Loans from all holders of First Lien Notes Claims (excluding Chatham (and its Affiliates) in an amount equal to the principal amount of First Lien Notes Claims held by such holders of the First Lien Notes Claims; and (C) the Sellers (or the Purchaser as directed by the Sellers) shall pay in cash in an amount equal to the First Lien Notes Interest to the First Lien Notes Trustee for distribution to the holders of First Lien Notes Claims. The Purchaser will use reasonable best efforts to, and the Sellers will use reasonable best efforts to cooperate with the Purchaser to, enter into each of the New 1.5L Indenture and the New First Lien Term Loan Facility in accordance with the Framework Agreement and satisfy all conditions precedent to the effectiveness of such documents.

Section 5.20    <u>Releases</u>.

(a)    Effective as of the Closing Date, and subject to entry of the Sale Order, each of Chatham (solely in its capacity as holder of First Lien Notes), the Purchaser and the Sellers (each of the foregoing on their own behalf and on behalf of each of their Affiliates, officers, directors, Subsidiaries, employees, representatives, partners, managers and other agents, a "<u>Releasing Party</u>") hereby agrees to irrevocably and unconditionally release and forever discharge to the fullest extent permitted by Law each other Releasing Party and each Releasing Party's Affiliates, funds, current and former officers, managers, directors, equity holders, predecessors, successors, assigns, Subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (each, a "<u>Released Party</u>") of and from all Actions, causes of action, suits, proceedings, executions, judgments, duties, debts, dues, accounts, bonds, contracts and covenants (whether express or implied), and claims and demands whatsoever, whether known or unknown, whether in law or equity which such Releasing Party may have against each Released Party, now or in the future, in each case in respect of any cause, matter or thing based on or relating to, or in any manner arising from, in whole or in part, the Sellers (including the management, ownership, or operation thereof), the Sellers' restructuring efforts, the formulation, preparation, dissemination, negotiation of this Agreement and the Ancillary Documents, the First Lien Notes Documents, the Chapter 11 Cases, the implementation of the transactions contemplated by this Agreement and the Ancillary Documents, the Credit Bid, any Prior Event, and any other act or omissions, transaction, agreement, event or other occurrence taking place on or before the Closing related to the foregoing (collectively, the "<u>Released Claims</u>"); <u>provided</u>, that the term "Released Party" shall not include any director of the Sellers nor any officer, manager or employee of the Sellers that is not a Transferred Employee. Each Released Party shall be an intended third-party beneficiary of this Agreement with respect to this <u>Section 5.20</u>. The provisions substantially in the form of this <u>Section 5.20</u> shall be reflected in the Sale Order in a manner acceptable to each Releasing Party and to the extent there exists any discrepancy between the release provided in the Sale Order and this <u>Section 5.20</u>, the Sale Order shall control.

(b)    To the extent that, notwithstanding the New York choice of law provisions in this Agreement, California law is deemed to apply to the release and

50

indemnification provisions set forth herein, the Releasing Parties each warrant, represent and agree that they are fully aware of California Civil Code Section 1542, which provides as follows:

**SECTION 1542. GENERAL RELEASE**.  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Releasing Parties each hereby knowingly and voluntarily waive and relinquish the provisions, rights and benefits of Section 1542 and all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction that may be applicable herein, and any rights they may have to invoke the provisions of any such law now or in the future with respect to the Released Claims, and such Releasing Parties hereby agree and acknowledge that this is an essential term of the releases set forth herein.  In connection with such releases, the Releasing Parties acknowledge that they are aware that they or their attorneys or others may hereafter discover claims or facts presently unknown or unsuspected in addition to or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims.  Nevertheless, it is the intention of the Releasing Parties in executing this Agreement to fully, finally, and forever settle and release all matters and all claims relating thereto, which exist, hereafter may exist or might have existed (whether or not previously or currently asserted in any action) constituting Released Claims.

Section 5.21    No Successor Liability.  The parties intend that, except where expressly prohibited under applicable Law, upon the Closing, the Purchaser shall not be deemed to: (i) be the successor or successor employer to any of the Sellers, including with respect to any Environmental Liabilities ,(ii) have, *de facto*, or otherwise, merged with or into the Sellers, (iii) have any common law successor liability in relation to any multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA), including with respect to withdrawal liability or contribution obligations or with respect to any Environmental Liabilities, (iv) be a mere continuation or substantial continuation of the Sellers or the enterprise(s) of the Sellers, or (v) be liable for any acts or omissions of the Sellers in the conduct of the Business or operation or administration of the Benefit Plans or arising under or related to the Acquired Assets other than as set forth in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that the Purchaser shall not be liable for any Encumbrances (other than Assumed Liabilities and Permitted Post-Closing Encumbrances) against any Seller or any of its predecessors or Affiliates, and the Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the operation or administration of the Benefit Plans, the Acquired Assets or any Liabilities of any Seller arising prior to the Closing Date. The parties agree that the provisions substantially in the form of this Section 5.21 shall be reflected in the Sale Order.

Section 5.22    Notice of Developments.  Each of the Parent and the Purchaser shall promptly notify the other party in writing after becoming aware of, and furnish the other

51

party any information it may reasonably request with respect to, any event that would reasonably be expected to cause any of the conditions set forth in Article VI not to be fulfilled on or prior to the Outside Date or upon the Sellers becoming aware of any material breach of the representations and warranties set forth in Article III, with respect to notice by the Parent, and Article IV, with respect to notice by the Purchaser.

Section 5.23  Transition of Business.  From and after the date of this Agreement until the Closing Date or earlier termination of this Agreement, Sellers shall use commercially reasonable efforts to assist Purchaser in accomplishing a smooth transition of the Business from Sellers to Purchaser, including, holding discussions with respect to personnel policies and procedures, and other operational matters relating to the Business.

Section 5.24  Casualty Loss.  Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is condemned or taken by eminent domain, or is damaged or destroyed by fire, flood or other casualty, Sellers shall notify Purchaser promptly in writing of such fact, and (a) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any condemnation or taking proceeds thereof (of which are payable to Sellers) to Purchaser at the Closing, and (b) in the case of fire, flood or other casualty to the Acquired Assets, Sellers shall, at Purchaser's option, either use insurance proceeds to restore such damage, or to the extent such proceeds were not previously applied, assign the insurance proceeds therefrom to Purchaser at Closing, in each case, in full or partial satisfaction, as applicable, of the First Lien Notes Claims or guarantees thereof made by the applicable Seller and in exchange for its share of the Cash Payment.

Section 5.25  Confidentiality.  Following the Closing, each Seller agrees not to, to instruct its Representatives not to, and to cause its Subsidiaries not to, disclose any confidential or non-public information concerning the Acquired Assets, the Business, the negotiation or existence and terms of this Agreement or the business affairs of Purchaser or the Assumed Liabilities ("Confidential Information") except disclosure of Confidential Information that (a) was or is lawfully obtained from a source that, to the knowledge of such Seller, was not under an obligation of confidentiality to Purchaser with respect to such information or (b) is or becomes available to the public other than as the result of a breach of this Section 5.25 or any other duty or Contract of confidentiality by the Sellers, their Representatives or their Subsidiaries.  Notwithstanding the foregoing, a Seller may disclose Confidential Information if such Seller believes (upon the advice of counsel) it is legally required to make such disclosure in order to comply with applicable Law, regulation, rule or legal, judicial or administrative process (including any rule, regulation or policy statement of (i) any organized securities exchange, market or automated quotation system on which the Parent's securities are listed or quoted, (ii) any self-regulatory organization of which a party is a member) or (iii) in connection with the Chapter 11 Cases.  If a Seller or any of its Representatives becomes required (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) or it becomes necessary in connection with the Chapter 11 Cases to disclose any of the Confidential Information, such Seller or Representative shall use reasonable efforts to provide Purchaser with prompt notice, to the extent allowed by law, rule and regulation, of such requirement.  Each Seller agrees to disclose only that portion of the Confidential Information which it believes it is necessary or required to disclose and to use commercially reasonable

52

efforts to obtain confidential treatment (at the Purchaser's sole cost and expense) of such Confidential Information. At the Closing, the Confidentiality Agreement will terminate and shall be of no further force and effect. Notwithstanding anything to the contrary in the foregoing, nothing in this Section 5.25 shall prohibit the Sellers or any of their Affiliates from ceasing operations or winding up its affairs following the Closing

Section 5.26    Financing Cooperation.

(a)    The Sellers shall use their reasonable best efforts to, and to cause their respective Representatives to provide all cooperation and assistance reasonably requested by the Purchaser in connection with the Payoff to obtain a new asset-based revolving facility as part of the Payoff (the "ABL Financing"), which cooperation and assistance shall include:

(i)    providing reasonable cooperation and assistance, at reasonable times and upon reasonable notices, to permit the providers, or potential providers, of the amounts required for such ABL Financing (the "ABL Lenders") to evaluate the Sellers' current assets, cash management and accounting systems, policies and procedures relating thereto for the purposes of establishing collateral arrangements as of Closing and to assist with other collateral audits and due diligence examinations;

(ii)    providing reasonable cooperation and assistance to (A) prepare and execute any definitive loan and security documentation in connection with the ABL Financing, including any borrowing base certificate reasonably requested by the ABL Lender, and (B) furnish the Purchaser and the ABL Lenders with copies of any historic borrowing base certificates; and

(iii)    providing all documentation and other information as is required by applicable "know your customer", beneficial ownership regulations and anti-money laundering rules and regulations including the USA PATRIOT Act at least three (3) Business Days prior to the Closing Date to the extent reasonably requested by Purchaser or the ABL Lenders;

provided, that, (A) the Sellers shall not be required to commit to take any action in connection with the ABL Financing that is not contingent upon the Closing, (B) neither the Sellers nor any of their respective officers, directors or managing members shall be required to take any action or provide any approval in respect of the ABL Financing prior to the Closing (other than those actions contemplated to be taken prior to the Closing pursuant to Section 5.17 or this Section 5.26), (C) none of the Sellers nor any of their Representatives shall be required to deliver or cause the delivery of any (x) legal opinions or accountants' comfort letters or reliance letters,(y) landlord waivers or estoppels, non-disturbance agreements, surveys or title insurance or (z) Tax Returns and other books, records and work papers that are not primarily related to Acquired Assets or Assumed Liabilities or that are subject to any privilege or similar protection under applicable Law, (D) none of the Sellers nor any of their Representatives shall be required to pass resolutions or consents to approve or authorize the execution of the ABL Financing or execute or deliver any definitive agreements related to the ABL Financing, (E) such assistance

53

shall not require the giving of representations or warranties to any third parties or the indemnification thereof, (F) such assistance shall not require the waiver or amendment of any terms of this Agreement, and (G) such assistance shall not cause any director, officer or employee of the Sellers to incur any personal liability. Nothing contained in this Section 5.26 or otherwise shall require the Sellers, prior to the Closing, to be an issuer or other obligor with respect to the ABL Financing. In addition, nothing in this Section 5.26 shall require the Sellers or their Representatives to provide access to or copies of any information the disclosure of which would jeopardize any attorney-client or attorney work product privilege or any similar protection (provided that the Sellers will use commercially reasonable efforts to provide such information in a manner that does not jeopardize such privilege or protection).

(b)    Purchaser may reasonably request the cooperation of the Sellers under this Section 5.26, upon reasonable notice and at reasonable times, from time to time and on multiple occasions, between the date hereof and the Closing to effect the ABL Financing.

Section 5.27    Exclusivity. During the period from the date of this Agreement through the earlier to occur of the Closing Date or the termination of this Agreement pursuant to Article VII, the Sellers will not, and will use their reasonable best efforts to cause all of their Representatives and controlled Affiliates not to solicit, initiate or encourage the submission of any inquiry, proposal or offer from any Person relating to the acquisition of any assets of the Business that are Acquired Assets (including any acquisition structured as a merger, consolidation, or share exchange) (each such transaction or series of transactions other than those contemplated by this Agreement, an "Alternative Transaction").

Section 5.28    Sale Contract Proceeds. During the period from the date of this Agreement through the Closing Date, to the extent any sale contemplated by any of the Sale Contracts is consummated prior to the Closing, the Sellers will hold the proceeds from any such sale in escrow for the benefit of the Purchaser, which proceeds, for the avoidance of doubt, shall be an Acquired Asset.

Section 5.29    Proceeds of Herald Custom Publishing of Mexico, S. de R.L. de C.V.. Prior to the Closing Date, the Sellers shall hold in escrow for the benefit of the Purchaser any proceeds received from the collection of Accounts Receivables or other assets of Herald Custom Publishing of Mexico, S.de R.L. de C.V., which proceeds, for the avoidance of doubt, shall be an Acquired Asset.

ARTICLE VI

CONDITIONS PRECEDENT

Section 6.1    Conditions Precedent to Obligation of the Sellers and the Purchaser. The respective obligations of each party hereto to effect the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing of the following conditions:

54

(a)     *Approvals*.  Any waiting period (and extensions thereof) applicable to the Acquisition under the HSR Act shall have expired or been terminated;

(b)     *No Orders.*  No Governmental Entity of competent jurisdiction shall have enacted, enforced or entered any Law and no Order shall be in effect and no proceeding seeking an Order shall be pending on the Closing Date that prohibits or materially restrains or delays the consummation of the Closing;

(c)     *DIP Facility*.  No "default" or "Event of Default" shall have occurred under the DIP Orders or the DIP Credit Agreement and the Sellers shall have delivered to Purchaser evidence in form and substance reasonably satisfactory to Purchaser, that the borrowed amount under the DIP Credit Agreement as of immediately prior to Closing is no less than $8,535,000;

(d)     *New Facilities*.  Each of the New 1.5L Indenture and the New First Lien Term Loan Facility  shall have been entered into by each of the parties thereto and all conditions precedent to the effectiveness of such documents shall have been satisfied or waived in accordance therewith; *provided*, *however*, that the Purchaser shall not be permitted to assert the failure of the condition set forth in this Section 6.1(d) unless both Brigade Capital Management, LP ("Brigade") and Chatham have used reasonable best efforts to cause the satisfaction of the condition set forth in this Section 6.1(d), subject to the applicable terms of the Framework Agreement as in effect on the date hereof relating thereto, including with respect to the terms set forth ~~in the term sheets set forth~~ on Exhibit G and Exhibit H hereto; and

(e)     *Sale Order*.  The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to the Purchaser and the Sellers, no later than twenty-five (25) days after the date of this Agreement or such later date as may be determined by the parties with the prior written consent of the Purchaser and such order shall have become final and not have been stayed, stayed pending appeal, reversed or vacated as of the Closing Date.

Section 6.2     Conditions Precedent to Obligation of the Sellers.  The obligation of the Sellers to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver (to the extent permitted by applicable Law) by the Sellers at or prior to the Closing of the following conditions:

(a)     *Representations and Warranties*.  The representations and warranties of the Purchaser contained in this Agreement shall be true and correct (disregarding any exception or qualification in such representations and warranties relating to "material" or "materiality") as of the Closing Date as if made at and as of such date (except to the extent such representations and warranties speak as of another date, in which case such representations and warranties shall be true and correct as of such other date), except where the failure of such representations and warranties to be so true and correct (disregarding any exception or qualification in such representations and warranties relating to "material" or "materiality") has not and would not reasonably be expected to, individually or in the aggregate, have a material

55

adverse effect on the Purchaser's ability to perform its obligations under this Agreement or the Ancillary Documents, or the consummation of the transactions contemplated hereby or thereby;

(b)     *Covenants*.  The covenants and obligations of the Purchaser to be performed or complied with at or prior to the Closing pursuant to this Agreement shall have been duly performed and complied with in all material respects;

(c)     *Officer's Certificate*.  The Purchaser shall have delivered to the Sellers a certificate duly executed by an authorized officer of the Purchaser certifying to the effect that the conditions set forth in Section 6.2(a) and Section 6.2(b) have been satisfied; and

(d)     *Deliverables*.  Each of the deliveries required to be made to the Sellers pursuant to Section 2.2(b) shall have been so delivered.

Section 6.3     Conditions Precedent to Obligation of the Purchaser.  The obligation of the Purchaser to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver (to the extent permitted by applicable Law) by the Purchaser at or prior to the Closing of the following conditions:

(a)     *Representations and Warranties*.  (i) The representations and warranties of the Sellers contained in Sections 3.1, 3.2, 3.3, 3.9, 3.16 and 3.27 shall be true and correct as of the date hereof and as of the Closing Date as if made at and as of the Closing Date; (ii) the representation and warranty of the Sellers contained in Section 3.8(b) shall be true and correct as of the date hereof and as of the Closing Date as if made at and as of the Closing Date and (iii) the representations and warranties of the Sellers contained in this Agreement (other than Sections 3.1, 3.2, 3.3, 3.9, 3.16, 3.8(b) and 3.27) shall be true and correct as of the date hereof and as of the Closing Date as if made at and as of the Closing Date (except to the extent such representations and warranties are made as of another date, in which case such representations and warranties shall be true and correct as of such other date), except where the failure of such representations and warranties to be so true and correct (disregarding any exception or qualification in such representations and warranties relating to "material," "materiality" or "Material Adverse Effect") has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)     *Covenants*.  The covenants and obligations of the Sellers to be performed or complied with at or prior to the Closing pursuant to this Agreement shall have been duly performed and complied with in all material respects;

(c)     *Officer's Certificates*.  Each of the Sellers shall have delivered to the Purchaser a certificate duly executed by an executive officer of each Seller certifying to the effect that the conditions set forth in Section 6.3(a) and Section 6.3(b) have been satisfied;

(d)     *Payoff*.  The Sellers shall have delivered to the Purchaser evidence reasonably satisfactory to the Purchaser of the Payoff, to the extent required under Section 5.18;

(e)     *Deliverables*.  Each of the deliveries required to be made to the Purchaser pursuant to Section 2.2(a) shall have been so delivered; and

56

(f)    *Retitled Assets.*  Substantially all of the Acquired Assets, including bank accounts, lockboxes, insurance policies and benefits plans have been retitled in the name of the Purchaser or the applicable Purchaser Designee to the Purchaser's reasonable satisfaction.

## ARTICLE VII

## TERMINATION

Section 7.1    Termination.

(a)    This Agreement may be terminated by either the Purchaser or the Sellers in the event that the Closing has not occurred on or before the date that is one hundred twenty (120) days after the date of this Agreement, or such later date as may be agreed in writing by the parties in their sole discretion (as such date may be extended in accordance with the terms of this Agreement, the "Outside Date") unless as of such date all conditions to the Closing set forth in Article VI shall have been satisfied or waived or shall be capable of being satisfied at the Closing (but subject to the satisfaction or waiver at or prior to the Closing of all such conditions), except for Section 6.1(a) or, solely in respect of the HSR Act, Section 6.1(b), unless the failure of the Closing to occur prior to such date results from the failure of the party seeking to terminate this Agreement to perform any of its obligations under this Agreement required to be performed by it at or prior to the Closing or a breach of any representation or warranty of such party to this Agreement; *provided*, that, notwithstanding anything to the contrary herein, if on the initial Outside Date the approval of the transactions contemplated by this Agreement by any Governmental Entity is pending, the Outside Date may be extended once by either the Purchaser or the Sellers by up to thirty (30) days.

(b)    This Agreement may also be terminated prior to the Closing:

(i)    at any time by the mutual written agreement of the Purchaser and the Sellers;

(ii)    by the Purchaser, if (x) there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of the Sellers which breach, either individually or in the aggregate with other breaches by the Sellers, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in Section 6.3(a) or Section 6.3(b), as the case may be, or (y) there has been any material breach by the Sellers of the Bidding Procedures Order or the Sale Order, in each case of the foregoing clauses (x) and (y) which is not cured within ten (10) Business Days following written notice to the Sellers thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided*, that the Purchaser is not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement or in the Sale Order on the part of the Purchaser);

(iii)    by the Sellers, if (x) there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this

57

Agreement on the part of the Purchaser which breach, either individually or in the aggregate with other breaches by the Purchaser, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in Section 6.2(a) or Section 6.2(b), as the case may be, or (y) there has been any material breach by the Purchaser of the Bidding Procedures Order or the Sale Order, in each case of the foregoing clauses (x) and (y) which is not cured within ten (10) Business Days following written notice to the Purchaser thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (*provided*, that the Sellers are not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement or in the Sale Order on the part of the Sellers);

(iv)     by either the Sellers or the Purchaser, if a Governmental Entity issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated by this Agreement; *provided, however*, that the right to terminate this Agreement pursuant to this Section 7.1(b)(iv) shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such ruling or Order;

(v)     by the Purchaser, if the Framework Agreement shall have been terminated in accordance with its terms as in effect on the date hereof; *provided, however*, that the Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 7.1(b)(v) unless both Brigade and Chatham have used reasonable best efforts to satisfy their respective obligations under the Framework Agreement; *provided, further* that Brigade shall be entitled to grant or withhold its consent to any amendment or modification of this Agreement, or any waiver of any covenant or condition of this Agreement, in each case as contemplated by, and in accordance with, the terms of the Framework Agreement as in effect on the date hereof; or

(vi)     by the Purchaser, if there shall have been a default or "Event of Default" under the DIP Facility.

Section 7.2     Effect of Termination.

(a)     Except as otherwise provided in this Section 7.2, in the event of termination of this Agreement by either party hereto in accordance with Section 7.1, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other parties hereto, except for liability for fraud or intentional breach of this Agreement prior to such termination, and the Release granted in Section 5.20 shall be of no force and effect. The final sentence of Section 5.2(a), this Section 7.2, Article VIII (other than Section 8.1, Section 8.2 and Section 8.4) and, with respect to any defined terms used in the foregoing Sections or Article, Article IX shall expressly survive the termination of this Agreement.

ARTICLE VIII

GENERAL PROVISIONS

Section 8.1     Tax Matters.

58

(a)     Notwithstanding anything to the contrary in this Agreement, the Parent and the Purchaser shall each pay, when due, and be responsible for, fifty percent (50%) of all sales, use, transfer (including real estate transfer), documentary, stamp, recording, conveyance, goods and services or similar Taxes and fees imposed on or payable in connection with the transfer of the Acquired Assets, the Assumed Liabilities and the Business contemplated by this Agreement ("Transfer Taxes").  The party hereto responsible under applicable Law for filing a Tax Return with respect to any such Transfer Taxes shall prepare and timely file (or cause to be prepared and timely filed) such Tax Return (and the Purchaser shall provide timely payment thereof, if any payment is due) and promptly provide a copy of such Tax Return to the other parties.  The Purchaser and the Parent shall, and shall cause their respective Affiliates to, reasonably cooperate to timely prepare and file any Tax Returns or other filings relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes to the extent permitted by applicable Law.

(b)     For purposes of this Agreement, with respect to the Business or any Acquired Asset or Assumed Liability, the Sellers and the Purchaser shall apportion the liability for Property Taxes, ad valorem Taxes, and similar Taxes ("Periodic Taxes") and for Taxes that are either (x) based upon or related to income or receipts, (y) imposed in connection with any sale, transfer or assignment or any deemed sale, transfer or assignment of property (real or personal, tangible or intangible), or (z) payroll or similar Taxes with respect to any employee, or independent contractor associated with the Business or the Acquired Assets ("Non-Periodic Taxes") for Straddle Periods applicable to the Business or such Acquired Asset or Assumed Liability in accordance with this Section 8.1(b).  The Periodic Taxes described in this Section 8.1(b) shall be apportioned between the Sellers and the Purchaser as of the Closing Date, with the Purchaser liable for that portion of the Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Post-Closing Tax Period) equal to the Periodic Taxes for such Straddle Period *multiplied by* a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of calendar days in such entire Straddle Period. The Non-Periodic Taxes described in this Section 8.1(b) shall be apportioned between the Sellers and the Purchaser as of the Closing Date, with the Purchaser liable for (i) California state Income Taxes imposed with respect to, arising out of, or relating to the transactions contemplated by this Agreement equal to approximately $1,700,000, and (ii) that portion of the other Non-Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes of this Agreement be deemed attributable to the Post-Closing Tax Period) equal to the amount that would be payable in the Post-Closing Tax Period if the taxable year or period ended at the end of the day on the Closing Date; *provided*, *however*, that exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for amortization or depreciation, shall be allocated to the Post-Closing Tax Period (notwithstanding that such exemptions, allowances or deductions may under applicable Law be determined solely at the end of the Straddle Period) by multiplying the total amount of such exemption, allowance, or deduction for such Straddle Period by a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of calendar days in such entire Straddle Period.  The Sellers shall be liable for that portion of the Periodic Taxes and Non-Periodic Taxes for a Straddle Period for which the Purchaser is not liable under the preceding sentences (which portion of such Taxes shall for

59

purposes of this Agreement deemed attributable to the Pre-Closing Tax Period); *provided* that Periodic Taxes attributable to the Pre-Closing Tax Period shall not include any reassessment or revaluation of any property occurring in connection with the transactions contemplated by this Agreement.  The party hereto responsible under applicable Law for paying a Tax described in this <u>Section 8.1(b)</u> shall be responsible for administering the payment of such Tax.  For purposes of this <u>Section 8.1(b)</u>, the Straddle Period for ad valorem Taxes and Property Taxes shall be the fiscal period for which such Taxes were assessed by the applicable Tax jurisdiction.  With respect to any Periodic Taxes or Non-Periodic Taxes imposed with respect to the Business or any Acquired Asset or Assumed Liability for a Post-Closing Tax Period, to the extent such Periodic Taxes or Non-Periodic Taxes were paid by any Seller or any Affiliate thereof, Purchaser shall pay to the Sellers such Periodic Taxes or Non-Periodic Taxes no later than ten (10) Business Days following receipt of written notice from the Sellers and with respect to any Periodic Taxes or Non-Periodic Taxes imposed with respect to the Business or any Acquired Asset or Assumed Liability for a Pre-Closing Tax Period to the extent such Periodic Taxes or Non-Periodic Taxes were paid by Purchaser or any Affiliate thereof, Seller shall pay to the Purchaser such Periodic Taxes or Non-Periodic Taxes no later than ten (10) Business Days following receipt of written notice from the Purchaser. For the avoidance of doubt, nothing in this Agreement shall allocate to any Seller or to Purchaser, or to any Affiliate of any Seller or Purchaser, any Taxes of any Purchased Entity or any Subsidiary thereof.

(c)    The parties shall, and shall cause their respective Affiliates to, cooperate and (at the expense of the requesting party to the extent that any out-of-pocket expenses or costs are incurred) provide to the other party and any Affiliate thereof such documentation, information, and assistance as may reasonably be requested by any of them in connection with (i) the preparation of any Tax Return relating to the Business, the Acquired Assets or the Assumed Liabilities, (ii) the determination of any liability in respect of Taxes or the right to any refund, credit or prepayment in respect of Taxes (including pursuant to this Agreement), or (iii) any audit or other examination by any Taxing Authority, or any judicial or administrative proceeding with respect to any Taxes relating to the Business, the Acquired Assets or the Assumed Liabilities.  Notwithstanding anything herein to the contrary, in no event shall any Seller or any Affiliate thereof be required to provide any Person with a copy of, or otherwise disclose the contents of, its Tax Returns.

(d)    Notwithstanding anything to the contrary in this Agreement, the Sellers shall have the exclusive right to control in all respects, and neither Purchaser nor any of its Affiliates shall be entitled to participate in, any Tax proceeding with respect to any Tax Return of any Seller or any Affiliate thereof; provided, that the Purchaser shall have the right to review and provide comments on any Tax Return related to the Specified Refunds and the Sellers shall incorporate any reasonable comments related to the Specified Refunds.  The Sellers shall promptly file all Tax Return of any Seller related to the Specified Refunds.  Additionally, the Purchaser shall have the right to participate in any Tax proceeding related to the Specified Refunds and the Sellers shall not be permitted to settle, compromise, concede or take any material action with respect to the Specified Refunds without the consent of the Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.  No later than ten (10) Business Days after receipt by any Seller of any amounts constituting the Specified Refunds, the Seller shall pay to the Purchaser such amounts.  The Purchaser shall bear all costs and expenses

60

of preparing and filing Tax Returns related to the Specified Refunds and of any Tax proceedings related to the Specified Refunds.  In the event that any amount of the Specified Refunds paid over to the Purchaser pursuant to this Section 8.1(d) is required to be repaid to the applicable Governmental Authority by the Sellers prior to their dissolution, the Purchaser shall repay such amount to the Sellers.

        (e)     The parties intend that the dispositions by the Sellers to Purchaser as contemplated by this Agreement shall be treated as taxable transactions governed by Section 1001 of the Code (the "Intended Tax Treatment").  Each of the Sellers and Purchaser agree (and agree to cause their respective Affiliates) to prepare and file all relevant U.S. federal, state, local and non-U.S. Tax Returns in accordance with the Intended Tax Treatment.  None of the Sellers or Purchaser shall (and each of the Sellers and Purchaser shall cause their Affiliates not to) take any position inconsistent with the Intended Tax Treatment on any Tax Return or in connection with any Tax proceeding, in each case, except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any applicable analogous provision of state, local or non-U.S. law).  In the event that the Intended Tax Treatment is disputed by any Taxing Authority, the party receiving notice of such dispute shall promptly notify the other party in writing of such notice, and the parties shall cooperate in good faith to resolve such dispute.

        Section 8.2     Bulk Sales.  The Sale Order shall provide either that (i) Sellers have complied with the requirements of any Law relating to bulk sales and transfer or (ii) compliance with the Laws relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

        Section 8.3     Guarantee.  To induce the Sellers and the Parent to enter into this Agreement, subject to the satisfaction of the closing conditions set forth in Article VI, the Guarantor hereby absolutely, irrevocably and unconditionally guarantees to the Sellers and the Parent, the due and punctual payment of the Cash Payment (the "Guaranteed Obligation").  Subject to the satisfaction of the closing conditions set forth in Article VI, the guarantee pursuant to this Section 8.3, (i) is absolute, irrevocable and unconditional and shall not be impaired, discharged or terminated by any act or omission by the Purchaser or the Guarantor that may affect the enforceability of this guarantee, and (ii) shall not be affected by the bankruptcy, insolvency or inability to pay of the Purchaser or the Guarantor.  The Guarantor, in its capacity as guarantor of the Guaranteed Obligation, hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Sellers or the Parent exhaust any right, power or remedy or proceed against the Purchaser.  If the Guarantor makes a payment or performs an action in full satisfaction of the Guaranteed Obligation, such satisfaction shall be deemed to be a satisfaction of such obligation in full by the Purchaser for purposes of this Agreement.  The Guarantor has all necessary power and authority to execute and deliver this Agreement and to perform the Guaranteed Obligation hereunder.  This Agreement has been duly authorized, executed and delivered by the Guarantor and, assuming the due and valid authorization, execution and delivery of this Agreement by the other parties hereto, this Agreement constitutes the legal, valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms.

61

Section 8.4    Survival of Representations, Warranties and Covenants.  No representations or warranties in this Agreement or in any Ancillary Document shall survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach or inaccuracy thereof.  No covenants in this Agreement or in any Ancillary Document shall survive the Closing and shall thereupon terminate, except (1) to the extent the terms thereof expressly contemplate performance following the Closing and (2) any covenants in Section 8.1.

Section 8.5    Public Announcements.  Unless otherwise required by applicable Law or by obligations of the Sellers or the Purchaser or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or in order to enforce a party's rights or remedies under this Agreement, the Sellers, on the one hand, and the Purchaser, on the other hand, shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed).  From and after the Closing, the parties may make public statements with respect to this Agreement or the transactions contemplated hereby so long as such announcements do not disclose the specific terms or conditions of this Agreement except where such terms and conditions have already been disclosed as required by Law or by obligations of the Purchaser or the Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or in order to enforce a party's rights or remedies under this Agreement; provided, that the issuing party shall use its commercially reasonable efforts to consult with the other party with respect to the text thereof to the extent practicable.  Notwithstanding the foregoing, Purchaser may disclose information regarding the transactions contemplated by the Agreement or the other Ancillary Documents (a) to any of its direct or indirect equity holders, Affiliates, Representatives and its and their respective Affiliates' financing sources, so long as such Persons are informed of the confidential nature of such information and Purchaser shall be liable for any failure by such Person to hold in confidence such information under this Section 8.5, (b) for purposes of compliance with its or their respective Affiliates' financial reporting obligations or (c) in connection with its or their respective Affiliates' fundraising or marketing activities, so long as such Persons are informed of the confidential nature of such information and Purchaser shall be liable for any failure by such Person to hold in confidence such information under this Section 8.5.

Section 8.6    Notices.  All notices, requests, claims, demands or other communications hereunder shall be deemed to have been duly given and made if in writing and (a) at the time personally delivered if served by personal delivery upon the party hereto for whom it is intended, (b) at the time received if delivered by registered or certified mail (postage prepaid, return receipt requested) or by a national courier service (delivery of which is confirmed), or (c) upon confirmation if sent by facsimile or email; in each case to the Person at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such Person:

(a)    if to the Purchaser, to:

62

SIJ Holdings, LLC
c/o Chatham Asset Management, LLC
26 Main Street, Suite 204
Chatham, New Jersey 07928
Email:        barry@chathamasset.com
              feisal@chathamasset.com
              jim@chathamasset.com
Attention:    Barry Schwartz
              Feisal Alibhai
              James Ruggerio, Jr.

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Email:        arosenberg@paulweiss.com
              ctheil@paulweiss.com
              jweber@paulweiss.com
Attention:    Andrew N. Rosenberg
              Chaim P. Theil
              John Weber

with a copy (which shall not constitute notice) to:

Brigade Capital Management
399 Park Avenue, 16th Floor
New York, New York 10022
Email: JCB@brigadecapital.com
Attention:    John Baylis

with a copy (which shall not constitute notice) to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Email:        dmannal@kramerlevin.com
Attention:    Douglas Mannal

and

(b)    if to the Sellers, to:

The McClatchy Company
2100 Q Street
Sacramento, California 95816

63

Email:  pfarr@mcclatchy.com
Attention:    Peter Farr

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Facsimile:    (213) 687-5600
Email:        van.durrer@skadden.com
Attention:    Van C. Durrer II

and

Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Palo Alto, California 94301
Facsimile:    (650) 798-6504
Email:        thomas.ivey@skadden.com
Attention:    Thomas J. Ivey

Brigade Capital Management
399 Park Avenue, 16th Floor
New York, New York 10022
Email: JCB@brigadecapital.com
Attention:    John Baylis

with a copy (which shall not constitute notice) to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Email:        dmannal@kramerlevin.com
Attention:    Douglas Mannal

(c)    Brigade shall be an intended third-party beneficiary of this Agreement with respect to this <u>Section 8.6</u> and <u>Section 8.12</u>.

Section 8.7    <u>Descriptive Headings; Interpretative Provisions</u>.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning

64

as defined in this Agreement.  Unless otherwise stated in this Agreement, references to any Contract are to that Contract as amended, modified or supplemented from time to time in accordance with the terms thereof.  Any reference to any law in this Agreement means such law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.  The words "to the extent" shall be interpreted to mean "to the extent (but only to the extent)".  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.  Any reference in this Agreement to "made available" shall mean (i) the Parent SEC Documents publicly available prior to the date hereof (excluding items which are cross-referenced, footnoted or only referred to in such documents except to the extent such cross-referenced or footnoted items are otherwise included as Parent SEC Documents publicly available prior to the date hereof) and (ii) with respect to any other documents or information, that such documents or information referenced shall have been provided in the dataroom for Purchaser and its Representatives at least two (2) Business Days prior to the date of this Agreement.  Whenever the last day for the exercise of any right or the discharge of any duty under this Agreement falls on other than a Business Day, the party hereto having such right or duty shall have until the next Business Day to exercise such right or discharge such duty.  Unless otherwise indicated, the word "day" shall be interpreted as a calendar day.  References to "dollars" or "$" mean United States dollars, unless otherwise clearly indicated to the contrary.  No summary of this Agreement prepared by or on behalf of any party hereto shall affect the meaning or interpretation of this Agreement.

Section 8.8    No Strict Construction.  The Sellers, on the one hand, and the Purchaser, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Sellers, the Purchaser, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any person with respect to this Agreement.

Section 8.9    Entire Agreement; Assignment.  This Agreement, the Ancillary Documents and the Confidentiality Agreement constitute the entire agreement and supersede all other prior agreements and understandings, both written and oral, among the parties hereto or any of them, with respect to the subject matter hereof and thereof.  Neither this Agreement nor any of the rights, interests or obligations under it may be directly or indirectly assigned, delegated, sublicensed or transferred by any of the parties hereto, in whole or in part, to any other Person by operation of law or otherwise, without the prior written consent of the other parties, and any attempted or purported assignment in violation of this Section 8.9 will be null and void; provided, however, that, subject to compliance with Section 2.3, Purchaser shall be permitted to assign all or part of its rights or obligations hereunder to (a) one or more Purchaser Designees, (b) at or following the Closing, any of its rights to any of Purchaser's financing sources as collateral or (c) following the Closing, to any successor or purchaser of all or part of the business

65

of Purchaser or any of its Subsidiaries without the prior consent of Sellers. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns and shall not be binding upon, inure to the benefit of, or be enforceable by, any other Person.

Section 8.10   Governing Law; Submission of Jurisdiction; Waiver of Jury Trial. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto. Each of the parties hereto irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated thereby (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court), and waives any objection to the laying of venue of any such litigation in the Bankruptcy Court. Each party hereto hereby consents to service of process in the manner and at the address set forth in Section 8.6. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.11   Expenses. Except as otherwise expressly provided herein, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated thereby shall be paid by the party hereto incurring such expenses.

Section 8.12   Amendment. This Agreement may not be amended, modified or supplemented except by an instrument in writing signed on behalf of all the parties hereto; provided that Section 8.6 and this Section 8.12 shall not be amended in a manner that affects the rights of Brigade thereunder without the prior written consent of Brigade.

Section 8.13   Waiver. At any time prior to the Closing, the parties hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

Section 8.14   Counterparts; Effectiveness. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by.pdf,.tif,.gif or similar attachment to electronic mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

Section 8.15   Severability; Validity; Parties in Interest. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or

66

unenforceable, the remainder of this Agreement, and the application of such provision to other Persons or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable. Except with respect to the parties released pursuant to Section 5.20, this Agreement, the Allocation and the other Ancillary Documents are for the sole benefit of the parties and their permitted assigns and nothing in this Agreement, express or implied, is intended to confer upon any Person not a party to this Agreement any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 8.16   <u>Specific Performance</u>.  The parties recognize that if any party breaches this Agreement or refuses to perform under the provisions of this Agreement, monetary damages alone would not be adequate to compensate the other parties for their injuries. Accordingly, a non-breaching party shall be entitled, in addition to any other remedies that may be available, to equitable relief, including an injunction or injunctions or Orders for specific performance, to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including, for the avoidance of doubt, the obligation of a party to consummate the transactions contemplated by this Agreement), without proof of actual damages or the posting of a bond or other undertaking. If any Action is brought by a party to enforce this Agreement, the other party shall waive the defense that there is an adequate remedy at Law. The rights set forth in this <u>Section 8.16</u> shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

Section 8.17   <u>No Recourse</u>.  This Agreement may only be enforced against the named parties hereto (subject to the terms, conditions and other limitations set forth herein). Subject to the limitations contained herein, (i) all claims or causes of action that may be based upon, arise out of or relate to this Agreement may be made only against the Persons that are expressly identified as parties hereto and (ii) except for any express obligations hereunder or under another Ancillary Document, no Person other than a named party hereto shall have any liability or obligation with respect to this Agreement or with respect any claim or cause of action that may arise out of or relate to this Agreement.

Section 8.18   <u>Seller Representative</u>.

(a)     Each of the Sellers hereby irrevocably appoints the Seller Representative as the sole agent of the Sellers to act on behalf of such Person regarding any matter relating to or arising under this Agreement and the Ancillary Documents, including for the purposes of: (i) receiving any payments due from the Purchaser that are required under the terms of this Agreement or the other Ancillary Documents; (ii) taking any action on behalf of the Sellers that may be necessary or desirable, as determined by the Seller Representative in its sole discretion, in connection with any provision of this Agreement or the Ancillary Documents in accordance with their terms; (iii) accepting notices on behalf of the Sellers in accordance with Section 8.6; (iv) executing and delivering, on behalf of the Sellers, any notices, documents or certificates to be executed by the Sellers in connection with this Agreement or the Ancillary Documents; and (v) granting any consent or approval on behalf of the Sellers under this Agreement or the Ancillary Documents.  As the representative of the Sellers, the Seller Representative shall act as the agent for such parties and shall have authority to bind the Sellers with respect to all matters arising under or relating to this Agreement and the Ancillary

67

Documents.  The Seller Representative shall only disburse the Cash Remainder or any portion thereof to a Seller other than the Parent to the extent the Excluded Liabilities of such Seller exceed the sum of (1) the amount of payments received by such Seller pursuant to this Agreement, (2) the amount of reimbursements received by such Seller pursuant to this Agreement, and (3) the Excluded Assets of such Seller.

(b)      The Purchaser may rely exclusively, without independent verification or investigation, upon all decisions, communications or writings made, given or executed by the Seller Representative in connection with this Agreement and the Ancillary Documents.  The Purchaser is entitled to deal exclusively with the Seller Representative on all matters arising under or relating to this Agreement, the Ancillary Documents and the transactions contemplated by this Agreement and the Ancillary Documents (the "Contemplated Transactions").  Any action taken or not taken or decisions, payments, communications or writings made, given or executed by the Seller Representative for or on behalf of the Sellers shall be deemed an action taken or not taken or decisions, payments, communications or writings made, given or executed by the Sellers.  Any notice or communication delivered in accordance with this Agreement by the Purchaser to the Seller Representative shall be deemed to have been delivered to each of the Sellers.  The Purchaser shall be entitled to disregard any decisions, communications or writings made, given or executed by any of the Sellers in connection with this Agreement, the Ancillary Documents and the Contemplated Transactions unless the same is made, given or executed by Seller Representative. Any reference in this agreement to a notice or information to be provided to, consent required by, or consultation with, payments made to or by and decisions, communications or writings made to or by any Seller, shall be deemed to refer to the Seller Representative and any such notice or information to, consent from, consultation with or decisions, payments made to or by, and communications or writings made to or by the Seller Representative, as applicable, shall satisfy any such notice, information, consent and consultation requirement in all respects and shall be final, binding and conclusive upon each of the Sellers, and the other parties hereto.

(c)      Each Seller hereby appoints the Seller Representative as such Person's true and lawful attorney-in-fact and agent with full powers of substitution and resubstitution, in such Person's name, place and stead, in any and all capacities, in connection with this Agreement, the Ancillary Documents and the Contemplated Transactions, granting unto said attorney-in-fact and agent, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection with this Agreement, the Ancillary Documents and the Contemplated Transactions as fully to all intents and purposes as such Person might or could do in person.

(d)      The Seller Representative shall be entitled to retain counsel and to incur such fees, costs and expenses (including reasonable attorneys' fees, costs and expenses) as the Seller Representative deems to be necessary or appropriate in connection with the performance of its obligations under this Agreement.  The Seller Representative shall be reimbursed for all such fees, costs and expenses (including reasonable attorneys' fees, costs and expenses) by the Parent, as agent for the Sellers, from the Cash Remainder.  For clarity, the Purchaser shall not be required to reimburse the Sellers or the Seller Representative for any such fees, costs or expenses.

68

(e)      All of the immunities, powers and rights granted to the Seller Representative under this Agreement shall survive the Closing.  The grant of authority provided for herein is coupled with an interest and shall be irrevocable and shall survive the death, incompetency, bankruptcy, dissolution, winding up or liquidation of any Seller.

(f)      Notwithstanding anything to the contrary set forth herein, the Purchaser shall not be liable for and shall be held harmless from any loss to any Person, including any Seller, for any action taken or not taken by the Seller Representative or for any act or omission taken or not taken in reliance upon the actions taken or not taken or decisions, communications or writings made, given or executed by the Seller Representative, including any failure of the Seller Representative to distribute, or to distribute or subdivide in the correct amounts, any payments made to the Seller Representative by the Purchaser for distribution to any Seller or any other Person; it being understood that once the Purchaser has made such a payment to the Seller Representative for distribution to a Seller or to such other Person, such payment shall constitute a complete discharge of the relevant payment obligation of the Purchaser.

(g)      The Seller Representative may be removed by unanimous action of the Sellers and such removal shall be effective upon written notice to the Seller Representative and the Purchaser.  If the Seller Representative (i) is so removed, (ii) terminates its legal existence, or (iii) resigns from its position as Seller Representative, then the Sellers shall, as promptly as practicable thereafter, appoint a replacement Seller Representative, which replacement Seller Representative shall be reasonably acceptable to the Purchaser.  Such appointment shall be effective upon delivery of at least two (2) Business Days' prior written notice to the Purchaser and, thereafter, the replacement Seller Representative shall be deemed to be the Seller Representative for all purposes of this Agreement and the Ancillary Documents. Any obligation of the Purchaser to take any action in respect of the Seller Representative shall be suspended during any period that the position of Seller Representative is vacant.

## ARTICLE IX

### DEFINITIONS

As used herein, the terms below shall have the following meanings:

"Accounts Receivable" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that has not been billed, chattel paper, notes and other rights to payment (whether current or non-current), including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"Action" means any action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including

69

any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter by or before any Governmental Entity.

"Affiliate" of a specified Person means a Person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Agents" means, collectively, the First Lien Notes Agent, the Second Lien Term Loan Agent, and the Third Lien Notes Agent.

"Agreement" has the meaning set forth in the Preamble and shall include the Exhibits and Schedules annexed hereto or referred to herein.

"Ancillary Documents" means the Bill of Sale, Assignment and Assumption Agreement, Intellectual Property Assignment Agreements, the Escrow Agreements, each Deed and each other agreement, document or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"Antitrust Laws" means any applicable supranational, national, federal, state, county, local or foreign antitrust, competition or trade regulation Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition, including the HSR Act, the Sherman Act, the Clayton Act and the Federal Trade Commission Act, in each case, as amended, and other similar antitrust, competition or trade regulation Laws of any jurisdiction other than the United States.

"Benefit Plan" means a plan, program, agreement or other arrangement providing for employment, compensation, retirement, deferred compensation, severance, separation, relocation, repatriation, expatriation, termination pay, performance awards, bonus, incentive, stock option, stock purchase, stock bonus, phantom stock, stock appreciation right, supplemental retirement or other pension or welfare benefits, whether written or unwritten, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, (i) which is or has been sponsored, maintained, contributed to, or required to be contributed to by the Sellers or any of their ERISA Affiliates for the benefit of any employee or former employee of the Purchased Entities, the Sellers or any of their Subsidiaries (or to which any Seller is a party) or (ii) with respect to which the Sellers or any of their ERISA Affiliates would reasonably be expected to have any liability.

"Bidding Procedures" means the bidding procedures set forth in the Bidding Procedures Order.

"Bidding Procedures Order" means the *Order (I) Establishing Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (II) Establishing Procedures for the Debtors to Enter into Stalking Horse Agreement with Bid Protections in Connection with a Sale of Substantially All of the Debtors' Assets; (III) Approving Procedures*

70

*for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (IV) Approving Form and Manner of Notice of All Procedures, Protections, Schedules and Agreements; (V) Scheduling a Hearing to Consider the Proposed Sale; and (VI) Granting Certain Related Relief* entered at Docket No. 432 in the Chapter 11 Cases.

"<u>Books and Records</u>" means all documents of, or otherwise in the possession, custody or control of, or used by, the Sellers in connection with, or relating to, the Business, the Acquired Assets, the Assumed Liabilities, or the operations of the Sellers, including all files, instruments, papers, books, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, lists of past, present and/or prospective customers, supplier lists, regulatory filings, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), data, reports (including environmental reports and assessments), plans, mailing lists, price lists, marketing information and procedures, advertising and promotional materials, equipment records, warranty information, architects agreements, construction contracts, drawings, plans and specifications, records of operations, standard forms of documents, and related books, records and workpapers, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information), in each case whether or not in electronic form; *provided,* that the Books and Records shall not include Tax Returns and other books, records and work papers related to Taxes paid or payable by the Sellers or their Affiliates but shall include copies of Tax Returns primarily related to Taxes of the Business, the Acquired Assets or the Assumed Liabilities).

"<u>Business Day</u>" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of Delaware or the State of New York or is a day on which banking institutions located in the State of Delaware or the State of New York are authorized or required by applicable Law or other governmental action to close.

"<u>Cash</u>" means all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and marketable securities, and any bank accounts and lockbox arrangements of the Sellers as of the Closing.

"<u>Claim</u>" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, against any Seller.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Committee</u>" means Official Committee of Unsecured Creditors appointed by the Office of the U.S. Trustee in the Chapter 11 Cases, as may be reconstituted from time to time.

"<u>Committee Retained Professional Fees</u>" means an aggregate amount equal to (a) the reasonable and documented out-of-pocket fees and expenses incurred by Professionals retained by the Committee, pursuant to section 327 of the Bankruptcy Code, in each case, to the extent such out-of-pocket fees and expenses are accrued and unpaid as of the Closing Date and (b) a good faith estimate, prepared by each applicable Professional retained by the Committee, of

71

out-of-pocket fees and expenses anticipated to incurred by such Professional following the Closing Date with respect to the Chapter 11 Cases.

"Committee Retained Professional Fees Escrow" means the escrow account established pursuant to the Committee Retained Professional Fees Escrow Agreement with subaccounts for each such Professional.

"Committee Retained Professional Fees Escrow Agreement" means a customary escrow agreement reasonably acceptable to the parties and the Committee by and among the Purchaser, the Sellers and the escrow agent for the disbursement of the amount payable by the Purchaser pursuant to Section 1.6 in connection with the Committee Retained Professional Fees.

"Confidentiality Agreement" means the Confidentiality Agreement, between Chatham and the Parent, dated May 22, 2020, as may be amended from time to time.

"Contract" means any oral or written agreement, contract, subcontract, settlement agreement, lease, sublease, use agreement, occupancy agreement, instrument, permit, concession, franchise, binding understanding, note, option, bond, mortgage, indenture, trust document, loan or credit agreement, license, sublicense, insurance policy or other legally binding commitment or instrument.

"Copyrights" means all copyrights, mask works, designs and other copyrightable subject matter, including any source code and object code.

"Designated Accounting Firm" means any nationally recognized independent public accounting firm, or any successor thereto, as shall be mutually agreed upon by the parties.

"DIP Credit Agreement" means that certain debtor-in-possession credit agreement, dated as of February 12, 2020, by and among Encina Business Credit, LLC, as administrative agent for each member of the Lender Group (as defined in the DIP Credit Agreement) and the Bank Product Providers (as defined in the DIP Credit Agreement), the Company (as defined in the DIP Credit Agreement), as a debtor and debtor-in-possession, and certain of the Borrowers party thereto, as the same may be subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

"DIP Facility" means the secured debtor-in-possession credit facility with Encina Business Credit, LLC in an aggregate principal amount up to $50,000,000 on terms consistent with the DIP Credit Agreement.

"DIP Orders" means, collectively, the (i) *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 64] entered by the Bankruptcy Court on February 14, 2020 and (ii) *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition*

72

*Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 233] entered by the Bankruptcy Court on March 26, 2020.

"Discharge" means, except as authorized by a valid Permit issued under Environmental Law, (i) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, emitting, leaching of any Hazardous Substance into the outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata, and (b) migration of Hazardous Substances into or out of any of the Real Property through soil, surface water, or groundwater.

"Effect" means any change, effect, development, circumstance, condition, fact, state of facts, event or occurrence.

"Encumbrance" means any "interest" as that term is used in Section 363(f) of the Bankruptcy Code, mortgage, deed of trust, pledge, security interest, encumbrance, easement, condition, reservation, lien (statutory or otherwise), mechanics lien, Claim, covenant, encroachment, lease, right of use or possession, or other similar third party interest, or other survey defect, charge, hypothecation, deemed trust, action, easement, right-of-way or covenant on real property, other than any license of Intellectual Property, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether voluntarily incurred, imposed by Contract or arising by operation of Law or otherwise.

"Environmental Laws" means any and all applicable Laws which (a) concern, regulate, govern or relate to (i) public health and safety, as may be affected by the use, treatment, storage, transportation, handling, disposal or Discharge of, or exposure to, Hazardous Substances, (ii) pollution or protection of the environment or natural resources, including those relating to (x) the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, distribution, importing, labeling, testing, processing, discharge, Discharge, threatened Discharge, control, cleanup, or other action or failure to act involving pollutants, contaminants, chemicals, or industrial, toxic or hazardous materials, substances or wastes and (y) human health as affected by hazardous or toxic substance or (b) impose liability or responsibility with respect to any of the foregoing, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 *et seq.*), or any other Law of similar effect.

"Environmental Liabilities" means all Liabilities arising from any impairment or damage to the environment or natural resources, failure to comply with Environmental Laws, or the Discharge of or exposure to Hazardous Substances:  (a) in connection with the prior or ongoing ownership or operation of the Business; or (b) on, in, under, to or from the Real Property or any other real property currently or formerly owned, operated, occupied or leased in connection with the ongoing or prior ownership or operation of the Business, including Liabilities related to:  (i) the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Substances; (ii) the Discharge of or exposure to Hazardous Substances; (iii) any other pollution or contamination of the environment; (iv) any other obligations imposed under Environmental Laws with respect to the Business or the Real Property; and (v) all other

73

damages and losses arising under applicable Law as a result of any of the matters identified in clauses (i) – (iv) of this definition.

"Environmental Permit" means any and all Permits, Governmental Authorizations, licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, notifications, exemptions, clearances and any other authorization required by or issued under any Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means, with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"Escrow Agreements" means, collectively, the Committee Retained Professional Fees Escrow Agreement, the Seller Retained Professional Fees Escrow Agreement and the Wind-Down Fees Escrow Agreement.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Taxes" means (i) any Taxes imposed with respect to the Acquired Assets, the Assumed Liabilities or the Business for any Pre-Closing Tax Period (as determined pursuant to Section 8.1(b)), including, for the avoidance of doubt, any Income Taxes arising from the transactions contemplated by this Agreement other than California state Income Taxes resulting from the transactions contemplated by this Agreement equal to approximately $1,700,000; (ii) Taxes payable to the extent arising out of or related to the Excluded Assets or with respect to the business or activities of Seller or any Affiliate of Seller (including any divested or discontinued business or activities of Seller or any Seller or any Affiliate of Seller) other than the Business or the Acquired Assets or the Assumed Liabilities; and (iii) Taxes for which the Sellers are liable under Section 8.1.

"Existing Secured Claims" means, collectively, the First Lien Notes Claims, the Second Lien Term Loan Claims, and the Third Lien Notes Claims.

"First Lien Notes" means those certain 9.000% Senior Secured Notes due 2026 issued pursuant to the First Lien Notes Indenture.

"First Lien Notes Agent" means The Bank of New York Mellon Trust Company, N.A. in its capacities as Trustee and Collateral Agent under the First Lien Notes Indenture.

"First Lien Notes Claim" means any claims or obligations arising under the First Lien Notes Documents.

74

"First Lien Notes Documents" means the First Lien Notes Indenture and all related amendments, supplements, notes, pledges, collateral agreements, loan and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the First Lien Notes Indenture, in each case as amended, restated, supplemented, or modified from time to time.

"First Lien Notes Indenture" means that certain Indenture dated July 16, 2018, by and among Parent, as issuer, the subsidiary guarantor parties thereto, and the First Lien Notes Agent, as amended, supplemented, or otherwise modified from time to time.

"Framework Agreement" means that certain Framework Agreement dated as of July 1, 2020, by and among Chatham and each of its managed funds or accounts that is a beneficial holder of the First Lien Notes, Brigade Capital Management, LP and each of its managed funds or accounts that is a beneficial holder of the First Lien Notes, and the Purchaser.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authorization" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Entity.

"Governmental Entity" means (a) any supranational, national, federal, state, county, municipal, local, or foreign government or any entity exercising executive, legislative, judicial, regulatory, taxing, or administrative functions of or pertaining to government, (b) any public international governmental organization or (c) any agency, division, bureau, department, commission, board, arbitral or other tribunal, branch or other political subdivision of any government, entity or organization described in the foregoing clause (a) or (b) of this definition (including patent and trademark offices and self-regulatory organizations).

"Hazardous Substance" means any pollutant, chemical, substance and any toxic, infectious, carcinogenic, reactive, corrosive, ignitable or flammable chemical, chemical compound, contaminant, hazardous substance, material or waste, or any other substance whether solid, liquid or gas, that is subject to regulation, investigation, control, corrective action or remediation under any Environmental Laws.

"Income Tax" means any Tax that is imposed on or measured by net income, including franchise Taxes.

"Indebtedness" means, with respect to any Person, (a) all obligations for borrowed money; (b) all obligations evidenced by bonds, debentures, notes or similar instruments, (c) all guarantees (or any other arrangement having the economic effect of a guarantee) of Indebtedness of others; (d) all obligations, contingent or otherwise, of such Person as an account party in respect of financial guaranties, letters of credit, letters of guaranty, surety bonds and other similar instruments; (e) all obligations, contingent or otherwise, in respect of bankers' acceptances; (f) net cash payment obligations of such Person under swaps, options, derivatives and other hedging agreements or arrangements that will be payable upon termination thereof (assuming they were terminated on the date of determination); (g) all indebtedness of

75

such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (h) all indebtedness of such Person for the deferred purchase price of assets, securities, or services in respect of which any Person is liable, contingently or otherwise (including "earn-outs," indemnities and "notes" payable with respect to the acquisition of any business, assets or securities) (other than Trade Payables, other expense accruals and deferred compensation items arising in the ordinary course of business consistent with past practice); (i) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded; (j) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities; (k) pension and other similar post-retirement obligations; (l) obligations with respect to bonuses or other forms of compensation to any Person as a result of or in connection with the transactions contemplated by this Agreement pursuant to any change in control, retention, transaction, severance, discretionary or similar bonuses or other similar payment or obligation; (m) all Indebtedness of others referred to in clauses (a) through (l) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness; (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness; (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered); or (iv) otherwise to assure a creditor against loss in respect of such Indebtedness; and (n) all Indebtedness referred to in clauses (a) through (m) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Intellectual Property" means all intellectual property rights, including all U.S. and foreign:  (a) Patents; (b) Trademarks; (c) Trade Secrets; (d) Copyrights; (e) internet domain names and social media identifiers; and (f) all applications for, and registrations of, of any of the foregoing.

"Knowledge of the Sellers" means, with respect to any matter in question, the actual knowledge after due inquiry of any of the individuals set forth on Article IX of the Seller Disclosure Letter.

"Law" means any law (including common law), statute, requirement, code, rule, regulation, order, ordinance, judgment or decree or other pronouncement of any Governmental Entity.

"Lease" means any Contract pursuant to which any Seller leases, uses or otherwise occupies any Leased Real Property.

"Liability" means a Claim or Encumbrance of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any Effect that, individually or in the aggregate (taking into account all other such Effects), has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (1) the Acquired Assets, the Assumed Liabilities or the assets, properties, financial condition or results of operations of the Business, in each case taken as a whole or (2) the ability of Sellers to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement; *provided*, *however*, that for purposes of the foregoing clause (1), no Effects resulting or arising from the following shall be deemed to constitute a Material Adverse Effect or shall be taken into account when determining whether a Material Adverse Effect exists or has occurred:  (i) changes in general economic, financial or securities markets or geopolitical conditions, (ii) general changes or developments in business, regulatory or macroeconomic conditions or trends or the industries and markets in which the Business operates, (iii) the execution and delivery of this Agreement, the announcement of the Acquisition or the consummation of the transactions contemplated by this Agreement, including termination of, reduction in or similar negative impact on business relationships with any customers, suppliers, distributors, licensors, licensees, partners or employees of the Business, assuming such termination of, reduction in or similar negative impact does not result from a breach of the terms of this Agreement by the Sellers or any of their Affiliates (iv) any actions expressly required to be taken or omitted by the Sellers under this Agreement (other than the actions contemplated by Section 5.1(a)) or any action or omission by the Purchaser in breach of this Agreement, (v) any action taken (or omitted) by the Sellers which is expressly requested in writing by the Purchaser, (vi) changes in any applicable Laws or applicable accounting regulations or principles or the enforcement or interpretation thereof, (vii) any outbreak or escalation of hostilities or war, act of terrorism, natural disaster, epidemic, pandemic (including the COVID-19 virus) or act of God and (viii) any failure of the Business to meet any budgets, plans projections or forecasts (internal or otherwise), in each case of clauses (i), (ii), (vi) and (vii) solely to the extent that such conditions do not disproportionately affect the Business, the Acquired Assets and the Assumed Liabilities, taken as a whole, as compared to other companies that are principally engaged in the same business as the Sellers.

"Material Contract" means (i) any Contract that is material to the Business and (ii) any Contract with a Material Customer or Material Supplier.

"New 1.5 Lien Indenture" means the indenture (as may be amended, modified or otherwise supplemented) governing the terms of the New 1.5 Lien Notes.

"New 1.5 Lien Notes" means the 1.5 lien notes issued by the Purchaser pursuant to the New 1.5 Lien Notes Indenture, which shall be on terms consistent in form and substance with the term sheet attached hereto as Exhibit G.

"New First Lien Term Loan Facility" means the first lien term loan facility to be entered into by the Purchaser, as borrower, and the holders of First Lien Notes Claims (excluding

77

Chatham and its Affiliates), as lenders, on the Closing Date, which shall be in the form attached hereto as <u>Exhibit H</u>.

"<u>New First Lien Term Loans</u>" means the first lien term loans deemed borrowed by the Purchaser pursuant to the New First Lien Term Loan Facility in exchange for the First Lien Notes Claims (excluding First Lien Notes Claims of Chatham and its Affiliates).

"<u>Notice of Sale</u>" means a notice of the sale of the Acquired Assets and the Sale Hearing.

"<u>Order</u>" means any order, injunction, judgment, decree, ruling, writ, assessment or award of a Governmental Entity.

"<u>Parent Confidentiality Agreements</u>" means those agreements by and between the Parent, on the one hand, and Persons expressing an interest in acquiring an ownership interest in the Parent or the Business, on the other hand, with respect to the use and confidentiality of information about the Parent and its Affiliates and the Business and certain other obligations.

"<u>Parent SEC Documents</u>" means all forms, statements, documents and reports filed or furnished prior to the date hereof by the Parent with the SEC since January 1, 2017, as amended through the date hereof.

"<u>Patents</u>" means patents and patent applications, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof.

"<u>Permitted Post-Closing Encumbrances</u>" means any Encumbrance that is specifically permitted by the Sale Order under applicable Law to survive the Closing, it being understood that the Sale Order shall extinguish Encumbrances to the maximum extent permissible under applicable Law.

"<u>Permitted Pre-Closing Encumbrances</u>" means, prior to the Closing Date, (i) liens for Taxes not yet due or delinquent or being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP, (ii) statutory or common law liens (including statutory or common law liens of landlords) and rights of set-off of carriers, warehousemen, mechanics, repairmen, workmen, suppliers and materialmen, in each case, incurred in the ordinary course of business consistent with past practice (A) for amounts not yet overdue, (B) for amounts that are overdue and that are being contested in good faith by appropriate proceedings, or (C) for amounts as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court, (iii) liens securing rental payments under capitalized lease obligations disclosed to the Purchaser, (iv) pledges or deposits under worker's compensation, unemployment insurance and social security Laws, to the extent required by applicable Law, (v) rights of third party purchasers to acquire Real Property pursuant to the Sale Contracts, ground leases, leases, subleases, licenses, concessions or similar agreements, (vi) easements, covenants, conditions, restrictions and other matters of record or defects or imperfections of title with respect to any Deeded Real Property, Leased Real Property or personal property, <u>provided</u>, <u>however</u>, that (with respect to clause (v) and (vi) only) any such

78

right or item does not, individually or in the aggregate, materially interfere with the ordinary conduct of the Business or materially impair the continued use and operation of such real property for the purpose for which it is used as of the date of this Agreement or as of the Closing, (vii) local, county, state and federal ordinances, regulations, building codes, variances, exceptions or permits (including such ordinances, regulations, building codes, variances, exceptions or permits relating to zoning), now or hereafter in effect, relating to any Deeded Real Property or Leased Real Property, (viii) restrictions or requirements set forth in any Permits relating to the Business, (ix) Encumbrances caused by or resulting solely from the acts or omissions of the Purchaser or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees, (x) Encumbrances arising by operation of Law under Article 2 of any state's Uniform Commercial Code (or successor statute) in favor of a seller of goods or buyer of goods in the ordinary course of business consistent with past practice, (xi) Encumbrances extinguished by the Sale Order and (xii) licenses or other grants of rights to use or obligations with respect to Intellectual Property.

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Entity or other entity or organization.

"Post-Closing Tax Period" means any taxable period or portion thereof beginning after the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, in the case of any Straddle Period, the portion of such Straddle Period ending at the end of the Closing Date.

"Prior Event" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, in each case, which occurred, existed, or was taken prior to the consummation of the transactions contemplated hereunder.

"Professional" means any Person retained by the Sellers or a statutory committee of unsecured creditors in the Chapter 11 Cases pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code.

"Property Taxes" means real, personal and intangible *ad valorem* property Taxes.

"Purchased Entity" means each entity the equity of which comprises the Purchased Ownership Interests.

"Purchased Ownership Interests" means one hundred percent (100%) of the equity ownership interests held by any of the Sellers in entities which are not Sellers (other than with respect to Ponderay Newsprint Company), including those set forth on Schedule B hereto.

79

"Purchaser Common Equity" means the common stock, restricted stock units, options or other instruments (including "profits interests"), or some combination of the foregoing, in the sole discretion of the Purchaser.

"Registered Intellectual Property" means all applications, registrations and filings for Intellectual Property that have been registered or filed with or by any state, government or other public or quasi-public legal authority anywhere in the world, including the United States Patent and Trademark Office or United States Copyright Office, including issued Patents and Patent applications, registered Trademarks and Trademark applications, registered Copyrights and Copyright applications, and internet domain name registrations.

"Rejected Leases" shall have the meaning set forth on Section 3.8(a) of the Seller Disclosure Letter.

"Release" means the release set forth in Section 5.20 herein and as approved by the Bankruptcy Court pursuant to the Sale Order.

"Representatives" means, when used with respect to any Person, the directors, officers, employees, consultants, financial advisors, accountants, legal counsel, investment bankers and other agents, advisors and representatives of such Person and its Subsidiaries and Affiliates.

"Retained Books and Records" means the company seal, minute books, stock certificates, stock or equity record books, Tax Returns and other books, records and work papers related to Taxes paid or payable by the Sellers or their Affiliates other than copies of Tax Returns primarily related to Taxes of the Business, the Acquired Assets or the Assumed Liabilities, work papers and such other books and records as pertain to the organization, qualification to do business, existence or capitalization of any Seller or any Affiliate thereof, books and records that the Sellers are required to retain under applicable Law and books and records that relate primarily to an Excluded Asset or Excluded Liability.

"Retained Professional Fees" means the Committee Retained Professional Fees and Seller Retained Professional Fees.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Order" means an Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit D, with such changes as the Purchaser and the Sellers find reasonably acceptable, that has not been stayed, vacated or stayed pending appeal, authorizing and approving the sale of the Acquired Assets to the Purchaser on the terms and conditions set forth herein.

"SEC" means the United States Securities and Exchange Commission.

"Second Lien Term Loan Agent" means The Bank of New York Mellon, in its capacities as Agent and Collateral Agent under the Second Lien Term Loan Agreement.

80

"<u>Second Lien Term Loan Agreement</u>" means that certain Junior Lien Term Loan Credit Agreement, dated as of July 16, 2018, by and among Parent, as borrower, the subsidiary guarantor parties thereto, the lenders party thereto and the Second Lien Term Loan Agent, as amended, supplemented, or otherwise modified from time to time.

"<u>Second Lien Term Loan Claim</u>" means any claims or obligations arising under the Second Lien Term Loan Documents.

"<u>Second Lien Term Loan Documents</u>" means the Second Lien Term Loan Agreement and all related amendments, supplements, assignments, pledges, collateral agreements, loan and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the Second Lien Term Loan Agreement, in each case as amended, restated, supplemented, or modified from time to time.

"<u>Seller Intellectual Property</u>" means all Intellectual Property owned or purported to be owned by any Seller, other than Intellectual Property that is an Excluded Asset.

"<u>Seller Registered Intellectual Property</u>" means all Registered Intellectual Property included in the Seller Intellectual Property.

"<u>Seller Retained Professional Fees</u>" means an aggregate amount equal to (a) the reasonable and documented out-of-pocket fees and expenses incurred by Professionals retained by the Sellers pursuant to section 327 of the Bankruptcy Code, in each case, to the extent such out-of-pocket fees and expenses are accrued and unpaid as of the Closing Date and (b) a good faith estimate, prepared by each applicable Professional retained by the Sellers, of out-of-pocket fees and expenses anticipated to incurred by such Professional following the Closing Date with respect to the Chapter 11 Cases.

"<u>Seller Retained Professional Fees Escrow</u>" means the escrow account established pursuant to the Seller Retained Professional Fees Escrow Agreement with subaccounts for each such Professional.

"<u>Seller Retained Professional Fees Escrow Agreement</u>" means a customary escrow agreement reasonably acceptable to the parties by and among the Purchaser, the Sellers and the escrow agent for the disbursement of the amount payable by the Purchaser pursuant to <u>Section 1.6</u> in connection with the Seller Retained Professional Fees.

"<u>Straddle Period</u>" means a taxable period that includes but does not end on the Closing Date.

"<u>Subsidiary</u>" means with respect to any Person, any corporation, limited liability company, partnership or other organization, whether incorporated or unincorporated, of which (a) outstanding shares of capital stock of, or other equity interests, having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation, limited liability company, partnership or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its

81

Subsidiaries, or by such Person and one or more of its Subsidiaries, or (b) with respect to a partnership, such Person or any other Subsidiary of such Person is a general partner of such partnership.

"Tax" *or* "Taxes" means (a) any and all U.S. federal, state, local and non-U.S. taxes, assessments, levies, duties, tariffs, imposts and other similar charges and fees imposed by any Governmental Entity, including income, franchise, windfall or other profits, gross receipts, property, sales, use, net worth, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, excise, withholding, ad valorem, stamp, transfer, value-added, occupation, environmental, disability, real property, personal property, registration, alternative or add-on minimum, or estimated tax, including any interest, penalty, additions to tax and any additional amounts imposed with respect thereto; and (b) any liability for or in respect of any amounts described in clause (a) under a Tax sharing, indemnity, assumption, succession, allocation or similar agreement, as a result of having filed any Tax Return on a combined, unitary, affiliated or similar basis, or as a transferee or a successor by Contract or operation of Law.

"Tax Return" means any report, return, certificate, claim for refund, election, estimated Tax filing or declaration filed or required to be filed with any Governmental Entity with respect to Taxes, including any schedule or attachment thereto, and including any amendments thereof.

"Taxing Authority" means any U.S. federal, state, local or non-U.S. Governmental Entity or authority responsible for the imposition, collection or administration of any Tax.

"Third Lien Notes Agent" means The Bank of New York Mellon Trust Company, N.A. in its capacities as Trustee and Collateral Agent under the Third Lien Notes Indenture.

"Third Lien Notes Claim" means any claims or obligations arising under the Third Lien Notes Documents.

"Third Lien Notes Documents" means the Third Lien Notes Indenture and all related amendments, supplements, notes, pledges, collateral agreements, loan and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the Third Lien Notes Indenture, in each case as amended, restated, supplemented, or modified from time to time.

"Third Lien Notes Indenture" means that certain Indenture, dated as of December 18, 2018, by and among Parent, as issuer, the subsidiary guarantor parties thereto, and the Third Lien Notes Agent, as amended, supplemented, or otherwise modified from time to time.

"Trade Secrets" means trade secrets, confidential or proprietary information, inventions, processes, procedures, databases, algorithms and know-how.

82

"<u>Trademarks</u>" means trademarks, trade names, service marks, trade dress, logos, design rights and other similar designations of origin, together with the goodwill symbolized by any of the foregoing.

"<u>Wind-Down Fees</u>" means an aggregate amount equal to $2,000,000, which shall be used to fund the wind down and dissolution of the Sellers' estates.

"<u>Wind-Down Fees Escrow</u>" means the escrow account established pursuant to the Wind-Down Fees Escrow Agreement.

"<u>Wind-Down Fees Escrow Agreement</u>" means a customary escrow agreement reasonably acceptable to the parties by and among the Purchaser, the Sellers and the escrow agent for the disbursement of the amount payable by the Purchaser pursuant to <u>Section 1.6</u> in connection with the Wind-Down Fees, and which shall provide that any amount not so used to satisfy such fees shall be promptly paid to the Sellers.

<u>Terms Defined Elsewhere</u>.  The following terms are defined elsewhere in this Agreement, as indicated below:

| **Term** | **Section** |
|---|---|
| ABL Financing | 5.26 |
| ABL Lenders | 5.26 |
| Acquired Assets | 1.1 |
| Acquisition | Recitals |
| Agreement | Preamble |
| Allocation | 1.8 |
| Alternative Transaction | 5.27 |
| Assigned Contract | 1.5(c) |
| Assigned Contracts | 1.1(c) |
| Assignment and Assumption Agreement | 2.2(a)(ii) |
| Assumed Benefit Plans | 1.1(q) |
| Assumed Liabilities | 1.3 |
| Assumption | 5.18 |
| Audited Financial Statements | 3.6 |
| Available Contracts | 1.5(a) |
| Avoidance Actions | 1.1(n) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bill of Sale | 2.2(a)(i) |
| Brigade | 6.1(d) |
| Business | Recitals |
| Cash Payment | 1.6 |
| Cash Remainder | 1.6 |
| Chapter 11 Cases | Recitals |
| Chatham | Preamble |
| Closing | 2.1 |
| Closing Date | 2.1 |
| Confidential Information | 5.25 |
| Contemplated Transactions | 8.18(b) |
| Credit Bid | Recitals |
| Cure Cost Dispute | 1.5(b) |
| Cure Costs | 1.5(a) |
| Deed | 2.2(a)(vi) |
| Deeded Real Property | 1.1(r) |
| Designated Parties | 1.1(n) |
| Determination Date | 1.5(g) |
| Discovering Party | 1.5(c) |
| DOJ | 5.3(b) |
| Employment Agreements | 5.16 |
| Enforceability Limitations | 3.3 |
| Excluded Assets | 1.2 |

84

| **Term** | **Section** |
| --- | --- |
| Excluded Liabilities | 1.4 |
| Extended Contract Period | 1.5(g) |
| FCPA | 3.18 |
| Financial Statements | 3.6 |
| First Lien Notes Interest | 1.6 |
| Foreign National Employees | 5.11(g) |
| FTC | 5.3(b) |
| Guaranteed Obligation | 8.3 |
| Guarantees | 5.17(a) |
| Guarantor | Preamble |
| HSR Act | 3.4 |
| Intellectual Property Assignment Agreements | 2.2(a)(iii) |
| Intended Tax Treatment | 8.1(e) |
| Inventory | 1.1(d) |
| Leased Real Property | 3.12(b) |
| Material Customer | 3.24 |
| Material Supplier | 3.24 |
| materiality | 6.2(a) |
| Necessary Consent | 5.3(a) |
| Non-Periodic Taxes | 8.1(b) |
| Outside Date | 7.1(a) |
| Parent | Preamble |
| Parent's Allocation Notice | 1.8 |
| parties | Preamble |
| party | Preamble |
| Payoff | 5.18 |
| Periodic Taxes | 8.1(b) |
| Permits | 3.19(a) |
| Petition Date | Recitals |
| Previously Omitted Contract | 1.5(c) |
| Previously Omitted Contract Notice | 1.5(c) |
| Purchase Price | 1.6 |
| Purchaser | Preamble |
| Purchaser Designee | 2.3 |
| Purchaser Disclosure Letter | IV |
| Purchaser's Allocation | 1.8 |
| Qualifying Cash Proposal | 3.27 |
| Real Property | 3.12(c) |
| Released Claims | 5.20(a) |
| Released Party | 5.20(a) |
| Releasing Party | 5.20(a) |
| Sale Contracts | 1.1(c) |
| Sale Motion | 5.6 |
| Securities Act | 3.16 |

Redline MNI - CAM APA (Court Filing) 631790v3 and MNI - CAM APA (Execution Version)
632032v7 8/3/2020 4:05:50 PM

| **Term** | **Section** |
| --- | --- |
| Seller Disclosure Letter | III |
| Sellers | Preamble |
| Specified Refunds | 1.1(b) |
| Trade Payables | 1.3(d) |
| Transfer Taxes | 8.1(a) |
| Transferred Employee | 5.11(b) |
| Unaudited Financial Statements | 3.6 |
| WARN Act | 3.21(d) |

*[Signature Page Follows]*

86

IN WITNESS WHEREOF, the Sellers and the Purchaser have caused this Agreement to be executed on their behalf as of the date first written above.

**PARENT:**

**The McClatchy Company**

By: /s/ Peter Farr
       Name:    Peter Farr
       Title:     Vice President, Finance and Chief Financial Officer

**SELLER REPRESENTATIVE:**

**The McClatchy Company, in its capacity as a Seller and the Seller Representative**

By: /s/ Peter Farr
       Name:    Peter Farr
       Title:     Vice President, Finance and Chief Financial Officer

*[Signature Page to Asset Purchase Agreement]*

**SELLER:**

**Aboard Publishing, Inc.**

By:      /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

*[Signature Page to Asset Purchase Agreement]*

**SELLER:**

**Bellingham Herald Publishing, LLC**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**


**Belton Publishing Company, Inc.**


By:      /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
           Treasurer

**SELLER:**


**Biscayne Bay Publishing, Inc.**


By:     /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**


**Cass County Publishing Company, Inc.**


By:    /s/ Peter Farr

Name: Peter Farr

Title:  Vice President, Assistant Secretary and
          Treasurer

**SELLER:**

**Columbus Ledger-Enquirer, Inc.**

By:     /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Cypress Media, Inc.**

By:      /s/ Peter Farr

Name: Peter Farr

Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Cypress Media, LLC**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**East Coast Newspapers, Inc.**

By: /s/ Peter Farr
Name: Peter Farr
Title: Vice President, Assistant Secretary and
   Treasurer

**SELLER:**

**El Dorado Newspapers**

By:   /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

**SELLER:**


**Gulf Publishing Company, Inc.**


By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Herald Custom Publishing of Mexico, S. de. R.L.
de C.V.**


By:    /s/ Peter Richard Farr

Name:  Peter Richard Farr

Title:  Attorney-in-fact

**SELLER:**

**HLB Newspapers, Inc.**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
Treasurer

**SELLER:**

**Idaho Statesman Publishing, LLC**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Keltatim Publishing Company, Inc.**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
         Treasurer

**SELLER:**


**Keynoter Publishing Company, Inc.**


By:     /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Lee's Summit Journal, Incorporated**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

**SELLER:**

**Lexington H-L Services, Inc.**

By:     /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
          Treasurer

**SELLER:**

**Mail Advertising Corporation**

By:     /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

**SELLER:**

**McClatchy Big Valley, Inc.**

By:      /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**McClatchy Interactive LLC**

By:     /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**McClatchy Interactive West**

By:      /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**


**McClatchy International, Inc.**


By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**McClatchy Investment Company**

By:      /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**


**McClatchy Management Services, Inc.**


By:      /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**McClatchy News Services, Inc.**

By:    /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
           Treasurer

**SELLER:**

**McClatchy Newspapers, Inc.**

By:      /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**McClatchy Property, Inc.**

By:     /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**McClatchy Resources, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

**SELLER:**

**McClatchy Shared Services, Inc.**

By:  /s/ Peter Farr
Name: Peter Farr
Title: Vice President, Assistant Secretary and
       Treasurer

**SELLER:**

**McClatchy U.S.A., Inc.**

By:    /s/ Peter Farr
Name: Peter Farr
Title: Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Miami Herald Media Company**

By:     /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**N & O Holdings, Inc.**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
       Treasurer

**SELLER:**

**Newsprint Ventures, Inc.**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Nittany Printing and Publishing Company**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Nor-Tex Publishing, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
        Treasurer

**SELLER:**


**Oak Street Redevelopment Corporation**


By:      /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Olympian Publishing, LLC**

By:      /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Olympic-Cascade Publishing, Inc.**

By:      /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
          Treasurer

**SELLER:**

**Pacific Northwest Publishing Company, Inc.**

By:  /s/ Peter Farr

Name: Peter Farr

Title:  Vice President, Assistant Secretary and Treasurer

**SELLER:**

**San Luis Obispo Tribune, LLC**

By:     /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Star-Telegram, Inc.**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Tacoma News, Inc.**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**The Bradenton Herald, Inc.**

By:     /s/ Peter Farr

Name:  Peter Farr

Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**The Charlotte Observer Publishing Company**

By:    /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**The Macon Telegraph Publishing Company**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**The McClatchy Company Foundation**

By:      /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
            Treasurer

**SELLER:**

**The News and Observer Publishing Company**

By:    /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**The State Media Company**

By:      /s/ Peter Farr
Name: Peter Farr
Title:   Vice President, Assistant Secretary and
           Treasurer

**SELLER:**

**The Sun Publishing Company, Inc.**

By:      /s/ Peter Farr
Name:  Peter Farr
Title:   Vice President, Assistant Secretary and
         Treasurer

**SELLER:**

**Tribune Newsprint Company**

By:    /s/ Peter Farr
Name: Peter Farr
Title: Vice President, Assistant Secretary and
      Treasurer

**SELLER:**

**Tru Measure, LLC**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**SELLER:**

**Wichita Eagle and Beacon Publishing Company, Inc.**

By:    /s/ Peter Farr

Name: Peter Farr

Title:  Vice President, Assistant Secretary and Treasurer

**SELLER:**

**Wingate Paper Company**

By:    /s/ Peter Farr
Name: Peter Farr
Title:  Vice President, Assistant Secretary and
        Treasurer

**PURCHASER:**

**SIJ Holdings, LLC**

By: /s/ James Ruggerio, Jr.
      Name: James Ruggerio, Jr.
      Title:  President and CEO

**SOLELY FOR SECTIONS 5.19 AND 5.20:**

**Chatham Asset Management, LLC**

By: /s/ Anthony R. Melchiorre
      Name: Anthony R. Melchiorre
      Title:  Managing Member

**SOLELY FOR SECTION 8.3:**

**Chatham Asset High Yield Master Fund, Ltd.**

By: Chatham Asset Management, LLC
Its: Investment Advisor

By: /s/ Anthony R. Melchiorre
      Name: Anthony R. Melchiorre
      Title: Managing Member

*[Signature Page to Asset Purchase Agreement]*

| Summary report: Litera® Change-Pro for Word 10.8.2.11 Document comparison done on 8/3/2020 4:05:50 PM | |
|---|---|
| **Style name:** #Skadden (Strikethrough, Double Score, No Moves) | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** dm://PALSR01A/631790/3 | |
| **Description:** MNI - CAM APA (Court Filing) | |
| **Modified DMS:** dm://PALSR01A/632032/7 | |
| **Description:** MNI - CAM APA (Execution Version) | |
| **Changes:** | |
| Add | 8 |
| Delete | 13 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 21 |

# EXHIBIT C

**Framework Agreement**

*Execution Version*

# FRAMEWORK AGREEMENT

This FRAMEWORK AGREEMENT (together with the attached Exhibits, this "Agreement") is made and entered into as of July 1, 2020, by and among (a) Chatham Asset Management LLC and each of its managed funds or accounts that is a beneficial holder of those certain 9.000% Senior Secured Notes due 2026 (the "First Lien Notes") issued by The McClatchy Company (the "Issuer" or "McClatchy") pursuant to that certain Indenture, dated as of July 16, 2018, by and among the Issuer, the Issuer's subsidiary guarantors party thereto, The Bank of New York Mellon Trust Company, N.A., as trustee (the "First Lien Notes Trustee"), as amended, supplemented, or otherwise modified from time to time (the "First Lien Notes Indenture"); (b) Brigade Capital Management and each of its managed funds or accounts that is a beneficial holder of the First Lien Notes and (c) the Purchaser (defined below). All persons that are party to this Agreement are referred to herein individually as a "Party" and, collectively as the "Parties". Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Term Sheet.

# RECITALS

WHEREAS, on February 13, 2020, McClatchy and certain of its direct and indirect subsidiaries and affiliates (collectively, the "Debtors") commenced voluntary proceedings (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, on May 11, 2020, the Bankruptcy Court entered the *Order (I) Establishing Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (II) Establishing Procedures for the Debtors to Enter Into Stalking Horse Agreement with Bid Protections in Connection with a Sale of Substantially All of the Debtors' Assets; (III) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (IV) Approving Form and Manner of Notice of All Procedures, Protections, Schedules and Agreements; (V) Scheduling a Hearing to Consider the Proposed Sale and (VI) Granting Certain Related Relief* [Docket No. 432] (the "Bidding Procedures Order") approving the Debtors' proposed bidding procedures for the Chapter 11 Cases (the "Bidding Procedures");

WHEREAS, the Parties desire and intend to submit a "credit bid" on account of the First Lien Notes (the "Credit Bid") for substantially all of the Debtors' assets pursuant to the Bidding Procedures in accordance with (i) the term sheet attached hereto as **Exhibit A** (the "Sale Term Sheet"), (ii) the APA (defined below) attached hereto as **Exhibit B** (the transaction contemplated thereunder, the "Sale Transaction") and (iii) that certain Instruction and Indemnity Letter substantially in the form attached hereto as **Exhibit C**, by and among the Parties and the First Lien Notes Trustee (the "Instruction Letter" and collectively with the APA and Sale Term Sheet, the "Sale Documents");

WHEREAS, as contemplated by the APA, it is intended that the Credit Bid shall be accompanied by a cash payment of up to $49.2 million (the "Cash Amount") to be funded by the Purchaser in accordance with this Agreement and pursuant to the APA;

WHEREAS, it is intended that at the date and time (the "Closing Date") of the closing of the Sale Transaction (the "Closing"), and simultaneously therewith, the Purchaser, in its capacity as a borrower or issuer (as applicable), shall issue the New First Lien Term Loans and New 1.5 Lien Notes consistent with this Agreement and the Transaction Documents (defined below);

WHEREAS, it is intended that, at the Closing, the Chatham Parties shall retain the entire equity interest in the Purchaser and shall be issued the New 1.5 Lien Notes, in consideration of the Assignment (defined below), the Cash Amount and the assumption of the Assumed Liabilities (as defined in the APA);

WHEREAS, it is intended that, at the Closing, the New First Lien Term Loans shall be issued to all holders of First Lien Notes, other than the Chatham Parties but including the Brigade Parties (defined below), in consideration of the Assignment;

WHEREAS, for U.S. federal (and applicable state and local) income tax purposes, the Parties intend to treat (i) the exchange of the First Lien Notes for the New First Lien Term Loans and the New 1.5 Lien Notes (the "Exchange") as a taxable exchange subject to Section 1001 of the Code and (ii) the Purchaser's adjusted basis in the First Lien Notes as equal to the issue price (within the meaning of Section 1.1273-2 of the Treasury Regulations) of the New First Lien Term Loans and the New 1.5 Lien Notes exchanged therefore; and

WHEREAS, each Party desires to memorialize certain agreements between the Parties to effectuate the Transaction (defined below).

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1.    DEFINITIONS

The following terms shall have the following meanings:

*"Affiliate"* means, with respect to a specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified.  The term "control "(including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"*Agreement*" shall have the meaning ascribed to such term in the Preamble.

*"Agreement Effective Date"* shall have the meaning ascribed to such term in Section 2.1(b).

2

"***Agreement Period***" means the period between the Agreement Effective Date and the earlier of (i) the Closing Date and (ii) a Termination Date.

"***APA***" means the Asset Purchase Agreement in the form attached hereto as **Exhibit B** (but not, for the avoidance of doubt, including any amendment or modification thereto unless approved in writing by the Brigade Parties), and including all schedules and exhibits and any other documentation related thereto, in each case as shall be acceptable in all respects to the Chatham Parties and the Brigade Parties.

"***Assignment***" shall have the meaning ascribed to such term in the Instruction Letter.

"***Auction***" shall have the meaning ascribed to such term in the Bidding Procedures.

"***Backup Bid***" shall have the meaning ascribed to such term in the Bidding Procedures.

"***Bankruptcy Code***" shall have the meaning ascribed to such term in the Recitals.

"***Bankruptcy Court***" shall have the meaning ascribed to such term in the Recitals.

"***Bidding Procedures***" shall have the meaning ascribed to such term in the Recitals.

"***Bidding Procedures Order***" shall have the meaning ascribed to such term in the Recitals.

"***Brigade Advisors***" means, collectively, (i) Kramer Levin Naftalis & Frankel LLP, as counsel to the Brigade Parties, and (ii) GLC Advisors &Co., LLC, as financial advisor to the Brigade Parties.

"***Brigade Parties***" means, collectively, Brigade Capital Management and each of its managed funds or accounts that is a beneficial holder of the First Lien Notes.

"***Business Day***" means any day other than Saturday, Sunday or a day that banks are authorized by law to be closed in the City of New York, Borough of Manhattan.

"***Chapter 11 Cases***" shall have the meaning ascribed to such term in the Recitals.

"***Chatham Advisors***" means, collectively, (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP and Quinn Emanuel Urquhart & Sullivan, LLP, as co-counsel to the Chatham Parties, and (ii) Ducera Partners LLC, as financial advisor to the Chatham Parties.

"***Chatham Parties***" means, collectively, Chatham Asset Management, LLC and each of its managed funds or accounts that is a beneficial holder of the First Lien Notes.

"***Claims***" means all claims (including, without limitation, crossclaims, counterclaims, and rights of setoff and/or recoupment), actions, causes of action, suits, debts, accounts, interests, liens, liabilities, promises, warranties, damages and

3

consequential damages, demands, agreements, obligations, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or other claims of whatever nature or kind, in each case whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, direct or indirect, now existing or hereafter arising, in law, equity, or otherwise that directly or indirectly relate to, arise out of or otherwise are in connection with any or all of: (a) the Debtors' restructuring efforts; (b) the formulation, preparation, dissemination, negotiation of the Transaction Documents and the implementation of the Transaction; (c) the First Lien Notes Documents; (d) the Chapter 11 Cases; (e) any Prior Event, and (f) any other act or omissions, transaction, agreement, event or other occurrence taking place on or before the Closing Date related to the foregoing.

"*Closing*" shall have the meaning ascribed to such term in the Recitals.

"*Closing Date*" shall have the meaning ascribed to such term in the Recitals.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collateral*"  means the New First Lien Term Loan Collateral and the New ABL Priority Collateral.

"*Credit Bid*" shall have the meaning ascribed to such term in the Recitals.

"*Debtors*" shall have the meaning ascribed to such term in the Recitals.

"*Exchange*" shall have the meaning ascribed to such term in the Recitals.

"*Final Bid*" shall have the meaning ascribed to such term in the Bidding Procedures.

"*First Lien Notes*" shall have the meaning ascribed to such term in the Preamble.

"*First Lien Notes Claims*" means any claims or obligations arising under the First Lien Notes Documents.

"*First Lien Notes Documents*" means the First Lien Notes Indenture and all related amendments, supplements, notes, pledges, collateral agreements, loan and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the First Lien Notes Indenture, in each case as amended, restated, supplemented, or modified from time to time.

"*First Lien Notes Indenture*" shall have the meaning ascribed to such term in the Preamble.

"*First Lien Notes Trustee*" shall have the meaning ascribed to such term in the Preamble.

"*Framework Commitments*" shall have the meaning ascribed to such term Section 2.1(b) hereof.

"*Governmental Body*" means any foreign, federal, state, municipal, local or other government, or other department, commission, board, bureau, agency, public authority or instrumentality thereof or any other court or arbitrator.

"*Indemnity Assumption Agreement*" means an agreement by and among the Purchaser, the Brigade Parties, and the Chatham Parties, pursuant to which the Purchaser will assume all obligations, including any indemnity obligations, of the Brigade Parties and the Chatham Parties to the First Lien Notes Trustee, its officers, directors, members, managers, employees and agents under the Instruction Letter or any Subsequent Instruction.  The Indemnity Assumption Agreement shall be in form and substance acceptable to the Parties.

"*Instruction Letter*" shall have the meaning ascribed to such term in the Recitals, and shall be in form and substance acceptable to the Parties.

"*Issuer*" shall have the meaning ascribed to such term in the Preamble.

"*Joinder*" shall have the meaning ascribed to such term Section 6.1.

"*McClatchy*" shall have the meaning ascribed to such term in the Preamble.

"*New 1.5 Lien Indenture*" means the indenture (as may be amended, modified or otherwise supplemented) governing the terms of the New 1.5 Lien Notes, which shall be in form and substance consistent in all material respects with the New 1.5 Lien Notes Term Sheet, and shall be entered into on the Closing Date by the New 1.5 Lien Trustee, as indenture trustee, and the Purchaser, as issuer, pursuant to which the Purchaser shall issue the New 1.5 Lien Notes to the New 1.5 Lien Noteholders.

"*New 1.5 Lien Notes Documents*" means the New 1.5 Lien Indenture, the New Intercreditor Agreement, and all related amendments, supplements, notes, pledges, collateral agreements, security agreements, instruments, mortgages, control agreements, deeds of trust, and other documents or instruments executed or delivered in connection with the New 1.5 Lien Indenture, in each case as amended, restated, supplemented, or modified from time to time.  The 1.5 Lien Notes Documents shall be in form and substance acceptable to the Chatham Parties and the Brigade Parties.

"*New 1.5 Lien Notes*" means the 1.5 lien notes issued by the Purchaser to the New 1.5 Lien Noteholders pursuant to the New 1.5 Lien Notes Indenture.

"*New 1.5 Lien Noteholders*" means, collectively, the Chatham Parties that are holders of First Lien Notes or Affiliates thereof as may be determined by the Chatham Parties to receive the New 1.5 Lien Notes on the Closing Date.

"*New 1.5 Lien Notes Term Sheet*" means the term sheet attached as Schedule 3 to the Sale Term Sheet setting forth the material terms of the New 1.5 Lien Notes.

"*New 1.5 Lien Trustee*" means the financial institution or other Person selected by the Chatham Parties, in its capacity as indenture trustee under the New 1.5 Lien Indenture.

"*New ABL Agent*" means Encina Business Credit, LLC, in its capacity as administrative agent and collateral agent under the New ABL Facility Credit Agreement.

"*New ABL Priority Collateral*" shall have a meaning substantially similar to the meaning ascribed to the term "ABL Priority Collateral" in the ABL/Notes Intercreditor Agreement, dated as of July 16, 2018, subject to modification that shall be acceptable to the Purchaser and Brigade Parties.

"*New ABL Facility*" means the senior secured asset-based revolving credit facility governed by the New ABL Facility Credit Agreement.

"*New ABL Facility Credit Agreement*" means the credit agreement (as may be amended, modified or otherwise supplemented) governing the New ABL Facility to be entering into on the Closing Date by and among the New ABL Agent, the New ABL Lenders party thereto, the Purchaser, and the guarantor parties thereto.

"*New ABL Facility Documents*" means the New ABL Facility Credit Agreement, the New Intercreditor Agreement, and all related amendments, supplements, notes, pledges, collateral agreements, loan and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the New ABL Facility Credit Agreement, in each case as amended, restated, supplemented, or modified from time to time. The New ABL Facility Documents shall be acceptable to the Chatham Parties and the Brigade Parties.

"*New Board*" means the board of directors of the Purchaser, which shall be selected in a manner set forth in the Sale Term Sheet.

"*New First Lien Term Loan Agent*" means The Bank of New York Mellon Trust Company, N.A., in its capacity as administrative agent and collateral agent under the New First Lien Term Loan Credit Agreement.

"*New First Lien Term Loan Collateral*" means all owned or after acquired assets and property of the Purchaser and its subsidiaries, including, without limitation, inventory, accounts receivable, real property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries, and the proceeds of the foregoing.

"*New First Lien Term Loan Credit Agreement*" means a credit agreement consistent in all respects with the term sheet attached as <u>Schedule 2</u> to the Sale Term Sheet, that is acceptable to the Brigade Parties and the Purchaser consistent with <u>Section 3.3</u> hereof.

"*New First Lien Term Loan Documents*" means the New First Lien Term Loan Credit Agreement, the New Intercreditor Agreement, and all related amendments, supplements, notes, pledges, collateral agreements, loan and security agreements,

instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the New First Lien Term Loan Credit Agreement, in each case as amended, restated, supplemented, or modified from time to time. The New First Lien Term Loan Documents shall be acceptable to the Chatham Parties and the Brigade Parties.

"***New First Lien Term Loan Facility***" means the first lien term loan facility governed by the New First Lien Term Loan Credit Documents.

"***New First Lien Term Loan Lenders***" means the holders of First Lien Notes as of the Closing Date (excluding the Chatham Parties) that shall receive the New First Lien Term Loans on the Closing Date.

"***New First Lien Term Loans***" means the loans of the New First Lien Term Loan Lenders to the Purchaser governed by the New First Lien Term Loan Documents.

"***New First Lien Term Sheet***" means the term sheet attached as <u>Schedule 2</u> to the Sale Term Sheet setting forth the materials terms of the New First Lien Term Loan Facility.

"***New Governance Documents***" means the articles of incorporation, certificate of formation, operating agreement and/or bylaws or similar documents (as applicable) of the Purchaser, and any subsidiary thereof, which shall be consistent with the Sale Term Sheet, acceptable in all respects to the Chatham Parties, and reasonably acceptable to the Brigade Parties solely with respect to provisions establishing that for so long as the New First Lien Term Loans are outstanding, the Purchaser shall maintain at least two independent directors.

"***New Intercreditor Agreement***" means the intercreditor agreement (as may be amended, modified or otherwise supplemented), to be entered into by the Purchaser, the New ABL Agent, the New First Lien Term Loan Agent and the New 1.5 Lien Trustee relating to, among other things, rights to the collateral securing the obligations under the New ABL Facility, the New First Lien Term Loan Facility and the New 1.5 Lien Notes, which shall be in form and substance acceptable to the Parties.

"***Outside Date***" shall have the meaning ascribed to such term in the APA.

"***Permitted Purchase Price Modification***" means an increase in the purchase price under the APA to an amount not exceeding $315 million; <u>provided</u> that the amount drawn under the New ABL Facility immediately following the Closing as a consequence of such increase in the purchase price shall in no event exceed $19.2 million; and <u>provided</u> <u>further</u> that all other terms and conditions of the APA shall remain unchanged.

"***Permitted Transferee***" shall have the meaning ascribed to such term <u>Section 6.1</u>.

"***Parent Entity***" shall mean any Person that is the direct holder of any portion of the Purchaser's equity.

"*Parties*" and "*Party*" shall have the meaning ascribed to such term in the Preamble.

"*Person*" means any individual, firm, corporation, business enterprise, trust, association, joint venture, partnership, Governmental Body or other entity, whether acting in an individual, fiduciary or other capacity.

"*Prior Event*" means any transaction, event, circumstances, action, failure to act or occurrence of any sort or type, including any approval or acceptance given or denied, whether known or unknown, in each case, which occurred, existed, was taken prior to, and in connection with, the consummation of the Transactions.

"*Purchaser*" mean a Delaware limited liability company (or such other entity or entities as determined by the Chatham Parties) formed by the Chatham Parties (or Affiliates thereof) for purposes of acting as the "Purchaser" (as defined in the APA), which shall be wholly-owned by the Chatham Parties (or Affiliates thereof).

"*Purchaser Debt Documents*" means collectively, the New ABL Facility Documents, the New First Lien Term Loan Documents, and the New 1.5 Lien Notes Documents.

"*Purchaser Debt Facilities*" means, collectively, the New ABL Facility, the New First Lien Term Loan Facility, and the New 1.5 Lien Notes incurred or issued by the Purchaser on the Closing Date.

"*Purchaser Subsidiary*" means each subsidiary, if any, of the Purchaser that acquires any of the Debtors' assets pursuant to the APA, or to which any such assets are transferred immediately following the consummation of the Sale Transaction.

"*Qualified Marketmaker*" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Debtors (or enter with customers into long and short positions in claims against the Debtors), in its capacity as a dealer or market maker in claims against the Debtors and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"*Released Party*" shall have the meaning ascribed to such term in Section 4.1.

"*Releasing Party*" shall have the meaning ascribed to such term in Section 4.1.

"*Sale Documents*" shall have the meaning ascribed to such term in the Recitals.

"*Sale Order*" means the order entered by the Bankruptcy Court approving the Sale Transaction and authorizing the Debtors to consummate the Sale Transaction, which shall be in form and substance acceptable to the Parties.

"*Sale Term Sheet*" shall have the meaning ascribed to such term in the Recitals.

"*Sale Transaction*" shall have the meaning ascribed to such term in the Recitals.

"*Subsequent Instruction Notice*" shall have the meaning ascribed to such term in Section 3.5(f).

"*Successful Bid*" shall have the meaning ascribed to such term in the Bidding Procedures.

"*Termination Date*" means the earliest date on which termination of this Agreement occurs pursuant to Section 7.

"*Transaction*" shall have the meaning ascribed to such term in Section 2.1(a).

"*Transaction Documents*" means, collectively, the Sale Documents, the Purchaser Debt Documents, the Indemnity Assumption Agreement, and all other agreements or documentation necessary to implement the Transaction.

"*Transaction Step*" shall have the meaning ascribed to such term in the Section 2.1(b).

"*Transfer*" shall have the meaning ascribed to such term Section 6.1.

"*Treasury Regulations*" means the treasury regulations promulgated under the Code.

## 2.    FRAMEWORK COMMITMENT; TRANSACTION STEPS

2.1    Framework Commitments.

(a)    The Sale Transaction, transactions contemplated by the Purchaser Debt Documents, and the transactions contemplated herein and the Sale Term Sheet are being effected as part of an integrated series of transactions (collectively, the "Transaction").

(b)    Beginning on the date that this Agreement is executed by each Party (the "Agreement Effective Date"), during the Agreement Period, each Party hereby expressly commits, agrees and covenants to: (i) take all actions reasonably necessary to effectuate, support, and to cooperate with the other Party to facilitate the implementation of the Transaction and each of the steps of the Transaction set forth in Section 2.2 (each such step, a "Transaction Step"); (ii) subject to each Party's rights under this Agreement and the Transaction Documents, not otherwise hinder, delay, impair or frustrate the Transaction or any Transaction Step; and (iii) negotiate in good faith to structure the Sale Transaction in a tax efficient manner acceptable to each Party (the commitments and covenants set forth in this Section 2.1(b), the "Framework Commitments").

9

(c)     Consistent with the Framework Commitments, during the Agreement Period:

    (i)     the Parties shall execute and deliver the Instruction Letter to the First Lien Notes Trustee on the date hereof;

    (ii)     the Purchaser and Chatham Asset Management LLC shall execute the APA on the date hereof;

    (iii)     consistent with the Instruction Letter and the Bidding Procedures, on the date hereof, the Parties shall coordinate with the First Lien Notes Trustee to submit the APA as a Final Bid;

    (iv)     if the Debtors conduct an Auction, the Parties shall participate in good faith at the Auction solely on the basis of the APA in the form attached to this Agreement, except to the extent the Parties agree to any modifications thereto, including, for the avoidance of doubt, any increase of the cash component of the purchase price thereunder other than a Permitted Purchase Price Modification, in their sole discretion (to the extent such modification are agreed, the Parties shall negotiate in good faith to make such modifications);

    (v)     the Parties shall negotiate the form of the Sale Order in good faith with each other and the Debtors, which shall be in form and substance acceptable to the Parties;

    (vi)     the Chatham Parties shall prepare the New Governance Documents, which shall be in form and substance consistent with the Sale Term Sheet, and the New Governance Documents shall become effective prior to or on the Closing Date;

    (vii)     the Chatham Parties shall appoint the New Board consistent with the terms of the New Governance Documents;

    (viii)     the Parties shall negotiate and document the New ABL Facility Documents, the New First Lien Term Loan Documents and the New 1.5 Lien Notes Documents as provided in Section 3.3;

    (ix)     the Chatham Parties shall take the required actions to obtain any necessary consents or approvals by any Governmental Body required to consummate the Transaction; and

    (x)     the Parties shall take any other action consistent with the Framework Commitments necessary to consummate the Transaction as may be mutually agreed among the Parties.

2.2     <u>Transaction Steps</u>. In the event the Sale Transaction is selected as the Successful Bid by the Debtors, the Parties agree that the steps taken to consummate the

Transaction shall be taken on the Closing Date and shall be deemed to occur in the following order substantially simultaneously:

(a)    the Chatham Parties or Affiliates thereof shall directly or indirectly contribute no less than $30 million to the Purchaser in exchange for all of the equity interests of the Purchaser, with the amount drawn under the New ABL Facility immediately following the Closing not to exceed $19.2 million;

(b)    the First Lien Notes Trustee and the Purchaser shall effectuate the Assignment, subject, however, to the payment and distribution in respect of the First Lien Notes as provided in clause (d) below;

(c)    the Sale Transaction contemplated under the APA shall be consummated;

(d)    the Purchaser on behalf of the Issuer, pursuant to the Sale Order, shall pay to the First Lien Notes Trustee cash in an amount equal to all accrued and unpaid interest due under the First Lien Notes Indenture through the Closing Date (such interest calculated at the non-default rate), and the First Lien Notes Trustee shall distribute such cash amount consistent with the First Lien Notes Indenture to the holders of the First Lien Notes as of the Closing Date in accordance with the practices and procedures of the Depository Trust Company;

(e)    the Chatham Parties shall cause the Purchaser and each Purchaser Subsidiary to execute;

(i)    the New First Lien Term Loan Credit Agreement and the other New First Lien Term Loan Documents, effective as of the Closing Date, such that the New First Lien Term Loan Documents shall become effective and the New First Lien Term Loans contemplated to be made thereunder or deemed made on the Closing Date shall be made or deemed made by each New First Lien Term Loan Lender to the Purchaser in an amount equal to the aggregate principal amount of First Lien Notes held by such New First Lien Term Loan Lender on the Closing Date, and the guarantee by each Parent Entity and Purchaser Subsidiary of the obligations of the Purchaser under or related to the New First Lien Term Loans and New First Lien Credit Agreement, and pledge by the Purchaser, each Parent Entity and each Purchaser Subsidiary of the Collateral as security for the obligations under or related to the New First Lien Loans and New First Lien Credit Agreement and, with respect to each Purchaser Subsidiary and each Parent Entity, its obligations under or related to such guarantee, shall each become effective as of the Closing Date; provided that to the extent that a holder of First Lien Notes as of the Closing Date cannot be identified, the New First Lien Term Loans issuable to such holder shall be held by the New First Lien

11

Term Loan Agent in a representative capacity until such holder can be identified;

(ii)    the New ABL Facility Credit Agreement and the other New ABL Facility Documents, effective as of the Closing Date, such that the New ABL Facility Documents shall become effective and any loans contemplated to be made thereunder or deemed made on the Closing Date shall be made or deemed made by each applicable New ABL Lender to the Purchaser, and the pledge by the Purchaser and each Purchaser Subsidiary of the Collateral as security for the loans under the New ABL Facility Documents, and the guarantee by each of the Purchaser Subsidiaries of the obligations of the Purchaser under the New ABL Facility, to the full extent provided in the New ABL Facility Documents, shall each become effective as of the Closing Date; and

(iii)    the New 1.5 Lien Notes Indenture and the other New 1.5 Lien Notes Documents effective as of the Closing Date, such that the New 1.5 Lien Notes Documents shall become effective and the New 1.5 Lien Notes contemplated to be issued or deemed issue to the New 1.5 Lien Noteholders on the Closing Date shall be issued or deemed issued to each New 1.5 Lien Noteholder in an amount equal to the aggregate principal amount of First Lien Notes held by such New 1.5 Lien Noteholder on the Closing Date and the guarantee by each Parent Entity and Purchaser Subsidiary of the obligations of the Purchaser under or related to the New 1.5 Lien Notes and the New 1.5 Lien Indenture, and pledge by the Purchaser, each Parent Entity and each Purchaser Subsidiary of the Collateral as security for the obligations under or related to the New 1.5 Lien Notes and the New 1.5 Lien Indenture and, with respect to each Purchase Subsidiary and each Parent Entity, its obligations under or related to such guarantee, shall each become effective as of the Closing Date; and

(f)    the Purchaser shall execute the Indemnity Assumption Agreement.

2.3    <u>Backup Bid</u>.  In the event that the Sale Transaction is selected as the Backup Bid by the Debtors, the Parties agree that the steps to be taken to consummate the Transaction described in the preceding Section 2.2 shall be taken upon the termination of the Successful Bid pursuant to the Bidding Procedures.

2.4    <u>Perfection of Security Interests</u>. As soon as practical, but (i) in no event later than the close of business on the date of the Closing Date, in the case of financing statements filed under the Uniform Commercial Code, (ii) in no event later than two (2) Business Days after the Closing Date, subject to reasonable extensions in the sole discretion of the New First Lien Term Loan Agent, in the case of filings related to the Purchaser's and any Purchaser Subsidiary's intellectual property and the delivery to the New First Lien Term Loan Agent of the Purchaser's and any

Purchaser Subsidiary's possessory collateral in respect of any entity domiciled in the United States (if any) and (iii) as promptly as reasonably practicable, but in no event later than 30 days from the Closing Date, subject to reasonable extensions in the sole discretion of the New First Lien Term Loan Agent, in the case of all other instruments of perfection, the Chatham Parties shall cause the Purchaser and the Purchaser Subsidiaries to file or record all such financing statements, mortgages and other documentation as shall be necessary to provide for (i) a fully perfected first priority lien in favor of the New First Lien Term Loan Agent in the New First Lien Term Loan Collateral and a fully perfected second priority lien in favor of the New First Lien Term Loan Agent in the New ABL Priority Collateral; (ii) a fully perfected first priority lien in favor of the New ABL Agent in the New ABL Priority Collateral and a fully perfected second priority lien in favor of the New ABL Agent in the New First Lien Term Loan Collateral; and (iii) a fully perfected third priority lien in favor of the New 1.5 Lien Trustee in the Collateral.

2.5    <u>Intended Tax Treatment</u>. The Parties agree to treat (i) the Exchange as a taxable exchange of the First Lien Notes for the New First Lien Term Loans and the New 1.5 Lien Notes subject to Section 1001 of the Code and (ii) the Purchaser's adjusted basis in the First Lien Notes as equal to the issue price (within the meaning of Section 1.1273-2 of the Treasury Regulations) of the New First Lien Term Loans and the New 1.5 Lien Notes exchanged therefore and shall report consistently therewith on their respective U.S. federal (and applicable state and local) tax returns.

2.6    <u>Conditions to Closing</u>. The obligations of each of the Parties to consummate the Transaction, the effectiveness of the Assignment and the Trustee's release of the Collateral (as defined in the First Lien Notes Indenture) as described in the Instruction Letter, are subject to satisfaction of the following conditions:

(a)    each Transaction Document shall have been duly executed and delivered by the parties thereto that are necessary for such Transaction Document to become effective, and all conditions precedent to the effectiveness of such documents shall have been satisfied or waived in accordance therewith, and all steps described in <u>Section 2.2</u> shall have occurred or shall occur substantially simultaneously;

(b)    the other Party has not materially breached or materially failed to perform any of its representations, warranties, covenants or agreements set forth in this Agreement, the Bidding Procedures or the APA;

(c)    the Closing Date shall have occurred by the Outside Date; and

(d)    the Purchaser shall have paid pursuant to the Sale Order, or the Issuer shall have paid on behalf of the Purchaser, all reasonable and documented out-of-pocket expenses incurred by the respective Parties, including the reasonable and documented out-of-pocket fees, charges and disbursements of Chatham Advisors and the Brigade Advisors, as the case may be.

3. **CERTAIN COVENANTS**

3.1 <u>Consideration</u>. Each of the Purchaser and the Chatham Parties, on the one hand, and the Brigade Parties, on the other hand agrees and acknowledges that the Brigade Parties and the Chatham Parties, as applicable, are providing the Instruction Letter and, subject to the terms thereof, agreeing to the Assignment in consideration of the issuance to them of the New First Lien Term Loans and New 1.5 Lien Notes, as applicable, and the payment of the accrued and unpaid interest on the First Lien Notes, and that but for such issuance and payment, the Brigade Parties and the Chatham Parties, as applicable, would not deliver the Instruction Letter or agree to the Assignment.

3.2 <u>Purchaser Subsidiaries.</u> The Chatham Parties shall, or shall cause the Purchaser to, furnish to the Brigade Parties as promptly as practicable, but in any event no later than five (5) Business Days prior to the Closing Date, a list of all Purchaser Subsidiaries and the assets to be held by each of them immediately following the Closing Date, which such list shall include all Purchaser Designees (as defined in the APA) and the assets to be held by each of them immediately following the Closing Date, to assure that each such Purchaser Subsidiary shall become a party on the Closing Date to the New First Lien Loan Documents, New ABL Facility Documents, and the New 1.5 Lien Notes Documents, as appropriate.

3.3 <u>Documentation</u>. The Parties shall cooperate timely and in good faith during the Agreement Period to negotiate and document (i) the New First Lien Loan Documents, which shall be in form and substance consistent with the New First Lien Term Sheet and, except as provided therein, on customary terms for a first lien loan facility, (ii) the New ABL Facility Documents, which shall be in form and substance consistent in all material respects with the New ABL Term Sheet, and (iii) the New 1.5 Lien Notes Documents, which shall be in form and substance consistent in all material respects with the New 1.5 Lien Notes Term Sheet. The New First Lien Loan Documents shall be acceptable to the Brigade Parties in their sole discretion and the New ABL Facility Documents and the New 1.5 Lien Notes Documents shall be reasonably acceptable to the Brigade Parties. The New First Lien Loan Documents shall be reasonably acceptable to the Purchaser and the Chatham Parties, and the New ABL Facility Documents and the New 1.5 Lien Notes Documents shall be acceptable to the Purchaser and the Chatham Parties in their sole discretion.

3.4 <u>Action Inconsistent with this Agreement</u>. No Party shall take any action inconsistent with the Framework Commitments, including, without limitation, instructing the First Lien Notes Trustee to take any action or refrain from taking any action that is inconsistent with the instructions set forth in the Instruction Letter, except as expressly provided in this Agreement.

3.5 <u>Obligations Relating to the APA</u>. Notwithstanding anything to the contrary herein, and without limiting any obligations of the Parties hereunder, including the obligations set forth in <u>Section 2.1(c)</u>:

14

(a)     the Chatham Parties shall not, and shall cause the Purchaser not to, (i) take any action it is permitted or obligated to take pursuant to the APA, including any action the Purchaser is permitted to take pursuant to Section 1.5(g) of the APA and the approval of the form of any Ancillary Document (as defined in the APA), any other document relating to the transactions contemplated by the APA or any other document for which Purchaser's consent is required pursuant to the APA or otherwise sought by Seller (ii) grant any consent to the Sellers in respect of any action of the Sellers, for which Purchaser's consent is required or sought, (iii) amend the APA or the Seller Disclosure Letter (as defined in the APA) or consent to the amendment thereof, other than a Permitted Purchase Price Modification, or (iv) waive the performance of any covenant under, or condition to closing set forth in, the APA, in each case without the prior written consent of the Brigade Parties (such consent not to be unreasonably withheld, delayed or conditioned, it being understood that the election of the Brigade Parties not to consent to any modification, waiver, amendment, or other action that modifies the amount or form of consideration under the APA or otherwise adversely affects the treatment of the holders of First Lien Notes Claims shall not be unreasonable);

(b)     if the Chatham Parties become aware of, or have reason to believe that, a Qualifying Cash Proposal has been made or is likely to be made to the Sellers, the Chatham Parties shall promptly, but in any event not less than 24 hours after becoming aware of, or having reason to believe that, such Qualifying Cash Proposal has been made or is likely to be made, notify the Brigade Parties of the facts and circumstances in respect of such Qualifying Cash Proposal.

(c)     in the event the Sale Transaction is selected as the Successful Bid by the Debtors, the Chatham Parties shall, and shall cause the Purchaser to, comply with or satisfy any covenant or agreement to be complied with or satisfied by it under the APA;

(d)     the Chatham Parties shall: (i) concurrent with the delivery of any notice, request, claim, demand or other communication to the Purchaser pursuant to the APA, deliver such notice, request, claim, demand or other communication to the Brigade Parties, (ii) (x) promptly after they become aware of the same, notify the Brigade Parties of any default under the APA or any agreements ancillary thereto or any proposed or executed amendments to the APA, and (y) provide the Brigade Parties reasonable access to any information which the Purchaser is entitled to receive under the APA prior to the Closing Date (other than any information that remains privileged when delivered to Chatham Parties and will lose such status if delivered to the Brigade Parties) or any agreements ancillary thereto that becomes available to the Chatham Parties; and (iii) keep the Brigade Parties reasonably informed with respect to the status of the Sale Transaction and any developments in respect thereto and promptly notify the Brigade Parties

15

in writing upon the occurrence of any event, fact or circumstance that to the knowledge of the Chatham Parties: (x) has caused any representation or warranty contained in the APA to be untrue or inaccurate in any respect such that it would be reasonable to expect that (A) the applicable closing conditions of the APA would be incapable of being satisfied by the Outside Date (as defined in the APA) or (B) such failure to be true or accurate would have an impact on the Transaction; (y) is likely to or has caused any failure of any party to the APA to comply with or satisfy any covenant or agreement to be complied with or satisfied by it under the APA; or (z) resulted in the failure of any condition necessary to consummate the APA capable of being satisfied by the Outside Date;

(e)    in the event notice is required under the immediately preceding clause (d)(ii)-(iii), the Chatham Parties shall as promptly as reasonably practicable provide the Brigade Parties with a reasonable summary of such event, fact or circumstance and a copy of the pertinent portions of the notice(s) delivered to, or received from, the other parties to the APA in respect thereof (if any); and

(f)    if (i) the APA is amended, or any waiver of any covenant or condition under the APA is granted by the Purchaser, in each case without the prior written consent of the Brigade Parties, other than a Permitted Purchase Price Modification, (ii) this Agreement is terminated in accordance with its terms, or (iii) a Qualifying Cash Proposal (as defined in the APA) has been submitted to the Sellers then, notwithstanding anything to the contrary herein, the Brigade Parties or the Chatham Parties are authorized to deliver a written notice (a "Subsequent Instruction Notice") to the First Lien Notes Trustee, in accordance with the terms of the Instruction Letter, instructing the First Lien Notes Trustee not to take any of the actions set forth in Section I of the Instruction Letter, provided that, to the extent this Agreement is not terminated pursuant to Section 7.1(d) hereof, the Brigade Parties or the Chatham Parties, as applicable, shall rescind such Subsequent Instruction Notice in the event that (x) a Qualifying Cash Proposal is designated as the Successful Bid at the conclusion of the Auction, and (y) the Credit Bid is designated as the Backup Bid at the conclusion of the Auction and is subsequently designated as the Successful Bid pursuant to the Bidding Procedures, so long as no other Qualifying Cash Proposals were received by the Debtors.

3.6    Alternative Credit Bid. Anything to the contrary in this Agreement notwithstanding, in the event that the Brigade Parties have delivered a Subsequent Instruction Notice to the First Lien Trustee as provided in Section 3.5(f), nothing herein shall prohibit the Chatham Parties from delivering, or joining with other holders of First Lien Notes to deliver, to the First Lien Trustee an alternative direction letter (an "Alternative Direction Letter") to submit an alternative credit bid on account of the First Lien Notes (an "Alternative Credit Bid"); provided that the Alternative Credit Bid is on terms at least as favorable to the holders of the First

16

Lien Notes as the terms of the Credit Bid; and provided further if an Alternative Direction Letter is submitted to the First Lien Trustee, nothing herein shall prevent the Brigade Parties from opposing or challenging the Alternative Direction Letter.

3.7    First Lien Notes Trustee Joinder. The Brigade Parties and the Chatham Parties shall use commercially reasonable efforts to cause the First Lien Notes Trustee to join this Agreement by executing a counterparty signature page hereto.

## 4.    RELEASE BY PARTIES; COVENANT NOT TO SUE

4.1    Releases by Parties.  Subject to Section 5, effective automatically and immediately upon the Closing Date, each Party (on behalf of itself and its officers, directors, employees, representatives, agents, partners, managers, advisors and Affiliates) (in such capacity, a "Releasing Party") hereby irrevocably forever waives, releases and discharges each other Party and such Party's officers, directors, employees, representatives, agents, partners, managers, advisors and Affiliates (in such capacity, a "Released Party") from any and all Claims that such Releasing Party has had, now has or may have in the future against any or all of the Released Parties based in whole or in part on facts existing or arising, whether known or unknown, on or before the Closing Date.

4.2    Covenants Not to Sue.  Subject to Section 5, effective automatically and immediately upon the Closing Date, each Releasing Party hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Released Party that it will not sue on or otherwise assert in any proceeding (at law, in equity, in any regulatory proceeding or otherwise) any Claim against a Released Party released, remised and discharged by the Releasing Party pursuant to this Agreement. If a court of competent jurisdiction finally determines that any Releasing Party has violated the foregoing covenant, such Releasing Party agrees to pay, in addition to such other damages as any Released Party may sustain as a result of such violation, all fees and costs incurred by any Released Party as a result of such violation.

## 5.    LIMITATIONS OF RELEASES

5.1    Notwithstanding anything to the contrary herein, the Parties shall not be deemed released from any obligations arising under this Agreement or the Transaction Documents.

5.2    Nothing in this Agreement shall constitute a release of, or a covenant not to sue in respect of, any Claims (a) against any Party who fails to execute and deliver any document required to be executed and delivered by such Party to effectuate this Agreement or any other Transaction Documents or to satisfy the conditions precedent to the effectiveness of the Transaction Documents or the Transactions, (b) arising from or relating to any action or inaction that is determined by a final order of a court of competent jurisdiction to constitute actual fraud, willful misconduct, or a criminal act, and (c) that may not be released by law.

5.3     For the avoidance of doubt, to the extent the APA is not the Successful Bid or a Termination Date occurs and the Closing Date does not occur, the releases and covenants set forth in Section 4 hereof shall be of no force and effect.

## 6.     RESTRICTION ON TRANSFERS OF FIRST LIEN NOTES CLAIMS

6.1     Permitted Transfers.  Except as expressly permitted in the Instruction Letter, during the Agreement Period, the Chatham Parties and the Brigade Parties shall not sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, any of its right, title, or interest in respect of any of the First Lien Notes Claims (each, a "Transfer") held by the Chatham Parties and Brigade Parties as of the Agreement Effective Date, except that (i) the Brigade Parties may Transfer their First Lien Note Claims to a transferee (provided that such transferee is not a material competitor of the Issuer) that executes both (A) a transfer agreement in a form reasonably acceptable to the Brigade Parties and the Chatham Parties and (B) a "Joinder" as defined in the Instruction Letter ((A) and (B) together, the "Joinders")  prior to or concurrently with the closing of such Transfer and (ii) the Chatham Parties may Transfer their First Lien Note Claims to a wholly-owned Affiliate, provided that the Chatham Parties shall remain liable for all of their duties, obligations and liabilities under this Agreement, including with respect to the First Lien Note Claims Transferred to any such Affiliate (a transferee permitted pursuant to this Section, a "Permitted Transferee").

6.2     Qualified Marketmakers.  Notwithstanding the previous paragraph, a Qualified Marketmaker, acting in its capacity as such, that acquires any First Lien Notes Claims shall not be required to execute the Joinders if such Qualified Marketmaker subsequently transfers such First Lien Notes Claims (by purchase, sale, assignment, participation, or otherwise) within five (5) business days of its acquisition to a Permitted Transferee.

6.3     References to Brigade Parties.  For so long as the Brigade Parties shall not have effected a Transfer of all of their First Lien Note Claims to one or more Permitted Transferees in accordance with this Agreement, all references in this Agreement to the Brigade Parties shall continue to refer to the Brigade Parties.  In the event that the Brigade Parties shall effect a Transfer of all of their First Lien Note Claims to one or more Permitted Transferees, references to the Brigade Parties shall mean the Permitted Transferees holding seventy-five percent (75%) in principal amount of the First Lien Note Claims held by the Permitted Transferees.  Notwithstanding anything to the contrary herein, if the Brigade Parties effect a Transfer of all of their First Lien Notes Claims to one or more Permitted Transferees, the Brigade Parties shall have no further rights or obligations hereunder, provided that, for the avoidance of doubt, the provisions of Section 4, as relevant, shall continue to apply to, and for the benefit of, such Brigade Parties.

### 7.    TERMINATION EVENTS; MUTUAL TERMINATION

7.1    <u>Termination Events</u>. Each Party shall have the right, but not the obligation, upon written notice to the other Parties, to terminate such Parties' obligations under this Agreement upon the occurrence of the following events (<u>provided</u>, that no Party shall be permitted to terminate this Agreement if the occurrence giving rise to the right of termination is a result of a material breach by such Party of this Agreement or any other Transaction Documents):

(a)    the Sale Transaction is not selected by the Debtors as the Successful Bid or the Backup Bid;

(b)    termination of the APA pursuant to the terms thereof;

(c)    the material breach of this Agreement by any Party or the material failure of any Party to perform under this Agreement, the Bidding Procedures or the APA such that the condition set forth in <u>Section 2.6(b)</u> is not capable of satisfaction;

(d)    the delivery of a Subsequent Instruction Notice permitted to be delivered to the First Lien Notes Trustee pursuant to <u>Section 3.5(f)(i)</u> and <u>(ii)</u>, or pursuant to <u>Section 3.5(f)(iii)</u> unless (x) a Qualifying Cash Proposal is designated as the Successful Bid at the conclusion of the Auction, (y) the Credit Bid is designated as the Backup Bid and (z) the Qualifying Cash Proposal has not been consummated;

(e)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(f)    the dismissal of one or more of the Chapter 11 Cases;

(g)    the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(h)    the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of any of the Debtors or that would materially and adversely affect any of the Debtors' ability to operate their businesses in the ordinary course;

(i)    the issuance by any Governmental Body, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Transactions; <u>provided</u>, <u>however</u>, that the Parties shall have five (5) business days after the issuance of such ruling or order to obtain relief that would allow consummation of the Transactions in a manner that (i) does

not prevent or diminish in a material way compliance with the terms of the this Agreement, or (ii) is reasonably acceptable to each of the Parties;

(j)    the Sale Order is not entered by the Bankruptcy Court on or before July 31, 2020; or

(k)    the Closing Date does not occur on or before the Outside Date (as defined in the APA).

7.2    <u>Mutual Termination</u>. This Agreement and the obligations of all Parties hereunder may be terminated by the mutual written agreement by and among each of the Parties.

## 8.    REPRESENTATIONS AND WARRANTIES.

8.1    Each Party hereby represents and warrants to each other Party that:

(a)    the execution, delivery and performance by such Party of this Agreement and all documents and instruments delivered in connection herewith have been duly authorized, and this Agreement and all documents and instruments delivered in connection herewith are legal, valid and binding obligations of such Party enforceable against such Party in accordance with their respective terms, except as the enforcement thereof may be subject to (i) the effect of any applicable receivership, bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally and (ii) general principles of equity (regardless of whether such enforcement is sought in a proceeding in equity or at law); and

(b)    neither the execution, delivery and performance of this Agreement and all documents and instruments delivered in connection herewith nor the consummation of the transactions contemplated hereby or thereby does or shall contravene, result in a breach of, or violate (i) any provision of such Party's corporate charter, bylaws, operating agreement, or other governing documents, as applicable, (ii) any law applicable or regulation, or any order or decree of any court or government instrumentality, or (iii) any indenture, mortgage, deed of trust, lease, agreement or other instrument to which such Party is a party or by which such Party or any of its property is bound.

## 9.    MISCELLANEOUS PROVISIONS.

9.1    <u>Binding on Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Except in connection with a Transfer of First Lien Note Claims to a Permitted Transferee, no Party may transfer or assign any of its rights or obligations hereunder (in whole or in part) without the prior written consent of all of the other Parties. Any transfer or assignment made in contravention of this <u>Section 9.1</u> shall be null and void, *ab initio*.

9.2    <u>Further Assurances</u>.  Notwithstanding any provision contained in this Agreement to the contrary, the Parties agree to perform all further acts, and execute and deliver such further documents, as may be required or as the other Parties may reasonably request (including continuing to use commercially reasonable efforts to obtain the consents of any Persons required in connection with the Transaction not obtained prior to the Closing Date), whether on or after the Closing Date, to implement, give further effect to and/or evidence the Transaction or the releases contemplated herein.

9.3    <u>Interpretation</u>.  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.  For purposes of this Agreement, unless otherwise specified: (a) each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) the words "herein," "hereof," "hereunder," and "hereto," refer to this Agreement in its entirety rather than to a particular portion of this Agreement; and (c) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation".

9.4    <u>Entire Agreement.</u>    This Agreement, together with the other Transaction Documents, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among such Parties with respect to the subject matter hereof.

9.5    <u>Severability.</u>  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law in any jurisdiction, but if any provision of this Agreement shall be held to be prohibited by or invalid under applicable law in any jurisdiction, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Agreement and without affecting the effectiveness or validity of this Agreement in any other jurisdiction.

9.6    <u>Counterparts.</u>  This Agreement may be executed in one or more counterparts and by different Parties in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all of which counterparts taken together shall constitute but one and the same Agreement.  Counterparts delivered by facsimile or other electronic transmission shall be deemed originals for all purposes.

9.7    <u>Section Headings.</u>  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

9.8     <u>Specific Performance</u>.  Each Party acknowledges and agrees that the other Parties would be damaged irreparably such that monetary damages or other legal remedies would not be an adequate remedy in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that a Party may have under law or equity, a Party may be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and for specific performance of this Agreement and the terms and provisions hereof, without the necessity of posting any bond or other undertaking in connection therewith.

9.9     <u>GOVERNING LAW.</u>  THIS AGREEMENT AND ALL MATTERS ARISING HEREUNDER, INCLUDING, WITHOUT LIMITATION, ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT, SHALL BE GOVERNED BY, CONSTRUED UNDER AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAW OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, THAT ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH JURISDICTIONS.

9.10    <u>WAIVER OF RIGHT TO JURY</u>. EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN ANY OF THEM ARISING OUT OF, CONNECTED WITH, RELATING TO OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT. INSTEAD, ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO TRIAL BY THE COURT.

9.11    <u>Amendments</u>.  Except as expressly provided herein, this Agreement and any term of this Agreement (including all exhibits, appendixes, annexes and schedules hereto) may only be amended, modified or restated and the observance of any term of this Agreement may only be waived (either generally or in a particular instance,

22

and either retroactively or prospectively, by merger, operation of law or otherwise), by a written instrument duly executed by all of the Parties

9.12    <u>Notices</u>.  All notices and other communications required or permitted to be given hereunder shall be sent in writing to the party to whom it is to be given with copies to all other parties as follows (as elected by the party giving such notice) and be either personally delivered, by e-mail or other electronic transmission, by registered or certified mail (postage prepaid, return receipt requested) or deposited with an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

(a)    if to the Chatham Parties or the Purchaser, to:

Chatham Asset Management, LLC
26 Main Street, Suite 204
Chatham, New Jersey 07928
Attention:  Feisal Alibhai
                    Barry Schwartz
                    Jim Ruggerio
E-mail:     feisal@chathamasset.com
                    barry@chathamasset.com
                    jim@chathamasset.com

with a copy (not constituting notice) to:

Paul Weiss Rifkind Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019

Attention:  Andrew Rosenberg, Esq.
E-mail:      arosenberg@paulweiss.com

(b)    if to the Brigade Parties, to:

Brigade Capital Management
399 Park Avenue
16th Floor
New York, New York 10022
Attention: John Baylis
Email: JCB@brigadecapital.com

with a copy to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attention: Douglas Mannal
Email: dmannal@kramerlevin.com

All notices and other communications shall be deemed to have been given (i) when received if given in person, (ii) on the date sent if sent by e-mail or other electronic transmission, (iii) five (5) Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid or (iv) one (1) Business Day after being deposited with a reputable overnight courier service. Notices sent via e-mail must also be sent via facsimile on the same day.

[*Signature Pages Follow*]

**SIGNATURE PAGES OMITTED**

## EXHIBIT A

**Term Sheet**

*Execution Version*

---

### THE MCCLATCHY COMPANY
### RESTRUCTURING TERM SHEET

---

This term sheet (this "Term Sheet") sets forth a summary of the principal terms of a proposed restructuring transaction (the "Restructuring") to be implemented in the cases (the "Chapter 11 Cases") commenced on February 13, 2020 (the "Petition Date") by The McClatchy Company ("McClatchy"), each subsidiary thereof that is a "Subsidiary Guarantor" under (and as defined in) the First Lien Notes Indenture (each a "Debtor" and collectively the "Debtors" or the "Company") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), except to the extent otherwise set forth in the Framework Agreement, dated as of the date hereof, by and among the Purchaser, the Chatham Parties and the Brigade Parties (the "Framework Agreement"). In the event of any conflict between any Definitive Document, the Framework Agreement or the Instruction Letter, on the one hand, and this Term Sheet, on the other hand, the terms of such Definitive Document, the Framework Agreement or the Instruction Letter, as applicable, shall control. Capitalized terms used but not otherwise defined in the main text of this Term Sheet shall have the meanings ascribed to such terms in Schedule 1 hereto or the Framework Agreement (as defined below), as applicable. Capitalized terms used herein but not otherwise defined in the Term Sheet, the Framework Agreement or Schedule 1 shall have the meanings given to them in the Bankruptcy Code.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH THE RESTRUCTURING. THE TRANSACTIONS CONTEMPLATED BY THIS TERM SHEET ARE SUBJECT TO NEGOTIATION AND EXECUTION OF DEFINITIVE DOCUMENTS, WHICH SHALL EACH BE IN FORM AND SUBSTANCE CONSISTENT WITH THE FRAMEWORK AGREEMENT AND THIS TERM SHEET AND ACCEPTABLE TO CHATHAM PARTIES, THE BRIGADE PARTIES AND THE COMPANY. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE ENTRY INTO DEFINITIVE DOCUMENTS ON THE TERMS DESCRIBED IN THE FRAMEWORK AGREEMENT AND THIS TERM SHEET, EXCEPT TO THE EXTENT SET FORTH IN THE FRAMEWORK AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO. NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL SIGNATURE PAGES TO THE FRAMEWORK AGREEMENT ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.**

**THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY. IT SHALL NOT BE USED AS EVIDENCE IN ANY LITIGATION, CONTESTED MATTER, OR ADVERSARY PROCEEDING, AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER**

**SIMILAR APPLICABLE RULES UNDER FEDERAL AND STATE LAW.  THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY WITHOUT THE PRIOR WRITTEN CONSENT OF THE CHATHAM PARTIES AND THE BRIGADE PARTIES.**

## I.    SALE TRANSACTION IMPLEMENTATION

| | |
|---|---|
| ***Purchaser*** | The purchaser shall be a newly formed entity formed by or on behalf of the Chatham Parties (the "Purchaser"). |
| ***Sale Transaction*** | Subject to the terms and conditions set forth in Framework Agreement, which attaches this Term Sheet as **Exhibit A**, the Restructuring may be implemented pursuant to consummation of a sale of all, or substantially all, of the Debtors' assets to the Purchaser pursuant to sections 105, 363 and 365 of the Bankruptcy Code and the terms of the Asset Purchase Agreement dated as of the date hereof attached to the Framework Agreement as Exhibit B (the "APA" and the transactions contemplated thereunder and the under the Framework Agreement, the "Sale Transaction"). |
| | Upon consummation of the Sale Transaction, the Purchaser shall acquire the Acquired Assets free and clear of any and all pledges, options, charges, liabilities, liens, claims, encumbrances, successor liability or security interests, subject to certain exceptions identified in the APA.  The order entered by the Bankruptcy Court approving the Sale Transaction (the "Sale Order") shall include language reasonably acceptable to the Purchaser and the Required Parties authorizing the consummation of the Sale Transaction "free and clear" of the Excluded Liabilities (as defined in the APA), including, for the avoidance of doubt, any obligations related to the PBGC Claims. |

## II.    TREATMENT OF INDEBTEDNESS

| | |
|---|---|
| ***DIP Facility*** | On the Closing Date, the obligations under the DIP Facility shall be refinanced by the Purchaser in the form of a new secured revolving credit facility (the "New ABL Facility"), which shall be on terms consistent with the Framework Agreement and acceptable to the Required Parties. |
| ***Other Secured Claims*** | On the Closing Date, solely to the extent such Other Secured Claims have priority over the liens securing the First Lien Notes Claims as permitted pursuant to the First Lien Notes Documents, such Other Secured Claims shall be assumed by the Purchaser (or an affiliate thereof). |
| ***First Lien Notes Claims*** | On the Closing Date, the principal amount outstanding under the First Lien Notes shall be credit bid pursuant to and in accordance with the APA and the Framework Agreement. |

### III.    PURCHASER'S CAPITAL STRUCTURE

| | |
|---|---|
| ***Debt*** | On the Closing Date, in accordance with the Transaction Steps set forth in the Framework Agreement, the Purchaser shall enter into (i) the New ABL Facility Documents, (ii) the New First Lien Term Loan Credit Agreement, which shall be in the form attached as Exhibit D to the Framework Agreement and the other New First Lien Term Loan Documents which shall be on terms consistent in form and substance with the term sheet attached hereto as **Schedule 2** and (iii) the New 1.5 Lien Notes Documents, which shall be on term consistent in form and substance with the term sheet attached hereto as **Schedule 3** which shall, in each case be acceptable to the Required Parties. |
| ***Equity*** | On the Closing Date, the Chatham Parties, or affiliates thereof, shall own 100% of the common stock of the Purchaser (the "Purchaser Common Stock"), subject to dilution by the MIP Equity (defined below). |

### IV.    OTHER PROVISIONS

| | |
|---|---|
| ***Definitive Documents*** | The Purchaser, the Chatham Parties and the Brigade Parties shall negotiate, the Purchaser Debt Documents and the Sale Order (together with the APA, collectively, the "Definitive Documents") in good faith.  Any and all documentation necessary to effectuate the Restructuring shall be in form and substance consistent with this Term Sheet (including all appendices hereto) and the Framework Agreement, and otherwise acceptable to the Purchaser and the Required Parties, as provided in the Framework Agreement. |
| ***Governance*** | The New Board shall be comprised of five directors.  On the Closing Date, the initial New Board shall consist of: (i) the Chief Executive Officer of the Purchaser; (ii) two directors selected by the Chatham Parties in their sole and absolute discretion; and (iii) two directors that shall be independent directors (the "Independent Directors").  For the avoidance of doubt, for so long as the New First Lien Term Loans are outstanding, the Purchaser shall maintain at least two independent directors.

Effective as of the Closing Date, the Purchaser may enter into the Key Executive Employment Agreements on mutually agreeable terms with the Key Executives to address existing change in control commitments or long-term agreements (such Key Executive Employment Agreements to be acceptable to the Chatham Parties).  For the avoidance of doubt, consummation of the Sale Transactions on the Closing Date shall not constitute a "change of control" or similar transaction that causes the acceleration of payments or benefits under existing employment agreements with Key Executives.  For the avoidance of doubt, the Chief Executive Officer shall receive no other compensation for board service in addition to his or her compensation as Chief Executive Officer. |

| | |
|---|---|
| ***Management Incentive Plan*** | After the Closing Date, the New Board shall establish a management equity incentive plan under which Purchaser Common Stock (or restricted stock units, options or other instruments (including "profits interests"), or some combination of the foregoing) representing up to 10% of the Purchaser Common Stock as of the Closing Date on a fully-diluted basis (the "<u>MIP Equity</u>") will be reserved for grants made from time to time to the directors, officers, and other management and employees of the Purchaser. |
| ***Conditions Precedent*** | The occurrence of the Closing Date shall be subject to the satisfaction of the conditions precedent set forth in the APA and the Framework Agreement. |
| ***Governing Law*** | Governing law for all applicable documentation shall be New York law. |

# SCHEDULE 1

## Certain Defined Terms

"*DIP Credit Agreement*" means the credit agreement (as may be amended, modified or otherwise supplemented) governing the terms of the DIP Facility.

"*DIP Documents*" means the DIP Credit Agreement and all related amendments, supplements, notes, pledges, collateral agreements, loan and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the DIP Credit Agreement, in each case as amended, restated, supplemented, or modified from time to time.

"*DIP Facility*" means that certain debtor-in-possession financing in the form of a senior secured $50 million asset-based revolving credit facility approved by the Bankruptcy Court pursuant to the Final DIP Order.

"*DIP Facility Claim*" means any claims or obligations arising under the DIP Documents.

"*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 233].

"*Key Executives*" means, collectively, the five officers and executive employees of the Purchaser who hold any one or more of the following titles: President; Chief Executive Officer; Chief Legal Officer; Chief People Officer; Chief Administrative Officer; Chief Financial Officer; Vice President, Finance; Vice President, Customer and Product; and Vice President, News.

"*Key Executive Employment Agreements*" means the employment agreements to be entered into with the Key Executives and which shall be effective on the Closing Date.

"*Other Secured Claim*" means any Secured Claim that is not a DIP Facility Claim, First Lien Notes Claim, Second Lien Term Loan Claim, Third Lien Notes Claim.

"*PBGC*" means the Pension Benefit Guaranty Corporation.

"*PBGC Claims*" means (a) any claims against the Debtors by the PBGC related to the distressed termination of the Debtors' qualified defined benefit pension plan, and (b) any claim relating to the termination premium incurred in connection with the distress termination of the Debtors' qualified defined benefit pension plan.

"*Required Parties*" means the Brigade Parties and the Chatham Parties.

"*Second Lien Credit Agreement*" means that certain Junior Lien Term Loan Credit Agreement dated as of July 16, 2018, by and among The McClatchy Company, as borrower, the guarantors party thereto, the Second Lien Term Lenders party thereto, and the Second Lien Term Loan Agent, as amended, supplemented, or otherwise modified from time to time.

"**_Second Lien Term Lenders_**" means any person or Entity party to the Second Lien Credit Agreement as "Lender" thereunder.

"**_Second Lien Term Loan Agent_**" means The Bank of New York Mellon, in its capacity as Administrative Agent, Tranche A Collateral Agent, and Tranche B Collateral Agent under the Second Lien Credit Agreement.

"**_Second Lien Term Loan Claim_**" means any claim or obligation arising under or based on the Second Lien Term Loan Documents.

"**_Second Lien Term Loan Documents_**" means the Second Lien Credit Agreement and all related amendments, supplements, notes, pledges, collateral agreements, loan and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the Second Lien Credit Agreement, in each case as amended, restated, supplemented, or modified from time to time.

"**_Secured Claim_**" means a claim to the extent it is (i) secured by a lien on property of a Debtor's estate, the amount of which is equal to or less than the value of such property (A) as agreed to by the holder of such claim and the Debtors, or (B) as determined by a final order of a court of competent jurisdiction in accordance with section 506(a) of the Bankruptcy Code.

"**_Third Lien Notes_**" means the 6.875% Senior Secured Junior Lien Notes due 2031 issued pursuant to the Third Lien Notes Indenture.

"**_Third Lien Notes Agent_**" means The Bank of New York Mellon, in its capacity as Trustee and Collateral Agent under the Third Lien Notes Indenture.

"**_Third Lien Notes Claim_**" means any Claim or obligation arising under or based on the Third Lien Notes Indenture and any related documents or instruments executed or delivered in connection with the Third Lien Notes Indenture, in each case as amended, restated, supplemented, or modified from time to time.

"**_Third Lien Notes Indenture_**" means that certain Indenture dated as of December 18, 2018, by and among The McClatchy Company, as issuer, the subsidiary guarantors party thereto, and the Third Lien Notes Agent, as amended, supplemented, or otherwise modified from time to time.

**SCHEDULE 2**

**OMITTED AS SUPERSEDED**

**SCHEDULE 3**

**NEW 1.5 LIEN NOTES TERM SHEET**

| Financial Terms | |
|---|---|
| **Issuer** | The Purchaser (in such capacity, the "Issuer") |
| **Initial Noteholders** | The Chatham Parties (or affiliates thereof) that are holders of First Lien Notes Claim as of the Closing Date. |
| **Net Amount** | An amount equal to the aggregate principal amount of the First Lien Notes Claims held by the Chatham Parties as of the Closing Date, which amount shall be no less than $80.79 million. |
| **OID** | 7.00% |
| **Gross Amount** | $86.9 million |
| **Interest Rate** | 10.0% per annum; provided, that, if the Net First Lien Debt/EBITDA ratio is greater than 1.75x, the interest rate shall be 12.5% paid-in-kind. "EBITDA" to include cash impact of operating leases. Ratio to be tested quarterly. |
| **Maturity** | July 15, 2027 (one year after maturity of New First Lien Term Loans) |
| **Collateral/Priority** | Substantially all assets of the Issuer; provided, that such liens and security interests shall be junior to the liens and security interests granted under the New First Lien Term Loans, but senior to all other liens on or security interests in the Issuer's assets. |

## EXHIBIT B

**APA**

**OMITTED AS SUPERSEDED**

## **EXHIBIT C**

**Instruction Letter**

**OMITTED**

## <u>EXHIBIT D</u>

**New First Lien Term Loan Credit Agreement**

# TERM LOAN CREDIT AGREEMENT

Dated as of [_____], 2020

among

[_____]¹

as the Borrower,

[_____]

as the Parent Entity,

## THE LENDERS PARTY HERETO FROM TIME TO TIME,

## THE BANK OF NEW YORK MELLON,
as Administrative Agent and Collateral Agent

---

¹ TBD – Borrower is to be a newly formed entity formed by or on behalf of the Chatham Parties.

# TABLE OF CONTENTS

**Page**

ARTICLE I Definitions ...................................................................................................1

    Section 1.01   Defined Terms ..........................................................................1
    Section 1.02   Terms Generally .......................................................................40
    Section 1.03   Effectuation of Transactions ....................................................40
    Section 1.04   Exchange Rates; Currency Equivalents ...................................40
    Section 1.05   Times of Day ............................................................................41
    Section 1.06   Divisions ..................................................................................41

ARTICLE II The Credits .................................................................................................41

    Section 2.01   Term Loan ................................................................................41
    Section 2.02   Termination of Commitments ..................................................41
    Section 2.03   Maturity of Term Loan; Evidence of Debt...............................41
    Section 2.04   Mandatory Repayment of Term Loan ......................................42
    Section 2.05   Optional Prepayment ...............................................................43
    Section 2.06   Interest .....................................................................................43
    Section 2.07   Increased Costs.........................................................................43
    Section 2.08   Taxes .......................................................................................45
    Section 2.09   Payments Generally; Pro Rata Treatment; Sharing of Set-offs.................48
    Section 2.10   Mitigation Obligations; Replacement of Lenders .....................49
    Section 2.11   Defaulting Lenders ..................................................................50

ARTICLE III Representations and Warranties.................................................................50

    Section 3.01   Organization; Powers ..............................................................51
    Section 3.02   Authorization; No Conflicts ....................................................51
    Section 3.03   Enforceability ..........................................................................51
    Section 3.04   Governmental Approvals; Consents..........................................51
    Section 3.05   [Financial Statements; Absence of Undisclosed Liabilities .....................52
    Section 3.06   No Material Adverse Effect ......................................................52
    Section 3.07   Title to Properties.....................................................................52
    Section 3.08   Subsidiaries. .............................................................................53
    Section 3.09   Litigation; Compliance with Laws ...........................................53
    Section 3.10   Federal Reserve Regulations ....................................................54
    Section 3.11   Investment Company Act .........................................................54
    Section 3.12   Use of Proceeds .......................................................................54
    Section 3.13   Tax Returns ..............................................................................54
    Section 3.14   No Material Misstatements .......................................................55
    Section 3.15   Employee Benefit Plans ...........................................................55
    Section 3.16   Environmental Matters .............................................................56
    Section 3.17   Security Documents .................................................................56
    Section 3.18   Perfection Certificate ...............................................................57
    Section 3.19   Solvency ..................................................................................57
    Section 3.20   Labor Matters ..........................................................................58
    Section 3.21   No Default ................................................................................58

i

Section 3.22    Intellectual Property; Licenses, Etc.........................................58
Section 3.23    Senior Debt.........................................................................58
Section 3.24    Liens...................................................................................58
Section 3.25    Patriot Act, OFAC, Etc.......................................................58
Section 3.26    Insurance ...........................................................................59

ARTICLE IV Conditions to the Credit Events on the Closing Date ....................59

Section 4.01    Closing Date .......................................................................59

ARTICLE V Affirmative Covenants ..................................................................62

Section 5.01    Existence; Businesses and Properties....................................62
Section 5.02    Required Insurance Coverage ...............................................63
Section 5.03    Taxes ..................................................................................64
Section 5.04    Financial Statements, Reports, Etc. ......................................64
Section 5.05    Litigation and Other Notices ................................................66
Section 5.06    Compliance with Laws .........................................................67
Section 5.07    Maintaining Records; Access to Properties and Inspections; Lender
                Calls....................................................................................67
Section 5.08    Compliance with Environmental Laws ...................................67
Section 5.09    Further Assurances; Additional Security ................................67
Section 5.10    Anti-Corruption Laws ..........................................................70

ARTICLE VI Negative Covenants .....................................................................70

Section 6.01    Indebtedness .......................................................................70
Section 6.02    Liens...................................................................................73
Section 6.03    Sale and Lease-Back Transactions ........................................73
Section 6.04    Investments, Loans and Advances ........................................74
Section 6.05    Limitation on Sales of Assets and Subsidiary Stock................74
Section 6.06    Restricted Payments ............................................................74
Section 6.07    Transactions with Affiliates .................................................75
Section 6.08    Business ..............................................................................76
Section 6.09    Limitation on Payments and Modifications of Certain
                Indebtedness; Modifications of Certain Agreements; Etc.........76
Section 6.10    Financial Performance Covenant ..........................................76
Section 6.11    Fiscal Year .........................................................................77
Section 6.12    Hedging Transactions ..........................................................77
Section 6.13    Merger, Consolidation or other Reorganization......................77
Section 6.14    Limitation on Restrictions on Subsidiaries .............................77
Section 6.15    Disinterested Directors ........................................................79

ARTICLE VII Events of Default ........................................................................79

Section 7.01    Events of Default.................................................................79
Section 7.02    Remedies upon Event of Default...........................................81
Section 7.03    Application of Proceeds .......................................................81
Section 7.04    Borrower Right to Cure .......................................................82

ARTICLE VIII The Agents ...............................................................................................83
Section 8.01    Appointment...............................................................................83
Section 8.02    Delegation of Duties...................................................................84
Section 8.03    Exculpatory Provisions...............................................................84
Section 8.04    Reliance by Agents......................................................................85
Section 8.05    Notice of Default ........................................................................85
Section 8.06    Non-Reliance on Administrative Agent, Collateral Agent and Other
                Lenders.......................................................................................86
Section 8.07    Indemnification .........................................................................86
Section 8.08    Agents in Their Individual Capacity .........................................87
Section 8.09    Successor Agents........................................................................87
Section 8.10    Payments Set Aside....................................................................87
Section 8.11    Administrative Agent May File Proofs of Claim .......................88
Section 8.12    Collateral and Guaranty Matters ..............................................88
Section 8.13    Intercreditor Matters .................................................................90

ARTICLE IX Miscellaneous .............................................................................................90
Section 9.01    Notices; Communications..........................................................90
Section 9.02    Survival of Agreement ...............................................................92
Section 9.03    Binding Effect ............................................................................92
Section 9.04    Successors and Assigns ..............................................................92
Section 9.05    Expenses; Indemnity ..................................................................96
Section 9.06    Right of Set-off...........................................................................99
Section 9.07    Applicable Law ..........................................................................99
Section 9.08    Waivers; Amendment .................................................................99
Section 9.09    Interest Rate Limitation............................................................101
Section 9.10    Entire Agreement .....................................................................101
Section 9.11    WAIVER OF JURY TRIAL .....................................................102
Section 9.12    Severability...............................................................................102
Section 9.13    Counterparts .............................................................................102
Section 9.14    Headings ...................................................................................102
Section 9.15    Jurisdiction; Consent to Service of Process .............................102
Section 9.16    Confidentiality..........................................................................103
Section 9.17    Platform; Borrower Materials ...................................................103
Section 9.18    Release of Liens, Guarantees and Pledges ...............................104
Section 9.19    Credit Bidding ..........................................................................105
Section 9.20    USA PATRIOT Act Notice.......................................................106
Section 9.21    No Advisory or Fiduciary Responsibility .................................106
Section 9.22    Acknowledgement and Consent to Bail-In of EEA Financial
                Institutions ...............................................................................106
Section 9.23    Certain ERISA Matters ............................................................107
Section 9.24    Intercreditor Agreement ...........................................................108

**<u>Exhibits and Schedules</u>**[2]

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Solvency Certificate |
| Exhibit C | Form of Borrowing Request |
| Exhibit D-1 | Form of Term Loan Collateral Agreement |
| Exhibit E | Form of Mortgage |
| Exhibit F | Form of Subordination, Non-disturbance and Attornment Agreement |
| Exhibit G | Form of Compliance Certificate |
| Exhibit H | Form of Foreign Lender Certificate |
| Exhibit I | Form of Intercreditor Agreement |
| Exhibit J-1 | Form of Term Loan Guarantee Agreement |

| | |
|---|---|
| Schedule 1.01A | Mortgaged Properties |
| Schedule 1.01B | Subsidiary Loan Parties |
| Schedule 1.01C | Chapter 11 Case Expenses |
| Schedule 2.01 | Commitments |
| Schedule 3.04 | Governmental Approvals |
| Schedule 3.07(c) | Intellectual Property |
| Schedule 3.08(a) | Subsidiaries |
| Schedule 3.08(b) | Subscriptions |
| Schedule 3.13 | Taxes |
| Schedule 3.16 | Environmental Matters |
| Schedule 3.22 | Intellectual Property |
| Schedule 3.26 | Insurance |
| Schedule 3.28 | Leases |
| Schedule 5.09(h) | Post-Closing Collateral Requirements |
| Schedule 6.01 | Indebtedness |
| Schedule 6.02 | Liens |
| Schedule 6.04 | Investments |
| Schedule 6.07 | Transactions with Affiliates |
| Schedule 9.01 | Notice Information |

---

[2] NTD: All Exhibits and Schedules shall be in form and substance satisfactory to the Agents and the Lenders.

iv

TERM LOAN CREDIT AGREEMENT, dated as of [_____], 2020 (this "Agreement"), among [_____], a [Delaware] [limited liability company/corporation] (the "Borrower"), [_____], a [Delaware] [limited liability company/corporation] (the direct parent of the Borrower, the "Parent Entity"), the LENDERS party hereto from time to time, and The Bank of New York Mellon, as administrative agent for the Lenders (in such capacity, the "Administrative Agent") and collateral agent for the Secured Parties (in such capacity, the "Collateral Agent").

WHEREAS, on February 13, 2020, The McClatchy Company ("McClatchy") and certain of its direct and indirect subsidiaries and affiliates ("McClatchy Affiliates" and together with McClatchy, the "McClatchy Group" or "Debtors") commenced voluntary proceedings (the "Chapter 11 Cases") under chapter 11 of the U.S. Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, in connection with the Chapter 11 Cases, the First Lien Note Claims have been credit bid (the "Credit Bid") in a sale for substantially all of the assets of the McClatchy Group, pursuant to the Bidding Procedures Order (as defined herein) on account of the existing First Lien Notes (as defined herein);

WHEREAS, in connection with the Credit Bid, and in accordance with the Sale Order (as defined herein), the Borrower, as the sole purchaser, has acquired substantially all, of the McClatchy Group's assets (the "Acquired Assets") under sections 105, 363 and 365 of the U.S. Bankruptcy Code and pursuant to the terms of the Asset Purchase Agreement and the Framework Agreement (each as defined herein) (the "Sale Transaction"); and

WHEREAS, in connection with the Transactions (as defined herein) and in accordance with the terms and conditions of the Sale Order, on the effective date of this Agreement each Lender (as defined herein) shall, automatically and without any funding or other action on the part of such Lender, receive in exchange for the portion of its outstanding claims owing to such Lender under the First Lien Notes ("First Lien Note Claims"), term loans in an aggregate principal amount equal to such Lender's First Lien Note Claims.

NOW, THEREFORE, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.  Accordingly, the parties hereto agree as follows:

## ARTICLE I
### Definitions

Section 1.01        Defined Terms.  As used in this Agreement, the following terms shall have the meanings specified below:

"ABL Priority Collateral" shall have the meaning set forth therefor in the Intercreditor Agreement.

"Additional Mortgage" shall have the meaning assigned to such term in Section 5.09(c).

"Administrative Agent" shall have the meaning assigned to such term in the preamble.

"Administrative Agent's Office" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 9.01, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Affiliate" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified. Each of the Chatham Parties shall be deemed to be an Affiliate of the Borrower for all purposes of this Agreement.

"Affiliate Transaction" shall have the meaning assigned to such term in Section 6.07.

"Agent Parties" shall have the meaning assigned to such term in Section 9.17.

"Agents" shall mean the Administrative Agent and the Collateral Agent.

"Agreement" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Applicable Law" shall mean all Laws applicable to the Person, conduct, transaction, covenant, Loan Document or contract in question, all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations, treaties, directives and orders of any Governmental Authority, and all orders, judgments and decrees of all courts and arbitrators.

"Approved Fund" shall have the meaning assigned to such term in Section 9.04(b)(ii).

"Asset Acquisition" means (1) an Investment by the Borrower or any Subsidiary in any other Person pursuant to which such Person shall become a Subsidiary or shall be consolidated or merged with the Borrower or any Subsidiary or (2) the acquisition by the Borrower or any Subsidiary of assets of any Person.

"Asset Disposition" shall mean any sale, lease, transfer, issuance or other disposition, or a series of related sales, leases, transfers, issuances or dispositions that are part of a common plan, of shares of Capital Stock of a Subsidiary (other than directors' qualifying shares or local ownership shares) property or other assets (it being understood that the Capital Stock of the Borrower is not an asset of the Borrower) (each referred to for the purposes of this definition as a "disposition") by the Parent Entity, the Borrower or any of their respective Subsidiaries, including any Sale and Lease-Back Transaction and any disposition by means of a merger, consolidation or similar transaction. Notwithstanding the preceding, the following items shall not be deemed to be Asset Disposition:

(a)      a disposition of assets by a Subsidiary to the Borrower or by the Borrower or a Subsidiary to a Subsidiary, which is a Loan Party;

(b)      the disposition of Cash Equivalents in the ordinary course of business or the voluntary termination or unwinding of Hedging Obligations;

(c)      a disposition of inventory in the ordinary course of business;

(d)      a disposition of used, obsolete, worn out, damaged or surplus equipment or equipment or assets that are no longer used or useful in the conduct of the business of the Borrower and its Subsidiaries and that is disposed of in each case in the ordinary course of business;

(e)      an issuance of Capital Stock by a Subsidiary to the Borrower or to a Subsidiary;

(f)      for purposes of Section 6.05 only, the making of a Permitted Investment or a disposition subject to Section 6.06;

2

(g)        dispositions of property or other assets (other than to the Subsidiary organized in Mexico) in a single transaction or a series of related transactions with an aggregate Fair Market Value of less than $500,000;

(h)        the creation of a Permitted Lien and dispositions in connection with Permitted Liens;

(i)        dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in Insolvency or Liquidation Proceedings and exclusive of factoring or similar arrangements;

(j)        the non-exclusive licensing or sublicensing of patents, trade secrets, know-how and other intellectual property, know-how or other general intangibles and licenses, leases or subleases of other property in the ordinary course of business as operated immediately prior to the granting of such license, lease or sublease;

(k)        to the extent allowable under Section 1031 of the Code, any exchange of like property (excluding any boot thereon) for use in a Related Business;

(l)        the receipt by the Borrower or any Subsidiary of any cash insurance proceeds or condemnation award payable by reason of theft, loss, physical destruction or damage, taking or similar event with respect to any of their respective property or assets;

(m)        operating leases in the ordinary course of business; and

(n)        the transfer of improvements, additions or alterations in connection with the lease of any property.

"Asset Purchase Agreement" shall mean the Asset Purchase Agreement dated the date hereof among the Borrower as the purchaser, The McClatchy Company, the subsidiaries listed on the signature pages thereto, SIJ Holdings, LLC, and each of the other parties thereto governing the Sale Transaction.

"Assignee" shall have the meaning assigned to such term in Section 9.04(b).

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an Assignee, and acknowledged by the Administrative Agent and the Borrower (if required by Section 9.04), in the form of Exhibit A or such other form as shall be approved by the Administrative Agent and reasonably satisfactory to the Borrower.

"Attributable Indebtedness" in respect of a Sale and Lease-Back Transaction means, as at the time of determination, (a) if such Sale and Lease-Back Transaction does not constitute a Capitalized Lease Obligation, the present value (discounted at the interest rate implicit in the transaction) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale and Lease-Back Transaction (including any period for which such lease has been extended), determined in accordance with GAAP or (b) if such Sale and Lease-Back Transaction constitutes a Capitalized Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capitalized Lease Obligations."

"Auction Agent" shall mean (i) the Administrative Agent or (ii) any other financial institution or advisor employed by the Parent Entity, the Borrower or any of their respective Subsidiaries

(whether or not an Affiliate of the Administrative Agent), and which shall be acceptable to the Brigade Parties, to act as an arranger in connection with a Dutch auction pursuant to Section 9.04(h); provided that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent); provided, further, that none of the Parent Entity, the Borrower, any of their respective Subsidiaries or Affiliates may act as the Auction Agent.

"Average Life" means, as of the date of determination, with respect to any Indebtedness or Preferred Stock, the quotient obtained by dividing (1) the sum of the products of the numbers of years from the date of determination to the dates of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Preferred Stock multiplied by the amount of such payment by (2) the sum of all such payments.

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Law" shall mean the U.S. Bankruptcy Code or any other Federal, state or foreign law for the relief of debtors.

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"Bidding Procedures Order" shall mean that certain order *(I) Establishing Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (II) Establishing Procedures for the Debtors to Enter Into Stalking Horse Agreement with Bid Protections in Connection with a Sale of Substantially All of the Debtors' Assets; (III) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (IV) Approving Form and Manner of Notice of All Procedures, Protections, Schedules and Agreements; (V) Scheduling a Hearing to Consider the Proposed Sale and (VI) Granting Certain Related Relief* entered into by the Bankruptcy Court on May 11, 2020 approving the proposed bidding procedures for the Chapter 11 Cases. "Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"Board of Directors" shall mean, as to any person, the board of directors or other governing body of such person, or if such person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Borrower Materials" shall have the meaning assigned to such term in Section 9.17.

"Borrowing Request" shall mean a request by the Borrower in accordance with the terms of Section 2.02 and substantially in the form of Exhibit C.

"Brigade Parties" shall mean, collectively, Brigade Capital Management and each of its managed funds or accounts that is a beneficial holder of the First Lien Notes.

"Budget" shall have the meaning assigned to such term in Section 5.04(a)(4).

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state where the Administrative Agent's Office is located.

"Calculation Date" shall have the meaning assigned to such term in the definition of Pro Forma Basis.

"Capital Stock" of any Person shall mean (a) with respect to any Person that is a corporation, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Common Stock or Preferred Stock, and (b) with respect to any Person that is not a corporation, any and all partnership, limited liability company, membership or other equity interests of such Person, but in each case excluding any debt securities convertible into any of the foregoing or cash and a combination thereof.

"Capitalized Lease Obligation" shall mean, an obligation that is required to be classified and accounted for as a capitalized lease for financial reporting purposes in accordance with GAAP, and the amount of Indebtedness represented by such obligation will be the capitalized amount of such obligation at the time any determination thereof is to be made as determined in accordance with GAAP, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty; provided that, all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP prior to the issuance by the Financial Accounting Standards Board on February 25, 2016 of an Accounting Standards Update  shall continue to be accounted for as operating leases for purposes of all financial definitions and calculations for purpose of this Agreement (whether or not such operating lease obligations were in effect on such date).

"Capitalized Software Expenditures" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of such Person and such Subsidiaries.

"Cash Equivalents" shall mean: (a) Dollars, or in the case of any Foreign Subsidiary, such currencies held by it from time to time in the ordinary course of business; (b) securities issued or directly and fully guaranteed or insured by the United States Government or any agency or instrumentality of the United States (provided that the full faith and credit of the United States is pledged in support thereof), having maturities of not more than one year from the date of acquisition; (c) marketable general obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition and, at the time of acquisition, having a credit rating of "A" or better from either S&P or Moody's; (d) certificates of deposit, demand deposits, time deposits, eurodollar time deposits, overnight bank deposits or bankers' acceptances having maturities of not more than one year from the date of acquisition thereof issued by any commercial bank (x) the long-term debt of which is rated at the time of acquisition thereof at least "A" or the equivalent thereof by S&P, or "A2" or the equivalent thereof by Moody's or (y) the short term commercial paper of such commercial bank or its parent company is rated at the time of acquisition thereof at least "A-1" or the equivalent thereof by S&P or "P-1" or the equivalent thereof by Moody's and having combined capital and surplus in excess of $500 million; (e) commercial paper rated at the time of acquisition thereof at least

"A-1" or the equivalent thereof by S&P or "P-1" or the equivalent thereof by Moody's or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of investments, and in any case maturing within one year after the date of acquisition thereof; (f) instruments equivalent to those referred to in clauses (a) through (e) above denominated in euros or any foreign currency comparable in credit quality and tenor to those referred to in such clauses and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction; (g) interests in any investment company or money market fund that invests 95% or more of its assets in instruments of the type specified in clauses (a) through (f) above; (h) money market funds that (i) comply with the criteria set forth in Rule 2A-7 of the Investment Company Act of 1940, as amended, (ii) are rated at the time of acquisition thereof "AAA" or the equivalent by S&P or "Aaa" or the equivalent thereof by Moody's and (iii) have portfolio assets of at least $5.0 billion; and (i) in the case of any Foreign Subsidiary, high quality short-term investments which are customarily used for cash management purposes in any country in which such Foreign Subsidiary operates.

"Cash Management Obligations" means obligations of the Borrower or any Subsidiary in relation to treasury, depository or cash management services agreements (including, without limitation, purchase cards).

"CFC" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"CFC Holdco" shall mean any Subsidiary of the Borrower that is treated as a disregarded entity for U.S. federal income tax purposes if substantially all of its assets consists of the equity of one or more CFCs.

"Change in Law" shall mean the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, however, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law".

"Change of Control" shall mean the occurrence of any of the following:

(a)     any "person" or "group" of related persons (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of a majority of the total voting power of the Voting Stock of the Borrower (or its successors by merger, consolidation or purchase of all or substantially all of its assets) or the Parent Entity (or its successors by merger, consolidation or purchase of all or substantially all of their assets), other than the Chatham Parties;

(b)     the sale, assignment, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of the Parent Entities, or the Borrower and its Subsidiaries taken as a whole, to any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act);

6

(c)    the Chatham Parties cease to hold in the aggregate a majority of the total voting power of the Voting Stock of the Borrower (or its successors by merger, consolidation or purchase of all or substantially all of its assets) or the Parent Entity (or its successors by merger, consolidation or purchase of all or substantially all of their assets);

(d)    the adoption by the stockholders of the Borrower of a plan or proposal for the liquidation or dissolution of the Borrower;

(e)    the occurrence of a "change of control" or "change in control" (or similar definition) as defined in the New ABL Facility Documents or the New 1.5 Lien Indenture or in any other indenture, credit agreement or similar debt instrument that constitutes Material Indebtedness; or

(f)    the Parent Entity ceases to hold in the aggregate 100% of the total voting power of the Voting Stock of the Borrower (or its successors by merger, consolidation or purchase of all or substantially all of its assets).

"Chapter 11 Cases" shall have the meaning assigned to such term in the preamble.

"Chatham New Money Investment" shall mean a contribution of $30.0 million by the Chatham Parties in the Borrower in exchange for all of the equity interests in the Borrower.

"Chatham Parties" shall mean Chatham Asset Management, LLC and each of its managed funds or accounts, together with any successor entity, or entity into which, any of the foregoing shall merge and consolidate.

"Charges" shall have the meaning assigned to such term in Section 9.09.

"Closing Date" shall mean [[_____], 2020].

"Code" shall mean the U.S. Internal Revenue Code of 1986.

"Collateral" shall mean all the "Collateral" (or equivalent term) as defined in any Security Document and shall also include the Mortgaged Properties, and all other property that is subject to a Lien in favor of the Collateral Agent for the benefit of the Secured Parties pursuant to any Security Document. The Collateral does not include the Excluded Assets.

"Collateral Agent" shall have the meaning assigned to such term in the preamble.

"Collateral Agreement" shall mean the Term Loan Collateral Agreement, dated as of the Closing Date, among the Parent Entity, the Borrower, each Subsidiary Loan Party, each other person that becomes a party thereto pursuant to the terms hereof and the Collateral Agent, substantially in the Form of Exhibit D-1, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Collateral and Guarantee Requirement" shall mean the requirement that (in each case subject to Section 5.09(g)):

(a)    on the Closing Date, (x) the Collateral Agent shall have received from the Borrower and each Subsidiary Loan Party, a counterpart of each Security Document to be executed as of the Closing Date duly executed and delivered on behalf of such person and (y) the Administrative Agent shall have received from the Borrower and each Subsidiary Loan Party, a counterpart of the Guarantee Agreement duly executed and delivered on behalf of such person; provided, however, that a CFC or CFC

Holdco shall not provide a guarantee solely to the extent such guarantee would result in material adverse tax consequences to the Borrower, any Affiliate of the Borrower or the direct or indirect owners of the Borrower.

(b)       on the Closing Date (or, with respect to Equity Interests of each Subsidiary of the Borrower, such later date as reasonably agreed by the Collateral Agent), the Collateral Agent shall have received a first priority pledge of all the issued and outstanding Equity Interests of the Borrower and each Subsidiary of the Borrower; provided, however, that solely to the extent any pledge of more than 65% of the Voting Stock of a Foreign Subsidiary or U.S. entity would result in material adverse tax consequences to the Borrower, any Affiliate of the Borrower or direct or indirect owners of the Borrower, a pledge of the Capital Stock of any CFC or CFC Holdco shall not include more than 65% of the Voting Stock of such Foreign Subsidiary or such U.S. entity, as the case may be, in each case, with stock powers or other instruments of transfer with respect thereto endorsed in blank and, in each case, for the avoidance of doubt, excluding any Excluded Assets;

(c)       the Obligations shall have been secured by a (i) first priority mortgage on the Mortgaged Properties (it being understood and agreed that in a state with a mortgage recording tax the amount secured by such Mortgage shall not exceed the Fair Market Value of the real property covered thereby (as reasonably determined in good faith by the Borrower) and the obligations to obtain Mortgages over Material Leased Real Properties shall be subject to the commercially reasonable efforts of the Borrower to obtain such Mortgages (and there shall be no breach of this provision so long as the Borrower has used such commercially reasonable efforts)) and a first priority perfected security interest in all tangible and intangible assets of the Parent Entity, the Borrower and the Borrower's Subsidiaries (including Equity Interests and intercompany debt, accounts, inventory, equipment, investment property, contract rights, copyrights, trademarks, and patents and related rights, other general intangibles, real property and proceeds of the foregoing), in each case, to the extent required hereunder and subject to exceptions and limitations otherwise set forth in this Agreement and the Security Documents (to the extent appropriate in the applicable jurisdiction) and, in each case, for the avoidance of doubt, excluding any Excluded Assets; and (ii) a second priority perfected security interest in the ABL Priority Collateral;

(d)       on the Closing Date and at all times thereafter, all Indebtedness of the Borrower and each Subsidiary (other than (A) intercompany current liabilities in connection with the cash management, accounting and tax operations of the Borrower and its Subsidiaries, (B) to the extent that a pledge of such promissory note or instrument would violate Applicable Law or (C) Indebtedness that is owing to a Loan Party) shall be evidenced by a promissory note or an instrument and (i) in the case of any such promissory note or instrument owing to the Borrower or any Subsidiary of the Borrower that is a Subsidiary Loan Party, the Collateral Agent shall have received a first priority pledge thereof pursuant to the Collateral Agreement (or other applicable Security Document as reasonably required by the Administrative Agent or the Collateral Agent (acting at the direction of the Required Lenders)), (ii) in the case of any such promissory note or instrument owing to any Loan Party other than the Borrower or any Subsidiary of the Borrower that is a Subsidiary Loan Party, the Collateral Agent shall have received a second priority pledge thereof pursuant to the Collateral Agreement (or other applicable Security Document as reasonably required by the Administrative Agent or the Collateral Agent (acting at the direction of the Required Lenders)), (iii) the Collateral Agent shall have received all such promissory notes or instruments for which the Collateral Agent shall have received a first priority pledge, together with note powers or other instruments of transfer with respect thereto endorsed in blank, and (iv) the New ABL Facility Administrative Agent shall have received, as bailee of the Collateral Agent pursuant to the Intercreditor Agreement, all such promissory notes or instruments for which the Collateral Agent shall have received a second priority pledge, together with note powers or other instruments of transfer with respect thereto endorsed in blank;

(e)       in the case of any person that becomes a Subsidiary Loan Party after the Closing Date, subject to Section 5.09(g), the Collateral Agent shall have received a supplement to each of the Collateral Agreement and the Guarantee Agreement, in each case in the form specified therein, duly executed and delivered on behalf of such Subsidiary Loan Party, as applicable;

(f)       after the Closing Date, all the outstanding Equity Interests of (i) any person that becomes a Subsidiary Loan Party after the Closing Date and (ii) subject to Section 5.09(g), all the Equity Interests that are acquired by any Loan Party after the Closing Date, shall have been pledged pursuant to the Collateral Agreement (in each case, other than any Excluded Assets);

(g)       on the Closing Date and at all times thereafter, except as otherwise contemplated by this Agreement or any Security Document and/or as contemplated by the Post-Closing Collateral Requirements, all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Administrative Agent or the Collateral Agent (acting at the direction of the Required Lenders) to be filed, registered or recorded to create Liens on the Mortgaged Properties and other assets and properties of the Borrower and the Subsidiaries of the Borrower that are Subsidiary Loan Parties pursuant to the Security Documents (in each case, including any supplements thereto) and perfect such Liens to the extent, and with the Lien priority contemplated thereby, required by the Intercreditor Agreement, shall have been filed, registered or recorded or delivered to the Collateral Agent for filing, registration or the recording concurrently with, or promptly following, the execution and delivery of each such Security Document;

(h)       on the date that is 60 days after the Closing Date (or such later date as reasonably agreed by the Collateral Agent) with respect to Mortgaged Properties existing on the Closing Date, and to the extent required by Sections 5.09(c) and 5.09(d), at all times thereafter, except as otherwise contemplated by this Agreement or any Security Document, the Collateral Agent shall have received (i) counterparts of each Mortgage to be entered into with respect to each Mortgaged Property duly executed and delivered by the record owner (or lessee, as applicable) of such Mortgaged Property and suitable for recording or filing in the applicable real property records and (ii) such other documents, including, but not limited to, any consents, agreements and confirmations of third parties, as the Administrative Agent (acting at the direction of the Required Lenders) may reasonably request with respect to any such Mortgage or Mortgaged Property;

(i)       on the date that is 60 days after the Closing Date (or such later date as reasonably agreed by the Collateral Agent) with respect to Mortgaged Properties existing on the Closing Dare, and to the extent required by Sections 5.09(c) and 5.09(d), at all times thereafter, except as otherwise contemplated by this Agreement or any Security Document, the Administrative Agent and the Collateral Agent shall have received (i) a loan policy or policies or pro forma loan policy or policies, in each case, in an amount reasonably acceptable to the Required Lenders (but in no event exceeding 100% of the Fair Market Value of such Mortgaged Property (as reasonably determined in good faith by the Borrower or the applicable Loan Party holding an interest in such Mortgaged Property)) accompanied by an unconditional binder of mortgagee's title insurance, or a marked-up unconditional binder of mortgagee's title insurance, as applicable, paid for by the Borrower or the Subsidiaries, in each case issued and validly executed by (x) [_____][3] or (y) any other nationally recognized title insurance company or agent for a nationally recognized title insurance company, in each case in this clause (y) reasonably acceptable to the Required Lenders (the "Title Issuer"), in form and substance reasonably acceptable to the Required Lenders , insuring the Lien of each Mortgage to be entered into (including those to be entered into after the Closing Date in accordance with Sections 5.09(c) and 5.09(d)) as a valid first priority or second priority, as applicable, Lien on the Mortgaged Property described therein, free of any other Liens, except for Permitted Encumbrances, together with such customary endorsements and affirmative coverage, coinsurance and reinsurance as the

---

[3] [To be determined]

Required Lenders may reasonably request, except for endorsements relating to zoning, mineral rights and street assessments and a zoning compliance letter from the applicable municipality or such other confirmation of zoning compliance in a form reasonably acceptable to the Required Lenders, (ii) unless otherwise agreed by the Required Lenders in its reasonable discretion, to the extent required by the Title Issuer to remove the survey exception from any title policy delivered pursuant to clause (i) above and to issue a survey endorsement for any title policy delivered pursuant to clause (i) above, a new or existing survey (or survey equivalent, such as an Express Map) of each Mortgaged Property (including all improvements, easements and other customary matters thereon reasonably required by the Lenders), as applicable, for which all necessary fees (where applicable) have been paid (such surveys, collectively, the "Surveys") (and any such new surveys shall, to the extent required by the Required Lenders and Title Issuer, (1) be certified to the Borrower, Collateral Agent and the Title Issuer, and such new or existing surveys shall be sufficient and satisfactory to the Title Issuer so as to enable the Title Issuer to issue coverage over all general survey exceptions and to issue all endorsements reasonably requested by the Required Lenders, in each case to the extent available on commercially reasonable terms and (2) be dated (or redated) not earlier than six months prior to the date of delivery thereof (unless otherwise acceptable to the Required Lenders or the Title Issuer)), (iii) (x) a completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination with respect to each Mortgaged Property on which a "Building" (as defined in 12 CFR Chapter III, Section 339.2) is located (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and/or the applicable Subsidiary Loan Party relating thereto) and (y) if any material improvements on any real property encumbered by a Mortgage is located in a special flood hazard area with respect to which flood insurance has been made available under the Flood Insurance Laws, a policy of flood insurance naming the Administrative Agent as loss payee and mortgagee that is in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (iv) if reasonably requested by the Administrative Agent, Opinions of Counsel regarding the enforceability, due authorization, execution and delivery of the Mortgages and such other matters customarily covered in real estate counsel opinions as the Administrative Agent may reasonably request, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders; and

(j)    after the Closing Date as contemplated by the Post-Closing Collateral Requirements, the Collateral Agent (acting at the direction of the Required Lenders) shall have received such other Security Documents as may be required to be delivered pursuant to Section 5.09.

"Commitments" shall mean with respect to any Lender, such Lender's Term Loan Commitment.

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Common Stock" shall mean, with respect to any Person, any and all shares, interest or other participations in, and other equivalents (however designated and whether voting or nonvoting) of such Person's common stock whether or not outstanding on the Closing Date, and includes, without limitation, all series and classes of such common stock.

"Conduit Lender" shall mean any special purpose corporation organized and administered by any Lender for the purpose of making Term Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund the Term Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender; provided, further, that no Conduit

10

Lender shall (a) be entitled to receive any greater amount pursuant to Section 2.09, 2.10 or 9.05 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender, unless the designation of such Conduit Lender is made with the Borrower's prior written consent or (b) be deemed to have any Commitment.

"Connection Income Taxes" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Depreciation and Amortization Expense" shall mean, with respect to any Person for any period, the total amount of depreciation and amortization expense, including the amortization of intangible assets, deferred financing fees and Capitalized Software Expenditures and amortization of unrecognized prior service costs and actuarial gains and losses related to pensions and other post-employment benefits, of such Person and its Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"Consolidated EBITDA" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period:

(a)     increased (without duplication) by the following items to the extent deducted in calculating such Consolidated Net Income:

(i)     Consolidated Interest Expense; *plus*

(ii)     Consolidated Income Taxes; *plus*

(iii)     consolidated depreciation expense; *plus*

(iv)     consolidated amortization expense or impairment charges recorded in connection with the application of Financial Accounting Standards Board issued Accounting Standards Codification ("ASC") Topic 350, Intangibles – Goodwill and Other and ASC Topic 360-10, Impairment and Disposal of Long-Lived Assets"; *plus*

(v)     other non-cash charges, losses or expenses (including, without limitation, non-cash pension expense) reducing Consolidated Net Income, including any write-offs or write-downs (excluding any such non-cash charge to the extent it represents an accrual of or reserve for cash charges in any future period or amortization of a prepaid cash expense that was paid in a prior period not included in the calculation); *plus*

(vi)     any non-cash compensation expense realized for grants of restricted stock, performance shares, stock options or other rights to officers, directors and employees of the Borrower or any Subsidiary; provided that such shares, options or other rights can be redeemed at the option of the holder only for Capital Stock of the Borrower (other than Disqualified Stock); *plus*

(vii)     any fees, charges or other expenses made or Incurred in connection with any actual or proposed Investment, asset sale, acquisition, recapitalization or issuance of Capital Stock or Incurrence of Indebtedness or any amendment or modification of Indebtedness (including as a result of Statement of Financial Accounting Standards 141R) (including, without limitation, the Transaction Expenses) which were (x) effectuated in compliance with the terms of this Agreement and the other Loan Documents or (y) incurred in connection with a proposed refinancing of the Facility or a potential amendment thereto and/or consent or waiver thereunder; *plus*

(viii)    all non-cash pension expenses included in non-operating expenses;

(ix)    any restructuring charges (including lease termination, severance and relocation expenses), integration costs, other non-recurring charges or expenses or stock based compensation expenses deducted (and not added back) in such period in computing Consolidated Net Income not in excess of an amount equal to (A) for such costs, charges or expenses allocable to the fiscal quarters ending September 30, 2020 and December 31, 2020, $10,000,000 in the aggregate, (B) for such costs, charges or expenses allocable to any fiscal quarter ending during the 2021 fiscal year, 17.5% of the aggregate Consolidated EBITDA allocable to the fiscal quarters in such fiscal year, (C) for such costs, charges or expenses allocable to any fiscal quarter ending during the 2022 fiscal year, 15% of the aggregate Consolidated EBITDA allocable to the fiscal quarters in such fiscal year, (D) for such costs, charges or expenses allocable to any fiscal quarter ending during the 2023 fiscal year, 10% of the aggregate Consolidated EBITDA allocable to the fiscal quarters in such fiscal year, and (E) for such costs, charges or expenses allocable to any fiscal quarter ending during the 2024 fiscal year, 5% of the aggregate Consolidated EBITDA allocable to the fiscal quarters in such fiscal year, in each case of the foregoing clauses (A) through (E), calculated after adding back such costs, charges and expenses without limitation for such period;

(b)    decreased by the cash expenses (regardless of accounting classification) related to lease obligations to the extent not otherwise deducted in calculating such Consolidated Net Income;

(c)    decreased (without duplication) by non-cash items increasing Consolidated Net Income of such Person for such period (excluding any items which represent the reversal of any accrual of, or reserve for, anticipated cash charges that reduced Consolidated EBITDA in any prior period);

(d)    increased or decreased (without duplication) to eliminate the following items reflected in Consolidated Net Income:

(i)    any net gain or loss resulting in such period from Hedging Obligations and the application of ASC Topic 815, Derivatives and Hedging;

(ii)    all unrealized gains and losses relating to financial instruments to which fair market value accounting is applied;

(iii)    any net gain or loss resulting in such period from currency translation gains or losses related to currency remeasurements of Indebtedness (including any net loss or gain resulting from Hedging Obligations for currency exchange risk); and

(iv)    effects of adjustments (including the effects of such adjustments pushed down to the Borrower and its Subsidiaries) in any line item in such Person's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to any completed acquisition; and

(e)    adjusted (without duplication) for any non-recurring fees, non-recurring expenses and non-recurring charges resulting from the Chapter 11 Cases that have been accrued on or prior to the Closing Date, as set forth on Schedule 1.01C, (other than, for the avoidance of doubt, any expenses or charges resulting from wind-down costs of the left-behind estate in the Chapter 11 Cases).

Notwithstanding the foregoing, clauses (a)(i) through (vii) relating to amounts of a Subsidiary of a Person will be added to Consolidated Net Income to compute Consolidated EBITDA of such Person only to the extent (and in the same proportion) that the net income (loss) of such Subsidiary (other than a Subsidiary Loan Party) was included in calculating the Consolidated Net Income of such Person and, to the extent the

amounts set forth in clauses (a)(ii) through (iv) are in excess of those necessary to offset a net loss of such Subsidiary or if such Subsidiary has net income for such period included in Consolidated Net Income, only if a corresponding amount would be permitted at the date of determination to be distributed to the Borrower by such Subsidiary without prior approval (that has not been obtained), pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, rules and governmental regulations applicable to that Subsidiary or its stockholders.

Notwithstanding anything to the contrary contained herein, for purposes of determining Consolidated EBITDA under this Agreement for any Test Period that includes any of the fiscal quarters listed below, Consolidated EBITDA for such fiscal quarters shall be as set forth below.

| Fiscal Quarter ending: | Consolidated EBITDA |
|---|---|
| September 2019 | $16,142,620 |
| December 2019 | $29,506,475 |
| March 2020 | $14,427,763 |
| June 2020 | $7,364,613 |

"Consolidated Income Taxes" means, with respect to any Person for any period, taxes imposed upon such Person or other payments required to be made by such Person by any governmental authority, which taxes or other payments are calculated by reference to the income or profits or capital of such Person or such Person and its Subsidiaries (to the extent such income or profits were included in computing Consolidated Net Income for such period), including, without limitation, state, franchise and similar taxes and foreign withholding taxes regardless of whether such taxes or payments are required to be remitted to any governmental authority.

"Consolidated Interest Expense" means, for any period, the interest expense of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, including but not limited to the portion of any payments or accruals with respect to Capitalized Lease Obligations that are allocable to interest expense, excluding (x) any write-offs of capitalized fees under the New ABL Facility Credit Agreement and all amendments thereto, (y) all non-cash charges for the amortization of original issue discount with respect to the Term Loan and (z) any interest on tax reserves to the extent the Borrower has elected to treat such interest as an interest expense under FIN 48 since its adoption.

"Consolidated Leverage Ratio" means, at any date of determination, the ratio of: (x) the sum of the aggregate outstanding amount of Indebtedness of the Borrower and the Subsidiaries as of the date of determination on a consolidated basis in accordance with GAAP to (y) Pro Forma Consolidated EBITDA as of such date.

"Consolidated Net Income" means, for any period, the net income (loss) of the Borrower and its consolidated Subsidiaries determined on a consolidated basis in accordance with GAAP (before preferred stock dividends); provided, however, that there will not be included in such Consolidated Net Income:

(a)    any net income (loss) of any Person if such Person is not a Subsidiary or that is accounted for by the equity method of accounting, except that: (i) subject to the limitations contained in clauses (c) through (f) below, the Borrower's equity in the net income of any such Person for such period will be included (and, without duplication, and to the extent such amounts decreased the Borrower's equity in the net income of any such Person for such period, shall be increased by the Borrower's Proportionate Equity Share of the amounts described in clauses (a)(i), (a)(ii), (a)(iii) and (a)(iv) of the definition of

13

Consolidated EBITDA that decreased the net income of such Person during such period) in such Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period or, without duplication, within 3 months following the last day of such period and prior to the date of determination or which the Borrower has determined as of such date of determination will be distributed imminently in respect of such period; and (ii) the Borrower's equity in a net loss of any such Person for such period will be included in determining such Consolidated Net Income to the extent such loss has been funded with cash from the Borrower or a Subsidiary during such period;

(b)     any after-tax effect of gain or loss (less all fees and expenses relating thereto) realized upon sales or other dispositions of any assets of the Borrower or such Subsidiary (including pursuant to any Sale and Lease-Back Transaction) other than in the ordinary course of business;

(c)     any after-tax effect of income (loss) from the early extinguishment of Indebtedness or Hedging Obligations or other derivative instruments;

(d)     the after-tax effect of extraordinary cash gain or cash loss resulting from a health emergency, hurricane, flood, tornado, earthquake or other natural disaster or act of God; provided that any exclusion pursuant to this clause (d), taken together with all other exclusions under this clause (d) in the aggregate for the relevant period, shall not exceed 5% of Consolidated EBITDA (calculated before giving effect to any adjustments under this clause(d));

(e)     the after-tax effect of the cumulative effect of a change in accounting principles;

(f)     any after-tax effect of non-cash impairment charges recorded in connection with the application of ASC Topic 350, Intangibles – Goodwill and Other and ASC Topic 360-10, Impairment and Disposal of Long-Lived Assets"; and

(g)     any non-cash compensation expense realized for grants of performance shares, stock options or other rights to officers, directors and employees of the Borrower or any Subsidiary; provided that such shares, options or other rights can be redeemed at the option of the holder only for Capital Stock of the Borrower (other than Disqualified Stock).

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Credit Bid" shall have the meaning assigned to such term in the preamble.

"Credit Event" shall mean the making, or deemed making, of the Term Loan.

"Cure Amount" has the meaning set forth in Section 7.04(a).

"Cure Expiration Date" has the meaning set forth in Section 7.04(a).

"Custodian" shall mean any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

"Debtors" shall have the meaning assigned to such term in the preamble.

"Debtor Relief Laws" shall mean the U.S. Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement,

receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" shall mean any event or condition which, but for the giving of notice, lapse of time or both would constitute an Event of Default.

"Defaulting Lender" shall mean, any Lender that has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent (acting at the direction of the Required Lenders) that a Lender is a Defaulting Lender shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender) upon delivery of written notice of such determination to the Borrower and each Lender.

"Designated Jurisdiction" shall mean any country or territory to the extent that such country or territory itself is the subject of any comprehensive Sanctions.

"DIP Facility" shall mean that certain debtor-in-possession financing in the form of a senior secured $50 million asset-based revolving credit facility approved by the Bankruptcy Court pursuant to the Final DIP Order.

"Disinterested Director" shall mean a director designated as such, who is not an employee or officer of the Parent Entity, the Borrower or any their respective Subsidiaries or an employee or officer of any holder of Equity Interests in the Parent Entity, the Borrower, any of their respective Subsidiaries or, in each chase, any Affiliate thereof and who has relevant experience in the business in which the Borrower and its Subsidiaries engage.

"Disqualified Stock" shall mean, with respect to any Person, any Capital Stock of such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event: (a) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (b) is convertible into or exchangeable for Indebtedness or Disqualified Stock (excluding Capital Stock which is convertible or exchangeable solely at the option of the Borrower or a Subsidiary (it being understood that upon such conversion or exchange it shall be an Incurrence of such Indebtedness or Disqualified Stock)), or (c) is redeemable at the option of the holder of the Capital Stock, in whole or in part, in each case on or prior to the date 91 days after the earlier of the final maturity date of the Notes or the date the Notes are no longer outstanding; provided, however, that only the portion of Capital Stock that so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock; provided, further, that any Capital Stock that would constitute Disqualified Stock solely because the holders thereof have the right to require the Borrower to repurchase such Capital Stock upon the occurrence of a Change of Control or Asset Disposition (each defined in a substantially identical manner to the corresponding definitions in this Agreement) shall not constitute Disqualified Stock if the terms of such Capital Stock (and all such securities into which it is convertible or for which it is ratable or

exchangeable) provide that the Borrower may not repurchase or redeem any such Capital Stock (and all such securities into which it is convertible or for which it is ratable or exchangeable) pursuant to such provision prior to compliance by the Borrower with Section 6.05 and unless such repurchase or redemption would comply with Section 6.06.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Domestic Subsidiary" shall mean any Subsidiary that is not a Foreign Subsidiary.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"environment" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, including flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"Environmental Laws" shall mean all applicable laws, including common law, treaties, rules, regulations, codes, ordinances, orders, injunctions, decrees, judgments or agreements promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the use, handling, generation, management, storage, treatment, transportation, disposal, Release or threatened Release of, or exposure to, any Hazardous Material, or to health and safety matters (to the extent relating to the environment or Hazardous Materials).

"Equity Interests" shall mean Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time and any final regulations promulgated and the rulings issued thereunder.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with the Parent Entity, the Borrower or a Subsidiary, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any Reportable Event or the requirements of Section 4043(b) of ERISA apply with respect to a Plan; (b) the determination that any Plan is in "at-risk status" (as defined in Section 303 of ERISA) or a Multiemployer Plan is in "endangered status" or "critical status" (each as defined in Section 305 of ERISA); (c) the filing pursuant to Section 412(c) of the Code or Section 303(c) of ERISA of an application for a waiver of the minimum funding standard with respect to

16

any Plan, the failure to satisfy the minimum funding standard (as defined in Section 412 of the Code and Section 302 of ERISA) with respect to any Plan or Multiemployer Plan; (d) the incurrence by the Borrower, a Subsidiary or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or Multiemployer Plan; (e) the receipt by the Borrower, a Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (f) the incurrence by the Borrower, a Subsidiary or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; (g) the receipt by the Borrower, a Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower, a Subsidiary or any ERISA Affiliate of any notice, concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the conditions for imposition of a lien under Section 303(k) of ERISA shall have been met with respect to any Plan; or (i) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 307 of ERISA.

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall have the meaning assigned to such term in Section 7.01.

"Excess Cash Flow" shall mean, for any fiscal year of the Borrower, the excess of, without duplication, (i) the sum of (x) the consolidated cash flow from operations of the Borrower for such fiscal year as determined in accordance with GAAP and (y) any amounts of federal, state or local income tax refunds actually received by the Borrower (or any other Loan Party) in cash (and to the extent not subsequently disbursed to, or payable to, a third party) attributable to the McClatchy Group from any period, over, without duplication, (ii) the sum of (x) purchases of property, plant and equipment paid in cash, (y) contributions to pension plans, and (z) additional cash Investments made pursuant to the terms of Investments as in effect on the Closing Date, in each case by the Borrower and its Subsidiaries during such fiscal year.

"Excess Cash Flow 2020 Refund" shall mean (a) Excess Cash Flow resulting from clause (i)(y) of the definition thereof during the period commencing on the Closing Date and ending on December 31, 2020, plus (b) to the extent negative, Excess Cash Flow for such period calculated in accordance with the definition thereof, but excluding any increase from the amount of federal, state or local income tax refunds actually received by the Borrower (or any other Loan Party) in cash.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Assets" shall have the meaning assigned to such term in the Collateral Agreement.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower under any Loan Document, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America (or any state or locality thereof) or the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located or any other jurisdiction as a result of such recipient engaging in a trade or business in such jurisdiction for tax purposes (other than a trade or business deemed to arise by virtue of entering into this Agreement, any other Loan Document or any of the transactions contemplated under such documents), (b) any branch profits tax or any similar tax that is imposed by any jurisdiction described in clause (a) above, (c) in the case of a Lender (other than an assignee selected by the Borrower pursuant to a

request by the Borrower under Section 2.10(b)), any withholding tax imposed by the United States federal government (or by another jurisdiction as a result of such Lender being organized or having its principal office or applicable lending office in such jurisdiction, or as a result of such Lender engaging in a trade or business in such jurisdiction for tax purposes (other than a trade or business deemed to arise solely by virtue of entering into this Agreement, any other Loan Document or any of the transactions contemplated under such documents)) that is imposed with respect to an applicable interest in a Commitment or Obligation pursuant to laws in effect at the time such Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to designation of a new lending office (or assignment), to receive additional amounts from a Loan Party with respect to such withholding tax pursuant to Section 2.08(a) or Section 2.08(c), (d) is attributable to such Lender's failure to comply with Section 2.08(e) or the Administrative Agent's failure to comply with Section 2.08(f), (e) any withholding taxes imposed by the United States federal government pursuant to FATCA and (f) any United States backup withholding.

"Existing Indebtedness" shall mean (i) the DIP Facility; (ii) the First Lien Notes; (iii) other Indebtedness as set forth on Schedule 6.01 and approved by the Lenders.

"Facility" shall mean the Term Loan Facility.

"Fair Market Value" shall mean, with respect to any property, the price that would reasonably be expected to be paid in an arm's length free-market transaction, for cash, between a willing seller and a willing buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Rate" shall mean, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent; provided, that the Federal Funds Rate, if negative, shall be deemed to be 0.00%.

"Final DIP Order" shall mean the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 233].

"Financial Officer" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer, Controller or Responsible Officer of such person.

"Financial Performance Covenant" shall mean the covenant of the Borrower set forth in Section 6.10.

"First Lien Net Leverage Ratio" shall mean, on any date, the ratio of (a) Net First Lien Debt as of the last day of the Test Period most recently ended as of such date to (b) Consolidated EBITDA

for the Test Period most recently ended as of such date, all determined in accordance with GAAP; provided that the First Lien Net Leverage Ratio shall be determined for the relevant Test Period on a Pro Forma Basis.

"First Lien Notes" means those certain 9.000% Senior Secured Notes due 2026 issued pursuant to the First Lien Notes Indenture.

"First Lien Note Claims" shall have the meaning assigned to such term in the preamble.

"First Lien Notes Indenture" means that certain Indenture dated July 16, 2018, by and among McClatchy,  as issuer, the subsidiary guarantor parties thereto, and the First Lien Notes Trustee (as therein defined), as amended, supplemented, or otherwise modified from time to time.

"First Lien Obligations" shall mean the (i) Obligations under the Loan Documents and (ii) New ABL Obligations (for the avoidance of doubt, in each case, limited to the principal amount of loans and unreimbursed amounts (including such unreimbursed amounts with respect to outstanding letters of credit) thereunder).

"Flood Insurance Laws" shall mean, collectively, (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" shall mean any Lender that is not a "U.S. Person" as defined by Section 7701(a)(30) of the Code.

"Foreign Subsidiary" shall mean any Subsidiary that is incorporated or organized under the laws of any jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"Four Quarter Period" shall have the meaning assigned to such term in the definition of the term "Pro Forma Consolidated EBITDA."

"Framework Agreement" shall mean that certain Framework Agreement by and among Chatham Asset Management LLC, Brigade Capital Management and the Borrower, dated as of July 1, 2020.

"GAAP" shall mean generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession.

"Governing Documents" shall mean, as to any Person, the articles or certificate of incorporation and bylaws, any certificate of limited partnership, any shareholders' agreement, articles of organization, certificate of organization or certificate of formation, limited liability company agreement, operating agreement, limited partnership agreement or other partnership agreement or other formation or constituent documents of such Person.

"Governmental Authority" shall mean the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" of or by any Person (each a "guarantor") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of the guarantor securing any Indebtedness (or any existing right, contingent or otherwise, of the holder of Indebtedness to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; provided, however, the term "Guarantee" shall not include endorsements for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted by this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such person in good faith.

"Guarantee Agreement" shall mean the Term Loan Guarantee Agreement, dated as of the Closing Date, among the Parent Entity, the Borrower, each Subsidiary Loan Party, each other Person that becomes a party thereto in accordance with the terms of this Agreement, and the Administrative Agent, substantially in the form of Exhibit J-1, as amended, amended and restated, supplemented or otherwise modified from time to time.

"guarantor" shall have the meaning assigned to such term in the definition of the term "Guarantee."

"Hazardous Materials" shall mean all pollutants, contaminants, wastes, chemicals or any toxic, hazardous, ignitable, explosive, corrosive, reactive or radioactive substances, wastes or materials, including petroleum or petroleum distillates or derivatives, asbestos or asbestos containing materials, lead paint, polychlorinated biphenyls or radon gas, and any other substances or wastes of any nature in violation of any Environmental Law.

"Hedging Obligations" shall mean, with respect to any Person, the obligations of such Person under: (a) currency exchange, interest rate or commodity swap agreements, currency exchange, interest rate or commodity cap agreements and currency exchange, interest rate or commodity collar agreements; and (b) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange, interest rates or commodity prices.

"Hedging Transaction" of any Person shall mean (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into by such Person that is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity

option, equity or equity index swap or option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, spot transaction, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Incur" shall mean issue, assume, guarantee, incur or otherwise become liable for; provided, however, that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a subsidiary; and the terms "Incurred" and "Incurrence" have meanings correlative to the foregoing. Any Indebtedness issued at a discount (including Indebtedness on which interest is payable through the issuance of additional Indebtedness) shall be deemed incurred at the time of original issuance of the Indebtedness at the initial accreted amount thereof.

"Indebtedness" means, with respect to any Person on any date of determination (without duplication): (a) the principal of and premium (if any) in respect of indebtedness of such Person for borrowed money; (b) the principal of and premium (if any) in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (c) the principal component of all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments (including reimbursement obligations with respect thereto; except to the extent such reimbursement obligation relates to a Trade Payable or similar obligation to a trade creditor in each case incurred in the ordinary course of business) other than obligations with respect to letters of credit, bankers' acceptances or similar instruments securing obligations (other than obligations described in clauses (a) and (b) above and clause (e) below) entered into in the ordinary course of business of such Person to the extent such letters of credit, bankers' acceptances or similar instruments are not drawn upon or, to the extent drawn upon, such drawing is reimbursed no later than the 5th Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit, bankers' acceptances or similar instruments; (d) the principal component of all obligations of such Person to pay the deferred and unpaid purchase price of property, which purchase price is due more than 6 months after the date of placing such property in service or taking delivery and title thereto, except (i) any such balance that constitutes a Trade Payable, accrued liability or similar obligation to a trade creditor, in each case accrued in the ordinary course of business, and (ii) any earn-out obligation, purchase price adjustment or other deferred payment until the amount of such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; (e) Capitalized Lease Obligations and all Attributable Indebtedness of such Person (whether or not such items would appear on the balance sheet of the guarantor or obligor); (f) the principal component or liquidation preference of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock or, with respect to any Subsidiary that is not a Subsidiary Loan Party, any Preferred Stock (but excluding, in each case, any accrued dividends); (g) the principal component of all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; provided, however, that the amount of such Indebtedness will be the lesser of (a) the Fair Market Value of such asset at such date of determination and (b) the principal amount of such Indebtedness of such other Persons; (h) the principal component of Indebtedness of other Persons to the extent guaranteed by such Person (whether or not such items would appear on the balance sheet of the guarantor or obligor); and (i) to the extent not otherwise included in this definition, net Hedging

Obligations of such Person (the amount of any such obligations to be equal at any time to the termination value of such agreement or arrangement giving rise to such Hedging Obligation that would be payable by such Person at such time). Notwithstanding the foregoing, in no event shall the term "Indebtedness" include (i) any indebtedness under any overdraft or cash management facilities so long as any such indebtedness is repaid in full no later than five (5) Business Days following the date on which it was incurred or in the case of such indebtedness in respect of credit or purchase cards, within 60 days of its incurrence, (ii) obligations in respect of performance, appeal or other surety bonds or completion guarantees incurred in the ordinary course of business, (iii) except as provided in clause (e) above, any obligations in respect of a lease properly classified as an operating lease in accordance with GAAP, (iv) any liability for federal, state, local or other taxes not yet delinquent or being contested in good faith and for which adequate reserves have been established to the extent required by GAAP or (v) any customer deposits or advance payments received in the ordinary course of business. The amount of Indebtedness of any Person at any date will be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date; provided that contingent obligations arising in the ordinary course of business and not with respect to borrowed money of such Person or other Persons shall not be deemed to constitute Indebtedness.

"Indemnified Taxes" shall mean (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 9.05(b).

"Independent Financial Advisor" shall mean (a) an accounting, appraisal or investment banking firm or (b) a consultant to Persons engaged in a Related Business, in each case, of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged.

"Ineligible Institution" shall mean (a) those persons that are "competitors" of the Borrower and the Subsidiaries that are identified in writing to the Administrative Agent by the Borrower on or prior to the Closing Date, and as may be identified in writing to the Administrative Agent by the Borrower from time to time thereafter, by delivery of a notice thereof to the Administrative Agent setting forth such person or persons, (b) those persons identified in writing to the Administrative Agent by the Borrower prior to the Closing Date and (c) in the case clauses (a) and (b), any of such person's Affiliates that are reasonably identifiable on the basis of such Affiliate's name or are identified in writing to the Administrative Agent by the Borrower from time to time; provided that (a) Ineligible Institution shall not include any person that the Borrower has notified the Administrative Agent is no longer considered an Ineligible Institution and (b) no written notice delivered pursuant hereto shall apply retroactively to disqualify any person that has previously acquired an assignment or participation.

"Information" shall have the meaning assigned to such term in Section 3.14(a).

"Insolvency or Liquidation Proceeding" shall mean (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other applicable Bankruptcy Law  with respect to the Borrower or any Subsidiary Loan Party, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to the Borrower or any Subsidiary Loan Party or with respect to a material portion of its respective assets, (c) any liquidation, dissolution, reorganization or winding-up of the Borrower or any Subsidiary Loan Party, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of the Borrower or any Subsidiary Loan Party.

"Intellectual Property Rights" shall have the meaning assigned to such term in Section 3.22.

"Intercreditor Agreement" shall mean that certain Intercreditor Agreement, dated as of the Closing Date, among the Parent Entity, the Borrower, Agents, the New ABL Facility Administrative Agent, the trustee for the New 1.5 Lien Notes, and each other person that becomes a party thereto pursuant to the terms thereof and each Subsidiary Loan Party party thereto, substantially in the form attached as Exhibit I, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Investment" in any Person shall mean any direct or indirect advance, loan (other than advances or extensions of credit in the ordinary course of business that are in conformity with GAAP recorded as accounts receivable on the balance sheet of the Borrower or its Subsidiaries) or other extensions of credit (including by way of guarantee or similar arrangement, but excluding any debt or extension of credit represented by a bank deposit other than a time deposit) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by such Person and all other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP; provided that none of the following will be deemed to be an Investment: (a) Hedging Obligations entered into in the ordinary course of business and in compliance with this Agreement and the other Loan Documents; (b) endorsements of negotiable instruments and documents in the ordinary course of business; (c) an account receivable arising, or prepaid expenses or deposits made, in the ordinary course of business; and (d) licensing or transfer of know-how or intellectual property or the providing of services in the ordinary course of business.

"Junior Financing" shall mean any Indebtedness of the Borrower or any Subsidiary that (i) is unsecured or (ii) is expressly subordinate in right of payment or right of security to the Obligations and, to the extent subordinated in right of payment or secured by the Collateral, subject to an intercreditor agreement acceptable to the Brigade Parties in their sole discretion, and which shall in any event include the New 1.5 Lien Notes.

"Junior Liens" means any obligations secured by Liens that are subordinated to the Liens securing the Obligations.

"Law(s)" shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any Governmental Authority, foreign or domestic.

"Leases" shall mean all leases, licenses and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Mortgaged Properties or the improvements thereon, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder.

"Lender" shall mean each financial institution listed on Schedule 2.01 (other than any such person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 9.04), as well as any person that becomes a "Lender" hereunder pursuant to Section 9.04 or Section 2.10.

"lending office" shall mean, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Loans.

23

"Lien" shall mean, with respect to any asset, (a) any mortgage, preferred mortgage, deed of trust, lien, notice of claim of lien, hypothecation, pledge, charge, collateral assignment, security interest or similar encumbrance in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Loan Documents" shall mean this Agreement, any promissory notes issued pursuant to this Agreement, the Collateral Agreement, the Intercreditor Agreement, the Mortgages, and all other agreements, instruments, documents and certificates identified in Section 4.01 or delivered in connection with the Collateral and Guarantee Requirements executed and delivered to, or in favor of, the Administrative Agent or the Collateral Agent.  Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loan Parties" shall mean the Parent Entity, the Borrower and the Subsidiary Loan Parties.

"Local Time" shall mean New York, New York local time (daylight or standard, as applicable).

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Effect" shall mean a material adverse effect on (i) the business, property, operations or financial condition, of the Parent Entity, or the Borrower and its Subsidiaries taken as a whole, (ii)  the validity and enforceability of any of the Loan Documents, (iii) the rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders thereunder (taken as a whole), or (iv) the ability of Loan Parties (taken as a whole) to perform their payment obligations under the Loan Documents.

"Material Indebtedness" shall mean (a) the New ABL Facility (and all loans and other obligations thereunder), (b) the New 1.5 Lien Notes and (c) any other Indebtedness (other than the Term Loan) of any one or more of the Parent Entity, the Borrower, or any Subsidiary in an aggregate outstanding principal amount exceeding $5.0 million.

"Material Leased Real Property(ies)" shall mean any Real Property leased by the Parent Entity, the Borrower or any Subsidiary, with a Fair Market Value in excess of $1,000,000 individually (determined as of the Closing Date, or, if acquired after the Closing Date, as of such date of acquisition).

"Maturity Date" shall mean July 15, 2026, or such earlier date on which the Loan becomes due and payable as herein provided, whether by acceleration or otherwise.

"Maximum Rate" shall have the meaning assigned to such term in Section 9.09.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgaged Properties" shall mean the Owned Real Properties, with a Fair Market Value in excess of $500,000 individually or, when aggregated with other Owned Real Properties not subject to a Mortgage, $2,000,000 in the aggregate (determined as of the Closing Date, or, if acquired after the Closing Date, as of such date of acquisition), and the Material Leased Real Properties and, in each case, the improvements thereto owned by the Parent Entity, the Borrower or any Subsidiary Loan Party, that is set forth on Schedule 1.01A and each additional Real Property which is encumbered by a Mortgage or Additional Mortgage pursuant to Sections 5.09(c) or 5.09(d).

"<u>Mortgages</u>" shall mean, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, and other security documents delivered with respect to Mortgaged Properties (but subject to commercially reasonable efforts to deliver such Mortgages with respect to Material Leased Real Properties), substantially, in the case of mortgages, in the form of Exhibit E (with such changes as are not adverse in any material respect to the interests of any Lender or are otherwise reasonably acceptable to the Required Lenders), as amended, amended and restated, supplemented or otherwise modified from time to time.

"<u>Multiemployer Plan</u>" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Borrower or any Subsidiary or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"<u>Net First Lien Debt</u>" means, at any date of determination, the excess of (i) the aggregate outstanding principal amount of the First Lien Obligations as of the date of determination over (ii) the amount of Unrestricted Cash and Cash Equivalents of the Borrower and its Subsidiaries as of such date.

"<u>Net Income</u>" shall mean, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"<u>Net Proceeds</u>" shall mean 100% of the cash proceeds actually received by the Borrower or any other Loan Party (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but only as and when received) from any Asset Disposition, or any Recovery Event, net of (i) customary attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations relating to the applicable asset to the extent such debt or obligations are secured by a Lien permitted hereunder (other than pursuant to the Loan Documents and other than any Lien that is *pari passu* or junior to the Liens under the Loan Documents) on such asset, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith, (ii) taxes paid or payable in connection with such sale, and (iii) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clauses (i) or (ii) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of the Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be cash proceeds of such Asset Disposition occurring on the date of such reduction).

"<u>New 1.5 Lien Indenture</u>" shall mean the indenture (as may be amended, modified or otherwise supplemented) governing the terms of the New 1.5 Lien Notes, which shall be in form and substance satisfactory to the Lenders.

"<u>New 1.5 Lien Notes</u>" shall mean those certain New 1.5 Lien Notes issued by the Borrower on the Closing Date with a face amount equal to no less than $80.79 million[4] to the Chatham Parties. Such notes shall be secured by all assets of the Borrower, <u>provided</u> that any and all liens and security interests granted in connection therewith shall be junior to the liens and security interests granted to the Secured

---

[4] [Amount to be confirmed and to be grossed up to include OID.]

Parties under any Loan Documents, provided, further, that such notes may not be repaid or refinanced prior to Payment in Full of all Obligations.

"New ABL Facility Administrative Agent" shall mean [_____].

"New ABL Facility" shall mean that certain senior secured asset-based revolving credit facility in an aggregate principal amount not to exceed $50 million, governed by the New ABL Facility Credit Agreement, which shall be in form and substance satisfactory to the Lenders.

"New ABL Facility Credit Agreement" shall mean the credit agreement dated as of the Closing Date (as may be amended, modified or otherwise supplemented) governing the New ABL Facility, among the Borrower and each of the lenders, the New ABL Facility Administrative Agent, collateral agent and guarantors party thereto.

"New ABL Facility Documents" shall mean the New ABL Facility Credit Agreement, the Intercreditor Agreement, and all related amendments, supplements, notes, pledges, collateral agreements, loan and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the New ABL Facility Credit Agreement, in each case as amended, restated, supplemented or modified from time to time.

"New ABL Obligations" means (i) all Obligations under the New ABL Facility and under any other agreement, document or instrument relating to the New ABL Facility, (ii) all Hedge Obligations (as defined in the New ABL Facility) secured pursuant to the New ABL Facility Documents and owing by the Borrower or any of the Subsidiaries, and (iii) all Bank Product Obligations (as defined in the New ABL Facility Documents) secured pursuant to the New ABL Facility Documents and owing by the Borrower or any of the Subsidiaries.  New ABL Obligations shall in any event include: all principal, premium, interest, fees, attorney fees, costs, charges, expenses, reimbursement obligations, indemnities, guarantees, and all other amounts payable under or secured by or pursuant to any New ABL Facility Document (including, in each case, all amounts (including interest, fees and expenses) accruing on or after the commencement of any Insolvency or Liquidation Proceeding relating to the Borrower or any Subsidiary Loan Party and all amounts that would have accrued or become due under the terms of the New ABL Facility Documents but for the effect of the Insolvency or Liquidation Proceeding and irrespective of whether a claim for all or any portion of such amounts is allowable or allowed in such Insolvency or Liquidation Proceeding).

"New York Courts" shall have the meaning assigned to such term in Section 9.15.

"Non-Consenting Lender" shall have the meaning assigned to such term in Section 2.10(c).

"Non-Defaulting Lender" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

"Notice of Intent to Cure" has the meaning set forth in Section 7.04(a).

"Obligations" shall mean all interest, principal, fees, indemnities and other obligations of every nature of any Loan Party from time to time owed to the Agents, the Lenders or the other Secured Parties or any of them under any Loan Document, whether for principal, interest, fees, expenses, indemnification or otherwise (including interest, fees and expenses which, but for the filing of a petition in bankruptcy with respect to any Loan Party would have accrued on any Obligation, whether or not a claim is allowed against any Loan Party for such interest, fees and expenses in the related bankruptcy proceeding).

"OFAC" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Officer" shall mean the Chairman of the Board, the Chief Executive Officer, the President, the Chief Financial Officer, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the applicable Loan Party or, in the event that a Person is a partnership or a limited liability company that has no such officers, a person duly authorized under Applicable Law by the general partner, managers, members or a similar body to act on behalf of such Person.  "Officer" of any Loan Party shall have a correlative meaning.

"Officers' Certificate" shall mean a certificate signed by two Officers or by an Officer and either an Assistant Treasurer or an Assistant Secretary of the applicable Loan Party.

"Opinion of Counsel" shall mean a written opinion from legal counsel who is reasonably acceptable to the Administrative Agent.  The counsel may be an employee of or counsel to the Borrower or any other Loan Party .

"Other Connection Taxes" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Term Loan or any Loan Document).

"Other Taxes" shall mean any and all present or future stamp, court or documentary or any other excise, transfer, sales, property, intangible, recording, filing or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery, performance, registration or enforcement of, from then receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.10) and any and all interest and penalties related thereto.

"Outstanding Amount" shall mean on any date, the amount of the aggregate outstanding principal amount of the Term Loans after giving effect to any borrowings and prepayments or repayments of such Term Loans occurring on such date.

"Overnight Rate" shall mean, for any day, with respect to any amount denominated in Dollars, the greater of (i) the Federal Funds Rate and (ii) an overnight rate determined by the Administrative Agent, as the case may be, in accordance with banking industry rules on interbank compensation.

"Owned Real Property(ies)" shall mean each parcel of Real Property that is owned in fee by the Borrower or any Subsidiary.

"Parent Entity" have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Participant" shall have the meaning assigned to such term in Section 9.04(c)(1).

"Participant Register" shall have the meaning assigned to such term in Section 9.04(c)(2).

"Payment in Full," "Paid in Full" and any other similar terms or phrases shall have the meaning provided in the last paragraph of Section 1.02.

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Perfection Certificate" shall mean the Term Loan Perfection Certificate with respect to the Borrower and the other Loan Parties and dated as of the Closing Date.

"Permitted Encumbrances" shall mean those exceptions specified in the title policies delivered in respect of the Mortgaged Properties.

"Permitted Investments" shall mean an Investment by the Borrower or any Subsidiary in:

(a)    the Borrower or a Subsidiary, including through the purchase of Capital Stock of a Subsidiary;

(b)    cash and Cash Equivalents or Investments that constituted Cash Equivalents at the time made;

(c)    receivables owing to the Borrower or any Subsidiary created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; provided, however, that such trade terms may include such concessionary trade terms as the Borrower or any such Subsidiary deems reasonable under the circumstances;

(d)    commission, relocation, entertainment, payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(e)    any Investment acquired by the Borrower or any of its Subsidiaries: (i) in exchange for any other Investment or accounts receivable held by the Borrower or any such Subsidiary in connection with or as a result of a judgment, bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; (ii) as a result of a foreclosure by the Borrower or any of its Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default; or (iii) in the form of notes payable, or stock or other securities issued by account debtors to the Borrower or any Subsidiary pursuant to negotiated agreements with respect to the settlement of such account debtor's accounts, and other Investments arising in connection with the compromise, settlement or collection of accounts receivable, in each case in the ordinary course of business;

(f)    Investments made in connection with the funding of contributions under any non-qualified retirement plan or similar employee compensation plan including, without limitation, split-dollar insurance policies, in an amount not to exceed the amount of compensation expense recognized by the Borrower and its Subsidiaries in connection with such plans;

(g)    Investments received in settlement of debts created in the ordinary course of business and owing to the Borrower or any Subsidiary or in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of a debtor;

(h)    any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility, unemployment insurance, workers' compensation,

performance and other similar deposits made in the ordinary course of business by the Borrower or any Subsidiary;

(i)     prepayments and other credits to suppliers made in the ordinary course of business;

(j)     endorsements of negotiable instruments and documents in the ordinary course of business;

(k)     loans or advances or similar transactions with customers, distributors, clients, developers, suppliers or purchasers of goods or services in the ordinary course of business;

(l)     provided that no Default or Event of Default has occurred and is continuing, any Investment by the Loan Parties in a Person that is engaged in a Related Business if as a result of such Investment: (i) such Person becomes a Loan Party and all acquired assets become part of the Collateral (to the extent required in accordance with further assurances covenant); or (ii) such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Loan Parties, and such assets become part of the Collateral;

(m)     Investments made as a result of the receipt of non-cash consideration from an Asset Disposition that was made pursuant to and in compliance with the Asset Disposition covenant or any other disposition of assets not constituting an Asset Disposition;

(n)     Investments by the Loan Parties, together with all other Investments pursuant to this clause (n), in an aggregate amount at the time of such Investment not to exceed $7.5 million outstanding at any one time (with the Fair Market Value of such Investment being measured at the time made and without giving effect to subsequent changes in value);

(o)     loans or advances to, or guarantees of third party loans to, employees, officers or directors of the Loan Parties in the ordinary course of business in an aggregate amount outstanding at any time not in excess of $1.0 million with respect to all loans or advances or guarantees made since the Closing Date;

(p)     Guarantees of Indebtedness issued in accordance with and permitted by Section 6.01; and

(q)     Investments existing on the Closing Date and set forth on Schedule 6.04 and approved by the Lenders.

"Permitted Junior Debt" means Indebtedness (including any Junior Financing) of the Borrower (which may be guaranteed by any Subsidiary Loan Party) (a) no portion of which has a scheduled maturity prior to the date that is six (6) months after the final maturity of the Term Loans and (b) which is not secured by any Liens on the assets of the Borrower or any Subsidiary of the Borrower except for Junior Liens on the Collateral that are subordinated to the Liens on the Collateral securing the Term Loans and subject to an intercreditor agreement acceptable to the Brigade Parties in their sole discretion (it being agreed, for the avoidance of doubt, that the New ABL Credit Facility shall not constitute Permitted Junior Debt or a Junior Financing).

"Permitted Liens" shall mean, with respect to any Person:

(a)     Liens on the Collateral securing the Obligations;

(b)      pledges or deposits by such Person under workers' compensation laws, unemployment, general insurance and other insurance laws and old-age pensions and other social security or retirement benefits or similar legislation, or good-faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person, or deposits as security for contested taxes or import or customs duties or for the payment of rent, in each case Incurred in the ordinary course and/or deposits of cash or United States government bonds to secure letters of credit issued in the ordinary course of business to support worker's compensation claims or related insurance;

(c)      Liens imposed by law and carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens, in each case Incurred in the ordinary course of business;

(d)      Liens for taxes, assessments or other governmental charges or levies not yet subject to penalties for non-payment or that are being contested in good faith by appropriate proceedings, provided that the appropriate reserves required pursuant to GAAP have been made in respect thereof;

(e)      Liens in favor of issuers of surety, appeal or performance bonds or letters of credit or bankers' acceptances or similar obligations issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(f)      minor survey exceptions, encumbrances, ground leases, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning, building codes or other restrictions (including, without limitation, minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(g)      leases, licenses, subleases and sublicenses of assets (including, without limitation, real property and intellectual property rights) that do not materially interfere with the ordinary conduct of the business of the Loan Parties;

(h)      Liens securing judgments that would not give rise to an Event of Default and Liens securing appeal or surety bonds related to such judgment so long as any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(i)      Liens for the purpose of securing Capitalized Lease Obligations or Purchase Money Indebtedness; provided that (1) the aggregate principal amount of Indebtedness secured by such Liens is otherwise permitted to be Incurred under the Facility and does not exceed the cost of the assets or property so acquired, constructed or improved plus reasonable fees and expenses of such Person Incurred in connection therewith; and (2) such Liens are created within 180 days of construction, acquisition or improvement of such assets or property and do not encumber any other assets or property of the Loan Parties other than such assets or property and assets affixed or appurtenant thereto and the proceeds thereof;

(j)      Liens that constitute banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a bank, depositary or other financial institution, whether arising by operation of law or pursuant to contract;

(k)      Liens evidenced by Uniform Commercial Code financing statement filings regarding operating leases entered into by the Borrower and its Subsidiaries in the ordinary course of business;

(l)      Liens on property or shares of stock of a Person at the time such Person becomes a Subsidiary; provided, however, that such Liens are not created, Incurred or assumed in connection with, or in contemplation of, such other Person becoming a Subsidiary; provided further, however, that any such Lien may not extend to any other property owned by the Borrower or any Subsidiary;

(m)      deposits as security for contested taxes or contested import or customs duties;

(n)      any interest or title of a lessor under any operating lease;

(o)      Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(p)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with importation of goods;

(q)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business;

(r)      Liens on funds of the Borrower or any Subsidiary held in deposit accounts with third party providers of payment services securing credit card charge-back reimbursement and similar cash management obligations of the Borrower or the Subsidiaries;

(s)      Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the Uniform Commercial Code in effect in the relevant jurisdiction covering only the items being collected upon;

(t)      Liens arising by operation of law or contract on insurance policies and the proceeds thereof to secure premiums thereunder;

(u)      Liens on insurance policies and proceeds of insurance policies (including rebates of premiums) securing Indebtedness Incurred pursuant to Section 6.01(b)(ix) to finance the payment of premiums on the insurance policies subject to such Liens;

(v)      statutory, common law or contractual Liens of landlords;

(w)      customary Liens granted in favor of a trustee to secure fees and other amounts owing to such trustee under an indenture or other agreement pursuant to which Indebtedness permitted under Section 6.01 is Incurred;

(x)      Liens on any cash earnest money deposit made by the Borrower or any Subsidiary in connection with any letter of intent or acquisition agreement that is not prohibited by this Agreement or the other Loan Documents;

(y)      Liens in favor of credit card processors granted in the ordinary course of business;

31

(z)      Liens securing cash management obligations incurred in the ordinary course of business;

(aa)      (i) Liens on the Collateral securing Indebtedness Incurred pursuant to Section 6.01(b)(ii), (ii) Bank Product Obligations (as defined in the New ABL Facility Credit Agreement) that are secured ratably (other than with respect to cash collateral for letters of credit) with Indebtedness outstanding pursuant to Section 6.01(b)(ii) and (iii) Liens on cash or deposits granted to the Collateral Agent with respect to Indebtedness Incurred pursuant to Section 6.01(b)(ii) in respect of letters of credit issued and outstanding thereunder; provided that, in each case, such Liens are subject to an intercreditor agreement acceptable to the Brigade Parties in their sole discretion;

(bb)      Junior Liens on the Collateral securing the Permitted Junior Debt, provided that, in each case, such Liens are subject to an intercreditor agreement acceptable to the Brigade Parties in their sole discretion;

(cc)      Liens existing on the Closing Date and set forth on Schedule 6.02 and approved by the Lenders;

(dd)      Liens securing Refinancing Indebtedness to the extent permitted in accordance with clause (e) of the definition of Refinancing Indebtedness;

(ee)      Liens securing Hedging Obligations relating to Indebtedness so long as the related Indebtedness is, and is permitted to be, secured by a Lien on the same property securing such Hedging Obligation;

(ff)      Liens on the Collateral securing Indebtedness Incurred pursuant to Section 6.01(b)(xvi) (it being understood that such Liens may not be Liens on the Collateral ranking *pari passu* or senior to the Liens securing the Term Loans);

(gg)      Liens on property or shares of stock of a Person at the time such Person becomes a Loan Party; provided that such Liens are not created, Incurred or assumed in connection with, or in contemplation of, such other Person becoming a Subsidiary; provided further, however, that any such Lien may not extend to any other property owned by the Borrower or any Subsidiary; and

(hh)      Liens for the purpose of securing (i) any Attributable Indebtedness in respect of a Sale and Lease-Back Transaction Incurred pursuant to the relevant debt basket or (ii) the payment of all or a part of the purchase price of, or Capitalized Lease Obligations, Purchase Money Indebtedness or other payments incurred to finance assets or property (other than capital stock or other Investments) acquired, constructed, improved or leased in the ordinary course of business; provided that, the case of each subclauses (hh)(i) and (hh)(ii) above: (x) the aggregate principal amount of Indebtedness secured by such Liens is otherwise permitted to be Incurred and does not exceed the cost of the assets or property so acquired, constructed or improved plus reasonable fees and expenses of such Person Incurred in connection therewith; and (y) such Liens are created within 90 days of construction, acquisition or improvement of such assets or property and do not encumber any other assets or property of the Loan Parties other than such assets or property and assets affixed or appurtenant thereto and the proceeds thereof.

"person" or "Person" shall mean any natural person, corporation, business trust, joint venture, association, the Borrower, partnership, limited liability company or government, individual or family trusts, or any agency or political subdivision thereof.

"Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) that is, (i) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and (ii) sponsored or maintained (at the time of determination or at any time within the five years prior thereto) by the Borrower or any ERISA Affiliate, and (iii) in respect of which the Borrower, any Subsidiary or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Platform" shall have the meaning assigned to such term in Section 9.17(a).

"Pledged Collateral" shall have the meaning assigned to such term in the Collateral Agreement.

"Policies" shall mean the insurance policies required pursuant to Section 5.02.

"Post-Closing Collateral Requirement" shall mean the satisfaction of the Collateral and Guarantee Requirement after the Closing Date by the Borrower and the Subsidiaries in accordance with Section 5.09(h) and Schedule 5.09(h), to the extent not satisfied on or prior to the Closing Date.

"Preferred Stock" shall mean, as applied to the Capital Stock of any corporation, Capital Stock of any class or classes (however designated) that is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"primary obligor" shall have the meaning assigned to such term in the definition of the term "Guarantee".

"Pro Forma Basis" shall mean, with respect to any calculation of Consolidated EBITDA or the First Lien Net Leverage Ratio, calculated after giving effect to the following:

(1)    In the event that Borrower or any of its Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of revolving credit borrowings in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the calculation is being calculated but prior to the event for which the calculation is made (the "Calculation Date"), then the calculation shall be made giving pro forma effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

(2)    For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations that the Borrower or any of its Subsidiaries has made during the four-quarter reference period or (except for purposes of actual compliance (and not pro forma compliance) with the Financial Performance Covenant under Section 6.10) subsequent to such reference period and on or prior to or simultaneously with the Calculation Date shall be calculated on a pro forma basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations, execution, termination, amendment and designations (and the change of any associated fixed charge obligations and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period.

33

(3)    For purposes of this definition, whenever pro forma effect is to be given to any event, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Borrower.

"Pro Forma Consolidated EBITDA" means the Borrower's Consolidated EBITDA for the four most recently completed fiscal quarters ending on our prior to the date of determination for which financial statements are available (the "Four Quarter Period") calculated on a Pro Forma Basis after giving effect to any Asset Dispositions or Asset Acquisitions (including, without limitation, any Asset Acquisition giving rise to the need to make such calculation as a result of the Borrower or one of the Subsidiaries (including any Person who becomes a Subsidiary as a result of such Asset Acquisition) Incurring Indebtedness and the application of the proceeds from any Asset Disposition) at any time on or subsequent to the first day of the Four Quarter Period and on or prior to the date of determination, as if such Asset Disposition or Asset Acquisition occurred on the first day of the Four Quarter Period. For purposes of this definition, whenever pro forma effect is to be given to any calculation under this definition, the pro forma calculations shall be (x) made in good faith by a responsible financial or accounting officer of the Company (and may include, for the avoidance of doubt, cost savings and operating expense reductions resulting from such Asset Disposition or Asset Acquisition which is being given pro forma effect that have been or are expected to be realized within twelve (12) months after the date of such Asset Disposition or Asset Acquisition as the result of specified actions taken or to be taken within six (6) months after such date), except as otherwise provided herein or (y) determined in accordance with Regulation S-X.

"Projections" shall mean any projections and forward-looking statements of the Borrower or any of the Subsidiaries furnished to the Lenders or the Administrative Agent by or on behalf of the Borrower or any of the Subsidiaries prior to the Closing Date.

"Proportionate Equity Share" means, with respect to the Borrower's equity in the net income of any Person included in the Borrower's Consolidated Net Income pursuant to clause (a) of the definition thereof, the ratio of the Borrower's equity in the net income of such Person during the applicable period to the total net income of such Person for such period.

"Public Lender" shall have the meaning assigned to such term in Section 9.17.

"Purchase Money Indebtedness" means Indebtedness (including Capitalized Lease Obligations) Incurred (within 365 days of such purchase or lease) to finance or refinance the purchase, lease, construction, installation, or improvement of any assets used or useful in a Related Business (whether through the direct purchase of assets or through the purchase of Capital Stock of any Person owning such assets).

"Qualified Equity Interests" shall mean any Equity Interests of the Borrower or the Parent Entity other than Disqualified Stock.

"Real Property" shall mean, collectively, all right, title and interest (including, without limitation, any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by the Parent Entity, the Borrower or any Subsidiary Loan Party, together with, in each case, all easements, hereditaments and appurtenances relating thereto, and all improvements situated, placed or constructed upon, or fixed to or incorporated into, or which becomes a component part of or which is permanently moored to such real property, and appurtenant fixtures incidental to the ownership or lease thereof.

"Recovery Event" shall mean any settlement of or payment in respect of any property or casualty insurance claim (other than a settlement in respect of business interruption insurance or other

34

similar insurance proceeds covering the loss of revenues and extra expenses), or any taking under power of eminent domain or by condemnation or similar proceeding of or relating to any property or asset of the Borrower or any other Loan Party.

"Refinancing Indebtedness" shall mean Indebtedness that is Incurred to refinance any Indebtedness existing on the Closing Date or Incurred in compliance with this Agreement (other than, in each case, the New 1.5 Lien Notes), including Indebtedness that refinances Refinancing Indebtedness; provided, however, that:

(a)    if the stated maturity of the Indebtedness being refinanced is later than the stated maturity of the Term Loans, the entire principal amount of the Refinancing Indebtedness has a stated maturity at least 6 months later than the stated maturity of the Term Loans;

(b)    the Refinancing Indebtedness has an average life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the average life of the Indebtedness being refinanced at such time;

(c)    such Refinancing Indebtedness is Incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the sum principal amount (or if issued with original issue discount, the aggregate accreted value) then outstanding of the Indebtedness being refinanced (plus, without duplication, any additional Indebtedness incurred to pay interest, premiums required by the instruments governing such existing Indebtedness or premiums necessary to effectuate such refinancing and costs, fees and expenses incurred in connection therewith);

(d)    if the Indebtedness being refinanced is subordinated in right of payment to the Term Loans or the Guarantee by a Subsidiary, such Refinancing Indebtedness is subordinated in right of payment to the Term Loans or the Guarantee by a Subsidiary on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being refinanced; and

(e)    such Refinancing Indebtedness shall not be secured by any Lien on any asset other than the assets that secured such Indebtedness being refinanced or, in the event Liens securing such Indebtedness being refinanced shall have been contractually subordinated to any Lien securing the Obligations, by any Lien that shall not have been contractually subordinated to at least the same extent.

"Register" shall have the meaning assigned to such term in Section 9.04(b)(iv).

"Regulation S-X" shall mean Regulation S-X promulgated under the Securities Act.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Business" means any business that is the same as or related, ancillary or complementary to any of the businesses of the Borrower and its Subsidiaries on the Closing Date and any reasonable extension or evolution of any of the foregoing, including without limitation, the online business of the Borrower and its Subsidiaries.

"Related Debt Fund" shall mean, with respect to the Chatham Parties or any of their Affiliates that is an investment fund, any other investment fund that invests in commercial loans and that is

managed or advised by the Chatham Parties, by an Affiliate of the Chatham Parties, by the same investment advisors as the Chatham Parties, by an Affiliate of such investment advisors, or by any other Person that administer or manage the Chatham Parties.

"Related Parties" shall mean, with respect to any specified person, such person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such person and such person's Affiliates.

"Release" shall mean any release, spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto, from, under or through the environment.

"Reportable Event" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"Required Lenders" shall mean, at any time, Lenders having more than 50% of the sum of the outstanding Term Loan, provided, however, that the Term Loan of (i) any Defaulting Lender or (ii) any of the Chatham Parties or any of their Affiliates and Related Debt Funds, or any other Affiliate of the Borrower, shall be disregarded in determining Required Lenders, at any time.

"Responsible Officer" when used with respect to the Administrative Agent or the Collateral Agent, as applicable, shall mean any officer within the department of the Administrative Agent or Collateral Agent, as applicable, administering this matter, including any vice president, assistant vice president, senior associate, assistant secretary, assistant treasurer, trust officer or any other officer of the Administrative Agent or the Collateral Agent (as applicable) who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any such matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Agreement and, with respect to any other person, shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement.

"Restricted Investment" means any Investment other than a Permitted Investment.

"Restricted Payments" shall have the meaning assigned to such term in Section 6.06.

"S&P" shall mean Standard & Poor's Ratings Group, Inc.

"Sale and Lease-Back Transaction" shall have the meaning assigned to such term in Section 6.03.

"Sale Order" shall mean the order entered into by the Bankruptcy Court approving the Sale Transaction and authorizing the Debtors to consummate the Sale Transaction.

"Same Day Funds" shall mean with respect to disbursements and payments in Dollars, immediately available funds.

"Sanction(s)" shall mean any sanction enforced or administered by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Parties" shall mean the Agents and the Lenders, and shall include, without limitation, all former Agents and Lenders (including each co-agent, sub-agent and attorney-in-fact appointed by the Agents from time to time pursuant to Article VIII, including the Administrative Agent and the Collateral Agent) to the extent that any Obligations owing to such Persons were incurred while such Persons were an Agent or a Lender (including co-agents, sub-agents and attorneys-in-fact appointed by the Agents from time to time pursuant to Article VIII, including the Administrative Agent and the Collateral Agent) and such Obligations have not been Paid in Full.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Security Documents" shall mean the Mortgages, the Collateral Agreement, the Guarantee Agreement and each of the security agreements and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Sections 4.02 or 5.09.

"Solvency Certificate" shall mean a Solvency Certificate of the Borrower substantially in the form of Exhibit B.

"Stated Maturity" means, with respect to any obligation, the date specified in the agreement governing or certificate relating to such obligation as the fixed date on which the final payment of principal of such obligation is due and payable, including pursuant to any mandatory redemption provision, but shall not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

"subsidiary" shall mean, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of that Person or a combination thereof, and (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"Subsidiary" shall mean, unless the context otherwise requires, a subsidiary of the Borrower or the Parent Entity.

"Subsidiary Loan Party" shall mean (a) each Subsidiary of the Borrower or the Parent Entity on the Closing Date as set forth on Schedule 1.01B (other than the Subsidiary of the Borrower existing on the Closing Date organized in Mexico) and (b) each Subsidiary of the Borrower and the Parent Entity that becomes, or is required pursuant to Section 5.09 to become, a party to the Collateral Agreement after the Closing Date.

37

"Swap Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of the Subsidiaries shall be a Swap Agreement.

"Tax Distributions" shall mean (a) with respect to any taxable year for which a Person is treated as a partnership or disregarded entity for U.S. federal tax purposes, the payment of distributions to any direct or indirect owner of such Person with respect to the federal, state and local tax liabilities of such Person's direct and/or indirect owners (as the case may be) related to their shares of such Person's taxable income (determined, if such Person is a disregarded entity, as if such Person were a partnership), assuming that they were subject to tax at the highest combined U.S. federal, state and local marginal tax rate applicable to an individual or corporation, as applicable, residing in [____], and (b) with respect to any taxable year for which such Person is not treated as a partnership or disregarded entity for U.S. federal tax purposes and is a member of a consolidated, combined, or similar group of corporations for tax purposes, the payment of dividends or other distributions to any direct or indirect parent of such Person that files a consolidated, combined or similar tax return that includes such Person and its Subsidiaries (by virtue of such parent being the common parent of a consolidated, combined or similar tax group of which such Person and/or its Subsidiaries are members) in an amount equal to the portion of the group's tax liability attributable to the income of such Person and its Subsidiaries, which amount shall in any case not exceed the amount that such Person and its Subsidiaries would have been required to pay in respect of federal, state or local taxes (as the case may be) if such Person and its Subsidiaries paid such taxes as a stand-alone taxpayer (or standalone group).

"Tax Rate" shall mean the greater of (a) the highest combined marginal U.S. federal, state and local tax rate for an individual resident in New York City and (b) the highest combined marginal U.S. federal, state and local tax rate for a corporation that conducts no activities other than the activities of the Borrower and its Subsidiaries, in each case applicable to income and gain attributable to the Borrower and its Subsidiaries, taking into account (where relevant) the holding period of assets held by the Borrower and its Subsidiaries, the taxable year in which such income or gain is recognized by the Borrower and its Subsidiaries and the character of such income or gain, at the time for U.S. federal income tax purposes.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties (including stamp duties), deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any and all interest, additions to tax, or penalties related thereto.

"Term Loan" shall mean the term loan made by a Lender pursuant to Section 2.01(a).

"Term Loan Commitment" shall mean, with respect to each Lender, the amount set forth opposite such Lender's name on Schedule 2.01.  The aggregate amount of the Lenders' Term Loan Commitments on the Closing Date is $182.1 million.

"Term Loan Percentage" shall mean, with respect to any Lender, the percentage of the total Term Loan Commitments represented by such Lender's Term Commitment.

"Test Period" shall mean, on any date of determination, the period of four consecutive fiscal quarters of the Borrower then most recently ended (taken as one accounting period) for which financial statements have been (or were required to be) delivered pursuant to Section 5.04(a) or 5.04(b).

"Title Issuer" shall have the meaning assigned to such term in the definition of "Collateral and Guarantee Requirement".

"Trade Payables" means, with respect to any Person, any accounts payable to trade creditors created, assumed or guaranteed by such Person arising in the ordinary course of business in connection with the acquisition of goods or services.

"Transaction Documents" shall mean the Loan Documents, the Framework Agreement, the New ABL Facility Documents, the New 1.5 Lien Indenture, the New 1.5 Lien Notes, [_____] and all documents executed in connection therewith.

"Transactions" shall mean, collectively, the transactions to occur pursuant to or in connection with the Transaction Documents, including (i) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party, (ii) the execution, delivery and performance by the applicable Loan Parties of the New ABL Facility Documents to which they are a party, (iii) the Sale Transaction, (iv) the approval of the Sale Transaction and entry of the Sale Order by the Bankruptcy Court in the Chapter 11 cases, (v) the granting of Liens pursuant to the Security Documents, (vi) the payment of all fees and expenses to be paid in connection with the foregoing, (vii) the payment or defeasance in full of all obligations, and termination of all commitments, under the Existing Indebtedness, (viii) the Chatham New Money Investment, and (x) any other transactions entered into by the Loan Parties in connection with any of the foregoing.

"Transaction Expenses" shall mean any fees or expenses incurred or paid by the Borrower or any of its Subsidiaries or any of their Affiliates in connection with the Transactions, this Agreement and the other Loan Documents, the other Transaction Documents and the transactions contemplated hereby and thereby.

"Unfunded Pension Liability" shall mean, as of the most recent valuation date for the applicable Plan, the excess of (1) the Plan's actuarial present value (determined on the basis of reasonable assumptions employed by the independent actuary for such Plan for purposes of Section 430 of the Code or Section 303 of ERISA) of its benefit liabilities (as defined in Section 4001(a)(16) of ERISA) over (2) the Fair Market Value of the assets of such Plan.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"Unrestricted Cash": as of any date of determination, the aggregate amount of all cash and Cash Equivalents maintained in the United States on the consolidated balance sheet of the Borrower and which does not appear as "restricted" on such consolidated balance sheet, is not subject to any Lien (other than Permitted Liens) and is otherwise freely available for use by the Borrower (it being acknowledged that cash or Cash Equivalents that is collateral securing outstanding letters of credit (or unreimbursed obligations in respect thereof) shall not be deemed to be Unrestricted Cash).

"U.S. Bankruptcy Code" shall mean Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"U.S. Tax Compliance Certificate" shall have the meaning assigned to such term in Section 2.08(e)(ii)(B).

39

"USA PATRIOT Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"Voting Stock" of any Person as of any date shall mean the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" shall mean any Loan Party or any other Person that is the applicable withholding agent making payments on behalf of any Loan Party.

"Write-Down and Conversion Powers" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Terms Generally.  The definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "or" shall not be exclusive.  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document or any other agreement or contract shall mean such document, agreement or contract as amended, restated, supplemented or otherwise modified from time to time.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

Unless the context otherwise requires, the expressions "Payment in Full," "Paid in Full" and any other similar terms or phrases when used with respect to the Obligations, shall mean the payment in full, in cash, of all of the Obligations (other than any unasserted contingent reimbursement or indemnity obligations).

Section 1.03    Effectuation of Transactions.  Each of the representations and warranties of the Loan Parties contained in this Agreement and the other Loan Documents (and all corresponding definitions) are made after giving effect to the Transactions, unless the context otherwise requires.

Section 1.04    Exchange Rates; Currency Equivalents.  Except for purposes of financial statements delivered by Loan Parties hereunder or calculating financial covenants hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such amount as so determined by the Administrative Agent (acting at the direction

of the Required Lenders).  No Default or Event of Default shall arise as a result of any limitation or threshold set forth in Dollars in Article VI or paragraph (g) or (j) of Section 7.01 being exceeded solely as a result of changes in currency exchange rates from those rates applicable on the first day of the fiscal quarter in which such determination occurs or in respect of which such determination is being made.

Section 1.05        Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Local Time.

Section 1.06        Divisions.  Any reference in this Agreement or any other Loan Document to a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, limited partnership or trust, or an allocation of assets to a series of a limited liability company, limited partnership or trust (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company, limited partnership or trust shall constitute a separate Person under this Agreement and the other Loan Documents (and each division of any limited liability company, limited partnership or trust that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

## ARTICLE II
### The Credits

Section 2.01        Term Loan.  Subject to the terms and conditions set forth herein and in accordance with the Sale Order, on the Closing Date each Lender shall automatically and without any funding or other action on the part of such Lender, receive in exchange for its First Lien Note Claims, Term Loans in an aggregate principal amount equal to such Lender's First Lien Note Claims which shall consist of Term Loans to the Borrower in the aggregate principal amount of $182.1[5] million. Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.

Section 2.02        Termination of Commitments.  The Term Loan Commitments of each Lender shall terminate on the Closing Date after giving effect to the Credit Event on such date.

Section 2.03        Maturity of Term Loan; Evidence of Debt.

(a)        The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of the Term Loan to the Borrower on the Maturity Date.

(b)        Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from the Term Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)        The Administrative Agent shall maintain a register in which it shall record (i) the amount of the Term Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

---

[5] Principal amount to be equal to the aggregate principal amount of First Lien Notes held by the Brigade Parties and the other First Lien Note holders, other than Chatham.

(d)     The entries made in the accounts or register, as applicable, maintained pursuant to Section 2.03(b) or (c) shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or register, as applicable, or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loans in accordance with the terms of this Agreement.

(e)     Any Lender may request that the Term Loan made by it be evidenced by a promissory note (a "Note").  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in the form attached hereto as Exhibit [_].  Thereafter, unless otherwise agreed to by the applicable Lender, the Term Loan evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein and its registered assigns.

Section 2.04          Mandatory Repayment of Term Loan.

(a)     Subject to Section 2.04(d) and the terms and provisions of the Intercreditor Agreement, the Borrower shall apply all Net Proceeds within five (5) Business Days of receipt thereof by any Loan Party to prepay the Term Loan. For the avoidance of doubt, there shall be no reinvestment rights with respect to any Net Proceeds.

(b)     If any Loan Party incurs or issues any Indebtedness after the Closing Date (other than Indebtedness permitted under Section 6.01), the Borrower shall cause to be prepaid an aggregate principal amount of the Term Loan in an amount equal to 100% of the net cash proceeds received therefrom on or prior to the date which is five (5) Business Days after the receipt by the Borrower or such Subsidiary of such proceeds.

(c)     Commencing with the fiscal year ending on December 31, 2020, the Borrower shall cause to be prepaid an aggregate principal amount of the Term Loan in an amount equal to (x) 90% (or, solely with respect to the fiscal year ending on December 31, 2020, 25%, and measured for the partial period commencing with the Closing Date and ending on December 31, 2020) of such Excess Cash Flow within 90 days of the end of each such fiscal year (or 120 days of the end of the fiscal year ending December 31, 2020) and (y) without duplication of clause (x) and solely to the extent there is any Excess Cash Flow 2020 Refund, 90% of such Excess Cash Flow 2020 Refund within 120 days of the end of such fiscal year. The amount of Excess Cash Flow or Excess Cash Flow 2020 Refund, as applicable that is required to be prepaid shall, without duplication, be (A) reduced Dollar for Dollar by the aggregate principal amount of (i) any Term Loan repurchased by the Borrower in open market purchases, which may include repurchases made through a Dutch auction in accordance with Section 9.04(h) (it being acknowledged, for the avoidance of doubt, that any Term Loan repurchased by the Borrower in privately negotiated transactions that are not offered ratably to all Lenders shall not be included in this subclause (i)), (ii) any voluntary prepayment of the Term Loan, except to the extent funded through an incurrence of long-term Indebtedness and (iii) for the payment with respect to the fiscal year ending December 31, 2020, the amount by which the outstanding principal amount of loans under the New ABL Facility on the Closing Date exceeds the outstanding principal amount of loans under the New ABL Facility on December 31, 2020 and (B) for the payment with respect to the fiscal year ending December 31, 2020, increased on a Dollar for Dollar basis by the amount by which the outstanding principal amount of loans under the New ABL Facility on December 31, 2020 exceeds the outstanding principal amount of loans under the New ABL Facility on the Closing Date; provided that, it is agreed any prepayment required by this clause (c) shall not be be less than zero ($0).

(d)     Notwithstanding any other provisions of this Section 2.04 to the contrary, (i) to the extent that any Net Proceeds of any Asset Disposition by a Foreign Subsidiary is prohibited or delayed by

applicable local law from being repatriated to the United States, the portion of such Net Proceeds so affected will not be required to be applied to repay the Term Loan at the times provided in Section 2.04(a) but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit repatriation to the United States (the Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly use commercially reasonable efforts to take all actions reasonably required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Proceeds is permitted under the applicable local law, such repatriation will be effected and such repatriated Net Proceeds will be promptly applied (net of additional taxes payable or reserved against as a result thereof) to the repayment of the Term Loan pursuant to Section 2.04(a), to the extent provided herein and (ii) to the extent that the Borrower has determined in good faith that repatriation of any or all of such Net Proceeds would have a material adverse tax cost consequence with respect to such Net Proceeds, the Net Proceeds so affected may be retained by the applicable Foreign Subsidiary; provided that in the case of this Section 2.04(d)(ii), on or before the date on which any Net Proceeds so retained would otherwise have been required to be applied to prepayments pursuant to Section 2.04(a), (x) the Borrower applies an amount equal to such Net Proceeds to such prepayments as if such Net Proceeds had been received by the Borrower rather than such Foreign Subsidiary, less the amount of additional taxes that would have been payable or reserved against if such Net Proceeds had been repatriated or (y) such Net Proceeds are applied to the permanent repayment of Indebtedness of a Foreign Subsidiary, if any.

Section 2.05    Optional Prepayment. The Borrower shall have the right at any time and from time to time to prepay the Term Loan in whole or in part in an aggregate principal amount that is an integral multiple of $1.0 million and not less than $5.0 million, or, if less, the amount outstanding, upon prior written notice to the Administrative Agent before 10:00 a.m. Local Time, not less than 1 Business Day prior to the date of prepayment, which notice shall be irrevocable except to the extent conditioned on a refinancing of the outstanding Term Loan in full. Each such notice shall be signed by a Responsible Officer of the Borrower and shall specify the date and amount of such prepayment. The Administrative Agent will promptly notify each applicable Lender of its receipt of each such notice, and of the amount of such Lender's pro rata share of such prepayment.

Section 2.06    Interest.

(a)    The Term Loan shall bear interest at ten percent (10%) per annum.

(b)    Notwithstanding the foregoing, upon an Event of Default, any amounts owed under this Agreement or any of the other Loan Documents shall bear interest, after as well as before judgment, at a rate equal to twelve percent (12%) per annum.

(c)    Accrued interest on the Term Loan shall be payable in arrears on the last Business Day of each calendar month; provided that (i) interest accrued pursuant to Section 2.06(b) shall be payable on demand, and (ii) in the event of any repayment or prepayment of the Term Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)    All interest hereunder shall be computed on the basis of a year of 365 days (or 366 days in a leap year).

Section 2.07    Increased Costs.

(a)    If any Change in Law shall:

(1)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Agent or any Lender;

(2)    subject any Agent or any Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (c) and (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(3)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or the Term Loan made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Term Loan or of maintaining its obligation to make any such Term Loan, or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Agent or Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Agent or Lender, the Borrower will pay to such Agent or Lender, as the case may be, such additional amount or amounts as will compensate such Agent or Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)    If any Agent or Lender determines that any Change in Law affecting such Agent or Lender or any lending office of such Lender or such Agent or Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Agent or Lender's capital or on the capital of such Agent or Lender's holding company, if any, as a consequence of this Agreement or the Term Loan made by such Lender to a level below that which such Agent or such Lender or such Lenders could have achieved but for such Change in Law (taking into consideration such Agent or Lender's policies and the policies of such Agent or Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Agent or Lender such additional amount or amounts as will compensate such Agent or Lender or such Agent or Lender's holding company for any such reduction suffered.

(c)    A certificate of an Agent or Lender setting forth the amount or amounts necessary to compensate such Agent or Lender or its holding company, as applicable, as specified in Section 2.07(a) and (b) shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Agent or Lender, as applicable, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Promptly after any Agent or any Lender has determined that it will make a request for increased compensation pursuant to this Section 2.07, such Agent or Lender shall notify the Borrower thereof.  Failure or delay on the part of any Agent or Lender to demand compensation pursuant to this Section 2.07 shall not constitute a waiver of such Agent or Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate an Agent or Lender pursuant to this Section 2.07 for any increased costs or reductions incurred more than 180 days prior to the date that such Agent or Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Agent or Lender's intention to claim compensation therefor; provided, further, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)    The foregoing provisions of this Section 2.07 shall not apply in the case of any Change in Law in respect of Taxes, which shall instead be governed by Section 2.08.

Section 2.08    <u>Taxes</u>.

(a)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without withholding or deduction for any Taxes except as required by Applicable Law; <u>provided</u>, that if a Withholding Agent shall be required to withhold or deduct any Tax from such payments, then (i) if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after making all required withholding or deductions (including withholding or deductions applicable to additional sums payable under this Section 2.08) the Administrative Agent or any Lender receives an amount equal to the sum it would have received had no such withholding or deductions been made, (ii) such Withholding Agent shall make such withholding or deductions and (iii) such Withholding Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)    In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)    Each Loan Party shall jointly and severally indemnify the Administrative Agent and each Lender within 10 days after written demand therefor, for the full amount of any Indemnified Taxes payable or paid by the Administrative Agent or such Lender on or with respect to any payment by or on account of any obligation of such Loan Party hereunder (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.08) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to such Loan Party by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf, on behalf of another Agent or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes by a Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (ii)(A), (ii)(B) and (ii)(D) of this Section) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

45

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or Exhibit H-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

46

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their respective obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. The Administrative Agent shall be entitled to withhold any Taxes attributable to FATCA without liability on its part for doing so. Notwithstanding anything to the contrary in this Agreement, each Lender shall indemnify each Agent for any Excluded Taxes attributable to such Lender, in each case that are payable or paid by any Agent in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.

(f)    (1) The Administrative Agent shall deliver to the Borrower (in such number of copies as shall be requested by the Borrower) on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter (i) promptly upon the obsolescence, expiration or invalidity of any form previously delivered by the Administrative Agent and (ii) upon the request of the Borrower) a properly completed and duly executed Internal Revenue Service Form W-9 or W-8IMY (or any other form prescribed by Applicable Law as a basis for claiming complete exemption from United States federal withholding Tax and reasonably requested by the Borrower) certifying the Administrative Agent's entitlement as of such date to a complete exemption from United States federal withholding Tax with respect to payments to be made under this Agreement and the other Loan Documents.

(2)    If the Administrative Agent is a U.S. branch described in Section 1.1441-1(b)(2)(iv)(A) of the Treasury Regulations and delivers to the Borrower a properly completed and duly executed Internal Revenue Service Form W-8IMY pursuant to Section 2.08(j)(1) certifying that the Administrative Agent is a U.S. branch and intends to be treated as a U.S. person for purposes of withholding under Chapter 3 of the Code, then the Borrower and the Administrative Agent shall treat the Administrative Agent as a U.S. person for purposes of withholding under Chapter 3 of the Code, pursuant to Treas. Reg. Section 1.1441-1(b)(2)(iv).

(g)    If the Administrative Agent or a Lender determines, in its sole discretion, exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by a Loan Party or with respect to which such Loan Party has paid additional amounts pursuant to this Section 2.08, it shall pay over such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.08 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund) as is determined by the Administrative Agent or Lender in good faith, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); <u>provided</u> that such Loan Party, upon the request of the Administrative Agent or such Lender,

47

agrees to repay as soon as reasonably practicable the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This Section 2.08 shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems to be confidential) to the Loan Parties or any other person.  Notwithstanding anything to the contrary, in no event will any Lender be required to pay any amount to a Loan Party the payment of which would place such Lender in a less favorable net after tax position than such Lender would have been in if the additional amounts giving rise to such refund of any Taxes had never been paid.

(h)    Survival.    Each party's obligations under this Section 2.08 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Term Loan Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.09    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    The Borrower shall make each payment required to be made by them hereunder (whether of principal, interest, or fees, or of amounts payable under Section 2.07 or 2.08, or otherwise) without condition or deduction for any defense, recoupment, set-off or counterclaim.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Agent or Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in Same Day Funds not later than 12:00 p.m. Local Time on the date specified herein.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent to the applicable account designated to the Borrower by the Administrative Agent, except that payments pursuant to Sections 2.07, 2.08 and 9.05 shall be made directly to the persons entitled thereto.  Without limiting the generality of the foregoing, the Administrative Agent may require that any payments due under this Agreement be made in the United States.  The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof.  Except as otherwise provided herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)    If at any time insufficient funds are received by and available to the Administrative Agent from the Borrower to pay fully all amounts of principal, interest and fees then due from the Borrower hereunder, such funds shall be applied (i) first, towards the payment of any fees, expenses, indemnities or other amounts due and owing to any Agent hereunder or in any other Loan Document; (ii) second, towards payment of interest and fees then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties and (iii) third, towards payment of principal of the Term Loan then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans and accrued interest

thereon than the proportion received by any other Lender entitled thereto, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Term Loans of other Lenders entitled thereto to the extent necessary so that the benefit of all such payments shall be shared by the Lenders entitled thereto ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph (c) shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Term Loans to any assignee or participant other than to the Borrower or any Subsidiary thereof (as to which the provision of this paragraph (c) shall apply).  The Borrower consents to the foregoing and agrees, to the extent they may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower's rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, but without any obligation to do so, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Overnight Rate.

(e)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.09(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.10    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.07, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.08, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Term Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.07 or 2.08, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If any Lender requests compensation under Section 2.07, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.08, or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon written notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume

such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall, to the extent such consent would be required in the case of an assignment to such assignee pursuant to Section 9.04, have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Term Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.07 or payments required to be made pursuant to Section 2.08, such assignment will result in a reduction in such compensation or payments. Nothing in this Section 2.10 shall be deemed to prejudice any rights that the Borrower may have against any Lender that is a Defaulting Lender. No action by or consent of the removed Lender shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price. In connection with any such assignment the Borrower, Administrative Agent, such removed Lender and the replacement Lender shall otherwise comply with Section 9.04; provided that if such removed Lender does not comply with Section 9.04 within 1 Business Day after the Borrower's request, compliance with Section 9.04 shall not be required to effect such assignment.

(c)     If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 9.08 requires the consent of all of the Lenders or all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) at their sole expense (including with respect to the processing and recordation fee referred to in Section 9.04(b)(ii)(B)) to replace such Non-Consenting Lender by deeming such Non-Consenting Lender to have assigned its Term Loans, and its Commitments hereunder to one or more assignees; provided that: (a) the Borrower shall, to the extent such consent would be required in the case of an assignment to such assignee pursuant to Section 9.04, have received the prior written consent to such assignee of the Administrative Agent, which consent shall not unreasonably be withheld, (b) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment and (c) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon. No action by or consent of the Non-Consenting Lender shall be necessary in connection with such assignment, which shall be immediately and automatically effective upon payment of such purchase price. In connection with any such assignment the Borrower, Administrative Agent, such Non-Consenting Lender and the replacement Lender shall otherwise comply with Section 9.04; provided that if such Non-Consenting Lender does not comply with Section 9.04 within 1 Business Day after the Borrower's request, compliance with Section 9.04 shall not be required to effect such assignment.

Section 2.11     Defaulting Lenders.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law, such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders and in Section 9.08.

ARTICLE III
Representations and Warranties

On the Closing Date, each of the Borrower, the Subsidiaries and the other Loan Parties represents and warrants to each of the Agents and the Lenders that:

Section 3.01    Organization; Powers.  Each of the Borrower, the Subsidiaries and the other Loan Parties (a) is a partnership, limited liability company or corporation duly organized or formed, validly existing and in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization or formation, (b) has all requisite power and authority, and the legal right, to own its property and assets, to lease the property it operates as lessee and to carry on its business as now conducted, (c) is qualified to do business in each jurisdiction where such qualification is required, except where the failure so to qualify would not reasonably be expected to have a Material Adverse Effect, and (d) has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party, including, in the case of the Borrower, to borrow and otherwise obtain credit hereunder, in the case of each Loan Party, to grant the Liens contemplated to be granted by it under the Security Documents, and, in the case of each Subsidiary Loan Party and the Parent Entity, to Guarantee the Obligations contemplated by the Guarantee Agreement.

Section 3.02    Authorization; No Conflicts.  The execution, delivery and performance by the Borrower and each of the other Loan Parties of each of the Loan Documents to which it is a party, and the borrowings hereunder and the transactions forming a part of the Transactions (a) have been duly authorized by all corporate, stockholder, partnership or limited liability company action required to be obtained by the Borrower and such Loan Parties and (b) will not (i) violate (A)  any provision of (x) law, statute, rule or regulation, or (y) the Governing Documents of the Borrower or any such Loan Party, (B) any applicable order of any court or any rule, regulation or order of any Governmental Authority or (C) any provision of any material indenture, certificate of designation for preferred stock, agreement or other instrument to which the Borrower or any such Loan Party is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or to a loss of a material benefit under any such indenture, certificate of designation for preferred stock, agreement or other instrument, where any such conflict, violation, breach or default referred to in Section 3.02(b)(i)(A)(x), (b)(i)(B) or (b)(i)(C) or (b)(ii), would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Borrower or any such Loan Party, other than the Liens created by the Loan Documents and Permitted Liens.

Section 3.03    Enforceability.  This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against each such Loan Party in accordance with its terms, subject to (a) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (b) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (c) implied covenants of good faith and fair dealing.

Section 3.04    Governmental Approvals; Consents.  No action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with the Transactions, the perfection or maintenance of the Liens created under the Security Documents or the exercise by any Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral, except for (a) the filing by the Borrower of Uniform Commercial Code financing statements, (b) filings by the Borrower with the United States Patent and Trademark Office and the United States Copyright Office and comparable offices in foreign jurisdictions and equivalent filings in foreign jurisdictions, (c) recordation of the Mortgages by the Borrower, (d)  such as have been made or obtained and are in full force and effect or is reasonably expected to be timely made or obtained

51

and be in full force and effect and (e) such actions, consents and approvals the failure of which to be obtained or made would not reasonably be expected to have a Material Adverse Effect.

Section 3.05        [Financial Statements; Absence of Undisclosed Liabilities.  The (a) audited consolidated balance sheet of the Borrower as at December 31, 2019, and the related audited consolidated statements of operations, members' equity and cash flows for the period from January 1, 2019 to December 31, 2019, reported on by and accompanied by a report from [Ernst & Young LLP], (b) unaudited consolidated balance sheet of the Borrower and the related unaudited consolidated statements of operations, members' equity and cash flows as of and for the fiscal quarters ended March 31, 2020 and (c) financial statements delivered pursuant to Sections 5.04(a) and 5.04(b), in each case of clauses (a) through (c), (i) present fairly in all material respects the consolidated financial condition of the Borrower as at such date and the consolidated results of operations and cash flows of the Borrower for such periods and (ii) disclose all material liabilities, direct or contingent, of the applicable Persons as of the dates thereof in accordance with GAAP.  Such financial statements were prepared in accordance with GAAP applied consistently throughout the periods involved (except for the absence of footnotes and year-end adjustments for any financial statements other than those prepared for a fiscal year-end).][6]

Section 3.06        No Material Adverse Effect.  As of the Closing Date, there has been no event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect.

Section 3.07        Title to Properties.

In each case, as of the respective date set forth below, as applicable:

(a)        As of (i) the Closing Date, (ii) the date on which any Real Property is acquired or leased by the Borrower, any Subsidiary or any other Loan Party and (iii) the date of the delivery of Mortgages (including pursuant to Section 5.09(c) or (d)), each of the Borrower, such Subsidiaries and such other Loan Parties have or will have (A) good and marketable fee simple title to, or valid leasehold interests in, or other rights to use all its Real Properties (including all Mortgaged Properties) and (B) good title to its personal property and assets, in each case, except for Permitted Liens.  The Mortgaged Properties are free from defects that would reasonably be expected to adversely affect the Mortgaged Properties suitability, taken as a whole, for the purposes for which they are contemplated to be used under the Loan Documents except such defects which would not reasonably be expected to have a Material Adverse Effect.  Each parcel of Real Property and the use thereof (as contemplated under the Loan Documents) complies in all material respects with all Applicable Laws (including building and zoning ordinances and codes) and with all insurance requirements except such failure which would not reasonably be expected to have a Material Adverse Effect.

(b)        As of the Closing Date, (i) the Borrower, each of the Subsidiaries and each of the other Loan Parties have complied in all material respects with all obligations under all material leases  to which it is a party, (ii)  all material leases to which the Borrower, any of the Subsidiaries or any of the other Loan Parties is a party are legal, valid, binding and in full force and effect and are enforceable in accordance with their terms, except where such failure would not reasonably be expected to have a Material Adverse Effect and (iii) none of the Borrower, any of the Subsidiaries or any of the other Loan Parties has defaulted, or with the passage of time would be in default, under any material leases to which it is a party, except for such defaults as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

---

[6] NTD: subject to confirmation.

(c)    As of the Closing Date, each of the Borrower, the Subsidiaries and the other Loan Parties own or possess, or are licensed to use, all patents, trademarks, service marks, trade names and copyrights, all applications for any of the foregoing and all licenses and rights with respect to the foregoing necessary for the present conduct of its business, without any conflict with the rights of others, and free from any burdensome restrictions on the present conduct of the Borrower, except where such conflicts and restrictions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or except as set forth on Schedule 3.07(c).

(d)    As of the Closing Date, none of the Borrower, any of the Subsidiaries or any of the other Loan Parties are obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Real Properties or any interest therein, except as permitted under Section 6.02 or 6.05.

Section 3.08        Subsidiaries.

(a)    Schedule 3.08(a) sets forth as of the Closing Date the legal name and jurisdiction of incorporation, formation or organization of the Borrower and each Subsidiary of the Borrower and, as to each such Subsidiary, the percentage of each class of Equity Interests owned by the Borrower or any such Subsidiary.

(b)    As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Equity Interests of the Borrower or any of the Subsidiaries, except as set forth on Schedule 3.08(b).

Section 3.09        Litigation; Compliance with Laws.

(a)    There are no actions, suits or proceedings at law or in equity or by or on behalf of any Governmental Authority or in arbitration now pending, or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower, any of the Subsidiaries or any of the other Loan Parties or any business, property or rights of any such person which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    None of the Borrower, the Subsidiaries, the other Loan Parties and their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permit, but excluding any violations of Environmental Laws, which are subject to Section 3.16) or any restriction of record or agreement affecting any Mortgaged Property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    None of the Borrower, any Subsidiary or any other Loan Party is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its contractual obligations, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default, except such defaults that would not reasonably be expected to have a Material Adverse Effect.

(d)    Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect : (i) no legal proceedings are pending or, to the Borrower's knowledge, threatened in writing with respect to the zoning of the Mortgaged Properties; (ii) all certifications, permits,

licenses and approvals, including certificates of completion and occupancy permits, that are required for the legal use, occupancy and operation of the Mortgaged Properties (collectively, the "Licenses"), have been obtained and are in full force and effect; and (iii) the use being made of the Mortgaged Properties is in conformity with the certificate of occupancy (or temporary certificate of occupancy if then applicable) issued for the Mortgaged Properties and all other restrictions, covenants and conditions affecting the Mortgaged Properties.

Section 3.10    Federal Reserve Regulations.

(a)    None of the Borrower, any of the Subsidiaries or any of the other Loan Parties is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b)    No part of the proceeds of the Term Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X or to involve any broker or dealer in violation of Regulation T.  Following the application of the proceeds of the Term Loan, Margin Stock will not constitute more than 25% of the value of the assets of the Loan Parties on each such date.  None of the transactions contemplated by this Agreement will violate or result in the violation of any of the provisions of the regulations of the Board, including Regulation T, U or X.

Section 3.11    Investment Company Act.  None of the Borrower, any of the Subsidiaries or any of the other Loan Parties is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.12    Use of Proceeds.  No part of the Term Loans will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock. The deemed making of any Term Loan will not violate the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System.

Section 3.13    Tax Returns.  Except as set forth on Schedule 3.13:

(a)    Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, the Borrower, each of the Subsidiaries and each of the other Loan Parties have filed or caused to be filed all federal, state, local and non-U.S. tax returns required to have been filed by it and each such tax return is true and correct in all material respects;

(b)    The Borrower, each of the Subsidiaries and each of the other Loan Parties have timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in Section 3.13(a) and all other Taxes or assessments that are due and payable with respect to all periods or portions thereof ending on or before the applicable Credit Event (and made adequate provision (in accordance with GAAP) for the payment of all Taxes not yet due), including in its capacity as a withholding agent, except any (i) Taxes or assessments that are being contested in good faith by appropriate proceedings in accordance with Section 5.03 and for which the Borrower, any of the Subsidiaries or any of the other Loan Parties (as the case may be) has set aside on its books adequate reserves in accordance with GAAP or (ii) Taxes which, if not paid or adequately provided for, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(c)        Other than as would not be, individually or in the aggregate, reasonably expected to have a Material Adverse Effect, as of the Closing Date, with respect to the Borrower, each of the Subsidiaries and each of the other Loan Parties, there are no claims being asserted in writing with respect to any Taxes.

Section 3.14        No Material Misstatements.

(a)        All written information (other than the Projections, estimates and information of a general economic nature or general industry nature) (the "Information") concerning the Borrower, the Subsidiaries, the other Loan Parties, the Transactions and any other transactions contemplated hereby prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or any Agent in connection with the Transactions or the other transactions contemplated hereby, when taken as a whole, was true and correct in all material respects, as of the date such Information was furnished to the Lenders or Agents, as applicable, and was (or, on the Closing Date, is) true and correct in all material respects as of the Closing Date and did not (or, on the Closing Date, does not), taken as a whole, contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements were made.

(b)        The Projections and estimates and information of a general economic nature prepared by or on behalf of the Borrower, any Subsidiary, any other Loan Party or any of their respective representatives and that have been made available to any Lenders or any Agent in connection with the Transactions or the other transactions contemplated hereby have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date thereof (it being understood that such Projections are as to future events and are not to be viewed as facts, such Projections are subject to significant uncertainties and contingencies and that actual results during the period or periods covered by any such Projections may differ materially from the projected results, and that no assurances can be given that the projected results will be realized), as of the date such Projections and estimates were furnished to the Agents or the Lenders, as applicable, and as of the Closing Date.

(c)        As of the Closing Date, the information included in the Beneficial Ownership Certification with respect to any Beneficial Owner (as defined in the Beneficial Ownership Regulation) of the Borrower, is true and correct in all material respects.

Section 3.15        Employee Benefit Plans.

(a)        Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) each Plan is in compliance with the applicable provisions of ERISA and the Code; (ii) no Reportable Event has occurred during the past five years as to which the Borrower, any of the Subsidiaries, any of the other Loan Parties or any ERISA Affiliate was required to file a report with the PBGC, other than reports that have been filed; (iii) as of the most recent valuation date preceding the date of this Agreement, no Plan has any material Unfunded Pension Liability; (iv) no ERISA Event has occurred or is reasonably expected to occur; and (v) none of the Borrower, the Subsidiaries or the other Loan Parties has engaged in a "prohibited transaction" (as defined in Section 406 of ERISA and Code Section 4975) in connection with any employee pension benefit plan (as defined in Section 3(2) of ERISA) that would subject the Borrower, any Subsidiary or any other Loan Party to tax.

(b)        The Borrower, each of the Subsidiaries and each of the other Loan Parties are in compliance (i) with all applicable provisions of law and all applicable regulations and published interpretations thereunder with respect to any employee pension benefit plan or other employee benefit plan governed by the laws of a jurisdiction other than the United States and (ii) with the terms of any such plan,

except, in each case, for such noncompliance that would not reasonably be expected to have a Material Adverse Effect.

(c)      Except as would not reasonably be expected to result in a Material Adverse Effect, there are no pending or, to the knowledge of the Borrower, threatened claims (other than claims for benefits in the normal course), sanctions, actions or lawsuits, asserted or instituted against any Plan or any person as fiduciary or sponsor of any Plan that would reasonably be expected to result in liability to the Borrower, any of the Subsidiaries or any of the other Loan Parties.

Section 3.16      Environmental Matters.  Except as set forth on Schedule 3.16 and except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) no written notice or order has been received by the Borrower, any Subsidiary or any other Loan Party, and there are no judicial, administrative or other actions, suits, claims or proceedings pending or, to the Borrower's knowledge, threatened which allege a violation of, or liability under, any Environmental Laws or relate to Hazardous Materials, in each case relating to the Borrower, any of the Subsidiaries or any of the other Loan Parties, (b) each of the Borrower, the Subsidiaries and the other Loan Parties have obtained all environmental permits, licenses and other approvals necessary for its operations to comply with all applicable Environmental Laws and is in compliance with the terms of such permits, licenses and other approvals and with all applicable Environmental Laws, (c) to the Borrower's knowledge, no Hazardous Material is located at, on or under any property currently or formerly owned, operated or leased, by the Borrower, any of the Subsidiaries or any of the other Loan Parties, and no Hazardous Material has been used, generated, owned, treated, stored, handled, controlled, transported, disposed of or Released at, under, on, from or to any property currently or formerly owned, operated or leased by the Borrower, any of the Subsidiaries or any of the other Loan Parties, in each case in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Borrower, any of the Subsidiaries or any of the other Loan Parties under any Environmental Laws, (d) there are no agreements in which the Borrower, any of the Subsidiaries or any of the other Loan Parties has assumed or undertaken responsibility for any liability or obligation of any other person under or relating to Environmental Laws or Hazardous Materials, which in any such case has not been made available to the Agents and the Lenders prior to the Closing Date, (e) to the knowledge of the Borrower, there are no liabilities of the Borrower, any Subsidiary or any other Loan Party, whether accrued, contingent, absolute, determined, determinable or otherwise, including such liabilities relating to off-site disposal, arising under or relating to any Environmental Law or Hazardous Materials, and, to the knowledge of the Borrower, there are no facts, conditions, situations or set of circumstances which would reasonably be expected to result in or be the basis for any such liability, and (f) there are no liens under Environmental Laws on any of the property or other assets owned, operated or leased by the Borrower, any Subsidiary or any other Loan Party, no governmental actions have been taken or, to the Borrower's knowledge, are in process which could subject any of such properties or assets to such liens and none of the Borrower, any Subsidiary or any other Loan Party would be required to place any notice or restriction relating to Hazardous Materials at any property owned by it in any deed to such property.

Section 3.17      Security Documents.

(a)      The Collateral Agreement is effective to create in favor of the Collateral Agent (for the benefit of the Secured Parties) a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  In the case of the Pledged Collateral described in the Collateral Agreement, when certificates or promissory notes, as applicable, representing such Pledged Collateral are delivered to the Collateral Agent (or the New ABL Facility Administrative Agent as bailee for the Collateral Agent pursuant to the Intercreditor Agreement), and in the case of the other Collateral described in the Collateral Agreement (other than the Intellectual Property (as defined in the Collateral Agreement)), when financing statements and other filings specified in the Perfection Certificate are filed in the offices specified

in the Perfection Certificate, the Collateral Agent (for the benefit of the Secured Parties) shall have a perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral with the priority contemplated by the Security Documents and, subject to Section 9-315 of the New York Uniform Commercial Code, the proceeds thereof, as security for the Obligations to the extent perfection in such Collateral can be obtained by filing Uniform Commercial Code financing statements, in each case prior and superior in right to the Lien of any other person (except for Permitted Liens)).

(b)      When the Collateral Agreement or a summary thereof is properly filed in the United States Patent and Trademark Office and the United States Copyright Office, and, with respect to Collateral in which a security interest cannot be perfected by such filings, upon the proper filing of the financing statements referred to in paragraph (a) above, the Collateral Agent (for the benefit of the Secured Parties) shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties thereunder in the domestic Intellectual Property, in each case prior and superior in right to the Lien of any other person, except for Permitted Liens (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the grantors after the Closing Date).

(c)      Each of the Mortgages executed and delivered on or after the Closing Date, and from and after the Closing Date, each other Mortgage delivered pursuant to Section 5.09 is or will be (as applicable) effective to create in favor of the Collateral Agent (for the benefit of the Secured Parties) a legal, valid and enforceable Lien on all of the applicable Loan Party's right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, and when such Mortgage is filed or recorded in the proper real estate filing or recording offices, and all relevant mortgage taxes and recording charges are duly paid, the Collateral Agent (for the benefit of the Secured Parties) shall have a perfected Lien on, and security interest in, all right, title, and interest of the applicable Loan Party in such Mortgaged Property and, to the extent applicable, subject to Section 9-315 of the Uniform Commercial Code, the proceeds thereof, in each case prior and superior in right to the Lien of any other person, except for Permitted Liens.

(d)      Notwithstanding anything herein (including this Section 3.17) or in any other Loan Document to the contrary, other than to the extent set forth in any foreign law pledge agreements (if any), neither the Borrower nor any other Loan Party makes any representation or warranty as to the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign law.

Section 3.18      Perfection Certificate. As of the Closing Date, the Perfection Certificate completely and correctly identifies, in all material respects, all matters identified therein.

Section 3.19      Solvency.

(a)      On the Closing Date, immediately after giving effect to the Transactions that occur on the Closing Date, (i) the fair value of the assets of the Borrower, its Subsidiaries and the other Loan Parties on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, direct, subordinated, contingent or otherwise, of the Borrower, its Subsidiaries and the other Loan Parties on a consolidated basis; (ii) the present fair saleable value of the property of the Borrower, its Subsidiaries and the other Loan Parties on a consolidated basis will be greater than the amount that will be required to pay the probable liability of the Borrower, its Subsidiaries and the other Loan Parties on a consolidated basis, on their debts and other liabilities, direct, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) the Borrower, its Subsidiaries and the other Loan Parties on a consolidated basis will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts

and liabilities become absolute and matured; and (iv) the Borrower, its Subsidiaries and the other Loan Parties on a consolidated basis will not have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted and are proposed to be conducted following the Closing Date.

(b)    On the Closing Date, neither the Borrower nor any of the other Loan Parties intend to, and the Borrower does not believe that it or any of the other Loan Parties will, incur debts beyond their ability to pay such debts as they mature, taking into account the timing and amounts of cash to be received by them or any such Subsidiary and the timing and amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Subsidiary.

Section 3.20    <u>Labor Matters</u>.    Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes pending or threatened against the Borrower, any of the Subsidiaries or any of the other Loan Parties; (b) the hours worked and payments made to employees of the Borrower, the Subsidiaries and the other Loan Parties have not been in violation of the Fair Labor Standards Act or any other Applicable Law dealing with such matters; and (c) all payments due from the Borrower, any of the Subsidiaries or any of the other Loan Parties or for which any claim may be made against the Borrower, any of the Subsidiaries or any of the other Loan Parties, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower, such Subsidiary or such Loan Party to the extent required by GAAP.  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, the consummation of the Transactions will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which the Borrower, any of the Subsidiaries or any of the other Loan Parties (or any predecessor) is a party or by which the Borrower, any of the Subsidiaries or any of the other Loan Parties (or any predecessor) is bound.

Section 3.21    <u>No Default</u>.    As of the Closing Date, no Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 3.22    <u>Intellectual Property; Licenses, Etc.</u>    Except as would not reasonably be expected to have a Material Adverse Effect and except as set forth on <u>Schedule 3.22</u>, (a) the Borrower, each of the Subsidiaries and each of the other Loan Parties own, or possess the right to use, all of the patents, registered trademarks, registered service marks or trade names, registered copyrights or mask works, domain names, applications and registrations for any of the foregoing (collectively, "<u>Intellectual Property Rights</u>") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other person, (b) to the best knowledge of the Borrower, the Subsidiaries and the other Loan Parties are not interfering with, infringing upon, misappropriating or otherwise violating Intellectual Property Rights of any person, and (c) no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened.

Section 3.23    <u>Senior Debt</u>.    The Obligations will constitute "Term Loan Obligations" under the Intercreditor Agreement.

Section 3.24    <u>Liens</u>.    There are no Liens on any of the properties or assets of the Borrower, any Subsidiary or any other Loan Party (other than Permitted Liens).

Section 3.25    <u>Patriot Act, OFAC, Etc.</u>    The Borrower, each Subsidiary and each other Loan Party are in compliance, in all material respects, with (a) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle

B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and all other applicable Sanctions and (b) USA PATRIOT Act. The Borrower, each of the Subsidiaries and each of the other Loan Parties have conducted their businesses in compliance with, and the use of the proceeds of the Term Loans shall not violate, in any material respects, the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions (in each case to the extent applicable to the Borrower, any Subsidiary or any other Loan Party). None of the Borrower, any Subsidiary or any other Loan Party, nor to the knowledge of the Borrower, any director, officer or employee of the Borrower, any Subsidiary or any other Loan Party, is an individual or entity that is, or is owned or controlled by, an individual or entity that is (a) currently the subject or target of any Sanctions, (b) included on OFAC's List of Specially Designated nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority, or (c) located, organized or resident in a Designated Jurisdiction. No part of the proceeds of the Term Loan hereunder will be used directly, or knowingly indirectly, to fund in any material respect any operations in, finance any investments or activities in or make any payments to, a Person that is subject to Sanctions or located, organized or resident in a Designated Jurisdiction.

Section 3.26        Insurance. Schedule 3.26 sets forth a true, complete and correct description in all material respects of all material insurance maintained or required to be maintained by or on behalf of the Borrower, the Subsidiaries or the other Loan Parties as of the Closing Date. As of the Closing Date, such insurance is in full force and effect and all premiums (or, if applicable, all installments thereof due on or before the Closing Date) have been duly paid and such insurance is provided in such amounts and covering such risks and liabilities (and with such deductibles, retentions and exclusions) as are in accordance with normal and prudent industry practice. As of the Closing Date, none of the Loan Parties has any reason to believe that it will not be able to (a) maintain (or obtain when and as required) the insurance coverage required to be maintained under the Loan Documents or (b) renew its existing coverage as and when such coverage expires or to obtain similar coverage from similar insurers.

## ARTICLE IV
### Conditions to the Credit Events on the Closing Date

Section 4.01        Closing Date. The conditions precedent to the effectiveness of this Agreement on the Closing Date are subject to the satisfaction of the following conditions:

(a)        The representations and warranties set forth in the Loan Documents shall be true and correct in all material respects (without duplication of any materiality or Material Adverse Effect qualifier) as of such date, as applicable, with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects (without duplication of any materiality or Material Adverse Effect qualifier) as of such earlier date).

(b)        At the time of and immediately after such borrowing of the Term Loan, no Event of Default or Default shall have occurred and be continuing.

(c)        The Chatham Parties shall have contributed as of the Closing Date the Chatham New Money Investment.

(d)        Legal Opinions. The Agents and Lenders shall have received written Opinions of Counsel from (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel for the Loan Parties and (ii) [_____], as special local counsel for the Loan Parties, each such Opinion of Counsel to be (A) dated the Closing Date, (B) addressed to the Agents and the Lenders, (C) covering such matters relating to the Loan Documents and the Transactions as the Administrative Agent and Lenders shall

59

reasonably request and which are customary for transactions of the type contemplated herein and (D) otherwise in form and substance reasonably satisfactory to the Administrative Agent and Lenders.

(e)    Loan Parties' Documents.  The Administrative Agent shall have received (i) a copy of the Governing Documents of each Loan Party, certified as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing of each Loan Party as of a recent date, from such Secretary of State; (ii) a certificate of the Secretary, Assistant Secretary, managing member or other Responsible Officer of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the Governing Documents of such Loan Party described in clause (i) above, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors, board of managers, manager, general partner, managing member or similar governing body of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party, and in the case of the Borrower, the borrowings hereunder, in the case of each Loan Party, the granting of the Liens contemplated to be granted by it under the Security Documents and the Guaranteeing of the Obligations as contemplated by the Guarantee Agreement and the other Loan Documents, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that attached thereto is a true and complete copy of the certificate of good standing of such Loan Party described in clause (i) above and (D) as to the incumbency and specimen signature of each officer or other authorized signatory executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; and (iii) such other documents related to the foregoing matters as the Administrative Agent or any Lender may reasonably request.

(f)    Officer's Certificate.  The Administrative Agent shall have received the closing certificate, dated the Closing Date and signed by a Financial Officer of the Borrower, confirming, among other things, compliance with the conditions precedent set forth in Sections 4.01(a), 4.01(b), 4.01(i), 4.01(k)(2) and 4.01(n).

(g)    Loan Documents.  The Administrative Agent shall have received each of the Loan Documents, in each case executed and delivered by a duly authorized officer of each party thereto, in form and substance reasonably satisfactory to the Administrative Agent and the Lenders and in full force and effect as of the Closing Date.

(h)    Collateral.  Except for matters to be completed following the Closing Date in accordance with Section 5.09(h) and/or as contemplated by the Post-Closing Collateral Requirements, the elements of the Collateral and Guarantee Requirement required to be satisfied on the Closing Date shall have been satisfied and the Administrative Agent shall have received a completed Perfection Certificate dated the Closing Date and signed by a Responsible Officer of the Borrower, together with all attachments contemplated thereby, and the Collateral Agent, for the benefit of the Secured Parties, shall have been granted on the Closing Date perfected Liens on the Collateral with the priority with respect thereto contemplated by the Security Documents, and shall have received such other reports, documents, instruments and agreements as the Lenders shall reasonably request and which are customarily delivered in connection with security interests in real property assets.  The Pledged Collateral shall have been duly and validly pledged under the Collateral Agreement to the Collateral Agent, for the benefit of the Secured Parties, and certificates representing such Pledged Collateral, accompanied by instruments of transfer and stock powers endorsed in blank, shall be in the actual possession of the Collateral Agent [(or the New ABL Facility Loan Administrative Agent as bailee for the Collateral Agent pursuant to the Intercreditor Agreement).]

(i)    No Material Adverse Effect.  Other than with respect to any effect of the Chapter 11 Cases, as of the Closing Date, there shall have been no event, circumstance or occurrence that has had or could reasonably be expected to have, a Material Adverse Effect.

(j)        UCC, Lien, Judgment and Bankruptcy Searches.  The Lenders shall have received the results of a recent lien, bankruptcy and judgment search in each relevant jurisdiction with respect to the Loan Parties and such search shall reveal no Liens on any of the Pledged Collateral or other assets of the Loan Parties except for Permitted Liens and except for Liens to be discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Lenders.

(k)        New ABL Facility; New 1.5 Lien Notes; Existing Indebtedness.

(1)        The Administrative Agent shall have received a fully-executed copy of each of the New ABL Facility Credit Agreement, the Intercreditor Agreement, and the New 1.5 Lien Indenture, as in effect on the Closing Date. The terms and conditions set forth in the New ABL Facility Credit Agreement, the Intercreditor Agreement and the New 1.5 Lien Indenture shall be in form and substance acceptable to the Brigade Parties.

(2)        No more than an aggregate principal amount of $19.2 million of loans and advances under the New ABL Facility shall be borrowed on the Closing Date.

(3)        The Borrower shall have repaid, redeemed or defeased or substantially simultaneously with the closing of the Transactions, shall repay, redeem or defease in full all obligations, and terminate all commitments, under the Existing Indebtedness and all Liens or security interests relating thereto shall have been terminated or released, and the Administrative agent shall have received a stamped copy of the Sale Order entered by the Bankruptcy Court in the Chapter 11 Cases.

(l)        Governmental Approvals.  All material governmental and third party approvals (including all necessary regulatory approvals and shareholder approvals) as of the Closing Date in connection with the Transactions, the operations of the Loan Parties or any Subsidiary (as contemplated under the Loan Documents), shall have been obtained and shall be in full force and effect.

(m)        Flood Insurance.  The Administrative Agent and the Collateral Agent shall have received (i) evidence as to whether (1) any Mortgaged Properties are located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards and (2) the communities in which any such Mortgaged Properties are located are participating in the National Flood Insurance Program, (ii) if there are any such Mortgaged Properties, the Borrower's written acknowledgement of receipt of written notification from the Administrative Agent (1) as to the existence of each such Mortgaged Property and (2) as to whether the communities in which such Mortgaged Properties are located are participating in the National Flood Insurance Program, and (iii) if any such Mortgaged Properties are located in communities that participate in the National Flood Insurance Program, evidence that the applicable Loan Party has obtained flood insurance in respect of such Mortgaged Properties to the extent required under the applicable regulations of the Board.

(n)        Litigation.  There shall be no action, suit, proceeding (whether administrative, judicial or otherwise) or arbitration (whether or not purportedly on behalf of any Loan Party) at law or in equity, or any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign that are pending or, to the knowledge of the Borrower, threatened against any Loan Party or affecting any property of any Loan Party (other than the Chapter 11 Cases), that relate to the Loan Documents, the other Transaction Documents or the Transactions.

(o)    <u>Insurance</u>.  The Loan Parties shall have insurance complying with the requirements of Section 5.02 in place and in full force and effect, and the Administrative Agent and the Collateral Agent shall each have received (x) a certificate from the Borrower's insurance broker(s) reasonably satisfactory to the Lenders stating that such insurance is in place and in full force and effect and (y) copies of all policies evidencing such insurance (or a binder, commitment or certificates signed by the insurer or broker authorized to bind the insurer, in which case copies of the applicable policies shall be delivered to the Administrative Agent within 90 days after the Closing Date or such later date as the Administrative Agent may agree in its sole discretion) naming the Collateral Agent as an additional insured and as loss payee (until such time as the Obligations have been Paid in Full), in accordance with the terms set forth in Section 5.02.

(p)    <u>Solvency Certificate</u>.   The Administrative Agent shall have received a duly executed Solvency Certificate from a Financial Officer of the Borrower (on behalf of the Borrower and its Subsidiaries).

(q)    <u>Consummation of Sale Transaction</u>.  The Administrative Agent shall have received a stamped copy of the Sale Order entered by the Bankruptcy Court in the Chapter 11 Cases and the Sale Transaction shall have been consummated in accordance with the Sale Order.

(r)    <u>Fees and Expenses</u>.  The Borrower shall have paid all reasonably and documented out-of-pocket expenses incurred by the Brigade Parties and the Agents in connection with the Transactions, including the reasonable and documented out-of-pocket fees, charges and disbursements of their respective counsel and, without duplication, financial advisors (which, in the case of counsel, is limited to one firm of primary outside counsel for the Brigade Parties and one firm of primary outside counsel for the Agents) (and in each case, local counsel in each relevant local jurisdiction), in each case, to the extent invoiced at least one (1) Business Day prior to the Closing Date.

(s)    <u>USA PATRIOT Act</u>.  The Administrative Agent shall have received, at least three (3) Business Days prior to the Closing Date, (i) all documentation and other information about any Loan Party reasonably requested by the Administrative Agent or any Lender in writing at least ten (10) Business Days prior to the Closing Date and that the Administrative Agent reasonably determines is required by United States bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, and (ii) if the Borrower qualifies as a "legal entity" customer under the Beneficial Ownership Regulation, and to the extent requested by any Lender at least five days prior to the Closing Date, a Beneficial Ownership Certification.

For purposes of determining compliance with the conditions specified in this Section 4.01, by signing this Agreement each Lender has consented to, approved or accepted or indicated its satisfaction with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

## ARTICLE V
### Affirmative Covenants

The Borrower covenants and agrees with each Agent and each Lender that so long as this Agreement shall remain in effect (other than in respect of contingent indemnification and expense reimbursement obligations for which no claim has been made) and until the Payment in Full of the Obligations, the Borrower will, and will cause each of the Subsidiaries and the other Loan Parties to:

Section 5.01        <u>Existence; Businesses and Properties</u>.

(a)        Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except, in the case of a Subsidiary of the Borrower, where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and except as otherwise expressly permitted under Section 6.05; provided that the Borrower may liquidate or dissolve one or more of its Subsidiaries if the assets of such Subsidiaries (to the extent they exceed estimated liabilities) are acquired by the Borrower or a Subsidiary of the Borrower in such liquidation or dissolution, except that Subsidiary Loan Parties may not be liquidated into Subsidiaries that are not Loan Parties and Domestic Subsidiaries may not be liquidated into Foreign Subsidiaries (except in each case as otherwise permitted under Section 6.05).

(b)        Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, do or cause to be done all things necessary to (i) lawfully obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, patents, trademarks, service marks, trade names, copyrights, licenses and rights with respect thereto necessary to the normal conduct of its business, and (ii) at all times maintain and preserve all property necessary to the normal conduct of its business (including the Mortgaged Properties) and keep such property in good repair, working order and condition (other than wear and tear occurring in the ordinary course of business), and (iii) from time to time make, or cause to be made, all necessary and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times.

Section 5.02        Required Insurance Coverage.

(a)        The Borrower, at its expense, shall maintain with financially sound and reputable insurance companies, and shall deliver to the Administrative Agent certificates of insurance evidencing, insurance with respect to the Borrower's and the Subsidiaries' properties and business against loss or damage of the kinds customarily insured against by persons engaged in the same or similar business and similarly situated and located, as determined in good faith by the Borrower, of such types and in such amounts as are customarily carried under similar circumstances by such other persons.

(b)        Policy Requirements.  All insurance policies shall (i) be issued by financially sound and reputable insurance companies, (ii) include the Collateral Agent as an additional insured on all liability insurance and as mortgagee and loss payee on property and flood insurance (as applicable), (iii) be endorsed to show that the Borrower's insurance shall be primary and all insurance carried by the Collateral Agent, the Administrative Agent or Lenders is strictly excess and secondary and shall not contribute with the Borrower's insurance as it relates to the Mortgaged Properties, (iv) provide that it shall not be canceled (x) by reason of nonpayment of premium upon not less than 10 days' prior written notice thereof by the insurer to the Collateral Agent and the Administrative Agent (giving the Collateral Agent and the Administrative Agent the right to cure defaults in the payment of premiums) or (y) for any other reason upon not less than 30 days' prior written notice thereof by the insurer to the Collateral Agent and the Administrative Agent (the Borrower shall deliver a copy of the policy (and to the extent any such policy is cancelled or renewed, a renewal or replacement policy) or other evidence thereof to the Collateral Agent, or insurance certificate with respect thereto), (v) be evidenced by a certificate of insurance to be provided to the Collateral Agent, (vi) include either policy or binder numbers on the ACORD form (which form Agent may rely on), and (vii) in the case of all such property and casualty insurance policies with respect to the Mortgaged Properties not later than 90 days after the Closing Date (or such longer period as the Collateral Agent may agree in writing in its discretion), be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable endorsement, in form and substance reasonably satisfactory to the Collateral Agent (at the written direction of the Required Lenders), which endorsement shall provide that, from and after the Closing Date, if the insurance carrier shall have received written notice from the Collateral Agent or the Administrative Agent of the occurrence of an Event of Default, the

insurance carrier shall pay all proceeds otherwise payable to the Borrower or the Loan Parties under such policies directly to the Collateral Agent.  It is agreed and understood that all policies required by the Loan Documents including this Section 5.02, shall be subject to commercially reasonable deductibles and/or retentions for businesses of similar size and quality.  It is further agreed and understood that all insurance coverage required by the Loan Documents including this Section 5.02, other than required flood insurance, may be effected under blanket policies covering the Mortgaged Property and other property and assets of the Borrower and its Affiliates not part of the Mortgaged Property.

(c)    Evidence of Insurance; Payment of Premiums.  The Borrower shall deliver to the Administrative Agent, as soon as practicable with the endeavor to be at least 14 days before the expiration of an existing policy, evidence acceptable to the Administrative Agent of the continuation of the coverage of the expiring policy.  If the Administrative Agent has not received satisfactory evidence of such continuation of coverage in the time frame herein specified, the Administrative Agent shall have the right, but not the obligation, to purchase such insurance for the Administrative Agent's interest only.  Any amounts so disbursed by the Administrative Agent pursuant to this Section shall be repaid by the Borrower within 10 days after written demand therefor. Nothing contained in this Section shall require the Agents or the Lenders to incur any expense or take any action hereunder, and inaction by the Agents or the Lenders shall never be considered a waiver of any right accruing to the Agents or the Lenders on account on this Section.  The payment by the Administrative Agent of any insurance premium for insurance which the Borrower is obligated to provide hereunder but which the Administrative Agent believes has not been paid, shall be conclusive between the parties as to the legality and amounts so paid. The Borrower agrees to pay all premiums on such insurance as they become due, and will not permit any condition to exist on or with respect to the Mortgaged Property which would wholly or partially invalidate any insurance thereon.

(d)    No Liability.  The Administrative Agent shall not by the fact of approving, disapproving, accepting, preventing, obtaining or failing to obtain any such insurance, incur any liability for the form or legal sufficiency of insurance contracts, solvency of insurers, or payment of losses, and the Borrower hereby expressly assume full responsibility therefor and all liability, if any, thereunder.

Section 5.03    Taxes.  Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, timely file all federal, state and other tax returns required to be filed by it.  Pay and discharge promptly when due all (i) Taxes, assessments, charges, levies or claims, imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, and (ii) all material lawful claims which, if unpaid, might give rise to a Lien (other than a Permitted Lien) upon such properties or any part thereof; provided, however, that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as (a) the validity or amount thereof shall be contested in good faith by appropriate proceedings, (b) the Borrower or the affected Subsidiary, as applicable, shall have set aside on its books reserves with respect thereto in accordance with GAAP and (c) such contest operates to suspend collection of the contested Tax, assessment, charge, levy or claim and enforcement of a Lien (other than a Permitted Lien).

Section 5.04    Financial Statements, Reports, Etc.

(a)    With respect to the Borrower, furnish to the Administrative Agent for distribution by the Administrative Agent to the Lenders:

(1)    No later than 90 days following the end of each fiscal year (in the case of the fiscal year ending December 31, 2020, within 120 days after the end of such fiscal year), audited annual financial statements and annual report, which shall include MD&A-type disclosure and appropriate notes, a consolidated balance sheet and related statements of operations, cash flows and owners' equity showing the financial condition of the Borrower and its Subsidiaries as of the close

of such fiscal year and the consolidated results of its operations during such year and setting forth in comparative form the corresponding figures for the prior fiscal year.  Such consolidated balance sheet and related statements of operations, cash flows and owners' equity shall be audited by independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which shall not be qualified as to scope of audit or as to the status of the Borrower or any Subsidiary as a going concern, other than solely with respect to, or resulting solely from an upcoming maturity date under any series of Indebtedness occurring within one year from the time such opinion is delivered or potential inability to satisfy a financial maintenance covenant under any series of Indebtedness) to the effect that such consolidated financial statements fairly present, in all material respects, the financial condition and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP (it being understood that such delivery obligation may be satisfied by causing the foregoing items to be made available on the datasite maintained in accordance with Section 5.04(b));

(2)    No later than 45 days following the end of each of the first three fiscal quarters of each fiscal year (in the case of the first applicable fiscal quarter ending after the Closing Date, within 60 days after the end of such fiscal quarter), unaudited quarterly financial statements and quarterly report, which shall include a management prepared narrative report , consolidated balance sheet and related statements of operations and cash flows showing the financial condition of the Borrower and its Subsidiaries as of the close of such fiscal quarter and the consolidated results of its operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of the Borrower on behalf of the Borrower and the Subsidiaries as fairly presenting, in all material respects, the financial condition and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes) (it being understood that such delivery obligation may be satisfied by causing the foregoing items to be made available on the datasite maintained in accordance with Section 5.04(b);

(3)    (x) concurrently with the delivery of financial statements and reports as set forth in Sections 5.04(a)(1) and 5.04(a)(2) above, a duly executed Compliance Certificate of a Financial Officer of the Borrower substantially in the form of Exhibit G, (A) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (B) setting forth computations in reasonable detail demonstrating compliance with the Financial Performance Covenant and (y) concurrently with any delivery of financial statements under paragraph (a) above, if the accounting firm is not restricted from providing such a certificate by its policies, a certificate of the accounting firm opining on or certifying such statements stating whether they obtained knowledge during the course of their examination of such statements of any Default or Event of Default (which certificate may be limited to accounting matters and disclaim responsibility for legal interpretations);

(4)    not later than 90 days after the beginning of each fiscal year of the Borrower commencing for the fiscal year ending December 31, 2021, a reasonably detailed consolidated annual budget for the Borrower and the Subsidiaries for such fiscal year, including a description of underlying assumptions with respect thereto (collectively, the "Budget"), which Budget shall in each case be accompanied by the statement of a Financial Officer of the Borrower to the effect that, the Budget is based on assumptions believed by such Financial Officer to be reasonable as of the date of delivery thereof;

65

(5)      upon acquisition of any Owned Real Property[, Material Leased Property] or Copyrights, an updated Perfection Certificate (or, to the extent such request relates to specified information contained in the Perfection Certificate, such information) reflecting all changes since the date of the information most recently received pursuant to this paragraph (5) or Section 5.09(f);

(6)      promptly, following receipt thereof by the Borrower or any of the Subsidiaries, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of the Borrower or any of the Subsidiaries or by independent consultants, Governmental Authorities or any other Persons, with respect to any environmental matter at any property of, or in connection with, the Borrower or any of the Subsidiaries that would reasonably be expected to have a Material Adverse Effect; and

(7)      promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Borrower or any of the Subsidiaries, or compliance with the terms of any Loan Document, as in each case the Administrative Agent (acting at the direction of the Required Lenders) may reasonably request (for itself or on behalf of the Lenders).

(b)      The Borrower shall maintain or cause to be maintained an internet accessible datasite that can be accessed by the Administrative Agent, the Lenders and other parties (subject to reasonable confidentiality restrictions), which shall contain all of the information required to be delivered by the Borrower pursuant to this Agreement. Such datasite may be password-protected so long as such password is made available to the Administrative Agent and the Lenders or may be maintained by the Administrative Agent, which expenses relating thereto shall be reimbursed by the Borrower. Access to such datasite may be limited to persons who agree (i) to be bound by confidentiality provisions reasonably acceptable to the Borrower and (ii) not to use the information for competitive purposes.

Section 5.05      Litigation and Other Notices. Furnish to the Administrative Agent, for distribution by the Administrative Agent to the Lenders, written notice of the following promptly after any Responsible Officer of the Borrower obtains actual knowledge thereof:

(a)      within 30 days after the knowledge thereof if such event is still continuing, written notice of any Event of Default (or any event which, with notice or the lapse of time or both, would constitute an Event of Default under Section 7.01(other than with respect to clause (h)) which shall include their status and what action the Borrower is taking or proposing to take in respect thereof;

(b)      the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority, or in arbitration, against the Borrower or any of the Subsidiaries as to which an adverse determination is reasonably probable and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect;

(c)      any other development specific to the Borrower, or the Subsidiaries that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect; and

(d)      the development or occurrence of any ERISA Event that, when taken together with all other ERISA Events that have developed or occurred, would reasonably be expected to have a Material Adverse Effect.

Section 5.06        Compliance with Laws.  Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except (a) that the Borrower and the Subsidiaries need not comply with any laws, rules, regulations and orders of any Governmental Authority then being contested by any of them in good faith by appropriate proceedings or (b) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; provided that this Section 5.06 shall not apply to Environmental Laws, which are the subject of Section 5.08, or to laws related to Taxes, which are the subject of Section 5.03.

Section 5.07        Maintaining Records; Access to Properties and Inspections; Lender Calls.

(a)        Maintain proper books of record and account containing entries of all material financial transactions and matters involving the assets and business of the Borrower and the Subsidiaries that are accurate and correct in all material respects and permit the preparation of consolidated financial statements in accordance with GAAP, and permit any persons designated by the Administrative Agent (acting at the direction of the Required Lenders) or, upon the occurrence and during the continuance of an Event of Default, any Lender to visit and inspect the financial records and the properties of the Borrower, or the Subsidiaries at reasonable times, upon reasonable prior notice to the Borrower, and as often as reasonably requested (provided, however, that except during the continuance of an Event of Default, only one visit per calendar year shall be reimbursed by any Loan Party or any Subsidiary) to make extracts from and copies of such financial records, and permit any persons designated by the Administrative Agent (acting at the direction of the Required Lenders) or, upon the occurrence and during the continuance of an Event of Default, any Lender upon reasonable prior notice to the Borrower, to discuss the affairs, finances and condition of the Borrower, or the Subsidiaries with the officers thereof and independent accountants therefor (so long as the Borrower has the opportunity to participate in any such discussions with such accountants) (in all cases subject to reasonable requirements of confidentiality and/or privilege, including requirements imposed by law or by contract).

(b)        Quarterly Conference Calls.        Promptly following the delivery of each of the quarterly financial statements and reports as set forth in Section 5.04(a)(2), the Borrower will make a telephonic presentation to the Lenders discussing the Borrower's financial condition and results of operations for such fiscal quarter.

Section 5.08        Compliance with Environmental Laws.  Comply, and use commercially reasonable efforts to cause all lessees and other Persons, if any, on or occupying any properties of the Borrower, or the Subsidiaries to comply, with all Environmental Laws applicable to their respective operations and properties; and obtain and renew all authorizations and permits required pursuant to Environmental Laws for their respective operations and properties, except, in each case with respect to this Section 5.08, to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.09        Further Assurances; Additional Security.

(a)        Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents and recordings of Liens in stock registries), that the Administrative Agent or the Collateral Agent may reasonably request, to satisfy the Collateral and Guarantee Requirement and to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties and provide to the Administrative Agent and the Collateral Agent, from time to time upon reasonable request, evidence reasonably satisfactory to the Administrative Agent and the Collateral Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents, subject in each case to paragraph (g) below.

(b)    If any asset (other than Real Property, which is covered by paragraph (c) below) is acquired by the Borrower or any other Loan Party after the Closing Date (in each case other than (x) assets constituting Collateral under a Security Document that become subject to the Lien of such Security Document upon acquisition thereof and (y) assets that are not required to become subject to Liens in favor of the Collateral Agent pursuant to Section 5.09(g) or any Security Document) will (i) as promptly as practicable notify the Collateral Agent thereof, in writing, and (ii) take or cause the Loan Parties to take such actions within thirty (30) Business Days (or such later date as reasonably agreed by the Collateral Agent in its reasonable discretion) of such notice, as shall be necessary to grant and perfect such Liens, including actions described in paragraph (a) of this Section, all at the expense of the Loan Parties, subject to paragraph (g) below.

(c)    Promptly (i) notify the Administrative Agent, in writing, of the acquisition of, (ii) grant and (iii) cause any other Loan Parties to grant to the Collateral Agent security interests and Mortgages in such Owned Real Property and Material Leased Real Property of the Borrower or any such Loan Parties, for the benefit of the Secured Parties, to the extent acquired or leased after the Closing Date, pursuant to documentation substantially in the form of the Mortgages or in such other form as is reasonably satisfactory to the Administrative Agent and the Collateral Agent (in each case, acting at the direction of the Required Lenders) (it being understood and agreed that in a state with a mortgage recording tax the amount secured by such Mortgage shall not exceed the Fair Market Value of the real property covered thereby (as reasonably determined in good faith by the Borrower) (each, an "Additional Mortgage") and constituting valid and enforceable Liens subject to no other Liens except Permitted Liens at the time of perfection thereof, record or file, and cause each such Subsidiary Loan Party to record or file, the Additional Mortgage or instruments related thereto in such manner and in such places as is required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Additional Mortgages and pay, and cause each such Subsidiary Loan Party to pay, in full, all Taxes, fees and other charges payable in connection therewith, in each case subject to paragraph (g) below. Unless otherwise waived by the Administrative Agent (acting at the direction of the Required Lenders), with respect to each such Additional Mortgage, the Borrower shall deliver to the Administrative Agent and the Collateral Agent contemporaneously therewith a title insurance policy, a completed "life-of-loan" Federal Emergency Management Agency standard flood hazard determination (along with an executed notice and evidence of flood insurance as required hereunder), legal opinion and a survey and otherwise comply with the Collateral and Guarantee Requirements applicable to Mortgages and Mortgaged Property.

(d)    If any additional direct or indirect Subsidiary of the Borrower or the Parent Entity is formed or acquired after the Closing Date, within five (5) Business Days after the date such Subsidiary is formed or acquired, notify the Administrative Agent and the Collateral Agent thereof, in writing, and, within thirty (30) Business Days (or such later date as reasonably agreed by the Collateral Agent in its reasonable discretion) after the date such Subsidiary is formed or acquired or such longer period as the Collateral Agent (acting at the direction of the Required Lenders) shall agree, cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of, or Owned Real Property owned by and Material Leased Real Property leased by, such Subsidiary owned by or on behalf of the Parent Entity, the Borrower or any Subsidiary, subject in each case to paragraph (g) below.

(e)    Each Subsidiary that becomes a Subsidiary Loan Party on or after the Closing Date shall also become a party to the applicable Loan Documents (including the Security Documents) to the extent required by this Agreement and any applicable Loan Document or Security Document, shall as promptly as practicable execute and deliver and file, if applicable, such security instruments, financing statements and certificates as may be necessary to vest in the Collateral Agent, subject to Permitted Liens, a perfected first-priority security interest in properties and assets that constitute Collateral as security for the Obligations and as may be necessary to have such property or asset added to the applicable Collateral

as required under this Agreement, the Loan Documents or the Security Documents, and thereupon all provisions of this Agreement relating to the Collateral shall be deemed to relate to such properties and assets to the same extent and with the same force and effect.

(f) Furnish to the Administrative Agent and the Collateral Agent promptly (and in any event within 30 days after such change) written notice of any change (A) in any Loan Party's corporate or organization name, (B) in any Loan Party's identity or organizational structure or (C) in any Loan Party's jurisdiction of organization; provided that the Borrower shall not effect or permit any such change unless all filings have been made, or will have been made within any statutory period, under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral for the benefit of the Secured Parties with the same priority as prior to such change (it being understood that, subject to the foregoing, any Loan Party may change the name under which it conducts its business or its corporate name, trade name, trademarks, brand name or other public identifiers).

(g) The Collateral and Guarantee Requirement and the other provisions of this Section 5.09 and the other provisions of the Loan Documents with respect to Collateral required to be delivered pursuant to Section 3.17(c) or this Section 5.09 need not be satisfied with respect to any Excluded Assets. Notwithstanding anything to the contrary in this Agreement, the Collateral Agreement, or any other Loan Document, (A) the Administrative Agent (acting at the direction of the Required Lenders) may grant extensions of time or waiver of requirement for the creation or perfection of security interests in or the obtaining of insurance (including title insurance) and surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where such Lenders reasonably determine, in consultation with the Borrower, that perfection or obtaining of such items cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the other Loan Documents, (B) no notice shall be required to be sent to account debtors or other contractual third parties prior to an Event of Default, (C) Liens required to be granted from time to time pursuant to, or any other requirements of, the Collateral and Guarantee Requirement and the Security Documents shall be subject to exceptions and limitations set forth in the Security Documents and, to the extent appropriate in the applicable jurisdiction, as otherwise agreed between the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower, (D) to the extent any Mortgaged Property is located in a jurisdiction with mortgage recording or similar tax, the amount secured by the Security Document with respect to such Mortgaged Property shall be limited to the Fair Market Value of such Mortgaged Property as determined in good faith by the Borrower (subject to any Applicable Laws in the relevant jurisdiction or such lesser amount agreed to by the Administrative Agent (acting at the direction of the Required Lenders)) and any requirement to obtain Mortgages over Material Leased Real Property shall be subject to the commercially reasonable efforts of the Borrower to obtain such Mortgage (and notwithstanding anything herein or any other Loan Document to the contrary, there shall be no Default or Event of Default for failure to obtain such Mortgages so long as the Borrower has used such commercially reasonable efforts), and (E) the Administrative Agent and the Borrower may make such modifications to the Security Documents, and execute and/or consent to such easements, covenants, rights of way or similar instruments (and Administrative Agent may agree to subordinate the lien of any mortgage to any such easement, covenant, right of way or similar instrument or record or may agree to recognize any tenant pursuant to an agreement in a form and substance reasonably acceptable to the Administrative Agent (acting at the direction of the Required Lenders)), as are reasonable or necessary in connection with any project or transactions otherwise permitted hereunder.

(h) The Borrower shall or shall cause the applicable Subsidiary Loan Parties to take such actions set forth on Schedule 5.09(h) within the timeframes set forth for the taking of such actions on Schedule 5.09(h) (or within such longer timeframes as the Administrative Agent (acting at the direction of the Required Lenders) shall permit in their reasonable discretion) (it being understood and agreed that all

representations, warranties and covenants of the Loan Documents with respect to the taking of such actions are qualified by the non-completion of such actions until such time as they are completed or required to be completed in accordance with this Section 5.09(h)).

Section 5.10    Anti-Corruption Laws.  The Borrower shall, and shall cause each other Loan Party to, conduct its businesses in compliance, in all material respects, with (a) the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions to the extent applicable to the Loan Documents and (b) applicable Sanctions.  The use of the proceeds of the Term Loan shall not violate, in any material respects, the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions (in each case to the extent applicable to the Loan Parties).  No part of the proceeds of the Term Loan hereunder will be used by the Borrower or any other Loan Party to directly, or knowingly indirectly, fund in any material respect any operations in, finance any investments or activities in or make any payments to, a Person that is subject to Sanctions or located, organized or resident in a Designated Jurisdiction.

## ARTICLE VI
## Negative Covenants

The Borrower covenants and agrees with each Agent and each Lender that, so long as this Agreement shall remain in effect (other than in respect of contingent indemnification and expense reimbursement obligations for which no claim has been made) and until the Payment in Full of the Obligations, the Borrower and the Parent Entity will not, and the Borrower will not permit any of the Subsidiaries to (and in the case of Section 6.16, the Parent Entity shall not):

Section 6.01    Indebtedness.  Incur, create, assume or permit to exist any Indebtedness, except:

(a)    Permitted Junior Debt (other than the New 1.5 Lien Notes) if on the date thereof and, after giving effect thereto, and the application of the proceeds thereof on a Pro Forma Basis the Consolidated Leverage Ratio for the Borrower and its Subsidiaries would be no greater than 5.25 to 1.00.

(b)    (i)    Indebtedness created hereunder and under the other Loan Documents;

(ii)    Indebtedness Incurred pursuant to (x) the New ABL Facility in an aggregate principal amount not to exceed $50,000,000 at any time outstanding and (y) the New 1.5 Lien Notes outstanding on the Closing Date in an aggregate principal amount equal to $80.79 million[7];

(iii)    Guarantees by any Loan Party of Indebtedness permitted to be Incurred by each of the other Loan Parties in accordance with the provisions of this Agreement and the other Loan Documents;

(iv)    Indebtedness of the Borrower owing to and held by any Subsidiary or Indebtedness of a Subsidiary owing to and held by the Borrower or any other Subsidiary; provided, however, (A) any subsequent issuance or transfer of Capital Stock or any other event that results in any such Indebtedness being beneficially held by a Person other than the Borrower or a Subsidiary of the Borrower; and (B) any subsequent sale or other transfer of any such Indebtedness to a Person other

---

[7] [Amount to be confirmed and to be grossed up to include OID.]

than the Borrower or a Subsidiary of the Borrower, shall be deemed, in each case, to constitute an Incurrence of such Indebtedness by the Borrower or such Subsidiary, as the case may be;

(v)    Purchase Money Indebtedness in an aggregate principal amount at any time outstanding not to exceed (x) $21.0 million less (y) the aggregate amount of Indebtedness incurred pursuant to clause (vi) at such time outstanding;

(vi)    Indebtedness Incurred by the Borrower or its Subsidiaries in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance, self-insurance obligations, performance, bid, surety, appeal and similar bonds and completion guarantees (not for borrowed money) or security deposits, letters of credit (including letters of credit issued to support worker's compensation claims or related insurance), banker's guarantees or banker's acceptances, in each case in the ordinary course of business;

(vii)    Indebtedness arising from agreements of the Loan Parties providing for indemnification, adjustment of purchase price, earn-outs or similar obligations, in each case, Incurred or assumed in connection with the acquisition or disposition of any business or assets of the Borrower or any business, assets or Capital Stock of a Subsidiary, in each case to the extent such acquisition or disposition is permitted hereby, other than Guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Capital Stock for the purpose of financing such acquisition; provided that, (A) the maximum aggregate liability in respect of all such Indebtedness shall at no time exceed the gross proceeds including non-cash proceeds (the Fair Market Value of such non-cash proceeds being measured at the time received and without giving effect to subsequent changes in value), actually received by the Loan Parties in connection with such disposition; and (B) such Indebtedness is not reflected on the balance sheet of the Loan Parties (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet shall not be deemed to be reflected on such balance sheet for purposes of this clause (vii));

(viii)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument, including, but not limited to, electronic transfers, wire transfers and commercial card payments drawn against insufficient funds in the ordinary course of business (except in the form of committed or uncommitted lines of credit); provided, however, that such Indebtedness is extinguished within ten (10) Business Days of Incurrence;

(ix)    Indebtedness Incurred by the Borrower or any Subsidiary in connection with insurance premium financing arrangements not to exceed $5.0 million at any one time outstanding or take or pay obligations in supply agreements incurred in the ordinary course of business;

(x)    Indebtedness owed on a short-term basis of no longer than 30 days to banks and other financial institutions Incurred in the ordinary course of business of the Borrower and its Subsidiaries with such banks or financial institutions that arises in connection with ordinary banking arrangements to provide treasury services or to manage cash balances of the Borrower and its Subsidiaries (for the avoidance of doubt, including Cash Management Obligations);

(xi)    Guarantees to suppliers or licensors (other than guarantees of Indebtedness) in the ordinary course of business;

(xii)    Indebtedness of the Borrower or any Subsidiary incurred in connection with any Sale and Lease-Back Transaction, in an aggregate principal amount not to exceed $52.5 million at

any time outstanding, so long as the proceeds of such Sale and Lease-Back Transaction are applied to repay the Term Loan;

(xiii)    Indebtedness outstanding on the Closing Date (other than the New ABL Facility and the New 1.5 Lien Notes) which is as set forth on Schedule 6.01 and approved by the Lenders and any Refinancing Indebtedness Incurred in respect of such Indebtedness;

(xiv)    Indebtedness under Hedging Obligations; *provided* that such Hedging Obligations are entered into to fix, manage or hedge interest rate, currency or commodity exposure of the Borrower or any Subsidiary and not for speculative purposes;

(xv)    Indebtedness of Persons Incurred and outstanding on the date on which such Person became a Loan Party or was acquired by, or merged or consolidated with or into, a Loan Party (other than Indebtedness incurred in connection with, or in contemplation of, such acquisition, merger or consolidation); *provided*, that at the time such Person is acquired by, or merged or consolidated with, the Borrower or any Subsidiary and after giving effect to the Incurrence of such Indebtedness pursuant to this clause (xv), either (x) the Consolidated Leverage Ratio for the Borrower and its Subsidiaries would be no greater than 5.25 to 1.00; or (y) the aggregate principal amount of such Indebtedness at any time outstanding Incurred pursuant to this clause (y) (together with all Refinancing Indebtedness in respect of Indebtedness previously Incurred pursuant to this clause (y)) shall not exceed $21.0 million; and

(xvi)    in addition to the items referred to in clauses (i) through (xv) above, Indebtedness of the Borrower and its Subsidiaries in an aggregate outstanding principal amount which, when taken together with the principal amount of all other Indebtedness Incurred pursuant to this clause (xvi) and then outstanding, shall not exceed $7.5 million at any time outstanding.

(c)    For purposes of determining compliance with, and the outstanding principal amount of any particular Indebtedness Incurred pursuant to and in compliance with, this Section 6.01:

(i)    in the event that Indebtedness meets the criteria of more than one of the types of Indebtedness described in Section 6.01(b) or could be Incurred pursuant to Section 6.01(a), the Borrower, in its sole discretion, may divide and classify such item of Indebtedness (or any portion thereof) on the date of Incurrence; provided that all Indebtedness under the New ABL Credit Facility shall be deemed Incurred on the Closing Date under Section 6.01(b)(ii) and all Indebtedness described in Section 6.01(b) or Incurred pursuant to Section 6.01(a) may not later be reclassified after the date of Incurrence;

(ii)    guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness shall not be included;

(iii)    the principal amount of any Disqualified Stock of the Borrower or a Subsidiary, or Preferred Stock of a Subsidiary that is not a Subsidiary Loan Party, shall be equal to the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference thereof;

(iv)    Indebtedness permitted by this Section 6.01 need not be permitted solely by reference to one provision permitting such Indebtedness but may be permitted in part by one such provision and in part by one or more other provisions of this Section 6.01 permitting such Indebtedness; provided that all Indebtedness under the New ABL Credit Facility shall be deemed

Incurred on the Closing Date under Section 6.01(b)(ii) and all Indebtedness described in Section 6.01(b) or Incurred pursuant to Section 6.01(a) may not later be reclassified after the date of Incurrence; and

(v)    the amount of Indebtedness issued at a price that is less than the principal amount thereof shall be equal to the amount of the liability in respect thereof determined in accordance with GAAP.

Accrual of interest, accrual of dividends, the accretion of accreted value or the amortization of debt discount, the payment of interest in the form of additional Indebtedness and the payment of dividends in the form of additional shares of Preferred Stock or Disqualified Stock shall not be deemed to be an Incurrence of Indebtedness for purposes of this Section 6.01. The amount of any Indebtedness outstanding as of any date shall be (i) the accreted value thereof in the case of any Indebtedness issued with original issue discount or the aggregate principal amount outstanding in the case of Indebtedness issued with interest payable-in-kind, (ii) the principal amount or liquidation preference thereof, together with any interest thereon that is more than 30 days past due, in the case of any other Indebtedness, (iii) in the case of the guarantee by a specified Person of Indebtedness of another Person, the maximum liability to which the specified Person may be subject upon the occurrence of the contingency giving rise to the obligation and (iv) in the case of Indebtedness of others guaranteed solely by means of a Lien on any asset or property of the Borrower or any Subsidiary (and not to their other assets or properties generally), the lesser of (x) the Fair Market Value of such asset or property on the date on which such Indebtedness is Incurred and (y) the amount of the Indebtedness so secured.

For purposes of determining compliance with this Section 6.01, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date, on the Closing Date and, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date that such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of fees, underwriting discounts, premiums (including tender premiums), defeasance costs and other costs and expenses incurred in connection with such refinancing.

Section 6.02    Liens.  Create, incur or assume any Lien (other than Permitted Liens) that secures any Indebtedness on any asset or property of the Borrower or such Subsidiary or any income or profits therefrom. Notwithstanding the foregoing, the Borrower shall not, and shall not permit any of the Subsidiaries to create, incur or assume any Lien (including any Permitted Liens) on the [ABL Priority Collateral or the [Term Loan Priority Collateral]][8] having higher or equal priority status than the Liens granted to Secured Parties under the Loan Documents.

Section 6.03    Sale and Lease-Back Transactions.  Except to the extent permitted under Section 6.01(b)(xii) and so long as the proceeds of such Sale and Lease-Back Transaction are applied to repay the Term Loan, enter into any arrangement, directly or indirectly, with any person whereby it shall

---

[8] Subject to review of Intercreditor Agreement.

sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter in the same or substantially related transaction rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "Sale and Lease-Back Transaction").

Section 6.04      Investments, Loans and Advances.  Make or permit to exist any Investment, except Permitted Investments.

Section 6.05      Limitation on Sales of Assets and Subsidiary Stock.  Make or permit to exist any Asset Disposition following the Closing Date unless: (i) the Borrower or such Subsidiary, as the case may be, receives consideration at least equal to the Fair Market Value (such Fair Market Value to be determined as of the date of contractually agreeing to such Asset Disposition) of the assets subject to such Asset Disposition, (ii) 90% of the consideration from such Asset Disposition received by the Borrower or such Subsidiary, as the case may be, is in the form of cash or Cash Equivalents and (iii) the Borrower shall have applied the Net Proceeds thereof to prepay the Term Loan in accordance with the provisions of Section 2.04(a).

Section 6.06      Restricted Payments.

(a)      Declare or pay any dividend or make any distribution (whether made in cash, securities or other property) on or in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving the Borrower or any of its Subsidiaries) other than: (i) dividends or distributions payable solely in Capital Stock of the Borrower (other than Disqualified Stock) or in options, warrants or other rights to purchase such Capital Stock of the Borrower; and (ii) Tax Distributions; (iii) dividends or distributions by a Subsidiary payable to the Borrower or another Subsidiary; and (iv) dividends or distributions in respect of franchise and similar taxes and other fees and expenses in connection with the maintenance of the Borrower's existence and its ownership of the Subsidiaries; provided, that the amount of such dividends or distributions shall not exceed the portion of any amounts referred to in this subclause that are allocable to the Borrower and their Subsidiaries.

(b)      purchase, redeem, retire or otherwise acquire for value any Capital Stock of the Borrower held by Persons other than the Borrower or a Subsidiary (other than in exchange for Capital Stock of the Borrower (other than Disqualified Stock)) (the actions or events described in clauses (a) and (b) (other than any express exception thereto) shall be referred to as a "Restricted Payment").

The provisions of Sections 6.06(a) and (b) hereof shall not prohibit: the purchase, repurchase, redemption or other acquisition, cancellation or retirement for value of Capital Stock, or options, warrants, equity appreciation rights or other rights to purchase or acquire Capital Stock, of the Borrower held by any existing or former employees, management or directors of or consultants to the Borrower or any Subsidiary of the Borrower or their assigns, estates or heirs, in each case in connection with the repurchase provisions under employee stock option or stock purchase agreements or other compensatory agreements approved by the Board of Directors of the Borrower; provided that such purchases, repurchases, redemptions, acquisitions, cancellations or retirements pursuant to this paragraph shall not exceed $2.0 million in the aggregate during any calendar year, although such amount in any calendar year (with any unused amounts in any year being available in succeeding years) may be increased by an amount not to exceed: (X) the Net Cash Proceeds from the sale of Capital Stock (other than Disqualified Stock) of the Borrower to existing or former employees or members of management of the Borrower or any of its Subsidiaries that occurs after the Closing Date, to the extent the cash proceeds from the sale of such Capital Stock have not otherwise been applied to the payment of Restricted Payments); plus (Y) the cash proceeds of key man life insurance policies received by the Borrower or its Subsidiaries after the Closing Date; less (Z) the amount of any

Restricted Payments previously made with the cash proceeds described in clauses (X) and (Y) of this clause (Z).

Section 6.07      Transactions with Affiliates.

(a)      Make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Borrower (an "Affiliate Transaction") unless:

(i)      the terms of such Affiliate Transaction, when viewed together with any related Affiliate Transactions, are not materially less favorable to the Borrower or such Subsidiary, as the case may be, than those that could be obtained in a comparable transaction at the time of such transaction in arm's-length dealings with a Person who is not an Affiliate;

(ii)      in the event such Affiliate Transaction involves an aggregate consideration in excess of $2.0 million, the terms of such transaction have been approved by a majority of the Disinterested Directors of the Board of Directors of the Borrower (and such majority determines that such Affiliate Transaction satisfies the criteria in clause (i) above); and

(iii)      in the event such Affiliate Transaction involves an aggregate consideration in excess of $5.0 million, the Borrower has received a written opinion from an Independent Financial Advisor that the terms of such Affiliate Transaction, when viewed together with any related Affiliate Transactions, are fair, from a financial point of view, to the Borrower and the Subsidiaries, as applicable, or not materially less favorable than those that might reasonably have been obtained in a comparable transaction at such time on an arm's-length dealings with a Person that is not an Affiliate.

(b)      The provisions of Section 6.07(a) shall not apply to:

(i)      any (x) Restricted Payment permitted to be made pursuant to Section 6.06 and (y) Permitted Investment in any Person that is an Affiliate of the Borrower solely as a result of ownership of Investments in such Person by the Borrower or any Subsidiary;

(ii)      any issuance of securities, or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements and other compensation arrangements, options to purchase Capital Stock of the Borrower pursuant to restricted stock plans, long-term incentive plans, stock appreciation rights plans, participation plans or similar employee benefits plans, pension plans or similar plans or agreements or arrangements approved by the Board of Directors of the Borrower;

(iii)      any transaction between or among the Borrower and any Subsidiary or between or among Subsidiaries, and any Guarantees issued by the Borrower or a Subsidiary for the benefit of the Borrower or a Subsidiary;

(iv)      the payment of reasonable and customary compensation (including fees, benefits, severance and incentive arrangements) to, and employee benefit arrangements, including, without limitation, split-dollar insurance policies, and indemnity or similar arrangements provided on

75

behalf of, directors, officers, employees and agents of the Borrower or any Subsidiary, whether by charter, bylaw, statutory or contractual provisions;

(v)     the existence of, and the performance of obligations of the Borrower or any of its Subsidiaries under the terms of any agreement to which the Borrower or any of its Subsidiaries is a party as of or on the Closing Date, as these agreements may be amended, modified, supplemented, extended or renewed from time to time; provided, however, that any future amendment, modification, supplement, extension or renewal entered into after the Closing Date shall be permitted to the extent that its terms, taken as a whole, are not more disadvantageous to the Holders in any material respect, as determined in good faith by the Borrower, than the terms of the agreements in effect on the Closing Date;

(vi)     any purchases by the Borrower's Affiliates of Indebtedness of the Borrower or any of its Subsidiaries the majority of which Indebtedness is placed with Persons who are not Affiliates;

(vii) Restricted Payments permitted under Section 6.06, including payments to the Borrower and its Subsidiaries; and

(viii)     any issuance or sale of Capital Stock (other than Disqualified Stock) to Affiliates of the Borrower and the granting of registration and other customary rights in connection therewith or any contribution to the Capital Stock of the Borrower or any Subsidiary.

Section 6.08     Business.  Notwithstanding any other provisions hereof, engage at any time in any business or business activity other than any Related Business.

Section 6.09     Limitation on Payments and Modifications of Certain Indebtedness; Modifications of Certain Agreements; Etc..

(a)     Amend or modify (i) in any manner materially adverse to the Lenders taken as a whole (including through a waiver, release or termination), the Governing Documents of any of the Loan Parties or (ii) in any manner materially adverse to the Lenders taken as a whole (including through a waiver, release or termination), any provision of any Permitted Junior Debt (including, without limitation, the New 1.5 Lien Notes, but for avoidance of doubt, excluding the New ABL Credit Facility), or, in each case, any agreement, document or instrument evidencing or relating thereto; provided that, notwithstanding the foregoing, in no event shall there be any amendment or modification to the terms and provisions of the New 1.5 Lien Notes relating to maturity date, interest rate or repayment with respect thereto in a manner restricted by the Intercreditor Agreement.

(b)     Other than scheduled payments when due, make, directly or indirectly, any payment or other distribution (whether in cash, securities, debt instruments or other property) of or in respect of principal of or interest on any Permitted Junior Debt (including, without limitation, the New 1.5 Lien Notes and any Junior Financing, but for avoidance of doubt, excluding the New ABL Credit Facility or any intercompany debt), or any payment or other distribution (whether in cash, securities, debt instruments or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, refinancing, retirement, acquisition, cancellation or termination in respect of any Permitted Junior Debt (including, without limitation, the New 1.5 Lien Notes and any Junior Financing).

Section 6.10     Financial Performance Covenant.  Commencing with last day of the first full fiscal quarter of the Borrower ending after the Closing Date, permit the First Lien Net Leverage Ratio as of the last day of any fiscal quarter set forth below to exceed the amount specified below for such fiscal quarter:

76

| Fiscal Quarter Ending | First Lien Net Leverage Ratio |
|---|---|
| Commencing with the first full fiscal quarter after the Closing Date through the fifth full fiscal quarter after the Closing Date | 4.00:1.00 |
| Commencing with the sixth full fiscal quarter after the Closing Date and each fiscal quarter thereafter | 3.50:1.00 |

Section 6.11       <u>Fiscal Year</u>.  Change the fiscal year-end of the Borrower or any Subsidiary to a date other than December 31.

Section 6.12       <u>Hedging Transactions</u>.  Enter into any Hedging Transaction, other than Hedging Transactions entered into in the ordinary course of business to hedge or mitigate risks to which the Borrower or the Subsidiaries is exposed in the conduct of their business or the management of their liabilities, including, without limitation, any Hedging Transaction entered into in order to hedge against fluctuations in interest rates or currency values that arise in connection with any borrowing or any other Indebtedness.  Solely for the avoidance of doubt, the Borrower acknowledge that a Hedging Transaction entered into for speculative purposes or of a speculative nature is not a Hedging Transaction entered into in the ordinary course of business to hedge or mitigate risks.

Section 6.13       <u>Merger, Consolidation or other Reorganization</u>.  Enter into any merger, consolidation or other reorganization with or into any other Person or acquire or sell all or a substantial portion of the assets or Equity Interests of any Person or permit any other Person to consolidate with or merge with it (other than an Investment permitted by Section 6.04), except that, if at the time thereof and immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, (A) any Subsidiaries of the Borrower may merge or consolidate with the Borrower or dissolve and transfer its assets to the Borrower so long as (i) the Borrower is the surviving entity with respect to any such merger, (ii) the Borrower is the recipient of any assets, including those of any dissolving Subsidiary and (iii) the Borrower provides Administrative Agent with not less than 10 days prior written notice of such merger or consolidation  and delivers all of the relevant documents evidencing such merger or consolidation  and (B) any Subsidiary of the Borrower may merge or consolidate with any other Subsidiary or dissolve and transfer its assets to such other Subsidiary so long as the Borrower or such Subsidiary provides the Administrative Agent with not less than 10 days prior written notice of such merger or consolidation and delivers all of the relevant documents evidencing such merger or consolidation.

Section 6.14       <u>Limitation on Restrictions on Subsidiaries</u>.

(a)       Create or otherwise cause or permit to exist any consensual encumbrance or consensual restriction which results in encumbrances or restrictions on the ability of any Subsidiary to:

(i)       (A) pay dividends or make any other distributions on its Capital Stock to the Borrower or any of its Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, (B) pay any Indebtedness or other obligations owed to the Borrower or any Subsidiary (it being understood that the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on Common Stock shall not be deemed a restriction on the ability to make distributions on Capital Stock) or (C) provide guarantees of the Obligations;

77

(ii)      make any loans or advances to the Borrower or any Subsidiary (it being understood that the subordination of loans or advances made to the Borrower or any Subsidiary to other Indebtedness Incurred by the Borrower or any Subsidiary shall not be deemed a restriction on the ability to make loans or advances);

(iii)      sell, lease or transfer any of its property or assets to the Borrower or any Subsidiary (it being understood that such transfers shall not include any type of transfer described in clause (i) or (ii) of this Section 6.14(a)); or

(iv)      grant Liens by the Borrower or any Subsidiary pursuant to the Security Documents.

(b)      The restrictions in Section 6.14(a) shall not prohibit encumbrances or restrictions existing under or by reason of:

(i)      any encumbrance or restriction pursuant to an agreement in effect at or entered into on the Closing Date, (including, without limitation, this Agreement and each of the other Loan Documents,  the New 1.5 Lien Notes (and related documentation) and the New ABL Facility in effect on such date);

(ii)      Purchase Money Indebtedness and Capitalized Lease Obligations permitted under this Agreement, in each case, provided that, in each case, any such encumbrance or restriction shall not extend to any assets or property of the Borrower or any Subsidiary other than the assets and property so acquired;

(iii)      contracts for the sale of assets, including customary restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale of all or a portion of the Capital Stock or assets of such Subsidiary;

(iv)      restrictions on cash or other deposits or net worth imposed by customers or lessors or required by insurance, surety or bonding companies under contracts entered into in the ordinary course of business;

(v)      any customary provisions in joint venture agreements relating to joint ventures and other similar agreements entered into in the ordinary course of business, provided that if such joint venture is a Subsidiary, such provisions shall not materially affect the Borrower's ability to make anticipated principal or interest payments on the Term Loan (as determined in good faith by the Borrower);

(vi)      any customary provisions in leases, subleases or licenses and other agreements entered into by the Borrower or any Subsidiary in the ordinary course of business;

(vii)      encumbrances or restrictions arising or existing by reason of Applicable Law or any applicable rule, regulation, order, permit or grant;

(viii)      encumbrances or restrictions contained in or arising under indentures or debt instruments or other debt arrangements Incurred or Preferred Stock issued by Subsidiary Guarantors in accordance with Section 6.01 that are not more restrictive, taken as a whole (as determined in good faith by the Borrower), than those applicable to the Borrower in this Agreement

and the New ABL Facility (which results in encumbrances or restrictions comparable to those applicable to the Borrower at a Subsidiary level); and

(ix)    under any contract, instrument or agreement relating to Indebtedness of any Foreign Subsidiary which imposes restrictions solely on such Foreign Subsidiary and its Subsidiaries.

Section 6.15    <u>Disinterested Directors</u>.  Unless or until the Brigade Parties hold Term Loans in an amount less than 50% of their initial Term Loan Commitments on the Closing Date as set forth on <u>Schedule 2.01</u>, have at any time less than two (2) Disinterested Directors on the Board of Directors of the Parent Entity; <u>provided</u>, <u>however</u>, that in the event of a vacancy in the position of a Disinterested Director as a result of  death, resignation, termination or such Disinterested Director being determined or adjudged incompetent by a court of competent jurisdiction (it being agreed that any illness (other than an illness resulting in such Disinterested Director being determined or adjudged incompetent) or other incapacitation shall not be deemed a vacancy), then the Board of Directors shall as promptly as possible, but in no event  later than thirty (30) Business Days after such event, appoint a replacement Disinterested Director therefor, and a vacancy for such reason shall be deemed not to be a breach of this covenant and shall not result in any Default or Event of Default until such thirty (30) Business Day period has ended.

## ARTICLE VII
Events of Default

Section 7.01    <u>Events of Default</u>.  In case of the happening of any of the following events (each, an "<u>Event of Default</u>"):

(a)    any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or any certificate or document delivered pursuant hereto or thereto shall prove to have been false or misleading in any material respect (without duplication of any materiality or Material Adverse Effect qualifier) when so made or deemed made;

(b)    default shall be made in the payment of any principal of any Term Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)    default shall be made in the payment of any interest on any Term Loan or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three (3) Business Days;

(d)    default shall be made in the due observance or performance by the Borrower of (i) any covenant, condition or agreement contained in Section 5.04, and such default shall continue unremedied for a period of five (5) days, or (ii) Article VI hereof; <u>provided</u> that any Event of Default resulting from a breach of Section 6.10 shall be subject to cure pursuant to Section 7.04;

(e)    default shall be made in the due observance or performance by the Borrower or any other Loan Party, of any covenant, condition or agreement contained in this Agreement (other than as provided in clauses (a), (b), (c), or (d) of this Section 7.01) or any of the other Loan Documents and such default shall continue unremedied for a period of 20 days;

(f)    there shall have occurred a Change of Control;

(g)      there shall have occurred and be continuing an "event of default" (however so defined and after giving effect to the passage of any applicable cure or grace period) under (x) the New ABL Facility Documents or the New 1.5 Lien Indenture or (y) any other Indebtedness whether now exists or is created after the Closing Date which principal amount of such Indebtedness (together with any other such Indebtedness under which there has been a payment default or acceleration) aggregates $5.0 million or more; or, in each case of (x) and (y) of this sub-clause, any other event or condition occurs that results in any such Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice) the holder or holders of such Indebtedness or any trustee or agent on its or their behalf, to cause any such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that there shall be no default or event of default to the extent the underlying "event of default" has been waived by the relevant holders of such Indebtedness, if the Term Loans have not been accelerated prior to such time;

(h)      any Loan Party (i) commences a voluntary Insolvency or Liquidation Proceeding with respect to itself; (ii) consents to the entry of an order for relief against it in an involuntary Insolvency or Liquidation Proceeding; (iii) consents to the appointment of a Custodian of it or for substantially all of its property; (iv) makes a general assignment for the benefit of its creditors; or (v) or takes any comparable action under any foreign Bankruptcy Laws relating to insolvency or the nights of creditors generally;

(i)      a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (i) is for relief against any Loan Party, in an involuntary case; (ii) appoints a Custodian of any Loan Party, for any substantial part of its property; or (iii) orders the winding up or liquidation of the Borrower or any Subsidiary;

(j)      failure by any Loan Party to pay final and non-appealable judgments aggregating in excess of $5.0 million (net of any amounts that are covered by insurance issued by a reputable and creditworthy insurance company (as determined in the good faith by the Borrower) that has not contested coverage), which judgments remain unsatisfied or undischarged for any period of 60 consecutive days during which a stay of enforcement of such judgments shall not be in effect;

(k)      any Guarantee of any Loan Party ceases to be in full force and effect (except as contemplated by the terms of this Agreement and the Guarantees of any Loan Party) or is declared null and void in a judicial proceeding or any Subsidiary Loan Party denies or disaffirms its obligations under this Agreement or any of the other Loan Documents and any Loan Party, as the case may be, fails to rescind such denials or disaffirmations within 30 days; and

(l)      with respect to any Collateral having a Fair Market Value in excess of $2.5 million, individually or in the aggregate, (i) the failure of the security interest with respect to such Collateral under the Security Documents, at any time, to be in full force and effect for any reason other than in accordance with the terms of the Loan Documents and the terms of this Agreement, as applicable, and other than the satisfaction in full of all Obligations, if such failure continues for 60 days or (ii) the assertion by any Loan Party, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable, except in each case for the failure or loss of perfection resulting from the failure of the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Security Documents if such assertion is not rescinded within 30 days.

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

then, and in every such event (other than an event with respect to the Borrower described in paragraph (h) or (i) above), and at any time thereafter during the continuance of such event, the Administrative Agent, at the request of the Required Lenders, shall, by notice to the Borrower, declare the Term Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Term Loan so declared to be due and payable, together with accrued interest thereon and all other liabilities of the Loan Parties accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event with respect to the Borrower described in paragraph (h) or (i) above, the principal of the Term Loans then outstanding, together with accrued interest thereon and all other liabilities of the Loan Parties accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 7.02    Remedies upon Event of Default.  Without limiting any other rights or remedies of the Administrative Agent, the Collateral Agent or the Lenders provided for elsewhere in this Agreement, the other Loan Documents, or by Applicable Law, or in equity, or otherwise:

(a)    Upon the occurrence and during the continuance of any Event of Default, subject to the Intercreditor Agreement and Article VIII herein, the Required Lenders may direct the Administrative Agent and the Collateral Agent to, and, at such direction, the Administrative Agent and Collateral Agent thereupon shall, on behalf of the Lenders, without notice to (except as expressly provided for in any Loan Document) or demand upon the Borrower, which are expressly waived by the Borrower (except as to notices expressly provided for in any Loan Document), proceed to protect, exercise and enforce their rights and remedies under the Loan Documents against the Borrower and each other Loan Party and such other rights and remedies as are provided by Law or equity.

(b)    Any right, remedy, privilege or power of any Secured Party with respect to the Collateral shall be exercised by the Collateral Agent and not by any Secured Party individually.  The order and manner in which the Lenders' rights and remedies are to be exercised shall be determined by the Required Lenders subject to the Intercreditor Agreement and all payments received by the Administrative Agent and the Lenders, or any of them, shall be applied as provided for in the Intercreditor Agreement and herein.  No application of payments under this clause (b) will cure any Event of Default, or prevent acceleration, or continued acceleration, of amounts payable under the Loan Documents, or prevent the exercise, or continued exercise, of rights or remedies of the Lenders hereunder or thereunder or at law or in equity.

Section 7.03    Application of Proceeds.  Except as expressly provided elsewhere in the Loan Documents and subject to the Intercreditor Agreement, after the exercise of remedies provided for under this Agreement or the other Loan Documents (or after the Term Loan has become immediately due and payable (whether due to acceleration or otherwise)) any amounts received on account of the Obligations (including all proceeds received by the Administrative Agent in respect of any sale, any collection from, or other realization upon all or any part of the Collateral but excluding the payment of current interest or interest paid as a form of adequate protection in any insolvency or liquidation proceeding) shall, subject to the Intercreditor Agreement, be applied in full or in part by the Administrative Agent against the Obligations in the following order of priority:

First, to the payment of that portion of the Obligations constituting fees, indemnities (other than unasserted contingent indemnification obligations), expenses and other amounts (including fees, charges and disbursements of counsel to the Agents (but, for the avoidance of doubt, excluding interest and

principal)) payable to the Agents in their capacities as such (including all costs and expenses of any sale, collection or other realization upon Collateral or any expenditures in connection with the preservation of Collateral), together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

Second, to the payment of that portion of the Obligations constituting fees and indemnities (other than unasserted contingent indemnification obligations) and other amounts (other than principal and interest) payable to the Lenders, ratably among them in proportion to the respective amounts described in this clause payable to them together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

Third, to the payment of that portion of the Obligations (including, for the avoidance of doubt, interest which, but for the filing of a petition in bankruptcy with respect to any Loan Party would have accrued on any such Obligation, whether or not a claim is allowed against any Loan Party for such interest in the related bankruptcy proceeding) constituting accrued and unpaid interest on the Term Loans and other Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause payable to them;

Fourth, to the payment of that portion of the Obligations constituting unpaid principal of the Term Loan and premiums, ratably among the Lenders, in proportion to the respective amounts described in this clause held by them;

Fifth, to the payment of all other Obligations owing under or in respect of the Loan Documents that are due and payable to any other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to such other Secured Parties on such date; and

Last, the balance, if any, after all of the Obligations have been paid in full (other than unasserted contingent indemnification obligations), to the Borrower or as otherwise required by Law.

Section 7.04    Borrower Right to Cure. Notwithstanding anything to the contrary contained in Section 7.01 or Section 7.02:

(a)    For the purpose of determining whether an Event of Default under Section 6.10 has occurred, the Borrower may on one or more occasions designate any portion of the net cash proceeds from a sale or issuance of Qualified Equity Interests of the Parent Entity or any cash contribution to the common capital of the Parent Entity, in each case, after the Closing Date and which are contributed to the Borrower (the "Cure Amount"), as an increase to Consolidated EBITDA for the applicable fiscal quarter; provided that (A) such amounts to be designated (i) are actually received by the Borrower after the first day of the applicable fiscal quarter and on or prior to the tenth (10th) Business Day after the date on which financial statements are required to be delivered with respect to such applicable fiscal quarter (the "Cure Expiration Date") and (ii) do not exceed the aggregate amount necessary to cure any Event of Default under Section 6.10 as of such date and (B) the Borrower shall have provided notice (the "Notice of Intent to Cure") to the Administrative Agent that such amounts are designated as a "Cure Amount" (it being understood that to the extent such notice is provided in advance of delivery of a Compliance Certificate for the applicable period, the amount of such net cash proceeds that is designated as the Cure Amount may be lower than specified in such notice to the extent that the amount necessary to cure any Event of Default under Section 6.10 is less than the full amount of such originally designated amount). The Cure Amount shall, solely for purposes of calculating the financial covenant in Section 6.10, be added to Consolidated EBITDA for the applicable fiscal quarter and included in any Test Period that includes such fiscal quarter.

(b)     The parties hereby acknowledge that this Section 7.04 may not be relied on for purposes of calculating any financial ratios other than for determining actual compliance with Section 6.10 and shall not result in any adjustment to any amounts (including the Consolidated First Lien Net Leverage Ratio, the Consolidated Leverage Ratio or any other calculation of net leverage or Indebtedness hereunder and shall not be included for purposes of determining pricing, mandatory prepayments and the availability or amount permitted pursuant to any covenant under Article VI) other than the amount of the Consolidated EBITDA referred to in Section 7.04(a) above.

(c)     In furtherance of Section 7.04(a) above, (i) upon actual receipt and designation of the Cure Amount by the Borrower, the covenant under Section 6.10 shall be deemed retroactively cured with the same effect as though there had been no failure to comply with the covenant under such Section 6.10 and any Event of Default or potential Event of Default under Section 6.10 shall be deemed not to have occurred for purposes of the Loan Documents, and (ii) neither the Administrative Agent nor any Lender may exercise any rights or remedies under Section 7.02 (or under any other Loan Document) on the basis of any actual or purported Event of Default under Section 6.10 following receipt of a Notice of Intent to Cure until and unless the Cure Expiration Date has occurred without the Cure Amount having been received.

(d)     (i) In each period of four consecutive fiscal quarters, there shall be at least two fiscal quarters in which no cure right set forth in this Section 7.04 is exercised and (ii) there shall be no *pro forma* reduction in Indebtedness (either directly or by netting cash) with the Cure Amount for determining compliance with Section 6.10 for the fiscal quarter with respect to which such Cure Amount was made. There can be no more than four fiscal quarters in which the cure rights set forth in this Section 8.04 are exercised during the term of the Facilities.

## ARTICLE VIII
### The Agents

Section 8.01     Appointment.  Each Lender hereby designates and appoints The Bank of New York Mellon to act as the agent of such Lender as the Administrative Agent and the Collateral Agent under this Agreement and the other Loan Documents and authorizes the Administrative Agent and the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent or the Collateral Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto, including, in the case of the Collateral Agent, to hold and enforce the Collateral (as directed, in writing, by the Required Lenders). Notwithstanding any provision to the contrary elsewhere in this Agreement, neither the Administrative Agent nor the Collateral Agent shall have any duties or responsibilities, except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, (a) neither the Administrative Agent nor the Collateral Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, and (b) except as expressly set forth herein, neither the Administrative Agent nor the Collateral Agent shall have any duty to disclose, nor shall either the Administrative Agent or the Collateral Agent be liable for the failure to disclose, any information relating to the Borrower or any of the other Loan Parties that is communicated to or obtained by the bank serving as Administrative Agent or Collateral Agent or any of its Affiliates in any capacity.  Neither the Administrative Agent nor the Collateral Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08) or in the absence of its own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment).  Neither the Administrative Agent nor the Collateral Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or

representation made in or in connection with this Agreement or the other Loan Documents, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or in the other Loan Documents, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or the Collateral Agent.

Section 8.02    <u>Delegation of Duties</u>.  The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Loan Documents by or through one or more co-agents, sub-agents or attorneys-in-fact.  Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any co-agents, sub-agents or attorneys-in-fact selected by it with due care and the exculpatory provisions below shall apply to such agents or attorneys in-fact.  Any such co-agents, sub-agents or attorneys-in-fact shall be entitled to the benefits of all provisions of this Article VIII and Article IX as though such co-agents, sub-agents or attorneys-in-fact were an Agent. The Administrative Agent and Collateral Agent may consult with legal counsel, independent accountants and other experts selected by it, and shall be entitled to rely upon the advice of any such counsel, accountants or experts and shall not be liable for any action taken or not taken by it in accordance with such advice.

Section 8.03    <u>Exculpatory Provisions</u>.  Neither the Administrative Agent nor the Collateral Agent, nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Agreement or any other Loan Document (except for its or such person's own gross negligence or willful misconduct, as determined by a court of competent jurisdiction by a final and nonappealable judgment) or (b) responsible in any manner to any of the Secured Parties for any recitals, statements, representations or warranties made by the Borrower or any other Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of the Borrower or any other Loan Party to perform its obligations hereunder or thereunder.  Neither the Administrative Agent nor the Collateral Agent shall be under any obligation to any Secured Party to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.  The provisions of this Article VIII (other than Section 8.09 which benefits, and may be enforced by, the Loan Parties) are solely for the benefit of the Administrative Agent, the Collateral Agent and the Secured Parties, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions. Neither the Administrative nor the Collateral Agent shall be responsible or liable for any failure or delay in the performance of their obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; pandemics or epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.  In no event shall any Agent be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  No Agent shall be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Agent or to enforce any rights and remedies in any foreign jurisdiction. No Agent shall be liable for any error of judgment made in good faith by a Responsible Officer of such Agent unless it shall be proved that such Agent was negligent in ascertaining the pertinent facts.

Delivery of any reports, information and documents to either Agent is for informational purposes only and such Agent's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Borrower's compliance with any of its covenants hereunder (as to which such Agent is entitled to rely exclusively on Officers' Certificates).

Section 8.04        Reliance by Agents.  The Administrative Agent and the Collateral Agent shall be entitled to conclusively rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons and upon advice and statements of legal counsel (including counsel to the Borrower or other Loan Party), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent.  Each Agent may also rely upon the statements made to it orally or by telephone and believed by it to be made by the proper person and shall not incur any liability for relying thereon.  Before either Agent acts or refrains from acting, it may require an Officers' Certificate from the Borrower satisfactory to such Agent with respect to the proposed action or inaction, such certificate and opinion to be given at the Borrower's expense.  Neither Agent shall be liable for any action it takes or omits to take in good faith in reliance upon such certificate or opinion, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of such Agent (as determined by a final, nonappealable judgment by a court of competent jurisdiction).  Whenever in the administration of the Loan Documents either Agent shall deem it necessary or desirable that a matter be proved or established before taking or suffering or omitting to take any act under any Loan Document, such matter (unless other evidence in respect thereof is herein specifically prescribed) may, in the absence of gross negligence or willful misconduct on the part of such Agent, be deemed to be conclusively proved and established by an Officers' Certificate delivered to such Agent, and such certificate, in the absence of gross negligence or willful misconduct on the part of such Agent, shall be full warrant to that Agent for any action taken, suffered or omitted to be taken by it under the Loan Documents upon the faith thereof.  Each Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or such other group of Lenders or Secured Parties as shall be necessary under the circumstances as provided in this Agreement) as it deems appropriate and it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action, provided that such Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable requirements of law.  The Administrative Agent and the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or such other group of Lenders or Secured Parties as shall be necessary under the circumstances as provided in this Agreement), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.  No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, or the transactions contemplated hereby or thereby shall require either the Administrative Agent or the Collateral Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers.

Section 8.05        Notice of Default.  Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or Collateral Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such

notice is a "notice of default". In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders and the Collateral Agent. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08), provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08).

Section 8.06        Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders. Each Lender expressly acknowledges that neither the Administrative Agent nor the Collateral Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent or Collateral Agent hereinafter taken, including any review of the affairs of the Borrower or any other Loan Party, shall be deemed to constitute any representation or warranty by the Administrative Agent or Collateral Agent to any Lender. Each Lender represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of the Borrower or any other Loan Party that may come into the possession of the Administrative Agent or Collateral Agent any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates.

Section 8.07        Indemnification. The Lenders agree to indemnify the Administrative Agent and the Collateral Agent, each in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective portions of the total Term Loans held on the date on which indemnification is sought, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent or the Collateral Agent in exercising its powers, rights and remedies or performing its duties hereunder or under then Credit Documents or otherwise in its capacity as Administrative Agent or Collateral Agent in any way relating to or arising out of the Term Loan, this Agreement, any of the other Loan Documents, or any documents contemplated by or referred to herein or therein, the Transactions or the other transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent or the Collateral Agent under or in connection with any of the foregoing, provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's or the Collateral Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.

The agreements in this Section 8.07 shall survive the termination of this Agreement, the resignation or removal of the Administrative Agent and/or the Collateral Agent or the Payment in Full of the Obligations.

Section 8.08        Agents in Their Individual Capacity.    The Administrative Agent, the Collateral Agent and their Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower or any other Loan Party as though such persons were not the Administrative Agent and Collateral Agent hereunder and under the other Loan Documents.   If the Administrative Agent or the Collateral Agent is at any time also a Lender hereunder, with respect to the Term Loans made by it, the Administrative Agent and the Collateral Agent shall each have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not the Administrative Agent or the Collateral Agent, and the terms "Lender" and "Lenders" shall include the Administrative Agent and the Collateral Agent in their individual capacities.

Section 8.09        Successor Agents.   The Administrative Agent or the Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrower and may be removed at any time by the Required Lenders.   Upon receipt of any such notice of resignation or upon any such removal, the Required Lenders shall have the right to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.   If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent or Collateral Agent gives notice of its resignation, then the retiring Administrative Agent or Collateral Agent may on behalf of the Lenders, appoint a successor Administrative Agent or Collateral Agent meeting the qualifications set forth above; provided that if the retiring Administrative Agent or Collateral Agent, as applicable, shall notify the Borrower and the Lenders that no qualifying person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of any Secured Parties, the retiring Collateral Agent shall continue to hold such collateral security as nominee until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through such Administrative Agent or Collateral Agent, as applicable, shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent or Collateral Agent as provided for above in this Section.   Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent or Collateral Agent, as applicable, and the retiring Administrative Agent or Collateral Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).   The fees payable by the Borrower (following the effectiveness of such appointment) to such Administrative Agent or Collateral Agent, as applicable, shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.   After the retiring Administrative Agent's or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article VIII and Section 9.05 shall continue in effect for the benefit of such retiring Administrative Agent or Collateral Agent, as applicable, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent or Collateral Agent was acting as Administrative Agent or Collateral Agent, as applicable.

Section 8.10        Payments Set Aside.   To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection

with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in the applicable currency of such recovery or payment.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the Payment in Full of the Obligations.

Section 8.11    Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise.

(1)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and each Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and each Agent and their respective agents and counsel and all other amounts due the Lenders and each Agent under Article II or Section 9.05) allowed in such judicial proceeding; and

(2)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent, the Collateral Agent and its agents and counsel, and any other amounts due the Administrative Agent or Collateral Agent under Article II and Section 9.05.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

Section 8.12    Collateral and Guaranty Matters.

(a)    Each Lender hereby further authorizes the Administrative Agent and Collateral Agent on behalf of and for the benefit of the Secured Parties, to be the representative of the Secured Parties with respect to the Security Documents, including without limitation pursuant to Section 9.18 and Section 5.09(g) hereof.  The Lenders irrevocably authorize each of the Collateral Agent and Administrative Agent to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document and the guarantees provided by the Loan Parties or any guarantor under any Loan Document (i) upon Payment in Full of the Obligations, (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document (and the Administrative Agent or Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry) to any

88

person other than a Loan Party, (iii) subject to Section 9.08, if the release of such Lien is approved, authorized or ratified in writing in accordance with Section 9.08, (iv) pursuant to Section 9.18 or (v) if required to be released by the Intercreditor Agreement.  Without in any way diminishing the authority granted to the Collateral Agent under the preceding sentence, within 10 days after written request by the Collateral Agent at any time, each of the Lenders agrees to confirm in writing the Collateral Agent's authority to release its interest in particular types or items of property in accordance with this Section and the failure of any Lender to deliver any such requested confirmation shall be deemed to be a confirmation by such Lender of the Collateral Agent's authority.

(b)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent (or the Collateral Agent at the direction of the Administrative Agent) or as the Required Lenders may require or otherwise direct, for the benefit of all the Lenders or the Secured Parties, as applicable; provided, however, that the foregoing shall not prohibit (i) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as an Agent) hereunder and under the other Loan Documents, (ii)  any Lender from exercising setoff rights in accordance with, and subject to, the terms of this Agreement, or (iii) any Lender from filing proofs of claim on its own behalf during the pendency of a proceeding relative to any Borrower under any Debtor Relief Law.  In furtherance of the foregoing, (x) no Secured Party, at its option and in its discretion, shall have any right individually to realize upon any of the Collateral and (y) in the event of a foreclosure or similar enforcement action by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, any Lender may be the purchaser of any or all of such Collateral at any such sale but only the Collateral Agent, as representative of the Secured Parties (and not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale or other disposition.

(c)     Beyond the exercise of reasonable care in the custody thereof, neither Agent shall have any duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto.  The Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith.

(d)     Neither Agent shall be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of such Agent (as determined by a final, nonappealable judgment by a court of competent jurisdiction), for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.  The Agents hereby disclaim any representation or warranty to the present and future holders of the Obligations concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

89

(e)      In the event that any Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in such Agent's sole discretion may cause the Agent, to be considered an "owner or operator" under any Environmental Laws or otherwise cause the Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, each Agents reserves the right, instead of taking such action, either to resign as Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver.  No Agent will be liable to any person for any Environmental Liabilities and Costs or any environmental liabilities or contribution actions under any federal, state or local law, rule or regulation by reason of such Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or Release or threatened discharge or Release of any Hazardous Materials into the environment.

Section 8.13      Intercreditor Matters.  The Administrative Agent and Collateral Agent shall be authorized from time to time on and after the Closing Date, without the consent of any Lender, to execute or to enter into amendments of, and amendments and restatements of, the Security Documents, the Intercreditor Agreement and any other intercreditor agreements, in each case in order to effect the subordination of and to provide for certain additional rights, obligations and limitations in respect of, any Liens required or permitted by the terms of this Agreement to be (i) solely with respect to Liens securing the New ABL Facility to the extent expressly provided in the Intercreditor Agreement to be Liens senior to the Obligations or (ii) Liens junior to the Obligations, that are, in each case, incurred in accordance with Article VI of this Agreement, and to establish certain relative rights as between the holders of the Obligations and the holders of such Indebtedness secured by such Liens.  Without in any way diminishing the authority granted to the Collateral Agent under the preceding sentence, within 10 days after written request by the Collateral Agent at any time, each of the Lenders agrees to confirm in writing the Collateral Agent's authority to execute and deliver such documents in accordance with this Section and the failure of any Lender to deliver any such requested confirmation shall be deemed to be a confirmation by such Lender of the Collateral Agent's authority.

ARTICLE IX
Miscellaneous

Section 9.01      Notices; Communications.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 9.01(b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier, as follows:

(1)      if to any Loan Party, the Administrative Agent, or the Collateral Agent to the address, telecopier number or electronic mail address specified for such person on Schedule 9.01; and

(2)      if to any other Lender, to the address, telecopier number or electronic mail address specified in its Assignment and Acceptance;

(b)      Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Required Lenders; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower (on behalf of the Loan Parties) may, in their discretion, agree to accept notices and other

communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

(c)        Solely with respect to the Agents, all notices shall be deemed to have been given when received by a Responsible Officer of such Agent, and with respect to the other parties hereto, (1) notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (2) notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient), and (3) notices or communications (i) sent to an e-mail address shall be deemed received when delivered and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefore.

(d)        Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)        Documents required to be delivered pursuant to Section 5.04 may be delivered electronically (including as set forth in Section 9.17) and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower post such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 9.01, or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that (A) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender, and (B) the Borrower shall notify the Administrative Agent (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.  The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

(f)        The Administrative Agent and the Collateral Agent shall have the right to accept and act upon instructions, including funds transfer instructions ("Instructions") given pursuant to this Agreement and sent by unsecured e-mail, pdf, facsimile transmission or other similar unsecured electronic methods; provided, however, that the Borrower shall amend the incumbency certificate provided by the Borrower in accordance with Section 5.01 whenever a person is to be added or deleted from the list.  If the Borrower elects to give either Agent Instructions using e-mail or facsimile instructions (or instructions by a similar electronic method) and the Agent in its discretion elects to act upon such Instructions, the Agent's understanding of such Instructions shall be deemed controlling.  The Borrower understands and agrees that the Agents cannot determine the identity of the actual sender of such Instructions and that the Agents shall conclusively presume that directions that purport to have been sent by an Authorized Officer listed on the incumbency certificate provided to such Agent have been sent by such Authorized Officer.  The Borrower shall be responsible for ensuring that only Officers transmit such Instructions to the Agents and that the Borrower and all Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Borrower.  Neither Agent shall be liable for any losses, costs or expenses arising directly or indirectly from such Agent's

91

reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction.  The Borrower agrees: (i) to assume all risks arising out of the use of e-mail or facsimile instructions (or instructions by a similar electronic method) to submit Instructions to the Agents, including without limitation the risk of such Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Agents and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Borrower; and (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances.

Section 9.02        Survival of Agreement.  All covenants, agreements, representations and warranties made by the Loan Parties herein, in the other Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans and the execution and delivery of the Loan Documents, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect until the Payment in Full of the Obligations.  Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to Sections 2.07, 2.08, 8.07 and 9.05) shall survive the Payment in Full of the Obligations and the termination of this Agreement.

Section 9.03        Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent and when the Administrative Agent shall have received copies hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the Borrower, each Agent and each Lender and their respective permitted successors and assigns.

Section 9.04        Successors and Assigns.

(a)        The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with Section 9.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in Section 9.04(c)), and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement or the other Loan Documents.

(b)        (i) Subject to the conditions set forth in Section 9.04(b)(ii), any Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Loan at the time owing to it) with the prior written consent (not to be unreasonably withheld or delayed) of:

(A)        the Borrower; provided that the Borrower shall be deemed to have consented to any such assignment unless they shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; provided further, that no consent of the Borrower shall be required (1) for an assignment of Term Loans from a Lender to a Lender or (2) if an Event of Default has occurred and is continuing, for an assignment to any other Person; and

(B)    the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Term Loans under the Facility, the amount of Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1.0 million, unless each of the Borrower and the Administrative Agent otherwise consent; provided that (1) no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing, (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds (with simultaneous assignments to or by two or more Approved Funds treated as one assignment), if any and (3) the Borrower shall have deemed to have consented to any such assignment unless they shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof;

(B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually);

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent information required pursuant to the Assignment and Acceptance and any tax forms required to be delivered pursuant to Section 2.08; and

(D)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Term Loans assigned.

For the purposes of this Section 9.04, "Approved Fund" shall mean any person (other than a natural person or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender. Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is an Ineligible Institution and the Administrative Agent shall have no liability with respect to any assignment made to an Ineligible Institution. Any assigning Lender shall, in connection with any potential assignment, provide to the Borrower a copy of its request (including the name of the prospective assignee) concurrently with its delivery of the same request to the Administrative Agent irrespective of whether or not an Event of Default has occurred and is continuing.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) below, from and after the effective date specified in each Assignment and Acceptance the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such

Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.07, 2.08 and 9.05). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(c).

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Loan Commitments of, and principal and interest amounts of the Term Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrower, each Agent, and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, all applicable tax forms, a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and any written consent to such assignment required by this Section 9.04(b), the Administrative Agent promptly shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this Section 9.04(b)(v).

(c)    (1) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Term Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; provided that such agreement may provide that such Lender will not, without the consent of the relevant Participant, agree to any amendment, modification or waiver described in (x) clauses (1) or (2) of the first proviso to Section 9.08(b) that directly and adversely affects the Loans or commitments in which such Participant has an interest and (y) clause (6) of the first proviso to Section 9.08(b). Subject to Section 9.04(c)(3), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.07 and 2.08 (subject to the limitations and requirements of those Sections (including, for the avoidance of doubt, subsection (e) of Section 2.08)), Sections 2.10 and 9.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.04(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.06 as though it were a Lender, provided that such Participant agrees to be subject to Section 2.09(c) as though it were a Lender.

(2)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and

94

address of each Participant and the principal and interest amounts of each Participant's interest in the Loans held by it (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments or Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Term Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive, and each party hereto shall treat each person whose name is recorded in the Participant Register as the owner of the participation in question for all purposes of this Agreement, notwithstanding notice to the contrary.

(3)    A Participant shall not be entitled to receive any greater payment under Section 2.07 or 2.08 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (not to be unreasonably withheld).  A Participant shall not be entitled to the benefit of Section 2.08 to the extent such Participant fails to comply with Section 2.08(e), as though it were a Lender.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender or its Affiliates, including any pledge or assignment to secure obligations to a Federal Reserve Bank and in the case of any Lender that is an Approved Fund, any pledge or assignment to any holders of obligations owed, or securities issued, by such Lender or its Affiliates, including to any trustee for, or any other representative of, such holders, and this Section 9.04 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)    The Borrower, upon receipt by the Borrower of written notice from the relevant Lender, agree to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

(f)    Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Term Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent.  Each of the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto and each Loan Party for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

(g)    Notwithstanding anything to the contrary contained herein, (i) no assignment may be made to an Ineligible Institution, (ii) no participation may be made to a person that is an Ineligible Institution so long as the list of Ineligible Institutions is made available to any Lender upon request by such Lender to the Administrative Agent, (iii) except in connection with the replacement of all, and not less than all, of the Term Loans pursuant to this Section 9.04 or an assignment of all, and not less than all, of the Term Loans hereunder, no assignments or participations may be made to the Borrower or any Affiliate of the Borrower (other than as specified in Sections 9.04(h)) and (iv) no assignment or participation may be made to any Defaulting Lender, any subsidiary of a Defaulting Lender or any natural Person or a holding

company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person. The Administrative Agent shall be under no duty to monitor or determine whether an assignee or participant is an Ineligible Institution or a Defaulted Lender.

(h)    Notwithstanding anything to the contrary contained herein, (x) assignments to the Borrower or any Affiliate of the Borrower, resulting in the Borrower or such Affiliate holdings outstanding Loans, may not, in the aggregate, exceed 30% of the aggregate outstanding principal amount of the Loans as calculated at such time of assignment (after giving effect to any substantially concurrent cancellation of the Loans) and (y) no assignments or participations may be made to the Borrower or any Affiliate of the Borrower other than as specified in subclause (x) above or through purchases of Loans made through (I) Dutch auction procedures open to all applicable Lenders on a pro rata basis in accordance with customary procedures to be agreed between the Borrower and the Auction Agent and/or (II) other procedures open to all applicable Lenders on a pro rata basis; provided that,

(1)    any Loans acquired by the Parent Entity, the Borrower or any of their respective Subsidiaries shall be retired and cancelled promptly upon the acquisition thereof;

(2)    by its acquisition of Loans, any Affiliate of the Borrower or any of the Chatham Parties or any of their Affiliates and Related Debt Funds, shall be deemed to have acknowledged and agreed that:

(A)    it shall not have any right to (I) attend or participate in (including, in each case, by telephone) any meeting (including "Lender only" meetings) or discussions (or portion thereof) among any Agent or any Lender to which representatives of the Borrower are not then present, (II) receive any information or material prepared at the request of Administrative Agent (acting at the direction of the Required Lenders) or any Lender or any communication by or among any Agent and one or more Lenders or any other material which is "Lender only", except to the extent such information or materials have been made available to the Borrower or its representatives (and in any case, other than the right to receive notices of prepayments and other administrative notices in respect of its Loans required to be delivered to Lenders pursuant to Article II) or receive any advice of counsel to any Agent or (III) make any challenge to any Agent's or any other Lender's attorney-client privilege on the basis of its status as a Lender; and

(B)    except with respect to any amendment, modification, waiver, consent or other action in Section 9.08 requiring the consent of all Lenders, all Lenders directly and adversely affected or specifically such Lender (or to the extent such Affiliates of the Borrower are being treated in a manner disproportionate to all other Lenders), the Loans held by any Affiliate of the Borrower or any of the Chatham Parties or any of their Affiliates and Related Debt Funds, shall be (x) in the case of an amendment, modification, waiver, consent or other action in Section 9.08 requiring only the consent of the Required Lenders, disregarded in both the numerator and denominator in the calculation of Required Lenders or (y) in all other cases, be entitled to vote in accordance with Section 9.08 as a Lender (or a directly and adversely affected Lender).

Section 9.05        Expenses; Indemnity.

(a)    The Borrower agrees to pay promptly (i) all reasonable documented out-of-pocket fees and expenses (including the reasonable fees, disbursements and other charges of counsel, but limited in the case of legal fees and expenses to the reasonable fees and expenses of one primary counsel to the Administrative Agent and the Collateral Agent, one primary counsel to the Lenders and a single firm of

local counsel in each relevant jurisdiction to the Administrative Agent and the Collateral Agent, taken as a whole) incurred by the Administrative Agent, the Collateral Agent and the Lenders, in connection with the preparation, negotiation and execution of this Agreement and the other Loan Documents, or in connection with the administration of this Agreement, the recordation of the Mortgages and title policies in respect thereof, and any amendments, modifications or waivers of the provisions hereof or the other Loan Documents (whether or not the transactions contemplated thereby are consummated), (ii) all out-of-pocket expenses (including Other Taxes and the reasonable fees, disbursements and other charges of counsel, but limited in the case of legal fees and expenses to the reasonable fees and expenses of one primary counsel to the Administrative Agent, the Collateral Agent and the Lenders, and a single firm of local counsel in each relevant jurisdiction to the Administrative Agent, the Collateral Agent and the Lenders, taken as a whole (and, in the case of an actual or perceived conflict of interest, where the person affected by such conflict notifies the Borrower of the existence of such conflict, one additional firm of primary counsel (and, if applicable, one additional firm of local counsel in each appropriate jurisdiction) for each group of similarly situated affected persons)) incurred by the Agents or any Lender in connection with the enforcement or protection of their rights in connection with this Agreement and the other Loan Documents and the Term Loans made hereunder and (iii) without duplication of other expense reimbursement obligation by any Person (including the Borrower) in favor of the Brigade Parties and subject to the terms thereof, all fees and expenses of the Brigade Parties, in their capacity as a Lender and the Agents incurred in connection with the Chapter 11 Cases from the Closing Date through and including the effective date of (x) entry of an order dismissing the bankruptcy cases or (y) a plan of reorganization or liquidation in the Chapter 11 Cases, including without limitation, review and analysis of any motion for the approval of such an order or plan, negotiation of the terms thereof, and review, preparation and negotiation of any documents, agreements or instruments in connection therewith (which, in the case of counsel, is limited to one firm of primary outside counsel for the Brigade Parties and one firm of primary outside counsel for the Administrative Agent) (and in each case, local counsel in each relevant local jurisdiction).

(b)      The Borrower shall indemnify the Administrative Agent, the Collateral Agent, each Lender, each of their respective Affiliates and each of their respective successors, assigns, officers, directors, employees, agents, advisors, controlling persons and members (each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all reasonable and documented losses, claims, damages, liabilities, charges and related expenses (but in the case of counsel fees, except in the case of an actual or perceived conflict of interest, limited to those charges and disbursements of one primary firm of outside counsel and if appropriate one additional firm of local counsel, for such Indemnitees taken as a whole, and, in the case of an actual or perceived conflict of interest, where the Indemnified Person affected by such conflict notifies the Borrower of the existence of such conflict, one additional firm of primary counsel (and, if applicable, one additional firm of local counsel in each appropriate jurisdiction) for each group of similarly situated Indemnified Persons)) (except the allocated costs of in-house counsel), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution, delivery, enforcement, performance or administration of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations thereunder or the consummation of or otherwise relating to the Transactions and the other transactions contemplated hereby, (ii) the use of the proceeds of the Term Loans or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of the Subsidiaries or Affiliates; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, charges or related expenses (x) are determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee (for purposes of this proviso only, each of the Administrative Agent, the Collateral Agent or any Lender shall be treated as several and separate Indemnitees, but each of them together with its respective Related Parties (other than advisors), shall be treated as a single Indemnitee), (y) to the extent determined in a final, non-appealable

judgment of a court of competent jurisdiction, arising from a material breach by any such Indemnitee or any of its Related Parties of such Indemnitee's obligations under the Loan Documents, or (z) arise out of any claim, actions, suits, inquiries, litigation, investigation or proceeding that does not involve an act or omission of the Borrower or any of their Affiliates and that is brought by an Indemnitee or any of its Related Parties against any other Indemnitee (or any of its Related Parties) (other than any claim, actions, suits, inquiries, litigation, investigation or proceeding against any arranger, Agent or other financial institution acting in a similar capacity hereunder).  Without limiting the generality of the foregoing sentence, the Borrower shall indemnify each Indemnitee against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, charges and related expenses, including reasonable counsel or consultant fees, charges and disbursements (limited to not more than one firm of primary counsel, plus, if appropriate, one firm of local counsel per jurisdiction (and, in the case of an actual or perceived conflict of interest, where the Indemnified Person affected by such conflict notifies the Borrower of the existence of such conflict, one additional firm of primary counsel (and, if applicable, one additional firm of local counsel in each appropriate jurisdiction) for each group of similarly situated Indemnified Persons)) (except the allocated costs of in-house counsel), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (A) any claim, violation or liability related in any way to Environmental Laws and the Borrower or any Subsidiary or any property owned, operated or leased by the Borrower or any Subsidiary at any time, or (B) any actual or alleged presence, Release or threatened Release of Hazardous Materials at, under, on, from or to any property owned, operated or leased by the Borrower or any Subsidiary at any time; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any of its Related Parties (other than advisors) (for purposes of this proviso only, each of the Administrative Agent, the Collateral Agent or any Lender shall be treated as several and separate Indemnitees, but each of them together with its respective Related Parties (other than advisors), shall be treated as a single Indemnitee), (y) to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction, arising from a material breach by any such Indemnitee or any of its Related Parties of such Indemnitee's obligations under the Loan Documents, or (z) arise out of any claim, actions, suits, inquiries, litigation, investigation or proceeding that does not involve the Borrower or any of their Affiliates and that is brought by an Indemnitee or any of its Related Parties against any other Indemnitee (or any of its Related Parties) (other than any claim, actions, suits, inquiries, litigation, investigation or proceeding against any arranger, Agent or other financial institution acting in a similar capacity hereunder).  None of the Indemnitees (or any of their respective affiliates) shall be responsible or liable to the Chatham Parties, the Borrower or any Subsidiary, Affiliates or stockholders or any other person or entity for any special, indirect, consequential or punitive damages, which may be alleged as a result of the Term Loan or the Transactions.  The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent or any Lender.  All amounts due under this Section 9.05 shall be payable on written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested. Paragraph (b) of this Section 9.05 shall not apply to Taxes, except taxes that represent damages or losses resulting from a non-Tax claim.

(c)     To the fullest extent permitted by Applicable Law, each of the parties hereto shall not assert, and hereby waive, any claim against any other party hereto or any of their respective Related Parties, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Term Loan or the use of the proceeds thereof; provided that nothing contained in this sentence shall limit the Borrower's indemnification obligations to the extent set forth hereinabove to the

extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such Indemnitee is entitled to indemnification hereunder.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(d)      To the fullest extent permitted by Applicable Law, no director, officer, employee, manager, incorporator or holder of any Equity Interests in the Borrower (other than a Loan Party) or any direct or indirect parent corporation (other than a Loan Party), as such, has any liability for any obligations of the Borrower or any other Loan Party under the Loan Documents, or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Lender and each other Secured Party hereby waives and releases all such liability of such Persons.  For the avoidance of doubt, this Section 9.05(e) shall not in any way limit or impair any party's obligations pursuant to the terms of any agreement entered into by such party in favor of the Agents or the Lenders.

(e)      The agreements in this Section 9.05 shall survive the resignation of the Administrative Agent, the Collateral Agent, the replacement of any Lender, the Payment in Full of the Obligations and the termination of this Agreement.

Section 9.06      Right of Set-off.  If an Event of Default shall have occurred and be continuing, each Agent and each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, subject to the Intercreditor Agreement, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Agent, such Lender or such Affiliate thereof to or for the credit or the account of the Borrower or any Subsidiary against any of and all the obligations of the Loan Parties now or hereafter existing under this Agreement or any other Loan Document held by such Agent or such Lender or any of their respective Affiliates, irrespective of whether or not such Agent, such Lender or such Affiliate thereof shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured.  The rights of each Agent and each Lender and their respective Affiliates under this Section 9.06 are in addition to other rights and remedies (including other rights of set-off) that such Agent or such Lender and their respective Affiliates may have.

Section 9.07      Applicable Law.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

Section 9.08      Waivers; Amendment.

(a)      No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any right or power hereunder or under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by Section 9.08(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice

99

or demand on the Borrower or any other Loan Party in any case shall entitle such person to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Administrative Agent (and consented to by the Required Lenders), and (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent, the Collateral Agent (in the case of any Security Document), the Loan Party or Loan Parties that are party thereto and consented to by the Required Lenders; provided, however, that, in addition to such agreement in writing by the Borrower, the Administrative Agent and the Required Lenders, no such agreement shall:

(1)    decrease or forgive the principal amount of, or extend the final maturity of, or decrease the rate of interest on, the Term Loan, without the prior written consent of each Lender directly adversely affected thereby (it being understood that a waiver of default interest shall not constitute a decrease in the rate of interest),

(2)    extend any date on which payment of interest on the Term Loan is due, without the prior written consent of each Lender directly adversely affected thereby,

(3)    amend or modify the provisions of this Agreement (including but not limited to Section 2.09(b)) in a manner that would by its terms alter the pro rata sharing of payments required thereby without the prior written consent of each Lender directly adversely affected thereby,

(4)    reduce the voting rights of any Lender under this Section 9.08 or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of such Lender,

(5)    (i) release (x) all or substantially all the Collateral except to the extent sold or otherwise disposed of in a transaction permitted by this Agreement, (y) all or substantially all of the value of the guarantees by the Subsidiary Loan Parties under the Guarantee Agreement except to the extent sold or otherwise disposed of in a transaction permitted by this Agreement or (z) the guarantees by the applicable Loan Party under the Guarantee Agreement, and in each case, except in connection with a "credit bid" undertaken by the Administrative Agent or the Collateral Agent at the written direction of the Required Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the U.S. Bankruptcy Code as now and hereafter in effect, or any successor statute or other sale or disposition of assets in connection with an enforcement action with respect to Collateral permitted pursuant to the Loan Documents (in which case only the consent of the Required Lenders will be needed for such release (unless such release is permitted by the terms of the Intercreditor Agreement)) or (ii) waive, amend or modify Section 7.03 of this Agreement or Section 4.02 of the Collateral Agreement, in each case, without the prior written consent of each Lender,

(6)    subordinate the Obligations, or, except as expressly provided in the Intercreditor Agreement, subordinate the Liens securing the Obligations to any other Liens, in each case, without the prior written consent of each Lender;

provided, further, that no such amendment shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder without the prior written consent of the

Administrative Agent or the Collateral Agent acting as such at the effective date of such amendment, as applicable, including any amendment of this Section 9.08.  Each Lender shall be bound by any waiver, amendment or modification authorized by this Section 9.08 and any consent by any Lender pursuant to this Section 9.08 shall bind any successor or assignee of such Lender.

(c)     Without the consent of any Lender, the Loan Parties and the Administrative Agent or Collateral Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document), but shall be under no obligation to, enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with Applicable Law or this Agreement or in each case to otherwise enhance the rights or benefits of any Lender under any Loan Document.

(d)     Notwithstanding the foregoing, technical and conforming modifications to the Loan Documents may be made with the consent of the Borrower and the Administrative Agent to the extent necessary to cure any ambiguity, omission, defect or inconsistency (as reasonably determined by the Administrative Agent (acting at the direction of the Required Lenders)).

(e)     Notwithstanding anything in this Section 9.08 to the contrary, in connection with the incurrence by any Loan Party or any Subsidiary thereof of additional Indebtedness, each of the Administrative Agent and the Collateral Agent agree, at the written direction of the Required Lenders, to execute and deliver any amendments, amendments and restatements, re-statements or waivers of or supplements to or other modifications to, any Security Document, to the extent otherwise consistent with the requirements of the Loan Documents, and to make or consent to any filings or take any other actions in connection therewith, as may be reasonably deemed by the Borrower to be necessary or reasonably desirable for any Lien on the assets of any Loan Party to secure such additional Indebtedness to become a valid, perfected lien (with such priority as may be designated by the relevant Loan Party or Subsidiary, to the extent such priority is permitted by the Loan Documents) pursuant to the Security Document being so amended, amended and restated, restated, waived, supplemented or otherwise modified or otherwise.

Section 9.09     Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the applicable interest rate, together with all fees and charges that are treated as interest under Applicable Law (collectively, the "Charges"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by such Lender in accordance with Applicable Law, the rate of interest payable hereunder, together with all Charges payable to such Lender shall be limited to the Maximum Rate; provided that such excess amount shall be paid to such Lender on subsequent payment dates to the extent not exceeding the legal limitation.

Section 9.10     Entire Agreement.  This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

Section 9.11       WAIVER OF JURY TRIAL.    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

Section 9.12       Severability.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.13       Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in Section 9.03.  Delivery of an executed counterpart to this Agreement by electronic signature, telecopy transmission (or other electronic transmission pursuant to procedures approved by the Administrative Agent) shall be as effective as delivery of a manually signed original.

Section 9.14       Headings.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 9.15       Jurisdiction; Consent to Service of Process.

(a)       Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, the Borough of Manhattan, and any appellate court from any thereof (collectively, "New York Courts"), in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction, except that each of the Loan Parties agrees that (a) it will not bring any such action or proceeding in any court other than New York Courts (it being acknowledged and agreed by the parties hereto that any other forum would be inconvenient and inappropriate in view of the fact that more of the Lenders who would be affected by any such action or proceeding have contacts with the State of New York than any other jurisdiction), and (b) in any such action or proceeding brought against any Loan Party in any other court, it will not assert any cross-claim, counterclaim or setoff, or seek any other affirmative relief, except to the extent that the failure to assert the same will preclude such Loan Party from asserting or seeking the same in the New York Courts.

(b)    Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by Applicable Law.

Section 9.16    Confidentiality.  Each of the Lenders and each of the Agents agrees that it shall maintain in confidence any information relating to any Loan Party furnished to it by or on behalf of any Loan Party (other than information that (a) has become available to the public other than as a result of a disclosure by such party in breach of this Section 9.16, (b) has been independently developed by such Lender or such Agent without violating this Section 9.16 or (c) was or becomes available to such Lender or such Agent from a third party which, to such person's knowledge, had not breached an obligation of confidentiality to the Parent Entity, the Borrower or any other Loan Party) and shall not reveal the same other than to its Affiliates and its and its Affiliates' directors, trustees, officers, employees, agents, auditors and advisors with a need to know or to any person that approves or administers the Term Loans on behalf of such Lender or to any numbering, administration or settlement service providers (so long as each such person shall have been instructed to keep the same confidential), except:  (A) to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, the National Association of Insurance Commissioners, any self-regulatory authority or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded; provided that notice of such requirement or order shall, unless pursuant to clause (B) of this Section 9.16, be promptly furnished to the Borrower prior to such disclosure to the extent practicable and legally permitted, (B) as part of normal reporting or review procedures to, or in connection with requests or examinations by, Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the National Association of Securities Dealers, Inc., (C) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (D) to any pledgee under Section 9.04(d) or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall have been instructed to keep the same confidential in accordance with this Section 9.16 or terms substantially similar to this Section 9.16), (E) to any direct or indirect contractual counterparty in Swap Agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section 9.16 or terms substantially similar to this Section 9.16) or (F) with the consent of the Borrower.  In addition, each Agent and each Lender may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar services providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement and the other Loan Documents.

Section 9.17    Platform; Borrower Materials.  The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform"), and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or their securities) (each, a "Public Lender").  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and

conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "PUBLIC", the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat the Borrower Materials as either publicly available information or not material information (although it may be sensitive and proprietary) with respect to the Borrower or their securities for purposes of United States Federal and state securities laws, (iii) all Borrower Material marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor;" and (iv) the Administrative Agent shall be entitled to treat Borrower Material that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor".

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIAL OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIAL. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIAL OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any other Loan Party, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Material through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to the Borrower, any other Loan Party, any Lender, or any other person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

Section 9.18        Release of Liens, Guarantees and Pledges.  In the event that any Loan Party conveys, sells, leases, assigns, transfers or otherwise disposes of all or any portion of any Equity Interests or assets to a person that is not (and is not required to become) a Loan Party in a transaction permitted hereunder or under any other Loan Document, any Liens created by any Loan Document in respect of such Equity Interests or assets shall be automatically released (provided that for the avoidance of doubt, with respect to any disposal consisting of an operating lease or license, the underlying property retained by such Loan Party will not be so released) and the Administrative Agent and Collateral Agent shall promptly (and the Lenders and the other Secured Parties receiving the benefits of the Loan Documents hereby authorize the Administrative Agent and Collateral Agent to) take such action and execute any such documents (in form and substance reasonably satisfactory to the party executing such document) as may be reasonably requested by the Borrower, on behalf of the applicable Loan Party, and at the Borrower's expense in connection with the release of any Liens created by any Loan Document in respect of such Equity Interests or assets, and, in the case of a disposition of the Equity Interests of any Subsidiary Loan Party in a transaction not prohibited by Section 6.05 and as a result of which such Subsidiary Loan Party would cease to be a Subsidiary Loan Party, such Subsidiary Loan Party's obligations under the Loan Documents shall be automatically terminated and the Administrative Agent and Collateral Agent shall promptly (and the Lenders and the other Secured Parties receiving the benefits of the Loan Documents hereby authorize the Administrative Agent and Collateral Agent to) take such action and execute any such documents (in form and substance reasonably satisfactory to the party executing such document)  as may be reasonably requested by the Borrower to terminate or evidence the termination of such Subsidiary Loan Party's obligations under the Loan Documents.  In addition, the Administrative Agent agrees to take such actions as are reasonably requested by the Borrower and at the Borrower's expense to terminate or evidence the

termination of the Liens and security interests created by the Loan Documents upon the Payment in Full of the Obligations.  Upon release pursuant to this Section 9.18, any representation, warranty or covenant contained in any Loan Document relating to any such Collateral or Subsidiary Loan Party shall no longer be deemed to be made.  The Administrative Agent or Collateral Agent may rely conclusively on a certificate certifying that such release is authorized and permitted hereunder and under the other Loan Documents and that all conditions precedent to such release have been satisfied, which certificate shall be provided to it by any Loan Party upon its reasonable request without further inquiry.

Section 9.19        Credit Bidding.

(a)        The Administrative Agent, on behalf of itself and the Lenders and other Secured Parties, shall have the right to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (x) at any sale thereof conducted under the provisions of Title 11 of the United States Code entitled "Bankruptcy", including under Sections 363, 1123 or 1129 thereof, or any similar Laws in any other jurisdictions to which a Loan Party is subject, (y) at any sale thereof conducted by (or with the consent or at the direction of the Required Lenders) the Administrative Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC, or (z) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of the Required Lenders) the Administrative Agent (whether by judicial action or otherwise) in accordance with any Applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid (A) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (B) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Lenders contained in clauses (b)(1) through (b)(5) of Section 9.08 of this Agreement), (C) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action (and the limitations and requirements set forth in Section 9.04(b) shall not apply to such assignments), and (D) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interest and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

(b)        Each Lender hereby agrees that, except as otherwise provided in any Loan Document or with the written consent of the Administrative Agent, the Required Lenders and, if applicable, the Collateral Agent, it will not take any enforcement action, accelerate obligations under any Loan

Documents, or exercise any right that it might otherwise have under Applicable Law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral.

Section 9.20          USA PATRIOT Act Notice.  Each Agent and each Lender that is subject to the USA PATRIOT Act or the Beneficial Ownership Regulation hereby notifies the Borrower and each other Loan Party that pursuant to the requirements of the USA PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies the Borrower and each other Loan Party, which information includes the name and address of the Borrower and each other Loan Party and other information that will allow such Lender or such Agent, as applicable, to identify the Borrower and each other Loan Party in accordance with the USA PATRIOT Act and the Beneficial Ownership Regulation.

Section 9.21          No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby, the Borrower acknowledge and agree that:  (i) the credit facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower, the other Loan Parties and their respective Affiliates, on the one hand, and the Agents and the Lenders, on the other hand, and the Borrower and the other Loan Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Agent and each Lender is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrower, any Loan Party or any of their respective Affiliates, stockholders, creditors or employees or any other person; (iii) none of the Agents or any Lender has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower or any other Loan Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any Agent or any Lender has advised or is currently advising the Borrower or any other Loan Party or their respective Affiliates on other matters) and none of the Agents or any Lender has any obligation to the Borrower, the other Loan Parties or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Agents, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and the other Loan Parties and their respective Affiliates, and none of the Agents or any Lender has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Agents and the Lenders have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Borrower and the other Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they deemed appropriate. The Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty.

Section 9.22          Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)        the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)        the effects of any Bail-In Action on any such liability, including, if applicable:

(1)        a reduction in full or in part or cancellation of any such liability;

(2)        a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(3)        the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 9.23        Certain ERISA Matters.

(a)        Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Collateral Agent, the Loan Parties and their respective Affiliates, that at least one of the following is and will be true:

(i)        such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the Commitments or this Agreement;

(ii)        the prohibited transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the Commitments and this Agreement;

(iii)        (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Term Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Term Loans, the Term Loan Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the Term Loan Commitments and this Agreement; or

107

(b)        In addition, unless the immediately preceding clause (a) is true with respect to a Lender, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Collateral Agent, the Loan Parties and their respective Affiliates, that each of the Administrative Agent, the Collateral Agent, the Loan Parties and their respective Affiliates is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Term Loans, the Term Loan Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Documents or any documents related hereto or thereto).

Section 9.24        <u>Intercreditor Agreement</u>. Notwithstanding anything to the contrary in this Agreement or in any other Loan Document: (i) the Liens granted to the Collateral Agent in favor of the Secured Parties pursuant to the Loan Documents and the exercise of any right related to any Collateral shall be subject, in each case, to the terms of the Intercreditor Agreement, (ii) in the event of any conflict between the express terms and provisions of this Agreement or any other Loan Document, on the one hand, and of the Intercreditor Agreement, on the other hand, the terms and provisions of the Intercreditor Agreement shall control  and (iii) each Lender authorizes the Administrative Agent and/or the Collateral Agent to execute the Intercreditor Agreement (or any other intercreditor agreement and/or subordination agreement pursuant to, or contemplated by, the terms of this Agreement) on behalf of such Lender, and such Lender agrees to be bound by the terms thereof.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

[_____], as the Borrower

By: _____
     Name:
     Title:

[_____], as the Parent Entity

By: _____
     Name:
     Title:

THE BANK OF NEW YORK MELLON**,**
as the Administrative Agent and the Collateral Agent


By: _____
    Name:
    Title:

[BRIGADE CAPITAL MANAGEMENT]**,** as a Lender

By: _____
    Name:
    Title:

**FORM OF TERM LOAN COLLATERAL AGREEMENT**

# TERM LOAN COLLATERAL AGREEMENT

This **TERM LOAN COLLATERAL AGREEMENT** (as amended, restated, modified or otherwise supplemented from time to time, this "Agreement"), dated as of [_____], 2020, by and among the Persons listed on the signature pages hereof as "Grantors" and those additional entities that hereafter become parties hereto by executing the form of Joinder attached hereto as Annex 1 (each, a "Grantor" and collectively, the "Grantors"), and **THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,** not in its individual capacity, but solely in its capacity as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns, the "Collateral Agent").

## W I T N E S S E T H:

**WHEREAS**, reference is made to that certain Term Loan Credit Agreement, dated as of [___], 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), by and among [_____], a Delaware [corporation/limited liability company], as borrower (the "Borrower"), the Grantors party thereto, as guarantors, The Bank of New York Mellon Trust Company, N.A., as administrative agent for the Lenders (in such capacity, the "Administrative Agent") and Collateral Agent, and each of the Lenders party thereto; and

**WHEREAS**, pursuant to the Credit Agreement and in connection with the Transactions (as defined in the Credit Agreement) each Lender party thereto on the Closing Date shall receive term loans issued by the Borrower in an aggregate principal amount equal to such Lender's First Lien Note Claims (as defined in the Credit Agreement); and

**WHEREAS**, The Bank of New York Mellon Trust Company, N.A. has been appointed to serve as collateral agent under the Credit Agreement and, in such capacity, to enter into this Agreement; and

**WHEREAS**, pursuant to the Term Loan Guarantee Agreement, each guarantor party thereto has unconditionally and irrevocably guaranteed, as primary obligor and not merely as surety, to the Administrative Agent, for the benefit of the Secured Parties, the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Secured Obligations; and

**WHEREAS**, each Grantor (other than the Borrower) is either a Subsidiary of the Borrower or a direct or indirect parent of the Borrower and, as such, will receive substantial benefits from the execution, delivery and performance of the obligations under the Credit Agreement and the Secured Obligations and each is, therefore, willing to enter into this Agreement; and

**WHEREAS**, this Agreement is made by the Grantors in favor of the Collateral Agent for the benefit of the Secured Parties to secure the payment and performance in full when due of the Secured Obligations;

**NOW, THEREFORE**, for and in consideration of the recitals made above and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.      Definitions; Construction.

(a)      All initially capitalized terms used herein (including in the preamble and recitals hereof) without definition shall have the meanings ascribed thereto in the Credit Agreement or, if not defined therein, in the Intercreditor Agreement whether or not then in effect. Any terms (whether capitalized or lower case) used in this Agreement that are defined in the Code (including, without limitation, Account, Account Debtor, Chattel Paper, Commercial Tort Claims, Deposit Account, Drafts, Documents, Equipment, Fixtures, General Intangibles, Inventory, Investment Property, Instruments, Letters of Credit, Letter of Credit Rights, Promissory Notes, Proceeds, Securities Account and Supporting Obligations) shall be construed and defined as set forth in the Code unless otherwise defined herein or in the Credit Agreement; provided, that to the extent that the Code is used to define any term used herein and if such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern. In addition to those terms defined elsewhere in this Agreement, as used in this Agreement, the following terms shall have the following meanings:

(i)      "Agreement" has the meaning specified therefor in the preamble to this Agreement.

(ii)      "Books" means books and records (including each Grantor's Records indicating, summarizing, or evidencing such Grantor's assets (including the Collateral) or liabilities, each Grantor's Records relating to such Grantor's business operations or financial condition, and each Grantor's goods or General Intangibles related to such information).

(iii)      "Borrower" shall have the meaning set forth in the preamble hereto.

(iv)      "Capitalized Lease Obligation" has the meaning specified therefor in the Credit Agreement.

(v)      "Code" means the New York Uniform Commercial Code, as in effect from time to time; provided, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to the Collateral Agent's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

(vi)      "Collateral" has the meaning specified therefor in Section 2 hereof.

(vii)      "Collateral Agent" has the meaning specified therefor in the preamble to this Agreement.

(viii)      "Commercial Tort Claims" means commercial tort claims (as that term is defined in the Code), and includes those commercial tort claims listed on Schedule 1 to the Perfection Certificate.

(ix)      "Copyrights" means, with respect to any Grantor, any and all rights of such Grantor in any works of authorship, including (A) copyrights and moral rights, (B)

3

copyright registrations and recordings thereof and all applications in connection therewith including those listed on Schedule 2 to the Perfection Certificate, (C) income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (D) the right to sue for past, present, and future infringements thereof, and (E) all of each Grantor's rights corresponding thereto throughout the world.

(x)      "Copyright Security Agreement" means each Copyright Security Agreement executed and delivered by Grantors, or any of them, and the Collateral Agent, in substantially the form of Exhibit A.

(xi)     "Credit Agreement" shall have the meaning set forth in the preamble hereto.

(xii)    "Default" or "Event of Default" has the meaning specified therefor in the Credit Agreement.

(xiii)   "Excluded Property" has the meaning specified therefor in Section 2 hereof.

(xiv)    "General Intangibles" means general intangibles (as that term is defined in the Code), and includes payment intangibles, software, contract rights, rights to payment, rights under any hedge agreements (including the right to receive payment on account of the termination (voluntarily or involuntarily) of such hedge agreements), rights arising under common law, statutes, or regulations, choses or things in action, goodwill, Intellectual Property, Intellectual Property Licenses, purchase orders, customer lists, route lists, rights to payment and other rights under any royalty or licensing agreements, including Intellectual Property Licenses, infringement claims, monies due or recoverable from pension funds, pension plan refunds, pension plan refund claims, insurance premium rebates, tax refunds, and tax refund claims, interests in a partnership or limited liability company which do not constitute a security under Article 8 of the Code, and any other personal property other than Commercial Tort Claims, money, Accounts, Chattel Paper, Deposit Accounts, goods, Investment Property, Negotiable Collateral, and oil, gas, or other minerals before extraction.

(xv)     "Grantor" and "Grantors" have the respective meanings specified therefor in the preamble to this Agreement.

(xvi)    "Intellectual Property" means, with respect to any Grantor, any and all of such Grantor's Patents, Copyrights, Trademarks, trade secrets, know-how, inventions (whether or not patentable), algorithms, software programs (including source code and object code), processes, product designs, industrial designs, blueprints, drawings, data, customer lists, URLs and domain names, specifications, documentations, reports, catalogs, literature, and any other forms of technology or proprietary information of any kind, including all rights therein and all applications for registration or registrations thereof.

(xvii)   "Intellectual Property Licenses" means, with respect to any Grantor, (A) any licenses or other similar rights provided to such Grantor in or with respect to Intellectual

4

Property owned or controlled by any other Person, and (B) any licenses or other similar rights provided to any other Person in or with respect to Intellectual Property owned or controlled by such Grantor, in each case, including (x) any software license agreements, (y) the license agreements listed on <u>Schedule 3</u> to the Perfection Certificate, and (z) the right to use any of the licenses or other similar rights described in this definition in connection with the enforcement of the Secured Parties' rights under the Loan Documents.

(xviii)    "<u>Intercreditor Agreement</u>" has the meaning specified therefor in the Credit Agreement.

(xix)    "<u>Investment Property</u>" means (A) any and all investment property of any Grantor, and (B) any and all of the following (regardless of whether classified as investment property under the Code): all Pledged Interests, Pledged Operating Agreements, and Pledged Partnership Agreements.

(xx)    "<u>Joinder</u>" means each Joinder to this Agreement executed and delivered by the Collateral Agent and each of the other parties listed on the signature pages thereto, in substantially the form of <u>Annex 1</u>.

(xxi)    "<u>Loan Documents</u>" has the meaning specified therefor in the Credit Agreement.

(xxii)    "<u>Material Adverse Effect</u>" has the meaning specified therefor in the Credit Agreement.

(xxiii)    "<u>Mortgaged Properties</u>" has the meaning specified therefor in the Credit Agreement.

(xxiv)    "<u>Negotiable Collateral</u>" means letters of credit, letter-of-credit rights, instruments, promissory notes, drafts and documents (as each such term is defined in the Code).

(xxv)    "<u>Patents</u>" means, with respect to any Grantor, patents and patent applications of such Grantor, including (A) the patents and patent applications listed on <u>Schedule 4</u> to the Perfection Certificate, (B) all continuations, divisionals, continuations-in-part, re-examinations, reissues, and renewals thereof and improvements thereon, (C) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (D) the right to sue for past, present, and future infringements thereof, and (E) all of each Grantor's rights corresponding thereto throughout the world.

(xxvi)    "<u>Patent Security Agreement</u>" means each Patent Security Agreement executed and delivered by Grantors, or any of them, and the Collateral Agent, in substantially the form of <u>Exhibit B</u>.

(xxvii)    "<u>Perfection Certificate</u>" has the meaning specified therefor in the Credit Agreement.

5

(xxviii)   "Pledged Companies" means each Person listed on Schedule 5 to the Perfection Certificate as a "Pledged Company", together with each other Person, all or a portion of whose Capital Stock is acquired or otherwise owned by a Grantor after the Closing Date other than Capital Stock constituting Excluded Property.

(xxix)   "Pledged Interests" means all of each Grantor's right, title and interest in and to all of the Capital Stock now owned or hereafter acquired by such Grantor, regardless of class or designation, including in each of the Pledged Companies, and all substitutions therefor and replacements thereof, all proceeds thereof and all rights relating thereto, also including any certificates representing the Capital Stock, the right to receive any certificates representing any of the Capital Stock, all warrants, options, share appreciation rights and other rights, contractual or otherwise, in respect thereof and the right to receive all dividends, distributions of income, profits, surplus, or other compensation by way of income or liquidating distributions, in cash or in kind, and all cash, instruments, and other property from time to time received, receivable, or otherwise distributed in respect of or in addition to, in substitution of, on account of, or in exchange for any or all of the foregoing.

(xxx)   "Pledged Interests Addendum" means a Pledged Interests Addendum substantially in the form of Exhibit C.

(xxxi)   "Pledged Notes" means any promissory note (as defined in the Code) constituting Collateral and pledged hereunder.

(xxxii)   "Pledged Operating Agreements" means all of each Grantor's rights, powers, and remedies under the limited liability company operating agreements of each of the Pledged Companies that are limited liability companies.

(xxxiii)   "Pledged Partnership Agreements" means all of each Grantor's rights, powers, and remedies under the partnership agreements of each of the Pledged Companies that are partnerships.

(xxxiv)   "Proceeds" has the meaning specified therefor in Section 2 hereof.

(xxxv)   "PTO" means the United States Patent and Trademark Office.

(xxxvi)   "Real Property" means any estates or interests in real property now owned, leased, or otherwise held or hereafter acquired by any Grantor and the improvements related thereto.

(xxxvii)   "Secured Obligations" means the Obligations, including all principal, premium and interest on the Term Loan and including all interest, fees and other amounts, which but for the filing of a bankruptcy proceeding would have accrued on any such Secured Obligations, whether or not a claim for such interest, fees or other amounts is allowed in such proceeding.

(xxxviii)   "Secured Parties" has the meaning specified therefor in the Credit Agreement.

KL2 3188650.7

(xxxix)  "Security Interest" has the meaning specified therefor in Section 2 hereof.

(xl)  "Supporting Obligations" means supporting obligations (as such term is defined in the Code), and includes letters of credit and guaranties issued in support of Accounts, Chattel Paper, documents, General Intangibles, instruments or Investment Property.

(xli)  "Trademarks" means, with respect to any Grantor, any and all of such Grantor's trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including (A) the trade names, registered trademarks, trademark applications, registered service marks and service mark applications listed on Schedule 6 to the Perfection Certificate, (B) all renewals thereof, (C) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (D) the right to sue for past, present and future infringements and dilutions thereof, (E) the goodwill of each Grantor's business symbolized by the foregoing or connected therewith, and (F) all of each Grantor's rights corresponding thereto throughout the world.

(xlii)  "Trademark Security Agreement" means each Trademark Security Agreement executed and delivered by Grantors, or any of them, and the Collateral Agent, in substantially the form of Exhibit D.

(xliii)  "URL" means "uniform resource locator," an internet web address.

(b)  This Agreement shall be subject to the rules of construction set forth in Section 1.02 of the Credit Agreement, and such rules of construction are incorporated herein by this reference, *mutatis mutandis*.

(c)  All of the schedules and exhibits attached to this Agreement or the Perfection Certificate shall be deemed incorporated herein by reference.

2.  Grant of Security. Each Grantor hereby unconditionally grants and pledges to the Collateral Agent, for the benefit of the Secured Parties, to secure the Secured Obligations (whether now existing or hereafter arising), a continuing security interest (hereinafter referred to as the "Security Interest") in all of such Grantor's right, title, and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located (the "Collateral"):

(a)  all of such Grantor's Accounts;

(b)  all of such Grantor's Books;

(c)  all of such Grantor's Chattel Paper;

(d)  all of such Grantor's Commercial Tort Claims;

(e)  all of such Grantor's Deposit Accounts;

7

(f)      all of such Grantor's Equipment;

(g)      all of such Grantor's Farm Products;

(h)      all of such Grantor's Fixtures;

(i)      all of such Grantor's General Intangibles;

(j)      all of such Grantor's Inventory;

(k)      all of such Grantor's Investment Property;

(l)      all of such Grantor's Intellectual Property and Intellectual Property Licenses;

(m)      all of such Grantor's Negotiable Collateral (including all of such Grantor's Pledged Notes);

(n)      all of such Grantor's Pledged Interests (including all of such Grantor's Pledged Operating Agreements and Pledged Partnership Agreements);

(o)      all of such Grantor's Securities Accounts;

(p)      all of such Grantor's Supporting Obligations;

(q)      all of such Grantor's money, Cash Equivalents, or other assets of such Grantor that now or hereafter come into the possession, custody, or control of the Collateral Agent (or its agent or designee) or any other Secured Party; and

(r)      all of the Proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, Farm Products, Fixtures, General Intangibles, Inventory, Investment Property, Intellectual Property, Negotiable Collateral, Pledged Interests, Securities Accounts, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "Proceeds"). Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Grantor or the Collateral Agent from time to time with respect to any of the Investment Property.

Notwithstanding anything contained in this Agreement to the contrary, the term "Collateral" shall not include any of the following (individually and collectively, the "Excluded Property"): (i) any "intent to use" trademark applications for which a statement of use has not been filed (but only until such statement is filed), (ii) solely to the extent any pledge of more than 65% of the Voting Stock of a Foreign Subsidiary or U.S. entity would result in material adverse tax consequences to the Borrower, a pledge of the Capital Stock of any CFC or CFC Holdco in excess of 65% of the Voting Stock of such Foreign Subsidiary or such U.S. entity, as the case may be, (iii) any assets in respect of which pledges and security interests are prohibited by applicable law, rule or regulation or agreements with any governmental authority, to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the Uniform Commercial Code or any other requirement of law to the extent, and for as long as such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the Uniform Commercial Code or any other requirement of law, (iv) motor vehicles, aircraft and other assets subject to certificates of title, except to the extent a security interest therein can be perfected by the filing of a UCC financing statement, (v) Equity Interests in any entities which do not constitute Subsidiaries, but only to the extent that (x) the Organizational Documents or other agreements with other equity holders of such entity do not permit or restrict the pledge of such Equity Interests, or (y) the pledge of such Equity Interests (including any exercise of remedies) would result in a change of control applicable to such entity or a repurchase obligation relating to such entity (in each case, to the extent such restriction existed on the Closing Date or on the date of acquisition of such non-wholly owned Subsidiary), (vi) any lease, license or agreement or any property subject to a purchase money security interest, capital lease obligations or similar arrangement, in each case, permitted under the Credit Agreement, solely to the extent the grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money or similar arrangement or create a right of termination in favor of any other party thereto (other than the Parent Entity, the Borrower, any Subsidiary of the Borrower or any other Loan Party) after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC or other applicable Law notwithstanding such prohibition, (vii) letter of credit rights, except to the extent constituting support obligations for other Collateral as to which perfection of the security interest in such other Collateral is accomplished solely by the filing of a UCC financing statement (it being understood that no actions shall be required to perfect a security interest in letter of credit rights, other than the filing of a UCC financing statement, (viii) commercial tort claims where the amount of damages claimed by the applicable Grantor is less than $500,000; *provided*, *however*, that "Excluded Property" shall not include any proceeds, products, substitutions or replacements of Excluded Property (unless such proceeds, products, substitutions or replacements would otherwise constitute Excluded Property).

For the avoidance of doubt, (i) the grant of a security interest herein shall not be deemed to be a present assignment of intellectual property rights owned by the Grantors and (ii) the security interest granted under this Agreement shall not extend to, and the definition of "Collateral" and definitions of and references to asset categories in the definition of "Collateral" and elsewhere in this Agreement or any agreement entered into or pursuant to this Agreement shall not include, Excluded Property; provided that, if and when any property shall cease to be Excluded Property, a lien on and security interest in such property (in favor of the Collateral Agent, for the benefit of the Secured Parties) shall automatically be deemed granted therein.

3.      Security for Secured Obligations. The Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to the Collateral Agent, the Secured Parties or any of them, but for the fact that they are unenforceable or not allowable (in whole or in part) as a claim in an Insolvency Proceeding involving any Grantor due to the existence of such Insolvency Proceeding. Further, the Security Interest created hereby encumbers each Grantor's right, title, and interest in all Collateral, whether now owned by such Grantor or hereafter acquired, obtained, developed, or created by such Grantor and wherever located.

4.      Grantors Remain Liable. Anything herein to the contrary notwithstanding, (a) each of the Grantors shall remain liable under the contracts and agreements included in the Collateral, including the Pledged Operating Agreements and the Pledged Partnership Agreements, to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Collateral Agent or the Secured Parties of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) none of the Secured Parties shall have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall any of the Secured Parties be obligated to perform any of the obligations or duties of any Grantors thereunder or to take any action to collect or enforce any claim for payment assigned hereunder. Until an Event of Default shall occur and be continuing, except as otherwise provided in this Agreement, the Credit Agreement, or any other Loan Document, Grantors shall have the right to possession and enjoyment of the Collateral, subject to and upon the terms hereof and of the Credit Agreement and the other Loan Documents. Without limiting the generality of the foregoing, it is the intention of the parties hereto that record and beneficial ownership of the Pledged Interests, including all voting, consensual, dividend, and distribution rights, shall remain in the applicable Grantor until the occurrence and continuance of an Event of Default.

5.      Representations and Warranties. In order to induce the Collateral Agent to enter into this Agreement for the benefit of the Secured Parties, each Grantor makes the following representations and warranties to the Collateral Agent and each other Secured Party which shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date and such representations and warranties shall survive the execution and delivery of this Agreement:

(a)      The name (within the meaning of Section 9-503 of the Code) and jurisdiction of organization of each Grantor is set forth on Schedule 7 to the Perfection Certificate (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

(b)      The chief executive office of each Grantor is located at the address indicated on Schedule 7 to the Perfection Certificate (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

10

KL2 3188650.7

(c)    Each Grantor's tax identification numbers and organizational identification numbers, if any, are identified on Schedule 7 to the Perfection Certificate (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

(d)    As of the Closing Date, no Grantor holds any Commercial Tort Claims where the amount of damages claimed is in excess of $500,000, except as set forth on Schedule 1 to the Perfection Certificate.

(e)    Schedule 8 to the Perfection Certificate sets forth (i) all Real Property owned by any of the Grantors as of the Closing Date, (ii) all Mortgaged Properties, and (iii) other information relating thereto required by such Schedule.

(f)    As of the Closing Date: (i) Schedule 2 to the Perfection Certificate provides a complete and correct list of all registered Copyrights owned by any Grantor, all applications for registration of Copyrights owned by and registered Copyrights exclusively licensed to any Grantor, (ii) Schedule 3 to the Perfection Certificate provides a complete and correct list of all material Intellectual Property Licenses entered into by any Grantor pursuant to which (A) any Grantor has provided any license or other rights in Intellectual Property owned or controlled by such Grantor to any other Person (other than non-exclusive software licenses granted in the ordinary course of business), or (B) any Person has granted to any Grantor any license or other rights in Intellectual Property owned or controlled by such Person that is material to the business of such Grantor, including any Intellectual Property that is incorporated in any Inventory, software, or other product marketed, sold, licensed, or distributed by such Grantor (other than off-the-shelf, shrink-wrapped or "click to accept" software licenses or other licenses to generally commercially available software), (iii) Schedule 4 to the Perfection Certificate provides a complete and correct list of all registered Patents owned by any Grantor and all applications for Patents owned by any Grantor, and (iv) Schedule 6 to the Perfection Certificate provides a complete and correct list of all registered Trademarks owned by any Grantor, and all applications for registration of Trademarks owned by any Grantor.

(g)    (i) (A) each Grantor owns exclusively or holds licenses in all Intellectual Property that is necessary in or material to the conduct of its business, and (B) all employees and contractors of each Grantor who were involved in the creation or development of any Intellectual Property for such Grantor that is necessary in or material to the business of such Grantor have signed agreements containing assignment of Intellectual Property rights to such Grantor and obligations of confidentiality;

(ii)    to each Grantor's knowledge, no Person has infringed or misappropriated or is currently infringing or misappropriating any Intellectual Property rights owned by such Grantor, in each case, that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect;

(iii)    (A) to each Grantor's knowledge, (1) such Grantor is not currently infringing or misappropriating any Intellectual Property rights of any Person, and (2) no product manufactured, used, distributed, licensed, or sold by or service provided by such Grantor is currently infringing or misappropriating any Intellectual Property rights of any Person, in each

11

case, except where such infringement either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect, and (B) there are no infringement or misappropriation claims or proceedings pending, or to any Grantor's knowledge, threatened in writing against any Grantor, and no Grantor has received any written notice or other communication of any actual or alleged infringement or misappropriation of any Intellectual Property rights of any Person, in each case, except where such infringement either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect;

(iv)     to each Grantor's knowledge, all registered Copyrights, registered Trademarks, and issued Patents that are owned by such Grantor and necessary in or material to the conduct of its business are valid, subsisting and enforceable and in compliance with all legal requirements, filings, and payments and other actions that are required to maintain such Intellectual Property in full force and effect; and

(v)     each Grantor has taken reasonable steps to maintain the confidentiality of and otherwise protect and enforce its rights in all trade secrets owned by such Grantor that are necessary in or material to the conduct of the business of such Grantor.

(h)     This Agreement creates a valid security interest in the Collateral of each Grantor, to the extent a security interest therein can be created under the Code, securing the payment of the Secured Obligations. Except to the extent a security interest in the Collateral cannot be perfected by the filing of a financing statement under the Code, all filings and other actions necessary to perfect and protect such security interest have been duly taken or will have been taken upon the filing of financing statements listing each applicable Grantor, as a debtor, and the Collateral Agent, as secured party, in the jurisdictions listed next to such Grantor's name on Schedule 11 to the Perfection Certificate. Upon the making of such filings, the Collateral Agent shall have a first priority (with respect to the [Term Loan Priority Collateral]) or second priority (with respect to assets that do not constitute [Term Loan Priority Collateral]) (subject only to Permitted Liens) perfected security interest in the Collateral of each Grantor to the extent such security interest can be perfected by the filing of a financing statement under the Code. Upon filing of any Copyright Security Agreement with the United States Copyright Office, filing of any Patent Security Agreement and any Trademark Security Agreement with the PTO, and the filing of appropriate financing statements in the jurisdictions listed on Schedule 11 to the Perfection Certificate, all action necessary to protect and perfect the Security Interest in and on each Grantor's United States issued and registered Patents, Trademarks, or Copyrights (including registered Copyrights exclusively licensed to such Grantor) has been taken and such perfected Security Interest is enforceable as such as against any and all creditors of and purchasers from any Grantor, subject to the Intercreditor Agreement, except to the extent such enforceability may be limited by applicable bankruptcy, insolvency, moratorium and other laws affecting creditor's rights generally and by equitable principles (regardless of whether enforcement is sought in equity or at law).

(i)     (i) Except for the Security Interest created hereby, each Grantor is and will at all times be the sole holder of record and the legal and beneficial owner, free and clear of all Liens other than Permitted Liens, of the Pledged Interests indicated on Schedule 5 to the Perfection Certificate as being owned by such Grantor and, when acquired by such Grantor, any Pledged Interests acquired after the Closing Date, (ii) all of the Pledged Interests are duly authorized, validly issued, and to the extent applicable, fully paid and non-assessable and the Pledged Interests

12

constitute or will constitute the percentage of the issued and outstanding Capital Stock of the Pledged Companies of such Grantor identified on <u>Schedule 5</u> to the Perfection Certificate as supplemented or modified by any Pledged Interests Addendum or any Joinder to this Agreement, (iii) such Grantor has the right and requisite authority to pledge, the Investment Property pledged by such Grantor to the Collateral Agent as provided herein, (iv) all actions necessary to perfect and establish the first priority (with respect to [Term Loan Priority Collateral]) or second priority (with respect to assets that do not constitute [Term Loan Priority Collateral]) (subject only to Permitted Liens) of, or otherwise protect, the Collateral Agent's Liens in the Investment Property, and the proceeds thereof, have been duly taken, upon (A) the execution and delivery of this Agreement, (B) the taking of possession by the Collateral Agent (or its agent or designee (or by the New ABL Facility Administrative Agent as the Collateral Agent's bailee for perfection pursuant to the applicable Intercreditor Agreement)) of any certificates representing the Pledged Interests, to the extent such Pledged Interests are represented by certificates, together with undated powers (or other documents of transfer acceptable to the Collateral Agent) endorsed in blank by the applicable Grantor and (C) the filing of financing statements in the applicable jurisdiction set forth on <u>Schedule 11</u> to the Perfection Certificate for such Grantor with respect to the Pledged Interests of such Grantor that are not represented by certificates, and (v) each Grantor has delivered to and deposited with the Collateral Agent (or the New ABL Facility Administrative Agent as the Collateral Agent's bailee for perfection pursuant to the applicable Intercreditor Agreement) all certificates representing the Pledged Interests owned by such Grantor to the extent such Pledged Interests are represented by certificates, and undated powers (or other documents of transfer acceptable to the Collateral Agent) endorsed in blank with respect to such certificates. None of the Pledged Interests owned or held by such Grantor has been issued or transferred in violation of any securities registration, securities disclosure, or similar laws of any jurisdiction to which such issuance or transfer may be subject.

(j)     No consent, approval, authorization, or other order or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required (i) for the grant of a Security Interest by such Grantor in and to the Collateral pursuant to this Agreement or for the execution, delivery, or performance of this Agreement by such Grantor, or (ii) for the exercise by the Collateral Agent of the voting or other rights provided for in this Agreement with respect to the Investment Property or the remedies in respect of the Collateral pursuant to this Agreement, except (A) as may be required in connection with such disposition of Investment Property by laws affecting the offering and sale of securities generally, (B) for consents, approvals, authorizations, or other orders or actions that have already been obtained or given (as applicable) and that are still in force, (C) the filing of financing statements and other filings necessary to perfect the Security Interests granted hereby and (D) such other consents, approvals, authorizations, actions, notices and filings as may be required in connection with the exercise by the Collateral Agent of its remedies in respect of the Collateral. No Intellectual Property License of any Grantor that is necessary in or material to the conduct of such Grantor's business requires any consent of any other Person that has not been obtained in order for such Grantor to grant the security interest granted hereunder in such Grantor's right, title or interest in or to such Intellectual Property License.

(k)     As to all limited liability company or partnership interests, issued under any Pledged Operating Agreement or Pledged Partnership Agreement, each Grantor hereby represents and warrants that the Pledged Interests issued pursuant to such agreement (i) are not dealt in or

13

traded on securities exchanges or in securities markets, (ii) do not constitute investment company securities, and (iii) are not held by such Grantor in a Securities Account. In addition, none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement or Pledged Partnership Agreement, provides that such Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction.

6.      Covenants. Each Grantor, jointly and severally, covenants and agrees with the Collateral Agent that from and after the date of this Agreement and until the date of termination of this Agreement in accordance with Section 24:

(a)      Possession of Collateral. In the event that any Collateral, including Proceeds, is evidenced by or consists of Negotiable Collateral or Chattel Paper having an aggregate value or face amount of $400,000 or more for all such Negotiable Collateral or Chattel Paper, the Grantors shall promptly (and in any event within ten (10) Business Days (or such longer period as agreed to by the ABL Agent, to the extent that the ABL Agent has a first priority security interest in such Collateral, and thereafter as agreed to by the Collateral Agent) after acquisition thereof), notify the Collateral Agent thereof, and if and to the extent that perfection or priority of the Collateral Agent's Security Interest is dependent on or enhanced by possession, the applicable Grantor, promptly (and in any event within ten (10) Business Days (or such longer period as agreed to by the ABL Agent, to the extent that the ABL Agent has a first priority security interest in such Collateral, and thereafter as agreed to by the Collateral Agent), endorse and deliver physical possession of such Negotiable Collateral or Chattel Paper to the Collateral Agent (or to the New ABL Facility Administrative Agent as the Collateral Agent's bailee for perfection pursuant to the Intercreditor Agreement), together with such undated powers (or other relevant document of transfer acceptable to the Collateral Agent or the New ABL Facility Administrative Agent, as applicable) endorsed in blank as shall be requested by the Collateral Agent or the New ABL Facility Administrative Agent, as applicable.

(b)      Commercial Tort Claims. If the Grantors (or any of them) obtain Commercial Tort Claims where the amount of damages claimed by such Grantor or Grantors is in excess of $500,000, then the applicable Grantor or Grantors shall promptly (and in any event within ten (10) Business Days (or such longer period as agreed to by the Collateral Agent) of obtaining such Commercial Tort Claim), notify the Collateral Agent upon incurring or otherwise obtaining such Commercial Tort Claims and, promptly (and in any event within ten (10) Business Days (or such longer period as agreed to by the New ABL Facility Administrative Agent in writing in its sole discretion with respect to the corresponding requirement under the New ABL Facility Documents)), amend Schedule 1 to the Perfection Certificate to describe such Commercial Tort Claims in a manner that reasonably identifies such Commercial Tort Claims, and hereby agrees to file additional financing statements or amendments to existing financing statements describing such Commercial Tort Claims.

(c)      Intellectual Property.

(i)      In order to facilitate filings with the PTO and the United States Copyright Office, each Grantor shall execute and deliver to the Collateral Agent, and cause to be filed with the applicable filing office, one or more Copyright Security Agreements, Trademark

14

Security Agreements, or Patent Security Agreements to further evidence the Collateral Agent's Lien on such Grantor's United States issued and registered Patents, Trademarks, or Copyrights (including registered Copyrights exclusively licensed to such Grantor), and the General Intangibles of such Grantor relating thereto or represented thereby in accordance with clause (iv) of this Section 6(c).

(ii) Each Grantor shall have the duty, with respect to Intellectual Property that is necessary in or material to the conduct of such Grantor's business, to protect and diligently enforce and defend at such Grantor's expense such material Intellectual Property as it determines in the exercise of its reasonable business judgment, including, as it may so determine and with respect to such material Intellectual Property, (A) to diligently enforce and defend, including promptly suing for infringement, misappropriation, or dilution and to recover any and all damages for such infringement, misappropriation, or dilution, and filing for opposition, interference, and cancellation against conflicting material Intellectual Property rights of any Person, (B) to prosecute diligently any material trademark application or service mark application that is part of the Trademarks pending as of the date hereof or hereafter until the termination of this Agreement, (C) to prosecute diligently any material patent application that is part of the Patents pending as of the date hereof or hereafter until the termination of this Agreement, (D) to take all reasonable and necessary action to preserve and maintain all of such Grantor's material Intellectual Property and Intellectual Property Licenses, and its rights therein, including paying all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of noncontestability, and (E) to require all employees, consultants, and contractors of each Grantor who were involved in the creation or development of such material Intellectual Property to sign agreements containing assignment of Intellectual Property rights and obligations of confidentiality. Each Grantor hereby agrees to take the steps described in this Section 6(c)(ii) with respect to all new or acquired Intellectual Property to which it or any of its Subsidiaries is now or later becomes entitled that is necessary in or material to the conduct of such Grantor's business.

(iii) Grantors acknowledge and agree that the Secured Parties shall have no duties with respect to any Intellectual Property or Intellectual Property Licenses of any Grantor. Without limiting the generality of this Section 6(c)(iii), Grantors acknowledge and agree that no Secured Party shall be under any obligation to take any steps necessary to preserve rights in the Collateral consisting of Intellectual Property or Intellectual Property Licenses against any other Person, but the Collateral Agent, for the benefit of the Secured Parties, may do so at its option from and after the occurrence and during the continuance of an Event of Default, and all fees and all reasonable and documented expenses incurred in connection therewith (including reasonable and documented fees and expenses of outside counsel and other professionals) shall be for the sole account of the Borrower.

(iv) On each date on which a quarterly or annual report is required to be delivered pursuant to Section 5.04 of the Credit Agreement in respect of a fiscal quarter or fiscal year (or, if an Event of Default has occurred and is continuing, more frequently if requested by the Collateral Agent), each Grantor shall provide the Collateral Agent with a written report of all new Patents, Trademarks or Copyrights that are registered or the subject of pending applications for registrations therewith, in each case, which were acquired, registered, or for which applications for registration were filed by any Grantor (including registered Copyrights exclusively licensed to any such Grantor) during the prior period and any statement of use or amendment to allege use

15

with respect to intent-to-use trademark applications. In the case of such registrations or applications therefor, which were acquired by any Grantor, each such Grantor shall file the necessary documents with the appropriate Governmental Authority identifying the applicable Grantor as the owner (or as a co-owner or exclusive licensee thereof, if such is the case) of such Intellectual Property. In each of the foregoing cases, the applicable Grantor shall promptly cause to be prepared, executed, and delivered to the Collateral Agent supplemental schedules to the applicable Loan Documents to identify such Patent, Trademark and Copyright registrations and applications therefor (with the exception of Trademark applications filed on an intent-to-use basis for which no statement of use or amendment to allege use has been filed) as being subject to the security interests created thereunder and have them filed with the United States Patent and Trademark Office or United States Patent Office, as applicable.

(v)     Each Grantor shall take reasonable steps to maintain the confidentiality of, and otherwise protect and enforce its rights in, the Intellectual Property that is necessary in or material to the conduct of such Grantor's business including, as applicable, (A) protecting the secrecy and confidentiality of its confidential information and trade secrets by having and enforcing a policy requiring all current employees, consultants, licensees, vendors and contractors with access to such information to execute appropriate confidentiality agreements, (B) taking actions reasonably necessary to ensure that no material trade secret falls into the public domain, and (C) protecting the secrecy and confidentiality of the source code of all software programs and applications of which it is the owner by having and enforcing a policy requiring any licensees (or sublicensees) of such source code to enter into license agreements with commercially reasonable use and non-disclosure restrictions.

(d)     <u>Investment Property</u>.

(i)     If any Grantor shall acquire, obtain, receive or become entitled to receive any Pledged Interests after the Closing Date, it shall promptly (and in any event within ten (10) Business Days (or such longer period as agreed to by the Collateral Agent) of acquiring or obtaining such Collateral) deliver to the Collateral Agent a duly executed Pledged Interests Addendum identifying such Pledged Interests.

(ii)     Upon the occurrence and during the continuance of an Event of Default, following the request of the Collateral Agent, all sums of money and property paid or distributed in respect of the Investment Property that are received by any Grantor shall be held by the Grantors in trust for the benefit of the Collateral Agent segregated from such Grantor's other property, and such Grantor shall deliver it forthwith to the Collateral Agent in the exact form received, in each case, subject to the Intercreditor Agreement.

(iii)     Following the occurrence and during the continuance of an Event of Default, each Grantor shall promptly deliver to the Collateral Agent a copy of each material notice or other material communication received by it in respect of any Pledged Interests.

(iv)     No Grantor shall make or consent to any amendment or other modification or waiver with respect to any Pledged Interests, Pledged Operating Agreement, or Pledged Partnership Agreement, or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests if the same is prohibited pursuant to the Loan Documents.

KL2 3188650.7

(v)    With regard to any Pledged Interests that are not certificated, any such Grantor of such non-certificated Interests (i) agrees that after the occurrence and during the continuation of an Event of Default, it will comply with instructions of the Collateral Agent or its nominee with respect to the applicable Pledged Interests without further consent by the applicable Grantor and (ii) waives, to the extent not prohibited by applicable law, any right or requirement at any time hereafter to receive a copy of this Agreement in connection with the registration of any Pledged Interests hereunder in the name of the Collateral Agent or its nominee or the exercise of voting rights by the Collateral Agent or its nominee.

(vi)    As to all limited liability company or partnership interests owned by such Grantor and issued under any Pledged Operating Agreement or Pledged Partnership Agreement, each Grantor hereby covenants that the Pledged Interests issued pursuant to such agreement (A) are not and shall not be dealt in or traded on securities exchanges or in securities markets, (B) do not and will not constitute investment company securities, and (C) are not and will not be held by such Grantor in a securities account. In addition, none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement or Pledged Partnership Agreement, provides or shall provide that such Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction.

(e)    [Reserved].

(f)    Transfers and Other Liens. Grantors shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral, except as permitted by the Credit Agreement, or (ii) create or permit to exist any Lien upon or with respect to any of the Collateral of any Grantor, except for Permitted Liens. The inclusion of Proceeds in the Collateral shall not be deemed to constitute the Collateral Agent's consent to any sale or other disposition of any of the Collateral.

(g)    [Reserved].

(h)    Account Verification. During the continuance of an Event of Default, each Grantor will, and will cause each of its Subsidiaries to, permit the Collateral Agent, in the Collateral Agent's name or in the name or a nominee of the Collateral Agent, to verify (it being understood that the Collateral Agent shall have no obligation to do so) the validity, amount or any other matter relating to any Account, by mail, telephone, facsimile transmission or other electronic means of transmission or otherwise. Further, during the continuance of an Event of Default, at the request of the Collateral Agent (it being understood that the Collateral Agent shall have no obligation to so request), each Grantor will, and will cause each of its Subsidiaries to, send requests for verification of Accounts or, send notices of assignment of Accounts to Account Debtors and other obligors.

7.    Relation to Other Collateral Documents. The provisions of this Agreement shall be read and construed with the other Loan Documents referred to below in the manner so indicated.

KL2 3188650.7

(a)    Credit Agreement. In the event of any conflict between any provision in this Agreement and a provision in the Credit Agreement, such provision of the Credit Agreement shall control.

(b)    Patent, Trademark, Copyright Security Agreements. The provisions of the Copyright Security Agreements, Trademark Security Agreements, and Patent Security Agreements, if any, are supplemental to the provisions of this Agreement, and nothing contained in the Copyright Security Agreements, Trademark Security Agreements, or the Patent Security Agreements shall limit any of the rights or remedies of the Collateral Agent hereunder. In the event of any conflict between any provision in this Agreement and a provision in a Copyright Security Agreement, Trademark Security Agreement or Patent Security Agreement, such provision of this Agreement shall control.

8.    Further Assurances.

(a)    Subject to the limitations set forth in Section 3 and elsewhere in this Agreement, each Grantor agrees that from time to time, at its own expense, such Grantor will promptly execute and deliver and file (if applicable) all further instruments and documents, and take all further action (including the filing of UCC-3 continuation statements), that are necessary or that the Collateral Agent may reasonably request, in order to perfect and protect the Security Interest granted hereby, to create, perfect or protect the Security Interest purported to be granted hereby or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any of the Collateral.

(b)    Each Grantor authorizes the filing by the Collateral Agent of financing or continuation statements, or amendments thereto, and such Grantor will execute and deliver to the Collateral Agent such other instruments or notices, as the Collateral Agent may reasonably request, in order to perfect and preserve the Security Interest granted or purported to be granted hereby.

(c)    Each Grantor authorizes the Collateral Agent at any time and from time to time to file, transmit, or communicate, as applicable, financing statements and amendments (i) describing the Collateral as "all personal property of debtor" or "all assets of debtor" or words of similar effect, (ii) describing the Collateral as being of equal or lesser scope or with greater detail, or (iii) that contain any information required by part 5 of Article 9 of the Code for the sufficiency or filing office acceptance. Each Grantor also hereby ratifies any and all financing statements or amendments previously filed by the Collateral Agent in any jurisdiction. For the avoidance of doubt, and notwithstanding the foregoing authorization or any other provision of this Agreement, each Grantor acknowledges its obligation to take all the actions required under Section 3 hereof and elsewhere in this Agreement to perfect the Security Interests and/or Liens granted by the Security Documents and that the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any Security Interest or Lien in the Collateral.

(d)    Each Grantor acknowledges that it is not authorized to file any release amendment or termination statement with respect to any financing statement filed in connection

18

with this Agreement without the prior written consent of the Collateral Agent, subject to such Grantor's rights under Section 9-509(d)(2) of the Code.

9.    <u>Collateral Agent's Right to Perform Contracts, Exercise Rights, etc</u>. Subject to the Intercreditor Agreement, upon the occurrence and during the continuance of an Event of Default, the Collateral Agent (or its designee) (a) may (but shall not be obligated to) proceed to perform any and all of the obligations of any Grantor contained in any contract, lease, or other agreement and exercise any and all rights of any Grantor therein contained as fully as such Grantor itself could, (b) shall have the right (but not the obligation) (subject to <u>Section 16(b)</u>) to use any Grantor's rights under Intellectual Property Licenses in connection with the enforcement of the Collateral Agent's rights hereunder, including the right to prepare for sale and sell any and all Inventory and Equipment now or hereafter owned by any Grantor and now or hereafter covered by such licenses, and (c) shall have the right (but not the obligation) to request that any Capital Stock that is pledged hereunder be registered in the name of the Collateral Agent or any of its nominees.

10.    <u>Collateral Agent Appointed Attorney-in-Fact</u>. Each Grantor hereby irrevocably appoints the Collateral Agent its attorney-in-fact until the Termination Date, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, at such time as an Event of Default has occurred and is continuing under the Credit Agreement, subject to the Intercreditor Agreement, to take any action and to execute any instrument which the Collateral Agent may reasonably deem necessary or advisable to accomplish the purposes of this Agreement, including:

(a)    to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Accounts or any other Collateral of such Grantor;

(b)    to receive, indorse, and collect any drafts or other instruments, documents, Negotiable Collateral or Chattel Paper;

(c)    to file any claims or take any action or institute any proceedings which the Collateral Agent may deem necessary for the collection of any of the Collateral of such Grantor or otherwise to enforce the rights of the Collateral Agent with respect to any of the Collateral;

(d)    to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to such Grantor in respect of any Account of such Grantor;

(e)    to use any Intellectual Property owned by such Grantor or Intellectual Property Licenses of such Grantor (to the extent permitted by such Intellectual Property Licenses), including but not limited to any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, or advertising matter, in preparing for sale, advertising for sale, or selling Inventory or other Collateral and to collect any amounts due under Accounts, contracts or Negotiable Collateral of such Grantor; and

(f)    subject to the Intercreditor Agreement, the Collateral Agent, on behalf of the Secured Parties, shall have the right, but shall not be obligated, to bring suit in its own name

19

to enforce the Intellectual Property and Intellectual Property Licenses and, if the Collateral Agent shall commence any such suit, the appropriate Grantor shall, at the request of the Collateral Agent, do any and all lawful acts and execute any and all proper documents reasonably required by the Collateral Agent in aid of such enforcement.

To the extent permitted by law, each Grantor hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated.

11.    <u>Collateral Agent May Perform</u>. If any Grantor fails to perform any agreement contained herein, the Collateral Agent may (but shall not be obligated to) itself perform, or cause performance of, such agreement, and the reasonable and documented expenses of the Collateral Agent incurred in connection therewith shall be payable, jointly and severally, by Grantors in accordance with the terms of the Credit Agreement.

12.    <u>Collateral Agent's Duties</u>. The powers conferred on the Collateral Agent hereunder are solely to protect the Collateral Agent's interest in the Collateral, for the benefit of the Secured Parties, and shall not impose any duty upon the Collateral Agent to exercise any such powers. Except for the safe custody of any Collateral in its actual possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its actual possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property.

13.    <u>Collection of Accounts, General Intangibles and Negotiable Collateral</u>. At any time upon the occurrence and during the continuance of an Event of Default, subject to the Intercreditor Agreement, the Collateral Agent or the Collateral Agent's designee may (a) make direct verification from Account Debtors with respect to any or all Accounts that are part of the Collateral, (b) notify Account Debtors of any Grantor that the Accounts, General Intangibles, Chattel Paper or Negotiable Collateral of such Grantor have been collaterally assigned to the Collateral Agent, for the benefit of the Secured Parties, or that the Collateral Agent has a security interest therein, or (c) collect the Accounts, General Intangibles and Negotiable Collateral of any Grantor directly, and any reasonable and documented collection costs and expenses shall constitute part of such Grantor's Secured Obligations under the Loan Documents.

14.    <u>Disposition of Pledged Interests by the Collateral Agent</u>. To the extent that any Pledged Interests have not been registered or qualified under the various federal or state securities laws of the United States, disposition thereof after an Event of Default has occurred and is continuing may be restricted to one or more private (instead of public) sales in view of the lack of such registration. Each Grantor understands that in connection with such disposition, the Collateral Agent may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Interests than if the Pledged Interests were registered and qualified pursuant to federal and state securities laws and sold on the open market. Each Grantor, therefore, agrees that: (a) if the Collateral Agent shall, pursuant to the terms of this Agreement, sell or cause the Pledged Interests or any portion thereof to be sold at a private sale, the Collateral Agent shall have the right to rely upon the advice and

KL2 3188650.7

opinion of any nationally recognized brokerage or investment firm (but shall not be obligated to seek such advice and the failure to do so shall not be considered in determining the commercial reasonableness of such action) as to the best manner in which to offer the Pledged Interest or any portion thereof for sale and as to the best price reasonably obtainable at the private sale thereof, and (b) such reliance shall be conclusive evidence that the Collateral Agent has handled the disposition in a commercially reasonable manner.

15.    <u>Voting and Other Rights in Respect of Pledged Interests</u>.

(a)    Upon the occurrence and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement, (i) the Collateral Agent may, at its option, and with two (2) Business Days prior notice to any Grantor (unless such Event of Default is an Event of Default specified in <u>Sections 7.01(h)</u> or <u>7.01(i)</u> of the Credit Agreement, in which case no such notice need be given), and in addition to all rights and remedies available to the Collateral Agent under any other agreement, at law, in equity, or otherwise, exercise all voting rights, or any other ownership or consensual rights (including any dividend or distribution rights) in respect of the Pledged Interests owned by such Grantor, but under no circumstances is the Collateral Agent obligated by the terms of this Agreement to exercise such rights, and (ii) if the Collateral Agent duly exercises its right to vote any of such Pledged Interests, each Grantor hereby appoints the Collateral Agent, such Grantor's true and lawful attorney-in-fact and IRREVOCABLE PROXY to vote such Pledged Interests in any manner the Collateral Agent deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be. The power-of-attorney and proxy granted hereby is coupled with an interest and shall be irrevocable until the Termination Date.

(b)    For so long as any Grantor shall have the right to vote the Pledged Interests owned by it, such Grantor covenants and agrees that it will not, without the prior written consent of the Collateral Agent, acting at the written direction of the Required Lenders, vote or take any consensual action with respect to such Pledged Interests which would be prohibited by the Credit Agreement.

(c)    Each Grantor, in its capacities as a "Member" "Manager", "Managing Member" and/or "Managing Partner" of each of its Subsidiaries (as applicable), hereby irrevocably:

(i)    Waives, to the extent not prohibited by applicable law, any and all provisions of any partnership or management agreement, limited liability company agreement, and operating agreement of each Subsidiary of such Grantor (as applicable) that (A) prohibit, restrict, condition or otherwise affect the grant hereunder of any Lien on any of the Pledged Interests (or any enforcement action which may be taken in respect of any such Lien, including, without limitation, any foreclosure upon, substitution of, or subsequent disposition of such Capital Stock by the Collateral Agent or any other Secured Party) or (B) otherwise conflict with the terms of this Agreement; and

(ii)    agrees that, notwithstanding anything to the contrary contained in any partnership or management agreement, limited liability company agreement, and operating agreement of each Subsidiary of such Grantor (as applicable), (A) such Grantor's pledge of its

21

ownership interest in its Subsidiaries, including all economic rights, control rights and status rights as a "Member," "Manager," "Managing Member" and/or "Managing Partner," pursuant to this Agreement to the Collateral Agent, for the benefit of the Secured Parties, and any transfer of such ownership interest in its Subsidiaries and such rights pursuant to the Collateral Agent's exercise of remedies in connection with such pledge shall be permitted under any such partnership or management agreement, limited liability company agreement, and operating agreement of each Subsidiary of such Grantor (as applicable) with no further action or approval required by Grantor, (B) the Collateral Agent shall have the right, as set forth and subject to the terms and conditions in this Agreement, and without further approval of any Grantor and without becoming a "Member," "Manager," "Managing Member" and/or "Managing Partner" under any such partnership or management agreement, limited liability company agreement, and operating agreement of each Subsidiary of such Grantor (as applicable), to exercise the membership or partnership voting rights of the Grantor thereunder, and (C) following any exercise of remedies in respect of the Pledged Interests by the Collateral Agent or the transferee or designee of the Collateral Agent, the pledging Grantor, at the election of the Collateral Agent or the transferee or designee of the Collateral Agent, as the case may be, shall cease to be a "Member," "Manager," "Managing Member" and/or "Managing Partner," as applicable, and shall have no further rights or powers under the partnership or management agreement, limited liability company agreement, or operating agreement of the applicable Subsidiary of such Grantor.

In furtherance of the foregoing, each Grantor hereby agrees that, by its signature below, this Agreement shall constitute the consent and approval of such Grantor under each such partnership or management agreement, limited liability company agreement, and operating agreement of each Subsidiary of such Grantor to each of the transactions contemplated hereby (including, without limitation, any foreclosure upon or subsequent disposition of such Capital Stock by the Collateral Agent or any other Secured Party, to the extent any such consent or approval is required thereunder for all purposes (including, without limitation, under the Delaware Limited Liability Company Act, as amended).

16.    Remedies. Upon the occurrence and during the continuance of an Event of Default, subject to the Intercreditor Agreement:

(a)    the Collateral Agent may, and, at the instruction of the Required Lenders and subject to Section 19, shall exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it, all the rights and remedies of a secured party on default under the Code or any other applicable law. Without limiting the generality of the foregoing, each Grantor expressly agrees that, in any such event, the Collateral Agent without demand of performance or other demand, advertisement or notice of any kind (except a notice specified below of time and place of public or private sale) to or upon any Grantor or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the Code or any other applicable law), may take immediate possession of all or any portion of the Collateral and (i) require Grantors to, and each Grantor hereby agrees that it will at its own expense and upon request of the Collateral Agent forthwith, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at one or more locations where such Grantor regularly maintains Inventory, and (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Collateral Agent's

22

offices or elsewhere, for cash, on credit, and upon such other terms as the Collateral Agent may deem commercially reasonable. Each Grantor agrees that, to the extent notification of sale shall be required by law, at least ten (10) days' notification by mail to the applicable Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification and specifically such notification shall constitute a reasonable "authenticated notification of disposition" within the meaning of Section 9-611 of the Code. The Collateral Agent shall not be obligated to make any sale of Collateral regardless of notification of sale having been given. The Collateral Agent may adjourn any public sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor agrees, to the extent not prohibited by applicable law, that (A) the internet shall constitute a "place" for purposes of Section 9-610(b) of the Code, and (B) to the extent notification of sale shall be required by law, notification by mail of the URL where a sale will occur and the time when a sale will commence at least ten (10) days prior to the sale shall constitute a reasonable notification for purposes of Section 9-611(b) of the Code. Each Grantor agrees that any sale of Collateral to a licensor pursuant to the terms of a license agreement between such licensor and a Grantor is sufficient to constitute a commercially reasonable sale (including as to method, terms, manner, and time) within the meaning of Section 9-610 of the Code.

(b)     The Collateral Agent is hereby granted (to the extent grantable without such Grantor breaching or violating any agreement) a non-exclusive license or other right to use (subject, in the case of Trademarks, to sufficient rights to quality control and inspection in favor of such Grantor to avoid the risk of invalidation of such Trademarks and in the case of trade secrets, to an obligation of the Collateral Agent to take reasonable steps under the circumstances to keep the trade secrets confidential to avoid the risk of invalidation of such trade secrets), without liability for royalties or any other charge, each Grantor's Intellectual Property, including but not limited to, any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, and advertising matter, whether owned by any Grantor or with respect to which any Grantor has rights under license, sublicense, or other agreements (including any Intellectual Property License), as it pertains to the Collateral, in preparing for sale, advertising for sale and selling any Collateral, and each Grantor's rights under all licenses and all franchise agreements shall inure to the benefit of the Collateral Agent.

(c)     Any cash held by the Collateral Agent as Collateral and all cash proceeds received by the Collateral Agent in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied against the Secured Obligations on a *pari passu* basis in the order set forth in the Credit Agreement. In the event the proceeds of Collateral are insufficient to satisfy all of the Secured Obligations in full, each Grantor shall remain jointly and severally liable for any such deficiency.

(d)     Each Grantor hereby acknowledges that the Secured Obligations arise out of a commercial transaction, and agrees that if an Event of Default shall occur and be continuing the Collateral Agent shall have the right to an immediate writ of possession without notice of a hearing. The Collateral Agent shall have the right to the appointment of a receiver for the properties and assets of each Grantor, and each Grantor hereby consents to such rights and such appointment and hereby waives any objection such Grantor may have thereto or the right to have a bond or other security posted by the Collateral Agent.

23

17.    <u>Remedies Cumulative</u>. Each right, power, and remedy of the Collateral Agent or any other Secured Party as provided for in this Agreement or the other Loan Documents now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in this Agreement and the other Loan Documents now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by the Collateral Agent or any other Secured Party, of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by the Collateral Agent or such Secured Party of any or all such other rights, powers, or remedies.

18.    <u>Impairment</u>. Neither the Borrower nor any of the Grantors will be permitted to take any action, or knowingly or negligently omit to take any action, which action or omission might or would have the result of materially impairing the security interest with respect to the Collateral for the benefit of the Secured Parties.

19.    <u>Voting Provisions</u>. Subject to the terms of the Intercreditor Agreement, except as provided in the succeeding sentence, in the case of an Event of Default under the Credit Agreement the Collateral Agent will only be permitted, subject to applicable law, to exercise remedies and sell Collateral at the written direction of the Required Lenders. If the Collateral Agent has asked the holders of the Secured Obligations for instruction and the applicable holders have not yet responded to such request, the Collateral Agent will be authorized to take, but will not be required to take, and will in no event have any liability for taking, any delay in taking or the failure to take, such actions with regard to a Default or Event of Default which the Collateral Agent, in good faith, believes to be reasonably required to promote and protect the interests of the Secured Parties and to preserve the value of the Collateral; <u>provided</u> that once instructions from the applicable Secured Parties have been received by the Collateral Agent (accompanied by indemnity or security satisfactory to the Collateral Agent, if requested by the Collateral Agent), the actions of the Collateral Agent will be governed thereby and the Collateral Agent will not take any further action which would be contrary thereto, subject to the Collateral Agent's rights under the Credit Agreement and hereunder.

20.    <u>Marshaling</u>. The Collateral Agent shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, each Grantor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Collateral Agent's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

21.    <u>Indemnity</u>. Each Grantor agrees to indemnify the Collateral Agent and the other Secured Parties from and against all claims, lawsuits and liabilities (including reasonable attorneys' fees) arising out of or resulting from this Agreement (including enforcement of this

24

Agreement) or any other Loan Document to which such Grantor is a party in accordance with and to the extent set forth in Sections 8.02, 8.07 and 9.05 of the Credit Agreement. This provision shall survive the termination of this Agreement and the Credit Agreement and the repayment of the Secured Obligations and the resignation or removal of the Collateral Agent in accordance with the Credit Agreement subject to any approval required pursuant to the Credit Agreement or any other Loan Document.

22.    Merger, Amendments; Etc. THIS AGREEMENT, TOGETHER WITH THE OTHER LOAN DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES. No waiver of any provision of this Agreement, and no consent to any departure by any Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Collateral Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No amendment of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Collateral Agent and each Grantor to which such amendment applies.

23.    Addresses for Notices. All notices and other communications provided for hereunder shall be given in the form and manner and delivered to the Collateral Agent at its address specified in the Credit Agreement, and to any of the Grantors at the notice address specified for the Borrower in the Credit Agreement, or as to any party, at such other address as shall be designated by such party in a written notice to the other party.

24.    Continuing Security Interest: Assignments under Credit Agreement.

(a)    This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until all Obligations are Paid in Full and the Credit Agreement, each in accordance with the provisions of the Loan Documents, (ii) be binding upon each Grantor, and their respective successors and assigns, and (iii) inure to the benefit of, and be enforceable by, the Collateral Agent, and its successors, transferees and assigns. Without limiting the generality of the foregoing clause (iii), any Secured Party may, in accordance with the provisions of the Credit Agreement, assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Secured Party herein or otherwise. Upon payment in full of the Secured Obligations in accordance with the provisions of the Loan Documents (other than contingent obligations for which a claim has not been made) and termination of the Credit Agreement (such date of payment in full, and termination, the "Termination Date"), the Security Interest granted hereby and any powers of attorney contained herein shall automatically terminate and all rights to the Collateral shall automatically revert to Grantors or any other Person entitled thereto. At such time, upon the Borrower's written request and at the Borrower's expense, the Collateral Agent will authorize the filing of appropriate termination statements or other release documentation to terminate such Security Interest. No transfer or renewal, extension, assignment, or termination of this Agreement, any other Loan Document, or any other instrument or document executed and delivered by any Grantor to the Collateral Agent, nor the taking of further security, nor the retaking or re-delivery of the Collateral

25

to Grantors, or any of them, by the Collateral Agent, nor any other act of the Secured Parties, or any of them, shall release any Grantor from any obligation, except a release or discharge executed in writing by the Collateral Agent in accordance with the provisions of the Credit Agreement. The Collateral Agent shall not by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by the Collateral Agent and then only to the extent therein set forth. A waiver by the Collateral Agent of any right or remedy on any occasion shall not be construed as a bar to the exercise of any such right or remedy which the Collateral Agent would otherwise have had on any other occasion.

(b)    The Liens securing the Secured Obligations will be automatically released, in whole or in part, as provided in Section 9.18 of the Credit Agreement.

(c)    If any Secured Party repays, refunds, restores, or returns in whole or in part, any payment or property (including any proceeds of Collateral) previously paid or transferred to such Secured Party in full or partial satisfaction of any Secured Obligation or on account of any other obligation of any Grantor under any Loan Document, because the payment, transfer, or the incurrence of the obligation so satisfied is asserted or declared to be void, voidable, or otherwise recoverable under any law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent transfers, preferences, or other voidable or recoverable obligations or transfers (each, a "Voidable Transfer"), or because such Secured Party elects to do so on the reasonable advice of its counsel in connection with a claim that the payment, transfer, or incurrence is or may be a Voidable Transfer, then, as to any such Voidable Transfer, or the amount thereof that such Secured Party elects to repay, restore, or return (including pursuant to a settlement of any claim in respect thereof), and as to all reasonable costs, expenses, and outside counsel attorneys' fees of such Secured Party related thereto, (i) the liability of the Grantors with respect to the amount or property paid, refunded, restored, or returned will automatically and immediately be revived, reinstated, and restored and will exist, and (ii) the Collateral Agent's Liens securing such liability shall be effective, revived, and remain in full force and effect, in each case, as fully as if such Voidable Transfer had never been made. If, prior to any of the foregoing, (A) the Collateral Agent's Liens shall have been released or terminated, or (B) any provision of this Agreement shall have been terminated or cancelled, the Collateral Agent's Liens, or such provision of this Agreement, shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligation of any Grantor in respect of such liability or any Collateral securing such liability.

25.    Survival. All representations and warranties made by the Grantors in this Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Collateral Agent or any Secured Party may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty as of the Closing Date, and shall continue in full force and effect until all of the Obligations are Paid in Full and the Credit Agreement terminated in accordance with its terms.

26.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

26

(a)    THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK; PROVIDED, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE COLLATERAL AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE COLLATERAL AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH GRANTOR AND THE COLLATERAL AGENT WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 26(b).

(c)    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH GRANTOR AND THE COLLATERAL AGENT HEREBY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "CLAIM"). EACH GRANTOR AND THE COLLATERAL AGENT REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)    EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK AND THE STATE OF NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE COLLATERAL AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

27

(e)    NO CLAIM MAY BE MADE BY ANY GRANTOR AGAINST THE COLLATERAL AGENT, THE SECURED PARTIES, OR THE BORROWER, OR ANY AFFILIATE, DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION HEREWITH, AND EACH GRANTOR HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

27.    New Subsidiaries. Pursuant to Section 5.09 of the Credit Agreement, new Subsidiaries (whether by acquisition or creation) of any Grantor are required to enter into this Agreement by executing and delivering in favor of the Collateral Agent a Joinder to this Agreement in substantially the form of Annex 1. Upon the execution and delivery of Annex 1 by any such new Subsidiary, such Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein. The execution and delivery of any instrument adding an additional Grantor as a party to this Agreement shall not require the consent of any Grantor hereunder. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor hereunder.

28.    Collateral Agent. Each reference herein to any right granted to, benefit conferred upon or power exercisable by the "Collateral Agent" shall be a reference to the Collateral Agent, for the benefit of the Secured Parties.

29.    [Intercreditor Agreement Control. Any reference in this Agreement or any other Loan Document to "first priority lien" "or second priority" or words of similar effect in describing the Liens created hereunder or under any other Loan Document shall be understood to refer to such priority as set forth in the Intercreditor Agreement. Nothing in this Section 29 shall be construed to provide that any Grantor is a third party beneficiary of the provisions of the Intercreditor Agreement or may assert any rights, defenses or claims on account of the Intercreditor Agreement or this Section 29 (other than as set forth in the last sentence hereof), and each Grantor agrees that nothing in the Intercreditor Agreement is intended or shall impair the obligation of any Grantor to pay the obligations under this Agreement, or any other Loan Document as and when the same become due and payable in accordance with their respective terms, or to affect the relative rights of the creditors with respect to any Grantor or except as expressly otherwise provided in the Intercreditor Agreement as to a Grantor's obligations, such Grantor's properties. In furtherance of the foregoing, notwithstanding anything to the contrary set forth herein, prior to the payment in full of the New ABL Obligations to the extent that any Grantor is required to (i) give physical possession over any Collateral (other than [Term Loan Priority Collateral]) to the Collateral Agent under this Agreement or the other Loan Documents, such requirement to give possession shall be satisfied if such Collateral is delivered to and held by the New ABL Facility Administrative Agent pursuant to the Intercreditor Agreement, and (ii) take any other action with respect to the Collateral (other than [Term Loan Priority Collateral]) or any proceeds thereof, including delivery of such Collateral or proceeds thereof to the Collateral Agent, such action shall be deemed satisfied to the extent undertaken with respect to the New ABL Facility Administrative Agent. In the event of any

28

conflict between the terms of the Intercreditor Agreement and this Agreement, as between the [ABL Claimholders (as defined in the Intercreditor Agreement)] and the [Term Loan Claimholders] (as each term is defined in the Intercreditor Agreement), the terms of the Intercreditor Agreement shall govern and control.][1]

30.    Miscellaneous.

(a)    This Agreement is a Loan Document. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

(b)    Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

(c)    Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

(d)    Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against any Secured Party, or any Grantor, whether under any rule of construction or otherwise. This Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

31.    Concerning the Collateral Agent.

The Bank of New York Mellon Trust Company, N.A. is entering into this Agreement solely in its capacity as collateral agent under the Credit Agreement and not in its individual capacity. In acting hereunder, the Collateral Agent shall be entitled to all of the rights, privileges, protections, indemnities and immunities set forth in the Credit Agreement as if such rights, privileges, protections, indemnities and immunities were set forth herein.

The Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Security Interests of the Liens in any of the Collateral, whether impaired by operation of law or by reason

---

[1] Subject to review of the Intercreditor Agreement.

of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Collateral Agent, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Grantors to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral.

The recitals contained herein shall be taken as the statements of the Grantors and the Collateral Agent assumes no responsibility for their correctness. The Collateral Agent makes no representations as to the validity or sufficiency of this Agreement.

[Signature pages follow]

30

IN WITNESS WHEREOF, the undersigned parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

**"Grantors"**

**[Borrower],** a Delaware [corporation/llc]

By: _____
Name: _____
Title: _____

**[OTHER GRANTORS TO BE ADDED]**

**"Collateral Agent"**

**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO TERM LOAN COLLATERAL AGREEMENT]

ANNEX 1 TO TERM LOAN COLLATERAL AGREEMENT
FORM OF JOINDER

Joinder No. _____ (this "Joinder"), dated as of _____ 20___, to the Term Loan Collateral Agreement, dated as of [_____], 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Term Loan Collateral Agreement"), by and among each of the parties listed on the signature pages thereto and those additional entities that thereafter become parties thereto (collectively, jointly and severally, "Grantors" and each, individually, a "Grantor") and **THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,** not in its individual capacity, but solely in its capacity as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent").

W I T N E S S E T H :

**WHEREAS**, reference is made to that certain Term Loan Credit Agreement, dated as of [___], 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), by and among [_____], a Delaware [corporation/limited liability company], as borrower (the "Borrower"), the Grantors party thereto, as guarantors, The Bank of New York Mellon Trust Company, N.A., as administrative agent for the Lenders (in such capacity, the "Administrative Agent") and Collateral Agent, and each of the Lenders party thereto;

**WHEREAS**, initially capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Term Loan Collateral Agreement or, if not defined therein, in the Credit Agreement, and this Joinder shall be subject to the rules of construction set forth in Section 1(b) of the Term Loan Collateral Agreement, which rules of construction are incorporated herein by this reference, *mutatis mutandis*;

**WHEREAS**, pursuant to Section 5.09 of the Credit Agreement and Section 28 of the Term Loan Collateral Agreement, certain Subsidiaries of the Borrower, must execute and deliver certain Loan Documents, including the Term Loan Collateral Agreement, and the joinder to the Term Loan Collateral Agreement by the undersigned new Grantor or Grantors (collectively, the "New Grantors") may be accomplished by the execution of this Joinder in favor of the Collateral Agent, for the benefit of the Secured Parties; and

**WHEREAS**, each New Grantor is a Subsidiary of the Borrower and, as such, by becoming a Grantor will benefit from certain rights granted to the Grantors pursuant to the terms of the Loan Documents.

**NOW, THEREFORE**, for and in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each New Grantor hereby agrees as follows:

1.      In accordance with Section 28 of the Term Loan Collateral Agreement, each New Grantor, by its signature below, becomes a "Grantor" under the Term Loan Collateral Agreement with the same force and effect as if originally named therein as a "Grantor" and each New Grantor hereby (a) agrees to all of the terms and provisions of the Term Loan Collateral Agreement applicable to it as a "Grantor" thereunder, and (b) represents and warrants that the representations and warranties made by it as a "Grantor" thereunder are true and correct in all material respects

1

(except that such materiality qualifier shall not be applicable to any representations and warranties that are already qualified or modified by materiality in the text thereof) on and as of the date hereof. In furtherance of the foregoing, each New Grantor hereby unconditionally grants and pledges to the Collateral Agent, for the benefit of the Secured Parties, to secure the Secured Obligations, a continuing security interest in and to all of such New Grantor's right, title and interest in and to the Collateral (as defined in Section 2 of the Term Loan Collateral Agreement). Each reference to a "Grantor" in the Term Loan Collateral Agreement shall be deemed to include each New Grantor. The Term Loan Collateral Agreement is incorporated herein by reference.

2.      Schedule 1, "Commercial Tort Claims," Schedule 2, "Copyrights," Schedule 3, "Intellectual Property Licenses," Schedule 4, "Patents," Schedule 5, "Pledged Companies," Schedule 6, "Trademarks," Schedule 7, Name; Chief Executive Office; Tax Identification Numbers and Organizational Numbers, Schedule 8, "Owned Real Property," Schedule 10, "Controlled Account Banks," and Schedule 11, "List of Uniform Commercial Code Filing Jurisdictions" attached hereto supplement Schedule 1, Schedule 2, Schedule 3, Schedule 4, Schedule 5, Schedule 6, Schedule 7, Schedule 8, Schedule 10, and Schedule 11 respectively, to the Perfection Certificate and shall be deemed a part thereof for all purposes of the Term Loan Collateral Agreement.

3.      Each New Grantor agrees at any time and from time to time to file, transmit, or communicate, as applicable, financing statements and amendments thereto (a) describing the Collateral as "all personal property of debtor" or "all assets of debtor" or words of similar effect, (b) describing the Collateral as being of equal or lesser scope or with greater detail, or (c) that contain any information required by part 5 of Article 9 of the Code for the sufficiency or filing office acceptance. Each New Grantor also hereby ratifies any and all financing statements or amendments previously filed in any jurisdiction in connection with the Loan Documents.

4.      Each New Grantor represents and warrants to the Collateral Agent and the other Secured Parties that this Joinder has been duly executed and delivered by such New Grantor and constitutes its legal, valid, and binding obligation, enforceable against it in accordance with its terms, except as enforceability thereof may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium, or other similar laws affecting creditors' rights generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

5.      This Joinder is a Loan Document. This Joinder may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Joinder. Delivery of an executed counterpart of this Joinder by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Joinder. Any party delivering an executed counterpart of this Joinder by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Joinder but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Joinder.

6.      The Term Loan Collateral Agreement, as supplemented hereby, shall remain in full force and effect.

KL2 3188650.7

7.        THIS JOINDER SHALL BE SUBJECT TO THE PROVISIONS REGARDING CHOICE OF LAW AND VENUE AND JURY TRIAL WAIVER SET FORTH IN <u>SECTION 26</u> OF THE TERM LOAN COLLATERAL AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

8.        The Bank of New York Mellon Trust Company, N.A. is entering into this Joinder solely in its capacity as collateral agent under the Credit Agreement and not in its individual capacity. In acting hereunder, the Collateral Agent shall be entitled to all of the rights, privileges, protections, indemnities and immunities set forth in the Credit Agreement and the Term Loan Collateral Agreement as if such rights, privileges and immunities were set forth herein. The recitals contained herein shall be taken as the statements of the Grantors and the Collateral Agent assumes no responsibility for their correctness. The Collateral Agent makes no representations as to the validity or sufficiency of this Joinder.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

KL2 3188650.7

**IN WITNESS WHEREOF**, the parties hereto have caused this Joinder to the Term Loan Collateral Agreement to be executed and delivered as of the day and year first above written.

**NEW GRANTORS:**                    **[NAME OF NEW GRANTOR]**


By: _____
Name: _____
Title: _____

**[NAME OF NEW GRANTOR]**


By: _____
Name: _____
Title: _____


**COLLATERAL AGENT:**                **THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.**


By: _____
Name: _____
Title: _____


[SIGNATURE PAGE TO JOINDER NO. [__] TO SECURITY AGREEMENT]

<u>**EXHIBIT A**</u>

**COPYRIGHT SECURITY AGREEMENT**

This COPYRIGHT SECURITY AGREEMENT (this "<u>Copyright Security Agreement</u>") is made this ___ day of _____, 20__, by and among Grantors listed on the signature pages hereof (collectively, jointly and severally, "<u>Grantors</u>" and each individually "<u>Grantor</u>"), and **THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, not in its individual capacity, but solely in its capacity as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "<u>Collateral Agent</u>").

W I T N E S S E T H :

**WHEREAS**, reference is made to that certain Term Loan Credit Agreement, dated as of [___], 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among [_____], a Delaware [corporation/limited liability company], as borrower (the "<u>Borrower</u>"), the Grantors party thereto, as guarantors, The Bank of New York Mellon Trust Company, N.A., as administrative agent for the Lenders (in such capacity, the "<u>Administrative Agent</u>") and Collateral Agent, and each of the Lenders party thereto;

**WHEREAS**, the Grantors shall have executed and delivered to the Collateral Agent, for the benefit of the Secured Parties, that certain Term Loan Collateral Agreement, dated as of [____], 2020 (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "<u>Term Loan Collateral Agreement</u>"); and

**WHEREAS**, pursuant to the Term Loan Collateral Agreement, the Grantors are required to execute and deliver to the Collateral Agent, for the benefit of the Secured Parties, this Copyright Security Agreement.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors hereby agree as follows:

1.      <u>DEFINED TERMS</u>. All initially capitalized terms used but not otherwise defined herein have the meanings given to them in the Term Loan Collateral Agreement or, if not defined therein, in the Credit Agreement, and this Copyright Security Agreement shall be subject to the rules of construction set forth in <u>Section 1(b)</u> of the Term Loan Collateral Agreement, which rules of construction are incorporated herein by this reference, *mutatis mutandis*.

2.      <u>GRANT OF SECURITY INTEREST IN COPYRIGHT COLLATERAL</u>. Each Grantor hereby unconditionally grants and pledges to the Collateral Agent, for the benefit of the Secured Parties, to secure the Secured Obligations, a continuing security interest (referred to in this Copyright Security Agreement as the "<u>Security Interest</u>") in all of such Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising (collectively, the "<u>Copyright Collateral</u>"):

(a)      all of such Grantor's Copyrights and registered Copyrights exclusively licensed to such Grantor, including those referred to on <u>Schedule I</u>;

1

(b)    all renewals or extensions of the foregoing; and

(c)    all products and proceeds of the foregoing, including any claim by such Grantor against third parties for past, present or future infringement of any Copyright or any Copyright exclusively licensed under any Intellectual Property License, including the right to receive damages, or the right to receive license fees, royalties, and other compensation under any Copyright Intellectual Property License.

Notwithstanding the foregoing, no security interest is granted in and the Copyright Collateral shall not include any Excluded Property; provided that, if and when any such property shall cease to be Excluded Property, a lien on and security interest in such property (in favor of the Collateral Agent, for the benefit of the Secured Parties) shall automatically be deemed granted therein.

3.    SECURITY FOR SECURED OBLIGATIONS. This Copyright Security Agreement and the Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Copyright Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to the Collateral Agent, the other Secured Parties or any of them, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.    TERM LOAN COLLATERAL AGREEMENT. The Security Interest granted pursuant to this Copyright Security Agreement is granted in conjunction with the security interests granted to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the Term Loan Collateral Agreement. Each Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the Security Interest in the Copyright Collateral made and granted hereby are more fully set forth in the Term Loan Collateral Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. To the extent there is any inconsistency between this Copyright Security Agreement and the Term Loan Collateral Agreement, the Term Loan Collateral Agreement shall control.

5.    AGREEMENT TO SUPPLEMENT. Grantors, when required pursuant to Section 6(c) of the Term Loan Collateral Agreement, hereby agree to modify this Copyright Security Agreement by amending Schedule I to include any future United States registered copyrights or applications therefor of each Grantor. Notwithstanding the foregoing, no failure to so modify this Copyright Security Agreement or amend Schedule I shall in any way affect, invalidate or detract from the Collateral Agent's continuing security interest in all Collateral, whether or not listed on Schedule I.

6.    COUNTERPARTS. This Copyright Security Agreement is a Loan Document. This Copyright Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Copyright Security Agreement. Delivery of an executed counterpart of this Copyright Security Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Copyright Security Agreement. Any party

2

delivering an executed counterpart of this Copyright Security Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Copyright Security Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Copyright Security Agreement.

7.      <u>CHOICE OF LAW AND VENUE AND JURY TRIAL WAIVER</u>. THIS COPYRIGHT SECURITY AGREEMENT SHALL BE SUBJECT TO THE PROVISIONS REGARDING CHOICE OF LAW AND VENUE AND JURY TRIAL WAIVER SET FORTH IN <u>SECTION 26</u> OF THE TERM LOAN COLLATERAL AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

8.      <u>CONCERNING THE COLLATERAL AGENT</u>. The Bank of New York Mellon Trust Company, N.A. is entering into this Copyright Security Agreement solely in its capacity as collateral agent under the Credit Agreement and not in its individual capacity. In acting hereunder, the Collateral Agent shall be entitled to all of the rights, privileges, protections, indemnities and immunities set forth in the Credit Agreement and the Term Loan Collateral Agreement as if such rights, privileges, protections, indemnities and immunities were set forth herein. The recitals contained herein shall be taken as the statements of the Grantors and the Collateral Agent assumes no responsibility for their correctness. The Collateral Agent makes no representations as to the validity or sufficiency of this Copyright Security Agreement.

[SIGNATURE PAGE FOLLOWS]

KL2 3188650.7

**IN WITNESS WHEREOF**, the parties hereto have caused this Copyright Security Agreement to be executed and delivered as of the day and year first above written.

**GRANTORS:**                          **[NAME OF GRANTOR]**


By: _____

Name: _____

Title: _____

**[NAME OF GRANTOR]**


By: _____

Name: _____

Title: _____


**COLLATERAL AGENT:**                  **ACCEPTED AND ACKNOWLEDGED BY:**

**THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.**


By: _____

Name: _____

Title: _____


[SIGNATURE PAGE TO COPYRIGHT SECURITY AGREEMENT]

SCHEDULE I
TO

**COPYRIGHT SECURITY AGREEMENT**

**COPYRIGHT REGISTRATIONS**

| Grantor | Country | Copyright | Registration No. | Registration Date |
|---------|---------|-----------|------------------|-------------------|
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |

<u>**EXHIBIT B**</u>

<u>**PATENT SECURITY AGREEMENT**</u>

This PATENT SECURITY AGREEMENT (this "<u>Patent Security Agreement</u>") is made this ___ day of _____, 2020, by and among the Grantors listed on the signature pages hereof (collectively, jointly and severally, "<u>Grantors</u>" and each individually "<u>Grantor</u>"), and **THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, not in its individual capacity, but solely in its capacity as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "<u>Collateral Agent</u>").

W I T N E S S E T H:

**WHEREAS**, reference is made to that certain Term Loan Credit Agreement, dated as of [___], 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among [_____], a Delaware [corporation/limited liability company], as borrower (the "<u>Borrower</u>"), the Grantors party thereto, as guarantors, The Bank of New York Mellon Trust Company, N.A., as administrative agent for the Lenders (in such capacity, the "<u>Administrative Agent</u>") and Collateral Agent, and each of the Lenders party thereto;

**WHEREAS**, the Grantors shall have executed and delivered to the Collateral Agent, for the benefit of the Secured Parties, that certain Term Loan Collateral Agreement, dated as of [____], 2020 (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "<u>Term Loan Collateral Agreement</u>"); and

**WHEREAS**, pursuant to the Term Loan Collateral Agreement, the Grantors are required to execute and deliver to the Collateral Agent, for the benefit of the Secured Parties, this Patent Security Agreement.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

1.     <u>DEFINED TERMS</u>. All initially capitalized terms used but not otherwise defined herein have the meanings given to them in the Term Loan Collateral Agreement or, if not defined therein, in the Credit Agreement, and this Patent Security Agreement shall be subject to the rules of construction set forth in <u>Section 1(b)</u> of the Term Loan Collateral Agreement, which rules of construction are incorporated herein by this reference, *mutatis mutandis*.

2.     <u>GRANT OF SECURITY INTEREST IN PATENT COLLATERAL</u>. Each Grantor hereby unconditionally grants and pledges to the Collateral Agent, for the benefit of the Secured Parties, to secure the Secured Obligations, a continuing security interest (referred to in this Patent Security Agreement as the "<u>Security Interest</u>") in all of such Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising (collectively, the "<u>Patent Collateral</u>"):

(a)     all of its Patents , including those referred to on <u>Schedule I</u>;

1

(b)    all    divisionals,    continuations,    continuations-in-part,    reissues, reexaminations, or extensions of the foregoing; and

(c)    all products and proceeds of the foregoing, including any claim by such Grantor against third parties for past, present or future infringement of any Patent or any Patent exclusively licensed under any Intellectual Property License, including the right to receive damages, or right to receive license fees, royalties, and other compensation under any Patent Intellectual Property License.

Notwithstanding the foregoing, no security interest is granted in and the Patent Collateral shall not include any Excluded Property; provided that, if and when any such property shall cease to be Excluded Property, a lien on and security interest in such property (in favor of the Collateral Agent, for the benefit of the Secured Parties) shall automatically be deemed granted therein.

3.    SECURITY FOR SECURED OBLIGATIONS. This Patent Security Agreement and the Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Patent Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to the Collateral Agent or the other Secured Parties, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.    TERM LOAN COLLATERAL AGREEMENT. The Security Interest granted pursuant to this Patent Security Agreement is granted in conjunction with the security interests granted to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the Term Loan Collateral Agreement. Each Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the Security Interest in the Patent Collateral made and granted hereby are more fully set forth in the Term Loan Collateral Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. To the extent there is any inconsistency between this Patent Security Agreement and the Term Loan Collateral Agreement, the Term Loan Collateral Agreement shall control.

5.    AGREEMENT TO SUPPLEMENT. If any Grantor shall obtain rights to any new patent application or issued patent or become entitled to the benefit of any patent application or patent for any divisional, continuation, continuation-in-part, reissue, or reexamination of any existing patent or patent application, the provisions of this Patent Security Agreement shall automatically apply thereto. Grantors, when required pursuant to Section 6(c) of the Term Loan Collateral Agreement, hereby agree to modify this Patent Security Agreement by amending Schedule I to include any such new patent rights of each Grantor. Notwithstanding the foregoing, no failure to so modify this Patent Security Agreement or amend Schedule I shall in any way affect, invalidate or detract from the Collateral Agent's continuing security interest in all Collateral, whether or not listed on Schedule I.

6.    COUNTERPARTS. This Patent Security Agreement is a Loan Document. This Patent Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Patent

2

Security Agreement. Delivery of an executed counterpart of this Patent Security Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Patent Security Agreement. Any party delivering an executed counterpart of this Patent Security Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Patent Security Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Patent Security Agreement.

7.    <u>CHOICE OF LAW AND VENUE AND JURY TRIAL WAIVER</u>. THIS PATENT SECURITY AGREEMENT SHALL BE SUBJECT TO THE PROVISIONS REGARDING CHOICE OF LAW AND VENUE AND JURY TRIAL WAIVER SET FORTH IN <u>SECTION 26</u> OF THE TERM LOAN COLLATERAL AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

8.    <u>CONCERNING THE COLLATERAL AGENT</u>. The Bank of New York Mellon Trust Company, N.A. is entering into this Patent Security Agreement solely in its capacity as collateral agent under the Credit Agreement and not in its individual capacity. In acting hereunder, the Collateral Agent shall be entitled to all of the rights, privileges, protections, indemnities and immunities set forth in the Credit Agreement and the Term Loan Collateral Agreement as if such rights, privileges, protections, indemnities and immunities were set forth herein. The recitals contained herein shall be taken as the statements of the Grantors and the Collateral Agent assumes no responsibility for their correctness. The Collateral Agent makes no representations as to the validity or sufficiency of this Patent Security Agreement.

[SIGNATURE PAGE FOLLOWS]

KL2 3188650.7

IN WITNESS WHEREOF, the parties hereto have caused this Patent Security Agreement to be executed and delivered as of the day and year first above written.

**GRANTORS:**                                **[NAME OF GRANTOR]**

By: _____
Name: _____
Title: _____

**[NAME OF GRANTOR]**

By: _____
Name: _____
Title: _____

**COLLATERAL AGENT:**                        **ACCEPTED AND ACKNOWLEDGED BY:**

**THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.**

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO PATENT SECURITY AGREEMENT]

## SCHEDULE I
to

## PATENT SECURITY AGREEMENT

### Patents

| Grantor | Country | Patent | Application/ Patent No. | Filing Date |
|---------|---------|--------|-------------------------|-------------|
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |

<u>**EXHIBIT C**</u>

**<u>PLEDGED INTERESTS ADDENDUM</u>**

This Pledged Interests Addendum, dated as of _____ __, 20___ (this "<u>Pledged Interests Addendum</u>"), is delivered pursuant to <u>Section 6</u> of that certain Term Loan Collateral Agreement, dated as of [_____], 2020, (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Term Loan Collateral Agreement</u>"), made by the undersigned, together with the other Grantors named therein, to **THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, as the Collateral Agent. The undersigned hereby agrees that this Pledged Interests Addendum may be attached to that certain Perfection Certificate. Initially capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Term Loan Collateral Agreement or, if not defined therein, in the Credit Agreement, and this Pledged Interests Addendum shall be subject to the rules of construction set forth in <u>Section 1(b)</u> of the Term Loan Collateral Agreement, which rules of construction are incorporated herein by this reference, *mutatis mutandis*. The undersigned hereby agrees that the additional interests listed on <u>Schedule I</u> hereto shall be and become part of the Pledged Interests pledged by the undersigned to the Collateral Agent in the Term Loan Collateral Agreement and any pledged company set forth on <u>Schedule I</u> hereto shall be and become a "Pledged Company" under the Term Loan Collateral Agreement, each with the same force and effect as if originally named therein.

This Pledged Interests Addendum is a Loan Document. Delivery of an executed counterpart of this Pledged Interests Addendum by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Pledged Interests Addendum. If the undersigned delivers an executed counterpart of this Pledged Interests Addendum by telefacsimile or other electronic method of transmission, the undersigned shall also deliver an original executed counterpart of this Pledged Interests Addendum but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Pledged Interests Addendum.

The undersigned hereby certifies that the representations and warranties set forth in <u>Section 5</u> of the Term Loan Collateral Agreement of the undersigned are true and correct as to the Pledged Interests listed herein on and as of the date hereof.

THIS PLEDGED INTERESTS ADDENDUM SHALL BE SUBJECT TO THE PROVISIONS REGARDING CHOICE OF LAW AND VENUE AND JURY TRIAL WAIVER SET FORTH IN <u>SECTION 26</u> OF THE TERM LOAN COLLATERAL AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned has caused this Pledged Interests Addendum to be executed and delivered as of the day and year first above written.

[_____]

By: _____
    Name:
    Title:

[SIGNATURE PAGE TO PLEDGED INTERESTS ADDENDUM]

## <u>SCHEDULE I</u>
TO

## <u>PLEDGED INTERESTS ADDENDUM</u>

<u>Pledged Interests</u>

| Name of Grantor | Name of Pledged Company | Number of Shares/Units | Class of Interests | Percentage of Class Owned | Certificate Nos. |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

## EXHIBIT D

## TRADEMARK SECURITY AGREEMENT

This TRADEMARK SECURITY AGREEMENT (this "Trademark Security Agreement") is made this ___ day of _____, 2020, by and among Grantors listed on the signature pages hereof (collectively, jointly and severally, "Grantors" and each individually "Grantor"), and **THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, not in its individual capacity, but solely in its capacity as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent").

W I T N E S S E T H:

**WHEREAS**, reference is made to that certain Term Loan Credit Agreement, dated as of [___], 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), by and among [_____], a Delaware [corporation/limited liability company], as borrower (the "Borrower"), the Grantors party thereto, as guarantors, The Bank of New York Mellon Trust Company, N.A., as administrative agent for the Lenders (in such capacity, the "Administrative Agent") and Collateral Agent, and each of the Lenders party thereto;

**WHEREAS**, the Grantors shall have executed and delivered to the Collateral Agent, for the benefit of the Secured Parties, that certain Term Loan Collateral Agreement, dated as of [_____], 2020 (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "Term Loan Collateral Agreement"); and

**WHEREAS**, pursuant to the Term Loan Collateral Agreement, the Grantors are required to execute and deliver to the Collateral Agent, for the benefit of the Secured Parties, this Trademark Security Agreement.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

1.     DEFINED TERMS. All initially capitalized terms used but not otherwise defined herein have the meanings given to them in the Term Loan Collateral Agreement or, if not defined therein, in the Credit Agreement, and this Trademark Security Agreement shall be subject to the rules of construction set forth in Section 1(b) of the Term Loan Collateral Agreement, which rules of construction are incorporated herein by this reference, *mutatis mutandis*.

2.     GRANT OF SECURITY INTEREST IN TRADEMARK COLLATERAL. Each Grantor hereby unconditionally grants and pledges to the Collateral Agent, for the benefit of the Secured Parties, to secure the Secured Obligations, a continuing security interest (referred to in this Trademark Security Agreement as the "Security Interest") in all of such Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising (collectively, the "Trademark Collateral"):

        (a)    all of its Trademarks, including those referred to on Schedule I;

1

(b)       all goodwill of the business connected with the use of, and symbolized by, each Trademark; and

(c)       all products and proceeds (as that term is defined in the Code) of the foregoing, including any claim by such Grantor against third parties for past, present or future (i) infringement or dilution of any Trademark or any Trademarks exclusively licensed under any Intellectual Property License, including right to receive any damages, (ii) injury to the goodwill associated with any Trademark, or (iii) right to receive license fees, royalties, and other compensation under any Trademark Intellectual Property License.

Notwithstanding the foregoing, no security interest is granted in and the Trademark Collateral shall not include any Excluded Property; provided that, if and when any such property shall cease to be Excluded Property, a lien on and security interest in such property (in favor of the Collateral Agent, for the benefit of the Secured Parties) shall automatically be deemed granted therein.

3.       SECURITY FOR SECURED OBLIGATIONS. This Trademark Security Agreement and the Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Trademark Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to the Collateral Agent, the Secured Parties or any of them, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.       SECURITY AGREEMENT. The Security Interest granted pursuant to this Trademark Security Agreement is granted in conjunction with the security interests granted to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the Term Loan Collateral Agreement. Each Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the Security Interest in the Trademark Collateral made and granted hereby are more fully set forth in the Term Loan Collateral Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. To the extent there is any inconsistency between this Trademark Security Agreement and the Term Loan Collateral Agreement, the Term Loan Collateral Agreement shall control.

5.       AGREEMENT TO SUPPLEMENT. If any Grantor shall obtain rights to any new trademarks, the provisions of this Trademark Security Agreement shall automatically apply thereto. Grantors, when required pursuant to Section 6(c) of the Term Loan Collateral Agreement, hereby agree to modify this Trademark Security Agreement by amending Schedule I to include any such new trademark rights of each Grantor. Notwithstanding the foregoing, no failure to so modify this Trademark Security Agreement or amend Schedule I shall in any way affect, invalidate or detract from the Collateral Agent's continuing security interest in all Collateral, whether or not listed on Schedule I.

6.       COUNTERPARTS. This Trademark Security Agreement is a Loan Document. This Trademark Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the

2

same Trademark Security Agreement. Delivery of an executed counterpart of this Trademark Security Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Trademark Security Agreement. Any party delivering an executed counterpart of this Trademark Security Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Trademark Security Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Trademark Security Agreement.

7.    CHOICE OF LAW AND VENUE AND JURY TRIAL WAIVER. THIS TRADEMARK SECURITY AGREEMENT SHALL BE SUBJECT TO THE PROVISIONS REGARDING CHOICE OF LAW AND VENUE AND JURY TRIAL WAIVER SET FORTH IN SECTION 26 OF THE TERM LOAN COLLATERAL AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

8.    CONCERNING THE COLLATERAL AGENT. The Bank of New York Mellon Trust Company, N.A. is entering into this Trademark Security Agreement solely in its capacity as collateral agent under the Credit Agreement and not in its individual capacity. In acting hereunder, the Collateral Agent shall be entitled to all of the rights, privileges, protections, indemnities and immunities set forth in the Credit Agreement and the Term Loan Collateral Agreement as if such rights, privileges, protections, indemnities and immunities were set forth herein. The recitals contained herein shall be taken as the statements of the Grantors and the Collateral Agent assumes no responsibility for their correctness. The Collateral Agent makes no representations as to the validity or sufficiency of this Trademark Security Agreement.

[SIGNATURE PAGE FOLLOWS]

KL2 3188650.7

IN WITNESS WHEREOF, the parties hereto have caused this Trademark Security Agreement to be executed and delivered as of the day and year first above written.

**GRANTORS:**                    **[NAME OF GRANTOR]**

By: _____
Name: _____
Title: _____

**[NAME OF GRANTOR]**

By: _____
Name: _____
Title: _____

**COLLATERAL AGENT:**            **ACCEPTED AND ACKNOWLEDGED BY:**

**THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.**

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO TRADEMARK SECURITY AGREEMENT]

## SCHEDULE I
### to

## TRADEMARK SECURITY AGREEMENT

### Trademark Registrations/Applications[2]

| Grantor | Country | Mark | Application/ Registration No. | App/Reg Date |
|---------|---------|------|-------------------------------|--------------|
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |

[2] Note to Grantors: Do not schedule intent-to-use applications.