**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

*In re*                                   :      **Chapter 11**
                                            :

**THE McCLATCHY COMPANY**, *et al.*,     :      **Case No. 20-10418 (MEW)**
                                            :

                 Debtors.[1]                  :      **(Jointly Administered)**
                                            :

---------------------------------------------------------- x

### ORDER (I) APPROVING THE SALE OF THE ACQUIRED ASSETS FREE AND CLEAR OF CLAIMS, LIENS, INTERESTS AND ENCUMBRANCES; (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

Upon the motion [Docket No. 418] (the "Motion")[2] of the Debtors, dated May 5, 2020, for, among other things, entry of an order (this "Order"): (I) approving the sale of the Acquired Assets (the "Sale Transaction") pursuant to the Acquisition Agreement filed as Exhibit A at Docket No. 731 (as may be amended, amended and restated, supplemented or otherwise modified), and which for purposes of this Order shall include all exhibits, schedules and ancillary documents related thereto and hereto, including the Ancillary Documents, free and clear of all claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Post-Closing Encumbrances); (II) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assigned Contracts") and the assumption of the Assumed Liabilities, each as more fully described in the Acquisition Agreement; and the Court having held a telephonic hearing on August 4, 2020 (the "Sale Hearing") to consider the Motion and to consider approval of the Sale

---

[1]    The last four digits of Debtor The McClatchy Company's tax identification number are 0478. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/McClatchy. The location of the Debtors' service address for purposes of these chapter 11 cases is: 2100 Q Street, Sacramento, California 95816.

[2]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion or the Acquisition Agreement, as applicable.

Transaction; and the Court having reviewed and considered the relief sought in the Motion with respect to the Sale Transaction, the declarations submitted in support of the Motion, all objections to the Motion and the Debtors' responses thereto at the Sale Hearing, and the arguments of counsel made, and the declarations admitted into evidence at the Sale Hearing; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale Transaction and the relief requested in this Order; and due and sufficient notice of the Sale Hearing and the relief sought therein having been given under the particular circumstances and in accordance with the Bidding Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion as set forth herein is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and upon the record of the Sale Hearing and these chapter 11 cases (the "Chapter 11 Cases"), and after due deliberation thereon, and good cause appearing therefor, it is hereby

**FOUND, CONCLUDED AND DETERMINED THAT:**[3]

A.     This Court has jurisdiction over the Motion and the Sale Transaction pursuant to 28 U.S.C. §§ 157 and 1334 and may enter a final order on the Motion consistent with Article III of the United States Constitution.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 364, 365 and 503 and Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014.

---

[3]   The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Furthermore, any findings of fact or conclusions of law made by the Court on the record at the close of the Sale Hearing are incorporated herein pursuant to Fed. R. Bank. P. 7052.

B.      A reasonable opportunity to object or to be heard regarding the requested relief has been afforded to all interested parties and entities.

C.      On May 11, 2020, the Court entered an order [Docket No. 432] (the "Bidding Procedures Order"), which, among other things, (i) established Bidding Procedures relating to the sale of substantially all of the debtors' assets; (ii) scheduled the Bid Deadline, the Auction, the Objection Deadline; (iii) approved procedures for the assumption and assignment of certain executory contracts and unexpired leases; (iv) approved the form and manner of notice of the Bidding Procedures, the Bid Deadline, the Auction, the Objection Deadline, and the relevant procedures, protections, schedules and agreements (the "Transaction Notice").

D.      The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Acquired Assets.  The Debtors and their professionals adequately marketed the Acquired Assets and conducted the marketing and sale process in accordance with the Bidding Procedures and the Bidding Procedures Order.

E.      There is no evidence before the Court of any collusion in connection with the Sale Process.

F.      On July 10, 2020, the Debtors held the Auction pursuant to the Bidding Procedures.  Based upon the record of these proceedings, Qualified Bidders (as defined in the Bidding Procedures) who submitted Qualified Bids (as defined in the Bidding Procedures) were afforded a reasonable and fair opportunity to bid for the Acquired Assets. The Debtors and their professionals conducted the Auction in compliance with the Bidding Procedures Order, and afforded potential purchasers a full, fair and reasonable opportunity to make a higher or otherwise better offer for the Acquired Assets than that reflected in the Acquisition Agreement.

3

G.     On July 10, 2020, the Debtors announced their determination that the Purchaser submitted the highest or best bid for the Acquired Assets, which was the Successful Bid for the Acquired Assets at the Auction.

H.     The Debtors have articulated good and sufficient business reasons for the Court to authorize (i) the Debtors' entry into the Acquisition Agreement and consummation of the Sale Transaction including the sale of the Acquired Assets to the Purchaser pursuant to the terms of the Acquisition Agreement and this Order, (ii) the assumption and assignment of the Assigned Contracts as set forth herein and in the Acquisition Agreement, and (iii) the assumption of the Assumed Liabilities as set forth herein and in the Acquisition Agreement.  Entry into the Acquisition Agreement and consummation of the Sale Transaction pursuant to this Order are sound exercises of business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest.

I.     The Debtors have articulated good and sufficient business reasons justifying the sale of the Acquired Assets to the Purchaser.  Additionally: (i) the Debtors conducted a robust marketing process to sell the Acquired Assets and the Acquisition Agreement constitutes the highest and best offer for the Acquired Assets; (ii) the Bidding Procedures utilized were designed to yield the highest or otherwise best bids for the Acquired Assets; (iii) the Acquisition Agreement and the closing of the Sale Transaction present the best opportunity to realize the highest value for the Acquired Assets; (iv) there is risk of deterioration of the value of the Acquired Assets if the Sale Transaction is not consummated promptly; and (v) the Acquisition Agreement and the sale of the Acquired Assets to the Purchaser provide greater value to the Debtors' estates than would be provided by any other presently available alternative.

J.      The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose for the sale outside: (i) the ordinary course of business, pursuant to Bankruptcy Code section 363(b); and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to maximize the value of the Debtors' estates.

K.      Sound business justifications also exist for the establishment of the Seller Retained Professional Fees Escrow, the Committee Retained Professional Fees Escrow and the Wind-Down Fees Escrow (collectively, the "Escrows") as provided in the Acquisition Agreement. The Escrows will avoid a freefall shutdown of the Debtors' remaining estates, provide for, among other things, the payment of accrued and unpaid professional fees and expenses in accordance with the Acquisition Agreement, and provide a mechanism to assist in the orderly and responsible wind-down of the Debtors' estates.

L.      As evidenced by the affidavits of service [Docket Nos. 475, 620, 662] and publication [Docket No. 477] previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Sale Transaction, the Assumption and Assignment Procedures and the assumption and assignment of the Assigned Contracts and the applicable Cure Amounts (as defined herein) has been provided in compliance with the Bidding Procedures Order and in accordance with Bankruptcy Code sections 102(1), 363, and 365, and Bankruptcy Rules 2002, 4001, 6004, 6006, 9006, 9007 and 9014, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale Transaction, the assumption and assignment of the Assigned Contracts or the Cure Amounts is or shall be required.  With respect to entities whose identities were not reasonably

ascertained by the Debtors, publication of the Transaction Notice was made in the *New York Times* on May 18, 2020. Such notice was sufficient and reasonably calculated under the circumstances to reach all known and unknown holders of claims and interests and non-Debtor counterparties to executory contracts.

M.    The Debtors' marketing process with respect to the Sale afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer. Multiple persons submitted a Qualified Bid prior to the Bid Deadline. Thereafter, in accordance with the Bidding Procedures Order, an Auction was conducted and the Debtors determined that the Acquisition Agreement constituted the highest and best offer and selected the Acquisition Agreement as the Successful Bid. The Debtors therefore determined in a valid and sound exercise of their business judgment, and in accordance with the Bidding Procedures and Bid Procedures Order, that the highest and best Qualified Bid for the Acquired Assets is that of the Purchaser and that the Acquisition Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.

N.    The Acquisition Agreement was negotiated and is undertaken by the Debtors, the First Lien Notes Agent, Brigade Capital Management, LP (along with its affiliates "Brigade"), Chatham, and the Purchaser at arm's-length and in good faith within the meaning of Bankruptcy Code section 363(m). The Purchaser is not an "insider" of any of the Debtors as that term is defined by Bankruptcy Code section 101(31). The Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets, complied with the Bidding Procedures Order, and agreed to, and did, subject its bid to the competitive Bidding Procedures approved in the Bidding Procedures Order. As a result of the foregoing, each of the First Lien Notes Agent, Brigade, Chatham, and the Purchaser is entitled to the protections of

Bankruptcy Code section 363(m), including in the event this Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with these cases.

