**EXHIBIT 1**

**Plan of Distribution**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

| | | |
|---|---|---|
| *In re* | : | **Chapter 11** |
| | : | |
| **JCK LEGACY COMPANY**, *et al.*, | : | **Case No. 20-10418 (MEW)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------- x

### FIRST AMENDED JOINT CHAPTER 11 PLAN OF DISTRIBUTION OF JCK LEGACY COMPANY AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Shana A. Elberg
Bram A. Strochlic
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000

TOGUT, SEGAL & SEGAL LLP
Albert Togut
Kyle J. Ortiz
Amy Oden
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Fax: (212) 967-4258

– and –

Van C. Durrer, II
Destiny N. Almogue (admitted *pro hac vice*)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Fax: (213) 687-5600

– and –

Jennifer Madden (admitted *pro hac vice*)
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Fax: (650) 470-4570

*Counsel for Debtors and Debtors in Possession*

Dated: New York, New York
    September 23, 2020

---

[1]    The last four digits of Debtor JCK Legacy Company's tax identification number are 0478.  Due to the large number of debtor entities in these jointly administered chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/McClatchy.  The location of the Debtors' service address for purposes of these chapter 11 cases is: 2100 Q Street, Sacramento, California 95816.

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS, RULES OF  INTERPRETATION, AND COMPUTATION OF
TIME................................................................................................................2

    A.    Scope of Definitions ................................................2
    B.    Definitions..............................................................2
    C.    Rules of Interpretation ...........................................24
    D.    Computation Of Time .............................................25
    E.    References to Monetary Figures ............................25
    F.    Exhibits ..................................................................25

Article II UNCLASSIFIED CLAIMS .........................................................25

    2.1    Administrative Claims ...........................................25
    2.2    Professional Fees and Expenses of the Debtors, the Chatham
        Parties, the Brigade Parties, and the Committee...................26
    2.3    Deferred Amounts Claims .....................................26
    2.4    Fees and Expenses of the 2027 Debentures Trustee and the 2029
        Debentures Trustee ................................................27
    2.5    Professional Claims. ..............................................27
        (a)    Final Fee Applications...........................27
        (b)    Payment of Interim Amounts.................27
        (c)    Payment of Holdback Amounts..............27
        (d)    Post-Confirmation Date Retention / Professional Fees .................28
    2.6    Priority Tax Claims................................................28
    2.7    Payments Under Other Final Orders.......................28
    2.8    First Lien Notes Claims .........................................28
    2.9    DIP Facility Claims................................................28

Article III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND
INTERESTS ..................................................................................................28

    3.1    Classification of Claims and Interests.....................28

Article IV PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS......................29

    4.1    Class 1 – Other Priority Claims. ...........................29
    4.2    Class 2 – Other Secured Claims.............................30
    4.3    Class 3 – Second Lien Term Loan Claims................31
    4.4    Class 4 – Third Lien Notes Claims ........................31
    4.5    Class 5 – General Unsecured Claims......................31
    4.6    Class 6 – Intercompany Claims .............................32
    4.7    Class 7 – Intercompany Interests ...........................32
    4.8    Class 8 – Subordinated Claims. .............................32

4.9      Class 9 – Existing Parent Equity ....................................................32

Article V ACCEPTANCE ..........................................................................33

5.1      Special Provisions Governing Unimpaired Claims ...................33
5.2      Class Entitled to Vote ................................................................33
5.3      Acceptance by Impaired Class ...................................................33
5.4      Elimination of Classes ...............................................................33
5.5      Cramdown ...................................................................................33

Article VI MEANS FOR IMPLEMENTATION OF THE PLAN ...............34

6.1      Distribution Mechanics. .............................................................34
6.2      General Settlement of Claims and Interests ...............................34
6.3      The Committee Settlement. ........................................................34
6.4      Plan Funding. ..............................................................................36
6.5      Wind-Down Debtors ...................................................................36
6.6      Plan Administration Trust and Plan Administration Trustee ......37
6.7      Wind Down .................................................................................39
6.8      Plan Administration Trustee Insurance, and Liability Limitation ............40
6.9      Tax Returns .................................................................................40
6.10     Dissolution of the Debtors and Wind-Down Debtors ................40
6.11     Cancellation of Old McClatchy Securities, Agreements, and the
         Second Lien Term Loan ..............................................................40
6.12     Restructuring Transactions .........................................................41
6.13     Corporate Action ........................................................................42
6.14     Effectuating Documents; Further Transactions ..........................42
6.15     [Reserved] ..................................................................................43
6.16     Preservation Of Causes Of Action .............................................43
6.17     Release of Avoidance Actions; Reservation of Rights ...............43
6.18     Exemption from Certain Transfer Taxes and Recording Fees ....44
6.19     Insured Claims ............................................................................44
6.20     GUC Recovery Trust ..................................................................44
6.21     Cooperation Among the Wind-Down Debtors, the Plan
         Administration Trust, the GUC Recovery Trust, and the Purchaser ........47

Article VII UNEXPIRED LEASES AND EXECUTORY CONTRACTS ...............47

7.1      Assumption and Rejection of Executory Contracts and Unexpired
         Leases .........................................................................................47
7.2      Cure Procedures and Payments Related to Assumption of
         Executory Contracts and Unexpired Leases ...............................49
7.3      Claims Based on Rejection of Executory Contracts or Unexpired
         Leases .........................................................................................49
7.4      Determination of Assumption Disputes and Deemed Consent ...............49
7.5      Insurance Policies .......................................................................50
7.6      General Reservation of Rights ....................................................50

ii

7.7    Nonoccurrence of the Effective Date ..................................................50

Article VIII PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND
INTERESTS ...............................................................................................50

8.1    Determination Of Claims and Interests ..............................................50
8.2    Claims Administration Responsibility ................................................51
8.3    Objections to Claims ..........................................................................51
8.4    Disallowance of Claims .....................................................................52
8.5    Estimation of Claims ..........................................................................52
8.6    No Interest on Disputed Claims ..........................................................53
8.7    Amendments to Claims ......................................................................53
8.8    Single Satisfaction of Claims .............................................................53

Article IX PROVISIONS GOVERNING DISTRIBUTIONS ....................................53

9.1    Time of Distributions .........................................................................53
9.2    Currency ............................................................................................54
9.3    Distribution Agent. ............................................................................54
9.4    Distribution on Account of Claims Administered by Servicers:
Delivery of Distributions to Servicers. ..............................................54
9.5    Distributions on Account of Claims Allowed After the Effective
Date ...................................................................................................54
(a)    No Distributions Pending Allowance .............................54
(b)    Special Rules for Distributions to Holders of Disputed
Claims ..........................................................................55
9.6    Delivery Of Distributions ..................................................................55
(a)    Record Date for Distributions ........................................55
(d)    Undeliverable Distributions ...........................................56
(e)    Reversion ......................................................................56
(f)    De Minimis Distributions ..............................................56
(g)    Fractional Distributions .................................................56
9.7    Surrender of Securities or Instruments ...............................................56
9.8    Compliance Matters ...........................................................................57
9.9    Claims Paid or Payable by Third Parties ............................................57
(a)    Claims Paid by Third Parties .........................................57
(b)    Claims Payable by Insurance Carriers ...........................57
(c)    Applicability of Insurance Policies ................................58
9.10    Setoffs ...............................................................................................58
9.11    Recoupment .......................................................................................58
9.12    Allocation of Plan Distributions Between Principal and Interest .............58

Article X EFFECT OF THE PLAN ON CLAIMS AND INTERESTS .......................59

10.1    Vesting of Assets ...............................................................................59
10.2    Compromises and Settlements ...........................................................59
10.3    Release by Debtors ............................................................................59

10.4    Release by Holders of Claims and Interests ............................................61
10.5    Exculpation and Limitation of Liability ................................................62
10.6    Injunction ...............................................................................................63
10.7    Subordination Rights .............................................................................63
10.8    Protection Against Discriminatory Treatment ........................................64
10.9    Release of Liens......................................................................................64
10.10   Reimbursement or Contribution .............................................................64

Article XI CONDITIONS PRECEDENT............................................................................64

11.1    Conditions to the Effective Date of the Plan .........................................64
11.2    Waiver of Conditions Precedent .............................................................65
11.3    Notice of Effective Date .........................................................................65
11.4    Effect of Non-Occurrence of Conditions to Consummation...................65
11.5    Substantial Consummation .....................................................................66

Article XII RETENTION OF JURISDICTION ..................................................................66

Article XIII MISCELLANEOUS PROVISIONS.................................................................68

13.1    Immediate Binding Effect.......................................................................68
13.2    Payment of Statutory Fees .....................................................................68
13.3    Modification and Amendments...............................................................68
13.4    Confirmation of the Plan ........................................................................69
13.5    Additional Documents ............................................................................69
13.6    Revocation, Withdrawal, or Non-Consummation ...................................69
        (a)     Right to Revoke or Withdraw .....................................................69
        (b)     Effect of Withdrawal, Revocation, or Non-Consummation ..........69
13.7    Notices ....................................................................................................69
13.8    Term of Injunctions or Stays..................................................................71
13.9    Governing Law .......................................................................................71
13.10   Entire Agreement ....................................................................................71
13.11   Dissolution of Committee .......................................................................71
13.12   Severability .............................................................................................72
13.13   Votes Solicited in Good Faith.................................................................72
13.14   No Waiver or Estoppel............................................................................72
13.15   Closing the Chapter 11 Cases .................................................................72

## INTRODUCTION

JCK Legacy Company (f/k/a The McClatchy Company), together with the other debtors and debtors in possession in the above-captioned Chapter 11 Cases, hereby propose this joint chapter 11 plan of distribution pursuant to section 1121(a) of the Bankruptcy Code for the resolution of outstanding Claims and Interests.[2] Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the Debtors and each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The distributions to be made to Holders of Claims are set forth herein. JCK Legacy Company's non-Debtor subsidiaries are not subject to the Chapter 11 Cases or this Plan.

Reference is made to the Disclosure Statement, filed substantially concurrently with this Plan, for a discussion of (i) the history, business, properties and operations, and projections of the Debtors and their subsidiaries, (ii) an overview of recent developments relating to the formulation of the Committee Settlement and the Plan, (iii) a summary and analysis of the Plan (which incorporates the Committee Settlement), and (iv) certain related matters.. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the Committee Settlement, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

On May 5, 2020, the Debtors filed a motion (the "***Bidding Procedures Motion***") seeking, among other things: (i) entry of an order (the "***Bidding Procedures Order***") approving the bidding procedures (the "***Bidding Procedures***") for the potential sale of all or substantially all of the Debtors' assets (the "***Acquired Assets***"). On May 11, 2020, the Bankruptcy Court entered the Bidding Procedures Order [Docket No. 432].

In accordance with the Bidding Procedures, on July 10, 2020, the Debtors conducted an auction by video and telephonic conference (the "***Auction***") to determine the highest or otherwise best bid for the Acquired Assets. At the Auction, the Debtors identified the bid submitted by SIJ Holdings, LLC (the "***Purchaser***"), an affiliate of Chatham Asset Management, LLC ("***Chatham***"), as the highest or otherwise best bid for the Acquired Assets and the Purchaser was therefore designated as the Successful Bidder (as defined in the Bidding Procedures).

On August 4, 2020, the Debtors, the Committee, the Chatham Parties and the Brigade Parties entered into the Committee Settlement (defined below), the terms of which are described in the Stipulation Regarding Mediated Sale and Plan Settlement (defined below) and in Article 6.3 hereof.

On August 7, 2020, the Bankruptcy Court entered an order (the "***Sale Order***") approving (i) the sale of the Acquired Assets to the Successful Bidder pursuant to the terms of the Asset Purchase Agreement (the "***Asset Purchase Agreement***") involving a credit bid of the First Lien Notes Claims, by and among The McClatchy Company, the subsidiary sellers parties thereto, SIJ Holdings, LLC, Chatham, and Chatham Asset High Yield Master Fund, Ltd. and (ii) the

---

[2]     Capitalized terms used herein shall have the meanings ascribed to them in Article I.B of this Plan.

Stipulation Regarding Mediated Sale and Plan Settlement [Docket No. 744]. The Stipulation Regarding Mediated Sale and Plan Settlement is an exhibit to the Sale Order.

ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THE PLAN, THE ACCOMPANYING DISCLOSURE STATEMENT AND THEIR RESPECTIVE EXHIBITS IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I

## DEFINITIONS, RULES OF <u>INTERPRETATION, AND COMPUTATION OF TIME</u>

### A.    <u>Scope of Definitions</u>

For purposes of this Plan, except as expressly provided otherwise or unless the context requires otherwise, all capitalized terms not otherwise defined shall have the meanings ascribed to them in <u>Article I.B</u> of this Plan.  Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

### B.    <u>Definitions</u>

1.1    "*2027 Debentures*" means those certain 7.15% Debentures due November 1, 2027 issued pursuant to the 2027 Debentures Indenture.

1.2    "*2027 Debentures Trustee*" means Wilmington Savings Fund Society, FSB, in its capacity as successor indenture trustee under the 2027 Debentures Indenture, and any predecessor thereof.

1.3    "*2027 Debentures Indenture*" means that certain Indenture dated as of November 4, 1997, as amended, supplemented or otherwise modified from time to time, by and between The McClatchy Company, as successor in interest to Knight-Ridder, Inc., as issuer, and the 2027 Debentures Trustee, as trustee.

1.4    "*2029 Debentures*" means those certain 6.875% Debentures due March 15, 2029 issued pursuant to the 2029 Debentures Indenture.

1.5    "*2029 Debentures Trustee*" means Wilmington Savings Fund Society, FSB, in its capacity as successor indenture trustee under the 2029 Debentures Indenture, and any predecessor thereof.

1.6    "*2029 Debentures Indenture*" means that certain Indenture dated as of November 4, 1997, as amended, supplemented or otherwise modified from time to time, by and between The McClatchy Company, as successor in interest to Knight-Ridder, Inc., as issuer, and the 2029 Debentures Trustee, as trustee.

1.7    "***Admin Liability Schedule***" means the schedule of limitations on certain professional fees and expenses attached to the Stipulation Regarding Mediated Sale and Plan Settlement.

1.8    "***Administrative Claim***" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the business of the Debtors; (ii) Allowed Professional Claims, subject to the Professional Fee Caps; (iii) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; and (iv) fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

1.9    "***Administrative Claim Request Form***" means the form to be included in the Plan Supplement for submitting Administrative Claim requests.

1.10    "***Administrative Claims Bar Date***" means the deadline for filing proofs of or requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to (i) Professional Claims, (ii) Administrative Claims Allowed by an order of the Bankruptcy Court on or before the Effective Date, or (iii) Administrative Claims that are not Disputed and arose in the ordinary course of business and were paid or are to be paid in accordance with the terms and conditions of the particular transactions giving rise to such Administrative Claims.

1.11    "***Affiliates***" has the meaning ascribed to such term by section 101(2) of the Bankruptcy Code.

1.12    "***Allowed***" means, with reference to any Claim, (a) any Claim arising on or before the Effective Date that (i) is timely filed by the applicable bar date, or (ii) as to which there exists no requirement for the Holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order; (b) any Claim (i) that is listed in the Debtors' schedules of assets and liabilities, as such schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as not contingent, not unliquidated, and not disputed, and (ii) for which no contrary proof of Claim has been timely filed; or (c) any Claim allowed under the Plan or by a Final Order.  With respect to any Claim described in clauses (a) and (b) above, such Claim will be considered Allowed only if, and to the extent that, (i) no objection to the allowance of such Claim has been asserted on or before any applicable deadline for filing objections to Claims under the Plan, the Bankruptcy Code, or the Bankruptcy Rules, (ii) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (iii) such Claim is settled by the Debtors with the consent of the Consent Parties, (iv) such Claim is allowed pursuant to a stipulation with the Debtors or the Plan Administration Trustee on or after the Effective Date, with the consent of the Consent Parties, or (v) such Claim is allowed pursuant to the Plan or any agreements related thereto and approved and authorized by the Bankruptcy Court.

3

**1.13** "*Asset Purchase Agreement*" means that certain Asset Purchase Agreement, dated as of July 24, 2020, by and among The McClatchy Company, the subsidiary sellers party thereto, SIJ Holdings, LLC, Chatham Asset Management, LLC, and Chatham Asset High Yield Master Fund, Ltd.

**1.14** "*Assumption Schedule*" means the schedule(s), in form and substance acceptable to the Debtors and the Committee (including any amendments or modifications thereto), if any, of certain Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan. For the avoidance of doubt, the Assumption Schedule shall not include any Executory Contracts and Unexpired Leases previously assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Order and the Asset Purchase Agreement.

**1.15** "*Avoidance Actions*" means any and all actual or potential claims and causes of action arising under Chapter 5 of the Bankruptcy Code other than the GUC Recovery Trust Causes of Action, including any claim or cause of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547–553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws. For the avoidance of doubt, (a) Avoidance Actions shall not include any claims or Causes of Action that are transferred to the GUC Recovery Trust pursuant to the Plan , and (b) no claims or Causes of Action released pursuant to Article X hereof shall be transferred to the GUC Recovery Trust.

**1.16** "*Ballot*" means the ballot upon which Holders of Claims entitled to vote on the Plan shall cast their votes to accept or reject the Plan, and, if applicable, make such other elections as may be made thereon.

**1.17** "*Bankruptcy Code*" means the Bankruptcy Reform Act of 1978, as amended and codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or as hereafter amended.

**1.18** "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York or such other court as may have jurisdiction over the Chapter 11 Cases.

**1.19** "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

**1.20** "*Bar Date*" means any deadlines set by the Bankruptcy Court pursuant to the Plan, a Bar Date Order or other Final Order for filing proofs of claim in the Chapter 11 Cases, as the context may require.

**1.21** "*Bar Date Order*" means any order entered by the Bankruptcy Court which establishes a Bar Date, and any subsequent order supplementing such order or relating thereto.

**1.22** "*Brigade Parties*" means, collective, Brigade Capital Management and each of its managed funds or accounts that is a beneficial Holder of the First Lien Notes.

4

**1.23** "*Brigade Release Requirements*" means that the Brigade Parties shall be included in the definition of Released Parties only to the extent that the Brigade Parties (a) support, act in good faith, and take all reasonable actions necessary to consummate the Plan and implement the terms of the Stipulation Regarding Mediated Sale and Plan Settlement, (it being understood that the Brigade Parties shall be under no obligation to incur any material expense or liability in connection therewith, except to the extent expressly set forth in the Stipulation Regarding Mediated Sale and Plan Settlement or the Asset Purchase Agreement), or (b) do not take any action, directly or indirectly, that could reasonably be expected to materially delay, interfere with or impede the confirmation or consummation of the Plan.