O.    All releases and payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale Transaction have been disclosed.

P.    There is no evidence that Brigade, Chatham, or the Purchaser has violated Bankruptcy Code section 363(n) by any action or inaction on their respective parts.

Q.    Pursuant to the Bidding Procedures, applicable law, including Bankruptcy Code sections 363(b) and 363(k), the Purchaser (on behalf of holders of the First Lien Notes Agent and the First Lien Notes Claims) was authorized to credit bid for the Acquired Assets, as contemplated by the Acquisition Agreement and Ancillary Documents.  Pursuant to the Acquisition Agreement and Ancillary Documents, the Purchaser credit bid (the "Credit Bid") all such obligations, with the balance of the Purchase Price being paid in cash and the assumption of liabilities.  The Credit Bid, plus the assumption of the Assumed Liabilities and the cash consideration provided for under the Acquisition Agreement, was a valid and proper offer pursuant to the Bidding Procedures Order and Bankruptcy Code sections 363(b) and 363(k).  There is no cause to limit the amount of the Credit Bid pursuant to section 363(k) of the Bankruptcy Code.

R.    The Debtors:  (i) have full power and authority to execute the Acquisition Agreement and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the transactions contemplated by the Acquisition Agreement, and (iii) have taken all corporate action necessary to authorize and approve the Acquisition Agreement, the sale of the Acquired Assets, and all other actions required to be performed by the Debtors in order

to consummate the transactions contemplated in the Acquisition Agreement. No consents or approvals, other than those already obtained or expressly provided for in the Acquisition Agreement or this Order, are required for the Debtors to consummate the Sale Transaction.

S.    The total consideration provided by the Purchaser for the Acquired Assets represents the highest and best offer received by the Debtors, and the Purchase Price constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and any other applicable laws.

T.    The relevant parties have agreed that the New First Lien Term Loan Facility, the New 1.5 Lien Notes, and the ABL Financing (collectively, the "New Facilities") are being extended in good faith and for fair value and, therefore, the obligations thereunder and the liens granted therein are valid and binding and may not be avoided under the Bankruptcy Code, Uniform Voidable Transactions Act, the Uniform Fraudulent Transaction Act, the Uniform Fraudulent Conveyance Act, and any other applicable laws.

U.    The Purchaser would not have entered into the Acquisition Agreement and would not agree to consummate the Sale Transaction if the sale of the Acquired Assets to the Purchaser were not free and clear of all claims, liens, interests and encumbrances (other than Permitted Post-Closing Encumbrances and Assumed Liabilities) to the fullest extent permitted pursuant to Bankruptcy Code section 363(f) or if the Purchaser would, or in the future could, be liable for any of such claims, liens, interests and encumbrances.

V.    The Debtors may sell the Acquired Assets free and clear of claims, liens, interests and encumbrances (other than Assumed Liabilities and Permitted Post-Closing Encumbrances) to the fullest extent permitted by section 363(f) of the Bankruptcy Code because, with respect to each

creditor asserting a claim, lien, interest or encumbrance, one or more of the standards set forth in

Bankruptcy Code section 363(f)(1)-(5) has been satisfied.  Those holders of claims, liens, interests

or encumbrances that did not object to or that withdrew their objections to the sale of the Acquired

Assets or the Motion, are barred from challenging the Motion, the Sale Transaction, or the sale of

assets free and clear of claims and liens.  Those holders of claims, liens, interests, or encumbrances

that did object fall within one or more of the other subsections of Bankruptcy Code section 363(f)

or are adequately protected by the terms of this Order.

W.      There is no evidence that any of the Debtors, the Purchaser, or the administrative

agents, lenders, and noteholders under the New Facilities engaged in any conduct that would cause

or permit the Acquisition Agreement, the other Ancillary Documents, including the New Facilities,

or the consummation of the Sale Transaction (including the extension of the New Facilities to the

Purchaser) to be avoided, or costs or damages to be imposed, under Bankruptcy Code section

363(n) or under any other law of the United States, any state, territory, possession thereof, the

District of Columbia, or any other applicable law.

X.      The Acquisition Agreement was not entered into, and the Sale Transaction is not

consummated, for the purpose of hindering, delaying or defrauding the Debtors' creditors under

the Bankruptcy Code or under any other law of the United States, any state, territory, possession

thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors, the

Purchaser, nor the administrative agents, lenders or noteholders under the New Facilities has

entered into the Acquisition Agreement or the other Ancillary Documents, including the New

Facilities, or is consummating the Sale Transaction for any fraudulent or otherwise improper

purpose.

Y.      The Purchaser would not have acquired the Acquired Assets but for the protections against potential claims based upon "successor liability," *de facto* merger, or theories of similar effect that are set forth in this Order.

Z.      The Debtors have proven and demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assigned Contracts to the Purchaser is in the best interests of the Debtors, their estates and creditors and all parties in interest.  The Assigned Contracts being assigned to the Purchaser are an integral part of the Acquired Assets being purchased by the Purchaser, and accordingly, such assumption and assignment of the Assigned Contracts is reasonable and enhances the value of the Debtors' estates.

AA.     The cure amounts required to be paid pursuant to Bankruptcy Code section 365(b), whether agreed or judicially resolved (the "Cure Amounts"), are deemed to be the entire cure obligation due and owing under the Assigned Contracts under Bankruptcy Code section 365(b). To the extent that any non-Debtor counterparty to an Assigned Contract failed to timely file an objection to the proposed Cure Amount filed with the Bankruptcy Court, the Cure Amount listed in the Cure Notice shall be deemed to be the entire cure obligation due and owing under the applicable Assigned Contract.

BB.     Each provision of the Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict or condition, or could be construed as prohibiting, restricting or conditioning, assignment of any Assigned Contracts has been satisfied or is otherwise unenforceable under Bankruptcy Code section 365.

CC.     Assumption and assignment of any Assigned Contract to the Purchaser pursuant to this Order and the Acquisition Agreement and full payment of any applicable Cure Amount shall result in the full release and satisfaction of any and all cures, claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assigned Contract at any time prior to the Closing Date, and shall relieve the Debtors and their estates from any liability for any breach of such Assigned Contract occurring after such assignment.

DD.     The Purchaser has demonstrated adequate assurance of future performance of all Assigned Contracts, within the meaning of Bankruptcy Code section 365.

EE.     Upon the assignment to the Purchaser and the payment of the relevant Cure Amount (if applicable), (i) each Assigned Contract shall be deemed valid and binding and in full force and effect in accordance with its terms, and all defaults thereunder, if any, shall be deemed cured, subject to the provisions of this Order; and (ii) the Purchaser shall assume all obligations under each Assigned Contract.

FF.     The injunction set forth in this Order against creditors and third parties pursuing claims against, and liens, interests and encumbrances on, the Acquired Assets is necessary to induce the Purchaser to close the Sale Transaction, and the issuance of such injunctive relief is therefore necessary to avoid irreparable injury to the Debtors' estates and will benefit the Debtors' creditors.

GG.     The Sale Transaction does not constitute a *sub rosa* chapter 11 plan.  The Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a Chapter 11 plan for any of the Debtors.

HH.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Acquisition Agreement. The Purchaser, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the Sale Transaction contemplated by the Acquisition Agreement at any time after entry of this Order.

II.     The parties' entry into the Global Settlement (as defined below) is fair and reasonable.

JJ.     The relief granted herein is in the best interests of the Debtors, their estates and creditors, and other parties in interest.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion is **GRANTED**, to the extent set forth herein.

2.     Any Objection to the Motion, or any other relief granted in this Order, to the extent not resolved, adjourned for hearing on a later date, waived or withdrawn or previously overruled, and all reservations of rights included therein, is hereby **OVERRULED** and **DENIED** on the merits.

3.     The Bidding Procedures utilized by the Debtors with respect to the Sale Transaction are hereby ratified and were appropriate under the circumstances in order to maximize the value obtained from the Sale Transaction for the benefit of the estates.