**1.24** "*Business Day*" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York City.

**1.25** "*Cash*" means legal tender of the United States of America and equivalents thereof.

**1.26** "*Causes of Action*" means any and all actions, claims, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, and actions against any Entity for failure to pay for products or services provided or rendered by the Debtors, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' businesses, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

**1.27** "*Chatham Advisors*" means, collectively, (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Chatham Parties, (ii) Quinn Emanuel Urquhart & Sullivan, LLP, as co-counsel to the Chatham Parties, and (iii) Ducera Partners LLC, as financial advisor to the Chatham Parties.

**1.28** "*Chatham Parties*" means, collectively, Chatham Asset Management, LLC and each of its managed funds or accounts that is a beneficial Holder of the First Lien Notes or Third Lien Notes, or that is a "Lender" under (and as defined in) the Second Lien Credit Agreement.

**1.29** "*Chatham Release Requirements*" means that the Chatham Parties shall be included in the definition of Released Parties only to the extent that the Chatham Parties (a) vote to accept the Plan (b) support, act in good faith, and take all reasonable actions necessary to consummate the Plan and implement the terms of the Stipulation Regarding Mediated Sale and Plan Settlement, (it being understood that the Chatham Parties shall be under no obligation to incur any material expense or liability in connection therewith, except to the extent expressly set forth in the Stipulation Regarding Mediated Sale and Plan Settlement or the Asset Purchase Agreement),

5

or (c) do not take any action, directly or indirectly, that could reasonably be expected to materially delay, interfere with or impede the confirmation or consummation of the Plan.

   **1.30** "***Chatham/Brigade Release***" shall have the meaning set forth in <u>Article 6.3</u> hereof.

   **1.31** "***Charging Lien***" means any lien or other priority in payment to which the First Lien Notes Agent, the Second Lien Term Loan Agent, the Third Lien Notes Agent, 2027 Debentures Trustee or the 2029 Debentures Trustee is entitled under the First Lien Notes Documents, the Second Lien Term Loan Documents, the Third Lien Notes Indenture, the 2027 Debentures Indenture, or the 2029 Debentures Indenture respectively, including reasonable fees, costs, expenses and indemnification, including the reasonable fees, costs and expenses of the First Lien Notes Agent's, the Second Lien Term Loan Agent's, the Third Lien Notes Agent's, the 2027 Debentures Trustee's or the 2029 Debentures Trustee's professionals, as set forth in the First Lien Notes Documents, the Second Lien Term Loan Documents, the Third Lien Notes Indenture, the 2027 Debentures Indenture, or the 2029 Debentures Indenture, respectively.

   **1.32** "***Certificate***" means any instrument evidencing a Claim or an Interest.

   **1.33** "***Chapter 11 Cases***" means the procedurally consolidated chapter 11 cases filed for the Debtors in the Bankruptcy Court and being jointly administered under Case No. 20-10418 (MEW).

   **1.34** "***Claim***" means any claims against the Debtors, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code, or an Administrative Claim, as applicable.

   **1.35** "***Claims and Solicitation Agent***" means Kurtzman Carson Consultants LLC, the notice, claims and solicitation agent retained by the Debtors in the Chapter 11 Cases by Bankruptcy Court order.

   **1.36** "***Claims Objection Deadline***" means, as applicable (except for Administrative Claims), (a) the day that is the later of (i) the first Business Day that is at least one (1) year after the Effective Date and (ii) as to proofs of claim filed after an applicable Bar Date, the first Business Day that is at least 180 days after a Final Order is entered deeming the late filed claim timely filed or (b) such later date as may be established by the Bankruptcy Court upon request of the GUC Recovery Trust, without further notice to other parties in interest.

   **1.37** "***Class***" means a category of Holders of Claims or Interests classified together pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, as described in <u>Article III</u> of this Plan.

   **1.38** "***Committee***" means the Official Committee of Unsecured Creditors appointed by the Office of the U.S. Trustee in the Chapter 11 Cases, as may be reconstituted from time to time.

   **1.39** "***Committee Advisors***" means, collectively, (a) Stroock & Stroock & Lavan LLP, as counsel to the Committee, (b) Berkeley Research Group, LLC, as financial advisor to the

Committee, (c) Moelis & Company LLC, as investment banker to the Committee, and (d) Dundon Advisers LLC, as co-financial adviser to the Committee.

1.40    "*Committee Retained Professional Fees*" means an aggregate amount, subject to the Professional Fee Caps, equal to (a) fees for reasonable and actual services rendered by the Committee Advisors and reasonable and documented out-of-pocket expenses incurred by the Committee Advisors, to the extent such fees and expenses are accrued and unpaid as of the closing date of the Sale Transaction and (b) a good faith estimate, prepared by each Committee Advisor, of fees and out-of-pocket expenses anticipated to be incurred by such Committee Advisor following the closing date of the Sale Transaction with respect to the Chapter 11 Cases, as described in the Asset Purchase Agreement.

1.41    "*Committee Retained Professional Fees Escrow*" means the escrow account established pursuant to the Committee Retained Professional Fees Escrow Agreement with subaccounts for each Committee Advisor, as described in the Asset Purchase Agreement.

1.42    "*Committee Retained Professional Fees Escrow Agreement*" means the escrow agreement by and among the Purchaser, the Debtors and the escrow agent, in form and substance acceptable to the Committee, for the disbursement of the amount payable by the Purchaser pursuant to Section 1.6 of the Asset Purchase Agreement in connection with the Committee Retained Professional Fees, subject to the Professional Fee Caps.

1.43    "*Committee Settlement*" shall have the meaning set forth in Article 6.3 hereof.

1.44    "*Confirmation*" means the entry, within the meaning of Bankruptcy Rules 5003 and 9012, of the Confirmation Order, subject to all conditions specified having been satisfied or waived.

1.45    "*Confirmation Date*" means the date on which Confirmation occurs.

1.46    "*Confirmation Hearing*" means the hearing before the Bankruptcy Court held under section 1128 of the Bankruptcy Code to consider confirmation of the Plan and related matters as such hearing may be adjourned or continued from time to time.

1.47    "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement and Solicitation Materials, which shall be in form and substance acceptable to the Consent Parties and the Brigade Parties.

1.48    "*Consent Parties*" means (a) if prior to the Effective Date, the Chatham Parties and the Committee; *provided*, *however*, that the Chatham Parties' consent rights shall only apply in the event that any proposed action or document has a material impact on the Chatham Parties; and (b) if on or after the Effective Date, the GUC Recovery Trust. For the avoidance of doubt, the consent of both the Chatham Parties and the Committee shall be required in connection with the preparation of any documents contemplated by Article 6.12(e) of the Plan.

7

**1.49**    "*Creditor*" has the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

**1.50**    "*Cure*" means the payment or other honoring of all obligations required to be paid or honored in connection with assumption of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, including (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution, within a reasonable period of time following the Effective Date, of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an Executory Contract or Unexpired Lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.51**    "*Cure Notice*" means the notice of proposed Cure amount provided to counterparties to assumed Executory Contracts or Unexpired Leases that are identified on the Assumption Schedule.

**1.52**    "*D&O Insurance*" means all current unexpired directors', managers', and officers' liability insurance policies (including any extended discovery period or "tail policy") of any of the Debtors with respect to directors, managers, officers, and employees of the Debtors.

**1.53**    "*D&O Insurance Release*" shall have the meaning set forth in <u>Article 10.3</u> hereof.

**1.54**    "*D&O Insurance Settlement Termination*" shall have the meaning set forth in <u>Article 6.3</u> hereof.

**1.55**    "*Debenture Claim*" means any claim or obligation arising under or based on the 2027 Debentures or the 2029 Debentures and any related documents or instruments executed or delivered in connection with the 2027 Debentures or 2029 Debentures, as applicable, in each case as amended, restated, supplemented, or modified from time to time.  For the avoidance of doubt the Debenture Claims shall constitute General Unsecured Claims.

**1.56**    "*Debtors*" means, collectively, JCK Legacy Company (f/k/a The McClatchy Company), Cypress Media, Inc., Aboard Publishing, Inc., Bellingham Herald Publishing, LLC, Belton Publishing Company, Inc., Biscayne Bay Publishing, Inc., Cass County Publishing Company, Columbus-Ledger Enquirer, Inc., Cypress Media, LLC, East Coast Newspapers, Inc., El Dorado Newspapers, Gulf Publishing Company, Inc., Herald Custom Publishing of Mexico, S. de R.L. de C.V., HLB Newspapers, Inc., Idaho Statesman Publishing, LLC, Keltatim Publishing Company, Inc., Keynoter Publishing Company, Inc., Lee's Summit Journal, Incorporated, Lexington H-L Services, Inc., Macon Telegraph Publishing Company, Mail Advertising Corporation, McClatchy Big Valley, Inc., McClatchy Interactive LLC, McClatchy Interactive West, McClatchy International Inc., McClatchy Investment Company, McClatchy Management Services, Inc., McClatchy Newspapers, Inc., McClatchy News Services, Inc., McClatchy Property, Inc., McClatchy Resources, Inc., McClatchy Shared Services, Inc.,

McClatchy U.S.A., Inc., Miami Herald Media Company, N & O Holdings, Inc., Newsprint Ventures, Inc., Nittany Printing and Publishing Company, Nor-Tex Publishing, Inc., Olympian Publishing, LLC, Olympic-Cascade Publishing, Inc., Pacific Northwest Publishing Company, Inc., Quad County Publishing, Inc., San Luis Obispo Tribune, LLC, Star-Telegram, Inc., Tacoma News, Inc., The Bradenton Herald, Inc., The Charlotte Observer Publishing Company, The News and Observer Publishing Company, The State Media Company, The Sun Publishing Company, Inc., Tribune Newsprint Company, Tru Measure, LLC, Wichita Eagle and Beacon Publishing Company, Inc., Wingate Paper Company, and Oak Street Redevelopment Corporation.

1.57    "*Deferred Amounts*" means, collectively, the following amounts, after application of the Professional Fee Caps, which would otherwise be payable as administrative claims of the Debtors' estates or would be payable pursuant to the Plan, which are to be paid, subject to Article 2.3 hereof, prior to any further distribution of the proceeds of the Tax Refund to the GUC Recovery Trust (except as provided in (c) and (d)) or the Purchaser (except as provided in (d)): (a) $500,000 of professional fees payable in the aggregate to the Chatham Advisors; (b) $100,000 of professional fees payable in the aggregate to the Committee Advisors; (c) $600,000 payable to the GUC Recovery Trust, and (d) the actual, reasonable, and documented costs and expenses and the reasonable and documented fees and expenses of professionals, if any, incurred by the Purchaser and/or the GUC Recovery Trust after the closing of the Sale Transaction or the Effective Date, as applicable, in connection with the pursuit of the Tax Refund payable to the Purchaser or the GUC Recovery Trust, as applicable; *provided*, *however*, that the Deferred Amounts shall not include (i) any allocation of Purchaser's overhead, or (ii) payment of any fees and expenses of Ernst & Young LLP, as tax services provider to the Debtors, to the extent such fees and expenses are included in the Wind-Down Budget.

1.58    "*Deferred Amounts Claims*" means Claims of the Chatham Advisors, the Committee Advisors, the GUC Recovery Trust and the Purchaser for the Deferred Amounts.

1.59    "*DIP Agent*" means Encina Business Credit, LLC, in its capacity as administrative agent for the DIP Lenders pursuant to the DIP Credit Agreement.

1.60    "*DIP Credit Agreement*" means that certain Senior Secured Super-Priority Debtor-In-Possession Credit Agreement by and among certain of the Debtors as borrowers thereunder, the DIP Agent, and the DIP Lenders, as amended, supplemented, or otherwise modified from time to time, and all documents executed in connection therewith.

1.61    "*DIP Facility*" means the debtor-in-possession senior secured asset-based revolving credit facility in an amount up to $50 million provided to the Debtors by the DIP Lenders pursuant to the DIP Credit Agreement as authorized by the Bankruptcy Court pursuant to the DIP Order, as may be amended or modified from time to time.

1.62    "*DIP Facility Claim*" means any claim or obligation arising under or based on the DIP Facility.

1.63    "*DIP Lenders*" means the banks and other financial institutions or entities from time to time party to the DIP Credit Agreement as lenders.

**1.64** "*DIP Order*" means the Bankruptcy Court's *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying the Automatic Stay and (IV) Granting Related Relief* [Docket No. 233], as it may be modified or amended.

**1.65** "*Disallowed*" means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, or as provided in this Plan, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a Bar Date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

**1.66** "*Disclosure Statement*" means the written disclosure statement filed substantially contemporaneously herewith or any supplements thereto (including the Plan Supplement and all schedules thereto or referenced therein), as such disclosure statement may be amended, modified, or supplemented from time to time.

**1.67** "*Disputed*" means, with respect to a Claim, (a) any such Claim to the extent neither Allowed or Disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503, or 1111 of the Bankruptcy Code, or (b) to the extent the Debtors or any party in interest has interposed a timely objection before the Confirmation Date in accordance with the Plan, which objection has not been withdrawn or determined by a Final Order. To the extent the Debtors dispute only a portion of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claims.

**1.68** "*Distribution Agent*" means, with respect to (a) all Claims other than General Unsecured Claims and Deferred Amounts Claims, the Plan Administration Trustee, or any Entity the Debtors or the Plan Administration Trustee select to make or to facilitate distributions in accordance with the Plan, and (b) General Unsecured Claims, the GUC Recovery Trustee or any Entity the GUC Recovery Trust selects to make or to facilitate distributions in accordance with the Plan and the GUC Recovery Trust Agreement, and (c) Deferred Amounts Claims, the Wind-Down Debtors or the Plan Administration Trustee, or any Entity that the Wind-Down Debtors or the Plan Administration Trustee select to make or facilitate distributions in accordance with the Plan.

**1.69** "*Distribution Date*" means, as applicable, (a) the Initial Distribution Date, or (b) a Periodic Distribution Date.

**1.70** "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which shall be (a) the Confirmation Date, or (b) such other date as designated by an order of the Bankruptcy Court.

1.71    "*Ds&Os*" means any current and former directors, officers, or managers, collectively with any other employees of the Debtors with similar duties.

1.72    "*DTC*" means the Depository Trust Company, and its successors and assigns.

1.73    "*Effective Date*" means the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which all conditions precedent to the effectiveness of this Plan specified in Article 11.1, have been satisfied, or, if capable of being waived, waived, which date shall be specified in a notice filed by the Plan Administration Trust with the Bankruptcy Court.

1.74    "*Entity*" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

1.75    "*Equity Security*" has the meaning ascribed to such term in section 101(16) of the Bankruptcy Code.

1.76    "*Estates*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

1.77    "*Exchange Act*" means the Securities Exchange Act of 1934, as now in effect or hereafter amended.

1.78    "*Existing Parent Equity*" means any Interests in JCK Legacy Company.

1.79    "*Excluded Claim*" means any Claim set forth on Schedule A to the Asset Purchase Agreement that is not being assumed by the Purchaser pursuant to the terms of the Asset Purchase Agreement.

1.80    "*Exculpated Claim*" means any Cause of Action or any Claim, act or omission derived from or based upon the Debtors' in-court restructuring efforts and related negotiations, the Chapter 11 Cases, the Mediation, the formulation, preparation, dissemination, or negotiation of the Disclosure Statement, the Plan (including any term sheets related thereto), the Asset Purchase Agreement, or any contract, instrument, release or other agreement or document (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with any of the foregoing, including without limitation (i) the Asset Purchase Agreement, (ii) the Sale Transaction, (iii) the execution, delivery, and performance of the DIP Credit Agreement, and (iv) the distribution of property under the Plan or any other agreement under the Plan, except (I) for Claims or Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence or (II) as may be expressly excluded herein; *provided* that the Exculpated Parties shall be entitled, in all respects, to reasonably rely upon the advice of counsel with respect to the foregoing; *provided*, *further*, that the foregoing shall not be deemed to release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, any of the Exculpated Parties' obligations or covenants arising under the

11

Confirmation Order, the Plan, the Plan Supplement, the Asset Purchase Agreement, and any contracts, instruments, releases, and other agreements or documents delivered in connection with, or contemplated by, the foregoing.

        **1.81** "***Exculpated Parties***" means the following parties in their respective capacities as such: (a) the Debtors (except as may be expressly excluded herein); (b) the DIP Lenders; (c) the DIP Agent; (d) the Brigade Parties; (e) the Chatham Parties; (f) the Purchaser; (g) the 2027 Debentures Trustee; (h) the 2029 Debentures Trustee; (i) the Committee and its members (each in their capacities as such), and (j) with respect to each of the foregoing persons in clauses (a) through (i), except as may be expressly excluded herein, such Entity's respective current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; provided, however, that the Brigade Parties and the Chatham Parties shall be Exculpated Parties only to the extent the Brigade Release Requirements and the Chatham Release Requirements have been met, respectively. Notwithstanding the foregoing, Ponderay shall not be an Exculpated Party.

        **1.82** "***Executory Contract***" means any contract to which any of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

        **1.83** "***Exhibit***" means an exhibit contained in the Plan Supplement or annexed as an appendix to the Disclosure Statement.

        **1.84** "***Final Decree***" means a final decree entered by the Court closing the Chapter 11 Cases pursuant to Bankruptcy Rule 3022.

        **1.85** "***Final Order***" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the chapter 11 cases (or the docket of such other court), which has not been reversed, stayed, modified, amended, or vacated and is in full force and effect, and as to which (x) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument or rehearing shall then be pending or (y) if an appeal writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided* that no order shall fail to be a Final Order solely due to the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rules 59 or 60 of the Federal Rules of Civil Procedure, or Rule 9024 of the Bankruptcy Rules, may be filed with respect to such order; *provided, further*, that the Debtors, Wind-Down Debtors,

or the Plan Administration Trust, as applicable, reserve the right to waive any appeal period for an order or judgment to become a Final Order.

1.86    "*First Lien Notes*" means those certain 9.000% Senior Secured Notes due 2026 issued pursuant to the First Lien Notes Indenture.

1.87    "*First Lien Notes Agent*" means The Bank of New York Mellon Trust Company, N.A. in its capacity as Trustee and Collateral Agent under the First Lien Notes Indenture.

1.88    "*First Lien Notes Claim*" means any claims or obligations arising under the First Lien Notes Documents.

1.89    "*First Lien Notes Documents*" means the First Lien Notes Indenture and all related amendments, supplements, notes, pledges, collateral agreements, loan and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the First Lien Notes Indenture, in each case as amended, restated, supplemented, or modified from time to time.