4.      Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503 and the Acquisition Agreement, the Credit Bid, the Framework Agreement,[4] the New Facilities, and the Sale Transaction are hereby approved and the Debtors are authorized to enter into and perform under the Acquisition Agreement and the other Ancillary Documents, in each case subject to the terms of the Global Settlement.

5.      Pursuant to Bankruptcy Code sections 105, 363, 364, 365 and 503, each of the Debtors and the Purchaser are hereby authorized and directed to take any and all actions necessary or appropriate to:  (i) consummate the Sale Transaction and the Closing in accordance with the Motion, the Acquisition Agreement, the Framework Agreement, and this Order; (ii) assume and assign the Assigned Contracts; (iii) provide for the assumption of the Assumed Liabilities; (iv) perform, consummate, implement and close fully the Acquisition Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Acquisition Agreement; (v) establish and fund the Escrows; and (vi) enter into the New Facilities on the Closing Date.

6.      The Debtors and each other party to the Ancillary Documents, including the Escrow Agreements, are hereby authorized and directed to perform each of their covenants and undertakings as provided in the Acquisition Agreement and the Ancillary Documents, including the Escrow Agreements, prior to or after the Closing Date without further order of the Court.  The Purchaser and the Debtors shall have no obligation to close the Sale Transaction except as is contemplated and provided for in the Acquisition Agreement and this Order.

---

[4] The term "Framework Agreement" means the Framework Agreement dated as of July 1, 2020, by and among Chatham and each of its managed funds or accounts that is a beneficial holder of the First Lien Notes, Brigade Capital Management, LP and each of its managed funds or accounts that is a beneficial holder of the First Lien Notes, and the Purchaser.

7.      Pursuant to Bankruptcy Code section 365(f), notwithstanding any provision of any Assigned Contract or applicable non-bankruptcy law that prohibits, restricts or conditions the assignment of the Assigned Contracts, the Debtors are authorized to assume the Assigned Contracts and to assign the Assigned Contracts to the Purchaser or to any Purchaser Designee, which assignment shall take place on and be effective as of the Closing or as otherwise provided by order of this Court.  There shall be no accelerations, assignment fees, increases, or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Assigned Contracts.

8.      The Purchaser shall have assumed the Assigned Contracts, and pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assigned Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amount (if applicable), neither the Debtors, their bankruptcy estates nor the Purchaser shall have any further liabilities to the non-Debtor counterparties to the Assigned Contracts, other than the Purchaser's obligations under the Assigned Contracts that accrue or become due and payable on or after the Closing Date.

9.      The Debtors' assumption of the Assigned Contracts is subject to the consummation of the Sale Transaction.  To the extent that an objection by a counterparty to any Assigned Contract, including all objections related to Cure Amounts, is not resolved prior to the Closing Date, the Debtors, with the consent of the Purchaser and in accordance with the Acquisition Agreement, may elect to: (i) not assume and assign to the Purchaser the Assigned Contract; (ii) postpone the assumption of such Assigned Contract until the resolution of such objection; or (iii) reserve the disputed portion of the Cure Amount and assume the Assigned Contract on the Closing Date.  So long as the claimed Cure Amount is held in reserve, and there are no other unresolved objections to the assumption and assignment of the applicable Assigned Contract, the

Debtors can, without further delay, assume and assign the Assigned Contract that is the subject of the objection. Under such circumstances, the respective objecting counterparty's recourse would be limited to the funds held in reserve.

10.     Upon the Closing: (a) the Debtors are hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of all of the Debtors' rights, title and interest in the Acquired Assets (which for the avoidance of doubt, and subject to paragraphs 36 through 41 hereof, includes any affirmative claims, demands, remedies, rights and/or causes of action against any third-party) to the Purchaser free and clear of all claims, liens, interests, and encumbrances (other than the Assumed Liabilities and Permitted Post-Closing Encumbrances) to the fullest extent permitted by section 363(f) of the Bankruptcy Code and (b) except as otherwise expressly provided in the Acquisition Agreement, all Encumbrances and Liabilities (other than the Assumed Liabilities and the Permitted Post-Closing Encumbrances) shall not be enforceable as against any member of the Purchaser Group or the Acquired Assets. A certified copy of this Order may be filed with the appropriate clerk and/or recorder to act to cancel any such lien, claim, interest or encumbrance of record.

11.     The transfer to the Purchaser of the Debtors' rights, title, and interest in the Acquired Assets pursuant to the Acquisition Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' rights, title, and interest in the Acquired Assets, and vests with or will vest in the Purchaser all rights, title, and interest of the Debtors in the Acquired Assets, free and clear of all claims, liens, interests, and encumbrances of any kind or nature whatsoever (other than the Permitted Post-Closing Encumbrances and the Assumed Liabilities) to the fullest extent permitted by section 363(f) of the Bankruptcy Code, with any such claims, liens, interests, and encumbrances attaching to the net available proceeds with the same

validity, extent, and priority as immediately prior to the sale of the Acquired Assets, subject to the provisions of the Acquisition Agreement and this Order, and any rights, claims, and defenses of the Debtors and other parties in interest.  For the avoidance of doubt, the Acquired Actions shall include all of the Debtors' claims and causes of action arising under Chapter 5 of the Bankruptcy Code against the Designated Parties.  By agreement of the parties, following the Closing, the Acquired Assets shall be subject in all respects to the liens securing the New Facilities, to the extent provided by the documents governing the New Facilities.

12.    Unless expressly included in the Assumed Liabilities and Permitted Post-Closing Encumbrances, neither the Purchaser nor any of the Purchaser's affiliates (including any subsidiary of Purchaser, any person or entity that could be treated as a single employer with the Purchaser pursuant to Section 4001(b) the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 414(b), (c), (m) or (o) of the Internal Revenue Code of 1986, as amended ("IRC"), Chatham Asset Management, LLC, or any of its managed funds or accounts, any of their investors, shareholders, owners, representatives, officers, limited or general partners, directors, or agents or affiliates thereof (collectively, the "Purchaser Group")) shall be responsible for any claims, liens, liabilities, obligations, interests and encumbrances in respect of any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability.

13.    Subject to the Closing and subject to paragraph 39 hereof, none of the First Lien Notes Agent, Brigade, Chatham, or the Purchaser or its affiliates, successors, assigns, equity

holders, officers, directors, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the Acquisition Agreement or the Framework Agreement, as applicable and the entry into and consummation of the sale of the Acquired Assets, except as expressly provided in the Acquisition Agreement and this Order.

14.     Except as expressly provided in the Acquisition Agreement, the other Ancillary Documents (including the New Facilities), or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants, and other persons, holding claims, liens, interests, or encumbrances of any kind or nature whatsoever arising prior to the Closing Date against or in the Debtors or the Debtors' interests in the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated, or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether imposed by agreement, understanding, law, equity, or otherwise), including, without limitation, the non-Debtor party or parties to each Assigned Contract holding claims arising prior to the Closing Date, shall be and hereby are forever barred, estopped and permanently enjoined to the fullest extent permitted by section 363(f) of the Bankruptcy Code from asserting, prosecuting or otherwise pursuing such pre-Closing Date claims, liens, interests and encumbrances against the Purchaser or its affiliates, successors, assigns, equity holders, directors, officers, employees or professionals, the Acquired Assets, or the interests of the Debtors in such Acquired Assets (other than Assumed Liabilities or Permitted Post-Closing Encumbrances).  Following the Closing, and to the fullest extent permitted

17

by section 363(f) of the Bankruptcy Code, no holder of a pre-Closing Date claim, lien, interest, or encumbrance against the Debtors (other than those arising under the Assumed Liabilities, the New Facilities, or Permitted Post-Closing Encumbrances) shall interfere with the Purchaser's title to or use and enjoyment of the Debtors' interest in the Acquired Assets based on or related to such claim, lien, interest or encumbrance, and, except as otherwise provided in the Acquisition Agreement, the Framework Agreement, the New Facilities, the Ancillary Documents, or this Order, all such claims, liens, interests, or encumbrances, if any, shall be, and hereby are transferred and will attach to the net available proceeds from the sale of the Acquired Assets in the order of their priority, with the same validity, force, and effect which they have against such Acquired Assets as of the Closing, subject to any rights, claims and defenses that the Debtors' estates and the Debtors, as applicable, may possess with respect thereto.  All persons are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Debtors to transfer the Acquired Assets in accordance with the terms of this Order.