1.90    "*First Lien Notes Indenture*" means that certain Indenture dated July 16, 2018, by and among The McClatchy Company, as issuer, the subsidiary guarantor parties thereto, and the First Lien Notes Agent, as amended, supplemented, or otherwise modified from time to time.

1.91    "*Framework Agreement*" has the meaning ascribed to such term in the Sale Order.

1.92    "*General Unsecured Claim*" means any Claim that is not an Administrative Claim, Deferred Amounts Claim, Professional Claim, Priority Tax Claim, DIP Facility Claim, Other Priority Claim, Other Secured Claim, First Lien Notes Claim, Second Lien Term Loan Claim, Third Lien Notes Claim, Intercompany Claim, or Subordinated Claim.  For the avoidance of doubt, General Unsecured Claims include, without limitation, Debenture Claims, PBGC Claims, Excluded Claims, and any Claim arising from the rejection of an Executory Contract or Unexpired Lease.

1.93    "*Governmental Unit*" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

1.94    "*GUC Takeover Scenario*" has the meaning ascribed to it in Article 6.3 hereof.

1.95    "*GUC Recovery Trust*" means the trust established on the Effective Date pursuant to this Plan and the GUC Recovery Trust Agreement and in accordance with Article 6.20 hereof.

1.96    "*GUC Recovery Trust Agreement*" means the trust agreement governing, among other things, the retention and duties of the GUC Recovery Trustee as described in Article 6.20 hereof, substantially in the form included in the Plan Supplement; *provided*, that the

GUC Recovery Trust Agreement shall be in form and substance acceptable to the Consent Parties, reasonably acceptable to the Debtors, and in accordance with the Committee Settlement.

1.97    "**GUC Recovery Trust Assets**" means, pursuant to the Committee Settlement, (a) Cash in the amount of $5,587,500 in the aggregate, comprised of (i) the Initial Purchaser Contribution of $400,000, which shall be transferred to the GUC Recovery Trust on the Effective Date, (ii) $4,587,500 in Cash, which shall be paid by the D&O Insurance carriers to the GUC Recovery Trust Escrow on or prior to the Effective Date and subsequently transferred to the GUC Recovery Trust on the Effective Date in accordance with Article 6.3, and (iii) $600,000 in Cash funded by the proceeds of the Tax Refund (prior to the distribution of any Net Tax Refund) in accordance with Article 2.3, (b) 77.5% of the Net Tax Refund, (c) an undivided interest in the GUC Recovery Trust Causes of Action and the proceeds thereof, (d) the New Parent Equity; and (e) any additional assets required to be transferred to the GUC Recovery Trust in connection with the Restructuring Transactions.

1.98    "**GUC Recovery Trust Causes of Action**" means any and all Causes of Action of the Debtors that are not released pursuant to Article 10.3 of this Plan or an order of the Bankruptcy Court; *provided*, *however*, that for the avoidance of doubt, the GUC Recovery Trust Causes of Action shall not include any Cause of Action relating to the Tax Refund or other tax refunds of the Debtors.

1.99    "**GUC Recovery Trust Escrow**" means the escrow account established pursuant to paragraph 7 of the Stipulation Regarding Mediated Sale and Plan Settlement that is governed by the GUC Trust Escrow Agreement and funded with the GUC Recovery Trust Escrow Amount, which amount shall be transferred to the GUC Recovery Trust on the Effective Date consistent with Article 6.3 hereof.

1.100    "**GUC Recovery Trust Escrow Agreement**" means a customary escrow agreement by and among the Purchaser, the Debtors and the escrow agent party thereto, in form and substance acceptable to the Committee, for the disbursement of the GUC Recovery Trust Escrow Amount to the GUC Recovery Trust on the Effective Date consistent with Article 6.3 hereof.

1.101    "**GUC Recovery Trust Escrow Amount**" means $4,987,500, comprised of the Initial Purchaser Contribution and the settlement amount paid by the D&O Insurance carriers.

1.102    "**GUC Recovery Trust Interest**" means a non-certificated beneficial interest in the GUC Recovery Trust granted to each holder of an Allowed General Unsecured Claim, which shall entitle such holder to its Pro Rata share of the GUC Recovery Trust Assets in accordance with the terms of the GUC Recovery Trust Agreement.

1.103    "**GUC Recovery Trustee**" means the Person selected by the Committee to serve as the trustee of the GUC Recovery Trust, and any successor thereto in accordance with the GUC Recovery Trust Agreement.

1.104    "**Holdback Amount**" means, subject to the Professional Fee Caps, the sum of (a) the aggregate amounts withheld by the Debtors as of the Confirmation Date as a holdback

on payment of Professional Claims pursuant to the Professional Fee Order and (b) twenty (20) percent of that portion of the unbilled fees of Professionals estimated pursuant to the terms of the Committee Retained Professional Fees Escrow and the Seller Retained Professional Fees Escrow.

        **1.105** "*Holder*" means a holder of a Claim against or Interest in the Debtors.

        **1.106** "*Impaired*" means impaired within the meaning of section 1124 of the Bankruptcy Code.

        **1.107** "*Indentures*" means the First Lien Notes Indenture, the Third Lien Notes Indenture, the 2027 Debentures Indenture, and the 2029 Debentures Indenture.

        **1.108** "*Initial Distribution Date*" means the date (a) selected by the Debtors or the Plan Administration Trustee, as applicable, in their sole discretion, upon which distributions to Holders of Allowed Claims (other than Allowed General Unsecured Claims and Deferred Amounts Claims) entitled to receive distributions under this Plan shall commence, (b) selected by the GUC Recovery Trustee, in its sole discretion, upon which distributions to Holders of Allowed General Unsecured Claims entitled to receive distributions under this Plan shall commence, and (c) selected by the Wind-Down Debtors or the Plan Administration Trustee, in each case in their or its sole discretion, upon which distributions to the Holders of Deferred Amounts Claims entitled to receive distributions under this Plan and the Committee Settlement shall commence.

        **1.109** "*Initial Purchaser Contribution*" means $400,000 in Cash funded by the Chatham Parties and/or the Purchaser on the closing date of the Sale Transaction to the GUC Recovery Trust Escrow.

        **1.110** "*Intercompany Claim*" means a claim held by a Debtor against another Debtor.

        **1.111** "*Intercompany Interests*" means all Interests in the Subsidiary Debtors.

        **1.112** "*Interest*" means any equity interest, equity-related instrument, or warrant in, or with respect to, a Debtor, including, but not limited to, all issued, unissued, authorized or outstanding shares of stock, preferred stock, membership interests, units, profit interests, other instruments evidencing an ownership interest, or equity security in any of the Debtors, whether or not transferable, and any option, warrant, right to purchase or acquire any such interests at any time, or any other interest that is exercisable, convertible or exchangeable into equity of a Debtor, contractual or otherwise, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors to acquire any such interests in a Debtor that existed immediately before the Effective Date.

        **1.113** "*Law*" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued, or promulgated by any Governmental Unit.

        **1.114** "*Lien*" has the meaning ascribed to such term in section 101(37) of the Bankruptcy Code.

15

1.115   "*Mediation*" means the mediation approved by the Bankruptcy Court pursuant to the order entered on February 25, 2020 [Docket No. 107].

1.116   "*Net Tax Refund*" means the proceeds of the Tax Refund, net of the Deferred Amounts.

1.117   "*New Parent Equity*" means one share of common stock or functional equivalent thereof of Wind-Down Debtor JCK Legacy Company to be issued on the Effective Date to the GUC Recovery Trust.

1.118   "*Old McClatchy Securities*" means, collectively, the 2027 Debentures, the 2029 Debentures, the First Lien Notes, the Third Lien Notes, the Existing Parent Equity, the Intercompany Interests, and all options, warrants, rights and other instruments evidencing an ownership interest in the Debtors (whether fixed or contingent, matured or unmatured, disputed or undisputed), contractual, legal, equitable, or otherwise, to acquire any of the foregoing.

1.119   "*Ordinary Course Professionals Order*" means the Bankruptcy Court's *Order Authorizing Debtors To Employ And Pay Professionals Utilized In The Ordinary Course Of Business* Nunc Pro Tunc *to the Petition Date* [Docket No. 173].

1.120   "*Other Priority Claim*" means a Claim against a Debtor that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim, Priority Tax Claim, or Professional Claim.

1.121   "*Other Secured Claim*" means any Secured Claim that is not a First Lien Notes Claim, Second Lien Term Loan Claim, Third Lien Notes Claim, or Priority Tax Claim.

1.122   "*PBGC*" means the Pension Benefit Guaranty Corporation.

1.123   "*PBGC Claims*" means claims arising from the termination of the Debtors' qualified defined benefit pension plan.

1.124   "*Periodic Distribution Date*" means such Business Days after the Initial Distribution Date(s) (a) selected by the Debtors or the Plan Administration Trustee, as applicable, in its reasonable discretion for making distributions under this Plan to Holders of Allowed Claims (other than Allowed General Unsecured Claims and Deferred Amounts Claims), (b) selected by the GUC Recovery Trustee, in its reasonable discretion, for making distributions under this Plan to Holders of Allowed General Unsecured Claims, and (c) selected by the Wind-Down Debtors or the Plan Administration Trustee, in each case in their or its reasonable discretion, for making distributions to the Holders of Deferred Amounts Claims under this Plan and the Committee Settlement.

1.125   "*Petition Date*" means February 13, 2020.[3]

---

[3]   On March 24, 2020 (the "*Additional Petition Date*") the Debtors' affiliate, Oak Street Redevelopment Corporation ("*Oak Street*"), also commenced a case by filing a chapter 11 petition. As used herein, the term "Petition Date" encompasses the Additional Petition Date and the term "Chapter 11 Cases" includes the Oak

*(cont'd)*

**1.126** "*Plan*" means this first amended joint plan of distribution for the resolution of outstanding Claims and Interests in the Chapter 11 Cases, as may be modified in accordance with the Bankruptcy Code and Bankruptcy Rules, including the Plan Supplement and all Exhibits, supplements, appendices, and schedules thereto.

**1.127** "*Plan Administration Trust*" means the trust established on the Effective Date pursuant to this Plan and the Plan Administration Trust Agreement and in accordance with Article 6.6 hereof.

**1.128** "*Plan Administration Trust Agreement*" means the trust agreement governing, among other things, the retention and duties of the Plan Administration Trustee as described in Article 6.6 hereof; *provided*, that the Plan Administration Trust Agreement shall be in form and substance reasonably acceptable to the Committee, the Debtors, and the Chatham Parties.

**1.129** "*Plan Administration Trust Assets*" means (a) the Committee Retained Professional Fees Escrow, (b) the Seller Retained Professional Fees Escrow, (c) the Wind-Down Budget Escrow, (d) the Deferred Amounts, and (e) any Estate non-Cash assets (which, for the avoidance of doubt, excludes the GUC Trust Recovery Assets, the Wind-Down Debtors' Rights, and the Acquired Assets (as defined in the Asset Purchase Agreement)).

**1.130** "*Plan Administration Trustee*" means the Person selected by the Debtors, with the consent of the Committee, to serve as the trustee of the Plan Administration Trust, and any successor thereto in accordance with the Plan Administration Trust Agreement.

**1.131** "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, the Bankruptcy Rules, and the Sale Transaction Documents), to be Filed by the Debtors, with the consent of the Consent Parties, no later than fourteen (14) days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents or amendments to previously Filed documents, Filed before the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the Assumption Schedule, if any, (b) a list of retained Causes of Action, if any, (c) the Administrative Claim Request Form, (d) the Sale Transaction Documents, (e) the GUC Recovery Trust Agreement, (f) the Plan Administration Trust Agreement, and (g) the Stipulation Regarding Mediated Sale and Plan Settlement; *provided* that the Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement, with the consent of the Consent Parties, through the Effective Date.

**1.132** "*Ponderay*" means Ponderay Newsprint Company.

---

Street chapter 11 case, which is being jointly administered with the Debtors' chapter 11 cases commenced on February 13, 2020. *See* Order (I) Directing Joint Administration of Cases and (II) Waiving Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1005 and 2002(n) [Docket No. 265].

1.133 "*Ponderay Owners*" means Newsprint Ventures, Inc., Tribune Newsprint Company, and Wingate Paper Company.

1.134 "*Priority Tax Claim*" means a Claim against a Debtor by a Governmental Unit that is entitled to priority in payment pursuant to sections 502(i) or 507(a)(8) of the Bankruptcy Code.

1.135 "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan.

1.136 "*Professional*" means any Entity retained in the Chapter 11 Case by separate Final Order pursuant to sections 327, 363, and 1103 of the Bankruptcy Code or otherwise and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (ii) a Final Order entered by the Bankruptcy Court authorizing such retention; *provided*, *however*, that Professional does not include any Entity retained pursuant to the Ordinary Course Professionals Order.

1.137 "*Professional Claim*" means all interim and final requests for payment for professional services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date by any Professional.

1.138 "*Professional Fee Caps*" means the limitations on certain professional fees set forth in the Admin Liability Schedule.

1.139 "*Professional Fee Order*" means any order entered by the Bankruptcy Court authorizing the interim payment of Professional Claims subject to the Committee Retained Professional Fees Escrow and the Seller Retained Professional Fees Escrow, and subject to the Professional Fee Caps.

1.140 "*Purchaser*" means SIJ Holdings, LLC, as set forth in the Asset Purchase Agreement.

1.141 "*Reinstate*", "*Reinstated*" or "*Reinstatement*" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Claim Holder so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Claim Holder to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Claim Holder for any damages incurred as a result of any reasonable reliance by such Claim Holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Claim Holder; *provided*, *however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such

Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, "going dark" provisions, and affirmative covenants regarding corporate existence prohibiting certain transactions or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured or reinstated in order to accomplish Reinstatement.

   **1.142** "*Released Parties*" means, collectively, the following parties in their respective capacities as such: (a) the Debtors (except as may be expressly excluded herein); (b) the DIP Lenders; (c) the DIP Agent; (d) the Brigade Parties; (e) the Chatham Parties; (f) the Purchaser; (g) the 2027 Debentures Trustee; (h) the 2029 Debentures Trustee; (i) BOKF, N.A.; (j) the Committee and its members (each in their capacities as such), and (k) with respect to each of the foregoing persons in clauses (a) through (j), such Entity's respective current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; *provided*, *however*, that the Brigade Parties and the Chatham Parties shall be Released Parties only to the extent the Brigade Release Requirements and the Chatham Release Requirements have been met, respectively. Notwithstanding the foregoing, Ponderay shall not be a Released Party.

   **1.143** "*Releasing Parties*" means, collectively, the following Entities in their respective capacities as such: the (a) Debtors; (b) the DIP Lenders; (c) the DIP Agent; (d) the Brigade Parties; (e) the Chatham Parties; (f) the Purchaser; (g) the Committee; (h) the 2027 Debentures Trustee; (i) the 2029 Debentures Trustee; (j) BOKF, N.A.; and (k) with respect to each of the foregoing persons in clauses (a) through (j), such Entities' respective current and former Affiliates, and such Entities' and their current and former Affiliates' current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their current and former officers, managers, directors, equity holders, principals, members, employees, agents, managed accounts or funds, management companies, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, on behalf of whom the parties identified in clauses (a) through (j) herein have the authority under applicable law to grant such release. For the avoidance of doubt, Releasing Parties do not include administrative creditors entitled to the treatment set forth in <u>Article II</u> of the Plan. For the avoidance of doubt, to the extent the Brigade Parties and the Chatham Parties are not Released Parties hereunder, then the Brigade Parties and the Chatham Parties shall not be Releasing Parties.

   **1.144** "*Restructuring Transactions*" has the meaning set forth in <u>Article 6.12</u> of the Plan.

   **1.145** "*Sale Transaction*" means the transactions contemplated by the Asset Purchase Agreement and the other Sale Transaction Documents, including the sale of substantially

all of the Debtors' assets to the Purchaser in exchange for the Sale Transaction Proceeds and the assumption of certain liabilities of the Debtors by the Purchaser.

1.146   "*Sale Transaction Documents*" means the Asset Purchase Agreement, the Framework Agreement, the Sale Order, and the other definitive documentation governing the Sale Transaction, as well as all exhibits, appendices, schedules, and other documents and agreements related thereto or entered into in connection therewith.

1.147   "*Sale Transaction Proceeds*" means the Cash proceeds of the Sale Transaction.

1.148   "*Sale Order*" means the *Order (I) Approving the Sale of the Acquired Assets Free and Clear of Claims, Liens, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 744].

1.149   "*Scheduled*" means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

1.150   "*Schedules*" means the schedules of assets and liabilities and the statements of financial affairs filed in the Chapter 11 Cases by the Debtors pursuant to section 521 of the Bankruptcy Code, which incorporate by reference the global notes and statement of limitations, methodology, and disclaimer regarding the Debtors' schedules and statements, as such schedules or statements have been or may be further modified, amended, or supplemented from time to time in accordance with Bankruptcy Rule 1009 or Final Orders of the Bankruptcy Court.

1.151   "*Second Lien Credit Agreement*" means that certain Junior Lien Term Loan Credit Agreement dated as of July 16, 2018, by and among The McClatchy Company, as borrower, the guarantors party thereto, the Second Lien Term Lenders party thereto, and the Second Lien Term Loan Agent, as amended, supplemented, or otherwise modified from time to time.

1.152   "*Second Lien Term Lenders*" means any Person or Entity party to the Second Lien Credit Agreement as "Lender" thereunder.

1.153   "*Second Lien Term Loan*" means the loans made by the Second Lien Term Lenders pursuant to and under the Second Lien Credit Agreement.

1.154   "*Second Lien Term Loan Agent*" means The Bank of New York Mellon, in its capacity as Administrative Agent, Tranche A Collateral Agent, and Tranche B Collateral Agent under the Second Lien Credit Agreement.

1.155   "*Second Lien Term Loan Claim*" means any Secured Claim arising under or based on the Second Lien Term Loan Documents and the Second Lien Term Loan Deficiency Claims.

1.156   "*Second Lien Term Loan Documents*" means the Second Lien Credit Agreement and all related amendments, supplements, notes, pledges, collateral agreements, loan

and security agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the Second Lien Credit Agreement, in each case as amended, restated, supplemented, or modified from time to time.

      **1.157**  "***Second Lien Term Loan Deficiency Claim***" means any unsecured Claim of a Holder of Second Lien Term Loan Claims arising under the Second Lien Term Loan Documents.