15.    Upon assumption of the Assigned Contracts by the Debtors and assignment of same to the Purchaser, the Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.  As of the Closing, subject to the provisions of this Order, the Purchaser shall succeed to the entirety of Debtors' rights and obligations in the Assigned Contracts first arising and attributable to the time period occurring on or after the date the assignment of the Assigned Contracts becomes effective and shall have all rights thereunder.

16.    Subject to paragraph 9 of this Order, upon the entry of this Order, (a) all defaults (monetary and non-monetary) under the Assigned Contracts through the Closing shall be deemed cured and satisfied through the payment of the Cure Amounts, (b) other than amounts that may

become due and owing in the ordinary course under the terms of the Assigned Contracts, no other amounts will be owed by the Debtors, their estates, or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assigned Contracts, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchaser that any additional amounts are due, other than amounts that may become due and owing in the ordinary course under the terms of the Assigned Contracts, or defaults exist under the Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing, including defaults of provisions restricting change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assigned Contract at any time on or prior to the Closing Date. Assignment by the Debtors of any Assigned Contract to the Purchaser or the Purchaser Designee shall relieve the Debtors and their estates from any liability for any breach of such Assigned Contract occurring after such assignment.

17.    The creation and funding of the Escrows is approved pursuant to Bankruptcy Code sections 105(a) and 363(b). The Debtors and the other parties thereto are authorized, pursuant to Bankruptcy Code sections 105(a) and 363(b) and without further notice or relief from this Court, to enter into the Escrow Agreements, to take any and all actions that are necessary or appropriate in the exercise of their business judgment to implement the Escrow Agreements, including employing third-party contractors in accordance therewith, including the applicable escrow agents, and to make or authorize payments contemplated thereunder. Funds deposited in accordance with the Escrow Agreements shall not constitute property of any Debtor's estate or be subject to claw-back or disgorgement, and such funds (including any residual funds) may be released and applied in accordance with the terms thereof, without further order of this Court.

18.     The Acquisition Agreement has been entered into by the Purchaser in good faith and the Purchaser is a good faith purchaser of the Acquired Assets as that term is used in Bankruptcy Code section 363(m).  Each of the First Lien Notes Agent, Brigade, Chatham, and the Purchaser is entitled to all of the protections afforded by Bankruptcy Code section 363(m).

19.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.  Except as otherwise provided in the Acquisition Agreement or the Ancillary Documents (including the Escrow Agreements), no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment is due to any person in connection with the Acquisition Agreement, the other Ancillary Documents, or the transactions contemplated hereby or thereby for which the Purchaser is or will become liable.

20.     The consideration provided by the Purchaser for the Acquired Assets under the Acquisition Agreement, including the portion of the consideration that consisted of the Credit Bid, shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the sale of the Acquired Assets may not be avoided, or costs or damages imposed or awarded under Bankruptcy Code section 363(n) or any other provision of the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar federal or state laws.

21.     There is no evidence that any of the Debtors, the First Lien Notes Agent, Brigade, Chatham, or the Purchaser have engaged in any conduct that would cause or permit the Acquisition Agreement or the consummation of the Sale Transaction to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any

state, territory, possession thereof, the District of Columbia, or any other applicable law. Accordingly, the Acquisition Agreement.

22.    The New Facilities are being extended in good faith and for fair value and, therefore, the obligations thereunder and the liens granted therein are valid and binding and may not be avoided under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar federal or state laws.

23.    On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Debtors' rights, title, and interest in the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Purchaser on the Closing Date pursuant to the terms of the Acquisition Agreement, free and clear of all claims, liens, interests, and encumbrances (other than Assumed Liabilities and Permitted Post-Closing Encumbrances) to the fullest extent permitted by section 363(f) of the Bankruptcy Code.

24.    On the Closing Date, the Purchaser, from the Cash Payment portion of the Purchase Price, on behalf of the Debtors, shall: (a) pay to the First Lien Notes Trustee cash in an amount equal to all accrued and unpaid interest due under the First Lien Notes Indenture through the Closing Date (such interest calculated at the non-default rate), and the First Lien Notes Trustee shall distribute such cash amount consistent with the First Lien Notes Indenture to the holders of the First Lien Notes as of the Closing Date in accordance with the practices and procedures of the Depository Trust Company; and (b) consistent with Section 5.01(b)(viii) of the Acquisition Agreement and subject to paragraph 39 hereof, pay to the First Lien AP Professionals the First Lien AP Professionals Fees and Expenses (each as defined in the DIP

Order [Docket No. 233]) that are accrued and unpaid as of the Closing Date ((a) and (b) collectively, the "**First Lien Notes Payments**").  On the Closing Date, subject to the consummation of the Sale Transaction including payment in full in cash of the First Lien Notes Payments in accordance with this paragraph 24, all First Lien Notes Obligations (as defined in the DIP Order) shall be satisfied in full and shall be deemed automatically cancelled, released, and extinguished.

25.    Each Debtor shall transfer and assign the Acquired Assets of such Debtor to the Purchaser or a Purchaser Designee in full or partial satisfaction, as applicable, of the First Lien Notes Claims or guarantees thereof made by the applicable Debtor. In addition, the Cash Payment shall be paid to the Parent, as agent for each Debtor.

26.    Each Debtor shall use any payments or reimbursements received by such Debtor pursuant to the Acquisition Agreement and any Excluded Assets of such Debtor to pay any Excluded Liabilities of such Debtor. The Cash Remainder shall only be used to pay expenses of a Debtor other than the Parent to the extent the Excluded Liabilities of such Debtor exceed the sum of (i) the amount of such payments received by such Debtor pursuant to the Acquisition Agreement, (ii) the amount of such reimbursements received by such Debtor pursuant to the Acquisition Agreement, and (iii) the Excluded Assets of such Debtor.

27.    Upon the Closing, neither the First Lien Notes Agent, Brigade, nor any member of the Purchaser Group shall, or shall be deemed to be the successor of or successor employer to any of the Sellers, including without limitation, having any common law successorship liability in relation to any pension plan of any of the Debtors, including with respect to withdrawal liability or contribution obligation except as otherwise provided in the Acquisition Agreement.

28.    Other than the Purchaser's assumption of the applicable Assumed Liabilities and the Purchaser's obligations under the Acquisition Agreement, the other Ancillary Documents, and this Order, and to the fullest extent permitted by section 363(f) of the Bankruptcy Code, the Purchaser Group and its respective affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders (or equivalent) shall have no obligations with respect to any Liabilities, including, without limitation, the Excluded Liabilities, and, subject to paragraph 39 hereof, upon consummation of the Sale Transaction, the Debtors and their estates are deemed to release and forever discharge Brigade, the Purchaser Group and its affiliates, and their respective successors, assigns, members, partners, officers, directors, principals and shareholders (or equivalent) from any and all claims, causes of action, obligations, Liabilities, demands, losses, costs, taxes, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, relating to the sale of the Acquired Assets or assignments of the Assigned Contracts.

29.    This Order:  (a) is and shall be effective as a determination that other than Permitted Post-Closing Encumbrances and Assumed Liabilities, all claims, liens, interests and encumbrances of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing have been unconditionally released, discharged, and terminated to the fullest extent permitted by section 363(f) of the Bankruptcy Code, and that the conveyances described herein have been effected, including claims in connection with any tax liability and (b) is and shall be binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or

23

who may be required to report or insure any title or state of title in or to the Acquired Assets conveyed to the Purchaser.  Other than Permitted Post-Closing Encumbrances, and liens and security interests relating to the Assumed Liabilities, all recorded claims, liens, interests, and encumbrances against the Acquired Assets from their records, official and otherwise, shall be deemed stricken.

30.     If any person or entity which has filed statements or other documents or agreements evidencing liens, interests, or encumbrances on, or claims against or interests in, the Acquired Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all claims, liens, interests or encumbrances (other than Permitted Post-Closing Encumbrances and liens and security interests relating to the Assumed Liabilities) which the person or entity has or may assert with respect to the Acquired Assets, the Debtors and the Purchaser are hereby authorized to file copies of this Order as evidence of the termination, satisfaction, and release of such liens and easements.

31.     All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser, and shall not charge the Debtors or the Purchaser for any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the sale of the Acquired Assets.

32.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale contemplated by the Acquisition Agreement.