      **1.158**  "***Secured Claim***" means a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

      **1.159**  "***Secured Tax Claim***" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

      **1.160**  "***Securities Act***" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

      **1.161**  "***Security***" has the meaning ascribed to such term in section 2(a)(1) of the Securities Act.

      **1.162**  "***Seller Retained Professional Fees***" means an aggregate amount, subject to the Professional Fee Caps, equal to (a) fees for reasonable and actual services rendered by the Debtors' Professionals and reasonable and documented out-of-pocket expenses incurred by the Debtors' Professionals, to the extent such fees and expenses are accrued and unpaid as of the closing date of the Sale Transaction and (b) a good faith estimate, prepared by each of the Debtors' Professionals, of fees and out-of-pocket expenses anticipated to be incurred by such Debtor Professional following the closing date of the Sale Transaction with respect to the Chapter 11 Cases, as described in the Asset Purchase Agreement.

      **1.163**  "***Seller Retained Professional Fees Escrow***" means the escrow account established pursuant to the Seller Retained Professional Fees Escrow Agreement with subaccounts for each of the Debtors' Professionals, as described in the Asset Purchase Agreement.

      **1.164**  "***Seller Retained Professional Fees Escrow Agreement***" means the escrow agreement by and among the Purchaser, the Debtors and the escrow agent for the disbursement of the amount payable by the Purchaser pursuant to Section 1.6 of the Asset Purchase Agreement in connection with the Seller Retained Professional Fees, subject to the Professional Fee Caps.

      **1.165**  "***Servicer***" means any indenture trustee, agent (including the Second Lien Term Loan Agent, Third Lien Notes Agent, the 2027 Debentures Trustee and the 2029 Debentures

Trustee), servicer, or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

**1.166** "***Standing Motion***" means the Committee's *Motion for (I) Leave, Standing and Authority to Commence and Prosecute Certain Claims and Causes of Action on Behalf of the Debtors' Estates and (II) Exclusive Settlement Authority* [Docket No. 551].

**1.167** "***Stipulation Regarding Mediated Sale and Plan Settlement***" means the stipulations by and among the Debtors, the Committee, the Chatham Parties, the Brigade Parties, and the Purchaser, attached as Annex A to the Sale Order and included in the Plan Supplement, which embodies the Committee Settlement.

**1.168** "***Subordinated Claim***" means any Claim against the Debtors that is subject to subordination under section 510(b) or (c) of the Bankruptcy Code, whether arising from rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, or otherwise, which Claim shall be subordinated to all Claims or Interests that are senior to or equal to the Claim or Interest represented by such security, except that if such security is an Interest in JCK Legacy Company, such Claim has the same priority as Existing Parent Equity.

**1.169** "***Subsidiaries***" means the direct or indirect subsidiaries of JCK Legacy Company.

**1.170** "***Subsidiary Debtors***" means each of the Debtors other than JCK Legacy Company.

**1.171** "***Tax Code***" means the Internal Revenue Code of 1986, as amended.

**1.172** "***Tax Refund***" means any tax refund of the Debtors arising from the carryback of any net operating loss or capital loss (or similar attribute) from the taxable year of the Debtors that includes the Sale Transaction.

**1.173** "***Third Lien Notes***" means the 6.875% Senior Secured Junior Lien Notes due 2031 issued pursuant to the Third Lien Notes Indenture.

**1.174** "***Third Lien Notes Agent***" means The Bank of New York Mellon, in its capacity as Trustee and Collateral Agent under the Third Lien Notes Indenture.

**1.175** "***Third Lien Notes Claim***" means any Secured Claim arising under or based on the Third Lien Notes Indenture and Third Lien Notes Documents, and the Third Lien Notes Deficiency Claims.

**1.176** "***Third Lien Notes Deficiency Claims***" means any unsecured Claim of a Holder of Third Lien Notes Claims arising under the Third Lien Notes Documents.

**1.177** "***Third Lien Notes Documents***" means the Third Lien Notes Indenture and all related amendments, supplements, notes, pledges, collateral agreements, loan and security

agreements, instruments, mortgages, control agreements, deeds of trust and other documents or instruments executed or delivered in connection with the Third Lien Notes Indenture, in each case as amended, restated, supplemented, or modified from time to time.

1.178   "*Third Lien Notes Indenture*" means that certain Indenture dated as of December 18, 2018, by and among The McClatchy Company, as issuer, the subsidiary guarantors party thereto, and the Third Lien Notes Agent, as amended, supplemented, or otherwise modified from time to time.

1.179   "*Transferred Employee*" means any current or former officers (and managers and any other employees of the Debtors with similar duties) of the Debtors who have been offered and accepted employment with the Purchaser.

1.180   "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Plan Administration Trust or the GUC Recovery Trust, as applicable, of an intent to accept a particular distribution; (c) responded to the Debtors', the Plan Administration Trust's, or the GUC Recovery Trust's request, as applicable for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

1.181   "*Unexpired Lease*" means a lease of nonresidential real property to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.182   "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interest that are not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.183   "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of New York.

1.184   "*Wind Down*" means the wind down and dissolution of the Debtors and final administration of the Estates following the Effective Date as set forth in Article 6.7 hereof.

1.185   "*Wind-Down Budget*" means an aggregate amount equal to $2,000,000, which shall be used to fund the Wind Down and dissolution of the Debtors' estates, including the payment of any fees and expenses of Ernst & Young LLP, as tax services provider to the Debtors, as described in the Asset Purchase Agreement.

1.186   "*Wind-Down Budget Escrow*" means the escrow account established pursuant to the Wind-Down Budget Escrow Agreement.

1.187   "*Wind-Down Budget Escrow Agreement*" means a customary escrow agreement reasonably acceptable to the parties by and among the Purchaser, the Debtors and the escrow agent for the disbursement of the amount payable by the Purchaser pursuant to Section 1.6 of the Asset Purchase Agreement in connection with the Wind-Down Budget, and which shall

provide that any amount not so used to satisfy such fees shall be promptly paid to the Debtors, as described in the Asset Purchase Agreement.

**1.188** "***Wind-Down Debtors***" means, subject to Article 6.12(e) hereof, JCK Legacy Company and Herald Custom Publishing of Mexico, S. de R.L. de C.V., on or after the Effective Date.

**1.189** "***Wind-Down Debtors' Rights***" means the Debtors' rights with respect to any tax returns of any of the Debtors and any claims for a Tax Refund and the proceeds thereof.

**1.190** "***Wind-Down Officer***" means the Plan Administration Trustee, who shall be vested with the all powers of the officer of the Wind-Down Debtors, and any successor thereto in accordance with the Plan.

## C.    Rules of Interpretation

For purposes of this Plan, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter includes the masculine, feminine, and neuter; (c) any reference in the Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) to the extent the Disclosure Statement is inconsistent with the terms of this Plan, this Plan shall control; (j) to the extent this Plan is inconsistent with the Confirmation Order, the Confirmation Order shall control; (k) references to "shares," "shareholders," "directors," and/or "officers" shall also include "membership units," "members," "managers," or other functional equivalents, as applicable, as such terms are defined under the applicable state limited liability company or alternative comparable laws, as applicable; (l) any immaterial effectuating provision may be interpreted by the Debtors in a manner that is consistent with the overall purpose and intent of the Plan without further Final Order of the Bankruptcy Court; (m) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (n) references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (o) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (p) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (q) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; and (r) except as otherwise specifically provided in the Plan to the contrary, references in the Plan

to the Debtors or to the Wind-Down Debtors mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

### D.    Computation Of Time

In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

### E.    References to Monetary Figures

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

### F.    Exhibits

All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein and such Exhibits shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date.  After the Plan Supplement Filing Date, copies of Exhibits may be obtained upon email request to the Claims and Solicitation Agent at McClatchyInfo@kccllc.com, or by downloading such exhibits from the Debtors' informational website at http://www.kccllc.net/McClatchy.  To the extent any Exhibit is inconsistent with the terms of this Plan and unless otherwise provided for in the Confirmation Order, the terms of the Exhibit shall control as to the transactions contemplated thereby and the terms of this Plan shall control as to any Plan provision that may be required under the Exhibit.

## ARTICLE II

## UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**2.1    Administrative Claims.**  Except to the extent that the Debtors and a Holder of an Allowed Administrative Claim agree to a less favorable treatment, and subject to the Professional Fee Caps, a Holder of an Allowed Administrative Claim (other than a Deferred Amounts Claim, which shall be subject to Article 2.3 of this Plan, or a Professional Claim, which shall be subject to Article 2.5 of this Plan) shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim either (a) on the later of (i) thirty (30) days following the Effective Date (or as soon as reasonably practicable thereafter); (ii) thirty (30) days after the date when the Administrative Claim becomes an Allowed Administrative Claim (or as soon as reasonably practicable thereafter); or (iii) the date when the Administrative Claim becomes payable pursuant to any agreement between the Debtors and the Holder of the Administrative Claim; or (b) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative

Claim, without any further action by the Holder of such Allowed Administrative Claim; *provided*, *however*, that other than the Holder of (v) a Deferred Amounts Claim, (w) a Professional Claim, (x) an Administrative Claim Allowed by a final order of the Bankruptcy Court on or before the Effective Date, (y) an Administrative Claim that is not disputed and arose in the ordinary course of business and was paid or is to be paid in accordance with the terms and conditions of the particular transaction giving rise to such Administrative Claim, or (z) an Administrative Claim arising under chapter 123 of title 28 of the United States Code, the Holder of any Administrative Claim shall have filed a proof of claim form no later than the Administrative Claims Bar Date and such claim shall have become an Allowed Claim. Except as otherwise provided herein and as set forth in Article 2.5 of this Plan, all requests for payment of an Administrative Claim must be filed, in substantially the form of the Administrative Claim Request Form contained in the Plan Supplement, with the Claims Agent and served on counsel for the Debtors and/or the Plan Administration Trustee, as applicable, no later than the Administrative Claims Bar Date. Any request for payment of an Administrative Claim pursuant to this Article 2.1 that is not timely filed and served in accordance with the terms of this Article 2.1 shall be Disallowed automatically without the need for any objection from the Plan Administration Trustee. The Plan Administration Trustee may settle an Administrative Claim without further Bankruptcy Court approval. In the event that the Plan Administration Trustee objects to an Administrative Claim and there is no settlement, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.

  **2.2 Professional Fees and Expenses of the Debtors, the Chatham Parties, the Brigade Parties, and the Committee**.

  In order to ensure the administrative solvency of the Debtors' estates and provide for the ability to confirm the Plan and cause it to become effective, the professional fees and expenses, other than the Deferred Amounts Claims, of the Debtors, the Chatham Parties, the Brigade Parties, and the Committee shall be paid on the Effective Date subject to and in accordance with the Sale Order, the DIP Order, the Committee Settlement described herein and in the Sale Order, the Stipulation Regarding Mediated Sale and Plan Settlement, and the Professional Fee Caps set forth in the Admin Liability Schedule (and, in the case of the Debtors and the Committee, subject to and in accordance with Article 2.5 of the Plan).

  **2.3 Deferred Amounts Claims**.

  Subject to and in accordance with the Sale Transaction Documents and the Committee Settlement described herein and in the Stipulation Regarding Mediated Sale and Plan Settlement, the Deferred Amounts Claims shall constitute Allowed Administrative Claims and shall be satisfied from the proceeds of the Tax Refund prior to the distribution of the Net Tax Refund to the Purchaser and the GUC Recovery Trust in accordance with the terms of the Committee Settlement. Notwithstanding the foregoing, to the extent that the Debtors have excess Cash available on the Effective Date to pay all or a portion of the Deferred Amounts Claims after satisfaction of all other Allowed Administrative Claims, such Deferred Amounts Claims shall be paid first in Cash with each of the Chatham Advisors, the Committee Advisors (subject to Article 2.5(a)), the GUC Recovery Trust, and the Purchaser receiving their Pro Rata share of such excess Cash amount if there is not enough Cash available to satisfy all such Deferred Amounts Claims, with any balance of such Deferred Amounts Claims paid from the proceeds of the Tax

Refund. In the event that the Debtors' or the Plan Administration Trust's excess Cash available is insufficient to pay all of the Deferred Amounts Claims and the Debtors and the Wind-Down Debtors do not obtain the Tax Refund, any amounts outstanding on account of the Deferred Amounts Claims (after giving effect to any distribution in Cash on account of such Claims as set forth in this Article 2.3) shall be waived.

**2.4     Fees and Expenses of the 2027 Debentures Trustee and the 2029 Debentures Trustee**.

Subject to and in accordance with the Sale Order, the Committee Settlement described herein and therein, and the Stipulation Regarding Mediated Sale and Plan Settlement, and in consideration of each of the 2027 Debentures Trustee's and 2029 Debentures Trustee's continued performance under the applicable indentures during these Chapter 11 Cases and as further required under the Plan, the fees and expenses of the 2027 Debentures Trustee and the 2029 Debentures Trustee, and the fees and expenses of Seward & Kissel LLP as their counsel, shall be paid in full in Cash on the Effective Date.

**2.5     Professional Claims.**

(a)     **Final Fee Applications**.     All final requests for payment of Professional Claims must be filed no later than forty-five (45) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, the Allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court, *provided*, *however*, that such Allowed amounts shall not exceed the Professional Fee Caps; *provided further*, *however*, that such Allowed amounts may include Deferred Amounts Claims, in the case of the Committee Advisors.

(b)     **Payment of Interim Amounts**.  Subject to the Holdback Amount and the Professional Fee Caps, on the Effective Date, the Plan Administration Trust shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed.  Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated amounts provided in connection with the Committee Retained Professional Fees Escrow and the Seller Retained Professional Fees Escrow shall submit a detailed invoice covering such period.

(c)     **Payment of Holdback Amounts**.  The Plan Administration Trustee shall maintain in the Committee Retained Professional Fees Escrow and the Seller Retained Professional Fees Escrow the Holdback Amounts in trust for the Committee Advisors, and the Debtors' Professionals, respectively, with respect to whom fees have been held back pursuant to a Professional Fee Order.  Such funds shall not be considered property of the Debtors, the Wind-Down Debtors, the Plan Administration Trust, or the Estates.  The Holdback Amounts of Professional Claims owing to the Professionals shall be paid to such Professionals by the Plan Administration Trustee from the Plan Administration Trust when such claims are finally Allowed by the Bankruptcy Court.

27

(d)     **Post-Confirmation Date Retention / Professional Fees**.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Wind-Down Debtors, the Plan Administration Trust, and the GUC Recovery Trust may employ and pay any professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.6     **Priority Tax Claims**.  Except to the extent that a Holder of an Allowed Priority Tax Claim, the applicable Debtor(s) or Wind-Down Debtor(s), as applicable, and the Committee or the GUC Recovery Trust, as applicable, agree to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

2.7     **Payments Under Other Final Orders**. For the avoidance of doubt, any amounts that come due and are payable under any Final Order of the Bankruptcy Court, including but not limited to the DIP Order and the Sale Order, shall be paid in accordance with such Final Order.

2.8     **First Lien Notes Claims**. Pursuant to the Sale Order, on the closing date of the Sale Transaction, all First Lien Notes Claims (other than certain claims for professional fees and expenses provided for under the First Lien Notes Documents, which shall be paid in accordance with the Committee Settlement) were satisfied in full and were deemed automatically cancelled, released, and extinguished. Accordingly, holders of First Lien Notes Claims will not receive any distributions under the Plan.

2.9     **DIP Facility Claims**. Pursuant to the Sale Order, and in accordance with section 5.18 of the Asset Purchase Agreement, DIP Facility Claims were paid in full (other than certain claims for professional fees and expenses provided for under the DIP Credit Agreement which will be paid in accordance with the DIP Order). Accordingly, holders of DIP Facility Claims will not receive any distributions under the Plan.

## ARTICLE III

## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

3.1     **Classification of Claims and Interests**.

28

(a)    The Plan is a single plan of distribution for the jointly administered Chapter 11 Cases, but does not constitute a substantive consolidation of the Debtors' Estates for voting purposes. The Plan, though proposed jointly, constitutes a separate plan for each of the Debtors for voting purposes. Therefore, all Claims against and Interests in a particular Debtor are placed in the Classes set forth below with respect to such Debtor. Classes that are not applicable as to a particular Debtor or group of Debtors shall be eliminated as set forth more fully in Article 5.3 below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth in Article II above.

(b)    Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and, to the extent applicable, receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

(c)    Claims and Interests are divided into numbered Classes as set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 4 | Third Lien Notes Claims | Impaired | Deemed to Reject |
| 5 | General Unsecured Claims | Impaired | Deemed to Reject |
| 6 | Intercompany Claims | Impaired | Deemed to Reject |
| 7 | Intercompany Interests | Impaired | Deemed to Reject |
| 8 | Subordinated Claims | Impaired | Deemed to Reject |
| 9 | Existing Parent Equity | Impaired | Deemed to Reject |

## ARTICLE IV

## PROVISIONS FOR TREATMENT
## OF CLAIMS AND INTERESTS

### 4.1    Class 1 – Other Priority Claims.

(a)    Classification: Class 1 consists of all Other Priority Claims.

29

(b)    <u>Treatment</u>:  On or as soon as practicable after the Effective Date, except as otherwise provided in and subject to <u>Article 9.5</u> of this Plan, and except to the extent that a Holder of an Allowed Class 1 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Class 1 Claim, each such Holder of an Allowed Class 1 Claim shall be paid in full in Cash; *provided*, *however*, that Other Priority Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(c)    <u>Voting</u>: Class 1 is Unimpaired, and Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 1 Claims are not entitled to vote to accept or reject the Plan.

### 4.2    Class 2 – Other Secured Claims.

(a)    <u>Classification</u>: Class 2 consists of all Other Secured Claims.

(b)    <u>Treatment</u>: On or as soon as practicable after the Effective Date, except as otherwise provided in and subject to <u>Article 9.5</u> of this Plan, and except to the extent that a Holder of an Allowed Class 2 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each and every Allowed Class 2 Claim, each such Holder of an Allowed Class 2 Claim shall, at the election of the Debtors:

(i)    be paid in full in Cash in an amount equal to such Allowed Class 2 Claim, including postpetition interest, if any, on such Allowed Class 2 Claim required to be paid pursuant to section 506 of the Bankruptcy Code; or

(ii)    such other recovery as is necessary to satisfy section 1129 of the Bankruptcy Code.

Nothing in this <u>Article 4.2</u> or elsewhere in this Plan shall preclude the Debtors from challenging the validity of any alleged Lien or any asset of the Debtors or the value of the property that secures any alleged Lien.

(c)    <u>Voting</u>: Class 2 is Unimpaired, and Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Class 2 Claims are not entitled to vote to accept or reject the Plan.