33.     Nothing in this Order or the Acquisition Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the Closing Date.

34.     Without limiting the provisions of paragraph 33 above, but subject to Bankruptcy Code section 525(a), no governmental unit may revoke or suspend any right, license, trademark or other permission relating to the use of the Acquired Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the sale of the Acquired Assets.

35.     Pursuant to this Order, the Acquisition Agreement, the Framework Agreement, and the other Ancillary Documents, on the Closing Date, (a) the Purchaser shall acquire the Acquired Actions as an Acquired Asset, and (b) the Acquired Actions shall be waived and released pursuant to the terms of the Waiver.

36.     Subject to paragraph 39 hereof, section 5.20 of the Acquisition Agreement is approved in its entirety and incorporated herein as if fully stated herein.  Additionally, except to the extent expressly preserved pursuant to the Acquisition Agreement, the other Ancillary Documents, and/or this Order, and subject to paragraph 39 hereof in all respects, upon the Closing Date, (a) the Debtors, (b) the Purchaser, (c) the First Lien Notes Agent, (d) Chatham and (e) Brigade (each a "Releasing Party"), to the fullest extent permissible under applicable law, mutually releases and discharges each other Releasing Party and such Releasing Parties' respective current and former affiliates, and such entities' and their current and former affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, incorporators,

employees, agents, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such (collectively, in such capacity, the "Released Parties" and each a "Released Party"), from any and all claims and causes of action, whether known or unknown, including any derivative claims that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Debtors' restructuring efforts, the formulation, preparation, dissemination, negotiation, or filing, as applicable of the Acquisition Agreement or the Framework Agreement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Acquisition Agreement, the Ancillary Documents, the Framework Agreement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the implementation of the Sale Transaction, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Closing Date related or relating to the foregoing; provided, however, that this paragraph 36 shall not (a) affect the liability of any entity that otherwise would result from any act or omission to the extent that such act or omission is determined by a final, nonappealable order by the Bankruptcy Court or another court with jurisdiction to have constituted fraud, gross negligence, or willful misconduct of such entity, or (b) relieve any Released Party from any obligations under, or otherwise affect the terms and conditions of, the Acquisition Agreement, the Framework Agreement, the New Facilities, the other Ancillary Documents, the direction letter between Chatham, Brigade and the First Lien Notes Agent, dated as of July 1, 2020, the Global Settlement and/or this Order.

37.     To the fullest extent permissible under applicable law, except as otherwise provided in the Acquisition Agreement, the Framework Agreement, the New Facilities, the other Ancillary

Documents, the Global Settlement, and/or this Order, upon the Closing Date, none of the Released

Parties shall have or incur any liability to, or be subject to any right of action by, any holder of a

claim against, or equity interest in, any of the Debtors or any other party in interest, or any of their

respective employees, representatives, financial advisors, attorneys, or agents, acting in such

capacity, or any of their successors and assigns, for any act or omission in connection with, related

to or arising out of the negotiation, execution, delivery, implementation, or consummation of the

transactions contemplated by the Acquisition Agreement and the Framework Agreement,

including, without limitation, the Sale Transaction, the assumption and assignment of the Assigned

Contracts, or any other contract, instrument, release, agreement, settlement, or document created,

modified, amended, terminated, or entered into in connection with the Acquisition Agreement;

provided, however, that this paragraph 37 shall not (a) affect the liability of any entity that

otherwise would result from any act or omission to the extent that such act or omission is

determined by a final, nonappealable order by the Bankruptcy Court or another court with

jurisdiction to have constituted fraud, gross negligence, or willful misconduct by such entity, or

(b) relieve any Released Party from any obligations under, or otherwise affect the terms and

conditions of, the Acquisition Agreement, the Framework Agreement, the New Facilities, the other

Ancillary Documents, and/or this Order.

38.     To the extent this Order is inconsistent with any prior order or pleading filed in

these Chapter 11 Cases, the terms of this Order shall govern.  To the extent there is any

inconsistency between the terms of this Order and the terms of the Acquisition Agreement, the

terms of this Order shall govern.

39.     The Debtors, the Committee, Chatham, Brigade and Purchaser (the "Settling

Parties") each agree to the terms of the mediated settlement set forth in Annex A attached hereto

(the "Global Settlement"), which is hereby approved and shall be binding and enforceable upon the Settling Parties and all other parties in interest; provided that to the extent any provisions of the Settlement Agreement are to be implemented in the Plan (as defined in Annex A hereto), such provisions shall be incorporated into the Plan and approval thereof shall be subject to confirmation of such Plan.  The Settling Parties are authorized and directed to take all actions necessary and appropriate to implement the Global Settlement, and the Settlement Parties shall negotiate in good faith any definitive documentation required to implement the Global Settlement (including, without limitation, the Plan).  The Acquisition Agreement and each of the Ancillary Documents are hereby deemed amended to incorporate and reflect the terms of the Global Settlement. Notwithstanding anything contained herein, in the Acquisition Agreement or the Ancillary Documents to the contrary, in the event of any inconsistency between the Acquisition Agreement or the Ancillary Documents, on the one hand, and this Order, on the other hand, this Order shall control; provided, further, that in the event of any inconsistency between any term or provision of this Order on the one hand, and paragraph 39 of this Order, on the other hand , this paragraph 39 shall govern.

40.     For the avoidance of doubt, the Acquisition Agreement provides for the assumption by the Purchaser of all collective bargaining agreements to which the Debtors are a party.

41.     Except as expressly provided in the Acquisition Agreement nothing in this Order shall be deemed to waive, release, extinguish, or estop the Debtors or their estates from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not an Acquired Asset.

42.    All entities (other than holders of Assumed Liabilities or Permitted Post-Closing Encumbrances) that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Purchaser on the Closing Date.

43.    This Order shall not be modified by any chapter 11 plan of any of the Debtors confirmed in these Chapter 11 Cases.

44.    This Order, the Acquisition Agreement, and the Ancillary Documents shall be binding in all respects upon all creditors and interest holders of the Debtors, all non-debtor parties to the Assigned Contracts, the Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Chapter 11 Cases or upon a conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Acquisition Agreement and the Ancillary Documents (including the Escrow Agreements) shall not be subject to rejection or avoidance under any circumstances.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to the Purchaser hereunder, and the rights and obligations of any escrow agent(s) appointed under the Escrow Agreements, shall remain effective and, notwithstanding such dismissal or conversion, shall remain binding on parties in interest.

45.    The failure specifically to include or make reference to any particular provisions of the Acquisition Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Acquisition Agreement is authorized and approved in its entirety subject to paragraph 38 of this Order.

46.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including, without limitation, the authority to:  (a) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order), the terms of the Acquisition Agreement, all amendments thereto and any waivers and consents thereunder, and the Global Settlement; (b) protect the Purchaser, or the Acquired Assets, from and against any of the claims, liens, interests or encumbrances (other than Assumed Liabilities and Permitted Post-Closing Encumbrances); (c) compel delivery of all Acquired Assets to the Purchaser (other than those in the possession of the holder of an Assumed Liability or Permitted Encumbrance); (d) compel the Purchaser to perform all of its obligations under the Acquisition Agreement, the Ancillary Documents, and this Order; and (e) resolve any disputes arising under or related to the Acquisition Agreement or the sale of the Acquired Assets.

47.    The Acquisition Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented through a written document signed by the parties thereto (subject to any consents required under the New Facilities and the Framework Agreement) in accordance with the terms thereof without further order of this Court; provided, however, that any such modification, amendment, or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby.

48.    Neither the Purchaser nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the Acquisition Agreement to each of their respective obligations to close the Sale Transaction have been met, satisfied, or waived in accordance with the terms of the Acquisition Agreement.

49.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited

to Bankruptcy Rule 6004(h), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly:  (a) the terms of this Order shall be immediately effective and enforceable upon its entry; (b) the Debtors are not subject to any stay of this Order or in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

50.    The provisions of this Order are nonseverable and mutually dependent.

51.    Notwithstanding anything to the contrary in this Sale Order, or any Notice related thereto, but conditioned upon the occurrence of the Closing Date: (a) the ASO Agreement (as defined in the Objection of Cigna to Notice of Proposed Assumption and Assignment of Certain Executory Contracts [Docket No. 558] (the "**Cigna Objection**")) is assumed and assigned to the Purchaser as of the Closing Date, and, in lieu of cure, all obligations due and unpaid under the ASO Agreement accruing prior to the Closing Date shall pass through to the Purchaser and survive assumption and assignment so that nothing in this Sale Order or 11 U.S.C. §365 shall affect such obligations; and (b) upon Closing, the Debtors shall transfer to the Purchaser, the Debtors' segregated bank account at Citibank, N.A., Account No. XXXXXX3746, held in the name of Debtor The McClatchy Company, through which eligible dental claims of the Debtors' employees and their dependents are funded under the ASO Agreement (as defined in the Cigna Objection). This fully resolves the Cigna Objection.