### 4.3    Class 3 – Second Lien Term Loan Claims

(a)    <u>Classification</u>: Class 3 consists of the Second Lien Term Loan Claims.

(b)    <u>Allowance</u>: The Second Lien Term Loan Claims shall be Allowed in the aggregate principal amount of not less than $157,083,000.

(c)    <u>Treatment</u>: But for potential claims that the Committee believes exist against the Holders of Second Lien Term Loan Claims or the Debtors, which such parties dispute, the Holders of Second Lien Term Loan Claims would be entitled receive in the aggregate on account of their Allowed Class 3 Claims, the GUC Recovery Trust Assets. The Debtors, the Committee, the Holders of Class 3 Claims and certain other parties in interest have agreed, pursuant to the Committee Settlement, that pursuant to Bankruptcy Rule 9019 and subject to the terms and conditions of the Committee Settlement, the GUC Recovery Trust Assets less $1.00 shall be distributed to the GUC Recovery Trust for the express benefit of the Holders of Allowed General Unsecured Claims, and the Holders of Allowed Class 3 Claims shall receive $1.00 on the Effective Date and then shall not receive any further distributions on account of their Allowed Class 3 Claims until Holders of Allowed Class 5 Claims have been satisfied in full. After Holders of Allowed Class 5 Claims have fully recovered, and in full and final satisfaction, settlement, and release of and in exchange for their Allowed Class 3 Claims, Holders of Second Lien Term Loan Claims shall receive their Pro Rata Share of GUC Recovery Trust Interests (entitling the Holders of Second Lien Term Loan Claims to their Pro Rata share of the GUC Recovery Trust Assets in accordance with the GUC Recovery Trust Agreement).

(d)    <u>Voting</u>: Class 3 is Impaired and Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

### 4.4    Class 4 – Third Lien Notes Claims

(a)    <u>Classification</u>:  Class 4 consists of all Third Lien Notes Claims.

(b)    <u>Treatment</u>: Holders of Allowed Class 4 Claims shall not receive any distributions on account of such Allowed Class 4 Claims, and on the Effective Date all Allowed Class 4 Claims shall be released and waived.

(c)    <u>Voting</u>: Class 4 is Impaired, and Holders of Allowed Class 4 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Class 4 Claims are not entitled to vote to accept or reject the Plan.

### 4.5    Class 5 – General Unsecured Claims.

(a)    <u>Classification</u>: Class 5 consists of all General Unsecured Claims.

(b)    <u>Treatment</u>: Pursuant to Bankruptcy Rule 9019, in satisfaction and in exchange for the Allowed Class 5 Claims, on the Effective Date each Holder of an Allowed Class 5 Claim shall receive its Pro Rata share of GUC Recovery Trust Interests (entitling such Holder to

a Pro Rata share of the GUC Recovery Trust Assets in accordance with the GUC Recovery Trust Agreement).

(c)     Voting: Class 5 is Impaired, and Holders of Allowed Class 5 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Class 5 Claims are not entitled to vote to accept or reject the Plan.

### 4.6     Class 6 – Intercompany Claims

(a)     Classification:  Class 6 consists of all Intercompany Claims.

(b)     Treatment: Following the dissolution of all Debtors other than the Wind-Down Debtors, holders of Allowed Class 6 Claims shall not thereafter receive any distributions on account of such Allowed Class 6 Claims.

(c)     Voting: Class 6 is Impaired, and Holders of Allowed Class 6 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Class 6 Claims are not entitled to vote to accept or reject the Plan.

### 4.7     Class 7 – Intercompany Interests

(a)     Classification:  Class 7 consists of all Intercompany Interests.

(b)     Treatment: Except as expressly provided in Article 6.12(c) of the Plan, Holders of Allowed Class 7 Interests shall not receive any distributions on account of such Allowed Class 7 Interests, and on the Effective Date all Allowed Class 7 Interests shall be deemed automatically cancelled and extinguished for no consideration without further action by the Debtors or the Wind-Down Debtors.

(c)     Voting: Class 7 is Impaired, and Holders of Allowed Class 7 Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Class 7 Interests are not entitled to vote to accept or reject the Plan.

### 4.8     Class 8 – Subordinated Claims.

(a)     Classification:  Class 8 consists of all Claims under Bankruptcy Code sections 510(b) and (c).

(b)     Treatment: Holders of Allowed Class 8 Claims shall not receive any distributions on account of such Allowed Class 8 Claims.

(c)     Voting: Class 8 is Impaired, and Holders of Allowed Class 8 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Class 8 Claims are not entitled to vote to accept or reject the Plan.

### 4.9     Class 9 – Existing Parent Equity.

(a)     Classification:  Class 9 consists of all Existing Parent Equity.

32

(b)    <u>Treatment</u>: Holders of Allowed Class 9 Interests shall not receive any distributions on account of such Allowed Class 9 Interests, and on the Effective Date all Allowed Class 9 Interests shall be deemed automatically cancelled and extinguished for no consideration without further action by the Debtors or the Wind-Down Debtors.

(c)    <u>Voting</u>: Class 9 is Impaired, and Holders of Allowed Class 9 Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Class 9 Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE V

## ACCEPTANCE

**5.1    Special Provisions Governing Unimpaired Claims.**  Except as otherwise specifically provided in this Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Wind Down Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including, but not limited to, legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in this Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left Unimpaired or Reinstated by this Plan.

**5.2    Class Entitled to Vote.**  Class 3 is Impaired and is entitled to vote to accept or reject this Plan.  By operation of law, Classes 1 and 2 are Unimpaired and are deemed to have accepted this Plan and, therefore, are not entitled to vote.  Pursuant to this Plan, Class 5 is deemed to have rejected this Plan and is not entitled to vote. By operation of law, Classes 4, 6, 7, and 8, and 9 are deemed to have rejected this Plan and are not entitled to vote.

**5.3    Acceptance by Impaired Class.**  An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code, (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

**5.4    Elimination of Classes.**  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, for all Debtors or with respect to any particular Debtor shall be deemed to have been deleted from this Plan for all Debtors or for such particular Debtor, as applicable, for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.  In particular, Class 8 shall exist only with respect to JCK Legacy Company.

**5.5    Cramdown.**    To the extent necessary, the Debtors shall request confirmation of this Plan, as it may be modified from time to time in accordance with the terms hereof, under section 1129(b) of the Bankruptcy Code.  The Debtors, with the consent of the

Consent Parties, reserve the right to modify, amend, or withdraw this Plan, with respect to all Debtors or any individual Debtor or group of Debtors to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

### 6.1    Distribution Mechanics.

On the Effective Date, each Claim against any Debtor shall be deemed only against JCK Legacy Company and shall be deemed a single Claim against and a single obligation of JCK Legacy Company, for purposes of distributions in respect of Claims only and the claims register shall be updated accordingly. This treatment effected pursuant to this Article 6.1 of the Plan shall not otherwise affect the rights of any Holder of any Claim, or affect the obligations of any Debtor with respect to such Claim, and no Debtor shall be treated as distributing any amount to any other Debtor with respect to the stock of the first Debtor.

### 6.2    General Settlement of Claims and Interests.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan and the Committee Settlement shall constitute good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness. Each provision of the Committee Settlement shall be deemed non-severable from each other and from the remaining terms of the Plan.

### 6.3    The Committee Settlement.

The treatment provided for hereunder to Class 3 Allowed Second Lien Term Loan Claims and Class 5 Allowed General Unsecured Claims incorporates and reflects a good faith compromise and settlement by and among the Debtors, the Chatham Parties, the Brigade Parties, the Purchaser, and the Committee (the "Committee Settlement") that will, subject to Confirmation of the Plan and the occurrence of the Effective Date, result in, among other things, (a) the release of each Chatham Party and Brigade Party pursuant to Articles 10.3 and 10.4 hereof (together, the "Chatham/Brigade Release"), (b) the contribution by the Chatham Parties and/or the Purchaser of $1,000,000 upon the closing of the Sale Transaction, with $400,000 of such amount being funded to the GUC Recovery Trust Escrow and the remainder utilized to fund the wind-down expenses of the Debtors' Estates consistent with the Admin Liability Schedule; and (c) the distribution of material value to holders of General Unsecured Claims in the form of (i) $4,587,500 in Cash settlement proceeds from the settlement of claims against the Ds&Os, (ii) a portion of the proceeds of the Net Tax Refund, and (iii) $1,000,000 in Cash consideration (consisting of (x) the Initial Purchaser Contribution ($400,000) that shall be transferred from the GUC Recovery Trust Escrow

34

to the GUC Recovery Trust on the Effective Date, and (y) $600,000 upon receipt of the Tax Refund to the GUC Recovery Trust, which amount shall constitute a Deferred Amounts Claim).

The terms of the Committee Settlement are set forth in full in the Stipulation Regarding Mediated Sale and Plan Settlement, which is included in the Plan Supplement. The Stipulation Regarding Mediated Sale and Plan Settlement shall be incorporated herein by this reference and be fully enforceable as if stated in full in the Plan. Failure to reference in the Plan to rights and obligations under the Stipulation Regarding Mediated Sale and Plan Settlement shall not impair such rights and obligations.

Pursuant to the Committee Settlement, the Chatham Parties have agreed to transfer the GUC Recovery Trust Assets to the GUC Recovery Trust in full and to only retain a distribution of one dollar on account of their Allowed Second Lien Term Loan Claims and to waive any right to receive a further distribution on account of any Allowed Second Lien Term Loan Claims under the Plan or from the GUC Recovery Trust until all General Unsecured Claims have been satisfied in full. The Chatham Parties and/or the Purchaser have also agreed, that the GUC Recovery Trust shall be funded with the GUC Recovery Trust Assets, including Cash, the GUC Recovery Trust Causes Of Action, and a portion of the proceeds of the Net Tax Refund on the Effective Date (or after the Effective Date, as may be required in the case of the proceeds of the Net Tax Refund). In pursuing the GUC Recovery Trust Causes of Action, the GUC Recovery Trust shall minimize discovery with respect to any Transferred Employees that accept employment from the Purchaser by seeking relevant information from other parties prior to seeking such information from any such Transferred Employees.

As contemplated in the Committee Settlement, the Debtors and the Committee have both approved an agreement to settle and release all estate claims against all current and former Ds&Os, including but not limited to those included in the proposed complaint annexed to the Committee's Standing Motion, in exchange for a payment of $4,587,500 from the D&O Insurance carriers to the GUC Recovery Trust Escrow until transferred to the GUC Recovery Trust. Such payment will be made by the D&O Insurance carriers on or before the Effective Date. In the event the Bankruptcy Court declines to enter an order confirming the Plan, or the Effective Date does not occur within twenty-one (21) days of the D&O Insurance carriers making such payment to the GUC Recovery Trust Escrow, then the agreement to settle and release all estate claims against all current and former Ds&Os shall automatically terminate, unless the D&O Insurance carriers sign a waiver or amendment to the effectiveness of such termination. In the event of termination (the "**D&O Insurance Settlement Termination**"), the $4,587,500 payment shall be returned to the D&O Insurance carriers from the GUC Recovery Trust Escrow within ten (10) days of such D&O Insurance Settlement Termination.

The Committee Settlement also includes critical commitments regarding the Tax Refund, which is an important source for the recoveries under this Plan. Specifically, pursuant to the Committee Settlement, the Purchaser has agreed that the proceeds of the Net Tax Refund, if any, shall be distributed as follows: 77.5% to the GUC Recovery Trust and 22.5% to the Purchaser. The Wind-Down Debtors hereby represent and warrant that they will diligently claim the Tax Refund and file a claim for the Tax Refund as soon as reasonably practicable. Each of the Purchaser (on its own account and on account of any Transferred Employees), and the Plan Administration Trustee hereby represents and warrants that it (i) will diligently and in good faith cooperate in all respects

35

with the Wind-Down Debtors to diligently claim the Tax Refund, including, without limitation, by (a) providing the Wind-Down Debtors and the Plan Administration Trustee with reasonable access to any books and records of the Debtors and the Wind-Down Debtors in such party's possession and (b) paying in accordance with Section 8.1(d) of the Asset Purchase Agreement the Wind-Down Debtors for all fees, costs, or expenses (including the fees, costs, or expenses of any professionals and advisors retained by the Purchaser or the Wind-Down Debtors) in connection with the Wind-Down Debtors' claim for the Tax Refund; (ii) will not engage in any conduct that could materially interfere with the Wind-Down Debtors' claim for the Tax Refund or reduce the value of the Tax Refund; (iii) will keep the GUC Recovery Trust and the Purchaser reasonably and timely informed with respect to the status and of and any developments with respect to the Tax Refund; and (iv) will not settle, compromise or otherwise resolve any challenge or dispute to the claim for the Tax Refund without the prior written consent of the Purchaser and the GUC Recovery Trustee; *provided*, that nothing herein shall require the Purchaser to incur fees, costs or expenses (including the fees, costs or expenses of any professionals and advisors retained by the Purchaser) in connection with the Wind-Down Debtors' claim for the Tax Refund to the extent the Purchaser determines, in consultation with the GUC Recovery Trust, that the Wind-Down Debtors' claim for the Tax Refund is unduly burdensome, no longer commercially reasonable, and unlikely to result in a recovery; *provided*, *further*, that nothing herein shall prevent the GUC Recovery Trust from facilitating the Wind-Down Debtors' claim for the Tax Refund, pursuing the Tax Refund itself (upon an appropriate assignment of the Wind-Down Debtors' Rights solely for purposes of prosecuting the claim), or utilizing its assets in connection with the Wind-Down Debtors' claim for the Tax Refund (such scenario, the "***GUC Takeover Scenario***"), and for the avoidance of doubt, the GUC Recovery Trust shall have Deferred Amounts Claims for any fees, costs or expenses incurred in connection therewith; *provided further*, *however*, that, notwithstanding the occurrence of the GUC Takeover Scenario, the proceeds of the Net Tax Refund, if any, shall be distributed as follows: 77.5% to the GUC Recovery Trust and 22.5% to the Purchaser.

Pursuant to the Committee Settlement, the Debtors, the Chatham Parties, the Brigade Parties, and the Committee have each agreed to the Professional Fee Caps and the Deferred Amounts Claims and to act in good faith to minimize their fees and expenses to conclude these cases in an orderly manner. This will ensure the administrative solvency of the Debtors' estates and provide for the ability to confirm the Plan and cause it to become effective.

### 6.4    Plan Funding.

(a)    **Plan Funding.** Other than as set forth in Article 6.6 of this Plan, all Cash necessary for the Plan Administration Trustee to make payments required by this Plan to Holders of Allowed Claims (other than General Unsecured Claims) shall be obtained from the Debtors' Cash balances then on hand, including the Plan Administration Trust Assets, after giving effect to the transactions contemplated herein.

(b)    **GUC Recovery Trust Funding.** Other than as set forth in Article 6.20 of this Plan, the GUC Recovery Trust will be funded on the Effective Date with the GUC Recovery Trust Assets.

### 6.5    Wind-Down Debtors.    JCK Legacy Company and Herald Custom Publishing of Mexico, S. de R.L. de C.V. shall continue in existence after the Effective Date as

the Wind-Down Debtors for the limited purposes specified in this Article 6.5.  In accordance with section 1141 of the Bankruptcy Code, and except as otherwise provided in the Plan, the Wind-Down Rights shall automatically vest in the Wind-Down Debtors free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, sales, use or other similar tax. The Wind-Down Officer shall be the exclusive administrator of the assets of the Wind-Down Debtors for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as a representative of the Estate of each of the Debtors that are Wind-Down Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the Wind-Down Debtors' duties under the Plan.

The powers, rights, and responsibilities of the Wind-Down Officer shall include the authority and responsibility to, among other things, take the actions set forth in this Article 6.5. The Wind-Down Officer shall hold the Wind-Down Debtors' Rights and distribute the proceeds thereof in accordance with the provisions of the Plan and Committee Settlement. Such assets, except as otherwise provided in the Plan, shall be held free and clear of all liens, claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. Any distributions to be made under the Plan from such assets shall be made by the Wind-Down Officer or its designee. The Wind-Down Officer and the Wind-Down Debtors shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the Wind-Down Officer under the Plan have been made, or a designee has been appointed to make them. The Wind-Down Officer shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

The Wind-Down Officer shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order. The powers of the Wind-Down Officer shall include any and all powers and authority to implement the Plan and to make certain distributions thereunder and Wind Down the businesses and affairs of the Wind-Down Debtors, as applicable, including: (1) holding and exercising the Wind-Down Debtors' Rights, (2) filing appropriate tax returns and claims for the Tax Refund, (3) administering and paying taxes of the Wind-Down Debtors and the Debtors, (4) representing the interests of the Wind-Down Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit; (5) seeking and receiving reimbursement or payment, as appropriate, from the Purchaser in connection with the Wind-Down Debtors' pursuit of the Tax Refund; (6) receiving the Tax Refund and making appropriate distributions in accordance with the Committee Settlement, (7) assuming and performing any post-closing obligations of the Debtors under Sale Transaction Documents, and (8) to the extent necessary, working with the Plan Administration Trust to wind down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidate any assets held by the Wind-Down Debtors after the Effective Date and after consummation of the Sale Transaction.

The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all tax-related matters.

### 6.6    Plan Administration Trust and Plan Administration Trustee.

On the Effective Date, the Debtors shall transfer the Plan Administration Trust Assets to the Plan Administration Trust and the Debtors and the Plan Administration Trustee shall execute the Plan Administration Trust Agreement and shall take all steps necessary to establish the Plan

Administration Trust in accordance with the Plan. In the event of any conflict between the terms of the Plan and the terms of the Plan Administration Trust Agreement, the terms of the Plan shall govern. Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the Plan Administration Trust all of their rights, title and interest in and to all of the Plan Administration Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, and except as otherwise provided in the Plan, the Plan Administration Trust Assets shall automatically vest in the Plan Administration Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, sales, use or other similar tax. The Plan Administration Trustee shall be the exclusive administrator of the assets of the Plan Administration Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as a representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the Plan Administration Trustee's duties under the Plan Administration Trust Agreement. The Plan Administration Trust shall be governed by the Plan Administration Trust Agreement and administered by the Plan Administration Trustee.