52.    Notwithstanding anything to the contrary in the Motion, the APA, the Backup Bid, any list of Assigned Contracts or Cure Notice, or this Order, (a) nothing shall permit or otherwise effect a sale, an assignment or any other transfer at this time of (i) any insurance policies that have been issued by ACE American Insurance Company, Illinois Union Insurance Company, Indemnity

31

Insurance Company of North America, Westchester Fire Insurance Company, Federal Insurance Company, Pacific Indemnity Company, Executive Risk Indemnity, Inc. and any of their U.S.-based affiliates and successors (collectively, the "**Chubb Companies**") and all agreements, documents or instruments relating thereto (collectively the "**Chubb Insurance Contracts**"), and/or (ii) any rights, proceeds, benefits, claims, rights to payments and/or recoveries under such Chubb Insurance Contracts, and (b) the Chubb Insurance Contracts shall not be or be deemed to be Assigned Contracts unless and until execution of an assumption agreement by the Debtors, the Successful Bidder, and the Chubb Companies, in form and substance satisfactory to each of the parties (the "**Chubb Assumption Agreement**"), with the rights of the parties fully preserved pending the execution of such Chubb Assumption Agreement.

53.    Since January 1, 2006, The Travelers Indemnity Company and certain of its property casualty insurance affiliates (collectively, "**Travelers**") have issued certain commercial insurance policies, which provide, among other things, workers' compensation, automobile liability, general liability, and excess liability insurance to certain of the Debtors in various states (the "**Travelers Policies**").  The current Travelers Policies run from January 1, 2020 through December 31, 2020.  Under the Travelers Policies, the Debtors have payment obligations to Travelers evidenced by various program agreements for each of the policy years (the "**Travelers Program Agreements**" and, together with the Travelers Policies, all ancillary agreements and insurance documents and all collateral provided by the Debtors pursuant to the Program Agreements, the "**Travelers Insurance Program**").  Pursuant to Section 365 of the Bankruptcy Code, the Debtors are authorized to assume the Travelers Insurance Program, including the payment obligations and collateral obligations thereunder, and to assign the Travelers Insurance Program to the Purchaser.

54.     There are no defaults that must be cured under the Travelers Insurance Program in connection with the assumption and assignment of the Travelers Insurance Program pursuant to this Order.  However, certain future payments may be required under the Travelers Insurance Program that relate to claims and occurrences that pre-date the entry of this Order. Notwithstanding anything to the contrary in the Motion, the APA, any List of Assigned Contracts or Cure Notice, or this Order, following the assumption and assignment of the Travelers Insurance Program pursuant to this Order, the Purchaser shall be responsible for payment of any amounts due under the Travelers Insurance Program, including amounts that relate to claims and occurrences that pre-date the entry of this Order.

55.     Notwithstanding anything to the contrary in the Motion, the APA, or any list of Assigned Contracts or Cure Notice, or this Order, the Triple Net Lease by and between SCF - 2100 Q Street Owner, LLC, 2100 Q Street TIC 1 Owner, LLC, 2100 Q Street TIC 2 Owner, LLC, and 2100 Q Street TIC IV Owner, LLC (collectively, "Landlord") and The McClatchy Company ("**Tenant**") for certain premises located at 2100 Q Street, Sacramento, California 95816 shall not be assumed and assigned to Purchaser unless and until Landlord and Tenant enter into a new and/or amended lease in form and substance acceptable to Landlord, Tenant, and OWS CF V SPV, LLC, including without limitation, satisfaction of all conditions required under section 365 of the Bankruptcy Code to effectuate the assumption and assignment of the subject lease.

56.     The portion of the claims of the Local Texas Tax Authorities (Harris County and Tarrant County) which are not Permitted Pre-Closing Encumbrances to be paid by the Purchaser pursuant to section 8.1(b) of the Asset Purchase Agreement, shall be afforded adequate protection by the following:  From the proceeds of the sale of any of the Debtors' assets located within their jurisdictions and funded from the Cash Remainder, the amount of $36,321.14 shall be placed in a

segregated account as adequate protection for the secured claims of the Local Texas Tax Authorities. The liens of the Local Texas Tax Authorities shall attach to these proceeds to the same extent and with the same priority as the liens they now hold against the property of the debtors. These funds shall be on the order of adequate protection and shall constitute neither the allowance of the claims of the Local Texas Tax Authorities, nor a cap on the amounts they may be entitled to receive. Furthermore, the claims and liens of the Local Texas Tax Authorities shall remain subject to any objections any party would otherwise be entitled to raise as to the priority, validity or extent of such liens. These funds may be distributed only upon agreement between the Local Texas Tax Authorities and the debtors, or by subsequent order of the Court, duly noticed to the Local Texas Tax Authorities.

Dated: New York, New York
       August 7, 2020

**s/Michael E. Wiles**
HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

**ANNEX A**

**STIPULATION REGARDING MEDIATED SALE AND PLAN SETTLEMENT**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
*In re*                                                 :    **Chapter 11**
                                                        :
**THE McCLATCHY COMPANY**, *et al.*,                    :    **Case No. 20-10418 (MEW)**
                                                        :
          **Debtors.**[1]                               :    **(Jointly Administered)**
                                                        :
-------------------------------------------------------- x

### STIPULATION REGARDING MEDIATED SALE AND PLAN SETTLEMENT

In consideration of entry of the Order (I) Approving the Sale of the Acquired Assets Free and Clear of Claims, Liens, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief [Docket No. 693, Exh. B] (as may be amended or modified consistent with the terms hereof) (the "**Sale Order**"), the Debtors, Official Creditors' Committee ("**Committee**"), Chatham Asset Management ("**CAM**"), Brigade Capital Management ("**BCM**") and the Buyer (as defined below) (collectively, the "**Parties**") hereby agree and stipulate to the following settlement terms:

1.      The Parties will affirmatively support entry of an order (the "**Sale Order**") approving (a) the sale (the "**Sale**") of substantially all of the Debtors' assets to the buyer-entity (the "**Buyer**") and on the terms provided for in the asset purchase agreement filed by the Debtors on July 24, 2020 as Exhibit B to the Notice of Successful Bid Asset Purchase Agreement [Docket No. 693] (the "**APA**"), as amended to provide for the terms of this settlement and all exhibits hereto and (b) this settlement.

2.      The Parties will affirmatively support a joint chapter 11 plan that reflects the terms of this settlement (the "**Plan**") on behalf of the Debtors and will affirmatively support entry of an order confirming the Plan and take all steps necessary to cause the Plan to become effective as soon as possible thereafter (the "**Effective Date**").

3.      Pursuant to the Plan, a trust for the benefit of unsecured creditors shall be created (the "**GUC Trust**").

---

[1]     The last four digits of Debtor The McClatchy Company's tax identification number are 0478.  Due to the large number of debtor entities in these jointly administered chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/McClatchy.  The location of the Debtors' service address for purposes of these chapter 11 cases is: 2100 Q Street, Sacramento, California 95816.

4.     The trustee of the GUC Trust and any party selected to monitor the administration of the claims against the Debtors' estates shall be selected by the Committee, with the costs for each to be borne by the GUC Trust.