The powers, rights, and responsibilities of the Plan Administration Trustee shall be specified in the Plan Administration Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Article 6.6. The Plan Administration Trustee shall hold and distribute the Plan Administration Trust Assets in accordance with the provisions of the Plan and the Plan Administration Trust Agreement. Such assets shall be held free and clear of all liens, claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. Any distributions to be made under the Plan from such assets shall be made by the Plan Administration Trustee or its designee. Other rights and duties of the Plan Administration Trustee shall be as set forth in the Plan Administration Trust Agreement. The Plan Administration Trustee and the Plan Administration Trust shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the Plan Administration Trustee under the Plan have been made. The Plan Administration Trustee shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

The Plan Administration Trustee shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order.  The powers of the Plan Administration Trustee shall include any and all powers and authority to implement the Plan and to make certain distributions thereunder and Wind Down the businesses and affairs of the Debtors and the Wind-Down Debtors, as applicable, including: (1) to the extent necessary, liquidating, receiving, holding, investing, supervising, and protecting the assets of the Debtors remaining after consummation of the Sale Transaction; (2) performing the Debtors' obligations under the Asset Purchase Agreement or any transition services agreement entered into on or after the Effective Date by and between the Debtors, the Purchaser, and/or the Chatham Parties, (3) resolving any Disputed Claims, (4) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan to Holders of Allowed Claims (other than General Unsecured Claims); (5) making, or hiring a Distribution Agent to make, distributions as contemplated under the Plan to Holders of Allowed Claims (other than General Unsecured Claims); (6) maintaining, and ultimately closing, bank accounts in the name of the Debtors and the Wind-Down Debtors; (7) employing, retaining, terminating, or replacing a tax advisor and/or return preparer to represent the Debtors and their successors in connection with the Wind Down Debtors' filing the final tax returns and pursuit of

38

the Tax Refund, (8) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (9) coordinating with the Wind-Down Debtors and facilitating the Wind-Down Debtors' efforts to file, or acting on behalf of the Wind-Down Debtors to file, appropriate tax returns and claims for the Tax Refund, and representing the Wind-Down Debtors in connection with any audits, contests, controversies or other interactions with any taxing authority; (10) making appropriate distributions on the Wind-Down Debtors' behalf, as necessary, in accordance with the Committee Settlement; (11) at the appropriate time, dissolving the Debtors and the Wind-Down Debtors in and withdrawing the Debtors and the Wind-Down Debtors from applicable states, in each case, in accordance with Article 6.10 hereof, (12) administering the Plan in an efficacious manner, and (13) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administration Trust shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case, other than tax-related matters or with respect to the GUC Recovery Trust Causes of Action, and without the need or requirement for the Plan Administration Trustee to file motions or substitutions of parties or counsel in each such matter.

To the extent any of the Plan Administration Trust Assets remain in the Plan Administration Trust after all Allowed Claims (other than Allowed General Unsecured Claims) have been paid or otherwise satisfied in full, such remaining assets shall be transferred to the GUC Recovery Trust.

The Plan Administration Trustee may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court, *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administration Trustee. Upon its appointment, the successor Plan Administration Trustee, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administration Trustee relating to the Wind-Down Debtors shall be terminated.

The Plan Administration Trustee's compensation, on a post-Effective Date basis, shall be as described in the Wind-Down Budget.

>        **6.7    Wind Down**. On and after the Effective Date, the Plan Administration Trustee will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administration Trustee shall have the power and authority to take any action necessary to Wind Down and dissolve the Estates.

As soon as practicable after the Effective Date, the Plan Administration Trustee shall cause the Debtors to comply with, and abide by, the terms of the Asset Purchase Agreement and take such other actions as the Plan Administration Trustee may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the Wind Down of any remaining assets or operations from and after the Effective Date the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the

Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

        **6.8**    **Plan Administration Trustee Insurance, and Liability Limitation**. The Plan Administration Trustee may obtain at its expense in accordance with the Wind-Down Budget commercially reasonable liability or other appropriate insurance. The Plan Administration Trustee may rely upon written information previously generated by the Debtors which the Plan Administration Trustee reasonably believes was accurately prepared by competent professionals or persons using reasonable methods.

        **6.9**    **Tax Returns**. After the Effective Date, the Wind-Down Debtors shall, with the assistance of a tax services provider and the Plan Administration Trustee, and with the consent of the GUC Recovery Trustee, complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid state or local tax liability of such Debtor or its Estate for any state or local tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

        **6.10**    **Dissolution of the Debtors and Wind-Down Debtors**. On or after the Effective Date, the Plan Administration Trustee may, with the consent of the GUC Recovery Trustee, file a certification with the Bankruptcy Court that it has substantially administered the Plan for any Debtor, and such Debtor shall be deemed dissolved without further order of the Bankruptcy Court or action by the Plan Administration Trustee, including the filing of any documents with the secretary of state for the state in which such dissolved Debtor(s) are formed or any other jurisdiction; *provided*, *however*, that any Debtor whose continued legal existence is necessary to preserve, claim, and receive the Tax Refund shall not be dissolved until the receipt of the Tax Refund or the GUC Recovery Trustee making a final determination that the Tax Refund is not available. The Plan Administration Trustee is authorized to take all necessary or appropriate actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

        **6.11**    **Cancellation of Old McClatchy Securities, Agreements, and the Second Lien Term Loan**. On the Effective Date, except as otherwise specifically provided for herein (including in Article 4.6(b) hereof) or pursuant to the Restructuring Transactions (a) the Old McClatchy Securities and the Second Lien Term Loan and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (including the First Lien Notes Indenture, the Third Lien Notes Indenture, the 2027 Debentures Indenture, and the 2029 Debentures Indenture), shall be deemed to be automatically cancelled without further action by any person and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, Indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old McClatchy Securities, and any other note, bond, indenture, Certificate, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors, as the case may be, shall be deemed to be automatically released and cancelled

without further action by any person; *provided*, *however*, that any agreement (including the Indentures) that governs the rights of a Holder of a Claim and that is administered by a Servicer shall continue in effect solely for the purposes of allowing such Servicer to (x) make the distributions on account of such Claims under this Plan and perform such other necessary functions with respect thereto, if any, as provided for in <u>Article 9.4</u> of this Plan and (y) maintain and exercise its Charging Lien or other right to priority payment against distributions under the Plan on account of such Servicer's reasonable fees, expenses, and indemnities owed to such Servicer under the terms of any of the Indentures. On or after the Effective Date, all duties and responsibilities of the 2027 Debentures Trustee under the 2027 Debentures Indenture, the 2029 Debentures Trustee under the 2029 Debentures Indenture, the First Lien Notes Agent under the First Lien Notes Indenture, the Second Lien Term Loan Agent under the Second Lien Term Loan Documents, and the Third Lien Notes Agent under the Third Lien Notes Indenture shall be deemed satisfied except to the extent required in order to effectuate the Plan.

**6.12    Restructuring Transactions**.

(a)      On or following the Confirmation Date, the Debtors or the Plan Administration Trustee, as the case may be, shall take such actions as may be necessary or appropriate to effect the relevant restructuring transactions as set forth in the Plan, the Committee Settlement, and the Sale Transaction Documents, and may take other actions on or after the Effective Date (collectively, the "<u>Restructuring Transactions</u>").

(b)      Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtors or the Plan Administration Trustee, as applicable, shall enter into the Restructuring Transactions described herein and in the Sale Transaction Documents.  The Restructuring Transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtors to be necessary or appropriate.  The actions taken by the Debtors or the Plan Administration Trustee, as applicable, to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan, the Sale Transaction Documents, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Sale Transaction Documents, and any ancillary documents and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion (or, in each case, the functional equivalent thereof) pursuant to applicable state law, including but not limited to an amended certificate of incorporation and by-laws (or, in each case, the functional equivalent thereof, as applicable); (iv) the cancellation of any shares and warrants; (v) the execution, delivery, or filing of contracts, instruments, releases, and other agreements to effectuate and implement the distribution of the GUC Recovery Trust Interests to be issued pursuant hereto without the need for any approvals, authorizations, actions, or consents; (vi) the issuance and distribution of New Parent Equity as set forth herein; and (vii) all other actions that the Debtors or the Plan Administration Trustee, as applicable, determine to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the Restructuring

41

Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.

(c)     On the Effective Date, any Intercompany Interests in Debtor Herald Custom Publishing of Mexico, S. de R.L. de C.V. shall be deemed transferred to the Plan Administration Trust. All Debtors except for the Wind-Down Debtors shall be dissolved upon the Effective Date. Such Debtors are deemed to be dissolved without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law, if any). Any Claim arising as a result of such dissolutions shall receive the applicable treatment under this Plan.

(d)     All Existing Parent Equity shall be cancelled and extinguished as of the Effective Date.  On the Effective Date, the New Parent Equity shall be issued to the GUC Recovery Trust in accordance with the terms hereof.  All of the New Parent Equity shall be duly authorized, validly issued, fully paid, and non-assessable when issued in accordance with the terms of such instruments.

(e)     The Plan Supplement may contain, with the consent of the Consent Parties, additional descriptions of contemplated Restructuring Transactions necessary or appropriate to implement the Plan.

**6.13    Corporate Action**.  On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (a) the  rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (b) the implementation of the Restructuring Transactions; (c) the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust and the execution of the GUC Recovery Trust Agreement; (d) the transfer of the Plan Administration Assets to the Plan Administration Trust and the execution of the Plan Administration Trust Agreement; and (e) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Debtors or Wind-Down Debtors, and any corporate action required by the Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or Wind-Down Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the Restructuring Transactions) in the name of and on behalf of the Wind-Down Debtors, and any and all other agreements, documents, Securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article 6.13 shall be effective notwithstanding any requirements under non bankruptcy law.

**6.14    Effectuating Documents; Further Transactions**.  On and after the Effective Date, the Plan Administration Trustee shall be authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, or to otherwise comply with

applicable law, in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

      **6.15**    **[Reserved]**.

      **6.16**    **Preservation Of Causes Of Action**.  As of the Effective Date, the GUC Recovery Trust Causes of Action shall vest in the GUC Recovery Trust, and all remaining Causes of Action shall vest in the Plan Administration Trust. In accordance with section 1123(b)(3) of the Bankruptcy Code, to the extent such Causes of Action do not constitute Acquired Assets (as defined in the Asset Purchase Agreement) or GUC Recovery Trust Assets, the Plan Administration Trust shall retain and may (but are not required to) enforce all rights to commence and pursue any and all Causes of Action that are not vested in the GUC Recovery Trust or released pursuant to Article 10.3 of this Plan or an order of the Bankruptcy Court, whether arising before or after the Petition Date, and such Causes of Action shall vest in the Plan Administration Trust as of the Effective Date.  The Debtors or the Plan Administration Trust, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  The Debtors or the Plan Administration Trust or any successors may pursue such litigation claims in accordance with the best interests of the Estates or any successor holding such rights of action.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administration Trust will not pursue any and all available Causes of Action against them.  The Debtors or the Plan Administration Trust expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, transferred, or settled in this Plan, the Sale Transaction Documents, or an order of the Bankruptcy Court, the Debtors or the Plan Administration Trust expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article 6.16 include any claim or Cause of Action with respect to, or against, a Released Party or any Causes of Action that constitutes an Acquired Asset (as defined in the Asset Purchase Agreement) or a GUC Recovery Trust Asset.

      **6.17**    **Release of Avoidance Actions; Reservation of Rights**. On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall abandon any and all Avoidance Actions and the Debtors and the Plan Administration Trust, and any of their successors or assigns and any Entity acting on behalf of the Debtors or the Plan Administration Trust, shall be deemed to have waived the right to pursue any and all Avoidance Actions. For the avoidance of doubt, and in accordance with the Committee Settlement, all preference claims are hereby waived. With respect to the Avoidance Actions that the Debtors abandon in accordance with this Article 6.17 of this Plan, the Debtors and the Plan Administration Trust, as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned Avoidance Action as a basis to

object to all or any part of a claim against any Estates asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

**6.18    Exemption from Certain Transfer Taxes and Recording Fees**.  To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor, the Plan Administration Trust, the GUC Recovery Trust, or to any other Person, or from the GUC Recovery Trust to any person) of property under the Plan (including the Restructuring Transactions) or pursuant to:  (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors; (ii) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment, or recording of any lease or sublease; or (iv) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.19    Insured Claims**. Notwithstanding anything to the contrary contained herein, to the extent the Debtors have insurance with respect to any Allowed General Unsecured Claim, the Holder of such Allowed Claim shall (a) be paid any amount from the proceeds of insurance to the extent that the Claim is insured, and (b) receive the treatment provided for in this Plan for Allowed General Unsecured Claims to the extent the applicable insurance policy does not provide coverage with respect to any portion of the Claim.

**6.20    GUC Recovery Trust**.

(a)    *Creation and Governance of the GUC Recovery Trust.* On the Effective Date, the GUC Recovery Trust shall be established for the sole purpose of liquidating the GUC Recovery Trust Assets and making distributions to Holders of Allowed General Unsecured Claims in accordance with this Plan. On the Effective Date, the Debtors shall transfer the GUC Recovery Trust Assets to the GUC Recovery Trust and the Debtors and the GUC Recovery Trustee shall execute the GUC Recovery Trust Agreement and shall take all steps necessary to establish the GUC Recovery Trust in accordance with the Plan and the beneficial interests therein; *provided*, that proceeds of the Tax Refund cannot and will not be transferred to the GUC Recovery Trust on the Effective Date, but the proceeds of the Tax Refund and the Net

Tax Refund, as applicable, to which the GUC Recovery Trust is entitled under this Plan will be transferred to the GUC Recovery Trust as soon as possible. In the event of any conflict between the terms of the Plan and the terms of the GUC Recovery Trust Agreement, the terms of the GUC Recovery Trust Agreement shall govern. Additionally, on the Effective Date, the Debtors shall transfer and shall be deemed to transfer to the GUC Recovery Trust all of their rights, title and interest in and to all of the GUC Recovery Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the GUC Recovery Trust Assets shall automatically vest in the GUC Recovery Trust free and clear of all Claims and Liens, and such transfer shall be exempt from any stamp, real estate transfer, sales, use or other similar tax; *provided*, that all rights, title and interest in and to the Tax Refund and claims therefor shall remain an asset of the Debtors or the Wind-Down Debtors, as applicable, until the Tax Refund is received and distributed in accordance with Article 2.3. The GUC Recovery Trustee shall be the exclusive administrator of the assets of the GUC Recovery Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as a representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, solely for purposes of carrying out the GUC Recovery Trustee's duties under the GUC Recovery Trust Agreement. The GUC Recovery Trust shall be governed by the GUC Recovery Trust Agreement and administered by the GUC Recovery Trustee. The powers, rights, and responsibilities of the GUC Recovery Trustee shall be specified in the GUC Recovery Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Article 6.20. The GUC Recovery Trustee shall hold and distribute the GUC Recovery Trust Assets to Holders of Allowed General Unsecured Claims in accordance with the provisions of the Plan and the GUC Recovery Trust Agreement. Other rights and duties of the GUC Recovery Trustee shall be as set forth in the GUC Recovery Trust Agreement. After the Effective Date, the Debtors, the Wind-Down Debtors, and the Plan Administration Trust shall have no interest in the GUC Recovery Trust Assets except as set forth in the GUC Recovery Trust Agreement.

(b)     *GUC Recovery Trustee.* Before the Confirmation Hearing, the Committee will select the GUC Recovery Trustee, whose appointment shall be confirmed by the Court in the Confirmation Order, and who shall act in accordance with the GUC Recovery Trust Agreement.

(c)     *GUC Recovery Trust Indemnification..* The GUC Recovery Trust Agreement may include reasonable and customary provisions that allow for indemnification of the GUC Recovery Trustee by the GUC Recovery Trust (including appropriate insurance). Any such indemnification shall be the sole responsibility of the GUC Recovery Trust and payable solely from the GUC Recovery Trust Assets.

(d)     *GUC Recovery Trust Assets.* The GUC Recovery Trustee shall have the exclusive right in respect of all GUC Recovery Trust Causes of Action to institute, file, prosecute, enforce, settle, compromise, release, abandon, or withdraw any and all GUC Recovery Trust Causes of Action without any further order of the Bankruptcy Court or consent of any other party, except as otherwise provided herein or in the GUC Recovery Trust Agreement. From and after the Effective Date, the GUC Recovery Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the GUC Recovery Trust, shall step into the shoes of and serve as a representative of the Estates including all rights and privileges, solely for purposes of carrying out the GUC Recovery Trustee's duties under the GUC Recovery Trust Agreement. In connection

with the investigation, prosecution and/or compromise of the GUC Recovery Trust Causes of Action, the GUC Recovery Trustee may expend such portion of the GUC Recovery Trust Assets as the GUC Recovery Trustee deems necessary.

      (e)    *GUC Recovery Trust Fees and Expenses.* From and after the Effective Date, the GUC Recovery Trustee, on behalf of the GUC Recovery Trust, shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable expenses (including professional fees) incurred by the GUC Recovery Trust and any professionals retained by the GUC Recovery Trust from the GUC Recovery Trust Assets, except as otherwise provided in the GUC Recovery Trust Agreement. The Wind-Down Debtors or any of their Affiliates (or anyone acting on their behalf) shall not be responsible for any costs, fees, or expenses of the GUC Recovery Trust (except to the extent such costs, fees, or expenses constitute Deferred Amounts).

      (f)    *Non-Transferability of GUC Recovery Trust Interests.* Any and all GUC Recovery Trust Interests shall not be transferrable, except in accordance with the GUC Recovery Trust Agreement.

      (g)    *Single Satisfaction of Allowed General Unsecured Claims.* Notwithstanding anything to the contrary herein, in no event shall holders of Allowed General Unsecured Claims recover more than the full amount of their Allowed General Unsecured Claims from the GUC Recovery Trust.

      (h)    *Tax Treatment.* In furtherance of this <u>Article 6.20</u> of the Plan, (i) the GUC Recovery Trust is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code to the holders of General Unsecured Claims, consistent with the terms of the Plan; (ii) the sole purpose of the GUC Recovery Trust shall be the liquidation and distribution of the GUC Recovery Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), including the resolution of General Unsecured Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iii) the transfer of the GUC Recovery Trust Assets to the GUC Recovery Trust is intended to be treated for all purposes of the Tax Code as a deemed transfer of such GUC Recovery Trust Assets to Holders of General Unsecured Claims to the extent that such Holders are recipients of GUC Recovery Trust Interests, followed by a deemed transfer of such GUC Recovery Trust Assets by such Holders to the GUC Recovery Trust; (iv) the holders of GUC Recovery Trust Interests are intended to be treated as the grantors and deemed owners of the GUC Recovery Trust; (v) the Debtors and the Estates, holders of General Unsecured Claims, and the GUC Recovery Trustee shall report consistently with such treatment; (vi) the Purchaser, the GUC Recovery Trustee and the holders of GUC Recovery Trust Interests shall report consistently with the valuation of the GUC Recovery Trust Assets transferred to the GUC Recovery Trust as determined by the Plan Administration Trustee (or its designee) for all U.S. federal income tax purposes; (vii) the GUC Recovery Trustee shall be responsible for filing tax returns for the GUC Recovery Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a); and (viii) the GUC Recovery Trustee shall annually send to each holder of an interest in the GUC Recovery Trust a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes. Subject to definitive guidance from the

46

Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the GUC Recovery Trustee of a private letter ruling if the GUC Recovery Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the GUC Recovery Trustee), the GUC Recovery Trustee may timely elect to (i) treat any portion of the GUC Recovery Trust allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. If a "disputed ownership fund" election is made, the Debtors and the Estates, holders of General Unsecured Claims, and the GUC Recovery Trustee shall report for United States federal, state, and local income tax purposes consistently with the foregoing.