5.     In connection with the entry of the Sale Order, the Parties shall support the adjournment of the pending motion of the Committee seeking standing to pursue all estate claims, as limited herein (the "**D&O Claims**") against current and former directors and officers (collectively, the "**D&Os**") to the date of the hearing scheduled for confirmation of the Plan. Prior to the Effective Date, any settlement, compromise and/or release of any of the D&O Claims must be approved by both the Debtors and by the Committee, each in their sole discretion. To the extent the D&O Claims are not settled or dismissed pursuant to a final order prior to the Effective Date, the Parties agree that the D&O Claims shall be transferred to the GUC Trust pursuant to the order confirming the Plan. The GUC Trust shall be deemed a successor to the Debtors with respect to the D&O Claims and shall have exclusive authority to prosecute or settle such claims, subject to the terms of the documents governing the GUC Trust. The confirmation order and the plan shall explicitly state that in pursuing the D&O Claims, the GUC Trust shall (i) expressly forgo enforcement of any final judgment against any defendant to the extent such judgment is not fully covered by and payable exclusively from insurance maintained by the Debtors for the benefit of any director or officer and (ii) minimize discovery with respect to any Transferred Employees that accept employment from the Buyer by seeking relevant information from other parties prior to seeking such information from any such Transferred Employees. For the avoidance of doubt, other than with respect to the D&O Claims, nothing herein shall affect the releases granted in the APA to the Transferred Employees; provided, however, that the confirmation order and the plan shall explicitly state that the GUC Trust shall not sue any Transferred Employees who are or were also D&Os.

6.     The Buyer agrees that, and pursuant to the Plan, the proceeds of any tax refund (the "**Tax Refund**") from the carryback of any net operating loss or capital loss (or similar attribute) from the taxable year that includes the Sale, net of the Deferred Amounts (as defined below), shall be distributed as follows: 77.5% to the GUC Trust and 22.5% to the Buyer.

7.     Pursuant to the Plan, the GUC Trust shall be entitled to receive $1 million as of the Effective Date, funded as follows: CAM shall fund $400,000 into an escrow on the closing date of the Sale for the benefit of the GUC Trust, which shall be transferred to the GUC Trust on the Effective Date, and $600,000 shall be deferred as described below.

8.     The following amounts, after application of the professional fee limits described in paragraph 12 hereof, which would otherwise be payable as administrative claims of the Debtors' estates or would be payable pursuant to the Plan, shall be deferred and paid from the Tax Refund prior to any distribution of the Tax Refund to the GUC Trust or the Buyer: (a) $500,000 of professional fees payable in the aggregate to Paul Weiss and Ducera, as advisors to CAM; (b) $100,000 of

professional fees payable in the aggregate to Stroock, BRG, Moelis and Dundon as advisors to the Committee; (c) $600,000 payable to the GUC Trust, and (d) the reasonable and documented costs, fees and expenses (including reasonable and documented fees and expenses of professionals), if any, incurred by the Buyer after the closing of the Sale to diligently pursue the Tax Refund (collectively, the "**Deferred Amounts**"); provided, however, that, on the Effective Date, to the extent that the Debtors have excess cash available to pay all or a portion of the Deferred Amounts after satisfaction of allowed administrative claims, such Deferred Amounts shall be paid in cash with each party receiving their pro rata share of such excess cash amount if there is not enough cash to satisfy all such Deferred Amounts.

9.    The Sale Order shall provide that, subject to the Closing, CAM shall receive a release, provided, however that such release shall not preclude the parties from enforcing this settlement (including, but not limited to, the requirement that CAM support the Plan and votes its deficiency claims to accept the Plan) and such release shall be invalidated to the extent that CAM fails to support confirmation and effectiveness of the Plan by (a) failing to vote to accept the Plan (b) failing to support, act in good faith, and take all reasonable actions necessary to consummate the Plan and implement the terms of this settlement agreement (it being understood that CAM shall be under no obligation to incur any material expense or liability in connection therewith, except to the extent expressly set forth in this settlement or the APA), or (c) taking actions, directly or indirectly, that could reasonably be expected to materially delay, interfere with or impede the confirmation or consummation of the Plan, whereupon any and all estate claims against CAM shall be transferred to the GUC Trust.

10.    The Sale Order shall provide that, subject to the Closing, BCM shall receive a release from any and all liability, including but not limited to any liabilities related to or arising out of the Debtors' chapter 11 cases, the operation of the Debtors' businesses during the chapter 11 cases, the investigation, formulation, preparation, negotiation, execution, delivery, implementation, or consummation of the transactions contemplated by the Sale, provided, however, that (a) such release shall not preclude the parties from enforcing this settlement (including, but not limited to, the requirement that BCM support the implementation of the terms of the settlement), and (b) such release shall be invalidated to the extent that (i) BCM fails to support, act in good faith, and take all reasonable actions necessary to implement the terms of this settlement (it being understood that BCM shall be under no obligation to incur any material expense or liability in connection therewith, except to the extent expressly set forth in this settlement or the APA), or (ii) BCM takes any actions, directly or indirectly, that could reasonably be expected to materially delay, interfere with or impede the settlement.

11.    Except for CAM's right to receive a distribution of one dollar on account of CAM's second lien debt, CAM and BCM shall waive any right to receive a distribution on account of any of claims held by them under the Plan or from the GUC Trust until

the claims of other unsecured creditors have been satisfied in full and the Plan shall provide that all secured creditor deficiency claims shall not share in any distributions to unsecured creditors or any other distribution and such claims shall have no right to any distributions from the GUC Trust, until such other unsecured creditors have been satisfied in full.

12. In order to ensure the administrative solvency of the Debtors' estates and provide for the ability to confirm the Plan and cause it to become effective, the schedule attached hereto (the "**Admin Liability Schedule**") sets forth various limits on professional fees applicable to the professionals for the Debtors, the Committee, CAM and BCM and certain modifications to the terms of the APA.

13. None of the Parties shall object to the professional fees and expenses requested to be paid by the professionals for the Debtors, the Committee, CAM or BCM (the "**Professional Fees**").

14. To the extent that Professional Fees are limited by the Admin Liability Schedule (such as for the months of July and August 2020 or the period after the entry of the Sale Order), the amounts payable to each professional within such limitation shall be allocated pro rata with the numerator being the total amount of such professional's fees for the period in which the fee limitation applies and denominator being the total amount of all claims of the professionals for the same period, and all Parties and professionals for all Parties agree to act in good faith to minimize the amount of fees and expenses to conclude these cases in an orderly manner. The Honorable Kevin Carey shall mediate any disputes with respect to the pro rata allocation of any Professional Fees.

15. As provided for in the Admin Liability Schedule, the fees and expenses of WSFS as indenture trustee for the unsecured debentures and Seward & Kissel as counsel to WSFS shall be paid on the Effective Date.

16. To the extent not already provided for in the APA, the APA shall provide for the assumption by the Buyer of all collective bargaining agreements to which the Debtors' are a party.

17. The Plan shall waive all preference claims.

18. The Plan shall contain representations and covenants among the Buyer (on its account and on account of any Transferred Employees), any plan administrator and the GUC Trust providing for reasonable access to books and records necessary to pursue the Tax Refund and requiring diligent pursuit of the Tax Refund and no conduct by any Party that could interfere with or degrade the value of the same.

19. Each of the undersigned counsel represents that he/she is authorized to execute this Stipulation and Order on behalf of his/her respective client(s).

*[Rest of Page Left Intentionally Blank]*

STIPULATED AND AGREED THIS ___ DAY OF AUGUST 2020:


___/s/ Van C. Durrer, II_____          ___/s/ Kristopher M. Hansen_____

SKADDEN, ARPS, SLATE, MEAGHER &          STROOCK STROOCK & LAVAN LLP
FLOM LLP                                 Kristopher M. Hansen
Van C. Durrer, II                        180 Maiden Lane
300 S. Grand Avenue, Suite 3400          New York, NY 10038
Los Angeles, California 90071-3144       Telephone: (212) 806-6056
Telephone: (213) 687-5000                Fax: (212) 806-6006
Fax: (213) 687-5600                      *Counsel for the Official Committee of*
*Counsel for Debtors*                    *Unsecured Creditors*


___/s/ Andrew N. Rosenberg_____          ___/s/ Douglas Mannal_____

PAUL, WEISS, RIFKIND, WHARTON &          KRAMER LEVIN NAFTALIS & FRANKEL
GARRISON LLP                             LLP
Andrew N. Rosenberg                      Douglas Mannal
1285 Avenue of the Americas              1177 Avenue of the Americas
New York, NY 10019-6064                  New York, NY 10036
Telephone: (212) 373-3158                Telephone: (212) 715-9313
Fax: (212) 492-0158                      Fax: (212) 715-8308
*Counsel for Chatham Asset Management, LLC*          *Counsel for Brigade Capital Management, LP*
*and the Buyer*