6.21    **Cooperation Among the Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, and the Purchaser**.  Each of the Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, and the Purchaser shall reasonably cooperate with one another and shall provide or grant access to (a) readily available documents and information from the Debtors' books and records (including the books and records acquired by the Purchaser from the Debtors under the Asset Purchase Agreement) related to the period prior to the Petition Date, and (b) such personnel having knowledge of the location or contents of such documents, relating to or concerning, (i) with respect to the Wind-Down Debtors, the tax filings, the Tax Refund, or the Deferred Amounts Claims; (ii) with respect to the Plan Administration Trust, the Administrative Claims, Professional Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, Second Lien Term Loan Claims, Third Lien Notes Claims, Intercompany Claims, Subordinated Claims, or the Deferred Amounts Claims, (iii) with respect to the GUC Recovery Trust, the General Unsecured Claims and the GUC Recovery Trust Assets, and (iv) with respect to the Purchaser, for legitimate business reasons as may be determined by the Purchaser in its reasonable discretion.  In addition, the Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, and the Purchaser shall coordinate to develop a document sharing, retention, and maintenance policy with respect to the Debtors' books and records related to the period prior to the Petition Date, the terms of which shall be agreed upon among the Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, and the Purchaser.

## ARTICLE VII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

7.1    **Assumption and Rejection of Executory Contracts and Unexpired Leases**.

(a)    The vast majority of Executory Contracts and Unexpired Leases have previously been assumed and assigned to the Purchaser pursuant to the Sale Order and Asset Purchase Agreement. This Article VII relates solely to the Executory Contracts and Unexpired Leases not previously assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Order and Asset Purchase Agreement. Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan or the Sale Transaction Documents, as of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases to which any of the Debtors are parties shall be deemed rejected unless such contract or lease (i) was previously assumed or rejected by the

Debtors pursuant to a Final Order of the Bankruptcy Court; (ii) had previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified for assumption on the Assumption Schedule included in the Plan Supplement; or (v) is to be assumed pursuant to the terms of the Plan.

(b)     Entry of the Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases subject to compliance with the requirements herein. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

(c)     Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors or the Plan Administration Trust, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts.

(d)     All assumed Executory Contracts and Unexpired Leases shall remain in full force and effect. All such assumed and assigned Executory Contracts and Unexpired Leases shall be enforceable in accordance with their terms, notwithstanding any provision in such assumed Executory Contract or Unexpired Lease that prohibits, restricts, or conditions such assumption, assignment, or transfer. Any provision in the assumed Executory Contracts and Unexpired Leases that purports to declare a breach or default based in whole or in part on commencement or continuance of these Chapter 11 Cases or any successor cases is hereby deemed unenforceable. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

(e)     Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or

48

Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(f)    For the avoidance of doubt, nothing in the Plan shall affect, modify, or otherwise alter the Debtors' assumption and assignment of Executory Contracts and Unexpired Leases to the Purchaser pursuant to the Sale Order and the Asset Purchase Agreement or affect, modify or otherwise alter such Executory Contracts and Unexpired Leases previously assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Order and Asset Purchase Agreement.

**7.2    Cure Procedures and Payments Related to Assumption of Executory Contracts and Unexpired Leases**.

(a)    With respect to each of the Executory Contracts or Unexpired Leases assumed hereunder, the Debtors, with the consent of the Committee, have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure. Except with respect to Executory Contracts and Unexpired Leases for which the Cure is set at $0 in the Cure Notice, the Cure shall be satisfied by the Plan Administration Trust by payment of the Cure in Cash within 30 days following the occurrence of the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court. **Claims Based on Rejection of Executory Contracts or Unexpired Leases**. All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Plan Administration Trust, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in a Proof of Claim to the contrary.**

**7.4    Determination of Assumption Disputes and Deemed Consent**.

(a)    Except as otherwise provided in the Plan, any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Plan Administration Trust or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption, then payment of Cure shall occur following the entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors and the counterparty to the Executory

Contract or Unexpired Lease. Other than those Executory Contracts and Unexpired Leases previously assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Order and the Asset Purchase Agreement, the Debtors with the consent of the Committee (which consent shall not be unreasonably withheld, conditioned, or delayed), reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after the Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

(b)    Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

**7.5    Insurance Policies**. The Debtors or the Plan Administration Trust, as the case may be, shall maintain D&O Insurance providing coverage for those indemnitees currently covered by such policies for the remaining term of such policy and shall maintain the runoff policies or tail coverage previously purchased with respect to policies in existence as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such indemnitees based upon any act or omission related to such indemnitee's service with, for, or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors.

**7.6    General Reservation of Rights**.  Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors, the Plan Administration Trust, or any of their Affiliates, has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administration Trust, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**7.7    Nonoccurrence of the Effective Date**.  In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

## ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

**8.1    Determination Of Claims and Interests**.  After the Effective Date, the Plan Administration Trustee or the GUC Recovery Trustee, as applicable, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest prior to the

Effective Date, including the Causes of Action retained pursuant to <u>Article 6.16</u>, except with respect to any Claim or Interest deemed Allowed under the Plan.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order and the Sale Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases Allowing such Claim or Interest. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties. For the avoidance of doubt, any Claim determined and liquidated pursuant to (a) an order of the Bankruptcy Court or (b) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination or any revision, modification, or amendment thereof as to which the time to appeal or seek review or rehearing has expired and no appeal or petition for review or rehearing was filed or, if filed, remains pending) shall be deemed an Allowed Claim in such liquidated amount and satisfied in accordance with this Plan.

Nothing contained in this <u>Article 8.1</u> shall constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors, the Wind-Down Debtors, the Plan Administration Trust, or the GUC Recovery Trust may have against any Entity in connection with or arising out of any Claim, including any rights under section 157(b) of title 28 of the United States Code.

**8.2    Claims Administration Responsibility**. Except as otherwise specifically provided for in the Plan, after the Effective Date, the Plan Administration Trustee shall retain responsibility for (a) administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors, including (i) filing, withdrawing, or litigating to judgment objections to Claims or Interests, (ii) settling or compromising any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (iii) administering and adjusting the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, and (b) making distributions (if any) with respect to all Claims and Interests; *provided, however*, that upon the creation of the GUC Recovery Trust, the GUC Recovery Trustee, on behalf of the GUC Recovery Trust, shall have the authority, but not the obligation, to object to, compromise, settle, otherwise resolve, or withdraw any objections to all General Unsecured Claims.

**8.3    Objections to Claims**. Unless otherwise extended by the Bankruptcy Court, any objections to Claims (other than Administrative Claims) shall be (a) served by e-mail on the parties on the master service list who have agreed to accept service by email and by the methods described in this <u>Article 8.3</u> on the Holder of a Claim that is the subject of the objection, and (b) filed with the Bankruptcy Court, in each case, on or before the Claims Objection Deadline (or such later date as may be established by the Bankruptcy Court upon request of the Plan Administration Trustee or the GUC Recovery Trustee, as applicable, without further notice to parties in interest). Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors, the Wind-Down Officer, the Plan Administration Trustee, or the GUC Recovery Trustee effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for a Holder of a Claim or Interest

51

is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address) and to the extent an e-mail address was provided by the signatory on the proof of Claim, by e-mail, or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the Holder of the Claim in the Chapter 11 Cases and has not withdrawn such appearance and to the extent an e-mail address was provided by the signatory on the proof of Claim, by e-mail.

**8.4    Disallowance of Claims**.  EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO, OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

Nothing herein shall in any way alter, impair, or abridge the legal effect of any Bar Date Order, or the rights of the Debtors, the Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, or other parties in interest to object to Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.  Nothing in this Plan shall preclude amendments to timely filed proofs of Claim to the extent permitted by applicable law.

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors, the Wind-Down Debtors, the Plan Administration Trust, or the GUC Recovery Trust allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Debtors, the Wind-Down Debtors, the Plan Administration Trust, or the GUC Recovery Trust, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**8.5    Estimation of Claims**.  Before or after the Effective Date, the Debtors, the Plan Administration Trustee, or the GUC Recovery Trustee (solely with respect to General Unsecured Claims), as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate a Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Disputed Claim, including during the litigation of any objection to any Disputed Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a

maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), without prejudice to the Holder of such Claim's right to request that estimation should be for the purpose of determining the Allowed amount of such Claim, and the Debtors, the Plan Administration Trustee, or the GUC Recovery Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

**8.6     No Interest on Disputed Claims**.  Unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

**8.7     Amendments to Claims**.  On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the authorization of the Bankruptcy Court, the Plan Administration Trustee, or the GUC Recovery Trustee, as applicable, and, to the extent such authorization is not received, any such new or amended Claim filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

**8.8     Single Satisfaction of Claims**.  Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE IX

## PROVISIONS GOVERNING DISTRIBUTIONS

**9.1     Time of Distributions**.  Except as otherwise provided for in the Plan and the GUC Recovery Trust Agreement or ordered by the Bankruptcy Court, distributions under this Plan shall be made on the later of (a) the Initial Distribution Date or (b) on the first Periodic Distribution Date occurring after the later of, (i) thirty (30) days after the date when a Claim is Allowed or (ii) thirty (30) days after the date when a Claim becomes payable pursuant to any

agreement between the Debtors and the Holder of such Claim; *provided*, *however*, that the Wind-Down Debtors and, with respect to Deferred Amounts Claims and Allowed General Unsecured Claims, the Plan Administration Trustee or the GUC Recovery Trustee, as applicable, may, in each case in its sole discretion, make one-time distributions on a date that is not a Periodic Distribution Date.

**9.2**    **Currency**.  Except as otherwise Provided in the Plan or Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Effective Date at 4:00 p.m. prevailing Eastern Time, mid-range spot rate of exchange for the applicable currency as published in the next *The Wall Street Journal, National Edition* following the Effective Date.

**9.3**    **Distribution Agent.**  Except as otherwise provided herein, all distributions under the Plan shall be made by the Distribution Agent.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.  The Distribution Agent shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

**9.4**    **Distribution on Account of Claims Administered by Servicers: Delivery of Distributions to Servicers.**  In the case of Holders of Claims whose Claims are governed by an agreement and administered by a Servicer, the respective Servicer shall be deemed to be the Holder of such Claims for purposes of distributions to be made hereunder.  The Distribution Agent shall make all distributions on account of such Claims to the Servicers or as directed by the Servicers, in the Servicers' sole discretion. Each Servicer shall, at its option, hold or direct such distributions for the beneficial Holders of such Allowed Claims, as applicable; *provided*, *however*, the Servicer shall retain all rights under its respective agreement in connection with delivery of distributions to the beneficial Holders of such Allowed Claim; and *provided further*, *however*, that the Debtors', the Wind-Down Debtors', the Plan Administration Trust's, and the GUC Recovery Trust's obligations to make distributions pursuant to this Plan shall be deemed satisfied upon delivery of distributions to each Servicer or the entity or entities designated by the Servicers.  The Servicers shall not be required to give any bond, surety, or other security for the performance of their duties with respect to such distributions.

**9.5**    **Distributions on Account of Claims Allowed After the Effective Date**.

(a)    **No Distributions Pending Allowance**.    No payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim has become an Allowed Claim.

(b)     **Special Rules for Distributions to Holders of Disputed Claims**. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. All distributions made pursuant to the Plan on account of a Disputed Claim that is later deemed an Allowed Claim by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class; *provided*, *however*, that no interest shall be paid on account to such Allowed Claims unless required under applicable bankruptcy law.

## 9.6     **Delivery Of Distributions**.

(a)     **Record Date for Distributions**. On the Distribution Record Date, the claims register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record Holders listed on the claims register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Interest is transferred less than twenty (20) days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. Each of the Second Lien Term Loan Agent and the Third Lien Notes Agent shall have no obligation to recognize any transfer of any applicable Claims occurring after the close of business on the Distribution Record Date and shall instead be entitled to recognize and deal for all purposes under the Plan with only those Holders of record as of the close of business on the Distribution Record Date.

(b)     **Cash Distributions.** Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Plan Administration Trustee, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

(c)     **Address for Distributions**. Distributions to Holders of Allowed Claims shall be made by the Distribution Agent or the appropriate Servicer (i) at the addresses set forth on the proofs of Claim filed by such Holders of Claims (or at the last known addresses of such Holders of Claims if no proof of Claim is filed or if the Debtors or the Distribution Agent have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related proof of Claim, (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address, or (iv) in the case of a Holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer. The Debtors, the Wind-Down Debtors, the Wind-Down Officer, the Plan Administration Trust, the Plan Administration Trustee, the GUC Recovery Trust, the GUC Recovery Trustee, and any Distribution Agent shall not incur any liability whatsoever on account of any distributions under the Plan.

(d)     **Undeliverable Distributions**.  The Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, and the Distribution Agent, as applicable, shall use reasonable efforts to locate any Holder of an Allowed Claim whose distribution is returned as undeliverable. If such reasonable efforts are not successful, no further distributions to such Holder of such Claim shall be made unless and until the Distribution Agent or the appropriate Servicer is notified of then-current address of such Holder of the Claim, at which time all missed distributions shall be made to such Holder of the Claim without interest, dividends, or accruals of any kind on the next Periodic Distribution Date.  Amounts in respect of undeliverable distributions shall be returned to the Plan Administration Trust or the GUC Recovery Trust, as applicable, until such distributions are claimed.

(e)     **Reversion**.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after such distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revert to and vest in the Plan Administration Trust or the GUC Recovery Trust, as applicable, free of any restrictions thereon.  Upon vesting, the Claim of any Holder or successor to such Holder with respect to such property shall be cancelled and forever barred, notwithstanding federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Plan Administration Trustee, the Wind-Down Officer, the GUC Recovery Trust, or the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

(f)     **De Minimis Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Plan Administration Trust, the GUC Recovery Trust, the Distribution Agent, and any Servicer shall not be required to make a distribution on account of an Allowed Claim if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has a value less than $50,000, or (ii) the distribution will result in a payment of less than $50.00 to the Holder of such Claim.

(g)     **Fractional Distributions**.  Notwithstanding any other provision of the Plan to the contrary, the Plan Administration Trust, the GUC Recovery Trust, the Distribution Agent, and any Servicer shall not be required to make distributions or payments of fractions of dollars.  Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

**9.7     Surrender of Securities or Instruments**.  On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer).  Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one

another with respect to such Certificate. Notwithstanding the foregoing paragraph, this Article 9.7 shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

**9.8** **Compliance Matters**.  In connection with the Plan, to the extent applicable, the Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors, the Wind-Down Debtors, the Plan Administration Trust, and the GUC Recovery Trust, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances. Amounts so withheld or allocated and paid over to the applicable Governmental Unit in accordance with applicable law shall be treated for all purposes of this Plan as having been paid to the person in respect of whom such withholding or allocation was made.

**9.9** **Claims Paid or Payable by Third Parties**.

(a) **Claims Paid by Third Parties**.  The Claims and Solicitation Agent shall reduce in full a Claim to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors, the Wind-Down Debtors, the Plan Administration Trust, or the GUC Recovery Trust, without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtors, the Wind-Down Debtors, the Plan Administration Trust, or the GUC Recovery Trust on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution under the Plan to the Wind-Down Debtors, the Plan Administration Trust or the GUC Recovery Trust, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b) **Claims Payable by Insurance Carriers**.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agree to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the claims register by the Claims and Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Applicability of Insurance Policies**.  Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**9.10    Setoffs**.  Except as otherwise expressly provided for in the Plan, and except with respect to any Second Lien Term Loan Claims, and any distributions on account thereof, the Plan Administration Trust or the GUC Recovery Trust, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtors, the Plan Administration Trust, or the GUC Recovery Trust, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Plan Administration Trust or the GUC Recovery Trust of any such Claims, rights, and Causes of Action that the Plan Administration Trust or the GUC Recovery Trust may possess against such Holder.  In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtors, the Wind-Down Debtors, the Plan Administration Trust, or the GUC Recovery Trust, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

**9.11    Recoupment**.  In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors, the Wind-Down Debtors, the Plan Administration Trust, or the GUC Recovery Trust, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**9.12    Allocation of Plan Distributions Between Principal and Interest**.  To the extent that any Allowed Claim entitled to a distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

# ARTICLE X

## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

**10.1    Vesting of Assets**.  Except as otherwise explicitly provided in this Plan, on the Effective Date, (a) all of the Wind-Down Debtors' Rights shall vest in the Wind-Down Debtors free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests; (b) all of the Plan Administration Trust Assets shall vest in the Plan Administration Trust free and clear of all Claims, Liens, charges, encumbrances, rights and Interests; and (c) all of the GUC Recovery Trust Assets shall vest in the GUC Recovery Trust, which, as successor to the Debtors, for purposes of prosecuting the GUC Recovery Trust Causes of Action, owned such property or interest in property as of the Effective Date, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests.

**10.2    Compromises and Settlements**.  Pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims or Interests and (b) Causes of Action that the Debtors have against other Entities up to the Effective Date.  After the Effective Date, any such right shall pass to the Wind-Down Debtors, the Plan Administration Trust, and the GUC Recovery Trust, as applicable, as contemplated in Article 10.1 of this Plan, without the need for further approval of the Bankruptcy Court.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable.