## ADMIN LIABILITY SCHEDULE

Project News
Administrative and Priority Claims Forecast
Assumes Transaction Close of August 31, 2020

| Administrative and Priority Claims Estimate | Admin Claims |
|---|---|
| ($USD 000's) | 8/31/2020 |
| **Funding Sources:** | |
| Cash Contribution | $    30,000 |
| ABL Cash Funding | 19,153 |
| CAM Settlement GUC Trust Funding | 1,000 |
| **Total Funding Sources** | $    50,153 |
| | |
| **Administrative Claims** | |
| Accrued and Unpaid Estate Professional Fees | 4,645 |
| Accrued and Unpaid Non-Estate Professional Fees | 900 |
| Est. Incremental Fees for Jul/Aug | 1,900 |
| Indenture Trustee Fee Estimate | 315 |
| Post-Closing Fees | 10,921 |
| Pre-Petition 1st Lien Interest | 14,447 |
| Outstanding 1st Lien Adequate Protection | 986 |
| DIP Revolver Balance | 8,535 |
| 503(b)(9) Claims | 163 |
| **Total Administrative Claims** | 42,812 |
| | |
| **Priority Claims** | |
| Other Tax Claims | 4,476 |
| Tax Adjustments | 1,000 |
| **Total Priority Claims** | 5,476 |
| | |
| **Total Administrative and Priority Claims** | 48,288 |
| | |
| **Excess (Shortfall) for Wind-Down Budget** | $    1,865 |
| | |
| Wind-Down Budget | 2,000 |
| | |
| **Excess (Shortfall) After Wind-Down Budget** | $    (135) |
| | |
| Paul Weiss/Ducera Professional Fee Deferral to Tax Refund | 500 |
| UCC Professsional Fee Deferral to Tax Refund | 100 |
| GUC Trust funding deferral to Tax Refund | 600 |
| | |
| **Excess/(Shortfall) After Fee Deferral (GUC Trust Funding)** | $    1,065 |

**Project News**
**Professional Fees Caps**
*($ in thousands)*

| | Professional Fee Caps |
| --- | --- |
| | **P2 - P8** |
| **Debtors** | |
| Skadden | $ 7,397 |
| FTI | 3,432 |
| Togut | 2,552 |
| Groom | 664 |
| Evercore | 979 |
| Evercore Post-Closing Fee | 3,456 |
| **Subtotal** | **18,481** |
| | |
| **UCC Professionals** | |
| Stroock | 6,045 |
| BRG | 1,770 |
| Dundon | 79 |
| Moelis | 640 |
| Moelis Post-Closing Fee | 2,933 |
| Forecast Fees | 950 |
| **Subtotal** | **12,415** |
| | |
| **CAM Professionals** | |
| Paul Weiss | 2,631 |
| Quinn Emanuel | 905 |
| Ducera | 857 |
| Ducera Post-Closing Fee | 3,206 |
| **Subtotal** | **7,599** |
| | |
| **Brigade Professionals** | |
| Kramer Levin | 2,937 |
| GLC | 861 |
| GLC Post-Closing Fee | 1,283 |
| **Subtotal** | **5,081** |
| | |
| **Professional fees in excess of budget Jul/Aug [FN1]** | **1,606** |
| | |
| **Grand Total** | **45,182** |

**[FN1]** Excludes Brigade Professionals.

**Project News**
**DIP Forecast**
*($ in 000s)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Filing/Emergence | | | | | | | 1 / 5 |
| Fiscal Month | | 7 | 8 | 8 | 8 | 8 | |
| Fiscal Week | | 31 | 32 | 33 | 34 | 35 | **Total Weeks 1 thru 5** |
| Week Number | | 1 | 2 | 3 | 4 | 5 | |
| Week Ending | | 8/2/2020 | 8/9/2020 | 8/16/2020 | 8/23/2020 | 8/30/2020 | |

**I. Cash Flows**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| A | 1 Operating Receipts | $ 9,342 | $ 9,230 | $ 8,288 | $ 9,157 | $ 12,688 | $ 48,706 |
| B | Operating Disbursements | | | | | | |
| | 2 Payroll & Benefits | $ (2,909) | $ (5,762) | $ (1,269) | $ (6,060) | $ (1,008) | $ (17,009) |
| | 4 Newsprint & Ink | - | - | (2,436) | - | - | (2,436) |
| | 5 Rent | (410) | (78) | (345) | (401) | (508) | (1,742) |
| | 6 Insurance (excl. personnel) | - | - | - | - | - | - |
| | 7 Taxes | (3) | (1) | (12) | (641) | (0) | (657) |
| | 8 Trade AP and Others | (7,379) | (6,612) | (5,973) | (7,379) | (6,621) | (33,965) |
| | 9 Total Operating Disbursements | $ (10,701) | $ (12,454) | $ (10,035) | $ (14,482) | $ (8,137) | $ (55,808) |
| | 10 Operating Cash Flows | $ (1,359) | $ (3,223) | $ (1,746) | $ (5,325) | $ 4,551 | $ (7,102) |
| C | Non-Operating Disbursements | | | | | | |
| | 11 Capital Expenditures | $ (169) | $ (171) | $ (368) | $ (144) | $ (151) | $ (1,003) |
| | 12 Lease Payments | - | (663) | - | - | - | (663) |
| | 13 Debt Payments | (59) | - | (1,971) | - | - | (2,031) |
| | 14 Total Non-Operating Disbursements | $ (228) | $ (833) | $ (2,340) | $ (144) | $ (151) | $ (3,697) |
| D | Restructuring Disbursements | | | | | | |
| | 15 Restructuring Professional Fees | $ - | $ - | $ (2,587) | $ (5,509) | $ - | $ (8,095) |
| | 16 US Trustee | (775) | - | - | - | - | (775) |
| | 17 Total Restructuring Disbursements | $ (775) | $ - | $ (2,587) | $ (5,509) | $ - | $ (8,870) |
| | 18 Net Cash Flow | $ (2,362) | $ (4,057) | $ (6,673) | $ (10,978) | $ 4,400 | $ (19,669) |

**II. Liquidity**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| E | Cash Balance | | | | | | |
| | 19 Beg. Book Cash (Restricted + Unrestricted) | $ 52,733 | $ 50,371 | $ 46,314 | $ 39,641 | $ 34,075 | $ 52,733 |
| | 20 *Add: Net Cash Flow* | (2,362) | (4,057) | (6,673) | (10,978) | 4,400 | (19,669) |
| | 21 *Add: Cash Float* | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| | 22 Cash Before Revolver Activity | 52,871 | 48,814 | 42,141 | 31,163 | 40,976 | 35,564 |
| | 23 *Add: Borrowing / (Paydown)* | - | - | - | 5,412 | 3,123 | 8,535 |
| | 24 Ending Bank Cash (Restricted + Unrestricted) | 52,871 | 48,814 | 42,141 | 36,575 | 44,099 | 44,099 |
| | 25 *Less: Restricted Cash* | (39,941) | (39,941) | (39,941) | (36,575) | (36,575) | (36,575) |
| | 26 *Ending Bank Cash Balance (Unrestricted)* | $ 12,929 | $ 8,873 | $ 2,200 | $ - | $ 7,523 | $ 7,523 |
| F | Revolver Balance | | | | | | |
| | 28 Beginning Revolver Balance (Borrowing) | $ - | $ - | $ - | $ - | $ 5,412 | $ - |
| | 29 *Borrowing / Paydown [Net Cash Flow]* | - | - | - | 5,412 | 3,123 | 8,535 |
| | 30 *Adjustment* | | | | | | - |
| | 31 Ending Revolver Balance (Borrowing) | $ - | $ - | $ - | $ 5,412 | $ 8,535 | $ 8,535 |
| G | Revolver Availability | | | | | | |
| | 32 Borrowing Base | $ 1,147 | $ 1,171 | $ 7,082 | $ 12,056 | $ 12,455 | $ 12,455 |
| | 33 *Less: Revolver Balance* | - | - | - | *(5,412)* | *(8,535)* | *(8,535)* |
| | 34 Revolver Availability | $ 1,147 | $ 1,171 | $ 7,082 | $ 6,644 | $ 3,920 | $ 3,920 |
| H | Total Liquidity | | | | | | |
| | 35 Liquidity (Availability + Unrestricted Bank Cash) | $ 14,076 | $ 10,044 | $ 9,281 | $ 6,644 | $ 11,444 | $ 11,444 |