**10.3    Release by Debtors.  Without limiting any other applicable provisions of, or releases contained in, this Plan or the Sale Order, pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, in consideration for the concessions made as set forth in this Plan, the Committee Settlement, and the other contracts, instruments, releases, agreements, or documents to be entered into or delivered in connection with the Plan, and the service of the Released Parties in facilitating the expeditious implementation of the restructuring contemplated by the Plan, the Sale Transaction, and the Committee Settlement, the Debtors and their Estates and any other Person seeking to exercise the rights of the Estates shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses**

59

to Claims asserted against the Debtors), the Debtors' restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, provided any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the formulation, preparation, dissemination, or negotiation of the Sale Transaction Documents, the Committee Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Sale Transaction Documents, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, solicitation of the Plan, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the distribution of property under the Plan, the creation of the GUC Recovery Trust, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan related or relating to the foregoing, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence as determined in a Final Order by a court of competent jurisdiction; *provided*, *however*, that notwithstanding anything to the contrary in this Plan or this <u>Article 10.3</u>, the Brigade Parties and the Chatham Parties shall only be Released Parties if they meet the Brigade Release Requirements and the Chatham Release Requirements, respectively, as shall be determined in the Confirmation Order. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  Notwithstanding anything to the contrary in this Plan or the foregoing provisions of <u>Article 10.3</u>, the Debtors shall forever release, remise, surrender and discharge the D&O Insurance carriers and their directors, officers, partners, principals, employees, agents, trustees, predecessors, affiliates, parents, subsidiaries, divisions, insurers, reinsurers, attorneys, representatives, successors and assigns, separately and jointly, of and from any and all claims, debts, liens, contracts, agreements, promises, demands, payments, rights, obligations, loss, judgments, awards, attorney's fees, costs, expenses, interests, damages, liabilities, benefits and causes of action of any kind that are known, unknown, present, past or future that they had, have or may have or may hereafter accrue, asserted in or that could have been asserted in, arising from, or concerning the proposed complaint annexed to the Committee's Standing Motion or the amount of the payment from the D&O Insurance carriers to the GUC Recovery Trust Escrow, including but not limited to any action, proceeding or claim arising from or involving the D&O Insurance carriers' investigation, evaluation, or handling of the Proposed Complaint or alleging any "bad faith" or breach of any promise, oral or written, or breach of any duty grounded in law or contract (the "*D&O Insurance Release*")*; provided*, that the D&O Insurance Release shall be null and void and have no effect upon the D&O Insurance Settlement Termination.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the Debtors' release pursuant to Bankruptcy Rule 9019, and further, shall

constitute the Bankruptcy Court's finding that the Debtors' release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtors' release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Debtors asserting any Claim or Causes of Action released pursuant to the Debtors' release. Nothing herein shall abrogate applicable attorney disciplinary rules.

10.4    Release by Holders of Claims and Interests. Without limiting any other applicable provisions of, or releases contained in, this Plan or the Sale Order, as of the Effective Date, in consideration for the obligations of the Debtors under this Plan, the Sale Transaction, the Committee Settlement, and the consideration and other contracts, instruments, releases, agreements, or documents to be entered into or delivered in connection with this Plan, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Debtors, their Estates, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, provided under any applicable law, rule, or regulation, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the formulation, preparation, dissemination, or negotiation of the Sale Transaction Documents, the Committee Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Sale Transaction Documents, the Committee Settlement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, solicitation of the Plan, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, the distribution of property under the Plan, the creation of the GUC Recovery Trust, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan related or relating to the foregoing, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes fraud, willful misconduct or gross negligence as determined in a Final Order by a court of competent jurisdiction; *provided*, *however*, that notwithstanding anything to the contrary in this Plan or this Article 10.4, the Brigade Parties and the Chatham Parties shall only be Released Parties if they meet the Brigade Release Requirements and the Chatham Release Requirements, respectively, as shall be determined in the Confirmation Order. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective

Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Notwithstanding anything to the contrary contained in this Plan, the Disclosure Statement, or the Confirmation Order, the PBGC does not release and nothing in this Plan, the Disclosure Statement, or the Confirmation Order discharges or exculpates any claim or cause of action relating to any liability under Title I or Title IV of ERISA against any persons or entities other than the Debtors in these Chapter 11 Cases.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the third party release pursuant to Bankruptcy Rule 9019, and further, shall constitute the Bankruptcy Court's finding that the third party release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the claims released by the third party release; (5) in the best interests of the Debtors and all Holders of Claims and Interests; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Causes of Action released pursuant to the third party release. Nothing herein shall abrogate applicable attorney disciplinary rules.

>    10.5    <u>Exculpation and Limitation of Liability</u>.  From and after the Effective Date, the Exculpated Parties shall neither have, nor incur any liability to any Person or Entity for any Exculpated Claim; *provided*, *however*, that the foregoing "exculpation" shall have no effect on: (1) the liability of any Person or Entity that would otherwise result from the failure to perform or pay any obligation or liability under this Plan or any contract, instrument, release or other agreement or document (i) previously assumed, (ii) entered into during the Chapter 11 Cases, or (iii) to be entered into or delivered in connection with this Plan, or (2) the liability of any Exculpated Party that results from any act or omission of such Exculpated Party that is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct; *provided further*, *however*, that notwithstanding anything to the contrary in this Plan or this <u>Article 10.5</u>, the Brigade Parties and the Chatham Parties shall only be Exculpated Parties if they meet the Brigade Release Requirements and the Chatham Release Requirements, respectively, as shall be determined in the Confirmation Order. For the avoidance of doubt, nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to rule 1.8(h) of the New York Rules of Professional Conduct.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and therefore are not and shall not be liable at any time for the violations of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan or Confirmation Order (including but not limited to the scope of the definition of "Released Parties" set forth in the Plan), no provision shall (i) preclude any Governmental Unit from enforcing its police or regulatory powers; or, (ii) enjoin, limit, impair or delay any Governmental Unit from commencing or continuing any claims, causes of action,

proceedings or investigations against any non-Debtor person or non-Debtor entity in any forum; *provided* that the foregoing shall in no way limit the protections with respect to postpetition Exculpated Claims.

        **10.6**    **Injunction.**  **Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article 10.3 or Article 10.4 of the Plan or are subject to exculpation pursuant to Article 10.5 of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, the Released Parties, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) except as provided in Articles 9.11 and 9.12 hereof, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement) executed to implement the Plan. Notwithstanding anything to the contrary in the Plan, all holders of Claims and Interests are enjoined from interfering with the distributions contemplated by the Plan.**

        **10.7**    **Subordination Rights**.

        (a)      Except as otherwise provided in the Plan, the allowance, classification and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  All Claims and all rights and claims between or among Holders of Claims relating in any manner whatsoever to distributions on account of Claims or Interests, based upon any claimed subordination rights, whether asserted or unasserted, legal or equitable, shall be deemed satisfied by the distributions under the Plan to Holders of Claims having such subordination rights.  Except as otherwise specifically provided for in the Plan, distributions to the various Classes of Claims hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim by reason of any subordination rights or otherwise, so that

each Holder of a Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.

(b)    Except as otherwise provided in the Plan, the right of the Debtors or the Plan Administration Trust, with the consent of the Committee (if prior to the Effective Date) or the GUC Recovery Trust (if after the Effective Date), to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code, other than the Second Lien Term Loan Claims, is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time shall be modified to reflect such subordination.  Unless the Plan or the Confirmation Order otherwise provide, no distributions shall be made on account of a Claim subordinated pursuant to this Article 10.7(b) unless ordered by the Bankruptcy Court.

**10.8    Protection Against Discriminatory Treatment**.    Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Plan Administration Trust or the GUC Recovery Trust or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Plan Administration Trust, the GUC Recovery Trust, or another entity with whom the Debtors have been associated, solely because the Debtors have been debtors under chapter 11 or have been insolvent before the commencement of the Chapter 11 Cases.

**10.9    Release of Liens**.    Except as otherwise provided in the Plan, the Sale Transaction Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, and their successors and assigns.  Notwithstanding the above, nothing in this Plan or the Confirmation Order shall release any deed restriction, easements, or institutional control that runs with the land under environmental law.

**10.10    Reimbursement or Contribution**.    If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has filed a noncontingent proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## ARTICLE XI

## CONDITIONS PRECEDENT

**11.1    Conditions to the Effective Date of the Plan**.    The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 11.2 of this Plan:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, (i) which shall approve the Chatham/Brigade Release and determine that the Brigade Release Requirements and the Chatham Release Requirements have been satisfied, and (ii) such order shall be a Final Order;

(b)    the Sale Transaction shall have been consummated in accordance with the terms of the Sale Transaction Documents;

(c)    with respect to all documents and agreements necessary to implement the Plan:  (i) all conditions precedent to such documents and agreements (other than any conditions precedent related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements; (ii) such documents and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (iii) such documents and agreements shall have been effected or executed;

(d)    the D&O Insurance carriers shall make a payment of $4,587,500 to the GUC Recovery Trust Escrow to be held in escrow for the benefit of the GUC Recovery Trust;

(e)    all governmental and material third party authorizations, consents, certifications, approvals, rulings, no action letters, opinions or other documents or actions required by any law, regulation or order, including Bankruptcy Court approval, that are necessary to implement the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and

(f)    all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

**11.2    Waiver of Conditions Precedent**.  The conditions set forth in Article 11.1 of this Plan may be waived, in whole or in part, by the Debtors, with the prior consent of the Consent Parties and the Brigade Parties (as to each, not to be unreasonably withheld or delayed), without any notice to any other parties in interest or the Bankruptcy Court and without a hearing.

**11.3    Notice of Effective Date**.  The Plan Administration Trust shall file with the Bankruptcy Court a notice of the occurrence of the Effective Date within a reasonable period of time after the conditions in Article 11.1 of this Plan have been satisfied or waived pursuant to Article 11.2 of this Plan.

**11.4    Effect of Non-Occurrence of Conditions to Consummation**.  If prior to consummation of the Plan, the Confirmation Order is vacated pursuant to a Final Order, then, except as provided in such Final Order, the Plan will be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by an Entity; (2) prejudice in any manner the rights of any

Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

**11.5    Substantial Consummation**. "Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE XII

## <u>RETENTION OF JURISDICTION</u>

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

(a)    resolve any matters related to Executory Contracts and Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Wind-Down Debtors' or the Plan Administration Trust's amendment, modification, or supplement after the Effective Date, pursuant to <u>Article VII</u> of the Plan, of the lists of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(b)    adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, this Plan, or that were the subject of proceedings before the Bankruptcy Court, prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

(c)    ensure that distributions to Holders of Allowed Claims are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)    allow in whole or in part, disallow in whole or in part, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including hearing and determining any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and the resolution of request for payment of any Administrative Claim;

(e)    hear and determine or resolve any and all matters related to Causes of Action;

(f)    enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

(g)     issue and implement orders in aid of execution, implementation, or consummation of this Plan;

(h)     consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(i)     hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(j)     determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

(k)     adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(l)     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan and disputes arising in connection with any Entity's obligations incurred in connection with the Plan;

(m)     hear and determine all suits or adversary proceedings to recover assets of the Debtors and property of their Estates, wherever located;

(n)     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

(p)     grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

(q)     hear any other matter not inconsistent with the Bankruptcy Code;

(r)     enforce the injunction, release, and exculpation provisions set forth in Article 10 hereof

(s)     enter a Final Decree closing the Chapter 11 Cases;

(t)     enforce all orders previously entered by the Bankruptcy Court; and

(u)     hear and determine all matters relating to any section 510(b) Claim.

67

From the Confirmation Date through the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date; *provided*, *however*, that the Bankruptcy Court shall not have nor retain exclusive jurisdiction over any post-Effective Date agreement, which shall be governed by the respective jurisdictional provisions therein.  Nothing contained herein shall be construed to increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the Bankruptcy Court.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

**13.1    Immediate Binding Effect**.  Upon the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, the Plan Administration Trust, the GUC Recovery Trust, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors, and all other parties in interest and their respective heirs, successors, and assigns.

**13.2    Payment of Statutory Fees**.

(a)    All fees payable pursuant to section 1930 of title 28 of the United States Code, and any applicable interest payable under section 3717 of title 31 of the United States Code, as of the entry of the Confirmation Order as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Plan Administration Trust, on behalf of the Debtors and the Wind-Down Debtors, shall continue to pay fees pursuant to section 1930 of title 28 of the United States Code, and any applicable interest payable under section 3717 of title 31 of the United States Code, until the Chapter 11 Cases are converted, dismissed, or closed by entry of the Final Decree.

(b)    The Plan Administration Trust, on behalf of the Debtors and the Wind-Down Debtors, shall file and serve on the United States Trustee quarterly reports of the disbursements made, within 15 days after the conclusion of each such period, until the Chapter 11 Cases are converted, dismissed, or closed by entry of the Final Decree.  Any such reports shall be prepared consistent with (both in terms of content and format) the applicable Bankruptcy Court and United States Trustee's Guidelines for such matters.

**13.3    Modification and Amendments**.  The Debtors may alter, amend, or modify this Plan under section 1127(a) of the Bankruptcy Code with the prior consent of the Consent Parties (such consent not to be unreasonably withheld or delayed) at any time prior to the Confirmation Date; *provided*, that the consent of the Brigade Parties shall be required for any amendment or modification that materially impacts the Brigade Parties (which consent shall not be unreasonably withheld or delayed).  After the Confirmation Date and prior to substantial consummation of this Plan as defined in section 1101(2) of the Bankruptcy Code, the Debtors may,

under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan.

**13.4    Confirmation of the Plan**.  The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to amend the Plan to any extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**13.5    Additional Documents**.  On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Debtors, the Plan Administration Trust, and the GUC Recovery Trust, as applicable, and Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provision and intent of the Plan.

**13.6    Revocation, Withdrawal, or Non-Consummation**.

(a)    **Right to Revoke or Withdraw**.  The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Effective Date and file subsequent chapter 11 plans, in each case with the consent of the Consent Parties.

(b)    **Effect of Withdrawal, Revocation, or Non-Consummation**.  If the Debtors revoke or withdraw this Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, then this Plan, any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims or the allocation of the distributions to be made hereunder), the assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be null and void in all respects.  In such event, nothing contained herein or in the Disclosure Statement, and no acts taken in preparation for consummation of this Plan, shall be deemed to constitute a waiver or release of any Claims, Interests, or Causes of Action by or against the Debtors or any other Entity, to prejudice in any manner the rights and defenses of the Debtors, the Holder of a Claim or Interest, or any Entity in any further proceedings involving the Debtors, or to constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**13.7    Notices**.  After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered on the Parties below shall be served as follows:

**If to the Wind-Down Debtors:**

JCK Legacy Company

2100 Q Street
Sacramento, California 95816
Attn:  Sean Harding

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Suite 3400
Los Angeles, CA 90071
Attention:  Van C. Durrer, II

525 University Avenue, Suite 1400
Palo Alto, CA 94301
Attn:  Jennifer Madden

**If to the Chatham Parties:**

Chatham Asset Management, LLC
26 Main Street, Suite 204
Chatham, New Jersey 07928
Attn.: Feisal Alibhai
        Barry Schwartz
        Roshan Karingada

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:    Andrew N. Rosenberg
         Elizabeth R. McColm
         John Weber

**If to the Brigade Parties:**

Brigade Capital Management
399 Park Avenue, 16th Floor
New York, New York 10022
Attn.:  John Baylis

with a copy to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas

70

New York, New York 10036
Attn.:  Douglas Mannal


**If to the Committee:**

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038-4982
Attn.: Kristopher Hansen, Frank Merola, Erez Gilad, Samantha Martin

**If to the Office of the United States Trustee:**

Office of the United States Trustee for the Southern District of New York
201 Varick Street, Suite 1006
New York, New York 10014
Attention:      Ben Higgins and Brian Masumoto


**13.8    Term of Injunctions or Stays**.  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**13.9    Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control).  Corporate governance matters shall be governed by the laws of the state of incorporation, formation, or functional equivalent thereof, as applicable, of the applicable Wind-Down Debtor.

**13.10    Entire Agreement**.  On the Effective Date, except as otherwise indicated, the Plan, the Confirmation Order, and the documents comprising the Plan Supplement, will supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**13.11    Dissolution of Committee**. On the Effective Date, the Committee shall dissolve and all members, employees or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases; *provided*, that the Committee Advisors may take actions consistent with Article 2.5 hereof.

71

**13.12   Severability**.  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, at the request of the Debtors, to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Consent Parties, and the Brigade Parties, and (c) nonseverable and mutually dependent.

**13.13   Votes Solicited in Good Faith**.  Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Wind-Down Debtors, the Plan Administration Trust, or the GUC Recovery Trust will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

**13.14   No Waiver or Estoppel**.  Upon the Effective Date, each Holder of a Claim or Interest shall be deemed to have waived any right to assert that its Claim or Interest should be Allowed in a certain amount, in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors and/or their counsel, or any other party, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court.

**13.15   Closing the Chapter 11 Cases**.  The Wind-Down Officer and the Plan Administration Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Dated:  September 23, 2020

Respectfully submitted,

JCK LEGACY COMPANY, on behalf of itself and its affiliates listed below

By: */s/ Sean M. Harding*
Name: Sean M. Harding
Title:   Chief Restructuring Officer

Cypress Media, Inc.
Aboard Publishing, Inc.
Bellingham Herald Publishing, LLC
Belton Publishing Company, Inc.
Biscayne Bay Publishing, Inc.
Cass County Publishing Company
Columbus-Ledger Enquirer, Inc.
Cypress Media, LLC
East Coast Newspapers, Inc.
El Dorado Newspapers
Gulf Publishing Company, Inc.
Herald Custom Publishing of Mexico, S. de R.L. de C.V.
HLB Newspapers, Inc.
Idaho Statesman Publishing, LLC
Keltatim Publishing Company, Inc.
Keynoter Publishing Company, Inc.
Lee's Summit Journal, Incorporated
Lexington H-L Services, Inc.
Macon Telegraph Publishing Company
Mail Advertising Corporation
McClatchy Big Valley, Inc.
McClatchy Interactive LLC
McClatchy Interactive West
McClatchy International Inc.
McClatchy Investment Company
McClatchy Management Services, Inc.
McClatchy Newspapers, Inc.
McClatchy News Services, Inc.
McClatchy Property, Inc.
McClatchy Resources, Inc.
McClatchy Shared Services, Inc.
McClatchy U.S.A., Inc.
Miami Herald Media Company
N & O Holdings, Inc.
Newsprint Ventures, Inc.

Nittany Printing and Publishing Company
Nor-Tex Publishing, Inc.
Olympian Publishing, LLC
Olympic-Cascade Publishing, Inc.
Pacific Northwest Publishing Company, Inc.
Quad County Publishing, Inc.
San Luis Obispo Tribune, LLC
Star-Telegram, Inc.
Tacoma News, Inc.
The Bradenton Herald, Inc.
The Charlotte Observer Publishing Company
The News and Observer Publishing Company
The State Media Company
The Sun Publishing Company, Inc.
Tribune Newsprint Company
Tru Measure, LLC
Wichita Eagle and Beacon Publishing Company, Inc.
Wingate Paper Company
Oak Street Redevelopment Corporation